UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FULL CIRCLE UNITED, LLC,

      Plaintiff,

v.

BAY TEK ENTERTAINMENT, INC.,

      Defendant.

---

BAY TEK ENTERTAINMENT, INC.,

      Counterclaim Plaintiff,

v.

FULL CIRCLE UNITED, LLC,

      Counterclaim Defendant.

and

ERIC PAVONY,

      Additional Counterclaim Defendant.

CASE NO. 1:20-CV-03395

## MEMORANDUM OF LAW IN SUPPORT OF BAY TEK ENTERTAINMENT, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ..................................................................................... 4
    A.    The Parties ............................................................................. 4
    B.    The Terms of the License Agreement ..................................... 5
    C.    The Alleged Revenue Share Agreement ................................. 7
    D.    The Alleged Dispute ............................................................... 7

ARGUMENT .......................................................................................... 9

I.      LEGAL STANDARD .................................................................... 9

II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE
       LICENSE AGREEMENT ............................................................ 10
    A.    The Complaint Fails to Allege A Breach of Paragraphs 4.2 and 5.3 ................... 11
    B.    The Complaint Fails to Allege A Breach Of The Implied Duty Of Good Faith .. 12
    C.    The Complaint Fails To Allege A Breach Of Paragraph 7.2 ............................... 15

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS
       INTEREFERENCE WITH PROSPECTIVE BUSINESS RELATIONS......................... 16

IV.    FULL CIRCLE'S CLAIMS FOR LOST PROFITS ARE IMPROPERLY
       SPECULATIVE AS A MATTER OF LAW AND SHOULD BE DISMISSED ............ 18

V.     FULL CIRCLE MAY NOT SEEK ATTORNEY'S FEES UNDER THE
       INDEMNIFICATION CLAUSE OF THE LICENSE AGREEMENT ........................... 21

CONCLUSION .......................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACCD Global Agric. Inc. v. Perry*,
    No. 12 CIV. 6286 KBF, 2013 WL 840706 (S.D.N.Y. Mar. 1, 2013) ...............................18, 20

*Adiel v. Coca-Cola Bottling Co. of New York*,
    No. 95 CIV. 0725 (WK), 1995 WL 542432 (S.D.N.Y. Sept. 13, 1995)...............................14

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,
    81 N.Y.S.3d 816 (2018).............................................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................12, 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................9, 12, 17

*Bourne Co. v. MPL Commc'ns, Inc.*,
    751 F. Supp. 55 (S.D.N.Y. 1990)................................................................................23

*Brian E. Weiss, D.D.S., P.C. v. Miller*,
    166 A.D.2d 283, 564 N.Y.S.2d 110 (1990),
    aff'd, 78 N.Y.2d 979, 580 N.E.2d 404 (1991) ........................................................18

*Calip Dairies, Inc. v. Penn Station News Corp.*,
    262 A.D.2d 193 (1st Dep't 1999) ...........................................................................18

*Friedman v. Coldwater Creek, Inc.*,
    551 F. Supp. 2d 166 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009).......................17

*Full Circle United, LLC v. Skee Ball, Inc.*,
    2014 WL 12829195 (E.D.N.Y. May 13, 2014) ........................................................4

*Gotham Partners, L.P. v. High River Ltd. P'ship*,
    906 N.Y.S.2d 205 (1st Dep't 2010) ....................................................................22, 23

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009).....................................................................................10

*Hartford Fire Ins. Co. v Federated Dept. Stores, Inc.*,
    723 F Supp 976 (S.D.N.Y. 198)..............................................................................13

ii

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010)........................................................................9

*Hooper Assoc., Ltd. v. AGS Comps., Inc.*,
    549 N.Y.S.2d 365 (1989)..........................................................................21

*Krasnyi Oktyabr, Inc. v. Trillin Imports*,
    578 F. Supp. 2d 455 (E.D.N.Y. 2008) ...............................................16, 17

*Lama Holding Co. v. Smith Barney Inc.*,
    215 A.D.2d 314 (1st Dep't 1995) ............................................................18

*Lind v. Vanguard Offset Printers, Inc.*,
    857 F. Supp. 1060 (S.D.N.Y. 1994)........................................................10

*O'Neill v. Standard Homeopathic Co.*,
    346 F. Supp. 3d 511 (S.D.N.Y. 2018).......................................................9

*Parkway Pediatric and Adolescent Medicine LLC v. Vitullo*,
    900 N.Y.S.2d 563 (4th Dep't 2010)...................................................21, 22

*Pot Luck, LLC v. Freeman*,
    No. 06 Civ. 10195(DAB), 2010 WL 908475 (S.D.N.Y. Mar. 8, 2010) ..........................19, 20

*S.O. Textiles Co., Inc. v. A & E Prods. Grp.*,
    18 F. Supp. 2d 232 (E.D.N.Y. 1998) ......................................................18

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000)........................................................18, 19, 20

*Stabile v. United Recovery Sys., L.P.*,
    No. CV 11-1152 (SJF) (WDW), 2011 WL 5578981 (E.D.N.Y. Nov. 16, 2011) ....................9

*Vazquez v. TriAd Media Solutions, Inc.*,
    2018 WL 6584147 (D.N.J. Dec. 14, 2018)..............................................22

*Waldbaum v. Laufer Delena Cadicina Jensen & Boyd, LLC*,
    No. 18-CV-4225 (ALC), 2019 WL 4735386 (S.D.N.Y. Sept. 27, 2019)..........................16, 17

## TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

*Wolff v. Rare Medium, Inc.*,
    171 F. Supp. 2d 354 (S.D.N.Y. 2001)........................................................................13

### STATUTES

15 U.S.C. § 1065 (Lanham Act § 15) ........................................................................1

### OTHER AUTHORITIES

Federal Rules of Civil Procedure
    Rule 8(a)(2)........................................................................................................9
    Rule 12(b) .........................................................................................................9
    Rule 12(b)(6).......................................................................................9, 16, 19
    Rule 12(c)...........................................................................1, 4, 9, 10, 18, 24

12525709.4

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendant/Counterclaim Plaintiff Bay Tek Entertainment, Inc. ("Bay Tek") respectfully submits this memorandum of law in support of its motion for an order dismissing with prejudice:

1. Full Circle United, LLC's ("Full Circle's") First Cause of Action for Breach of the License Agreement;

2. Full Circle's Third Cause of Action for Tortious Interference with Prospective Business Relationship;

3. Full Circle's damages claim for lost profits; and

4. Full Circle's claim for attorneys' fees and litigation costs.

## PRELIMINARY STATEMENT

As discussed below, the July 2014 Trademark License Agreement (the "License Agreement") between Skee Ball, Inc. ("SBI") and Full Circle, pertaining to the trademark "SKEE-BALL®" (the "Mark"),[1] defines the obligations of the parties in this case.  Bay Tek obtained ownership of the Mark from SBI in 2016, along with its interest as licensor in the License Agreement.  Bay Tek, among other things, manufactures Skee-Ball branded alley rollers ("Skee-Ball Lanes" or "Skee-Ball branded Lanes").[2]

---

[1] The Mark was registered on the Principal Register of the United States Patent and Trademark Office ("USPTO") on May 21, 1929, under the Trademark Act of 1905, in connection with "game in the nature of a bowling game and parts thereof."  The Mark remains registered on the Principal Register of the USPTO.  It is incontestable pursuant to 15 U.S.C. § 1065 (Lanham Act § 15).

[2] Bay Tek is a family-owned business based in Northeast Wisconsin that was founded in 1977. Bay Tek is a developer and designer of family-friendly ticket redemption games, which now include Skee-Ball, the iconic and beloved arcade game in which players roll a ball up an inclined lane to get the ball to fall into various holes corresponding to different point values.  The Mark is famous and is widely recognized by the consuming public of the United States as a designation of source, and, following Bay Tek's acquisition of the Mark in 2016, has been used and has

1

Pursuant to the License Agreement, Full Circle was granted only a limited license to use the Mark in connection with live play leagues, teams, events and tournaments, subject to expressly enumerated restrictions, exclusions, and other conditions.  However, Full Circle and its principal, additional Counterclaim Defendant Eric Pavony, were not satisfied with that limited license.  Thus, they have embarked on an effort to expand their reach and use of the Mark into digital and broadcast arenas, acting as if Full Circle, and not Bay Tek, is the owner of the Mark.  However, they are expressly prohibited from doing so under the License Agreement.  *See* Paragraphs 4.5 and 6.1 of the License Agreement.  This and other unlawful conduct by Full Circle and Pavony forms the basis for Bay Tek's Counterclaims against them.[3]

Indeed, Full Circle brought its Complaint to seek improper leverage over Bay Tek—*i.e.,* to try to force Bay Tek to capitulate to Pavony's improper goal of using the Mark in mediums and markets for which Full Circle has no license, and to compel Bay Tek to undertake obligations that are nowhere to be found in the License Agreement.  When Full Circle's voluminous Complaint is stripped to its essentials, it becomes evident that camouflage is its goal, because Full Circle's allegations fail to state any viable claims for relief.

---

become recognized as a source of Bay Tek's goods and services.

[3] As detailed in the Counterclaims, it is Full Circle that is committing trademark infringement and breaching express terms of the License Agreement in numerous ways, including by violating its express commitment to honor the Mark's family-friendly heritage.  Full Circle has deliberately cultivated an unsavory image that is anathema to the family and image for the Mark required under the License Agreement.  For example, Full Circle has used the Mark in ways that associate it with drug abuse, sexual conduct and even a murder case involving a child—such as the uses "Skeemature Ejaculation," "Hepatitis Skee," "Skeefer Madness," and "K. Skee Anthony."  Full Circle also improperly regularly engages in digital streaming broadcasts which make unauthorized uses of the Mark.  These streaming broadcasts further tarnish the Mark through, *inter alia*, their amateurish production values and promotion of alcohol abuse.

2

*First*, Full Circle's First Cause of Action, for alleged "Breach of the License Agreement," fails to identify any actions of Bay Tek that violate any ***express*** provision of the License Agreement.  Instead, Full Circle improperly tries to inject purported obligations of Bay Tek under an alleged oral "Revenue Share Agreement" into the License Agreement.[4]  This effort fails under governing New York law, given that the License Agreement is a fully integrated contract containing no such obligations.

*Second*, Full Circle's Third Cause of Action, for alleged "Tortious Interference with Prospective Business Relationship," fails as a matter of law because it does not—and cannot— allege that Bay Tek committed any crime or an independent tort, or that Bay Tek otherwise engaged in physical violence, fraud or misrepresentation, civil suits or criminal prosecutions.

*Third*, Full Circle's damages claim, which it seeks as relief in connection with all three of its causes of action, for "millions of dollars" in lost profits, also fails as a matter of law.  This damages claim is improperly speculative, and therefore not cognizable, because Full Circle is an untested business in the notoriously fickle entertainment industry.

*Fourth*, Full Circle's claim for attorneys' fees and litigation costs, pursuant to the indemnification clause in the License Agreement, also must be dismissed, because the plain language of that clause solely applies to third-party claims, and does not apply to disputes between the parties to the License Agreement.

---

[4] Full Circle's Second Cause of Action alleges a claim for breach of the purported oral Revenue Share Agreement.  Although Bay Tek does not seek the outright dismissal of the Second Cause of Action at this time, Bay Tek submits that this claim will ultimately fail.  Moreover, as discussed herein, the damages which Bay Tek seeks in connection with the Second Cause of Action—namely, "millions of dollars" in lost profits—fails as a matter of law and should be dismissed at this time.

## BACKGROUND

We summarize below the relevant allegations in Full Circle's Complaint.  Although the Complaint's allegations of purported wrongdoing are vociferously disputed by Bay Tek, they are assumed to be true solely for purposes of this Rule 12(c) motion, as they must be at this juncture.

### A.    The Parties

Full Circle operates live Skee-Ball leagues, teams, events and tournaments ("Live Play"), which it refers to as Brewskee-Ball.  Compl. ¶ 33.  According to public records, on or about 2011, Skee Ball, Inc. ("SBI"), which was then the owner of the registered "SKEE-BALL" trademark (the "Mark") brought suit against Full Circle for infringing the Mark; Full Circle retaliated a month later with a lawsuit of its own against SBI.  (These two suits are referred to hereinafter collectively as the "SBI Actions").  *See Full Circle United, LLC v. Skee Ball, Inc.*, 2014 WL 12829195 (E.D.N.Y. May 13, 2014).  In the SBI Actions, Full Circle outrageously alleged that SBI had orally agreed that Full Circle was granted permission to engage in unfettered use of the Mark simply because SBI's CEO had purportedly "wished them luck" when they first started Brewskee-Ball.  The Court roundly rejected Full Circle's spurious argument. *Id.*

In 2014, Full Circle and SBI settled the SBI Actions by entering into the License Agreement, as well as an accompanying settlement agreement.  Compl. ¶ 62.  The License Agreement granted Full Circle a limited license to make certain uses of the Mark in connection with Live Play.  *See* License Agreement, annexed as Exhibit 1 to the Declaration of Jeffrey M. Movit ("Movit Decl."), filed herewith.  In 2016, Bay Tek acquired the Mark and related trademarks from SBI, and received an assignment of SBI's interest under the License Agreement with Full Circle.  Compl. ¶ 86.

4

**B.      The Terms of the License Agreement**

***The Limited Scope of the Trademark License Granted to Full Circle.*** Paragraph 3 of the License Agreement sets forth four limited categories of permitted uses of the Mark (collectively, the "Licensed Uses") by Full Circle: (1) in connection with Live Play, which is expressly limited under the License Agreement to "live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball® machines"; (2) in connection with developing, producing, selling, and distributing merchandise solely in connection with Live Play; (3) in connection with developing, producing, offering, and using a free electronic scoring application to be used solely in connection with Live Play to record and maintain scores, statistics, league and player information, wins and losses, awards, and rankings; and (4) in connection with sponsorships or endorsements solely and directly related to Live Play, "***provided, however***" that Full Circle was required to provide notice of the sponsorships or endorsements to SBI, a copy of the executed sponsorship agreement, and pay SBI five percent (5%) of gross sponsorship revenues. (emphasis added).

***Prohibition on Full Circle's Digital Transmittal or Other Broadcasting of Live Play.*** Pursuant to Paragraph 3.2 of the License Agreement, Full Circle's right to use the Mark over the Internet, radio, television, or other communication and media outlets, was limited to "promotional and marketing purposes only." In other words, Full Circle was entitled to use the Mark to advertise and promote Live Play at bars, but it could not transform Live Play into a digitally transmitted event, or otherwise broadcasted. *See also* License Agreement, Paragraph 4.1 ("it is understood that no rights for digital or virtual play or other digital rights utilizing the SKEE-BALL Trademark beyond the Scoring App are granted to FCU herein.").

***Prohibition on Full Circle's Use of Unauthorized Phrases and Slogans Containing the Mark.*** Paragraph 4.2 of the License Agreement provided that Full Circle had the right to use a limited number of specified, pre-approved phrases and slogans but prohibited Full Circle from using other phrases containing the Mark, unless Full Circle obtained prior written approval from SBI, "which approval shall not be unreasonably withheld or delayed so long as the phrases or slogans pertain to Live Play and are consistent with the terms, conditions, exclusions and restrictions of this Agreement …."

***Prohibition on Sponsorships of Competing Leagues.*** Paragraph 5.3 of the License Agreement states: "SBI hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term or in the Territory, operate, sponsor or endorse a business, involving Live Play."

***The So-Called "Best Efforts to Promote the Licensed Uses" Clause.*** Paragraph 7.2 of the License Agreement states: "SBI and FCU will use their respective best efforts to promote the Licensed Uses offered in connection with the SKEE-BALL Trademark and to coordinate the development, creation, distribution, sale, advertising, and promotion of the Licensed Uses so as to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark."

***Indemnification.*** Paragraph 14 of the License Agreement contains a provision in which each party agrees to indemnify the other party for claims related to or arising, directly or indirectly, from breach by the other party of any representation, warranty or covenant in the License Agreement. Paragraph 14 is devoid of any reference to fee-shifting with respect to lawsuits between the parties.

6

*Choice of Law and Forum.* Paragraph 18.7 of the License Agreement contains a broad, mandatory New York choice-of-law clause, and requires that any suit relating to the License Agreement be brought in the state or Federal courts within the Eastern District of New York.

*Merger and Integration.* The License Agreement contains a merger and integration clause in Paragraph 18.4 which further states the following: "This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto which specifically refers to this Agreement."

### C.    The Alleged Revenue Share Agreement

In or around 2017, Bay Tek and Full Circle allegedly discussed an oral revenue-sharing arrangement, separate and apart from the License Agreement, pursuant to which Bay Tek would build custom Skee-Ball lanes to be used for Live Play, at no up-front cost to Full Circle (the "Revenue Share Agreement"). Pursuant to the Revenue Share Agreement, Bay Tek allegedly agreed to manufacture eleven (11) lanes, ten of which would be delivered in time for "The BEEB," the National Skee-Ball Championship, Compl. ¶ 107, and the eleventh would be held by Bay Tek for research and development. Compl. ¶ 130. Full Circle alleges that these eleven lanes were intended to serve as prototypes to test Full Circle's concept, and that, on some unspecified date thereafter, Bay Tek would deliver twenty-five (25) production lanes, for a total of thirty-six (36) lanes. Compl. ¶ 110. In exchange, Full Circle allegedly agreed to share 15% of "top line revenue" generated from each of the lanes via monthly payments to Bay Tek, for an indefinite period of time, until Bay Tek recouped 150% of the manufacturing costs. Comp. ¶¶ 112, 252.

### D.    The Alleged Dispute

Full Circle alleges that communications between the parties broke down in 2018, and that Bay Tek decided to place production of the twenty-five additional custom Skee-Ball lanes "on

hold." Compl. ¶ 150.  Full Circle further alleges that the parties disagreed over the terms of the

alleged Revenue Share Agreement and further had disagreements over actions Full Circle was

taking in purported breach of the License Agreement.  Compl., *passim*.

On July 28, 2020, Full Circle commenced this action by filing its Complaint.  ECF No. 1.

In Paragraph 6 therein, Full Circle alleges that the Complaint is premised upon "six clearly

unlawful acts" which it contends Bay Tek purportedly committed:

- "First, … Bay Tek breached the [Revenue Share A]greement to build and finance [customized Skee-Ball] lanes [by providing only 10 of the 25 lanes Bay Tek allegedly agreed to provide] …." Compl. ¶ 7.

- "Second, when Full Circle reached an agreement in principle with a partner [a company called Play Mechanix] who would either buy or manufacture the [customized Skee-Ball] lanes for Full Circle, Bay Tek tortiously interfered by intimidating the partner into backing out of the deal with Full Circle."   Compl. ¶ 8.

- "Third, … Bay Tek invented obligations in the [L]icense [Agreement] for Full Circle to comply with and accused Full Circle of breaching those obligations …." Compl. ¶ 9.

- "Fourth, Bay Tek refused to build any [customized Skee-Ball] lanes for Full Circle, even if Full Circle paid for them in full, and threatened Full Circle that it would terminate the license if Full Circle engaged another manufacturer to build lanes." Compl. ¶ 10.

- "Fifth, days after Full Circle confidentially presented its "Skee-Ball Live" branding idea to Bay Tek, Bay Tek registered the trademark 'Skee-Ball Live' without Full Circle's knowledge or consent. Then, Bay Tek told Full Circle that it could not use the phrase 'Skee-Ball Live' in connection with its Skee-Ball Live Play license, despite previously authorizing Full Circle to operate and promote its Skee-Ball Live Concept using the phrase." Compl. ¶ 11.

- Sixth, "after Full Circle advised Bay Tek of a deal with ESPN to broadcast NSBL tournaments, Bay Tek killed the deal, threatening to sue Full Circle and ESPN if Full Circle entered into the broadcast agreement." Compl. ¶ 12.

Based upon those six alleged acts, Full Circle's Complaint seeks money damages,

including "millions of dollars" of lost profits, from Bay Tek in connection with three causes of

action: (1) breach of the License Agreement; (2) breach of the alleged Revenue Share

8

Agreement, and (3) tortious interference with prospective business relations.  Full Circle's Complaint also seeks reimbursement of its attorneys' fees and costs incurred in connection with this action pursuant to the indemnification provisions of Section 14 of the License Agreement.

## ARGUMENT

### I.    LEGAL STANDARD

In deciding a Rule 12(c) motion, courts in this Circuit "employ[] the same standard applicable to dismissal pursuant to Fed. R. Civ. P. 12(b)(6)."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (citing *Hohnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)).  Thus, as with Rule 12(b)(6), to survive Rule 12(c), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hayden*, 594 F.3d at 160; *Stabile v. United Recovery Sys., L.P.*, No. CV 11-1152 (SJF) (WDW), 2011 WL 5578981, at *1 (E.D.N.Y. Nov. 16, 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (explaining the complaint must raise a right to relief "above the speculative level").[5] This plausibility requirement reflects the threshold requirement of Fed. R. Civ. P. 8(a)(2) that the "plain statement" possess "enough heft to 'sho[w] that the pleader is entitled to relief.'"  *See Twombly*, 550 U.S. at 557; *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 521 (S.D.N.Y. 2018) ([I]f a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed . . . .").  Though the court must accept as true all allegations contained in a complaint, that "tenet" is "inapplicable to legal conclusions"; and "[t]hreadbare recitals of the elements of a cause of action, supported by mere

---

[5] For purposes of Rules 12(c) and 12(b), the complaint "includes any written instrument attached to it or any statements or documents incorporated in it by reference, as well as any document on which the complaint heavily relies."  *Stabile*, 2011 WL 5578981, at *1 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).  The Complaint incorporates and heavily relies on the License Agreement, which is set forth in Exhibit 1 to the Movit Decl. filed herewith.

9

conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

## II. THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE LICENSE AGREEMENT

"When a contract is before a Court, and its language is unambiguous, the Court may render a judgment rejecting a [breach of contract] claim which is contradicted by the contract's express language." *Lind v. Vanguard Offset Printers, Inc.*, 857 F. Supp. 1060, 1065 (S.D.N.Y. 1994) (citing *Arcadian Phsophates, Inc. v. Arcadian Corp.*, 884 F.2d 69 73 (2d Cir. 1989)). Here, all of Full Circle's claims for breach of the License Agreement are either contradicted by the plain language of the License Agreement and/or otherwise foreclosed by black-letter New York law. Accordingly, dismissal of Full Circle's cause of action for breach of the License Agreement is warranted pursuant to Rule 12(c).

Full Circle's Complaint sets forth three separate theories as to how the alleged actions of Bay Tek have purportedly breached the License Agreement. *First*, Full Circle alleges that Bay Tek has purportedly breached specific provisions of the License Agreement, *i.e.*, Paragraphs 4.2 and 5.3 therein. Compl., ¶¶ 228-237. *Second*, in a tacit acknowledgement that Full Circle is unable to plausibly allege any breach by Bay Tek of a specific provision of the License Agreement, Full Circle alleges that Bay Tek purportedly breached the implied contractual duty of good faith and fair dealing. Compl., ¶¶ 243-246. *Third*, as a last-ditch effort to concoct a contractual breach, Full Circle alleges that Bay Tek's purported actions breached the "best efforts to promote the Licensed Uses" provision in Paragraph 7.2 of the License Agreement. Compl., ¶¶ 238-240. All three theories are equally unavailing.

10

**A.      The Complaint Fails to Allege A Breach of Paragraphs 4.2 and 5.3**

The Complaint alleges that Bay Tek purportedly breached Paragraph 4.2 of the License

Agreement by allegedly rescinding prior approval for Full Circle to use "Skee-Ball Live" and

asserting that it is the owner of the registered trademark "Skee-Ball Live."  However, Paragraph

4.2 allows Full Circle to use certain phrases and slogans that include the Mark, subject to Bay

Tek's prior approval, and with respect to registering phrases which incorporate the Mark such as

"Skee-Ball Live," expressly states:

> "No right is granted to FCU to ownership of the said Live Play Phrases
> and Slogans, it being understood that ***FCU is granted a license to use the
> SKEE-BALL Trademark*** in connection with such Live Play.  ***All such use
> of the Phrases and Slogans inures to the ownership rights of [Bay Tek]
> in the trademark***."

(emphasis added).  Accordingly, Full Circle's suggestions that Bay Tek could not rescind its

approval or register the Skee-Ball Mark are completely unsupported by the License Agreement.

Full Circle further alleges that Bay Tek breached Paragraph 5.3 of the License

Agreement, which provides that Bay Tek "covenants, warrants, and agrees that it will not,

directly or indirectly, during the Term and in the Territory, operate, sponsor, or endorse a

business, involving Live Play."  Compl. ¶ 235.  Full Circle fails, however, to allege any conduct

that actually violates this section.  Instead, Full Circle claims, without any factual basis, that Bay

Tek manufactured custom Skee-Ball branded lanes for uses in bars operating competing Live

Play, Compl. ¶ 236, and "liked" or "shared" social media posts from competing Live Play

leagues, Compl. ¶¶ 203-204.  However, Full Circle fails to identify a single competing Live Play

league that Bay Tek allegedly operated, sponsored, or endorsed; does not allege any instance in

which Bay Tek manufactured lanes for competing Live Play, and does not allege any instance in

11

which Full Circle "liked" or "shared" a social media post.[6]  ***Pointedly, at the initial Status Conference in this action on September 10, 2010, the Court asked Full Circle's counsel to specifically identify alleged acts by Full Circle which allegedly violated this Paragraph 5.3, and Full Circle's counsel was utterly unable to do so.***  Full Circle's vague and conclusory allegations that Paragraph 5.3 has been violated therefore plainly fail the "plausibility" test under *Iqbal* and *Twombly*, and they should be dismissed on that ground.

But on top of this, Full Circle does not plausibly allege how any of these actions, *even if assumed to be true*, would constitute operating, sponsoring, or endorsing a competing Live Play business in violation of Paragraph 5.3. They would not.[7]

**B.**    **The Complaint Fails to Allege A Breach Of The Implied Duty Of Good Faith**

The implied contractual duty of good faith and fair dealing is a limited doctrine under New York law.  As a court has explained in summarizing the relevant authority:

> Every contract governed by New York law … contains an implied covenant to perform the contract fairly and in good faith.  *See Rowe v. Great Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 385 N.E.2d 566, 569, 412 N.Y.S.2d 827, 830 (1978). This implied covenant means that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." ….

---

[6] Even if, *arguendo*, Full Circle had plausibly pled that Bay Tek had built lanes for other Live Play leagues or "liked" social media posts by other Live Play leagues, such alleged conduct would not violate Paragraph 5.3 of the License Agreement because it would not constitute "operat[ing], sponsor[ing], or endors[ing] a business, involving Live Play."

[7] Full Circle also alleges that Bay Tek hosted one event featuring Skee-Ball ***to promote a local indoor football team***.  Compl. ¶¶ 146-148. However, this event was conducted with the permission of Full Circle.  *Id.*  Even if that had not been the case, this one isolated event, which again was for purposes of promoting a football team, and ***not*** a competing Live Play league, would not constitute "operat[ing], sponsor[ing], or endors[ing] a business, involving Live Play" in violation of Paragraph 5.3 of the License Agreement.

> However, the implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract. *See, e.g., Gardner & Florence Call Cowles Found. v. Empire, Inc.,* 589 F. Supp. 669, 673 (S.D.N.Y.1984) …. In addition, "[t]he mere exercise of one's contractual rights, without more, cannot constitute ... a breach [of the implied covenant of good faith and fair dealing]." *Broad,* 642 F.2d at 957. Nor can a court imply a covenant to supply additional terms for which the parties did not bargain. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F. Supp. 1504, 1519 (S.D.N.Y.1989) ….

*Hartford Fire Ins. Co. v Federated Dept. Stores, Inc.,* 723 F Supp 976, 991 (S.D.N.Y. 198)

(emphasis added). Here, Full Circle's claim for breach of the implied covenant must fail because it seeks to rewrite the parties' contract and to add terms for which the parties did not bargain in the fully-integrated License Agreement.

Full Circle alleges five purported breaches of the implied covenant. Compl., ¶ 244.

*First*, Full Circle alleges that Bay Tek purportedly refused to agree to manufacture custom lanes for Full Circle. *Id.* However, there is no provision in the License Agreement which requires Full Circle to manufacture any Skee-Ball lanes for Bay Tek—let alone custom lanes. It is presumably for this reason that Full Circle has alleged the purported existence of the oral Revenue Sharing Agreement pertaining to the manufacturing of custom lanes. Full Circle cannot bootstrap its claim for alleged breach of this separate purported oral agreement into the fully-integrated License Agreement. *See Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001) ("[T]he obligation of good faith cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract.").

*Second*, Full Circle alleges that Bay Tek allegedly frustrated Full Circle's attempts to obtain financing. Compl., ¶ 244. However, nothing in the License Agreement concerns the

13

subject of financing—let alone contains any prohibitions on Bay Tek's actions regarding financing. *Adiel v. Coca-Cola Bottling Co. of New York*, No. 95 CIV. 0725 (WK), 1995 WL 542432, at *3 (S.D.N.Y. Sept. 13, 1995) ("[T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement.") (citing *Hartford Fire Ins.*, *supra*).

*Third*, Full Circle alleges that Bay Tek purportedly breached the covenant by "identifying frivolous immaterial 'breaches' of the License Agreement, and then refusing to acknowledge that the alleged breaches had been cured, or to explain what issues remained …." Compl., ¶ 244. However, Paragraph 11.6 of the License Agreement sets forth a detailed process for the parties to provide notice of breaches, with which Bay Tek is alleged to have complied.  "[U]nder New York law a party's reliance upon express contractual terms insulates it from [implied covenant of good faith and fair dealing] claims" such as that asserted by Full Circle with respect to Paragraph 11.6. *Adiel*, 1995 WL 542432, at *3.

*Fourth*, Full Circle alleges that Bay Tek purportedly breached the implied covenant by registering the "Skee-Ball Live" mark and "using the mark itself …." Compl., ¶ 244.  Again, however, as discussed above, Bay Tek's alleged use and registration of this mark was fully consistent with Paragraph 4.2 of the License Agreement and therefore cannot have violated the covenant. *Adiel*, 1995 WL 542432, at *3.

*Fifth*, Full Circle alleges that Bay Tek purportedly breached the implied covenant by "unreasonably objecting to Full Circle's broadcast agreement with ESPN …." Compl., ¶ 244. Quite the contrary, the License Agreement expressly limits Full Circle's use of the Mark "via Internet, radio, television, or other communication and media outlets" to "***promotional and marketing purposes only***."  License Agreement Paragraph 4.5 (emphasis added).  Examples of

14

such promotional and marketing purposes include "allowing Live Play players to enroll in/ sign up for Live Play." *Id.*  Paragraph 6.1 further makes clear that Full Circle's license is limited to the rights granted therein:

> No license or other interest of any kind in any of [Bay Tek]'s rights or property is granted to Full Circle, whether directly or indirectly, except as specifically provided herein.  Any rights in or to the SKEE-BALL Trademark not licensed hereunder are fully reserved to [Bay Tek] and shall remain the property of [Bay Tek], to be used in any manner [Bay Tek] deems appropriate.

It is absurd for Full Circle to argue that Bay Tek had an implied contractual obligation to ***allow*** Full Circle to engage in an unlicensed and unauthorized use of the Mark.

### C.     The Complaint Fails To Allege A Breach Of Paragraph 7.2

In a final attempt to manufacture contractual obligations out of whole cloth, Full Circle alleges that Bay Tek purportedly breached Paragraph 7.2 of the License Agreement by: (1) "by refusing to manufacture Full Circle [custom Skee-Ball] lanes for Live Play under any scenario and frustrating Full Circle's ability to work with a third-party manufacturer to obtain [custom Skee-Ball] lanes for Live Play;" and (2) "causing Full Circle to miss the opportunity to… start a working relationship with ESPN …." Compl., ¶ 239.  This argument also fails completely. Paragraph 7.2 of the License Agreement says absolutely nothing about manufacturing custom Skee-Ball lanes or permitting use of the Mark in connection with television broadcasts.  Rather, Paragraph 7.2 merely states:

> SBI and FCU will use their respective best efforts to **promote the Licensed Uses** offered in connection with the SKEE-BALL Trademark and to coordinate the development, creation, distribution, sale, advertising, and promotion of the Licensed Uses so as to **maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark.**

15

*First*, manufacturing custom Skee-Ball lane has absolutely nothing to do with "promot[ing] the Licensed Uses" or "maintain[ing] and enhanc[ing] the value of the goodwill residing the SKEE-BALL Trademark." Full Circle had every ability to promote the Licensed Uses and enhance the value of the goodwill residing in the SKEE-BALL Trademark with non-custom Skee-Ball lanes. Again, nothing in the License Agreement obligates Bay Tek to create custom lanes, and Full Circle's argument to the contrary is simply another invalid attempt to shoehorn the terms of the alleged oral Revenue Sharing Agreement into the fully integrated License Agreement. *Second*, as also discussed above, Full Circle has no right under the License Agreement to engage in televised broadcasts of Live Play; nothing in Paragraph 7.2 of the License Agreement is to the contrary.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTEREFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

To successfully plead tortious interference with a prospective business relationship, a plaintiff must allege (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. *Waldbaum v. Laufer Delena Cadicina Jensen & Boyd, LLC*, No. 18-CV-4225 (ALC), 2019 WL 4735386, at *5 (S.D.N.Y. Sept. 27, 2019) (granting Rule 12(b)(6) motion to dismiss claim for tortious interference with prospective business relationship).

The third element requires that the tortfeasor's conduct must have been "undertaken for the ***sole purpose*** of harming plaintiff, or that such conduct was wrongful or improper ***independent*** of the interference allegedly caused thereby." *Krasnyi Oktyabr, Inc. v. Trillin Imports*, 578 F. Supp. 2d 455, 472 (E.D.N.Y. 2008) (citing *Jacobs v. Continuum Health*

16

*Partners, Inc.*, 7766 N.Y.S.2d 279, 280 (1st Dep't 2004)) (emphasis added).  Misrepresentations

alone are insufficient to constitute wrongful or improper conduct.  *Friedman v. Coldwater Creek,*

*Inc.*, 551 F. Supp. 2d 166, 170 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009).  Rather,

the alleged tortfeasor's actions "must amount to a ***crime or an independent tort***," or the alleged

tortfeasor must otherwise engage in "***physical violence, fraud or misrepresentation, civil suits***

***and criminal prosecutions***."  *Friedman*, 321 F. App'x at 60 (emphasis added).  "Lawful conduct

is generally insufficient to give rise to the required level of culpability as it pertains to a

defendant."  *Waldbaum*, 2019 WL 4735386, at *7.

Here, the Complaint is devoid of any allegations that Bay Tek intentionally interfered

with a purported prospective business relationship "solely out of malice" or by committing a

crime or independent tort—as no such allegation could be made in good faith.  Full Circle's

entire tortious interference claim instead rests on the nebulous and conclusory allegation that Bay

Tek purportedly "threatened" a competing arcade game manufacturer, Play Mechanix, if it tried

to help Full Circle obtain Skee-Ball lanes, causing Play Mechanix to back out of a prospective

deal that Full Circle allegedly obtained.  *See* Compl. ¶¶ 178, 272.

As a threshold matter, the Complaint's failure to allege any factual basis for, or even the

substance of, Bay Tek's alleged "threat," fails to meet the plausibility standard under *Iqbal* and

*Twombly*.  Just as fatally, the Complaint fails to state a cause of action for tortious interference

with prospective business relationship because it does not—as it cannot—allege any facts to

demonstrate that Bay Tek acted "solely out of malice," or acted with "wrongful means."  There

are no allegations suggesting that Bay Tek interfered "for the sole purpose of harming" Full

Circle, *Krasnyi Oktyabr*, 578 F. Supp. 2d at 472, nor are there any allegations that the alleged

interference was itself an illegal or improper act.  *Waldbaum*, 2019 WL 4735386, at *7-8; *see*

17

*also S.O. Textiles Co., Inc. v. A & E Prods. Grp.*, 18 F. Supp. 2d 232, 240 (E.D.N.Y. 1998) (dismissing tortious interference claim under Fed. R. Civ. P. 12(c) where plaintiff did not allege any facts to show either that defendants acted solely to harm plaintiff and not to advance their own interests, or that defendants took criminal or fraudulent actions). Rather, the allegations, taken as true, suggest *at most* that Bay Tek purportedly persuaded Play Mechanix not to supply Full Circle with modified Skee-Ball lanes. That Bay Tek allegedly wanted Full Circle to avoid working with another arcade game manufacturer is no basis for a cause of action for tortious interference with prospective business relations. Accordingly, this claim should be dismissed.

## IV.   FULL CIRCLE'S CLAIMS FOR LOST PROFITS ARE IMPROPERLY SPECULATIVE AS A MATTER OF LAW AND SHOULD BE DISMISSED

In an action for breach of contract or tort, a plaintiff is entitled to recover lost profits "only if he can establish both the existence and the amount of such damages with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (citing *Kenford Co., Inc. v. Eric County*, 502 N.Y.S.2d 131, 131 (1986) ("*Kenford I*"). *See also Brian E. Weiss, D.D.S., P.C. v. Miller,* 166 A.D.2d 283, 284, 564 N.Y.S.2d 110, 111 (1990), aff'd, 78 N.Y.2d 979, 580 N.E.2d 404 (1991). "**New York courts have dismissed claims for lost profits [at the pleadings stage] where the pleadings suggest that an award of lost profits would require an unreasonable level of speculation.**" *ACCD Global Agric. Inc. v. Perry*, No. 12 CIV. 6286 KBF, 2013 WL 840706, at *6 (S.D.N.Y. Mar. 1, 2013) (emphasis added) (dismissing claim for lost profits at the pleadings stage). *See, e.g., Calip Dairies, Inc. v. Penn Station News Corp.*, 262 A.D.2d 193, 194 (1st Dep't 1999) (affirming dismissal of lost profits claim at the pleading stage); *Lama Holding Co. v. Smith Barney Inc.*, 215 A.D.2d 314, 315 (1st Dep't 1995) (same).

18

A plaintiff's claim for "lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld*, 218 F.3d at 172. Of critical relevance here, "[s]ubject as they are to the changing whims and . . . tastes of the general public, claims for profits lost in unsuccessful entertainment ventures have received a chilly reception in the New York courts." *Id.* at 174 (citing *Kenford I*, 67 N.Y.2d at 263 ("New York has long recognized the inherent uncertainties of predicting profits in the entertainment field in general.")). *See Pot Luck, LLC v. Freeman*, No. 06 Civ. 10195(DAB), 2010 WL 908475, at * (S.D.N.Y. Mar. 8, 2010) (granting Rule 12(b)(6) motion to dismiss claim for lost profits in connection with alleged breach of agreements concerning film licensing and distribution because the calculation of plaintiff's lost profits could not be calculated with any degree of reasonable certainty due to dependency on numerous uncontrollable factors).

The instant action presents a paradigmatic example of when a claim for lost profits should be dismissed at the pleadings stage.  Full Circle operates a young, and completely untested entertainment venture that, by its own admissions, is the first of its kind.  *See* Compl., ¶ 2.  Notwithstanding Full Circle's pie-in-the-sky ambitions, Full Circle's own allegations demonstrate that it is barely even in the initial stages of development, with no proven track record.  Compl., ¶ 42 ("Full Circle's **goal** is to make Skee-Ball a national sport, the type broadcast on ESPN.") (emphasis added); *id.* ¶ 84 (discussing Full Circle's "Full Circle's **goals** of using its Live Play License to develop the NSBL with custom Skee-Ball Live Lanes in bars throughout the country, as well as local, regional, and national tournaments and events ….") (emphasis added).  Full Circle attempts to paint a fanciful picture, but fails to include a single allegation in its 276-paragraph Complaint to suggest in more than a conclusory manner that it would actually be profitable, let alone to the tune of "millions of dollars," if it were not for Bay

19

Tek's alleged actions.  *See ACCD Global Agric.*, 2013 WL 840706, at *6 (dismissing lost profits

where plaintiff failed to allege any factual basis for its claim that it would have made millions of

dollars in claimed lost profits).

Indeed, any lost profits calculation here would be dependent on a multitude of factors,

"the contingency and uncertainty" of which makes "calculating a measure of lost profits

opportunities . . . with any degree of reasonable certainty . . . impossible."  *Pot Luck*, 2010 WL

908475, at *3.  The current COVID pandemic is emblematic of the uncertainty surrounding

entertainment ventures such as Full Circle's.  Like countless other entertainment ventures, Full

Circle has been forced to postpone live events, for reasons completely unrelated to any dispute

with Bay Tek.  Some other representative examples of the innumerable factors which render Full

Circle's lost profits claim utterly speculative include: (1) Full Circle's ability to obtain and

maintain relationships with "hundreds of bars throughout the country" to host Live Play, *see*

Compl. ¶ 3; (2) the general public's yet-to-be-tested reception to and sustained interest in Skee-

Ball Live Play on a national level; (3) the pre-existing local entertainment markets, including the

number of competing or alternative sources of entertainment that draw the public's interest;

(4) the Live Play bars' ability to attract patrons; (5) the efforts that Live Play bars would take to

market Live Play to its patrons and attract players; and (6) the effectiveness of those efforts.

Considering that Full Circle's lost-profits claim does not even pertain to an established

form of entertainment, but instead, to an entertainment concept that Full Circle ***alleges to have***

***invented***, any calculation of lost profits would be even ***more*** speculative than other cases where

lost profits were dismissed at the pleadings stage.  *See, e.g., Schonfeld*, 218 F.3d at 173 (holding

that lost profits in connection with failed launch of television network were "purely hypothetical,

20

stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers").[8]

For all of these reasons, Full Circle's claim for lost profits should be dismissed as improperly speculative as a matter of law.

## V.   FULL CIRCLE MAY NOT SEEK ATTORNEY'S FEES UNDER THE INDEMNIFICATION CLAUSE OF THE LICENSE AGREEMENT

Full Circle also alleges that if it prevails on its breach of contract claim, then Bay Tek is required to reimburse Full Circle for its attorneys' fees and litigation costs pursuant to the parties' indemnification obligations under Section 14 of the License Agreement.   Compl. ¶ 249. Full Circle is wrong.

New York courts construe indemnification agreements narrowly. "[W]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper Assoc., Ltd. v. AGS Comps., Inc.*, 549 N.Y.S.2d 365, 367 (1989).  This is particularly true where a party attempts to use an indemnification provision to upset the American rule by which each party to a lawsuit generally bears its own costs, including attorney's fees: "[i]nasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court ***should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise***."  *Parkway Pediatric*

---

[8] Additionally, Full Circle's lost profits claim under its First and Third Causes of Action is clearly premised upon Full Circle obtaining a television broadcast deal, which deal is prohibited under the License Agreement for the reasons discussed above.  With respect to Full Circle's Second Cause of Action, it is palpably absurd for Full Circle to allege that the delivery of twenty-five custom Skee-Ball lanes would result in millions of dollars of profits.

21

*and Adolescent Medicine LLC v. Vitullo*, 900 N.Y.S.2d 563, 564 (4th Dep't 2010) (citing *Hooper Assoc.*, 549 N.Y.S.2d at 367) (emphasis added).

      As such, courts will not construe an indemnification provision to require one party to a contract to indemnify the other for attorney's fees incurred in litigation between them unless the provision "exclusively or unequivocally refer[] to claims between the parties themselves."  *See, e.g., Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 81 N.Y.S.3d 816 (2018) (holding that indemnity clause did not permit fee-shifting in dispute between the contracting parties where "the subjects set forth in [the indemnity clause] are all 'susceptible to third-party claims,' and '[n]one are ***exclusively or unequivocally referable to claims between the parties themselves***.") (emphasis added); *Vazquez v. TriAd Media Solutions, Inc.*, 2018 WL 6584147, at \*7 (D.N.J. Dec. 14, 2018) (applying New York law and holding that fees incurred in attempting to enforce indemnification clause were not recoverable under that clause, because "the plain text does not mention or even obliquely refer to claims between the parties"); *Parkway*, 900 N.Y.S.2d at 564 ("Here, the broad indemnification clause in the parties' agreement does not even refer to litigation between the parties to the agreement.  The agreement thus does not make it "unmistakably clear" that the parties intended that plaintiff must indemnify defendant for attorney's fees and costs arising from the instant litigation."); *Gotham Partners, L.P. v. High River Ltd. P'ship*, 906 N.Y.S.2d 205, 207 (1st Dep't 2010) ("[F]or an indemnification clause to cover claims between the contracting parties rather than third party claims, its language must unequivocally reflect that intent.").

      Here, Section 14 of the License Agreement does not "exclusively or unequivocally refer[] to claims between the parties themselves."  Quite to the contrary, Section 14 is devoid of any reference to claims between the parties.  It merely provides that Bay Tek shall indemnify Full

22

Circle for "any and all Claims, related to or arising, directly or indirectly, from: (a) breach by [Bay Tek] of any representation, warranty or covenant herein, and (b) [Full Circle]'s use of the SKEE-BALL Trademark solely in compliance with this Agreement, provided, however, that such indemnity obligations shall not apply to the extent that the Claim is a Claim for which [Full Circle] would owe indemnity to [Bay Tek]."  This broad, catch-all indemnification provision is "typical of those which contemplate reimbursement when the indemnitee is required to pay damages on a ***third-party claim***," not a first-party claim.  *Gotham Partners,* 906 N.Y.S.2d at 206-07 (emphasis added) (holding that defendant's agreement to indemnify plaintiff against claims "as a result of any action taken by (or failure to act of) [defendant] following the execution and delivery of this agreement . . . ." did not provide for right of indemnification in connection with an action between the parties); *accord, Bourne Co. v. MPL Commc'ns, Inc.*, 751 F. Supp. 55, 57 (S.D.N.Y. 1990).  Full Circle's demand for attorney's fees should be dismissed.[9]

---

[9] Bay Tek included a request for attorney's fees pursuant to the indemnification clause in Section 14 in its Counterclaims purely out of an abundance of caution.  *See* Counterclaims, at Prayer for Relief ¶ F.  Bay Tek will voluntarily dismiss its indemnification request under Section 14 to the extent that the Court grants Bay Tek's motion to dismiss Full Circle's indemnification claim.

12525709.4

## **CONCLUSION**

For the foregoing reasons, Bay Tek's Rule 12(c) motion should be granted.

DATED:      September 30, 2020      MITCHELL SILBERBERG & KNUPP LLP
                New York, New York


                By: /s/ Jeffrey M. Movit
                    Christine Lepera (*ctl@msk.com*)
                    Jeffrey M. Movit (*jmm@msk.com*)
                    Leo M. Lichtman (*lml@msk.com*)
                    437 Madison Avenue, 25th Floor
                    New York, NY 10022
                    Telephone: (212) 509-3900
                    Facsimile:  (212) 509-7239

                    *Attorneys for Defendant and Counterclaim*
                    *Plaintiff Bay Tek Entertainment, Inc.*

24

12525709.4