# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FULL CIRCLE UNITED, LLC, | Civ. Action No.  1:20-cv-03395 |
| *Plaintiff,* | |
| *v.* | JURY TRIAL DEMANDED |
| BAY TEK ENTERTAINMENT, INC., and LARRY TREANKLER | |
| *Defendants.* | |

| |
|---|
| BAY TEK ENTERTAINMENT, INC., |
| *Counterclaim Plaintiff,* |
| *v.* |
| FULL CIRCLE UNITED, LLC, |
| *Counterclaim Defendant,* |
| *and* |
| ERIC PAVONY, |
| *Additional Counterclaim Defendant.* |

Deleted: ¶
*Defendant.*¶

## THIRD AMENDED COMPLAINT

Deleted: SECOND

Plaintiff Full Circle United, LLC ("Full Circle" or "FCU"), through undersigned counsel,

brings this Third Amended Complaint against Defendant Bay Tek Entertainment, Inc. ("Bay Tek")

Deleted: Second

and Defendant Larry Treankler ("Treankler") and hereby alleges as follows:

## SUMMARY OF THE ACTION

1.      This case is about two companies that had similar ideas about how to evolve a quintessentially American pastime. One succeeded; the other did not. Rather than innovate, the loser struck corrupt backroom deals and brazenly lied to the winner about its desire for a partnership in which both would find success. In reality, its only goal was to drive the winner out of the market by any means necessary.

2.      The Plaintiff here is Full Circle United, LLC. FCU's founder and president, Eric Pavony, is a lifelong fan of games with fond memories of playing Skee-Ball growing up. He realized that others probably shared his sense of nostalgia, and through Full Circle, created the country's first meaningful adult skee-ball experience, called Brewskee-Ball. With skee-ball machines in bars and organized league play (a concept referred to as "Live Play"), Full Circle steadily grew Brewskee-Ball into a national presence.

3.      Brewskee-Ball's—and Live Play's—growth attracted the attention of Defendant Bay Tek Entertainment, Inc. Bay Tek is an American game manufacturer that has provided redemption and coin-operated games, primarily for the amusement market, for over forty years. It is a private company headquartered in Wisconsin, one of a consortium of 13 businesses that provide manufacturing and related services making up the Village Companies and owned by the Treankler family. Through its extensive network of operators and distributors, Bay Tek generates millions of dollars in sales revenue each year through the sale of its games worldwide.

4.      Bay Tek tried to launch a business called Beer Ball to compete with Brewskee-Ball. While Bay Tek was correct about the size of the bar and Live Play market, it was a manufacturer, not an operator, and could not sustain or scale its league. Beer Ball failed.

2

Deleted: <#>In this case, Bay Tek is a licensor with an express contractual obligation to use its "best efforts" to promote the business of Full Circle, its licensee. Bay Tek chose to try to destroy Full Circle instead.¶
Full Circle launched the first competitive adult Skee-Ball league, evolving the boardwalk children's game into a social, competitive sport played by adults. As part of its "National Skee-Ball League" ("NSBL"), Full Circle places competition-grade Skee-Ball lanes in venues and operates them at a substantial profit. The NSBL conducts live Skee-Ball tournaments using the lanes and markets the broadcast of those tournaments.¶
Over the last few years, demand for the lanes, tournaments, and broadcasts (collectively, "Live Play") has been robust. If not for Bay Tek's actions described below, Full Circle would have placed lanes in hundreds of venues throughout the country, the NSBL would be broadcast on ESPN, and Full Circle would be generating millions per year in profit from Live Play.¶
Full Circle originally obtained its license to use the Skee-Ball mark in the Live Play business from Skee-Ball, Inc. ("SBI"), the prior owner of the mark. The license agreement required SBI to use its "best efforts" to help Full Circle succeed. Bay Tek subsequently acquired the Skee-Ball mark from SBI, assuming the license and its obligation to help Full Circle grow the Live Play business.¶
Bay Tek did not comply with its obligations. Instead, seizing an opportunity to enter the Live Play market for its own profit, Bay Tek embarked on a scheme to destroy Full Circle by starving it of funds, equipment, and business opportunities, and by placing the license in dispute.¶
Each time Full Circle attempted to mitigate the damage caused by Bay Tek's wrongs, Bay Tek would dig deeper, ultimately committing at least six clearly unlawful acts (that Full Circle is thus far aware of) in its scheme to deprive Full Circle of the fruits of its license.¶
First, when Bay Tek learned Full Circle was raising funds to purchase a significant number of lanes, Bay Tek intervened, assured Full Circle that it did not need investors, and agreed to build and finance the lanes itself. After building only ten lanes, Bay Tek breached the agreement to build and finance lanes, leaving Full Circle without sufficient revenue to fund its growth plan.¶
Second, when Full Circle reached an agreement in principle with a partner who would either buy or manufacture the lanes for Full Circle, Bay Tek tortiously interfered by intimidating the partner into backing out of the deal with Full Circle.¶
Third, Bay Tek prevented Full Circle from obtaining financing from third parties by frivolously placing Full Circle's license in dispute. Bay Tek knew Full Circle could not obtain financing or investment if it could not confidently represent it had the right to operate Skee-Ball Live Play, so, Bay Tek invented obligations in the license for Full Circle to comply with and accused Full Circle of breaching those obligations. Even after Full Circle complied with the phantom obligations, Bay Tek continued to assert that Full Circle was in breach, but repeatedly refused to explain ... [1]

5.      During this time, Bay Tek was a client of a licensing agency called Dimensional Branding. Dimensional also advised Skee-Ball, Inc. ("SBI"), then the holder of the Skee-Ball trademark.

6.      Presumably to advance Bay Tek's interests, Dimensional ran to SBI to suggest that Brewskee-Ball was infringing SBI's trademark. Notably, it neglected to mention that Bay Tek, too, was trying to break into the Live Play market without SBI's blessing, or that Bay Tek and many others had operated skee-ball machines under their own branding for years. It instead painted a target directly on Bay Tek's principal competitor, FCU.

7.      SBI then sued Full Circle for trademark infringement. SBI claimed that Full Circle infringed the skee-ball trademark by referring to skee-ball branded machines as skee-ball machines and by referring to the game being played at its events as skee-ball. While Bay Tek and others had, for many years, also used the term skee-ball to describe the skee-ball game and skee-ball machines, SBI did not sue Bay Tek or any other operators. Full Circle was selectively targeted.

8.      Full Circle defended SBI's lawsuit by asserting that its use of the mark to describe the skee-ball game being played was fair use and that the mark as used was generic. Bay Tek and Dimensional attentively watched the progress of the suit.

9.      SBI and Full Circle resolved their disputes in a transaction evidenced by two written agreements: a Settlement Agreement and a License Agreement. In the transaction, Full Circle released its fair use and generic claims and received in return 1) a complete release of Full Circle and a covenant not to sue for Full Circle's prior uses of the term skee-ball or other conduct SBI alleged tarnished the mark, 2) an agreement not to contest the validity of the Brewskee-Ball trademark, and 3) a license for Full Circle to use the Skee-Ball trademark in the Live Play market.

3

10.    So far, so good, but not for Bay Tek. The settlement left them still frozen out of the Live Play market. Rather than compete directly with FCU, Bay Tek decided to acquire the Skee-Ball mark, and its accompanying licenses, from SBI. Bay Tek believed its new status as licensor would give it the power to destroy the value of the license to Full Circle, while allowing Bay Tek to learn Full Circle's "secret sauce" for success in the Live Play market.

11.    Bay Tek faced a hurdle, though. SBI and Bay Tek had to obtain Full Circle's consent to the assignment. Bay Tek induced Full Circle to consent and later to divulge its plans and technology by representing that it would be an enthusiastic supporter of Full Circle, would devote resources to help Full Circle succeed in the Live Play market, that it approved of the way Full Circle positioned itself in the bar market using adult humor, kitsch, and puns, and that it agreed with Full Circle's plans to promote its leagues and tournaments on ESPN and other channels. In truth, however, Bay Tek's plan was to learn what it could from Full Circle and then threaten to destroy Full Circle if it did not agree to "rewrite" the License Agreement to give back the license to Bay Tek.

12.    Believing Bay Tek's lies, Full Circle disclosed its ideas and technologies to Bay Tek. Shortly thereafter, Bay Tek began the work of driving Full Circle out of business. To accomplish this, Bay Tek repeatedly and consistently interfered with Full Circle's ability to use the license, or to engage in transactions that would grow Full Circle's business, despite an express "best efforts" clause in the License Agreement. Bay Tek's plan culminated with its claims in this litigation of supposed infringements of the mark based on uses that Bay Tek permitted and encouraged for years, some of which SBI had previously released and covenanted not to sue for in the Settlement Agreement.

4

**PARTIES**

13.     Plaintiff Full Circle is a New York limited liability company with its principal place
of business at 1810 East 12th Street, Austin, Texas 78702. Full Circle's sole member, Eric Pavony
("Pavony"), is a resident of and domiciled in the state of New York.

14.     Defendant Bay Tek Entertainment, Inc., by change of name from Bay Tek Games,
Inc., is a Wisconsin corporation with its principal place of business at 1077 East Glenbrook Drive,
Pulaski, Wisconsin 54162. Prior to November 8, 2018, Bay Tek was known as and operated as
Bay Tek Games, Inc.

15.     Bay Tek Games, Inc. changed its name to Bay Tek Entertainment, Inc. on
November 8, 2018. Bay Tek Entertainment is responsible for the prior acts of Bay Tek Games,
Inc. in that they are one and the same entity, but for the name change. Bay Tek Entertainment, Inc.
and Bay Tek Games, Inc. employed the same officers, including Defendant Larry Treankler. For
conduct that occurred prior to the name change in 2018, Bay Tek Games, Inc. is referred to as Bay
Tek.

16.     Defendant Larry Treankler is an individual domiciled in Wisconsin.  For all times
relevant, Treankler has been an officer or director of Bay Tek, and directly controlled, authorized,
and benefited from Bay Tek's conduct alleged herein. Treankler has an ownership interest in Bay
Tek.

**JURISDICTION AND VENUE**

5

| Deleted: , |

| Deleted: <#>Full Circle and Bay Tek, by assignment and assumption, are parties to the License Agreement (as defined more specifically below), which incorporates a Settlement Agreement. The License Agreement and Settlement Agreement were executed in and are to be performed in substantial part in Brooklyn, New York.¶ |

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as the parties are citizens of different States and the amount in controversy is greater than $75,000.00.

18. This Court has original subject matter jurisdiction under 28 U.S.C. §1331 because this action involves a claim arising under the laws of the United States, the Defend Trade Secrets Act of 2016, 18 U.S.C. §1832, et seq., and supplemental jurisdiction under 28 U.S.C. §1367 because all other claims are so related to Full Circle's claim for violation of the Defend Trade Secrets Act that they form part of the same case or controversy.

19. This Court has personal jurisdiction over Defendants pursuant to the terms and conditions of the Settlement Agreement and License Agreement, which provide that all parties consent to the jurisdiction, *inter alia*, of the state and federal courts within the boundaries of the Eastern District of New York, and pursuant to CPLR 302(a) because, upon information and belief, Defendants transact business in New York, and/or because they committed torts within the state of New York, or which had effects within the state of New York, and because the actions complained of herein took place within the state of New York, and to the extent they occurred outside New York, Defendants knew or should have known that these acts had effects on business transactions within this state.

20. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Bay Tek is subject to personal jurisdiction in this district and is thus "deemed to reside" here for venue purposes under 28 U.S.C. § 1391(c)(2), and also pursuant to the express written agreement of the parties. The Settlement Agreement and License Agreement provide: "[a]ny legal action or other legal proceeding relating to this Agreement must be brought or otherwise commenced in a court

6

**Deleted:** due

**Deleted:** provides

of competent jurisdiction located in the boundaries of the Eastern District of New York; whether

that court is a federal court or state court will depend on the nature of the case."

21.    Furthermore, venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events giving rise to the claim occurred in this district. The License

Agreement and Settlement Agreement (as detailed below) were executed here, Full Circle is a New

York entity, and communications between the parties relevant to the claims have occurred here.

## GENERAL ALLEGATIONS

22.    Skee-ball is a well-known ticket redemption and arcade game.

23.    The game is similar in concept to bowling, but is played using an inclined lane

leading to a ramp, with various rings corresponding to different point values arranged on a

backboard positioned beyond the ramp. A player must land a ball within one of the rings to earn

points.

24.    "SKEE-BALL" is registered on the Principal Register of the United States Patent

and Trademark Office (the "USPTO") in connection with "a game in the nature of a bowling game

and parts thereof" (the "Mark").

### Relationship Between the Parties

25.    Plaintiff Full Circle is a marketing, promotions and entertainment company that,

among other things, operates the National Skee-Ball League ("NSBL"), a national network of

social and competitive skee-ball leagues, events, and tournaments.

7

26.   As part of the NSBL, Full Circle owns, operates and promotes skee-ball leagues,

events and tournaments under its Brewskee-Ball brand.[2]

27.   SBI, a manufacturer, acquired the Mark by assignment in or around 1989. SBI built

SKEE-BALL® branded lanes ("Skee-Ball Lanes"), as well as other games.

28.   In 2014, SBI granted Full Circle the exclusive license to use the Mark for Live Play

pursuant to the terms of a Confidential Settlement Agreement (the "Settlement Agreement") (ECF

No. 78-1) and Confidential Trademark License Agreement (the "License Agreement") (ECF No.

48-1). Live Play is specifically defined in the License Agreement, which definition is adopted

herein.

29.   Bay Tek is an American game manufacturer that has been building games for the

amusement industry for over forty years. In 2008, Bay Tek started offering a line of skee-ball

machines under its own brand.

30.   Bay Tek has claimed that it acquired the Mark from SBI in 2016, and concurrently

received an assignment of SBI's interest under the License Agreement as licensor of the Mark.

**Full Circle's Operations**

31.   Full Circle is largely responsible for popularizing Live Play, which it describes as

skee-ball as an adult social and competitive league-based sport. Live Play is a dynamic new market

for leagues, events and skee-ball tournaments featuring competitive gameplay.

_____

[2] In 2008, Full Circle registered "BREWSKEE-BALL" as a trademark on the Principal Register of the USPTO in connection with "[e]ntertainment in the nature of skee-ball games; entertainment services, namely arranging and conducting skee-ball competitions; providing a website that provides statistics for skee-ball league players; providing recognition and incentives by the way of awards to demonstrate excellence in the field of skee-ball" (the "Brewskee-Ball Mark").

8

---

Deleted: Full Circle is the owner

Deleted: trademark "BREWSKEE-BALL®"¹ (the "Brewskee-Ball Mark"). In addition to the

Deleted: and

Deleted: Skee-Ball

Deleted: the

Deleted: the License Agreement.

Deleted: In or around 2000,

Deleted: , operating as

Deleted: Games, Inc.,

Deleted: producing

Deleted: line of alley rollers, and became a direct competitor of SBI.

Deleted: In 2016,

Deleted: and assumed

Deleted: , with

Deleted: consent.

Deleted: Full Circle Creates the Skee-Ball Live Play Market, ¶
**Revitalizing Skee-Ball as a Game and a Brand**¶
¶
For over a century, Skee-Ball existed almost exclusively within the amusement market and remained essentially unaltered in concept and design.¶
Before Full Circle created Live Play, Skee-Ball was generally considered an old- fashioned children's game.¶

Deleted: Skee-Ball

Deleted: : An innovative concept of Skee-Ball

Deleted: , and

Deleted: Skee-Ball

Deleted: for adults

32.     In 2005, Pavony, President and sole member of Full Circle, along with a former partner, launched the first Live Play league, called Brewskee-Ball. Brewskee-Ball brought skee-ball into bars and allowed adults to organize into competitive teams. Participants, referred to as "rollers," competed in league events and tournaments using rules, scoring strategies, and terminology they invented specifically for Live Play.

33.     Full Circle relied heavily on social media and technology to market and promote Live Play. As early as 2006, Full Circle made footage from events, tournaments and competitions available to viewers on the internet and other platforms, and maintained a number of websites used by the Brewskee-Ball community. Later, Full Circle launched a talk show about Live Play called the "Brewskee-Ball Show", which was aired on the radio and on YouTube, and developed a league app.

34.     Full Circle also promoted Live Play through community-building. Pavony opened two Full Circle Bars, first in Brooklyn, New York, and later in Austin, Texas. They became the flagship venues for Live Play, where Full Circle conducted Live Play events and tournaments, and, more importantly, cultivated a unique playful and inclusive culture around Live Play, attracting a growing community of rollers.

35.     Due to Full Circle's efforts and creativity, a new adult, competitive market for skee-ball emerged, with Brewskee-Ball leagues, and leagues modeled after it, forming in neighborhood bars around the country to meet the demand for Live Play in bars.

36.     By 2010, Brewskee-Ball had grown into a national league, with a vibrant network of rollers competing in over 400 teams from coast to coast.

9

37.     At the time, Full Circle operated Brewskee-Ball using Skee-Ball lanes built by SBI in the 1980s and 1990s. These lanes were designed for children. As Brewskee-Ball's operations expanded, it encountered challenges using vintage SBI lanes, and could not use lanes built by other manufacturers without threatening the integrity of competition.

38.     To solve its problem, Full Circle developed the idea for the NSBL, a competitive league that would operate using custom machines designed by Full Circle specifically for Live Play (the "Skee-Ball Live Lane"), and leverage technology to operate and scale the league.

**Live Play Attracts National Attention, Leading Bay Tek**
**to Try to Enter the Live Play Market**

39.     Brewskee-Ball and the Live Play market gained the attention of the national news media, including ESPN, and piqued the interest of manufacturers within the game industry, particularly, Bay Tek and SBI.

40.     In or around 2010, Bay Tek began manufacturing a new line of skee-ball machines for the Live Play market.

41.     Bay Tek marketed the game as "Beer Ball" and tried to launch and operate competitive, adult leagues to compete with Full Circle's Brewskee-Ball league and capitalize on the Live Play market.

42.     In February 2010, Brewskee-Ball was set to hold its first national championship, a 64-person tournament that received attention in an article published in the New York Post.

43.     Days after the article was published, SBI, through its exclusive licensing agent, non-party Dimensional Branding Group ("Dimensional"), expressed interest in working with Full Circle to develop Brewskee-Ball and Full Circle's Skee-Ball Live Concept. Full Circle found

---

**Deleted:** the league with Skee

**Deleted:** branded Classic "Model-S"

**Deleted:** manufactured

**Deleted:** from

**Deleted:** ("Classic Lanes"). Classic Lanes are vintage games

**Deleted:** ticket redemption and mainly for

**Deleted:** , so Full Circle modified and refurbished the lanes to make them suitable for Skee-Ball Live Play themselves.¶

**Deleted:** its

**Deleted:** Full Circle

**Deleted:** with

**Deleted:** and obtaining additional Classic Lanes to use for Skee-Ball Live Play

**Deleted:** introduce different types of alley rollers

**Deleted:** Full Circle's goal is to make Skee-Ball a national sport, the type broadcast on ESPN.

**Deleted:** attain its goal, Full Circle needed the ability to obtain lanes that fulfilled its Live Play demands, and a new league where Skee-Ball could transition from a playful social sport to a bona fide, regulated sport.¶
To this end

**Deleted:** Skee-Ball

**Deleted:** Skee-Ball lanes

**Deleted:** and developed

**Deleted:** Skee-Ball

**Deleted:** ") (hereinafter, the "Skee-Ball Live Lane" and the NSBL are collectively referred to as the "Skee-Ball Live Concept").¶
In connection with its Skee-Ball Live Concept, FCU developed proprietary

**Deleted:** designed to facilitate Live Play.

**Deleted:** <#>The Live Play market helped shepherd Skee-Ball into the modern era and revitalized Skee-Ball as a game and a brand.¶
FCU intended to expand the existing Live Play market using its Skee-Ball Live Concept, a new and innovative way ... [2]

**Deleted:** , and SBI's Attempt to Quash Full Circle

**Deleted:** alley rollers

**Deleted:** in or around 2010.

**Deleted:** alley roller

**Deleted:** alley roller

**Deleted:** ,

**Deleted:** new

SBI's interest in Brewskee-Ball surprising, since SBI had passed on participating in its league concept five years prior, before Full Circle launched the league. At the time, SBI claimed to be a manufacturer uninterested in operations, and gave Full Circle its blessing to launch Brewskee-Ball and wished it luck.

44. For these reasons, Full Circle shared, confidentially, with Dimensional and SBI its business plans for the NSBL.

**Deleted:** <#>Though curious, SBI's timing was ideal. Full Circle needed a manufacturer to build Skee-Ball Live Lanes to expand its Live Play operations.¶

**Deleted:** <#>and Skee-Ball Live Concept.

45. Afterwards, Full Circle began negotiating the terms of an agreement whereby SBI granted Full Circle a license to use the Mark to develop the NSBL. Discussions included the manufacture of a custom skee-ball lane designed by Full Circle that would be used by rollers competing as part of the NSBL.

**Deleted:** Skee-Ball

**Deleted:** to fulfill

**Deleted:** Circle's Live Play needs.

46. During the course of negotiations, Full Circle disclosed, confidentially, to SBI the potential income streams associated with its Skee-Ball Live concept, including revenue projections for the NSBL and goal of broadcasting the NSBL on ESPN.

**Deleted:** Concept

**Deleted:** .

47. After learning the potential value of Full Circle's business, negotiations with SBI started to stall.

**Deleted:** Skee-Ball Live Concept

48. By July 2011, SBI informed Full Circle that the parties had reached an impasse and terminated negotiations. Full Circle focused on expanding its Live Play operations using its existing Brewskee-Ball brand.

**SBI Attempts to Squash Full Circle**

49.     On October 5, 2011, SBI sued Full Circle[3], claiming that Full Circle's use of Brewskee-Ball was unauthorized, and infringed upon and tarnished the Mark.[4] SBI sought damages and entry of a permanent injunction against Full Circle and cancellation of the Brewskee-Ball Mark in order to prevent Full Circle from operating Live Play, and put it out of business.

50.     To protect itself, Full Circle filed suit against SBI in the Eastern District of New York, Case No. 1:11-cv-05476, which included a claim for cancellation of the Mark, and also filed a Petition for Cancellation of the Mark on the grounds of genericness and opposed applications to register related marks with the USPTO.

51.     The disputes between SBI and Full Circle (the "SBI Litigation") went on for almost three years. During that time, Full Circle, headed by young entrepreneurs, exhausted all its resources to fight SBI, determined to save Full Circle's dream and its business.

---

[3] SBI filed suit against Full Circle in the Northern District of California, Case No. 3:11- cv- 04930-EDL, which was transferred to the Eastern District of New York, Case No. 1:11-cv- 06277.

[4] In its five-count Complaint, SBI asserted claims against Full Circle for: Cancelation of Trademark Registration (15 U.S.C. §§1064(3) and 1119), Trademark Infringement (15 U.S.C. §1114, *et seq.*); Dilution and Tarnishment of a Famous Mark (15 U.S.C. §1125(c)); False Designation of Origin (15 U.S.C. §1125(a)); and Common Law Unfair Competition.

---

**Deleted:** (the "SBI Litigation").¶

**Deleted:** Skee-Ball

**Deleted:** ,

**Deleted:** Brewskee-Ball

**Deleted:** <#>Full Circle was financially and emotionally unprepared for the SBI Litigation, but risked losing the business it loved and created.¶
The SBI Litigation

**To Save the Mark, SBI Grants Full Circle the
Exclusive Live Play License As Part of a Settlement**

52.     On July 17, 2014, the day before SBI's deadline to file its answer to Full Circle's petition for cancellation of the Mark, Full Circle and SBI settled the SBI Litigation by entering into the Settlement Agreement and License Agreement (ECF No. 35-1).

53.     As part of the Settlement Agreement, and in consideration for the perpetual Live Play License (specifically defined below), Full Circle transferred the domain name "www.skee-ball.com" to SBI, which it had maintained and used to promote Live Play since 2008. *See* Settlement Agreement at ¶7.1.

54.     Full Circle agreed never to challenge or contest the Mark on the basis that it is generic, or other grounds asserted in the SBI Litigation. *See Settlement Agreement at ¶3.1.*

55.     The Settlement Agreement likewise precluded SBI from challenging or contesting the Brewskee-Ball Mark. *See Settlement Agreement at ¶3.2. The Settlement Agreement included comprehensive releases of claims arising from or related to the SBI Litigation, and mutual covenants not to sue. See Settlement Agreement at ¶¶1.1, 1.2, 2.1 and 2.2.*

56.     Full Circle had reason to believe Dimensional interfered with its relationship with SBI and instigated the SBI Litigation. Despite this, Full Circle also agreed to release Dimensional, including its officers and directors, from any claims related to or arising out of the SBI Litigation. *See* Settlement Agreement at ¶1.2.

57.     Full Circle agreed to release Dimensional in reliance upon Dimensional's agreement to relinquish its right to administer Full Circle's Live Play License pursuant to a separate carve out agreement between Dimensional and SBI (the "Carve Out Agreement").

13

---

**Deleted:** after years of litigation

**Deleted:** Confidential

**Deleted:** (the "Settlement Agreement")

**Deleted:** the Confidential Trademark

**Deleted:** the "License Agreement"). The Settlement Agreement and License Agreement are incorporated by reference as if set forth fully herein.

**Deleted:** also included a promise by

**Deleted:** never to challenge

**Deleted:** contest

**Deleted:** ,

**Deleted:** (the "Release").

**Deleted:** provided the Release

**Deleted:** .

58.    The rights granted to Full Circle in the Settlement Agreement and License Agreement were crafted to permit Full Circle to exploit the Live Play market it created and grow its business, with SBI's support and without interference. *See* Settlement Agreement at ¶6.1 (instructing that the parties should describe the settlement as resulting in "a business relationship by the terms of which FCU has become a licensee of SBI for live league play"); *see* Settlement Agreement at Ex. D (the parties agreeing to jointly announce that Full Circle "will continue to advance creative concepts, including competitive SKEE-BALL® league play featuring only official SKEE-BALL® brand name machines").

59.    SBI also granted Full Circle an exclusive, perpetual and worldwide license to use the Mark for Live Play, which is broadly defined in the License Agreement as, "conducting, arranging, presenting, marketing and promoting live play leagues, teams, events and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball machines."

60.    It also granted Full Circle the right to other categories of permitted uses related to Live Play, including the right to develop and sell merchandise ("Live Play Merchandise"), an app ("App"), and to generate sponsorships and endorsements related to Live Play ("Sponsorships") (collectively with Live Play, the "Licensed Uses").

61.    SBI is entitled to certain royalties generated by the Live Play Merchandise, the App, and Sponsorships set forth in the License Agreement.

62.    Further, Section 4.2 of the License Agreement provides Full Circle the right to use certain identified phrases and slogans that include the Mark, such as "National Skee-Ball League", as well any other future phrases and slogans including the Mark in connection with Live Play.

14

**Deleted:** Full Circle's Exclusive Live Play License¶

**Deleted:** ensure

**Deleted:** .

**Deleted:** The License Agreement

**Deleted:** in connection with Skee-Ball "

**Deleted:** ,"

**Deleted:** " (the "Live Play License").

**Deleted:** The Live Play License

**Deleted:** certain

**Deleted:** licensed

**Deleted:** , such as

**Deleted:** Live Play

**Deleted:** a Live Play scoring

**Deleted:** Scoring

**Deleted:** directly

**Deleted:** In exchange,

**Deleted:** Scoring

**Deleted:** The value

**Deleted:** is directly tied

**Deleted:** Full Circle's ability to profit from

**Deleted:** . Critically, Full Circle cannot conduct Skee-Ball Live Play at the scale

that Full Circle wanted to adopt, subject SBI's approval, which SBI could not unreasonably withhold. *See* License Agreement at ¶4.2.

63. Additionally, Section 5.2 requires Full Circle to operate Live Play using Skee-Ball branded skee-ball machines built by SBI or a successor, unless SBI "no longer manufactures" or is "unable to fulfill [Full Circle's] needs for alley roller machines," and if, after Full Circle's best efforts, it becomes "impractical or unreasonable" for Full Circle to obtain the Skee-Ball Lanes it needs from SBI. *See* License Agreement at ¶5.2.

64. The restrictive covenants set forth in the Settlement Agreement and License Agreement, read together, prohibit SBI from competing with Full Circle, directly or indirectly, in any market or venue, anywhere in the world. *See* License Agreement at ¶5.3 (SBI promises it will not "directly or indirectly, during the Term and in the Territory, operate, sponsor, or endorse a business, involving Live Play"); *see* License Agreement at ¶10 (defining "Territory" is as "venues around the World for Live Play"); *see* Settlement Agreement at ¶4.1 (SBI promises it will not "directly or indirectly, operate, sponsor, or endorse a business, anywhere in the world, involving Live Play ...").

65. SBI and Full Circle each agreed to use their "best efforts to promote and to coordinate the development, creation, distribution, sale, advertising, and promotion of the Licensed Uses." *See* License Agreement at ¶5.1, ¶5.2.

66. The License Agreement specifically permitted Full Circle's use of various mediums, including the internet, radio and television, to promote Live Play, as Full Circle had been doing since 2006, and permitted Full Circle to expand Live Play marketing and promotions onto additional mediums in the future:

15

Pursuant to the license granted to FCU herein under Section 3.1, and subject to the restrictions and exclusions set forth below, the Parties acknowledge and agree that ***FCU may use the SKEE-BALL Trademark, for advertising and promotional purposes in any and all mediums now known or hereafter devised,*** so long as such use is solely in connection with and in compliance with the Licensed Uses above, and the restrictions, conditions and exclusions below.

License Agreement at ¶3.2 (emphasis added).

For the avoidance of doubt, **FCU has the right to use the SKEE-BALL Trademark, per Paragraph 3.2, via the Internet, radio, television, or other communication and media outlets, whether now known or hereafter created, developed or devised, for promotional and marketing purposes only of its Live Play business** (including for the purpose of allowing Live Play players to enroll in / sign up for Live Play) and Live Play Merchandise.

License Agreement at ¶4.5 (emphasis added).

67.    The License Agreement is binding upon and inured to the benefit of SBI's successors, representatives, and assigns. *See* License Agreement at §9.3.

68.    However, the Settlement Agreement included a broad anti-assignment provision that makes any assignment made without the prior written consent of the other party void. *See* Settlement Agreement at ¶8.

**Full Circle Consents to the Assignment to Bay Tek in Reliance on Bay Tek's Promises**

69.    In August 2015, Pavony contacted Sladek, SBI's President, to ask whether SBI still manufactured S-Model Lanes and request a call "to discuss purchasing custom lanes from [SBI] moving forward".

70.    In response, Sladek informed Pavony that SBI had stopped manufacturing S-Model Lanes.

16

**Deleted:** upon transfer or

**Deleted:** , with Full Circle's

**Deleted:** .

**Deleted: Bay Tek Acquires the Mark, Subject to SBI's Obligations to**

**Deleted:** ¶
Full Circle planned to use its Live Play License to launch the Skee-Ball Live Concept, which it had presented to SBI prior to the SBI Litigation. Full Circle's license permitted it to develop the NSBL and its key component, a custom Skee-Ball Live Lane.¶

**Deleted:** September

**Deleted:** , and

**Deleted:** Joe Sladek ("Sladek"), discussed specifications for the custom Skee-Ball Live Lane.

**Deleted:** During the conversation

**Deleted:** planned to sell its business assets to Bay Tek, the company that launched Beer Ball, but

**Deleted:** already

**Deleted:** the game by this time.

71.     On November 25, 2015, Sladek informed Pavony during a telephone call that "a very, very large" manufacturer in the industry approached him to buy SBI. Sladek assured Pavony that it would be "interested in helping [Full Circle] with any equipment that [Full Circle] may need, in any way shape or form, to launch a league." The manufacturer was Bay Tek.

72.     Sladek reminded Pavony that, pursuant to the Settlement Agreement, SBI needed Full Circle's consent in order to disclose or assign the Settlement Agreement and License Agreement to Bay Tek.

73.     On December 18, 2015, Pavony spoke to Gaeton Philippon ("Philippon"), Bay Tek's Chief Executive Officer, via telephone and explained Full Circle's goals of using its Live Play License to develop the NSBL with technology and custom Skee-Ball Live Lanes throughout the country, as well as local, regional, and national tournaments and events – ultimately turning Skee-Ball into a ubiquitous bar game and a bona fide, national sport televised on ESPN.

74.     Pavony told Philippon he wanted to confirm, before executing the Consent to Assignment, that Bay Tek intended to act as Full Circle's "manufacturing partner" in "work[ing] together on building the future of what the NSBL Lanes are going to look like".

75.     Philippon so confirmed, and also disclosed that Sladek had shared with him the Settlement Agreement and License Agreement.

76.     Philippon agreed that, if Bay Tek acquired SBI or the Mark, Bay Tek would manufacture Skee-Ball lanes for Full Circle and Full Circle could broadcast its tournaments, league play, and events.

77.     In reliance on Philippon's representations that Bay Tek would help facilitate Full Circle's goals, including an agreement to build the custom lanes needed to reach those goals and

17

**Deleted:** Bay Tek was well suited to help Full Circle use its Live Play License and build custom Skee-Ball Live lanes, and …

**Deleted:** willing to do so.

**Deleted:** Later,

**Deleted:** requested

**Deleted:** to the assignment of the Agreements, explaining that SBI intended to

**Deleted:** and transfer its rights and obligations under the Agreements

**Deleted:** upon the closing of the sale of its assets.

**Deleted:** 3

**Deleted:** at the time, explaining

**Deleted:** in bars

**Deleted:** Bay Tek's representation

**Deleted:** it

to Full Circle's broader business plans to promote Live Play through the broadcast of tournaments, league play, and events, Full Circle consented to the disclosure and assignment of the Settlement Agreement and License Agreement to Bay Tek.

78.    The transaction between Bay Tek and SBI closed on or around February 23, 2016.

79.    Upon information and belief, Bay Tek's acquisition of SBI left two alley roller manufacturers remaining in the United States: Bay Tek and non-party Innovative Concepts in Entertainment, Inc. ("ICE").

**Full Circle's Development of the NSBL Technology**

80.    By this time, Full Circle had fine-tuned its concept for the NSBL. Full Circle developed a unique and proprietary technology it planned to employ for the NSBL to facilitate and enhance gameplay (the "NSBL Technology").

81.    The NSBL Technology is not generally known by game manufacturers or anyone else, and had never been used in connection with skee-ball or other games.

82.    The NSBL Technology provides independent economic value to Full Circle in a number of ways.

83.    First, it facilitates cashless payments of games, thereby providing transparency into revenue generated by each game, and the ability to easily track and collect a portion thereof as a reoccurring revenue stream.

84.    Second, it facilitates a type of gameplay whereby games in different locations could be used for networked, competitive tournaments and competitions, without having to install expensive hardware.

18

85.     Third, it enhances Full Circle's ability to scale the NSBL while maintaining control of the environment.  The NSBL Technology, which was to be incorporated into the Skee-Ball Live Lane, enabled Full Circle to identify and address game servicing issues remotely, which created efficiencies in operating and maintaining games by reducing reliance on operators.  Full Circle's ability to address operational issues remotely.

86.     Fourth, the NSBL Technology enabled real time, remote competition, so players could play in Live Play leagues, events, competitions, and tournaments regardless of where they were.  This gameplay functionality, in addition to ease of operations, increased Full Circle's ability to sell the Skee-Ball Live Lanes and grow the NSBL by making the Skee-Ball Live Lane attractive to operators and players.

87.     Finally, it allowed Full Circle to license the software to others for use in connection with other games as a potential source of reoccurring revenue.

88.     Full Circle invested a significant amount of time and resources to develop the NSBL Technology. Full Circle's Chief Technology Officer, Eric Wikman ("Wikman") left a high-paying job as an executive at a software development firm to write the software for the NSBL Technology, which took years and multiple iterations to completely develop.  In addition, the functionality offered by the NSBL Technology was created utilizing information learned by Full Circle over a decade of operating Live Play, which enabled Full Circle to design an experience and product uniquely tailored for the Live Play market.

89.     In addition, Full Circle spent significant time and expense developing marketing material, business models and prototypes to solicit investors for the NSBL including, but not limited to, the following documents:  (1) 2016 National Skee-Ball League Business Deck; (2) Bay

19

Tek Equity Models; (3) September 2017 NSBL Deck; (4) 2016 Prototype Lane; (5) 2017 Prototype Lane; and (6) NSBL App Storyboards (the "Confidential Information").

90.    The Confidential Information and NSBL Technology are disclosed only to individuals who agree to maintain the information confidential pursuant to a written nondisclosure agreement, and not made publicly available.

20

**Full Circle Meets with Bay Tek to Discuss and Eventually Reach
an Agreement to Manufacture Lanes and Share Revenue**

91.    With Bay Tek's proposed transaction with SBI on the horizon, Full Circle needed to know whether and to what extent Bay Tek intended to participate in the development and manufacture of the Skee-Ball Live Lane.

92.    Prior to such discussions, Full Circle and Bay Tek executed a written Mutual Non-Disclosure Agreement (the "NDA"). A copy of the NDA is attached as Exhibit 1.

93.    The NDA was executed by Holly Hampton ("Hampton"), Bay Tek's Director of Innovation and Defendant Larry Treankler's niece.

94.    Pursuant to the NDA, Bay Tek agreed to use Full Circle's Confidential Information "solely for the Purpose" "of conducting discussions regarding possible partnership" to manufacture or develop the Skee-Ball Live Lanes for the NSBL.

95.    The NDA defines Confidential Information broadly:

"Confidential Information" any data or information that is proprietary to whichever of the Parties is disclosing its information (the "Disclosing Party") to the other Party (the "Receiving Party") and which is not generally known to the public, whether in tangible or intangible form, whenever and however disclosed, including, but not limited to marketing strategies, plans, financial information, projections, operations, sales estimates, business plans and performance results relating to the past, present or future business activities, plans for products or services, and customer or supplier lists, scientific or technical information, invention, design, process, procedure, formula, improvement, technology or method, concepts, reports, data, know-how, works-in-progress, designs, development tools, specifications, computer software, source code, object code, flow charts, databases, inventions, information and Trade Secrets, as defined in the Wisconsin Trade Secret Act, §134.90, Wis. Stat., and, further, any other information that should reasonably be recognized as confidential information of the Disclosing Party  Confidential Information need not be novel, unique, patentable, copyrightable or constitute a Trade Secret in order to be designated Confidential Information. The Receiving Party acknowledges that the Confidential Information of the Disclosing Party proprietary to the Disclosing Party, has been developed and obtained through great

21

**Deleted:** <#>Full Circle and Bay Tek began a series of conversations aimed at finding ways to cooperate within the framework of the License Agreement.¶
To that end, on March 22, 2016

**Deleted:** entered into

**Deleted:** In

efforts by the Disclosing Party and that Disclosing Party regards all of its Confidential Information as Trade Secrets.

*See* NDA at ¶1.

96.     On April 13, 2016, Full Circle traveled to Bay Tek's headquarters in Pulaski, Wisconsin for meetings with Philippon, Holly Hampton ("Hampton"), Bay Tek's Director of Innovation, Lance Treankler, Treankler's son who worked for Innovation and Marketing, and other individuals in Bay Tek's finance and research and development ("R&D") departments.

97.     At a meeting in Pulaski, Full Circle confidentially presented to Bay Tek details about how the NSBL would operate, its income streams, market opportunities and projected revenue ("Oral Confidential Information"). Full Circle also explained the NSBL Technology and demonstrated certain of its features using its 2016 Prototype Lane.

98.     Full Circle provided Bay Tek its 2016 National Skee-Ball League Business Deck ("2016 NSBL Pitch Deck"), which was marked "CONFIDENTIAL". A copy of the 2016 NSBL Deck is attached hereto as Exhibit 2.

99.     The pitch deck included images from past Live Play events, identified past sponsors, such as MillerCoors®, and illustrated how Full Circle planned to use its proprietary technology to connect players, and live stream competitions using its Skee-Ball Live Lanes, with the goal of broadcasting Live Play on ESPN.

100.    During the first meeting in Pulaski, Full Circle learned Bay Tek was already familiar with Full Circle and its operations. Philippon admitted Bay Tek modeled Beer Ball after Brewskee-Ball, and believed Beer Ball would be the next big thing.

**Deleted:** a meeting

**Deleted:** Larry

**Deleted:** ("Treankler"), the owner and Chairman of Bay Tek…

**Deleted:** that

**Deleted:** its business plan for the Skee-Ball Live Concept, including …

**Deleted:** .*
FCU also disclosed to Bay Tek details about the technology developed by

**Deleted:** to facilitate its Skee-Ball Live Concept. Among other things, the technology enabled real time, remote competition, so players could play in Live Play leagues, events, competitions and tournaments regardless of where they were.…

**Deleted:** visit

**Deleted:** . Full Circle later learned Bay Tek abandoned the Live Play market because it was unable to create a cohesive league culture or establish leagues to support the product

101.   It also learned Bay Tek thought Beer Ball would be the next big thing, but ultimately Bay Tek couldn't operate or scale Beer Ball, "and so we failed".

102.   Full Circle explained how the NSBL Technology addressed this issue, making the NSBL easier to scale.

103.   While holding up both agreements, Philippon, asked Full Circle "what these two documents say.... the settlement and the licensing agreement" and, "What if we look at our lineup of projects, and we say, 'ya know guys, from an ROI standpoint and everything it's not there, we're out, we're not going to build the lanes.' What would you guys do?"

104.   Full Circle told Philippon that if Bay Tek decided not to build Full Circle the lanes, the License Agreement permitted it to get the lanes elsewhere and continue to use the Skee-Ball brand.

105.   Bay Tek never raised an objection or called Full Circle's understanding of its rights into question. Instead, Bay Tek, through its officers and agents, knowingly and intentionally made representations or omissions confirming Full Circle's understanding of its rights so that Full Circle would continue to disclose to its Confidential Information and NSBL Technology.

106.   Upon information and belief, Philippon was terminated from Bay Tek shortly after Full Circle's visit to Pulaski.

107.   In May 2016 Hampton informed Full Circle that Treankler had assumed the role of Bay Tek's Chief Executive Officer, consolidating his control over Bay Tek.

**Bay Tek Executes on its Plan to Learn and Steal Full Circle's Business,
While Concealing its True Intentions**

23

---

**Deleted:** soon

**Deleted:** the meeting with

**Deleted:** Circle in

**Deleted:** Afterwards,

**Deleted:** The parties once again discussed that

108.   Over the next several months, Bay Tek continued to gather information about Full Circle's current business operations, as well as its plans for the NSBL.

109.   To that end, Full Circle disclosed specifications for the custom Skee-Ball Live Lanes to Hampton, Lance Treankler and Bay Tek's R&D team, specifically the R&D Project Development and Concept Development Manager Eric Schadrie ("Schadrie").

110.   On January 19, 2017, Full Circle discussed with Bay Tek whether it was interested in investing in the development or manufacture of the Full Circle's custom lane or funding the project through a revenue sharing arrangement.

111.   Bay Tek did not agree at that time to manufacture custom lanes pursuant to Full Circle's specifications, but it authorized Full Circle to build a prototype custom lane by modifying an existing vintage lane or one of Bay Tek's "New Classic" Skee-Ball lanes (the "Stock Lane"), which Bay Tek offered and agreed to send to Full Circle.

112.   Bay Tek expressed no objection to Full Circle securing investors from within the gaming industry, except for ICE, Bay Tek's sole remaining competitor in the alley roller manufacturing market.

113.   On January 21, 2017, Treankler reported to Bay Tek's "Leadership Team", via email, that Full Circle asked Bay Tek to "fund the development of the first 25 of a new proprietary design for them" but we "stayed the course and said no."

114.   He recognized that there is "a significant social media component to what [Full Circle] is doing" and confirmed he "gave them the option to take a new [Stock Lane] to modify but quoted at least the end of March for us to get it to them."

24

115.   By March 2017, Full Circle had completed the development of the NSBL Technology, and no longer needed any help with R&D. Full Circle would be writing all the software for the NSBL Technology. Bay Tek's role would be limited to building the structure of the game.

116.   After learning about the limited scope of work, Bay Tek delivered the Stock Lane to Full Circle. Full Circle began modifying it to complete a prototype that would demonstrate its NSBL Technology for potential investors.

117.   On July 17, 2017, at Full Circle's request, representatives from Bay Tek, including Treankler, Hampton and Schadrie, met Full Circle in Austin to see the prototype of the Skee-Ball Live Lane, and to observe Full Circle's Live Play operations.

118.   In Austin, Bay Tek learned Full Circle was developing the prototype Skee-Ball Live Lane with help from Mixer Design Group, a design and engineering firm that specializes in products for global electronics companies ("Mixer"). Full Circle and Mixer demonstrated the prototype's features for Bay Tek, and explained design specifications and manufacturing needs.

119.   After observing Full Circle's operations in Austin, including a Brewskee-Ball Live Play competition, Bay Tek expressed, for the first time, an interest in handling the R&D and manufacture of the Skee-Ball Live Lanes, including the prototype.

120.   Bay Tek urged Full Circle to keep R&D and financing for the Skee-Ball Live Lanes in house with Bay Tek, and told Full Circle it did not need the initial investors it had courted.

121.   Before leaving Austin, Bay Tek requested that the parties' discussions continue to determine the structure for Bay Tek's manufacture of the lanes and Full Circle's method of acquisition of the lanes.

122.    The parties began initial discussions regarding terms of a contemplated revenue-sharing agreement, under which Bay Tek would manufacture custom Skee Ball Live lanes for Full Circle, which Full Circle would pay for in the form of a promise to share the revenue generated by each lane. The parties initially discussed a possibility that Bay Tek would produce twenty-five (25) Skee-Ball Live Lanes as a test of a revenue share arrangement.

123.    Bay Tek later agreed to expedite the manufacture of eleven (11) Skee-Ball Live prototype lanes so that they could be delivered in time to use at "The BEEB," the National Skee-Ball Championship, which was scheduled for October 26-29, 2017 at Full Circle Bar in Austin (the "National Championship").

124.    Bay Tek explained that, due to the turnaround time, the eleven (11) lanes would not incorporate all Full Circle's Live Play design specifications, and would serve as prototype lanes to test Full Circle's concept (the "Skee-Ball Live Prototype Lanes").

| Deleted: However |
|---|

125.    These eleven (11) Skee-Ball Live Prototype Lanes were initially contemplated as part of the twenty-five (25) lanes promised by Bay Tek.

126.    Shortly thereafter, the parties discussed increasing the number of initial lanes that would be produced under the test arrangement to thirty-six (36), so that Bay Tek and Full Circle had twenty-five (25) production model lanes, incorporating all Full Circle's Live Play specifications, in addition to the eleven (11) lanes that were being expedited (collectively, the "Skee-Ball Live Lanes").

127.    On September 5, 2017, at Bay Tek's request, Full Circle traveled to Bay Tek headquarters in Pulaski, Wisconsin to further discuss Full Circle's business and marketing plans

for the Skee-Ball Live Play Concept and to check on the progress of the Skee-Ball Live Prototype Lanes.

128.    During this visit, Full Circle and Treankler, on behalf of Bay Tek, orally agreed to the final terms of the revenue share agreement (the "Revenue Share Agreement"). The parties agreed that Full Circle would not need to pay Bay Tek upfront for the lanes, but instead would share 15% of "top line revenue" generated from each of the lanes until 150% of Bay Tek's manufacturing costs had been recouped.

129.    Revenue was to be generated through payments collected using Full Circle's Scoring App and a credit card reader installed on the lanes. Bay Tek agreed to develop the computer code needed for the lanes to collect credit card payments, and deliver it to Full Circle after the National Championship.

130.    Under the terms of the Revenue Share Agreement, Bay Tek agreed to specifically manufacture thirty-six (36) Skee-Ball lanes for Full Circle.

131.    Bay Tek wanted Full Circle to use the thirty-six (36) Skee-Ball Live Lanes to prove its business model for the Skee-Ball Live Concept.

132.    Full Circle projected that each lane would generate $1,200 per month based on its historical revenue.

133.    On September 5, 2017, Pavony asked Treankler to confirm the terms of the Revenue Share Agreement.

134.    Pavony asked Treankler, "So, just to be clear, we have these eleven (11) prototype lanes that will ultimately become production model lanes in the real world doing their thing, and

27

then we have the twenty-five (25) that you already agreed to on top of those, plus more? We're talking about that little showcase first."

135.    Treankler responded, "Correct."

**Deleted:** Treanker

136.    Treankler added, "Yeah, you should want to prove that model as much as I want you to prove it."

137.    Again, Pavony asked Treankler to confirm the terms of the Revenue Share Agreement.

138.    Pavony asked Treankler, "And so, from our standpoint then, you're agreeing to do the rev share on these initial eleven (11) plus the twenty-five (25), and maybe more, but no help right now with operational cash for us to roll that out? That's up to us to figure out?"

139.    In response, Treankler said, "Yup."

140.    Also during this September 2017 visit, Full Circle disclosed additional proprietary and confidential details regarding its business and marketing plans, including the details of its App

**Deleted:** Scoring

and new software technology it developed for integration into the Skee-Ball Live Lanes.

141.    After the presentation, Treankler confirmed the terms of the Revenue Share Agreement during a meeting with Full Circle. The meeting is recorded on video.

142.    Treankler assured Full Circle that Bay Tek planned to honor the License Agreement and had no intention of trying to operate Skee-Ball Live Play, other than through Full Circle.

**Full Circle Showcases Skee-Ball Live Lanes,**
**the "Lane of the Future," at the National Championship**

143.    In the weeks that followed the September 2017 meeting, Full Circle continued to work with Bay Tek's R&D team on specifications for the Skee-Ball Live Lanes.

28

144.    On September 22, 2017, Full Circle sent Schadrie, from Bay Tek's R&D department, a logo and related art for use with Skee Ball Live. The logo and related art used the phrase and slogan "Skee-Ball Live" ("Skee-Ball Live Art").

145.    It was mutually understood and agreed that Full Circle developed the "Skee-Ball Live" brand and Skee-Ball Live Art for its use in connection with Full Circle's Skee-Ball Live Concept pursuant to the License Agreement.

146.    On October 2, 2017, Bay Tek's R&D department confirmed that the eleven (11) Skee-Ball Live Prototype Lanes for the National Championship would not have credit card readers and inquired whether "the next 25 [Bay Tek] build[s] for [Full Circle]" needed them.

147.    On or around October 18, 2017, Bay Tek delivered ten (10) Skee-Ball Live Prototype Lanes affixed with the Skee-Ball Live Art to Full Circle in Austin. The parties mutually agreed that Bay Tek could keep the eleventh (11th) lane for use by Bay Tek R&D to facilitate developing the production model Skee-Ball Live Lanes, and deliver the lane to Full Circle later.

148.    The Skee-Ball Live Prototype Lanes were used at the National Championship.

149.    The Skee-Ball Live Prototype Lanes featured proprietary software that allowed for new types of gameplay and tracked rolling achievements. The internet-connected Skee-Ball Live Prototype Lanes included cameras that enabled players to compete with each other, even if playing at different times or locations.

**Deleted:** in bars across the country

**Deleted:**  using Full Circle's Scoring App

150.    The National Championship was a resounding success, particularly due to the Skee-Ball Live Prototype Lanes and the debut of the new Skee-Ball Live experience.

151.     Representatives from Bay Tek, including Hampton and Schadrie, attended the National Championship, observing Full Circle's operations and experiencing firsthand the Live Play culture Full Circle created and the event's success.

152.     After the National Championship, Full Circle and Bay Tek continued to work on the Skee-Ball Live Lanes, referring to the project as "Skee-Ball Live."

153.     On November 6, 2017, Schadrie emailed Pavony to discuss changes to be incorporated into "the product that will be Skee-Ball Live (at least for the next 25 units)," stressing it "will be the design that will go down the production line - hopefully many, many times."

154.     On or around the same day, the Austin American Statesman newspaper published "Holy rollers: Austin's competitive Skee-Ball players are building the future of the sport," an article about the National Championship and the Skee-Ball Live Prototype Lanes (the "Statesman Article").

155.     The Statesman Article heralded the Skee-Ball Live Prototype Lanes as the "lane of the future," and applauded it for "bringing new technology to the world of Skee-Ball."

156.     Shortly after it was published, Pavony sent the Statesman Article to Hampton, who had expressed enthusiasm about the National Championship to Full Circle. Full Circle also sent the Statesman Article to Schadrie, who then forwarded the article within Bay Tek.

**After Watching the Success of the National Championship,
Bay Tek Decides to Place Skee-Ball Live Project "On Hold"**

157.     After the National Championship, the tenor of Bay Tek's communications with Full Circle changed.

30

158.   Full Circle sent a number of emails to Bay Tek's R&D team discussing changes and additions to the production model Skee-Ball Live Lanes, and a timeline for rolling them out.

159.   In response, Schadrie, previously eager to confirm specifications for the production model Skee-Ball Live Lanes, expressed reluctance to engage with Full Circle.

160.   On November 30, 2017, Schadrie explained there were "some loose ends to tie up (at a higher level) prior to …further discussing and developing [Skee-Ball Live]."

161.   Hampton and Schadrie shifted focus onto the Skee-Ball Live Prototype Lanes, asking Full Circle for details about the lanes' location and performance.

162.   On December 21, 2017, Full Circle sent Bay Tek its six-month plan, which included Full Circle's receipt of the remaining twenty-five (25) production model Skee-Ball Live Lanes pursuant to the Revenue Share Agreement.

163.   On the same day, Bay Tek, through Hampton, asked Full Circle for permission to host a 64-person competitive Skee-Ball tournament to promote the Green Bay Blizzards, an indoor football team owned by Treankler (the "Blizzard Event").

164.   In making the request, Hampton acknowledged Bay Tek was seeking permission from Full Circle to engage in conduct that violated the License Agreement and infringed upon Full Circle's Live Play License, since Full Circle had "the exclusive right to Skee-Ball Live Play."

165.   Full Circle told Hampton that its consent was contingent upon Bay Tek's execution of a written document that made clear the permission Full Circle was extending was solely for the Blizzard Event. Full Circle wanted documentation to confirm the parties understood it was a one-time agreement, so as not to be seen as waiving any of its rights under the License Agreement.

| Deleted: it would agree to |
|---|
| Deleted: Tek conducting the Blizzard Event if Bay Tek executed… |

166.   According to Hampton, Bay Tek preferred to conduct business "with just a handshake . . . with no legal documentations." Hampton reported that Bay Tek was upset by Full Circle's request to confirm the one-time agreement in writing.

167.   On January 3, 2018, citing this perceived slight, Hampton informed Full Circle that Bay Tek had decided to place the Skee-Ball Live project "on hold."

**The Relationship Between Full Circle and Bay Tek Devolves
after Bay Tek Acquires Dimensional, as Bay Tek Denies the Existence of the
Revenue Share Agreement and Breaches its Obligations to Full Circle**

168.   Bay Tek publicly announced that it had acquired Dimensional on January 3, 2018, the same day it informed Full Circle it had decided to place Skee-Ball Live "on hold."

169.   After Bay Tek acquired Dimensional, Bay Tek refused to respond to Full Circle's requests for information regarding the status of the Skee-Ball Live project or explain why Bay Tek had purportedly made an organizational decision to stop working on it.

170.   Bay Tek proceeded to host a Skee-Ball competition involving the Green Bay Blizzard, conduct it previously admitted violated the terms of the License Agreement and infringed upon Full Circle's Live Play License.

171.   Afterwards, Bay Tek continued to ignore correspondence from Full Circle, hindering Full Circle's ability to perform its obligations and operate its business.

172.   Unsettled, Full Circle sought assurances from Bay Tek that it planned to perform under the terms of the Revenue Share Agreement and manufacture the additional twenty-five (25) production model Skee-Ball Live Lanes that remained undelivered.

173.   Bay Tek failed to respond to Full Circle's requests for assurances and remained silent for weeks.

32

**Deleted:** Sometime in late 2017,

**Deleted:** , the licensing agent used by SBI that describes itself as specializing in "the toy and interactive markets."
Bay Tek announced the acquisition

**Deleted:** to promote

174.    In March 2018, *Ad Age* published an article featuring Full Circle's Scoring App, the same app Full Circle utilized at the National Championship with Bay Tek's knowledge and approval. The article lauded the Scoring App's Skee-Ball Live Play functionalities for innovating and enhancing the game.

175.    Days after the article was published, Bay Tek, through its attorney, sent Full Circle a letter demanding that it disclose proprietary information to prove its Scoring App complied with the License Agreement. It was the first time Full Circle had heard from Bay Tek in months.

176.    Then, rather than clearly identifying its issues with Full Circle, or working to resolve them, Bay Tek took a series of inconsistent and untenable positions to justify nonperformance under the Revenue Share Agreement.

177.    First, Bay Tek threatened to repossess the ten (10) Skee-Ball Live Prototype Lanes in Full Circle's possession if Full Circle did not pay for them at a price higher than agreed under the Revenue Share Agreement (the "March 2018 Letter").

**Deleted:** ,

178.    In the March 2018 Letter, Bay Tek acknowledged the existence of the Revenue Share Agreement, but contended Full Circle was in violation of its terms. Bay Tek claimed Full Circle breached the agreement by failing to pay Bay Tek its portion of Lane Revenue, even though Bay Tek never provided Full Circle the information it needed to remit the payment, despite Full Circle's requests.

179.    The next month, after Full Circle proved the purported breach baseless, Bay Tek rejected Full Circle's tender of Bay Tek's portion of Lane Revenue, claiming no Revenue Share Agreement existed (the "April 2018 Letter").

180.    In the April 2018 Letter, Bay Tek threatened to sue Full Circle if its App went live

without being in "strict compliance" with the License Agreement, but ignored Full Circle's

entreaties to identify what aspects of the app purportedly violated the License Agreement.

181.    Over the following four months, Bay Tek ignored eleven (11) separate emails sent

by Full Circle and continued to refuse Full Circle's tender of Lane Revenue.

182.    Meanwhile, Bay Tek promoted Live Play leagues, events and tournaments

conducted by competitors of Full Circle on numerous occasions, over Full Circle's protests,

conduct Hampton recognized is in violation of Bay Tek's non-competition obligations under the

License Agreement, and which continues to this day.

183.    On August 6, 2018, Wikman, Full Circle's Director of Technology, sent Bay Tek a

summary of the performance of the ten (10) Skee-Ball Live Prototype Lanes, detailing lane

revenue that tracked Full Circle's initial revenue projections.

184.    In the email, Wikman asked Bay Tek to accept tender of the Lane Revenue, noting

that the lanes' performance proved Full Circle's Skee-Ball Live model.

185.    Almost two weeks later, Bay Tek, through its attorney, asked Full Circle to send

the rejected funds to Bay Tek again. Full Circle did so.

186.    After Bay Tek accepted the Lane Revenue, Bay Tek asserted for the first time that

it never agreed to manufacture and deliver (36) Skee-Ball Live Lanes pursuant to the Revenue

Share Agreement.

187.    Bay Tek asked Full Circle to sign a new revenue share agreement, limited to the

ten (10) Skee-Ball Live Prototype Lanes already in Full Circle's possession. Full Circle declined

the request.

34

**Deleted:** Scoring

**Deleted:** Eric

**Deleted:** ("Wikman"),

188.    On November 11, 2018, Bay Tek changed its name from Bay Tek Games, Inc. to Bay Tek Entertainment, Inc. Bay Tek explained the new name described its transition to a multi-platform entertainment company, a transition facilitated by its new licensing agent Dimensional.

**Bay Tek Kills Full Circle's Agreement to Have a
Third-Party Buy or Manufacture Skee-Ball Live Lanes**

189.    After Bay Tek reneged on its agreement to manufacture lanes, Full Circle sought a third-party partner to help it acquire or manufacture its custom Skee-Ball Live Lanes, as was its right under the License Agreement.

190.    In August 2018, Full Circle turned to George Petro ("Petro"), the Chief Executive Officer of Play Mechanix, Inc. ("Play Mechanix"), an arcade game manufacturer who had previously expressed interest in investing in Full Circle's Skee-Ball Live Concept.

191.    Play Mechanix agreed in principle with Full Circle to purchase stock Classic Lanes from Bay Tek and pay all the expenses to modify the lanes for Live Play, pursuant to a revenue share agreement with Full Circle (the "Play Mechanix Agreement").

192.    Unlike Bay Tek, a company that focused on the family entertainment center market, Play Mechanix had experienced success placing arcade games into bars, and had a network of 1,750 operators within the bar market. Play Mechanix agreed to leverage its network of operators to promote Full Circle's Skee-Ball Live Concept, providing Full Circle instant access to thousands of potential locations to place its Skee-Ball Live Lanes.

193.    Bay Tek knew Play Mechanix had the capability to modify Bay Tek's stock alley rollers to create Skee-Ball Live Lanes, since Bay Tek had turned to Play Mechanix about its

capabilities for Beer Ball in the past. Bay Tek also knew Play Mechanix was well-positioned to help Full Circle expand Skee-Ball Live Play.

194.   However, when Petro reached out to Rick Rochetti ("Rochetti"), Bay Tek's Director of Sales, he learned there was "no opportunity" for Play Mechanix to either manufacture the lanes itself, or acquire the stock lanes from Bay Tek and modify them. In other words, Bay Tek threatened Petro to prevent Play Mechanix from doing a deal with Full Circle.

195.   With no path to move forward, Play Mechanix pulled out of the agreement with Full Circle.

**Bay Tek Finally Makes its Motive Clear:**
**To Take Back Full Circle's License so it Can Conduct Live Play Itself**

196.   By the end of 2018, it had been almost three (3) years since Bay Tek acquired the Mark. Full Circle had only been provided ten (10) Skee-Ball Live Prototype Lanes, with no indication Bay Tek intended to manufacture the additional production model Skee-Ball Live lanes promised, or otherwise work with Full Circle, or even allow Full Circle to acquire lanes through some other means.

197.   In December 2018, Full Circle communicated its serious concerns to Bay Tek, including Bay Tek's breaches of the License Agreement and Revenue Share Agreement.

198.   Full Circle asked for Bay Tek's consent to engage another manufacturer to build the Skee-Ball Live Lanes, since Bay Tek would not.

199.   In response, Treankler, on behalf of Bay Tek, asserted that since Bay Tek is still making Skee-Ball Lanes, it would be a violation of Section 5.2 of the License Agreement for Full Circle to engage another manufacturer. Treankler said Bay Tek's attorneys believed such a

36

**Deleted:** It

violation would render Full Circle's Live Play License "null and void." He requested an in-person meeting with Full Circle to discuss "business solutions."

200.    On January 17, 2019, at Treankler's request, Pavony and Wikman, on behalf of Full Circle, met with Treankler in New York (the "January 2019 Meeting").

> **Deleted:** City

201.    At the January 2019 Meeting, Treankler offered Full Circle a new licensing agreement with Bay Tek if Full Circle agreed to terminate the existing Live Play License.

202.    The new license proposed by Bay Tek limited Full Circle to conducting activities in "bars or taverns" and was limited to a period of three (3) years. As part of the deal, Bay Tek would manufacture and provide Full Circle forty (40 ) "Brewskee-Ball Live Lanes"; Full Circle would be allowed to keep the Skee-Ball Live Prototype Lanes in its possession so long as it rebranded them to "Brewskee-Ball Live".

> **Deleted:** Under the
>
> **Deleted:** new licensing agreement
>
> **Deleted:** additional
>
> **Deleted:** ."

203.    In its proposal, Bay Tek projected the 50 "Brewskee-Ball Live" lanes would generate $778,838 per annum in revenue, an amount consistent with Full Circle's revenue projections and the actual revenue generated by the Skee-Ball Live Prototype Lanes.

204.    In exchange, Full Circle would have to relinquish its right to use the Skee Ball Mark and operate Live Play solely under the Brewskee-Ball brand.

> **Deleted:** give up
>
> **Deleted:** would

205.    Finally, Treankler admitted Bay Tek wanted to terminate Full Circle's Live Play License so it could enter the Live Play market and operate Live Play itself, specifically, but not exclusively, in casinos.

> **Deleted:** <#>Treankler explained Bay Tek wanted to terminate the existing Live Play License.¶
>
> **Deleted:** <#>,
>
> **Deleted:** <#>Skee-Ball
>
> **Deleted:** <#>.

206.    Full Circle declined Bay Tek's offer to give up its Live Play License and enter into the new licensing deal proposed by Bay Tek.

**After Full Circle Rejects Bay Tek's Attempt to**

**Take Back the Live Play License, Bay Tek Tries to Terminate It**

207.    In the year that followed, Full Circle continued performing under the terms of the License Agreement and the Revenue Share Agreement, sending Bay Tek its monthly share of Lane Revenue and Sponsorship revenue pursuant to the Revenue Share Agreement and License Agreement, respectively. Bay Tek accepted the payments.

208.    During that time, though greatly impeded by Bay Tek, Full Circle found creative ways to operate its business despite only having ten (10) Skee-Ball Live Prototype Lanes for the NSBL.

209.    For example, Full Circle conducted remote, live-streamed Live Play events and tournaments to promote Live Play and the NSBL.

210.    In November 2018, one such live-streamed event conducted by Full Circle drew over 130,000 unique views on Twitch and attracted viewers from around the world.

211.    On May 7, 2019, Full Circle received a letter from Bay Tek, sent from its attorney, contending for the first time that Bay Tek had no obligation under the License Agreement to manufacture custom Skee-Ball Lanes for Full Circle (the "May 2019 Letter").

212.    Bay Tek maintained the Revenue Share Agreement was limited to the ten (10) Skee-Ball Live Prototype Lanes already delivered to Full Circle.

213.    In the May 2019 Letter, Bay Tek proposed to resolve the dispute by offering Full Circle a new licensing agreement with exactly the same terms as the licensing agreement offered by Treankler at the January 2019 Meeting that had already been rejected by Full Circle.

38

214.    This time, Bay Tek presented the offer as non-negotiable, stating "To be crystal clear, Bay Tek does not anticipate changing the proposal, or making any new proposal," and "This really is Bay Tek's final proposal."

215.    Full Circle rejected the "new" licensing agreement offered by Bay Tek for a second time.

216.    Through the summer of 2019, Bay Tek contended Full Circle was in violation of various terms of the License Agreement, including its sponsorship and insurance obligations.

217.    On July 26, 2019, Bay Tek sent Full Circle a Notice of Default identifying extremely minor, immaterial supposed breaches of the License Agreement.

218.    For example, Bay Tek took a joke made by Full Circle during a Twitch broadcast about "avocado straws" seriously, claiming Full Circle's failure to disclose the sponsorship of the "avocado straw manufacturer" breached the terms of the License Agreement. Bay Tek also baselessly claimed Full Circle had failed to meet the insurance requirements set forth in the License Agreement, despite refusing to specifically identify how Full Circle's policy failed to comply with its terms.

219.    After claiming Full Circle was in default of the License Agreement, Bay Tek refused to acknowledge that the alleged breaches had been cured, or even explain to Full Circle what claimed issues remained uncured, despite Full Circle's request.

220.    Bay Tek's conduct forced Full Circle's business into a holding pattern. Full Circle could not obtain the Skee-Ball Live Lanes it needed to expand its business. Now, with the status of its Live Play License in question, Full Circle could not confidently operate or promote its existing business, either.

39

221.   Full Circle expended efforts trying to cure the baseless, immaterial breaches identified by Bay Tek. Meanwhile, Bay Tek engaged in behavior that denied the existence of Full Circle's Live Play License to the public, and undermined Full Circle's rights.

222.   On social media, Bay Tek continued to support competing Live Play leagues, events and tournaments that infringed upon Full Circle's Live Play License on dozens of occasions.

**Deleted:** promote

**Deleted:** , despite Full Circle's protests

223.   Yet, not once did Bay Tek "like," "share," or otherwise promote on social media Live Play leagues, events, or tournaments operated by Full Circle.

224.   In fact, Full Circle learned Bay Tek had removed it from its licensing guide, and no longer identified Full Circle as one of its licensees.

225.   Full Circle also learned that days after it presented its Skee-Ball Live branding concept to Bay Tek subject to the NDA, Bay Tek filed an application for trademark registration for "Skee-Ball Live" without Full Circle's knowledge or consent.

226.   On November 22, 2019, Full Circle emailed Bay Tek a request for a quote for stock Classic Lanes. Full Circle explained it wanted to purchase the lanes, and have the lanes modified to build Skee-Ball Live Lanes, like it had done with the Skee-Ball Live Lane prototype it developed in Austin in 2017 (the "Request for Quote").

227.   On December 16, 2019, Bay Tek informed Full Circle, for the first time, that it may not use the trademark "Skee-Ball Live" in connection with its license for Skee-Ball Live Play.

228.   Bay Tek further asserted that having another manufacturer modify lanes would be a violation of the License Agreement, since Bay Tek theoretically could perform the modifications itself.

229.    In sum, Bay Tek left no avenue open for Full Circle to get the lanes it needed to expand its business. Further, Bay Tek's purported revocation of authority to use the "Skee-Ball Live" mark suggested that Bay Tek wanted to stop Full Circle from operating Skee-Ball Live Play altogether, even with the Skee-Ball Live Prototype Lanes already in Full Circle's possession.

230.    On December 23, 2019, Full Circle sent Bay Tek a Notice of Default Pursuant to §11.6 of the License Agreement, identifying breaches of the License Agreement and providing Bay Tek an opportunity to cure.

231.    In February 2020, Full Circle informed Bay Tek, through its attorneys, that Full Circle had the opportunity to broadcast an NSBL 2020 Tournament on ESPN (the "ESPN Broadcast"), one of Full Circle's long-desired goals.

232.    At the time, Bay Tek maintained Full Circle was still in default of the License Agreement, but it refused to identify the supposed default.

233.    Full Circle promoted Live Play by broadcasting various Skee-Ball Live Play events and competitions on various platforms over the years with Bay Tek's knowledge and without any objection.

234.    Bay Tek objected to the proposed contract for the ESPN Broadcast, claiming that Full Circle's use of the Mark in the tournament and its broadcast would violate the License Agreement as well as Bay Tek's rights as owner of the Mark.

235.    Bay Tek further asserted that if Full Circle decided to move forward with the ESPN Broadcast, it would take legal action against Full Circle, and possibly also against ESPN, without notice.

41

**Deleted:** Skee-Ball Live

**Deleted:** Bay Tek's

**Deleted:** has broadcast

**Deleted:** issue.¶
Full Circle sent the proposed contract for the ESPN Broadcast to Bay Tek and asked whether Bay Tek had an

**Deleted:** to Full Circle moving forward under its terms

236.  To avoid potentially irreparable damage to its relationship with ESPN, Full Circle

backed out of the broadcast deal with ESPN as a result of Bay Tek's threats.

237.  Bay Tek still has not manufactured or delivered the remaining twenty-five (25)

production model Skee-Ball Live Lanes promised under the Revenue Share Agreement to Full

Circle, and has retained possession of the eleventh Skee-Ball Live Prototype Lane.

238.  As for Full Circle, it continues to perform all its obligations under the License

Agreement and Revenue Share Agreement, operating its business with just ten (10) Skee-Ball Live

Prototype Lanes.

239.  The ten (10) Skee-Ball Live Prototype Lanes continue to perform as Full Circle

projected. Notwithstanding the COVID-19 pandemic, and closures that resulted in eight months

of little to no lane revenue, each lane generates, on average, $1,353 per month.

**Full Circle Discovers Additional Bay Tek Misconduct**

240.  Full Circle has learned, through discovery, that Bay Tek never intended to perform

under the License Agreement or the Revenue Share Agreement. Instead, Bay Tek, through its

officers and agents, materially misrepresented and omitted its true intentions in order to induce

Full Circle's continued performance, so that it would disclose its NSBL Technology and

Confidential Information and refrain from exercising its rights under the License Agreement.

241.  Correspondence from Philippon to Hampton and Treankler on March 16, 2016

shows Bay Tek had a plan to rewrite Full Circle's License Agreement from the onset, but first

wanted to get "what we need to learn" from Full Circle, such as how Full Circle modeled its growth

projections.

**Deleted:** At the time of filing this Complaint,

**Deleted:** ,

**Deleted:** <#>All conditions precedent to bringing this action have been satisfied or waived.¶

242.   Correspondence from Ryan Cravens to Treankler and Hampton on September 5, 2017, also demonstrates that Bay Tek was focused on learning the details of how the NSBL Technology operated with an eye towards its possible incorporation into other Bay Tek games. Cravens stated:

My motivation for this project is not because this Skee-Ball project is neat and exciting but because the platform that they are building is powerful and could be the foundation for more games that we produce like Super Shot or we could license it to other manufacturers like Arachnid.  Also, we spoke about Gamer Green integration last week. I love where your head was at in the Leadership meeting today.

243.   On April 15, 2016, during meetings with Full Circle in Pulaski, Philippon, on behalf of Bay Tek, represented that Bay Tek intended to keep Full Circle's license as a "stand alone" and "independent from" Dimensional, confirming Full Circle's understanding of Bay Tek's obligations under the Settlement Agreement.

244.   In truth, however, Bay Tek had already decided to acquire Dimensional. Further, Bay Tek shared Full Circle's confidential information with Dimensional and explored with it ways to operate Live Play, such as a national Live Play tournament in the family entertainment market.

245.   In fact, Bay Tek concealed from Full Circle that it developed additional Skee-Ball Live Prototype Lanes to keep for itself, which it used to test the software written by Wikman, and likely used to compete with Full Circle. Upon information and belief, Bay Tek shared the Skee-Ball Live Prototype Lanes with third parties, including Dimensional and Raw Thrills, without Full Circle's knowledge or authority and in violation of the License Agreement and Revenue Share Agreement.

43

246.   Full Circle has also learned that Bay Tek has actively explored opportunities to operate Live Play on its own. Specifically, Bay Tek has been in active discussions with GameCo LLC ("GameCo") about operating Live Play in casinos. Once Live Play was rolled out for skee-ball, GameCo and Bay Tek then planned to expand the Live Play concept to other Bay Tek games. This was consistent with the undisclosed business strategy that Cravens, Hampton, and Treankler were discussing in internal emails back in September 2017.

247.   Finally, Bay Tek's correspondence confirms that its explanation for putting Skee-Ball Live "on hold" was bogus. An email from Pat Scanlan to Hampton, Treankler and others on December 1, 2017, prior to Hampton's request regarding the Blizzard Event, confirms that Bay Tek had already made the decision to "press forward with working to rewrite the contract and determine our path forward with this opportunity."

## COUNT I
### Fraud
### (Bay Tek)

248.   Plaintiff Full Circle re-alleges as though fully set forth herein the allegations in the preceding paragraphs.

249.   This is an action for damages against Defendants Bay Tek and Treankler for fraud.

250.   Bay Tek and Treankler made the misrepresentations and omissions alleged above to Full Circle to induce Full Circle to execute the NDA, to continue to perform under the NDA, and to disclose its NSBL Technology, Confidential Information and Oral Confidential Information. This was designed to and did in fact allow Bay Tek to learn Full Circle's trade secrets

**Deleted:** (Breach of the License Agreement)

**Deleted:**  1 through 225,

**Deleted:** .

44

and confidential information, which Bay Tek intended to and did learn, and has used and continues to use for its benefit and to compete with Full Circle.

251.   Bay Tek and Treankler knowingly and intentionally omitted and failed to disclose the true purpose for building the Skee-Ball Live Prototype lanes, and Full Circle falsely believed Bay Tek intended to be its manufacturing partner once it "proved the model" with the prototypes.

252.   These omissions, failures to disclose, and active concealments, all harmed Full Circle.

253.   Bay Tek and Treankler had a duty to disclose to Full Circle that Bay Tek intended to operate Live Play itself, and was actively seeking opportunities to do so using Confidential Information disclosed by Full Circle pursuant to the NDA, including in a venture with GameCo. This duty arises from their superior knowledge of the information, which Full Circle did not know, could not learn independently, and only recently learned in discovery.

254.   Full Circle has and will continue to suffer damages as a direct and proximate result of the misrepresentations and omissions.

255.   In light of the foregoing, Full Circle requests entry of judgment against Bay Tek and Treankler, for damages, or, in the alternative, the remedy of rescission of the Settlement Agreement, with the remedy to be selected at trial.

**COUNT II**
**Breach of the NDA**
**(Bay Tek)**

256.   Plaintiff Full Circle re-alleges as though fully set forth herein the allegations in the preceding paragraphs.

257.   This is an action for damages against Defendant Bay Tek for breach of the NDA.

45

258.    Full Circle has performed all its obligations under the NDA.

259.    Bay Tek has breached the NDA by disclosing Full Circle's trade secret information, in violation of the terms of the NDA, and for the purpose of competing against Full Circle and to provide an unfair advantage to Bay Tek.

260.    By reason of the foregoing, Full Circle has been damaged in an amount to be determined at trial.

**COUNT III**
**Breach of the License Agreement (5.3)**
**(Bay Tek)**

261.    Full Circle and Bay Tek, by assignment, are parties to a valid and enforceable contract, the License Agreement.

262.    Section 5.3 of the License Agreement provides, "SBI hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term and in the Territory, operate, sponsor, or endorse a business, involving Live Play."

263.    Bay Tek has breached Section 5.3 of the License Agreement by directly and indirectly operating, sponsoring and endorsing businesses involving Live Play on numerous occasions.

264.    Bay Tek's conduct in violation of Section 5.3 includes, but is not limited to: manufacturing custom Skee-Ball-branded lanes for "Aunt Ethel's", the "UpDown", and other venues that organize, promote and conduct skee-ball leagues, tournaments and events; through the actions of its licensees Alchemy3 and GameCo.; and through its affiliates and subsidiaries.

265.    Bay Tek's conduct in violation of Section 5.3 of the License Agreement dilutes Full Circle's Live Play License, causing Full Circle significant competitive and economic harm,

46

---

**Deleted:** breaches

**Deleted:** .

**Deleted:** <#>The License Agreement required Full Circle to use its best efforts to create a national network of Live Play teams, leagues and/or events using Skee-Ball branded lanes.¶
Prior to entering into the License Agreement, Full Circle disclosed its idea, growth and revenue projections for the NSBL and Skee-Ball Live Lanes to SBI, then, again, to Bay Tek.¶
Bay Tek has breached three express provisions of the License Agreement, and the License Agreement's implied covenants of good faith and fair dealing.¶
First, Bay Tek breached Section 4.2 of the License Agreement, which provides Full Circle the right to use the Mark in connection with Live Play Phrases.¶
"Skee-Ball Live" is a phrase or slogan Full Circle created to use solely and directly with Skee-Ball Live pursuant to Section 4.2 of the License Agreement.¶
Full Circle presented "Skee-Ball Live" to Bay Tek in September 2017 as a branding and marketing phrase to use in connection with the Skee-Ball Live Play Concept.¶
Shortly thereafter, Bay Tek submitted an application to register the trademark "Skee-Ball Live" without Full Circle's knowledge or consent.¶
Bay Tek authorized Full Circle to use "Skee-Ball Live" pursuant to Section 4.2 of the License Agreement in various written correspondence and by affixing "Skee-Ball Live" on the Skee-Ball Live Prototype Lanes Bay Tek delivered to Full Circle and that remain in Full Circle's possession.¶
Bay Tek breached Section 4.2 of the License Agreement by rescinding its approval for Full Circle to use "Skee-Ball Live." Bay Tek asserted it is the owner of the registered trademark "Skee-Ball Live" and Full Circle is not authorized to use "Skee-Ball Live" as a Live Play Phrase.¶
Bay Tek's revocation of authority to use the trademark as a Live Play Phrase damages Full Circle through the loss of goodwill and industry recognition it has already established through its authorized use of the mark "Skee-Ball Live" and by preventing Full Circle from expanding its Skee-Ball Live Play Concept using the mark.¶
Second, Bay Tek also breached the restrictive covenant set forth in Section 5.3 of the License Agreement.¶

**Deleted:** Bay Tek's conduct in violation of Section 5.3 of the License Agreement includes, but is not limited to, manufacturing custom Skee-Ball-branded lanes for use in bars operating competing Live Play, endorsing competing Live Play on social media and hosting and endorsing competing Live Play....

including lost profits from expansion of the Live Play market, as contemplated in the License Agreement.

<div align="center">

**COUNT IV**
**Breach of the License Agreement - 7.2 ("Best Efforts Provision")**
**(Bay Tek)**

</div>

266.   Plaintiff Full Circle re-alleges as though fully set forth herein the allegations in the preceding paragraphs.

267.   This is an action for damages against Defendant Bay Tek for breach of Section 7.2 of the License Agreement.

268.   Section 7.2 states: "SBI and Full Circle each agree that they will use their respective best efforts to promote the Licensed Uses offered in connection with the Skee-Ball Trademark and to coordinate the development, creation, distribution, sale, advertising, and promotion of the Licensed Uses so as to maintain and enhance the value of the goodwill residing in the Skee-Ball Trademark."

269.   Yet, in violation of the Best Efforts Provision, Bay Tek has deprived Full Circle of its ability to operate Live Play by refusing to manufacture Full Circle lanes for Live Play under any scenario and frustrating Full Circle's ability to work with a third-party manufacturer to obtain the custom skee-ball lanes Bay Tek refused to build. In addition, Bay Tek violated the Best Efforts Provision by withholding consent for Full Circle to proceed with the ESPN Broadcast, causing Full Circle to miss the opportunity to bring Live Play onto a national platform, and start a working relationship with ESPN that would likely lead to additional broadcasts of Live Play.

270.   Rather than promote Full Circle's Licensed Uses, Bay Tek willfully concealed and misrepresented the nature and scope of Full Circle's license to others, including through

<div align="center">47</div>

publications made available on the internet, and by claiming ownership over the Licenses Uses itself.

271.    Due to Bay Tek's breaches, Bay Tek has prevented Full Circle from expanding its business, and thwarted Full Circle's opportunity to use ESPN as a launching pad for Skee-Ball Live, causing Full Circle to suffer millions of dollars in damages, including lost profits.

**COUNT V**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Bay Tek)**

272.    Plaintiff Full Circle re-alleges as though fully set forth herein the allegations in the preceding paragraphs.

273.    Bay Tek has breached the License Agreement's implied covenants of good faith and fair dealing.

274.    Under New York law, a party breaches the implied duty of good faith and fair dealing by: a) depriving the other party of the fruits of the contract or defeating the purpose of the agreement with its actions; b) failing to act reasonably in the performance of the agreement; or c) exercising a right under the agreement for an illegitimate purpose or in bad faith.

275.    Bay Tek breached the implied covenants of good faith and fair dealing by acting to prevent Full Circle from operating Live Play, depriving it of the fruits of the License Agreement, and failing to act reasonably in the performance of the License Agreement.

276.    Specifically, Bay Tek breached the implied covenants of good faith and fair dealing by: a) refusing to manufacture Full Circle lanes for Live Play under any scenario and frustrating Full Circle's ability to work with a third-party manufacturer to obtain lanes for Live Play; b) deliberately frustrating Full Circle's efforts to obtain financing to facilitate activities contemplated

48

| Deleted: | of the "Best Efforts" Provision |
| Deleted: | Live Play |

| Deleted: | Finally, |

under the License Agreement; c) identifying frivolous immaterial "breaches" of the License Agreement, and then refusing to acknowledge that the alleged breaches had been cured, or to explain what issues remained; d) registering the "Skee-Ball Live" trademark for the improper purpose of withholding the mark from Full Circle, and using the mark itself, as part of its scheme to take back Full Circle's license and operate Live Play itself; and e) unreasonably objecting to Full Circle's broadcast agreement with ESPN, and threatening frivolous legal action against Full Circle and ESPN, causing Full Circle to miss the opportunity to bring Live Play onto a national platform and start a relationship that would likely lead to additional broadcasts of Live Play on ESPN.

277.   Bay Tek's actions prevented Full Circle from expanding its Live Play business, obtaining financing, and confidently operating and promoting Live Play. Further, Bay Tek's actions are intended to exhaust and frustrate Full Circle so it would capitulate to Bay Tek's offers that entailed giving up its Live Play License, or go out of business, so Bay Tek could operate Live Play itself.

278.   Bay Tek's breaches of the covenant of good faith and fair dealing have caused Full Circle to suffer millions of dollars in damages, including lost profits.

279.   The damages suffered by Full Circle as a result of Bay Tek's breaches of its obligations under the License Agreement, including the implied covenant of good faith and fair dealing, include but are not limited to lost profits from the revenue that the NSBL and Skee-Ball Live Lanes would have generated had Full Circle been able to obtain the lanes and expand the NSBL.

**Deleted:** its Skee-Ball

**Deleted:** Concept

280.   The damages sought by Full Circle are the natural and probable results of Bay Tek's breaches of the License Agreement and were contemplated by the parties at the time Full Circle and SBI entered into the License Agreement.

**COUNT VI**
**Breach of the Revenue Share Agreement**
**(Bay Tek)**

281.   Plaintiff Full Circle re-alleges as though fully set forth herein the allegations in the preceding paragraphs.

282.   This is an action for damages against Defendant Bay Tek for its breaches of the Revenue Share Agreement.

283.   Bay Tek and Full Circle are parties to the Revenue Share Agreement, a binding agreement whereby Bay Tek agreed to manufacture thirty-six (36) Skee-Ball Live Lanes for Full Circle in exchange for Bay Tek's receipt of 150% of its manufacturing costs, paid back via monthly payments of Lane Revenue.

284.   Bay Tek promised to install credit card readers on all thirty-six (36) Skee-Ball Live Lanes and furnish the API needed to enable them to receive credit card payments.

285.   Under the terms of the Revenue Share Agreement, Bay Tek would develop and manufacture the Skee-Ball Live Lanes at an agreed manufacturing cost of $4,500 per lane.

286.   The parties agreed Bay Tek would first manufacture eleven (11) Skee-Ball Live Prototype Lanes for use at the National Championship. These lanes would not incorporate all the specifications for the Skee-Ball Live Lane or have the ability to collect credit payments. Bay Tek promised to deliver the code to enable the collection of credit card payments to Full Circle after the National Championship.

50

Deleted: II

Deleted: (

Deleted: )

Deleted: 1 through 225, above

Deleted: All

Deleted: were to be programmed with code developed by Bay Tek …

Deleted: the lanes

Deleted: collect

287.    The parties agreed that Bay Tek would then manufacture twenty-five (25) Skee-Ball Live Lanes incorporating all Full Circle's Live Play specifications, and deliver the lanes to Full Circle when complete.

288.    Bay Tek partially performed under the Revenue Share Agreement by delivering the Skee-Ball Live Prototype Lanes to Full Circle in Austin for the National Championship.

289.    Bay Tek breached the Revenue Share Agreement by failing to deliver the additional twenty-five (25) Skee-Ball Live Lanes it promised to manufacture and deliver to Full Circle after the National Championship and retaining the eleventh Skee-Ball Live Prototype Lane in its possession.

290.    Full Circle has, on numerous occasions, demanded Bay Tek's performance under the Revenue Share Agreement. Worse yet, Bay Tek has denied the existence of the Revenue Share Agreement for thirty-six (36) Skee-Ball Live Lanes, despite confirming the terms of the Agreement during a meeting in Pulaski, Wisconsin and in written correspondence between the parties.

291.    Bay Tek's breaches of the Revenue Share Agreement are material, and caused Full Circle to suffer damages, including lost profits.

292.    By failing to deliver the additional twenty-five (25) Skee-Ball Live Lanes and the eleventh Skee-Ball Live Prototype Lane, Bay Tek has damaged Full Circle through the loss of lane revenue and inability to expand the NSBL.

293.    The damages suffered by Full Circle include but are not limited to lost profits from the revenue that the NSBL and Skee-Ball Live Lanes would have generated had Full Circle been able to obtain the lanes and expand the NSBL.

51

294.    The damages sought by Full Circle are the natural and probable results of Bay Tek's breach of the Revenue Share Agreement and were contemplated by the parties at the time of entering into the Revenue Share Agreement.

<div align="center">

**COUNT VII**
**Tortious Interference with Prospective Business Relationship**
**(Bay Tek)**

</div>

295.    Plaintiff Full Circle re-alleges as though fully set forth herein the allegations in the preceding paragraphs.

296.    This is an action for damages against Defendant Bay Tek for tortious interference with Full Circle's prospective business relationship with Play Mechanix.

297.    By the summer of 2018, Bay Tek had refused to provide Full Circle the additional twenty-five (25) Skee-Ball Live Lanes promised under the Revenue Share Agreement, or otherwise provide Full Circle the lanes it needed to operate and expand its business.

298.    Due to Bay Tek's refusal to perform, Full Circle sought the help from a third-party manufacturer, Play Mechanix, through its CEO, Petro.

299.    Full Circle and Play Mechanix reached an agreement in principle – the Play Mechanix Agreement.

300.    In connection with the Play Mechanix Agreement, Play Mechanix agreed to help Full Circle obtain Skee-Ball Live Lanes in exchange for a share of lane revenue. It further agreed to facilitate placement of Full Circle's Skee-Ball Live Lanes using its network of operators in the bar market.

| | |
|---|---|
| Deleted: III | |
| Deleted: ( | |
| Deleted: ) | |
| Deleted: 1 through 225, above | |

301.   At the time, an investor was ready to inject a substantial amount of operational capital into Full Circle, contingent upon Play Mechanix and Petro's participation in Full Circle's Skee-Ball Live Concept.

302.   At the time, there was a reasonable probability Full Circle and Play Mechanix would have entered into a formal contractual relationship.

303.   Bay Tek interfered with Full Circle's relationship with Play Mechanix by expressing displeasure with or withholding its approval from Play Mechanix when it proffered the idea of helping Full Circle obtain Skee-Ball Live Lanes. Bay Tek threatened Play Mechanix if it tried to help Full Circle obtain Skee-Ball Live Lanes, causing Play Mechanix to back out of its deal with Full Circle.

304.   Once the deal fell through, Full Circle lost the potential investor that was willing to invest based on the participation of Play Mechanix.

305.   Bay Tek knew Play Mechanix could help Full Circle succeed in the bar market and was capable of building Skee-Ball Live Lanes.

306.   Bay Tek, maliciously and for the improper purpose of harming and unfairly competing with Full Circle, acted in a manner that it knew would kill any chance of Play Mechanix working with Full Circle to manufacture Skee-Ball Live Lanes, by withholding its blessing for Play Mechanix to do so and threatening Play Mechanix that it would not be a good situation for it if it decided to help Full Circle.

307.   Due to Bay Tek's interference, Full Circle suffered millions of dollars in damages, including lost profits under the Play Mechanix Agreement, the loss of the opportunity to learn and work with an industry leader in the market like Play Mechanix, and the investment funds Full

53

**Deleted:** Mechnanix

Circle would have received had Play Mechanix participated in Full Circle's Skee-Ball Live Concept.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Full Circle respectfully requests that the Court enter judgment in its favor and against Defendants Bay Tek and Treankler:

A.      Entering judgment against Bay Tek and Treankler for fraudulently representing or concealing material facts that caused Full Circle harm;

B.      Declaring that Bay Tek is liable for breach of the License Agreement, including the implied covenant of good faith and fair dealing; for breach of the Revenue Share Agreement; and for tortious interference with prospective economic;

C.      Awarding Full Circle damages, including lost profits, consequential damages, and punitive damages;

D.      Awarding pre- and post-judgment interest; and

E.      Awarding such other relief at law or equity as the Court may deem just and proper.

**JURY DEMAND**

54

---

Deleted: Defendant

Deleted: A.→

Deleted:  relations

Deleted: B.→

Deleted: D.→

Deleted: E.→

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of

Civil Procedure.

Dated: November 8, 2021

Deleted: 13, 2020

Respectfully submitted,

/s/ Christina Casadonte-Apostolou
Paul Thanasides
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Christina Casadonte-Apostolou
christina@mcintyrefirm.com
complexlit@mcintyrefirm.com
McIntyre Thanasides Bringgold Elliott
    Grimaldi Guito & Matthews, P.A.
500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
Telephone: 813.223.0000
Facsimile: 813.225.1221

and

Lindsey "Reid" Skibell
rskibell@hs-law.com
Harris St. Laurent & Wechsler LLP
40 Wall Street, 53rd Floor
New York, NY 10005

*Counsel for Plaintiff/Counterclaim Defendant Fun Circle United, LLC and Counterclaim Defendant Eric Pavony*

Deleted: Jon Fetterol¶
jfetterolf@zuckerman.com¶
Shawn Naunton¶
jfetterolf@zuckerman.com¶
Zuckerman Spaeder LLP¶
485 Madison Avenue, 10th

Deleted: 10022

Deleted: Telephone: 212.704.9600¶
Facsimile 212.704.4256¶
¶
Ezra Marcus¶
emarcus@zuckerman.com¶
Zuckerman Spaeder LLP¶
1800 M Street, N.W., Suite 1000¶
Washington, DC 20036¶
Telephone: 202.778.1800¶
Facsimile: 202.822.8106

55

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 8, 2021, a true and correct copy of the foregoing was <span>Deleted: 13, 2020</span>

electronically filed and served using the Court's CM/ECF system to all parties including the following:

Christine Lepera
ctl@msk.com
Jeffrey Movit
jmm@msk.com
Leo M. Lichtman
lml@msk.com
Mitchell Silberberg & Knupp LLP
437 Madison Avenue, 25th Floor
New York, NY 10022
Telephone: 212.509.3900
Facsimile: 212.509.7239

*Counsel for Defendant/Counterclaim
Plaintiff Bay Tek Entertainment, Inc.*

                                */s/ Christina Casadonte-Apostolou*
                                    Christina Casadonte-Apostolou

| Page 2: [1] Deleted | Reid Skibell | 11/8/21 9:50:00 PM |
|---|---|---|

| Page 10: [2] Deleted | Reid Skibell | 11/8/21 9:50:00 PM |
|---|---|---|