

MITCHELL SILBERBERG & KNUPP LLP
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Christine Lepera
A Professional Corporation
(917) 546-7703 Phone
(917) 546-7673 Fax
ctl@msk.com

August 4, 2022

**VIA ECF ONLY**

Hon. Brian M. Cogan, U.S.D.J.
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Full Circle United, LLC v. Bay Tek Entertainment, Inc.*, No. 1:20-cv-03395-BMC

Dear Judge Cogan:

We are counsel for Defendant-Counterclaim Plaintiff Bay Tek Entertainment, Inc. ("BTE"), writing to request a pre-motion conference on BTE's anticipated motion for summary judgment on Plaintiff Full Circle United, LLC's ("FCU") claims in its Second Amended Complaint ("SAC")[1] in their entirety, and for partial summary judgment on certain of BTE's counterclaims against FCU and its principal, Eric Pavony.

This action centers around a dispute between BTE, the sole owner of the iconic trademark "Skee-Ball" (the "Mark") and FCU, a limited trademark licensee who has narrow rights to use the Mark in a live competition setting ("Live Play")[2] in the brick and mortar world. FCU has violated and exceeded the terms of its License Agreement (Ex. A), committed trademark infringement and pressured BTE to give it more rights than it has under the License Agreement. Now that discovery is completed, summary judgment is wholly warranted in BTE's favor.

***FCU's claims for breach of the License Agreement fail (Count I)***. FCU's claims that BTE breached a "best efforts" provision (§ 7.2) by failing to manufacture lanes customized to FCU's liking, and by not permitting FCU to broadcast Live Play on ESPN channels (SAC ¶ 243), are refuted by the unambiguous language of the License Agreement (Ex. A). *Seasbury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2022) ("Where the contract is unambiguous, courts must effectuate its plain language.").[3] With respect to the manufacturing of lanes, the License Agreement only requires BTE to provide "SKEE-BALL® branded alley roller machines manufactured by [BTE]". Ex. A, § 5.2. These are not customized lanes, but rather stock lanes. Undisputedly, BTE stood ready to provide those stock lanes but FCU did not want them unless they could be customized. FCU concedes that it has not asserted any claim that the License Agreement obligates BTE to manufacture custom lanes. (FCU's Response to ROG 10).

[1] FCU seeks to file a Third Amended Complaint ("TAC") with proposed claims for fraud and breach of an NDA between FCU and BTE. BTE opposes this, and the matter *is sub judice*. Should the TAC be allowed, BTE will establish on summary judgment that FCU has no evidentiary support for the proposed claims, which fail as a matter of law. The TAC also omits FCU's breach claim as to BTE's registration of the Skee-Ball Live mark, conceding its lack of merit.
[2] § 3.2 defines licensed uses as "conducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by [BTE] and called Skee-Ball machines." Ex. A.
[3] FCU's claim for breach of the implied covenant of good faith should be "dismissed as redundant" of its breach of contract claim. *Nat'l Football League Props. v. Dallas Cowboys Football Club*, 922 F. Supp. 849, 855 (S.D.N.Y. 1996).





The License Agreement also expressly precludes Live Play being broadcast over networks: § 4.1 of the License Agreement states that FCU has "**no rights for digital or virtual play or *other digital rights***" to use the Mark. The sole exception to the preclusion is expressly and unambiguously stated in §§ 3.2 and 4.5, which state that FCU may use the Mark outside the brick and mortar world in connection with Live Play ***only for advertising and promotional purposes***.

FCU's claim of breach by BTE of § 5.3 by "operat[ing], sponsor[ing], or endors[ing] a business, involving Live Play" in competition with FCU fails. FCU has no proof to support its allegations that BTE "manufactur[ed] custom Skee-Ball branded lanes for use in bars operating competing Live Play." SAC ¶ 239-40. Pavony testified he had no evidence BTE operated, sponsored, or endorsed any use of the Mark for Live Play by ***anyone*** other than FCU.

***Second, FCU's breach of an alleged "oral revenue share agreement" fails (Count II).*** FCU cannot meet its burden that the parties had the requisite "meeting of the minds" on all "material terms" for an enforceable oral agreement for building custom lanes to exist. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019). The undisputed evidence establishes that the parties did not have any meeting of the minds on any material terms, including any specific number of custom lanes, where such lanes would be placed, how they would be monitored, and how they would be monetized. At most, BTE created 10 prototype lanes and agreed to *consider* entering into a further agreement with FCU, as part of an amendment to the License Agreement. FCU thus cannot establish that an enforceable oral agreement existed—let alone was breached.

***Third, FCU's tortious interference claim fails (Count III)***. FCU's claim that BTE interfered with an "agreement in principle" between FCU and Play Mechanix ("PM"), a developer of arcade games, has been debunked. George Petro of PM testified: (a) FCU and PM never had any agreement; and (b) BTE never interfered with anything. FCU has no proof otherwise.[4]

With respect to BTE's counterclaims, the overwhelming evidence establishes as a matter of undisputed fact that it is Counterclaim Defendants who have committed substantial breaches of the License Agreement and trademark infringement.

***First, FCU breached numerous provisions of the License Agreement as a matter of law (Counterclaim Count VI).*** As an ***exclusive*** limited licensee, FCU was required to use its best efforts to "promote the [4] Licensed Uses"[5] of the Mark. The undisputed evidence shows that FCU failed to use *any* effort, let alone best efforts, to promote the Licensed Uses ***for BTE's benefit***, as was required by the Agreement.[6] *See* Ex. A, § 6; *see also* §§ 5, 7.2, 7.7, 7.8, 15. This best efforts obligation is at the heart of any exclusivity right. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 92 (N.Y. 1917). FCU not only failed to exercise best efforts, it used the Mark as it pleased, in callous disregard of BTE's rights. FCU operated under the false premise that it could do

---

[4] FCU's damages claims for lost profits for each of its causes of action also fail, as it is wholly speculative for FCU to assert it would have earned windfall profits worth millions of dollars but for BTE's (nonexistent) breaches.

[5] § 3.1 of the License Agreement unambiguously limits the license granted to: (1) conducting, arranging, presenting, marketing, and promoting live play leagues, teams and tournaments using Skee-Ball manufactured machines; (2) developing, producing, selling, and distributing merchandise of the same; (3) developing, producing and offering a defined Scoring App; and (4) using the Mark for sponsorships and endorsements for Live Play.

[6] Ignoring these obligations, FCU secretly recorded BTE employees and disparaged BTE publicly.

“everything and anything with Live Play.” FCU indisputably breached the License Agreement by, *inter alia*: (1) failing to develop Live Play Merchandise, Sponsorships and Endorsements related to Live Play; (2) failing to exploit the Licensed Uses outside the niche “hipster” bar market; (3) engaging in conduct that harms the Mark by using unapproved names such as “Hepatitis Skee,” and “Skeemature Ejaculation” (§ 7.7)[7]; (4) using the Mark without permission in connection with intellectual property of third parties (§ 7.8); (5) failing to obtain sublicenses from the bars in which FCU primarily used the Mark; and (6) failing to hold teams, leagues, and/or FCU Managed Events in at least 15 states in the United States within 5 years of the Effective Date (§ 5.1).

Since BTE inherited the License Agreement in 2016, it has received only ***$161.50*** from FCU’s “efforts.” Self-servingly, FCU created merchandise for its Brewskee-Ball mark (not the Mark) and obtained sponsorships that solely benefited Pavony’s bars, where Skee-Ball Live Play was hosted.

***Second, BTE is entitled to judgment on certain of its trademark related causes of actions (Counterclaim Counts I, II, and IV).*** FCU committed trademark infringement and Lanham Act violations as a matter of law. Indisputably, BTE owns the Mark, it was used in commerce, and FCU exceeded the scope of the License Agreement in its uses of the Mark. If a licensee exceeds the scope of a license, it can be liable for breach of the license ***and*** infringement of the underlying mark. *Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.*, 576 F. Supp. 1055, 1058-60 (E.D.N.Y. 1983). BTE’s False Endorsement and Unfair Competition claims[8] share elements with this claim, and BTE’s motion thereon is based on the same nucleus of undisputed facts below.

§ 7.7 forbids FCU from using the Mark in any manner that disparages, demeans, tarnishes or dilutes the Mark and BTE. FCU further agreed the Mark, and its branded goods and services, are “geared towards families and children.” Undisputedly, FCU allowed countless vulgar names incorporating the Mark to be used, such as “Hepatitis Skee” and “Skeemature Ejaculation.” FCU also promoted merchandise using these vulgar team names. FCU held an event at which the Mark was featured, at which invited representatives of a company that has received negative public criticism for alleged sexist and racist behavior made crude comments. FCU also used BTE’s Skee-Ball design mark—to which it has no rights—in vulgar ways.

Finally, FCU hosted entire Live Play events on digital streaming platforms in which the Mark frequently was used. The License Agreement prohibits such digital and virtual play. Ex. A. § 4.1.

***Third, BTE is entitled to declaratory relief (Counterclaim Counts VII-VIII).*** The License Agreement must be terminated due to FCU’s incurable breaches. And, a contract lacking a definite term, with no express, unequivocal statement of intent to be perpetually bound, is terminable at will. *Cia. Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 245 (2d Cir. 2020). The License Agreement is such because it (1) lacks a definite term, (2) can be terminated at any time by agreement; (3) identifies contingent events upon which termination may occur, none of which gives rise to a determinable duration; and (4) lacks a clear, unequivocal statement of perpetuity.

---

[7] This conduct also constitutes trademark infringement, as discussed below.

[8] False endorsement requires that a defendant, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services. *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446 (S.D.N.Y. 2008). The New York common law claims mirror the Lanham Act claims. *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008).

Respectfully submitted,

/s/Christine Lepera

Christine Lepera
A Professional Corporation of
Mitchell Silberberg & Knupp LLP

cc: All counsel of record (by ECF)