UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FULL CIRCLE UNITED, LLC, | CASE NO. 1:20-CV-03395-BMC |
| Plaintiff, | |
| v. | |
| BAY TEK ENTERTAINMENT, INC., | |
| Defendant. | |

BAY TEK ENTERTAINMENT, INC.,

Counterclaim Plaintiff,

v.

FULL CIRCLE UNITED, LLC,

Counterclaim Defendant,

and

ERIC PAVONY,

Additional Counterclaim
Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF BAY TEK ENTERTAINMENT, INC.'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................................. 1

II.  UNDISPUTED FACTS IN SUPPORT OF THE INSTANT MOTION ............................ 4
     A.   Background Facts ............................................................................................ 4
          1.   The Skee-Ball Mark and SBI ................................................................. 4
          2.   Full Circle and Eric Pavony ................................................................... 5
          3.   SBI/FCU Lawsuit ................................................................................... 5
          4.   Bay Tek .................................................................................................. 5
          5.   Standard vs. Custom Lanes .................................................................... 6
     B.   Undisputed Facts That Defeat FCU's Claims .................................................. 6
          1.   Breach Of The License Agreement (Count I) .......................................... 6
          2.   Breach Of The Alleged Oral Revenue Share Agreement (Count II) ........ 10
          3.   Tortious Interference (Count III) ........................................................... 12
          4.   Lost Profits ........................................................................................... 12
     C.   Undisputed Facts Entitling BTE To Summary Judgment On Certain
          Counterclaims .............................................................................................. 13
          1.   Breach Of The License Agreement (Count VI) ...................................... 13
          2.   Claims For Declaratory Judgment (Counts VII and VIII) ...................... 16
          3.   Trademark Infringement (Count I), False Endorsement (Count II),
               And Common Law Unfair Competition (Count IV) ............................... 16

III. LEGAL ARGUMENT ........................................................................................ 17
     A.   BTE Is Entitled To Summary Judgment On FCU's Claims ............................ 17
          1.   FCU's Claim For Breach Of The License Agreement Fails ................... 17
          2.   FCU's Claim For Breach Of An Alleged Oral Agreement Fails ............. 20
          3.   FCU's Tortious Interference Claim Fails As A Matter Of Law .............. 26
          4.   FCU Cannot Establish Lost Profits As A Matter Of Law ...................... 27
     B.   BTE Is Entitled To Summary Judgment On Certain Of Its Counterclaims ......... 34
          1.   FCU Breached The License Agreement As A Matter Of Law ............... 34
          2.   BTE Is Entitled To Declaratory Relief As A Matter Of Law ................. 38
          3.   BTE Is Entitled To Judgment On Its Trademark Infringement Claim ..... 40
          4.   BTE Is Entitled To Judgment On Its False Endorsement Claim ............ 42
          5.   BTE Is Entitled To Judgment On Its Unfair Competition Claim ........... 43
          6.   Pavony Is Individually Liable ............................................................... 43
          7.   FCU Cannot Avoid Liability By Invoking The License Agreement's
               Notice-And-Cure Provision ................................................................... 44

# **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015)....................................................................................27

*Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*,
457 F. Supp. 3d 313 (S.D.N.Y. 2020).................................................................34, 35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................17

*Anderson v. Regents of Univ. of Cal.*,
203 Wis.2d 469, 554 N.W.2D 509 (Ct. App.1996) ................................................27

*Apollon Waterproofing & Restoration Corp. v. Bergassi*,
241 A.D.2d 347 (1st Dep't 1997) .........................................................................33

*Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*,
2009 WL 1803458 (S.D.N.Y. June 23, 2009) ....................................28, 30, 31, 32

*Awards.com, LLC v. Kinko's, Inc.*,
42 A.D.3d 178 (1st Dep't 2007) .......................................................................30, 31

*Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.*,
576 F. Supp. 1055 (E.D.N.Y. 1983) ..................................................................41, 43

*BJB Ltd. v. iStar Jewelry LLC*,
533 F.Supp.3d 83 (E.D.N.Y. 2021) .......................................................................41

*Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.*,
497 F.Supp. 947 (S.D.N.Y. 1980).........................................................................42

*Burck v. Mars, Inc.*,
571 F. Supp. 2d 446 (S.D.N.Y. 2008)...................................................................42

*Carson Optical, Inc. v. Prym Consumer USA, Inc.*,
11 F. Supp.3d 317 (E.D.N.Y. 2014) .....................................................................43

*City of N.Y. v. Tavern on the Green Int'l LLC*,
351 F.Supp.3d 680 (S.D.N.Y. 2018)......................................................................44

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

*Co. Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009)................................................................28, 39

*Coastal Aviation, Inc. v. Commander Aircraft Co.*,
  937 F. Supp. 1051 (S.D.N.Y. 1996)................................................................29

*Crabtree Auto., Inc. v. BMW of N. Am.*,
  105 A.D.2d 825 (2d Dep't 1984)................................................................25

*Danusiar v. Auditchain USA, Inc.*,
  No. 20-CV-1477 (KNF), 2020 WL 6126378 (S.D.N.Y., Oct. 8, 2020) ................................20

*Daubert. Amorgianos v. Nat'l. R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)................................................................31

*Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*,
  847 F. Supp. 18 (E.D.N.Y. 1994) ................................................................39

*Express Indus. & Terminal Corp. v. New York State Dept. of Transp.*,
  93 N.Y.2d 584 (1999)................................................................20

*First Bank v. HKA Enters., Inc.*,
  183 Wis. 2d 418 (1994) ................................................................25

*Glob. Truck & Equip. Co. v. Palmer Mach. Works, Inc.*,
  628 F. Supp. 641 (N.D. Miss. 1986)................................................................26

*Grayson v. Ressler & Ressler*,
  271 F. Supp. 3d 501 (S.D.N.Y. 2017)................................................................21

*Great Earth Int'l. Franchising Corp. v. Milks Dev.*,
  311 F. Supp.2d 419 (S.D.N.Y. 2004)................................................................29

*Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc.*,
  2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010),
  *aff'd*, 501 F. App'x 85 (2d Cir. 2012)................................................................28

*In re Ore Cargo, Inc.*,
  544 F.2d 80 (2d Cir. 1976)................................................................19

iii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*,
    717 F.2d 664 (2d Cir. 1983)........................................................................................19

*Kayo Corp. v. Fila U.S.A., Inc.*,
    2022 WL 381995 (S.D.N.Y. Jan. 26, 2022) .........................................................29

*Kenford Co., Inc. v. Cnty of Erie*,
    67 N.Y.2d 257 (1986) .......................................................................................28, 33

*Kenford Co. v. Cnty of Erie*,
    73 N.Y.2d 312 (1989) .......................................................................................28, 30

*Ketcham v. Hall Syndicate, Inc.*
    236 N.Y.S.2d 206 (Sup.Ct. N.Y. Cnty. 1962),
    *aff'd* 242 N.Y.S.2d 182 (1st Dep't 1963)..............................................................39

*Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*,
    41 N.Y.2d 972 (1977) .............................................................................................21

*Kosher Provisions, Inc. v. Blue & White Food Prod. Corp.*,
    No. CV-04-361 (NGG) (SAC), 2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005).......................21

*Lakeside Bridge & Steel Co. v. Mountain State Const. Co.*,
    400 F.Supp. 273 (E.D. Wis. 1975)..........................................................................24

*Linden v. Cascade Stone Co., Inc.*,
    283 Wis. 2d 606 (Ct. App. 2005)............................................................................24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................................17

*Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*,
    2018 WL 2012875 (E.D.N.Y., Apr. 30, 2018) ......................................................40

*Murray v. Holiday Rambler, Inc.*,
    83 Wis.2d 406, 265 N.W.2d 513 (Ct. App. 1978) .................................................29

*New York Trust Co. v. Believe It Or Not, Inc.*,
    178 N.Y.S.2d 12 (1958).........................................................................................42

iv

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*New York Univ. v. Cont'l Ins. Co.*,
  87 N.Y.2d 308 (1995) ........................................................................20

*Old Country Toyota Corp. v. Toyota Motor Distribs., Inc.*,
  966 F.Supp. 167 (E.D.N.Y.1997) ...............................................23, 24

*Ontel Prod. Corp. v. Airbrushpainting Makeup Store*,
  2017 WL 1969681 (S.D.N.Y. May 12, 2017) .........................................40

*Or. Potato Co. v. Kerry Inc*.,
  No. 20-CV-92-JDP, 2022 WL 1153469 (W.D. Wisc. Apr. 19, 2022) ...................29

*PCS Sales (USA), Inc. v. Nitrochem Distrib. LTD*,
  2004 WL 944541 (S.D.N.Y. May 3, 2004),
  *aff'd*, 128 F. App'x 817 (2d Cir. 2005)..............................................21

*Peguero v. 601 Realty Corp.*,
  58 A.D.3d 556 (1st Dep't 2009) .....................................................44

*PH Int'l Trading Corp. v. Nordstrom, Inc.*,
  555 F.App'x 9 (2d Cir. 2013) ........................................................26

*R.G. Group, Inc. v. Horn & Hardart Co.*,
  751 F.2d 69 (2d Cir. 1984)...........................................................22

*Realtime Data, LLC v. Melone*,
  104 A.D.3d 748 (2d Dep't 2013) .....................................................19

*Renschler Co., Inc. v. MSA Prof'l Servs., Inc.*,
  348 Wis.2d 763 (Ct. App. 2013)......................................................33

*Revealed Water Prods., Inc. v. Arrowhead Plastic Eng'g, Inc.*,
  No. IP99-0069-C-T/G, 2000 WL 1469571 (S.D. Ind., Sept. 29, 2000) ...............26

*Richard A. Rosenblatt & Co., Inc. v. Davidde Data Sys. Corp.*,
  295 A.D.2d 168(1st Dep't 2002) .....................................................24

*Roe v. City of Waterbury*,
  542 F.3d 31 (2d Cir. 2008)...........................................................17

v

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

*Sang Lan v. Time Warner, Inc.*,
  2014 WL 764250 (S.D.N.Y., Feb. 25, 2014) ........................................................................21

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000) .................................................................................................31

*Scott-Macon Sec., Inc. v. Zoltek Cos., Inc.*,
  2007 WL 2914873 (2d Cir. Oct. 4, 2007) .............................................................................35

*Seasbury Const. Corp. v. Jeffrey Chain Corp.*,
  289 F.3d 63 (2d Cir. 2022) ...................................................................................................18

*Sevel Argentina, S.A. v. General Motors Corp.*,
  46 F. Supp.2d 261 (S.D.N.Y. 1999) .....................................................................................21

*SG Block, Inc. v. Osang Healthcare Co.*,
  2022 WL 16787936 (E.D.N.Y. Sept. 22, 2022) ..............................................................28, 29

*SSAA-A, Inc. v. Morgan Stanley Dean Witter & Co.*,
  281 A.D.2d 201 (1st Dep't 2001) .........................................................................................30

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) .................................................................................................20

*Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*,
  135 A.D.2d 891 (3d Dep't 1987) ..........................................................................................44

*Superview Network, Inc. v. SuperAmerica, a Div. of Ashland Oil, Inc.*,
  827 F. Supp. 1392 (E.D. Wis. 1993) ................................................................................20, 21

*Swerdloff v. Mobil Oil Corp.*,
  74 A.D.2d 258 (2d Dep't 1980) ............................................................................................25

*T & M Inventions, LLC v. Acuity Brands Lighting, Inc.*,
  2013 WL 1754862 (E.D. Wis. Apr. 23, 2013) .......................................................................21

*Talon Indus., LLC v. Rolled Metal Prod., Inc.*,
  2022 WL 3754800 (D.N.J. Aug. 30, 2022) ...........................................................................25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Target Corp. v. RichRelevance, Inc.*,
2017 WL 590316 (S.D.N.Y., Feb. 13, 2017)..........................................................................26

*Toltec Fabrics, Inc. v. August Inc.*,
29 F.3d 778 (2d Cir.1994)....................................................................................................31

*Total Wall, Inc. v. Wall Sos. Supply, LLC*,
No. 09-cv-404-WME, 2010 WL 2572816 (W.D. Wisc. June 23, 2010)................................29

*Tractebel Energy Mktg. v. AEP Power Mktg.*,
487 F.3d 89 (2d Cir. 2007)...................................................................................................29

*Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*,
63 N.Y. 2d 395 (1984) .........................................................................................................19

*Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co.*,
321 F. Supp. 771 (S.D.N.Y. 1971)........................................................................................34

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*,
178 F. Supp. 655 (S.D.N.Y. 1959),
*aff'd on opinion of the district court*, 280 F.2d 197 (2d Cir. 1960) .......................................39

*Winston v. Mediafare Entm't Corp.*,
777 F.2d 78 (2d Cir.1985).....................................................................................................21

*Wood v. Lucy, Lady Duff-Gordon*,
222 N.Y. 88 (1st Dep't. 1917) ..............................................................................................34

### STATUTES

15 U.S.C.A. § 1055............................................................................................................34, 40

1 White, Summers, & Hillman, Uniform Commercial Code § 3:7 (6th ed.)................................26

Lanham Act............................................................................................................................40, 42

New York Uniform Commercial Code
..................................................................................................20, 21, 23, 24, 25, 28, 29

**TABLE OF AUTHORITIES**
<u>(continued)</u>

**<u>Page(s)</u>**

N.Y. U.C.C.
    § 1-201 .................................................................................................................25
    § 2-201(1) ............................................................................................................25

Wisconsin Statute
    § 401.201 .............................................................................................................25
    § 402 ....................................................................................................................24
    § 402.201(1) .........................................................................................................25

**OTHER AUTHORITIES**

3 McCarthy on Trademarks and Unfair Competition § 18:52 (5th ed.) ........................................40

Bay Tek Entertainment, Inc. ("BTE") respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment on the Second Amended Complaint of Full Circle United, LLC ("FCU"), and on certain of BTE's Counterclaims against FCU and Eric Pavony ("Pavony").[1] At the November 29, 2022 Pre-Motion Conference, the Court converted BTE's pending Motion for Judgment on the Pleadings to a Motion for Summary Judgment and allowed BTE to submit supplemental briefing (ECF No. 146).[2]

## I.     PRELIMINARY STATEMENT

Under black letter law, a substantial, fundamental and unequivocal difference exists between a trademark owner and a limited-use trademark licensee.

Here, there is no dispute that BTE, a privately held Wisconsin-based company, is the sole owner and licensor of the trademark at issue, "Skee-Ball" (the "Mark"), and that FCU, a single-member entity run by one person, namely Pavony, is only a limited-use trademark licensee of the Mark. "Skee-Ball" is an iconic brand name that has been widely used in connection with alley roller games for over a century; it enjoys common law and trademark registration protection.

FCU, through Pavony, has been intent on taking over the Mark for its own agenda for years, refusing to accept FCU is not the owner of the Mark or free to use the Mark as it pleases. This litigation is their latest attempt to usurp expansive rights in the Mark—far greater than FCU's limited license provides—that belong to the trademark owner, BTE.

---

[1] BTE seeks summary judgment on FCU's claims for breach of contract, breach of the alleged revenue share agreement, and tortious interference, as well as FCU's lost profits damages claims. BTE seeks summary judgment on its counterclaims for breach of the License Agreement, trademark infringement, false endorsement, and common law unfair competition, and seeks declaratory judgments.

[2] On September 30, 2020, BTE filed a Motion for Judgment on the Pleadings on FCU's Complaint. (ECF No. 34). FCU opposed on October 28, 2020 (ECF No. 44), and BTE filed a Reply on November 23, 2020 (ECF No. 54). BTE incorporates herein these prior submissions.

In October 2011, litigation commenced between the Mark's previous owner, Skee-Ball, Inc. ("SBI") and FCU (BTE acquired the Mark from SBI in 2016 pursuant to an asset purchase agreement). In that litigation, SBI claimed that FCU was infringing the Mark by using the term "Brewskee Ball," and FCU challenged the validity of the Mark as generic—revealing then its overarching goal to invalidate the Mark to achieve its own business agenda. In resolution of that litigation, FCU was granted certain narrow and expressly limited rights in the Mark under the License Agreement that is the subject of this litigation. Therein FCU warranted: to never contest the validity or ownership of the Mark; that all of the licensed uses would "inure to the benefit" of the Mark's owner by FCU's "best efforts; that FCU would refrain from disparaging the Mark's owner and the Mark, and that FCU would only use the Mark under approved terms and slogans.

None of this has come to pass. FCU's conduct has only worsened, as it arrogantly disregards the License Agreement and uses the Mark beyond the licensed scope in multiple infringing ways (including by creating disgusting and infringing slogans). Most damaging and brazen, however, is FCU's insistence that BTE build it customized Skee-Ball lanes. FCU admits BTE has no obligation to do so under the License Agreement, which contemplates only standard, non-custom lanes. The contemplated use of standard lanes is the heart of the License Agreement, from which all rights licensed to FCU flow. From merchandise to sponsorship, they pre-suppose that FCU will be promoting the Skee-Ball brand by using those standard alley rollers manufactured by BTE. By refusing to do so—in favor of vainly pursuing its own ends—FCU has spent the last several years failing to build out its business and generate any benefit for BTE, its licensor. **Indeed, in the nearly seven years since BTE was assigned the License Agreement, the only royalties paid by FCU to BTE thereunder amount to $161.50.**

2

As demonstrated herein, BTE never agreed to the claimed oral agreement on "custom lanes"—the undisputed record establishes it instead only made a non-binding arrangement for 10 prototype custom lanes as a test case, and that there was no "meeting of the minds" beyond that arrangement. BTE soured on any further relationship beyond those prototypes with FCU when it began to fully comprehend the bad-faith conduct exhibited by Pavony, which included his habit of surreptitiously taping his conversations with BTE employees, maligning BTE on social media, threatening litigation, and pursuing an agenda that had nothing to do with compliance with the License Agreement. BTE realized that the more it entertained FCU's pie-in-the-sky fantasies, the more Pavony would want from BTE—*i.e.*, that no good deed would go unpunished.

True to form, rather than work under the License Agreement to exploit the narrow licensed uses for BTE's benefit, as the "best efforts" clause required it to do, FCU then brought this baseless litigation to continue to pressure BTE to capitulate to FCU's business agenda.

Now, at the close of voluminous discovery, FCU's claims are exposed as devoid of any evidence that could raise a genuine issue of material fact in their favor, and are defeated by FCU's own admissions. FCU's concocted narrative of a conspiracy in which BTE has been seeking to take over FCU's business is pure fantasy, and has zero support in the record. BTE breached no agreement, and it has committed no tortious interference, as a matter of law.

On the other hand, FCU has committed serious wrongdoings as a matter of law. Undisputedly, FCU has engaged in uses of the Mark that exceed the scope of several unambiguous terms of the License Agreement and committed material and willful breaches thereof. FCU has also willfully and continuously infringed the Mark in violation of trademark and unfair competition laws. Pavony is fully cognizant of, a participant in and responsible for the

willful trademark infringement of the Mark by FCU, as both an officer and sole controlling member of that entity, and is liable for his own such acts as an individual. BTE should prevail on its counterclaims against FCU for breach of the License Agreement, and against FCU and Pavony for violating trademark and unfair completion laws, as a matter of summary judgment.

The undisputed evidence also demonstrates that BTE is entitled to terminate the License Agreement at will and alternatively for cause. Under governing law, the absence of any term of duration and express statement of perpetuity therein allows for its termination at will, and BTE has requested a declaration to that effect by the Court. Further, based on the abundant, irrefutable evidence of FCU's willful trademark infringement and material breaches of the License Agreement, BTE is entitled to a declaration that it may terminate for cause.

In sum, FCU is not a protector of the Mark, but rather its enemy. FCU uses the Mark in callous disregard of BTE's rights, and in pursuit of only its self-serving purposes, absent capitulation to which it improperly threatens to revert to its goal of seeking to destroy the Mark's validity. FCU must be prevented from doing any further harm to the Mark.

## II.     UNDISPUTED FACTS IN SUPPORT OF THE INSTANT MOTION

### A.     <u>Background Facts</u>

#### 1.     The Skee-Ball Mark and SBI

Skee-Ball is played on a machine called an alley roller, composed of an inclined lane leading to a ramp with rings corresponding to different point values arranged on a backboard positioned beyond the ramp. SUF ¶ 1.

The term "SKEE-BALL®" was registered on the Principal Register of the United States Patent and Trademark Office ("USPTO") on May 21, 1929, in connection with "a game in the nature of a bowling game and parts thereof" (the "Mark"). SUF ¶ 2. The Mark remains registered

on the Principal Register of the USPTO and is incontestable by law. SUF ¶¶ 3, 4. Prior to

February 2016, the Mark was owned by Skee-Ball, Inc. ("SBI"). SUF ¶ 5.

### 2.    Full Circle and Eric Pavony

FCU has operated live leagues, events and tournaments with alley roller lanes in bars

under the name "Brewskee Ball" since 2005. SUF ¶ 7. Pavony is the owner, founder, president

and sole member of FCU, which has never had any employees. SUF ¶ 6. Eric Wikman

("Wikman") and Eric Cooper ("Cooper") are independent contractors with FCU. SUF ¶¶ 10, 11.

FCU operates Brewskee Ball in bars in Brooklyn, New York and Austin, Texas, called "Full

Circle Bar." SUF ¶¶ 8, 9. Pavony is a co-owner of the Brooklyn bar through Full Circle Bar,

LLC, and the Austin bar through Extra Positive Land, LLC. SUF ¶¶ 8, 12.

### 3.    SBI/FCU Lawsuit

In October 2011, litigation commenced between FCU and SBI, in which SBI claimed that

FCU was infringing the Mark by using the term "Brewskee Ball." SUF ¶ 13. The case settled in

2014, and FCU and SBI entered into a settlement agreement and limited License Agreement (the

"License Agreement") "granting to FCU a limited license to use the SKEE-BALL Trademark in

connection with Live Play, subject to the restrictions, exclusions and other terms and conditions

set forth herein." SUF ¶¶ 14-17. "Live Play" is defined as "live play leagues, teams, events, and

tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball® machines

(including without limitation BREWSKEE BALL live play leagues, teams, events, and

tournaments) utilizing alley rollers manufactured by SBI." SUF ¶ 33.

### 4.    Bay Tek

BTE is a Wisconsin-based manufacturer of coin-operated arcade machines and ticket

redemption games. SUF ¶ 18. In 2016, BTE purchased SBI's assets, including the Mark. SUF

¶ 19. BTE is the sole owner of the Mark, in which it has common law and federal rights. SUF ¶¶ 19, 125. In connection with the sale, BTE was assigned the License Agreement by SBI. SUF ¶ 20.

### 5.    Standard vs. Custom Lanes

After BTE was assigned the License Agreement, FCU approached BTE to build customized lanes which would include equipment beyond that used in Standard Lanes such as video cameras, HD video screens, and internet connectivity (the "Custom Lanes"). SUF ¶ 22. Under the License Agreement, FCU was only entitled to receive, "SKEE-BALL® branded alley roller machines manufactured by SBI or its successor" ("Standard Lanes"). [3] SUF ¶¶ 21, 23, 24.

On July 28, 2020, FCU sued BTE for breach of the License Agreement, breach of oral contract, and tortious interference. (ECF No. 1). On September 21, 2020, BTE counterclaimed for breach of the License Agreement and for trademark infringement and unfair competition, and sought declaratory relief to terminate the License Agreement. (ECF No. 25). FCU filed its operative Second Amended Complaint ("SAC") on November 13, 2020. (ECF No. 52).

### B.    Undisputed Facts That Defeat FCU's Claims

#### 1.    Breach Of The License Agreement (Count I)

##### a.    BTE's Purported Violation Of ¶ 4.2

¶ 4.2 provides that any phrases or slogans BTE wishes to use in connection with the Mark must be approved by BTE, that no right is granted to FCU to ownership of any such phrases or slogans, and that use of such phrases or slogans inures to BTE's ownership rights in the Mark. SUF ¶ 25.

---

[3] In this case, Standard Lanes are sometimes referred to "stock" and "Classic" lanes. Custom Lanes are also called "Skee-Ball Live Lanes," "Live Lanes," or "NSBL Lanes."

### b.      BTE's Purported Violation Of ¶5.3

¶ 5.3 of the License Agreement reads as follows:

> SBI hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term and in the Territory, operate, sponsor, or endorse a business, involving Live Play.

SUF ¶ 26. FCU alleges that BTE breached ¶ 5.3 by "manufacturing custom Skee-Ball-branded lanes for use in bars operating competing Live Play, endorsing competing Live Play on social media and hosting and endorsing competing Live Play." SAC ¶ 240. FCU never sent BTE a Notice under the ¶ 11.6 "notice and cure" procedure pertaining to any breach of ¶ 5.3. In discovery, FCU mentioned alleged violations pertaining to BTE licensees (GameCo and Alchemy3) and two bars (Aunt Ethel's and The Up Down). FCU admitted it has no supporting evidence, and the undisputed facts show that BTE neither engaged in nor endorsed such conduct. SUF ¶¶ 27-31.

### c.      Breach Of ¶ 7.2 "Best Efforts" Provision

¶ 7.2 of the License Agreement reads as follows:

> SBI and FCU each agree that they will use their respective best efforts to promote the Licensed Uses offered in connection with the SKEE-BALL Trademark and to coordinate the development, creation, distribution, sale, advertising, and promotion of the Licensed Uses so as to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark.

SUF ¶ 32.

The "Licensed Uses" are set forth at ¶ 3.1 as follows:

> a) Conducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball® machines (including without limitation BREWSKEE BALL live play leagues, teams, events, and tournaments) utilizing alley rollers manufactured by SBI (collectively "Live Play").
>
> b) Developing, producing, selling, and distributing merchandise solely in

7

connection with Live Play ("Live Play Merchandise") subject to the restrictions on merchandise set forth below.

c) Developing, producing, offering, and using an electronic scoring application that will be made available for free, which allows Live Play players, teams, and leagues to record and maintain scores, statistics, league and player information, wins and losses, awards and rankings, solely and directly in connection with Live Play, and which does not include virtual play of the game manufactured by SBI known as Skee-Ball® (the "Scoring App").

d) Using the Skee-Ball Trademark for sponsorships or endorsements solely and directly related to Live Play, provided however, that notice of such sponsorships or endorsement must be given to SBI, SBI shall receive a copy of the executed agreement and SBI shall receive five percent (5%) of Gross Sponsorship Revenues (as defined below in Paragraph 8.4 ).

SUF ¶ 33. FCU alleges three separate breaches of the "best efforts" provision by BTE, none of which are supported by the undisputed record.

### (i)     BTE's Alleged Failure To Manufacture Custom Lanes

The SAC asserts that BTE breached ¶ 7.2 by "refusing" to manufacture Custom Lanes "under any scenario." FCU has admitted, however, that BTE has no obligation under the License Agreement to manufacture custom lanes. SUF ¶¶ 24, 34.

### (ii)    BTE's Alleged Interference With FCU's Efforts To Obtain Alley Rollers From Third Party Manufacturers

FCU contends that BTE breached ¶ 7.2 by allegedly interfering with FCU's ability to purchase Standard Lanes from third parties. SAC ¶ 243. However, ¶ 5.2 of the License Agreement states that FCU must utilize "SKEE-BALL® branded alley-roller machines" manufactured by BTE unless it becomes "impractical or unreasonable because SKEE-BALL® branded alley-roller machines [are] not available to buy, rent, or borrow."[4] SUF ¶ 35. At all times relevant, BTE has stood ready, willing and able to manufacture Standard Lanes. SUF ¶ 36. FCU

---

[4] This indisputably refers to Standard Lanes. SUF ¶¶ 24, 34.

never purchased any Standard Lanes from BTE. SUF ¶ 37.

FCU sought to purchase 150 Standard Lanes from BTE in late 2019 so they could be **altered** by a third party into Custom Lanes SUF ¶¶ 38-41. BTE told FCU this would violate ¶ 5.4 because it would be competing with BTE. SUF ¶ 41. BTE also noted that unauthorized alterations were not permitted and would void the two-year warranty. *Id.*

### (iii)    The Proposed ESPN Deal

FCU alleges that BTE violated ¶ 7.2 "by withholding consent for Full Circle to proceed with a deal between FCU and ESPN to broadcast Live Play." SAC ¶ 243. FCU, however, had no right to enter into such a deal, because FCU was precluded by the plain language of the License Agreement from broadcasting Live Play events and tournaments.

¶ 4.1 states that FCU has "no rights for digital or virtual play, or other digital rights" using the Mark (aside from a Scoring App). SUF ¶ 43. ¶ 3.2 defines "Licensed Uses" as only "conducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball machines …." SUF ¶ 43. ¶ 3.2 limits use of the Mark outside the brick and mortar world to "advertising and promotional purposes" only, "so long as such use is solely in connection with and in compliance with the Licensed Uses." *Id.* ¶ 4.5 allows FCU to use the Mark via the Internet, radio, television or other communications media "**for promotional and marketing purposes only** of its Live Play business … and Live Play Merchandise." SUF ¶ 44 (emphasis added). ¶ 18.4 states that the License Agreement is a fully integrated document. SUF ¶ 45.[5]

---

[5] The SAC further alleges that each of the above alleged acts breached the implied covenant of good faith and fair dealing in the License Agreement. SAC ¶ 248.

### 2.    Breach Of The Alleged Oral Revenue Share Agreement (Count II)

FCU alleges that during a September 2017 lunch at a diner near BTE's headquarters,

BTE's chairman, Larry Treankler, on behalf of BTE, **at that time** "orally agreed to the final

terms" of a revenue share agreement for BTE to manufacture a total of 36 Custom Lanes (which

included the 10 Custom Lanes BTE had already agreed to build). SAC ¶¶ 116-119. No such

agreement was made at this "diner meeting" over sandwiches.

Prior to the meeting, FCU and BTE had discussed the possibility of a potential revenue

share arrangement. At the meeting, Pavony asked when he could expect a "counter-proposal"

from BTE concerning a potential revenue share, to which Treankler responded that "the quantity

of games," "R&D part," and other issues **were still to be resolved**. SUF ¶ 48. Wikman asked

hypothetical questions about what BTE would do if FCU "proved the model" on the initial 10

lanes: "I'm asking you to make the assumption that in – like go through the thought process,

**make the assumption that, okay, we hit those target goals,** the amount of revenue that we said

we would make per lane, we made, **and if we do succeed with that, what would you be willing**

**to make at that point**?" SUF ¶ 49 (emphasis added). Wikman added, "**if it comes in that our**

**numbers are lower, I understand that none of it is binding**." SUF ¶ 50 (emphasis added).

Pavony then asked:

> PAVONY: And so from our standpoint, then, you're agreeing to do the rev share on these initial 11 plus the 25 and maybe more, but no help right now with operational cash for us to roll that out.  That's up to us to figure out.
>
> TREANKLER: Yep, that's the agreement with the – in the middle there, we're going to be willing to pay you guys some money to make, to help us so that we can leverage our Skee Ball.

Supplemental Declaration of Jeffrey M. Movit ("Movit MSJ Decl."), Video Ex. 2.

The parties did not discuss or agree to material terms of any definitive agreement at this

10

casual lunch, or at any time thereafter, including (1) any specific number of additional Custom Lanes potentially to be built by BTE beyond the 10 prototypes, (2) any manufacturing or delivery dates for Custom Lanes beyond the 10 prototypes, (3) further specifications with respect to any potential Custom Lanes beyond the 10 prototypes, (4) locations that were acceptable as to where any potential Custom Lanes beyond the 10 prototypes would be placed and monetized, or (5) the financial terms between FCU and BTE as to any exploitation of any potential Custom Lanes beyond the 10 prototypes. SUF ¶¶ 51-60. Indeed, months later FCU speculated whether an agreement was made, selectively relying on snippets of the diner conversation to try to trap BTE. On January 5, 2018, Wikman wrote to Pavony: ██████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ SUF ¶ 52.  On May 17, 2018, Pavony wrote to Wikman: ███████████████████████████████████████████████████████████ █████████████ SUF ¶ 54 (emphasis added).

On February 28, 2018, Pavony emailed Mr. Treankler complaining about a lack of clarity in BTE's and FCU's relationship. SUF ¶ 53 ████████████████████████████ █████████ (emphasis added).

In August 2018, BTE tried to memorialize a revenue share agreement, preparing a written agreement for FCU to sign pertaining **only** to the 10 Custom Lanes that had been delivered. SUF ¶¶ 55, 56. Ultimately, no written revenue share agreement was entered into. SUF ¶ 57.

In discovery, FCU admitted it does not contend there are any statements or writings

prepared or signed by someone with authority to bind BTE memorializing the terms of the alleged agreement. SUF ¶¶ 58, 59. FCU identified documents it claimed show the terms of the alleged agreement, but none of them do so. SUF ¶¶ 59, 60 FCU has not identified any additional documents containing any material terms of the alleged oral agreement. SUF ¶ 60.

### 3.    Tortious Interference (Count III)

FCU alleges that it reached an agreement in principle with Play Mechanix ("PM"), under which PM purportedly agreed to "help" FCU "obtain Skee-Ball Live Lanes in exchange for a share of lane revenue." SAC ¶¶ 270-272. FCU further alleges that "Bay Tek threatened Play Mechanix if it tried to help Full Circle obtain Skee-Ball Live Lanes, causing Play Mechanix to back out of its deal with Full Circle." *Id.*; *see also* SAC ¶ 182.

FCU and PM did not have an "agreement in principle." SUF ¶ 61. PM's president, George Petro, called Rick Rochetti (BTE's then-Director of Sales), told him PM would not be working with FCU, and Mr. Rochetti did not threaten PM or Petro in the call. SUF ¶¶ 62, 63.

### 4.    Lost Profits

FCU claims it is entitled to lost profits it allegedly would have earned but for BTE's supposed breaches of the License Agreement and alleged revenue share agreement, and arising from BTE's alleged interference with the PM relationship. SAC ¶¶ 251, 263, 279.

The damages calculations submitted by FCU's expert witness, which purport that FCU is owed approximately $30 million, are not reasonably certain as to their amount. SUF ¶ 64. For a period of time between 2016 and 2018, FCU did not maintain its own bank account, and for a time FCU used a personal bank account opened in Eric Cooper's name. SUF ¶ 65. FCU's financial record-keeping also was poor, and it does not have its own accounting software, generate annual reports, or maintain a general ledger. SUF ¶ 66. In addition, FCU tried to obtain

12

investor funding but did not succeed. SUF ¶ 67.

    **C.**    **<u>Undisputed Facts Entitling BTE To Summary Judgment On Certain Counterclaims</u>**

        **1.**    **Breach Of The License Agreement (Count VI)**

            **a.**    **Failure To Promote Licensed Uses**

                **(i)**    **Building Out Live Play Business Using Standard Lanes**

¶ 3.1(a) granted FCU the limited right to use the Mark in connection with "[c]onducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments" using Standard Lanes manufactured by BTE. SUF ¶ 33.

FCU has not purchased **any** Standard Lanes from BTE. SUF ¶ 37. FCU instead has insisted on having BTE manufacture Custom Lanes. SUF ¶¶ 22, 24, 34, 36, 37. FCU admits that BTE is not obligated to do so under the License Agreement. SUF ¶¶ 24, 34. FCU admits it was free to operate Live Play outside of bars. SUF ¶ 69. But, FCU has only operated Live Play in bars. SUF ¶ 70.

                **(ii)**    **Live Play Merchandise**

¶ 3.1(b) granted FCU the limited right to use the Mark in connection with "[d]eveloping, producing, selling, and distributing merchandise solely in connection with Live Play" subject to restrictions set forth in ¶ 3.2(a). SUF ¶ 33.

FCU has not sold **any** Live Play merchandise. SUF ¶ 72. Instead, FCU sold "Brewskee Ball" merchandise, which does not generate revenue for BTE. SUF ¶ 73, 74.

                **(iii)**    **Live Play Sponsorships And Endorsements**

¶ 3.1(d) granted FCU the limited right to use the Mark in connection with "sponsorships or endorsements solely and directly related to Live Play[.]" SUF ¶ 33. FCU was required to, among other things, remit 5% of Gross Sponsorship Revenues to BTE. SUF ¶¶ 75, 76.

FCU has paid just **$161.50** in total revenue to BTE. SUF ¶ 77. FCU had Live Play sponsors, but they paid FCU via in-kind donations, particularly liquor, that benefited the Full Circle Bar venues owned by Pavony, with none resulting in royalties to BTE. SUF ¶ 78.

### b.      Failure To Use Best Efforts To Create Live Play Network

¶ 5.1 sets forth that FCU "agrees to use best efforts to build a national network of Live Play teams, leagues, and/or events in at least fifteen (15) states in the United States within five (5) years of the Effective Date of this Agreement" (*i.e.,* by July 16, 2019). SUF ¶ 79.

FCU first operated Live Play in nine states in 2019. SUF ¶ 80. Most of those states held **one-time** events and had no Live Play presence thereafter. SUF ¶¶ 81, 82. FCU claims it operated Live Play in Colorado in 2011, but Colorado is not listed in ¶ 5.1 as a state where FCU "had developed Live Play teams, leagues, and events" as of July 2014. SUF ¶¶ 83, 84.

### c.      Use of Unauthorized Slogans And Phrases

¶ 4.2 sets forth that FCU's license to use the Mark in connection with Live Play extends to pre-approved words and phrases that include the Mark, including those set forth on Exhibit B to the License Agreement. SUF ¶ 86. It further states that if FCU wishes to use phrases not set forth in Exhibit B, FCU must seek prior written approval from BTE. *Id.*

FCU has used the Mark in connection with slogans and phrases that do not appear on Exhibit B. SUF ¶¶ 88-91. And, Pavony registered, in his individual name, web domain names that utilize the Mark. SUF ¶ 92. None of this was approved by BTE. SUF ¶¶ 91-92.

### d.      Uses That Disparage And Tarnish The Mark And BTE

¶ 7.7 sets forth that FCU "shall not use the SKEE-BALL Trademark in a manner that disparages, demeans, tarnishes or dilutes the reputation of SBI or the SKEE-BALL Trademark." FCU further "acknowledges and agrees that SBI's SKEE-BALL Trademark branded goods

14

and/or services are geared towards families and children," and that FCU "will ensure that its use of SKEE-BALL Trademark shall not tarnish, dilute, weaken, blur or otherwise malign the SKEE-BALL Trademark and/or SBI." SUF ¶ 94.

FCU has published team and player names on its public websites accessible by children, such as "Hepatitis Skee"; "Skeemature Ejaculation"; "Skeefer Madness"; "Can You Skee My Balls?"; "Monica LewinSkee-Ball Liquors"; "K. Skee Anthony"; and "Salty Skeemen." SUF ¶¶ 91, 95. In July 2018, FCU released a video on Twitch in which Pavony disparaged BTE. SUF ¶ 101. In November 2020, after BTE's counterclaims were filed, the Full Circle Bar Facebook account posted a vulgar photo of the Skee-Ball design Mark. SUF ¶ 103. In summer 2021, FCU and Pavony allowed members of Barstool Sports to conduct an internet livestream at the Brooklyn bar filled with discussions of the members' sexual exploits, which Pavony attended, with the Mark displayed. SUF ¶¶ 104-106.

### e.   Unauthorized Use Of Third Party Intellectual Property

¶ 7.8 sets forth that if FCU seeks to use the Mark in connection with intellectual property of any third party, FCU must first "obtain any required third party authorization, release, approval, consent or license." SUF ¶ 107.

FCU has published on its websites and/or social media team and player names that use third party trademarks, including "Skee.I.Joes" (G.I. Joe), "Skeeyonce Rolles" (Beyonce Knowles), and "ACDSkee" (AC/DC), and encourages players to use such names. SUF ¶¶ 91, 108-111, 118. In recent months, FCU has posted names such as "SKEEnage Mutant Ninja Turtles," "PusSKEEcat Dolls," "Shang-Skee and the 10 Brews," and "A-Skee/D-Skee." SUF ¶¶ 113-116. FCU did not obtain authorization to use these trademarks. SUF ¶¶ 91, 117.

### f.      Unauthorized Broadcasts Of Live Play Events

¶ 4.5 states that FCU has the right to use the Mark via the Internet, radio, television, or other communication and media outlets, whether now known or hereafter created, developed or devised, for promotional and marketing purposes only. SUF ¶ 44.

It is undisputed that FCU has broadcast full Live Play events and tournaments on the internet, and that it sought to enter into deal with ESPN to broadcast Live Play. SUF ¶¶ 119-120.

### 2.      Claims For Declaratory Judgment (Counts VII and VIII)

### a.      The Duration Of The License Agreement

BTE seeks a declaratory judgment that it may terminate the License Agreement because a contract of indefinite duration is terminable at will unless it states expressly and unequivocally that the parties intend to be perpetually bound. *See* Counterclaims, ¶ 99.

¶ 11 does not set forth a term for the License Agreement. SUF ¶¶ 121, 122. ¶ 11 sets forth scenarios upon the occurrence of which the License Agreement may be terminated. SUF ¶¶ 121. The License Agreement contains no statement that FCU's rights are perpetual. SUF ¶ 123.

### b.      FCU's Incurable Breaches Of The License Agreement

BTE also seeks a declaratory judgment that it is entitled to terminate the License Agreement on the grounds that FCU has committed incurable breaches. Counterclaims, ¶ 94.

This counterclaim is premised on the same undisputed facts that underlie BTE's counterclaims for breach of the License Agreement (SUF ¶¶ 68-120), and they are incorporated by reference. SUF ¶ 124.

### 3.      Trademark Infringement (Count I), False Endorsement (Count II), And Common Law Unfair Competition (Count IV)

BTE is the lawful owner of the Mark. SUF ¶ 125. Otherwise, the same facts that underlie BTE's contract claims give rise to its trademark infringement, false endorsement, and common

law unfair competition claims, and are incorporated herein by reference. SUF ¶¶ 68-120, 126.

## III.   LEGAL ARGUMENT[6]

### A.   BTE Is Entitled To Summary Judgment On FCU's Claims

#### 1.   FCU's Claim For Breach Of The License Agreement Fails

##### a.   BTE Did Not Breach ¶ 4.2

The SAC alleges that BTE breached ¶ 4.2 by registering a trademark for "Skee-Ball Live." Under ¶ 4.2, BTE had every right to register the trademark. BTE incorporates the arguments made in Section II.A of its Motion for Judgment on the Pleadings at page 11, as well.

##### b.   BTE Did Not Breach ¶ 5.3

The undisputed facts confirm that BTE did not compete with FCU's efforts to develop, promote, and operate Live Play. FCU identified only four instances where it alleged BTE partook in or endorsed such conduct. But, FCU admitted it has **no evidence** for these claims, which relate to alleged conduct by two BTE licensees and two bars, and it is undisputed that BTE neither took part in these alleged violations, nor endorsed any of them. *See* SUF ¶¶ 27-30.

##### c.   BTE Did Not Breach ¶ 7.2

None of BTE's purported breaches of the "best efforts" clause withstand scrutiny based on the unambiguous language of the License Agreement and FCU's admissions. Pavony erroneously claims he can do "anything at all" with the Mark with Live Play. Not so. ¶ 7.2 only applies to promoting the "Licensed Uses"; it is not a vehicle for FCU to do whatever it wants

---

[6] Pursuant to the well-known summary judgment standard, "[a] party can defeat a summary judgment motion only 'by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial.'" *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted). "The non-movant must advance more than 'a scintilla of evidence'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and demonstrate more than 'some metaphysical doubt as to the material facts.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

17

with the Mark in connection with Live Play.

First, FCU admits it is not entitled to Custom Lanes under the License Agreement, declaring the issue a "straw man" and admitting its claim "is not based on any duty to customize lanes in the License Agreement." SUF ¶ 24. Under ¶ 5.2, FCU was required to utilize Standard Lanes, and would only be relieved from that obligation if it became "impractical or unreasonable because [Standard Lanes were] not available to buy, rent, or borrow." That never occurred; FCU could have obtained Standard Lanes from BTE, but chose not to. SUF ¶¶ 36, 37. As such, FCU's allegations are improper and deceptive. *See* SAC ¶ 243 ("[I]n violation of the Best Efforts Provision, Bay Tek has deprived Full Circle of its ability to operate Live Play by refusing to manufacture Full Circle lanes for Live Play under any scenario[.]").

Second, Play Mechanix never had an agreement with FCU. SUF ¶ 61. BTE thus did not "interfere" with FCU's ability to obtain lanes, even if FCU was entitled to do so (it was not).

Third, FCU's claim pertaining to the ESPN deal fails because the License Agreement precludes FCU from entering such deal or using the Mark in that fashion. When, as here, "the contract is unambiguous, courts must effectuate its plain language" rather than consider extrinsic evidence of the parties' intent. *Seasbury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2022). The License Agreement is integrated, and interpretation of its terms is limited to the four corners of the contract. SUF ¶ 45. Broadcast and digital rights are not among the Licensed Uses—in fact, they are expressly excluded. ¶ 4.1 unambiguously states that FCU has "no rights for digital or virtual play, or **other digital rights**" using the Mark (aside from a Scoring App). SUF ¶ 43. ¶ 3.1(a) unambiguously defines "Live Play" as "**conducting, arranging, presenting, marketing, and promoting**" Live Play. SUF ¶ 33. The word "broadcast" is absent.

18

Any claim that "broadcast" rights are included in the Licensed Uses also fails under the doctrine of *expressio unius est exclusion alterious* (expression of one thing is exclusion of the other). *See Realtime Data, LLC v. Melone*, 104 A.D.3d 748, 751 (2d Dep't 2013). If SBI intended to let FCU broadcast Live Play, the License Agreement would have listed such in the Licensed Uses, and not expressly reserved to the licensor all rights "not licensed hereunder." *See* License Agreement ¶ 6 ("Any rights in or to the SKEE-BALL Trademark not licensed hereunder are fully reserved to SBI and shall remain the property of SBI[.]"); *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976) (failure by sophisticated drafter to include specific terms precludes "divining or implying such a right on the basis of the general language of the agreement").

¶ 3.2 further states that FCU's use of the Mark outside the brick-and-mortar world must be "for advertising and promotional purposes" **only**. SUF ¶ 42 (emphasis added). ¶ 4.5 allows FCU to use the Mark via the Internet, radio, television or other communications media outlets "for promotional and marketing purposes **only** of its Live Play business … and Live Play Merchandise." SUF ¶ 44 (emphasis added). FCU has asserted that broadcasting full Live Play events constitutes "advertising and promotion" of Live Play. But this would allow any use of the Mark in connection with Live Play to constitute "advertising and promotion," rendering the restriction meaningless. *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y. 2d 395, 403-04 (1984). "New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary." *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 670 n.8 (2d Cir. 1983). If FCU's broad interpretation of "advertising and promotion" were adopted, it would swallow the foregoing prohibitions.

19

        **d.**       **FCU's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Fails As A Matter Of Law**

FCU's breach of the implied covenant of good faith and fair dealing claim is duplicative of its baseless breach of contract claim and must be dismissed on that ground alone. *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 319–20 (1995); *Danusiar v. Auditchain USA*, *Inc.*, No. 20-CV-1477 (KNF), 2020 WL 6126378, at *9–10 (S.D.N.Y., Oct. 8, 2020). Moreover, this claim arises from the same facts as FCU's contract claim. Thus, BTE is entitled to judgment as a matter of law based on the evidence and arguments discussed above.

        **e.**       **FCU Has Itself Breached The License Agreement**

A party in breach cannot recover damages on a breach-of-contract claim. As set forth in BTE's briefing on its Counterclaims, (*see below*), FCU has breached the License Agreement by, *inter alia*, failing to use its best efforts to promote the Licensed Uses and misusing the Mark. Accordingly, BTE is entitled to judgment as a matter of law for this reason as well.

        **2.**       **FCU's Claim For Breach Of An Alleged Oral Agreement Fails**

        **a.**       **There Was No Meeting Of The Minds On Any Material Terms**

FCU alleges at the diner meeting, the parties agreed to the "final terms" of an oral agreement for BTE to build 36 Custom Lanes. No contract was formed as a matter of law.

To create a contract, there must be both an offer and an acceptance, as well as a meeting of the minds or binding mutual understanding between the parties. *See Express Indus. & Terminal Corp. v. New York State Dept. of Transp.*, 93 N.Y.2d 584, 589 (1999). Absent a meeting of the minds on material terms, no contract can exist. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019). Wisconsin law is in accord. *See Superview Network, Inc. v. SuperAmerica, a Div. of Ashland Oil, Inc.*, 827 F. Supp. 1392, 1396 (E.D. Wis. 1993). "Even where interpretation of an agreement is otherwise controlled by the [Uniform Commercial

Code], courts use common law principles to determine whether a meeting of the minds has occurred." *See, e.g.*, *PCS Sales (USA), Inc. v. Nitrochem Distrib. LTD*, 2004 WL 944541, at *3 n.47 (S.D.N.Y. May 3, 2004), *aff'd*, 128 F. App'x 817 (2d Cir. 2005) (internal quotation marks omitted). If there is no basic agreement between the parties, the UCC will not imply one. *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 973, (1977).

"[B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 521 (S.D.N.Y. 2017). Lack of agreement on terms such as price, quantity, timing, payment, and scope of distribution renders an alleged contract unenforceable. *See, e.g.*, *Sevel Argentina, S.A. v. General Motors Corp.*, 46 F. Supp.2d 261, 268-69 (S.D.N.Y. 1999); *see also Sang Lan v. Time Warner, Inc.*, 2014 WL 764250, at *2 (S.D.N.Y., Feb. 25, 2014); *Kosher Provisions, Inc. v. Blue & White Food Prod. Corp.*, No. CV-04-361 (NGG) (SAC), 2005 WL 1890039, at *5 (E.D.N.Y. Aug. 9, 2005). Wisconsin again is in accord. *See Superview Netywork, Inc.,* 827 F.Supp. at 1396.

If either party communicates an intent not to be bound until an agreement is fully executed, "no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir.1985) (citation omitted); *accord, T & M Inventions, LLC v. Acuity Brands Lighting, Inc.*, 2013 WL 1754862, at *5 (E.D. Wis. Apr. 23, 2013), *citing Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 280 (7th Cir. 1979) (applying Wisconsin law).

FCU claims that Mr. Treankler orally agreed that BTE would build 36 Custom Lanes. But, when FCU and BTE discussed the number of lanes, it was in the context of Wikman posing

hypotheticals to Mr. Treankler. SUF ¶¶ 48-50. No other material terms were discussed (much

less agreed to), and Wikman interjected that he understood "**none of it was binding**." The

parties did not discuss or agree on specifications for potential Custom Lanes beyond the 10

prototypes, acceptable locations for potential Custom Lanes beyond the 10 prototypes, or

financial terms between FCU and BTE as to any exploitation of any potential Custom Lanes

beyond the 10 prototypes. SUF ¶ 51. This is insufficient to create a binding contract.

      Crucially, **not even FCU believed an agreement was reached**. Months later, Pavony

and Wikman tried to reverse-engineer an agreement by viewing video of the meeting and cherry-

picking statements. SUF ¶¶ 52, 54. Such strategic, *ex post facto* scheming is incompatible with a

meeting of minds. By May 2018, Pavony had concocted a narrative that BTE agreed to build 36

Custom Lanes. SUF ¶ 54 ("You were right. I did say 11 lanes + the 25 lanes on camera … **so

moving forward, when we talk about the rev share agreement . . . it was for 36 lanes.**")

(emphasis added). This confirms the parties never had a meeting of the minds.

      BTE sought to memorialize an agreement for the 10 Custom Lanes before a revenue

share could be enforceable. SUF ¶¶ 55, 56; *see R.G. Group, Inc. v. Horn & Hardart Co.*, 751

F.2d 69, 74 (2d Cir. 1984) ("Under New York law, if the parties do not intend to be bound by an

agreement until it is in writing and signed, then there is no contract until that event occurs.")

(citation omitted). But, no agreement ever was signed. SUF ¶ 57.

      In discovery, BTE asked FCU to identify "all statements made and writings prepared by

or signed by someone with authority to bind Bay Tek" that FCU contends "memorialize the

terms of the alleged revenue share agreement[.]" SUF ¶ 58. In response, FCU stated it "has not

made this contention," but that "**[c]ertain terms** of the Revenue Share Agreement" are reflected

in multiple documents FCU identified. SUF ¶ 59. This is an admission that no agreement on all material terms exists, and none of the documents proves the existence of the same. SUF ¶ 60.

BTE put the project on hold in early 2018 because it was expending significant resources on a project outside of the License Agreement for a licensee with no funding, for which a revenue share agreement was not finalized. BTE was then irritated when FCU then demanded a written contract to allow BTE to hold a one-time Skee-Ball event for charity that FCU contended was Live Pay. BTE also discovered that FCU was recording conversations with BTE, further eroding trust. All of this, along with FCU's eventual public disparagement of BTE, led BTE to place the project on hold, and led to the ultimate breakdown of the relationship. *See* Movit MSJ Decl., Exs. 7, 8 (Hampton Depo Tr. at 305:8-308:3, 552:25-554:14; Treankler Depo Tr. at 112:6-20, 127:24-128:10, 129:23-130:7).

The foregoing conclusively shows that no oral revenue share agreement ever came into being, entitling BTE to judgment as a matter of law on this claim.

>           **b.      An Oral Agreement Would Fail Under The Statute Of Frauds**

FCU's claim also fails because any purported oral agreement would be governed by the Uniform Commercial Code ("UCC") and unenforceable under the UCC's statute of frauds.

Contracts for the sale of goods, including custom or "specially manufactured" goods, are subject to the New York Uniform Commercial Code (UCC). "A contract must be considered one for [sale of goods] when services are 'merely incidental or collateral to the sale of goods,'" an issue that a district judge may determine as a matter of law. *Old Country Toyota Corp. v. Toyota Motor Distribs., Inc.*, 966 F.Supp. 167, 168 (E.D.N.Y.1997) (quoting *Triangle Underwriters, Inc. v. Honeywell Inc.*, 604 F.2d 737, 742-43 (2d Cir.1979) (citation omitted).) "Contracts for goods which involve … services such as installation, maintenance, testing, instruction or

supervision are still subject to the UCC." *Richard A. Rosenblatt & Co., Inc. v. Davidge Data Sys. Corp.,* 295 A.D.2d 168, 169(1st Dep't 2002) (holding contract for the installation and maintenance of computer hardware and software subject to UCC).[7]

The SAC alleges that BTE "orally agreed" to a "revenue-share agreement" to "manufacture thirty-six (36) Skee-Ball lanes for Full Circle," for which FCU would not pay up front, but would instead pay "15% of 'top line revenue' generated from each of the lanes until 150% of Bay Tek's manufacturing costs had been recouped." SAC ¶¶ 116-118; *see also ¶* 110. The SAC also alleges "Bay Tek agreed to develop the computer code needed for the lanes to collect credit card payments," through "credit card reader[s] installed on the lanes," and that it would "deliver [this code] to Full Circle after the National Championship." *Id.* ¶ 117. The SAC further alleges that "[u]nder the terms of the Revenue Share Agreement, Bay Tek would develop and manufacture the Skee-Ball Live Lanes at an agreed manufacturing cost of $4,500 per lane." *Id.* ¶ 257. Where an alleged contract has elements both of a contract for goods and contract for services, courts apply a "predominant purpose test," and may be guided by "the face of the complaint." *Old Country Toyota*, 966 F. Supp. at 169, citing *Triangle Underwriters, Inc.*, 604 F.2d at 742-43. *Accord, Linden v. Cascade Stone Co., Inc.*, 283 Wis. 2d 606 (Ct. App. 2005).

The purported oral "revenue-share agreement" is properly categorized as a contract for sale of goods, since under it, "Bay Tek would manufacture custom Skee Ball Live lanes for Full Circle, which Full Circle would pay for in the form of a promise to share the revenue generated

---

[7] Nearly identical UCC provisions govern in Wisconsin. *See* Wis. Stat. § 402; *Lakeside Bridge & Steel Co. v. Mountain State Const. Co.*, 400 F.Supp. 273, 277 (E.D. Wis. 1975) ("'Goods' are defined in § 402.105(1) as 'all things including specially manufactured goods … movable at the time of identification to the contract for sale").

by each lane." SAC ¶110. That the purported agreement includes aspects of design, or payment of revenues, does not remove it from the UCC. *Talon Indus., LLC v. Rolled Metal Prod., Inc.*, 2022 WL 3754800, at *5 (D.N.J. Aug. 30, 2022) ("[C]ourts have found that contracts, like the one here, for custom-designed manufactured equipment which also provide for services like testing and training are goods contracts governed by the UCC.").

The New York UCC, like the Wisconsin UCC, contains a statute of frauds that applies to the sale of goods for a price of $500 or more:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

N.Y. U.C.C. § 2-201(1); *see* Wisc. Stat. § 402.201(1). A writing must consist of an "intentional reduction to tangible form." *See id.* § 1-201, § 401.201.

New York and Wisconsin courts have found alleged oral agreements unenforceable where they are deemed to involve the sale of goods valued at $500 or more. *See, e.g.*, *Swerdloff v. Mobil Oil Corp.*, 74 A.D.2d 258, 259 (2d Dep't 1980); *Crabtree Auto., Inc. v. BMW of N. Am.*, 105 A.D.2d 825, 826 (2d Dep't 1984); *First Bank v. HKA Enters., Inc.*, 183 Wis. 2d 418 (1994).

The same result should obtain here. The SAC states that "[u]nder the terms of the Revenue Share Agreement, Bay Tek would develop and manufacture the Skee-Ball Live Lanes at an agreed manufacturing **cost of $4,500 per lane**." The SAC does not claim this alleged agreement was ever put in writing, nor that BTE ever prepared or signed any statements or writings memorializing its purported terms; FCU has admitted it lacks any such evidence.

In opposing this Motion, FCU may note that the UCC's statute of frauds is subject to an exception for "specially manufactured goods." That exception does not apply here. It provides:

> A contract which does not satisfy the requirements of [the statute of frauds] but which is valid in other respects is enforceable (a) if the goods **are to be specially manufactured for the buyer** and are **not suitable for sale to other**s in the ordinary course of the seller's business **and the seller**, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, **has made either a substantial beginning of their manufacture or commitments for their procurement**[.]"

*PH Int'l Trading Corp. v. Nordstrom, Inc.*, 555 F.App'x 9, 10 n.2 (2d Cir. 2013) (emphasis

added) (quoting N.Y. U.C.C. § 2-201(3)(a)). Here, "customized" Skee-Ball lanes would still be

"suitable for sale to others." But in any event, this exception exists to protect a **seller** who has

undertaken to manufacture goods for a **buyer** who later reneges on an oral agreement. *Revealed*

*Water Prods., Inc. v. Arrowhead Plastic Eng'g, Inc.*, No. IP99-0069-C-T/G, 2000 WL 1469571,

at *6 (S.D. Ind., Sept. 29, 2000) ("[T]his statute is not a buyer's remedy. The clear purpose of

this statute is to benefit sellers who have manufactured specific goods for a particular buyer. If

those goods are unsuitable for sale to others and the buyer repudiates … the seller is left holding

goods that are of no value to it."); *Glob. Truck & Equip. Co. v. Palmer Mach. Works, Inc.*, 628 F.

Supp. 641, 648 (N.D. Miss. 1986) ("[The] exception for specially manufactured goods according

to its terms, only applies when the seller, not the buyer, of the goods seeks to obviate the statute

of frauds defense."); 1 White, Summers, & Hillman, Uniform Commercial Code § 3:7 (6th ed.)

(describing as "a seller's exception to the statute"). FCU cannot invoke this exception.

### 3.    FCU's Tortious Interference Claim Fails As A Matter Of Law

To prevail on a claim for tortious interference a plaintiff must show that it (1) had

business relations with a third party; (2) the defendant interfered with those business relations;

(3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and

(4) the defendant's acts injured the relationship. *Target Corp. v. RichRelevance, Inc.*, 2017 WL

590316, at *8 (S.D.N.Y., Feb. 13, 2017) (citation omitted). FCU cannot establish these elements.

26

First, contrary to FCU's pleading (SAC ¶ 271), as a matter of undisputed fact, FCU and PM did not have an "agreement in principle" regarding Custom Lanes.[8] SUF ¶ 61.

Second, FCU alleges that BTE "threatened" PM. This is a speculative, unsupported, false allegation. Petro called Rick Rochetti, BTE's then-Director of Sales, to tell him he would not be doing business with FCU. SUF ¶ 62. Mr. Rochetti did not "threaten" Petro or PM. SUF ¶ 63.

Third, New York courts have recognized that the "wrongful means" element "sets a high bar" because it requires that a defendant's conduct "amount[ed] to a crime or an independent tort" or that the "defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261-62 (2d Cir. 2015). But there is no evidence BTE undertook **any** conduct, much less "a crime or an independent tort."

FCU will seek to rely on secret recordings Pavony made of his conversations with Petro, which FCU will claim support its narrative. *See* Movit MSJ Decl., Video Exs. 5-12. These improper recordings only show that the parties discussed a potential agreement—nothing more. They also do not support any claim that BTE threatened PM; no such evidence exists because this never happened.

### 4.    FCU Cannot Establish Lost Profits As A Matter Of Law

#### a.    FCU Cannot Establish Lost Profits On Its Contract Claims

The purported lost profits FCU seeks as damages on its contract claims are consequential as opposed to general damages. "As a general matter, 'lost profits' constitute 'general damages' when 'the non-breaching party seeks only to recover money that the breaching party agreed to

---

[8] Wisconsin recognizes the tort of "interference with prospective relations" but requires proof of "a prospective contractual relationship on behalf of the plaintiff," which FCU cannot show. *Anderson v. Regents of Univ. of Cal.*, 203 Wis.2d 469, 490, 554 N.W.2d 509 (Ct. App.1996).

pay under the contract.' … 'Lost profits are properly considered consequential damages, by contrast, 'when as a result of the breach, the non-breaching party suffers loss or profits on collateral business relationships.'" *Co. Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (citing *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109 (2d Cir. 2007)). FCU does not seek payments it claims BTE should have made to FCU. Rather, FCU seeks profits it alleges it would have made from collateral business with third-parties. SAC ¶ 265. These are consequential damages. *SG Block, Inc. v. Osang Healthcare Co.*, 2022 WL 16787936, at *3-4 (E.D.N.Y. Sept. 22, 2022).

The New York standard for lost profits is set forth in two seminal cases. *See Kenford Co., Inc. v. Cnty of Erie*, 67 N.Y.2d 257 (1986) ("*Kenford I*"); *Kenford Co. v. Cnty of Erie*, 73 N.Y.2d 312 (1989) ("*Kenford II*") (collectively, "*Kenford*'). *Kenford* applies in New York to lost profits claims under common law and the UCC. *Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc.*, 2010 WL 4892646, at *8 (S.D.N.Y. Dec. 2, 2010) (applying *Kenford* to lost-profits claim under N.Y.U.C.C.), *aff'd*, 501 F. App'x 85 (2d Cir. 2012); *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC*, 2009 WL 1803458, at *23 (S.D.N.Y. June 23, 2009) (same).

Under *Kenford*, a party seeking consequential damages "is required to demonstrate 'with certainty that such damages have been caused by the breach,' and that the alleged loss is 'capable of proof with reasonable certainty.'" *Co. Embotelladora Del Pacifico, S.A.*, 650 F. Supp.2d at 322 (citing *Kenford I*, 502 N.Y.S.2d 131 (1986)). "While certainty of amount is not an element of general damages in New York, it is an element of consequential damages. In addition to proving that the *existence* of damage is reasonably certain, and that the damages were foreseeable and within the contemplation of both parties, **a party claiming consequential**

**damages must also prove the *amount* of damage with 'reasonable certainty.'**" *Tractebel Energy Mktg.*, 487 F.3d at 111 (emphasis added, italics in original) (citing *Kenford I*, 502 N.Y.S.2d 131). These are "stringent" requirements. *SG Block, Inc.*, 2022 WL 16787936, at *4.[9]

"Courts impose a 'high standard' on parties seeking to establish that any agreement contemplated lost profits …." *Kayo Corp. v. Fila U.S.A., Inc.*, 2022 WL 381995, *1 (S.D.N.Y. Jan. 26, 2022); *accord, Great Earth Int'l. Franchising Corp. v. Milks Dev.,* 311 F. Supp.2d 419, 435-36 (S.D.N.Y. 2004)). The plaintiff must prove that "**the parties contemplated awarding lost profits as damages for any potential breach**." *Kayo Corp.*, 2022 WL 381995, *2 (emphasis added)[10]; *accord*, *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1065 (S.D.N.Y. 1996) (applying UCC).

As discussed below, with respect to its two contract claims, FCU can establish neither that: (1) the parties contemplated awarding lost profits as damages for any potential breach; nor (2) the existence and amount of alleged lost profits are reasonably certain.

### (i)  FCU Cannot Establish The Parties Contemplated Awarding Lost Profits As Damages

FCU cannot establish that the parties contemplated awarding lost profits for any breach of the License Agreement because the License Agreement: (a) does not provide for recovery of consequential damages in the event of a breach; and (b) contains unambiguous integration and

---

[9] Wisconsin's common law and UCC are in accord. *See, e.g., Murray v. Holiday Rambler, Inc*., 83 Wis.2d 406, 432, 265 N.W.2d 513 (Ct. App. 1978) (plaintiff "must prove by credible evidence to a reasonable certainty that such damages were suffered and must prove, at least to a reasonable probability, the amount of these damages …."); *Total Wall, Inc. v. Wall Sos. Supply, LLC*, No. 09-cv-404-WME, 2010 WL 2572816, at *3 (W.D. Wisc. June 23, 2010)*.*
[10] Wisconsin law is in accord that "the nonbreaching party is entitled to only those consequential damages that are **contemplated by the parties' agreement**". *Or. Potato Co. v. Kerry Inc*., No. 20-CV-92-JDP, 2022 WL 1153469, at *2 (W.D. Wisc. Apr. 19, 2022) (emphasis added) (citing *Peterson v. Cornerstone Prop. Dev., LLC*, 294 Wis. 2d 800 (Ct. App. 2006)).

"no oral modification" provisions in ¶ 18.4. *See SSAA-A, Inc. v. Morgan Stanley Dean Witter & Co.*, 281 A.D.2d 201, 203 (1st Dep't 2001).

And, nowhere during the diner meeting in which the alleged revenue share agreement purportedly was formed did any party discuss liability for consequential damages. Where a contract is silent, courts employ a "common sense" approach to determine the parties' intent by considering "the nature, purpose and particular circumstances of the contract known by the parties ... as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." *Kenford II*, 73 N.Y.2d at 319 (internal quotation marks omitted). As the First Department held in rejecting a similar lost profits claim on summary judgment:

> **It would be highly speculative and unreasonable to infer an intent to assume the risk of lost profits in what was to be a start-up venture by [plaintiff].** There is nothing to suggest that, in those circumstances, [defendant] would have entered into an agreement to undertake responsibility for lost profits, a liability with unlimited potential. ... **That the evidence suggests [defendant] viewed the [contractual] relationship as one having value and potential is not to say that the parties contemplated being liable for each other's losses.**

*Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 184 (1st Dep't 2007) (emphasis added). The same is true here. "Skee-Ball Live" was unproven; it is absurd to infer BTE would have assumed liability for $1.2 million arising from the manufacture of **26 custom Skee-Ball lanes**. *Atateks Foreign Trade Ltd.* 2009 WL 1803458, at *23 (citing *Tractebel Energy Mktg.*, 487 F.3d at 109).

  **b. FCU Cannot Establish The Existence, Let Alone The Amount, Of Lost Profits With Reasonable Certainty**

Initially, and as discussed on pages 18-21 of BTE's Rule 12(b)(2) motion, FCU's lost-profits claim should be dismissed as a matter of law because it involves an untested start-up venture with no track record in the fickle entertainment industry.

Beyond this, FCU's expert, Laura Smith, admitted at her deposition that FCU's lost profits claims **fail** to meet the requisite legal standard. SUF ¶ 64 (Q: "Ms. Smith, would you opine that the amounts of damages in your reports are reasonably certain?" A: "Well, first of all, **the amount of damages really can't be reasonably certain**." (emphasis added)). This admission is sufficient, in and of itself, for the Court to dismiss FCU's lost profits claims.

It is no surprise Ms. Smith made this dispositive admission, because her calculations are premised on pie-in-the-sky assumptions.[11] As the court held in *Atateks Foreign Trade Ltd.*:

> Defendants fail to establish that they are entitled to lost profits because they do not provide "objective proof of the amount of that loss." *Toltec Fabrics, Inc. v. August Inc*., 29 F.3d 778, 781 (2d Cir.1994) (*citing Kenford I*, 67 N.Y.2d at 261)).

2009 WL 1803458, at *23. The same analysis applies here.

### (i)      The Alleged Revenue Share Agreement

Ms. Smith purported to calculate lost profits of $1,243,281 in connection with FCU's claim for breach of the alleged revenue share agreement. However, the "data" upon which she relied consisted of manipulated financial data prepared by Wikman, included incomplete documentation such as bank records with significant gaps (because FCU was unable to maintain a bank account for nearly two years) and lacked any financial statements. SUF ¶¶ 65, 66; Movit MSJ Decl., Ex. 4 (Wikman Depo Tr. at 401:9-408:16, 494:11-500:23); *Awards.com, LLC,* 42 A.D.3d. at 185 (dismissing lost profits claim where company "could not keep up with its monthly fee payments").

---

[11] Ms. Smith's baseless assumptions warrant her preclusion under *Daubert*. *Amorgianos v. Nat'l. R.R. Passenger Corp*., 303 F.3d 256, 266 (2d Cir. 2002). But the Court need not engage in a *Daubert* analysis because plaintiff "failed to establish a foundation for the existence of damages for lost profits …." *Schonfeld v. Hilliard*, 218 F.3d 164, 171 (2d Cir. 2000).

### (ii)     The License Agreement

Ms. Smith further opines that FCU incurred lost profits in the staggering amount of $23,488,030 in connection with BTE's alleged breach of the License Agreement. This is perhaps even more unmoored from reality than her prior calculation.

*First*, this calculation is premised, improperly, upon the same incomplete and doctored data from Wikman that Ms. Smith relied upon to calculate her other damages numbers. Movit MSJ Decl., Ex. 4 (Wikman Depo Tr. at 401:9-408:16, 494:11-500:23)

*Second*, the calculation is based on self-serving projections FCU included in pitches to BTE and potential investors. They are not based on historical growth in the number of Skee-Ball Live lanes, as no such lanes existed. They are an improper basis for calculating lost profits. *Atateks Foreign Trade Ltd.*, 2009 WL 1803458, at *23 (citing *Toltec Fabrics, Inc.*, 29 F.3d at 781).

*Third*, this calculation is premised, improperly, upon an assumption that FCU would have obtained "approximately $612,000" in outside investment in 2019. Movit MSJ Decl. Ex. 27 at ¶ 63.  However, it is undisputed that FCU tried, but failed, to obtain financing. SUF ¶ 67. And FCU was so bereft of cash that for a period of time it did not maintain its own bank account. SUF ¶ 65.

*Fourth*, this calculation is also premised, improperly, upon an assumption that BTE would have been "using its best efforts and following the terms of the License Agreement" by "complet[ing] the activities under the Revenue Share Agreement (the additional 26 [custom] lanes supplied) …." However, the "best efforts" provision of the License Agreement imposes no

obligation on BTE to manufacture Custom Lanes, and FCU has expressly admitted this.[12]

*Fifth*, the calculation assumes the NSBL would have been such a success that 1,750 custom lanes would have been manufactured within 5 years. Movit MSJ Decl. Ex. 27 at ¶ 50. This is also wishful thinking, given there have only been 10 Custom Lanes in two bars, both operated by Pavony himself. *Kenford I*, 67 N.Y.2d at 263 ("New York has long recognized the inherent uncertainties of predicting profits in the entertainment field in general … and, in this case, we are dealing, in large part, with a new facility furnishing entertainment for the public.").

### c.      FCU Cannot Establish Lost Profits For Interference

FCU cannot establish lost profits on its claim for tortious interference, let alone in the extravagant amount of $6,875,983 asserted by Ms. Smith. Under Wisconsin law, a tort plaintiff must "'prove by credible evidence to a reasonable certainty that damages were suffered and ... **establish at least to a reasonable probability the amount of these damages**.'" *Renschler Co., Inc. v. MSA Prof'l Servs., Inc*., 348 Wis.2d 763 (Ct. App. 2013) (emphasis added). Similarly, under New York law, a claim for damages for alleged tortious interference should be dismissed as a matter of summary judgment when the damages "are too speculative to warrant recovery." *Apollon Waterproofing & Restoration Corp. v. Bergassi*, 241 A.D.2d 347, 348 (1st Dep't 1997). Ms. Smith's opinions fail to meet these standards.

*First*, Ms. Smith's calculation again is premised, improperly, on the same incomplete and doctored data from Wikman that she relied upon to calculate her other damages numbers. Movit

---

[12] FCU's counsel stated in a letter to the Court that "BTE contends FCU's only allegation of breach of the best efforts clause [in the License Agreement] is based on a claim that BTE had a duty in the License Agreement to make custom lanes for FCU. BTE's argument on this issue will waste the Court's time, since it is merely a straw man. **FCU's claim is not based on any duty to customize lanes in the License Agreement.**" Movit MSJ Decl., Ex. 76.

MSJ Decl. Ex. 4 (Wikman Depo Tr. at 401:9-408:16, 494:11-500:23). *Second*, the calculation assumes, without basis, that but for BTE's alleged interference, Play Mechanix would have invested $10.5 million manufacturing 1,750 custom lanes. Movit MSJ Decl. Ex. 27 at ¶ 68. There is no evidence Play Mechanix would have committed to pay for 1,750 lanes to the tune of $10.5 million. Again, Ms. Smith has offered only rank speculation.

### B. BTE Is Entitled To Summary Judgment On Certain Of Its Counterclaims

#### 1. FCU Breached The License Agreement As A Matter Of Law

##### a. Failure To Use Best Efforts To Promote Licensed Uses

The obligation to use "best efforts to promote the Licensed Uses" is perhaps the most important of FCU's obligations. The License Agreement states in ¶ 6, and elsewhere, that FCU's uses of the Mark are to "inure to the benefit of [BTE]" under the terms of the License Agreement.[13] SBI licensed the Mark with the expectation of **some** benefit from doing so. But this would only be possible if its licensee exploited the Mark. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1st Dep't. 1917) ("Her sole compensation for the grant of an exclusive agency is to be one-half of all the profits resulting from the plaintiff's efforts. Unless he gave his efforts, she could never get anything."); *see Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 321 (S.D.N.Y. 2020). "[I]t would be unfair to place the productiveness of the licensed property solely within the control of the licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee." *See also Vacuum Concrete Corp. of Am. v. Am. Mach. & Foundry Co.*, 321 F. Supp. 771, 773 (S.D.N.Y. 1971).

Whether a party used its "best efforts" may in some cases be a question for the trier of

---

[13] This tracks trademark law. 15 U.S.C.A. § 1055 ("Where a registered mark … is … used legitimately by related companies, such use shall inure to the benefit of the registrant ….").

fact, but the Second Circuit has recognized it is appropriate to decide on summary judgment if there are no factual disputes. *See Scott-Macon Sec., Inc. v. Zoltek Cos., Inc.*, 2007 WL 2914873, at *1 (2d Cir. Oct. 4, 2007). BTE submits that this is just such a situation.

The undisputed evidence shows that FCU failed to use **any** effort to promote several Licensed Uses. Instead, FCU attempted to use the Mark to benefit itself and itself alone.

### (i) ¶ 3.1(a): Failure To Build Out Live Play

FCU indisputably failed to use its best efforts to build out its Live Play concept in the manner contemplated by the License Agreement. As described above, it is undisputed that BTE stood ready to manufacture Standard Lanes but FCU refused to accept them, demanding that BTE create Custom Lanes to FCU's specifications (which FCU now acknowledges BTE was not required to do under the License Agreement). SUF ¶ 24. Because there is nothing in the License Agreement giving FCU any right to dictate customization of Standard Lanes, FCU's failure to use any Standard Lanes constitutes a breach of this provision as a matter of law.

### (ii) ¶ 3.1(b): Failure To Develop, Produce, Sell or Distribute Live Play Merchandise

FCU has not sold any Live Play Merchandise. SUF ¶ 72. FCU instead sold Brewskee Ball merchandise, generating no revenue for BTE. SUF ¶¶ 73, 74. This rendered FCU's obligation to pay 15% of Gross Revenues from any Live Play Merchandise to BTE meaningless. FCU therefore deprived BTE of a significant benefit of licensing the Mark. *See, e.g.*, *Advanced Water Techs., Inc.*, 457 F. Supp. 3d at 321.

### (iii) ¶ 3.1(d): Failure To Use Mark For Sponsorships Or Endorsements Solely And Directly Related To Live Play

FCU failed to obtain sponsorships and endorsements related to Live Play that would inure to BTE's benefit. Instead, FCU took in-kind donations of various items, particularly liquor,

35

that benefited the Full Circle Bar venues (owned by Pavony). SUF ¶¶ 77, 78. This is significant

because ¶ 8 also required FCU to pay to BTE a 5% royalty on Gross Sponsorship Revenues.

SUF ¶ 76. But, it is undisputed that from 2016 to 2022, **BTE received only $161.50 from FCU**

in revenue relating to **the entirety of the License Agreement**. SUF ¶ 77. This is a direct result

of FCU's failure to use any efforts to promote this Licensed Uses.

### b.       Failure To Use Best Efforts To Create National Network

FCU claims that it built a national network of Live Play teams, leagues, and/or events in

at least 15 states in the United States by July 2019, and has purported to identify 15 states where

it had Live Play operations running by that time. The undisputed facts belie that claim. SUF ¶ 85.

Nine of the states FCU has identified hosted single events in the first half of 2019. SUF

¶¶ 80, 81. Most of those states never had any Live Play presence again. SUF ¶ 82. This does not

constitute an effort to create a **national network** of Live Play teams, leagues and/or events.

Instead, it is clear that FCU—even though it had been an exclusive licensee for **five years**—was

scrambling to meet the ¶ 5.1 milestone by cobbling together a series of one-off events.

Following his deposition, Pavony submitted an errata sheet in which he said that he

forgot to mention that two bars in Colorado had hosted Live Play in 2011, bringing FCU to the

15-state threshold. SUF ¶ 83. FCU has produced no evidence of this Colorado Live Play

operation beyond this errata sheet, and there is no evidence it existed at any point after 2011.

SUF ¶¶ 83, 84. And again, two bars hosting Live Play years before the License Agreement

existed is not an example of FCU using its best efforts to create a national Live Play **network**.[14]

---

[14] FCU further failed to use **any** efforts—much less best efforts—to conduct Live Play leagues outside the niche "hipster" bar market, particularly Pavony's own bars. FCU admits it was free to use the Mark in connection with Live Play in any number of venues outside of bars, but simply chose not to. SUF ¶¶ 69, 70. This failure to maximize the value of the Mark in connection with

To the extent FCU contends it missed this milestone because it could not obtain Skee-Ball lanes from BTE, FCU was free to purchase Standard Lanes but chose not to. Its failure to do so also falls below the threshold of the "best efforts" that were required of FCU under ¶ 5.1.

### c.      ¶ 4.2: Use Of Unapproved Phrases And Slogans In Connection With The Mark

It is undisputed that FCU has utilized the Mark in connection with numerous phrases, slogans and team names that were **not** pre-approved by BTE. SUF ¶¶ 88-91. And, Pavony registered internet domains using the Mark, without approval from BTE. ¶ 92. FCU's use of a voluminous number of other, unauthorized phrases and slogans constitute breaches of ¶ 4.2, and entitle BTE to judgment as a matter of law.

### (i)      ¶ 7.7: Vulgar Phrases And Slogans

FCU has published team names online that use the Mark in disgusting ways not befitting of the Mark's family-friendly image. SUF ¶¶ 95, 98-100. Examples are team names referencing a disease ("Hepatitis Skee"); bodily functions and sexual innuendo ("Skeemature Ejaculation" and "Salty Skeemen); drug use ("Skeefer Madness"); a political sex scandal ("Monica LewinSkee-Ball Liquors"); and the murder of a child ("K. Skee Anthony"). SUF ¶ 95.

FCU violated ¶ 7.7 in other ways. In November 2020 (shortly after BTE's counterclaims were filed), the Full Circle Bar Facebook account posted a sexualized photo using the design mark. SUF ¶ 103. And, in direct violation of the proviso that FCU could not demean or disparage SBI (or a successor), in July 2018 FCU released a "State of the Brewnion" video in which Pavony spent a significant amount of time disparaging BTE. SUF ¶ 101.

Accordingly, there is ample, undisputed evidence that FCU breached, and continues to

---

Live Play, other than to benefit Pavony's own venues, is a breach of ¶ 5.1.

breach, this provision of the License Agreement, entitling BTE to judgment as a matter of law.

>    **(ii)    ¶ 7.8: Unauthorized Use Of Third-Party Trademarks In Connection With Mark**

FCU has promoted numerous team names that use third party intellectual property. SUF ¶ 108-111, 113-117. Examples include "Skee.I.Joes" (G.I. Joe), "Skeeyonce Rolles" (Beyonce Knowles), and "ACDSkee" (the band AC/DC). SUF ¶ 108. This has continued since BTE filed its counterclaims. In the last few months the Full Circle Bar Brooklyn Instagram account has promoted teams using third party intellectual property in their names, such as "SKEEnage Mutant Ninja Turtles," "PusSKEEcat Dolls," and "Shang-Skee and the 10 Brews." The account even recently promoted the team "A-Skee/D-Skee" even though the name "ACDSkee" was highlighted in BTE's counterclaims as violating ¶ 7.8. SUF ¶ 112. FCU has not obtained authorization to use this intellectual property. SUF ¶¶ 108, 112, 113.

It therefore is undisputed that FCU breached the License Agreement on this separate and independent basis, entitling BTE to judgment as a matter of law on this counterclaim.

>    **d.    ¶ 4.5: Unauthorized Internet Broadcasts**

Similar to the restriction in ¶ 3.2, ¶ 4.5 states that FCU has a limited right to use the Mark via the Internet, radio, television, or other communication and media outlets, whether now known or hereafter created, developed or devised, **for promotional and marketing purposes only.** But FCU broadcast full Skee-Ball matches on online streaming video platforms. SUF ¶ 119. The analysis in the above Section III.A.1.c applies here.

>    **2.    BTE Is Entitled To Declaratory Relief As A Matter Of Law**

>    **a.    The License Agreement Is Terminable At Will**

"Under New York law, it is well settled that a contract of indefinite duration is terminable at will unless the contract states expressly and unequivocally that the parties intend to be

perpetually bound." *Co. Embotelladora Del Pacifico, S.A.*, 976 F.3d at 245; *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F. Supp. 18, 19-20 n.1 (E.D.N.Y. 1994) ("An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor."); *Ketcham v. Hall Syndicate, Inc.* 236 N.Y.S.2d 206, 212 (Sup.Ct. N.Y. Cnty. 1962), *aff'd* 242 N.Y.S.2d 182 (1st Dep't 1963) (holding that absent a fixed or determinable duration, or express provision that duration is perpetual, a contract is terminable at will); *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 661 (S.D.N.Y. 1959), *aff'd on opinion of the district court*, 280 F.2d 197 (2d Cir. 1960) ("[I]f it appears that no termination date was within the contemplation of the parties, or that their intention with respect thereto cannot be ascertained, the contract will be held to be terminable within a reasonable time or revocable at will[.]").

The License Agreement is terminable at will. First, the License Agreement is silent as to its duration. While the License Agreement does identify certain events upon the occurrence of which termination may occur (such bankruptcy), none can be said to give rise to a "determinable duration." One of the enumerated events could occur next week, in ten years, or never.

Second, the License Agreement contains **no** express provision stating that its duration is to be perpetual. This is dispositive. For an agreement to be perpetual, it must state "**expressly and unequivocally that the parties intend to be perpetually bound**." *Co. Embotelladora Del Pacifico, S.A.*, 976 F.3d at 245 (emphasis added). The License Agreement has no such language.

BTE is entitled to a judicial declaration that the License Agreement is terminable at will.

> **b.     BTE Is Entitled To Terminate The License Agreement Due To FCU's Incurable Breaches**

FCU's breaches of the License Agreement (discussed above) are incurable, and they

entitle BTE to a declaratory judgment that the License Agreement can be terminated on those grounds. Thus, the same legal arguments apply to this counterclaim as apply to BTE's counterclaim for breach of the License Agreement, set forth in the above Section III.B.1.

### 3.      BTE Is Entitled To Judgment On Its Trademark Infringement Claim

"To prevail on a trademark-infringement claim, a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, (5) without the plaintiff's consent and (6) that defendant's use of the mark is likely to cause confusion as to the affiliation, connection, or association of defendant with plaintiff, or as to the origin, sponsorship, or approval of the defendant's goods, services, or commercial activities by plaintiff." *Ontel Prod. Corp. v. Airbrushpainting Makeup Store*, 2017 WL 1969681, at *1 (S.D.N.Y. May 12, 2017) (internal quotation marks omitted).

The foregoing elements are satisfied as a matter of law. BTE is the unquestioned owner of the Skee-Ball Mark.[15] SUF ¶¶ 2, 125. FCU and Pavony have used the Mark in commerce in connection with selling and advertising goods and services. *See, e.g.*, SUF ¶¶ 80-83, 104-106. And, it is undisputed that FCU and Pavony have used the Mark without BTE's consent, including by using it in connection with unapproved phrases and slogans, some of which include vulgar material, as well as unauthorized third party intellectual property. SUF ¶¶ 88-91.

When, as here, a trademark licensee's use has exceeded the scope of a license, "**the element of consumer confusion is established as a matter of law.**" *Mitsubishi Motors N. Am.*

---

[15] FCU did not acquire ownership rights in the Mark under the terms of the License Agreement or trademark law. 15 U.S.C. § 1055; 3 McCarthy on Trademarks and Unfair Competition § 18:52 (5th ed.) ("A licensee's use inures to the benefit of the licensor-owner of the mark and the licensee acquires no ownership rights in the mark itself.").

40

*Inc. v. Grand Auto., Inc.*, 2018 WL 2012875, at *11 (E.D.N.Y., Apr. 30, 2018) (emphasis

added); *accord Baskin-Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.*, 576 F. Supp. 1055,

1060 (E.D.N.Y. 1983).

FCU has committed breaches of the License Agreement that include numerous instances

where FCU's use of the Mark vastly exceeded the scope of the License Agreement. *See, e.g.*,

SUF ¶¶ 88-91. Such a use by a licensee is **both** trademark infringement and a breach of contract.

*BJB Ltd. v. iStar Jewelry LLC*, 533 F.Supp. 3d 83, 99 (E.D.N.Y. 2021) (citing 4 McCarthy on

Trademarks and Unfair Competition § 25:30 (5th ed. 2021)).

### a. FCU Exceeded Its License Under ¶ 4.5 For Use Of The Mark Via Media Outlets

FCU was granted the right to use the Mark via the internet, radio, television and other

communication and media outlets, **solely** provided such use was for promotional and marketing

purposes. Despite this restriction, FCU broadcast entire Skee-Ball matches online. SUF ¶ 119.

Doing so was completely at odds with the limited license granted to FCU to use the Mark, and

therefore constituted trademark infringement as a matter of law.

### b. FCU Exceeded The Licenses Granted Under ¶¶ 4.2, 7.7 And 7.8

FCU's use of the Mark in connection with phrases that were not set forth in ¶ 4.2 or

Exhibit B to the License Agreement (SUF ¶¶ 88-91), its use of the Mark in connection with

vulgar and offensive phrases, slogans and team names (SUF ¶ 95), as well as its use in

connection with unauthorized third party trademarks (SUF ¶¶ 108-117), were outside the scope

of the License Agreement and constituted trademark infringement as a matter of law. As such,

the same analysis and undisputed facts set forth in Section III.B.1 are applicable. *See* SUF ¶¶ 68-

120. Accordingly, BTE is entitled to judgment as a matter of law on this basis, as well.

41

### c.   BTE May Terminate The Agreement Due To FCU's Breaches

Under New York law, "a trademark licensor is entitled to terminate a license agreement if the licensee breaches the agreement." *Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.*, 497 F.Supp. 947, 958-59 (S.D.N.Y. 1980) (citing *New York Trust Co. v. Believe It Or Not, Inc.*, 178 N.Y.S.2d 12 (1958)). In *Believe It Or Not*, a corporate licensee of a trademark was found to have breached its license agreement by effectively treating the trademark as its own. The licensee did this by, among other things, applying for and obtaining a registration for the trademark in Canada, refusing to make royalty payments to the licensor, failing to carry on its business diligently, and obtaining the appointment of a receiver. The court ultimately ruled that these breaches "prejudiced and disparaged" the trademark and gave the plaintiffs the right to terminate the license agreement. *Believe It Or Not, Inc.*, 178 N.Y.S.2d at 17-18.

The situation here is analogous. FCU was required to operate within the parameters of the License Agreement but instead acted as if it owned the Mark by, among other things, using the Mark as it pleased with unapproved phrases. SUF ¶¶ 88-91. BTE is entitled to terminate the License Agreement, just like the plaintiffs in *Believe It Or Not*.

### 4.   BTE Is Entitled To Judgment On Its False Endorsement Claim

The elements of a false endorsement claim under the Lanham Act are that the defendant (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services. *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008).

It is undisputed that FCU used the Mark in commerce in connection with its goods and services. *See, e.g.*, SUF ¶¶ 80-83, 104-106. FCU's open and obvious use of the Mark in phrases,

slogans, team names, and other ways carries with it the false and misleading misrepresentation that BTE endorsed and approved FCU's use of the Mark. This is further supported by the well settled principle that the use of an identical mark that consumers have come to know is an extremely strong indicator of source that is likely to confuse them. *See Baskin-Robbins Ice Cream Co.*, 576 F. Supp. at 1060. As a result, the likelihood of confusion element is satisfied here, for the same reasons it is satisfied with respect to BTE's trademark infringement claim. Accordingly, BTE is entitled to judgment as a matter of law on this claim.

## 5.    BTE Is Entitled To Judgment On Its Unfair Competition Claim

The undisputed factual record pertaining to FCU's brazen misuse of the Mark also entitles BTE to judgment as a matter of law on its common law unfair competition claim. "[T]he essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another and has done so in bad faith." *Carson Optical, Inc. v. Prym Consumer USA, Inc*., 11 F. Supp.3d 317, 329 (E.D.N.Y. 2014) (citation omitted).  FCU has taken a limited License Agreement and attempted to expand it, while falling to exploit the Mark in any way that would benefit its licensor. By using unapproved phrases and disparaging the Mark and BTE, even after BTE's counterclaims were filed, it is indisputable that FCU has operated in bad faith.

## 6.    Pavony Is Individually Liable

BTE's trademark infringement, false endorsement and unfair competition counterclaims are also asserted against Pavony in his individual capacity. The undisputed evidence firmly shows that he is liable to BTE as well. Indeed, it is undisputed that Pavony is the owner, president, and sole member of FCU. SUF ¶ 6. It further is undisputed that Pavony personally engaged in conduct that infringed and tarnished the Mark and BTE, including by (1) appearing in the 2018 "State of the Brewnion" video and disparaging BTE; (2) allowing and attending the

43

2021 Barstool Sports event at the Brooklyn bar; and (3) registering Internet domain names that utilize the Mark, without seeking authorization from BTE. SUF ¶¶ 92, 101, 104-106.

To the extent Pavony argues he was acting solely in his capacity as an officer of Full Circle United, LLC, he would not escape liability because "a corporate officer who participates in the commission of a tort may be held individually liable, **regardless of whether the officer acted on behalf of the corporation in the course of official duties** and regardless of whether the corporate veil is pierced." *Peguero v. 601 Realty Corp.*, 58 A.D.3d 556, 558 (1st Dep't 2009) (emphasis added) (internal quotation marks omitted) (citing *Espinosa v. Rand*, 24 A.D.3d 102, 102, (1st Dep't 2005)).

### 7.    FCU Cannot Avoid Liability By Invoking The License Agreement's Notice-And-Cure Provision

FCU has committed material breaches of the License Agreement which post-date BTE's transmittal of its breach notice letter on September 23, 2020. SUF ¶¶ 103-106, 113-117. However, the breaches FCU committed prior to transmittal of that letter are also actionable. When a defendant has made clear it will not cease its breaching conduct, compliance by the plaintiff with a notice-and-cure provision will not be required because it would be futile. *City of N.Y. v. Tavern on the Green Int'l LLC*, 351 F.Supp. 3d 680, 692–93 (S.D.N.Y. 2018); *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891 (3d Dep't 1987) In *Tavern on the Green*, the City of New York was party with the defendant licensee to a trademark license agreement, which defendant breached. The court found it would have been futile for the City to follow the notice-and-cure provision in the agreement because the licensee continued to breach it after the City filed suit.

Here, FCU has continued to breach the License Agreement after this lawsuit was filed. It

has continued to use the Mark in connection with unapproved sponsorships, as in the summer of 2021 when it allowed members of Barstool Sports, a media company accused of sexism and racism, to attend an event at which the Mark was showcased, during which the members conducted a broadcast where they discussed their sexual exploits. SUF ¶ 104-106. And FCU still uses third-party trademarks without authorization in connection with the Mark. SUF ¶¶ 113-117.

## CONCLUSION

BTE respectfully requests that the Court grant its requested relief.

DATED:  New York, New York
         December 23, 2022

Respectfully submitted,

Mitchell Silberberg & Knupp LLP


By: /s/ Jeffrey M. Movit
    Christine Lepera (ctl@msk.com)
    Jeffrey M. Movit (jmm@msk.com)
    Mark C. Humphrey (*pro hac vice*)
    (mxh@msk.com)
    437 Madison Ave., 25th Floor
    New York, New York 10022-7001
    *Attorneys for Bay Tek Entertainment, Inc.*

45