UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FULL CIRCLE UNITED, LLC, | CASE NO. 1:20-CV-03395-BMC |
| Plaintiff, | |
| v. | |
| BAY TEK ENTERTAINMENT, INC., | |
| Defendant. | |

| |
|---|
| BAY TEK ENTERTAINMENT, INC., |
| Counterclaim Plaintiff, |
| v. |
| FULL CIRCLE UNITED, LLC, |
| Counterclaim Defendant, |
| and |
| ERIC PAVONY, |
| Additional Counterclaim Defendant. |

## RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant/Counterclaim Plaintiff Bay Tek Entertainment, Inc. ("BTE") submits this statement pursuant to Local Rule 56.1 of the United States District Court for the Eastern District of New York in connection with its Motion for Summary Judgment on the Second Amended Complaint of Full Circle United, LLC ("FCU"), and on certain of BTE's Counterclaims against

FCU and Eric Pavony ("Pavony"). The material facts as to which there is no genuine issue to be tried are as follows:

## I.      UNDISPUTED FACTS IN SUPPORT OF THE INSTANT MOTION

### A.      Background Facts

#### 1.      The Skee-Ball Mark and SBI

1.      Skee-Ball is played on a machine called an alley roller, composed of an inclined lane leading to a ramp with rings corresponding to different point values arranged on a backboard positioned beyond the ramp. Second Amended Complaint (Dkt. No. 52) ("SAC"), ¶¶ 20-23.

2.      "SKEE-BALL®" (the "Mark") is a federal trademark that was registered on the Principal Register of the United States Patent and Trademark Office ("USPTO") on May 21, 1929, in connection with "game in the nature of a bowling game and parts thereof." Supplemental Declaration of Jeffrey M. Movit ("Movit MSJ Decl."), ¶¶ 75-76 & Exs. 63-64.

3.      The Mark remains registered on the Principal Register of the USPTO. Movit MSJ Decl., ¶¶ 75, 77 & Exs. 63, 65.

4.      The Mark is the subject of multiple registrations filed with the USPTO since 1929. There are seven trademarks currently registered that pertain to the Mark, all of which are owned by BTE.  Movit MSJ Decl., ¶¶ 77-78 & Exs. 65-66

5.      Prior to February 2016, the Mark was owned by Skee-Ball, Inc. ("SBI"). Movit MSJ Decl., ¶¶ 33, 79 & Exs. 21, 67; SAC ¶ 24.

#### 2.      Full Circle and Eric Pavony

6.      Eric Pavony is the founder, president, and sole member of Full Circle United, LLC ("FCU"), a limited liability company that has never had any employees. SAC at ¶34;

2

Deposition of Eric Pavony ("Pavony Depo.") (Movit MSJ Decl., ¶ 15 & Ex. 3) at 29:18-31:3;

184:22-185:3, Deposition of Eric Wikman ("Wikman Depo.") (Movit MSJ Decl., ¶ 16 & Ex. 4)

at 47:16-20; 59:5-21; Movit MSJ Decl., ¶ 43 & Ex. 31 (FCU's Amended Answers to BTE's First

Set of Interrogatories]) at Nos. 1-2; *id.*, ¶ 41 & Ex. 29 (Amended Responses of Eric Pavony to

BTE's First Set of Requests for Admission ("RFAs")) at No. 6; *id.*, ¶ 44 & Ex. 32 (Amended

Answers of Eric Pavony to BTE's First Set of Interrogatories) at No. 3.

       7.     Since 2005, FCU has organized, operated and promoted live alley roller leagues,

teams, events and tournaments in bars under the name "Brewskee Ball." SAC ¶¶ 22-28, 34;

Pavony Depo. (Movit MSJ Decl. Ex. 3) at 67:4-68:17; 276:4-7.

       8.     There are two separate limited liability companies named Full Circle Bar, LLC

("FCB") and Extra Positive Land, LLC ("EPL"), which respectively own two bars named "Full

Circle Bar" in Brooklyn, New York and Austin, Texas. Wikman Depo. (Movit MSJ Decl. Ex. 4)

at 22:3-13; Pavony Depo. (Movit MSJ Decl. Ex. 3) at 232:23-234:2.

       9.     Both Full Circle Bar locations host Brewskee Ball events, teams, leagues, and

tournaments. Wikman Depo. (Movit MSJ Decl. Ex. 4)  at 26:6-15; 319:23-320:15; Movit MSJ

Decl., ¶ 60 & Ex. 48.

       10.    Eric Wikman has never been an employee of FCU.  Wikman Depo. (Movit MSJ

Decl. Ex. 4) at 16:16-23; 17:16-23; 24:6-17; 111:4-10; 112:13-23.

       11.    Eric Cooper is an independent contractor for FCU who is also a member of EPL.

Deposition of Eric Cooper ("Cooper Depo.") (Movit MSJ Decl., ¶ 17 & Ex. 5) at 15:13-16,

19:23-20:10; Pavony Depo. (Movit MSJ Decl. Ex. 3) at 233:23-234:10.

       12.    Pavony is an owner of FCB and EPL. Pavony Depo. (Movit MSJ Decl. Ex. 3) at

232:23-234:10; Wikman Depo. (Movit MSJ Decl. Ex. 4) at 17:16-23; 19:8-16; 22:3-13; Cooper

Depo. (Movit MSJ Decl. Ex. 5) at 15:13-16; 26:2-12; Movit MSJ Decl., ¶ 44 & Ex. 32

(Amended Answers of Eric Pavony to BTE's First Set of Interrogatories) at No. 3.

### 3.    SBI/FCU Lawsuit

13.    In October 2011, litigation commenced between FCU and SBI. In that litigation,

Skee-Ball, Inc. ("SBI"), claimed that FCU was infringing the Mark by using the term "Brewskee

Ball" (the "SBI/FCU Lawsuit"). SAC ¶ 60.

14.    The SBI/FCU Lawsuit settled in 2014, with SBI and FCU entering into a

settlement agreement as well as a license agreement (the "License Agreement") that granted

FCU certain limited rights to exploit the Mark. SAC ¶64; Deposition of Gaetan Philippon

("Philippon Depo.") Movit MSJ Decl., ¶ 23 & Ex. 11) at 153:6-22; Pavony Depo. (Movit MSJ

Decl. Ex. 3) at 61:16-62:2; 63:2-9; Movit MSJ Decl., ¶ 14 & Ex. 2 at ¶¶ 3.1, 4; *id.*, ¶ 31 & Ex. 19

(Philippon Depo. Ex. 33).

15.    The fifth "WHEREAS" clause of the License Agreement reads as follows:

> WHEREAS, SBI is desirous of granting to FCU a limited license
> to use the SKEE-BALL Trademark in connection with Live Play,
> subject to the restrictions, exclusions and other terms and
> conditions set forth herein[.]

Movit MSJ Decl., Ex. 2.

16.    Paragraph 2 of the License Agreement reads as follows:

> Pursuant to the terms of the Settlement Agreement of even date,
> and in further consideration of this Agreement, FCU agrees, from
> the Effective Date hereof, never to contest, directly or indirectly, or
> take any action, or to assist others in taking any action, directly or
> indirectly, to attack the legal sufficiency (including on grounds of
> genericness), status, or ownership of the SKEE-BALL Trademark
> or SKEE-BALL Registration.

Movit MSJ Decl., Ex. 2 at ¶ 2.

17.    The preamble to Paragraph 4 of the License Agreements reads as follows:

4

> FCU acknowledges and agrees that the license granted to it herein is limited to the right, license, and ability to use the SKEE-BALL Trademark in connection with the Licensed Uses, subject to the following terms, conditions, exclusions, and restrictions of this Agreement, including the SBI Use Guidelines.

Movit MSJ Decl., Ex. 2 at ¶ 4.

### 4. Bay Tek

18.     Bay Tek Entertainment, Inc. ("BTE"), is a manufacturer of coin-operated arcade machines and ticket redemption games headquartered in Pulaski, Wisconsin. Deposition of Holly Hampton ("Hampton Depo.") (Movit MSJ Decl., ¶ 19 & Ex. 7 at 282:12- 283:1; 286:12-288:9; SAC ¶ 15.

19.     In 2016, BTE purchased the assets of SBI, including the Mark. SAC ¶ 30; Deposition of Larry Treankler ("Treankler Depo.") (Movit MSJ Decl., ¶ 20 & Ex. 8) at 33:2-4; Philippon Depo. (Movit MSJ Decl. Ex. 11) at 23:13-23; 201:24-202:10; Movit MSJ Decl., ¶¶ 32, 79 & Exs. 20, 67.

20.     In connection with the purchase of the Mark, SBI assigned its Settlement Agreement and License Agreement with FCU to BTE. Treankler Depo. (Movit MSJ Decl., Ex. 8) at 52:3-14; Philippon Depo. (Movit MSJ Decl., Ex. 11) at 208:13-209:22; Movit MSJ Decl., ¶ 33 & Ex. 21.

### 5. Standard vs. Custom Lanes

21.     Since acquiring the Mark, BTE has had non-customized "stock" lanes, which are "SKEE-BALL® branded alley roller machines manufactured by SBI or its successor," referred to in Paragraph 5.2 of the License Agreement (hereinafter "Standard Lanes"), available for purchase. Deposition of Eric Schadrie ("Schadrie Depo.") (Movit MSJ Decl., ¶ 21 & Ex. 9) at 113:7-116:7; SAC ¶¶ 42-43; 91.

5

22.     FCU approached BTE to build customized lanes which would include equipment beyond that used in Standard Lanes such as video cameras, HD video screens, and internet connectivity (the "Custom Lanes").[1] Schadrie Depo. (Movit MSJ Decl., Ex. 9) at. 122:16-123:13; *see also* SAC ¶ 44.

23.     Paragraph 5.2 of the License Agreement requires FCU to buy and use Standard Lanes under the terms set forth therein. Movit MSJ Decl., Ex. 2 at ¶ 5.2; *id.*, ¶ 46 & Ex. 34 at No. 10; *id.*, ¶ 88 & Ex. 76 at p. 2.

24.     The License Agreement does not require BTE to manufacture Custom Lanes. Movit MSJ Decl., Ex. 2; *id.*, Ex. 34 at No. 10; *id.*, Ex. 76 at p. 2.

**B.     Undisputed Facts That Defeat FCU's Claims**

**1.     Breach of the License Agreement (Count I)**

**a.     BTE's Purported Violation of Paragraph 4.2**

25.     FCU contends that BTE purportedly breached Paragraph 4.2 by registering the trademark "SKEE-BALL LIVE." Paragraph 4.2 provides in pertinent part as follows:

> No right is granted to FCU to ownership of the said Live Play Phrases and Slogans, it being understood that FCU is granted a license to use the SKEE-BALL Trademark in connection with such Live Play. All such use of the Phrases and Slogans inures to the ownership rights of SBI in its trademark. FCU will not seek to register, or otherwise assert an ownership interest or right in any such Live Play Phrases and Slogans referred to herein or subsequently approved and used in the Live Play business.

Movit MSJ Decl., Ex. 2 at ¶ 4.2.

**b.     BTE's Purported Violation of Paragraph 5.3**

26.     Paragraph 5.3 of the License Agreement reads as follows:

---

[1] FCU has referred to Custom Lanes interchangeably as "Skee-Ball Live Lanes," "Live Lanes," or "NSBL Lanes."

> SBI hereby covenants, warrants, and agrees that it will not, directly
> or indirectly, during the Term and in the Territory, operate,
> sponsor, or endorse a business, involving Live Play.

Movit MSJ Decl., Ex. 2 at ¶ 5.3.

27.    BTE has never licensed the Mark to GameCo for use in casino settings, nor has it sponsored or endorsed any efforts by GameCo to do the same. Hampton Depo. (Movit MSJ Decl., Ex. 7) at 195:12-196:1, 197:22-198:11; 198:16-23; *see also id.* at 94:5-10.  Pavony Depo. (Movit MSJ Decl., Ex. 3) at 400:19-406:23.

28.    BTE was unaware of the "Roll for Ohio" event and did not approve the use of the Mark at the event. Hampton Depo. (Movit MSJ Decl., Ex. 7) at 458:21-459:1; 460:21-461:2; 462:17-463:2; Movit MSJ Decl., ¶ 2 & Video Exhibit 1 (Hampton Deposition Ex. 14) ; Pavony Depo. (Movit MSJ Decl., Ex. 3) at 406:24-410:6

29.    BTE did not endorse or allow Alchemy 3 to run any leagues or tournaments on Skee-Ball alleys. Hampton Depo. (Movit MSJ Decl. Ex. 7) at 456:8-457:6; Pavony Depo. (Movit MSJ Decl., Ex. 3) at 406:24-410:6

30.    BTE did not endorse or allow Aunt Ethel's or the Up Down to operate Live Play. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 411:1-417:23; 418:15-420:21.

31.    Venues are allowed to have Skee-Ball machines for purposes other than leagues and tournaments (*i.e.*, for purposes other than Live Play).  Pavony Depo. (Movit MSJ Decl. Ex. 3) at 419:12-24.

### c.    Breach of Paragraph 7.2 "Best Efforts" Provision

32.    Paragraph 7.2 of the License Agreement reads as follows:

> SBI and FCU each agree that they will use their respective best
> efforts to promote the Licensed Uses offered in connection with
> the SKEE-BALL Trademark and to coordinate the development,
> creation, distribution, sale, advertising, and promotion of the

7

Licensed Uses so as to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark.

Movit MSJ Decl., Ex. 2 at ¶ 7.2.

33.     Paragraph 3.1 of the License Agreement reads as follows:

Subject to the terms, conditions, exclusions, and restrictions of this Agreement, including without limitation the SBI use guidelines set forth in Exhibit "A" hereto (the "SBI Use Guidelines"), SBI grants to FCU a worldwide, right and license to use the SKEE-BALL Trademark in connection with the following specified Licensed Uses during the Term and within the Territory:

a) Conducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball® machines (including without limitation BREWSKEE BALL live play leagues, teams, events, and tournaments) utilizing alley rollers manufactured by SBI (collectively "Live Play").

b) Developing, producing, selling, and distributing merchandise solely in connection with Live Play ("Live Play Merchandise") subject to the restrictions on merchandise set forth below.

c) Developing, producing, offering, and using an electronic scoring application that will be made available for free, which allows Live Play players, teams, and leagues to record and maintain scores, statistics, league and player information, wins and losses, awards and rankings, solely and directly in connection with Live Play, and which does not include virtual play of the game manufactured by SBI known as Skee-Ball® (the "Scoring App").

d) Using the Skee-Ball Trademark for sponsorships or endorsements solely and directly related to Live Play, provided however, that notice of such sponsorships or endorsement must be given to SBI, SBI shall receive a copy of the executed agreement and SBI shall receive five percent (5%) of Gross Sponsorship Revenues (as defined below in Paragraph 8.4 ).

Movit MSJ Decl., Ex. 2 at ¶ 3.1.

### (i)     BTE's Alleged Failure to Manufacture Custom Lanes

34.     BTE incorporates Statement of Undisputed Fact No. 24 by reference herein.

        **(ii)**    **BTE's Alleged Interference with FCU's Efforts to Obtain Alley Rollers From Third Party Manufacturers**

35.    Paragraph 5.2 of the License Agreement reads as follows:

> For as long as SBI, or a successor, is a manufacturer of SKEE-BALL® branded alley roller machines, all Live Play under the direction, control, sponsorship, authority, affiliation or supervision of FCU, or otherwise presented, promoted or marketed directly or indirectly by FCU, including but not limited to by permitted sub-licensees, shall (i) utilize SKEE-BALL® branded alley roller machines manufactured by SBI or its successor, and (ii) take place in a venue that exclusively utilizes (or will exclusively utilize if the venue does not house alley roller machines) SKEE-BALL® branded alley roller machines. In the event that SBI, or a successor, no longer manufactures SKEEBALL® branded alley roller machines, or SBI, or a successor, are unable to fulfill FCU's needs for alley roller machines, FCU shall use its best efforts to comply with the aforementioned (i) and (ii), and have its sub-licensees do the same, but when compliance becomes impractical or unreasonable because SKEE-BALL® branded alley-roller machines are not available to buy, rent or borrow, FCU (and its sublicensees) shall be relieved of the obligations set forth in this paragraph. Should SBI, or a successor, cease business as a manufacturer of alley rollers, then this Agreement shall not terminate so long as SBI or a successor continue to own the SKEE-BALL Trademark (unless the parties agree otherwise).

Movit MSJ Decl., Ex. 2 at ¶ 5.2.

36.    At all times since BTE was assigned the License Agreement, BTE has had Standard Lanes available for purchase, whether directly or through BTE's distributor. Movit MSJ Decl., ¶¶ 33, 50 & Exs. 21, 38.

37.    FCU has never purchased a single Standard Lane from BTE. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 507:12-509:2; 516:7-517:2; Movit MSJ Decl., ¶¶ 29-30 & Exs. 17-18 (Pavony Depo. Exs. 21, 23).

38.    On November 22, 2019, for the first time since BTE acquired the License Agreement in early 2016, Eric Pavony emailed Larry Treankler seeking to purchase 150

Standard Lanes, stating that FCU intended to customize the lanes. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 516:7-517:2; Movit MSJ Decl., Ex. 18 (Pavony Depo. Ex. 23).

39.     On November 26, 2019, Holly Hampton responded to Pavony's email regarding the purchase of 150 Standard Lanes, indicating that Standard Lanes were available for purchase and writing in pertinent part as follows: "I'm not sure what you mean when you say that you'll work with a partner so that the lanes comply with the License Agreement. What would need to be done to a Classic lane for it to comply with the agreement?" Movit MSJ Decl., Ex. 18 (Pavony Depo. Ex. 23)

40.     On December 4, 2019, Pavony responded to Ms. Hampton, stating that FCU would "work with a funding/manufacturing partner to make the lanes Skee-Ball® LIVE lanes," which would be done "in compliance with the License Agreement." Movit MSJ Decl., Ex. 18 (Pavony Depo. Ex. 23).

41.     On December 17, 2019, Ms. Hampton responded to Pavony, writing in pertinent part as follows:



10

Movit MSJ Decl., Ex. 18 (Pavony Depo. Ex. 23).

### (iii)   The Proposed ESPN Deal

42.   Paragraph 3.2 of the License Agreement reads as follows:

> The foregoing (a) - (d) are referred to as the "Licensed Uses."
> Pursuant to the license granted to FCU herein under Section 3.1,
> and subject to the restrictions and exclusions set forth below, the
> Parties acknowledge and agree that FCU may use the SKEE-
> BALL Trademark, for advertising and promotional purposes in any
> and all mediums now known or hereafter devised, so long as such
> use is solely in connection with and in compliance with the
> Licensed Uses above, and the restrictions, conditions and
> exclusions below.

Movit MSJ Decl., Ex. 2 at ¶ 3.2.

43.   Paragraph 4.1 of the License Agreement reads as follows:

> The Scoring App will be an electronic application that solely
> allows Live Play players, teams, and leagues to record and
> maintain scores, statistics, league and player information, wins and
> losses, awards and rankings, solely and directly in connection with
> Live Play; and which does not include virtual play of the game
> manufactured by SBI known as Skee-Ball®, it being understood
> that no rights for digital or virtual play or other digital rights are
> granted herein. The Parties acknowledge and agree that nothing in
> this Agreement confers any right to FCU to use the SKEE-BALL
> Trademark in connection with a virtual, digital, mobile, and/or
> electronic game or app that allows the user to play the game of
> Skee-Ball® (whether by finger swiping or otherwise). For the
> avoidance of doubt, the Scoring App shall not include virtual play
> of the game manufactured by SBI known as Skee-Ball®, and it is
> understood that no rights for digital or virtual play or other digital
> rights utilizing the SKEE-BALL Trademark beyond the Scoring
> App are granted to FCU herein.

Movit MSJ Decl., Ex. at ¶ 4.1.

44.   Paragraph 4.5 of the License Agreement reads as follows:

> Except as expressly provided herein as to the Scoring App, FCU
> may not use the SKEEBALL Trademark in connection with any
> digital, mobile, or electronic game, console, app, device, platform,
> or product whether in a format now known or hereafter created,

11

> developed or devised. For the avoidance of doubt, FCU has the
> right to use the SKEE-BALL Trademark, per Paragraph 3.2, via
> the Internet, radio, television, or other communication and media
> outlets, whether now known or hereafter created, developed or
> devised, for promotional and marketing purposes only of its Live
> Play business (including for the purpose of allowing Live Play
> players to enroll in / sign up for Live Play) and Live Play
> Merchandise.

Movit MSJ Decl., Ex. at ¶ 4.5.

45.     Paragraph 18.4 of the License Agreement reads as follows:

> Entire Agreement. This is an enforceable Agreement. This
> Agreement, including the attached Exhibits, which are
> incorporated by reference herein, and the referenced Settlement
> Agreement, constitutes the entire agreement between the Parties
> regarding the subject matter hereof and supersedes all previous
> communications, representations, agreements or understandings,
> either oral or written, between the Parties with respect to the
> subject matter hereof. This Agreement may be amended,
> supplemented or modified only by a written instrument duly
> executed by or on behalf of each Party hereto which specifically
> refers to this Agreement.

Movit MSJ Decl., Ex. at ¶ 18.4.

## 2.     Breach Of The Alleged Oral Revenue Share Agreement (Count II)

46.     On September 6, 2017, Pavony, Wikman, and Cooper had lunch with Larry Treankler and other BTE employees at a diner. Treankler Depo. (Movit MSJ Decl. Ex. 8) at 87:7-12; Movit MSJ Decl., ¶ 3 & Video Exhibit 2.

47.     BTE told FCU that it would determine whether to proceed with any further Custom Lanes at a subsequent time and after assessing the performance of the 10 prototypes. Treankler Depo. (Movit MSJ Decl. Ex. 8) at 184:14-185:15; Movit MSJ Decl., ¶ 34 & Ex. 22.

12

48.     At the diner meeting, which FCU claims created a binding agreement,[2] BTE and FCU only discussed various potential issues relative to a future potential arrangement on Custom lanes beyond the 10. For example, Pavony asked when he could expect a "counter-proposal" from BTE concerning a potential arrangement involving revenue sharing, to which Treankler responded that "the quantity of games," "R&D part," and other issues were still to be resolved. Movit MSJ Decl., Video Exhibit 2 at 32:40.

49.     For further example, Wikman asked Mr. Treankler the following: "I'm asking you to make the assumption that in – like go through the thought process, make the assumption that, okay, we hit those target goals, the amount of revenue that we said we would make per lane, we made, and if we do succeed with that, what would you be willing to make at that point?"  Movit MSJ Decl., Video Exhibit 2 at 40:05.

50.     For further example, Wikman said to Mr. Treankler: "[I]f it comes in that our numbers are lower, I understand that none of it is binding."  Movit MSJ Decl., Video Exhibit 2 at 40:20.

51.     At the September 6, 2017 meeting, FCU and BTE did not agree on material terms of a purported oral agreement, including (1) any specific number of additional Custom Lanes potentially to be built by BTE beyond the 10 prototypes, (2) any manufacturing or delivery dates for Custom Lanes beyond the 10 prototypes that were delivered, (3) further specifications with respect to any potential Custom Lanes beyond the 10 prototypes, (4) locations that were acceptable as to where any potential Custom Lanes beyond the 10 prototypes would be placed

---

[2] FCU's pleading selectively quotes portions of the approximately 45 minute diner video without regard to the context provided by the following facts.

13

and monetized, or (5) the financial terms between FCU and BTE as to any exploitation of any potential Custom Lanes beyond the 10 prototypes.  Movit MSJ Decl., Video Exhibit 2.

52.     On January 5, 2018, Eric Wikman sent an email to Eric Pavony which read in pertinent part as follows:



Movit MSJ Decl., ¶ 52 & Ex. 40.

53.     On February 28, 2018, Pavony sent an email to Mr. Treankler complaining about a lack of clarity in the working relationship between FCU and BTE. In this email, Pavony wrote to Mr. Treankler: "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Movit MSJ Decl., ¶ 47 & Ex. 35.

54.     On May 17, 2018, Pavony emailed Wikman, writing in pertinent part as follows:



Movit MSJ Decl., ¶ 53 & Ex. 41.

55.     BTE sought to have FCU sign a written revenue share agreement, and on August 20, 2018 sent a draft prepared by its attorneys to FCU. Movit MSJ Decl., ¶¶ 48-49, 65, & Exs. 36-37, 53.

56.     The draft written revenue share agreement sent by BTE to FCU pertained only to the 10 Custom Lanes BTE had already manufactured.  Hampton Depo. (Movit MSJ Decl. Ex. 7) at 304:10-305:2; Movit MSJ Decl., ¶¶ 48, 65 & Exs. 36, 53.

14

57.     BTE and FCU never entered into a written revenue share agreement. Hampton

Depo. (Movit MSJ Decl. Ex. 7) at 253:11-14; 301:8-21; 304:10-305:2; 316:24-317:6.

58.     BTE's Interrogatory No. 20 propounded on FCU reads as follows:

> Identify all statements made and writings prepared by or signed by
> someone with authority to bind Bay Tek that you contend
> memorialize the terms of the alleged revenue share agreement
> underlying Count II of the Second Amended Complaint.

Movit MSJ Decl., ¶ 45 & Ex. 33 (FCU Amended Answers to BTE's Second Set of

Interrogatories) at No. 20.

59.     FCU's response to Interrogatory No. 20 reads in pertinent part as follows:

> Full Circle has not made this contention. Certain terms of the
> Revenue Share Agreement are reflected on the following
> documents: BT0008343, BT0005905 – BT0005906,
> FCU000002453 – FCU000002455, BT0006 BT0000089831 –
> BT0006836. Full Circle also refers Bay Tek to Larry Treankler's
> recorded statements: FCU000000183.

Movit MSJ Decl., Ex. 33 at No. 20.

60.     FCU has not identified any additional documents containing any material terms of

the alleged oral agreement. None of the documents identified by FCU in its response to

Interrogatory No. 20 contain material terms of an oral agreement, individually or cumulatively,

that reflect any of the following: (1) any specific number of additional Custom Lanes potentially

to be built by BTE beyond the 10 prototypes, (2) any manufacturing or delivery dates for Custom

Lanes beyond the 10 prototypes that were delivered, (3) further specifications with respect to any

potential Custom Lanes beyond the 10 prototypes, (4) locations that were acceptable as to where

any potential Custom Lanes beyond the 10 prototypes would be placed and monetized, or (5) the

financial terms between FCU and BTE as to any exploitation of any potential Custom Lanes

beyond the 10 prototypes. Movit MSJ Decl., Video Exhibit 2; *id.*, Ex. 33 at No. 20.

15

### 3. Tortious Interference (Count III)

61.     FCU and Play Mechanix never had an "agreement in principle," as alleged by FCU in its Second Amended Complaint. Deposition of George Petro ("Petro Depo.") (Movit MSJ Decl., ¶ 22 & Ex. 10) at 171:9-19; 175:5-176:6.

62.     In the fall of 2018, Petro spoke with Rick Rochetti, BTE's former director of sales, and told him that Play Mechanix would not be working with FCU. Petro Depo. (Movit MSJ Decl. Ex. 10) at 73:19-74:5; 126:3-5; Deposition of Rick Rochetti ("Rochetti Depo") (Movit MSJ Decl., ¶ 24 & Ex. 12)  at 7:13-8:6; 246:18-247:3; 257:2-11.

63.     During his fall 2018 conversation with Petro, Mr. Rochetti did not threaten Play Mechanix in any way. Petro Depo. (Movit MSJ Decl. Ex. 10) at 172:12-17; Rochetti Depo. (Movit MSJ Decl. Ex. 12) at 257:2-11; 257:23-258:19.

### 4. Lost Profits

64.     In her report pertaining to FCU's lost profits claims, Laura Smith, FCU's expert witness, did not provide damages calculations that were reasonably certain as to their amount. Deposition of Laura Smith ("Smith Depo.") (Movit MSJ Decl., ¶ 18 & Ex..6) at 126:17-23.

65.     For a period of time between 2016 and 2018, FCU did not maintain its own bank account, and for a time FCU used a personal bank account opened in Eric Cooper's name. Wikman Depo. (Movit MSJ Decl. Ex. 4) at 445:3-448:19; 455:5-457:21; 459:4-18; Cooper Depo. (Movit MSJ Decl. Ex. 5) at 123:20-127:20.

66.      At times during and after the lawsuit with SBI, FCU's record keeping was poor. FCU does not have its own accounting software, generate annual reports, or maintain a general ledger.   Wikman Depo. (Movit MSJ Decl. Ex. 4) at 47:5-10; 327:20-334:19; 337:4-24; 386:6-387:12.

67.    FCU tried to obtain investor funding but did not succeed.  Wikman Depo. (Movit

MSJ Decl. Ex. 4) at 289:8-290:2; 307:4-309:9; Pavony Depo. (Movit MSJ Decl. Ex. 3) at 205:5-

24 Movit MSJ Decl., ¶ 25 & Ex. 13 (Wikman Depo. Ex. 8).

**C.    Undisputed Facts Entitling BTE To Summary Judgment On Certain Counterclaims**

**1.    Breach Of The License Agreement (Count VI)**

**a.    Failure to Promote Licensed Uses**

**(i)    Building Out Live Play Business Using Standard Lanes**

68.    Paragraph 6 of the License Agreement reads as follows:

> SBI shall retain all ownership rights in the SKEE-BALL
> Trademark. **All use of the SKEE-BALL Trademark, including
> the Licensed Uses, shall inure to the benefit of SBI.** Nothing in
> this Agreement shall be interpreted as giving FCU any right, title,
> or interest in or to the SKEE-BALL Trademark, other than the
> right to use the SKEE-BALL Trademark in accordance with the
> terms of this Agreement. No license or other interest of any kind in
> any of SBI's rights or property is granted to FCU, whether directly
> or indirectly, except as specifically provided herein. Any rights in
> or to the SKEE-BALL Trademark not licensed hereunder are fully
> reserved to SBI and shall remain the property of SBI, to be used in
> any manner SBI deems appropriate. Except as otherwise set forth
> herein, FCU understands and acknowledges that SBI has reserved
> the right to authorize others to use the SKEE-BALL Trademark
> during the Term in connection with tangible and intangible
> products and services, unless otherwise agreed upon in this
> Agreement. The decision whether to pursue trademark
> infringement actions and the manner in which SBI pursues such
> actions shall solely rest with SBI and SBI shall not incur any
> liability to FCU based on SBI's decision whether or not to pursue
> such infringement actions or the manner in which it pursues such
> actions. FCU shall reasonably assist SBI in the pursuit of
> infringement actions when requested by SBI, provided, however, it
> is understood that FCU shall not be required to incur any costs or
> expenses as a result of providing any such assistance.

Movit MSJ Decl., Ex. 2 at ¶ 6 (emphasis added).

17

69.     The License Agreement encompasses the exclusive operation of Live Play in any type of brick and mortar venue, not only in bars. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 260:25-262:23.

70.     FCU has only operated Live Play in bars. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 262:24-263:7.

### (ii)     Live Play Merchandise

71.     Paragraph 8.1 of the License Agreement reads as follows:

> No royalties are payable under this Agreement for FCU's use of the SKEE-BALL Trademark in connection with Live Play except for: (1) the fifteen percent (15%) Gross Revenues from Live Play Merchandise, set forth in 8.2 below; (2) the five percent (5%) royalty in connection with the Scoring App Revenue, set forth in 8.3; (3) the ten percent (10%) royalty on permitted Transfers of this license Agreement and ( 4) the five percent (5%) royalty on Gross Sponsorship Revenues, set forth in 8.4 below.

Movit MSJ Decl., Ex. Ex. 2 at ¶ 8.1.

72.     FCU has not sold any Live Play merchandise.  Pavony Depo. (Movit MSJ Decl. Ex. 3) at 291:11-19; Wikman Depo. (Movit MSJ Decl. Ex. 4) at 393:6-394:10; Hampton Depo. (Movit MSJ Decl. Ex. 7) at 106:17-107:8; *see also* Movit MSJ Decl., ¶ 40 & Ex. 28 at RFA No. 14.

73.     Rather than selling Skee-Ball branded merchandise under the License Agreement, FCU has sold Brewskee Ball merchandise. Wikman Depo. (Movit MSJ Decl. Ex. 4) at 393:6-394:10.

74.     BTE has not received royalties on revenue of any Skee-Ball branded merchandise or Brewskee Ball merchandise sales. Wikman Depo. (Movit MSJ Decl. Ex. 4) at 393:6-394:10; 395:17-396:11; *see* Movit MSJ Decl., Ex. 2 at ¶¶ 3, 8.

### (iii)     Live Play Sponsorships and Endorsements

18

75.     Paragraph 8.2 of the License Agreement reads as follows:

SBI shall be entitled to fifteen percent (15%) of the Gross
Revenues From Sale of Live Play Merchandise, which is defined
as all gross revenues from any and all retail sales of Live Play
Merchandise less only returns and allowances (including cash or
credit refunds made to customers, rebates, and other allowances off
the actual sale price), whether generated directly by FCU or as a
result of outsourcing the merchandising of such products. For the
avoidance of doubt, in the event that FCU outsources Live Play
Merchandise, SBI's percentage shall be based on the gross
revenues generated by the outsourcing entity from merchandising,
and not just what revenues FCU receives from the outsourcing
entity. In the event of any outsourcing of the Live Play
Merchandise, SBI shall have prior written approval of the
outsourcing agreement, which approval will not be unreasonably
withheld, and which agreement shall include at a minimum that
SBI shall be named as an indemnitee and additional insured under
such agreement and, further, at a minimum the outsourcing
agreement shall conform to the terms, conditions, restrictions and
exclusions of this Agreement.

Movit MSJ Decl., Ex. 2 at ¶ 8.2.

76.     Paragraph 8.4 of the License Agreement reads as follows:

FCU shall pay to SBI five percent (5%) of all "Gross Sponsorship
Revenues," which is defined as the gross revenues FCU receives
from sponsorships or endorsements of Live Play. Gross
Sponsorship Revenues do not include any money paid to FCU by a
venue or company owned by Eric Pavony and/or FCU, including
but not limited to Full Circle Bar.

Movit MSJ Decl., Ex. 2 at ¶ 8.4.

77.     Since BTE acquired the Skee-Ball Mark and was assigned the License

Agreement, FCU has paid to BTE $161.50 in total revenue under the License Agreement.

Pavony Depo. (Movit MSJ Decl. Ex. 3) at 291:11-19; Hampton Depo. (Movit MSJ Decl. Ex. 7)

at 106:17-107:8; Movit MSJ Decl., ¶ 41 & Ex. 29 at Response to RFA No. 14.

78.     FCU has taken in-kind donations in exchange for sponsorships, including alcohol, that benefited the Full Circle Bar venues. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 296:19-302:8; Movit MSJ Decl., ¶¶ 43, 51 & Ex. 31 at Interrogatory No. 5; *id.*, Ex. 39.

**b.     Failure To Use Best Efforts To Create Live Play Network**

79.     Paragraph 5.1 of the License Agreement reads as follows:

> FCU agrees to use best efforts to build a national network of Live
> Play teams, leagues, and/or events in at least fifteen (15) states in
> the United States within five (5) years of the Effective Date of this
> Agreement. It is acknowledged by SBI and FCU that as of the
> Effective Date, FCU had developed Live Play teams, leagues, and
> events in California, Texas, New York and North Carolina.

Movit MSJ Decl., Ex. 2 at ¶ 5.1.

80.     FCU operated Live Play for the first time in nine states in 2019: Michigan, Massachusetts, Illinois, Iowa, New Jersey, Minnesota, Louisiana, Oregon, and Washington. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 212:25-215:25; Wikman Depo. (Movit MSJ Decl. Ex. 4) at 476:10-481:22; Movit MSJ Decl., ¶ 26 & Ex. 14 (Wikman Depo. Ex. 23).

81.     The 2019 Live Play operations in Massachusetts, Illinois, Iowa, New Jersey, Minnesota, Louisiana, Oregon, and Washington were one-time events that were characterized on a spreadsheet given to FCU's expert as "Added Lanes Used for 2019 NSBL Skee-Ball® Open." Pavony Depo. (Movit MSJ Decl. Ex. 3) at 212:25-215:25; Wikman Depo. (Movit MSJ Decl. Ex. 4) at 476:10-481:22;  Movit MSJ Decl., Ex. 14 (Wikman Depo. Ex. 23).

82.     After 2019, there were no further Live Play operations in Massachusetts, Illinois, Iowa, New Jersey, Minnesota, Louisiana, Oregon, and Washington. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 212:25-215:25; Wikman Depo. (Movit MSJ Decl. Ex. 4) at 476:10-481:22; Movit MSJ Decl., Ex. 14 (Wikman Depo. Ex. 23).

83.     After his deposition, Pavony submitted an errata sheet in which he claimed that FCU operated Live Play "for the first time" in two Colorado bars in 2011. *See* Movit MSJ Decl., Ex. 3 (Pavony Depo., including errata sheet).

84.     Colorado is not listed in Paragraph 5.1 of the License Agreement as a state where FCU "had developed Live Play teams, leagues, and events." There is also no reference to Colorado in the spreadsheet given to FCU's expert marked as Wikman Exhibit 23. Movit MSJ Decl., Ex. 2 at ¶ 5.1. *id.*, Ex. 14 (Wikman Depo. Ex. 23).

85.     FCU did not "build a national network of Live Play teams, leagues, and/or events in at least fifteen (15) states in the United States" within five years of the Effective Date of the License Agreement. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 212:25-215:25; Wikman Depo. (Movit MSJ Decl. Ex. 4) at 476:10-481:22; Movit MSJ Decl., ¶ 26 & Ex. 14 (Wikman Depo. Ex. 23); *see also id.*, Ex. 2 at ¶ 5.1.

### c.     Use of Unauthorized Slogans and Phrases

86.     Paragraph 4.2 of the License Agreement reads as follows:

> FCU's Licensed Use of the SKEE-BALL Trademark in connection with Live Play (as opposed to virtual play), includes the use of such phrases and slogans that include the SKEE-BALL Trademark such as: "First Ever Skee-Ball League", "National Skee-Ball League" and "National Skee-Ball League Championship", including those phrases and slogans set forth on <u>Exhibit B</u> to this Agreement, and phrases and slogans that are not set forth on <u>Exhibit B</u> to this Agreement, but which FCU may wish to adopt and use in the future solely and directly with Live Play, subject to prior written approval by SBI, which approval shall not be unreasonably withheld or delayed so long as the phrases or slogans pertain to Live Play and are consistent with the terms, conditions, exclusions and restrictions of this Agreement (collectively "Live Play Phrases and Slogans"). No right is granted to FCU to ownership of the said Live Play Phrases and Slogans, it being understood that FCU is granted a license to use the SKEE-BALL Trademark in connection with such Live Play. All such use of the Phrases and Slogans inures to the ownership rights of SBI in its

21

> trademark. FCU will not seek to register, or otherwise assert an ownership interest or right in any such Live Play Phrases and Slogans referred to herein or subsequently approved and used in the Live Play business.

Movit MSJ Decl., Ex. 2 at ¶ 4.2.

87.     Paragraph 4.8 of the License Agreement reads as follows:

> Should FCU desire, during the Term of this Agreement, to use the SKEE-Ball Trademark in any manner not expressly licensed under this Agreement, FCU shall make a written request to SBI of the proposed specific use(s), for SBI's prior written approval, and FCU may only use the said SKEEBALL Trademark as requested if the Parties complete negotiation of terms related to such additional requested uses and such agreement is set forth in writing.

Movit MSJ Decl., Ex. 2 at ¶ 4.8.

88.     Annexed to the License Agreement as Exhibit "B" is a list of terms and phrases using the Mark that FCU has been pre-approved to use in connection with Live Play. Movit MSJ Decl., Ex. 2 at Exhibit B.

89.     FCU has used the Mark in connection with slogans, phrases, and team names that do not appear on the pre-approved list set forth in Exhibit B. Movit MSJ Decl., Ex. 2 at Exhibit B; Movit MSJ Decl., ¶¶ 54-57 & Exs. 42-45.

90.     The following phrases do not appear on Exhibit B to the License Agreement but have been posted on social media and/or websites operated and controlled by FCU.  "Hepatitis Skee," "Skeemature Ejaculation," "Skeefer Madness," "Can You Skee My Balls?," "Monica LewinSkee-Ball Liquors," "K. Skee Anthony," "Salty Skeemen," "Skee.I.Joes," "Skeeyonce Rolles," and "ACDSkee," "SKEEnage Mutant Ninja Turtles," "PusSKEEcat Dolls," "Shang-Skee and the 10 Brews," and "A-Skee/D-Skee."  Movit MSJ Decl., Ex. 2 at Exhibit B; *id.,* ¶¶ 54-64 & Exs. 24-25, 42-52.

22

91.     None of the slogans and phrases set forth in SUF 90 were ever approved by BTE under the terms of Paragraphs 4.2 and 4.8 of the License Agreement. *See* Movit MSJ Decl., Ex. 2.

92.     Pavony registered, in his individual name, the domain names http://www.nationalskeeballleague.com and http://www.skeeballleague.com. BTE did not approve this under the terms of Paragraphs 4.2 and 4.8 of the License Agreement. Movit MSJ Decl., Ex. 2 at ¶¶ 4.2, 4.8; *id.*, ¶ 27 & Ex. 15 (Pavony Depo. Ex. 7).

### d.     Uses That Disparage And Tarnish The Mark And BTE

93.     Paragraph 7.1 of the License Agreement reads as follows:

> FCU agrees that it will use the SKEE-BALL Trademark only in accordance with the terms of this Agreement. FCU is familiar with SBI' s asserted high quality standards employed by SBI and agrees to maintain that standard of quality when using the SKEE-BALL Trademark so as to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark. SBI reserves the right to review FCU's uses of the SKEE-BALL Trademark in order to assure, without limitation, that such standard of quality is maintained by FCU in its use of the SKEE-BALL Trademark, that the SKEEBALL Trademark is being used in conformity with the terms and conditions of this Agreement, in a manner conforming to SBI's reputation, and in a manner that will not tarnish or otherwise malign the SKEE-BALL Trademark.

Movit MSJ Decl., Ex. 2 at ¶ 7.1.

94.     Paragraph 7.7 of the License Agreement reads as follows:

> FCU shall not use the SKEE-BALL Trademark in a manner that disparages, demeans, tarnishes or dilutes the reputation of SBI or the SKEE-BALL Trademark. FCU acknowledges and agrees that SBI's SKEE-BALL Trademark branded goods and/or services are geared towards families and children and FCU will ensure that its use of SKEE-BALL Trademark shall not tarnish, dilute, weaken, blur or otherwise malign the SKEE-BALL Trademark and/or SBI.

Movit MSJ Decl., Ex. 2 at ¶ 7.7.

15030309.7

95.     FCU has posted on its public website and/or social media accounts Brewskee Ball team and player names such as Hepatitis Skee; Skeemature Ejaculation; Skeefer Madness; Can You Skee My Balls?, Monica LewinSkee-Ball Liquors; K. Skee Anthony; and Salty Skeemen. Movit MSJ Decl., Exs. 24-25, 42-52.

96.     Eric Cooper has approval over team names used at the Austin Full Circle Bar, and allows teams to use vulgar names in connection with the Mark.  Cooper Depo. (Movit MSJ Decl. Ex. 5) at 247:3-18, 248:2-11.

97.     Cooper deemed the team names "Can You Skee My Balls," "Hepatitis Skee," and "Skeemature Ejaculation" appropriate uses of the Mark. Cooper Depo. (Movit MSJ Decl. Ex. 5) at 251:22-252:15; 253:22-254:19; 243:21-25; 265:19-266:16; Movit MSJ Decl., Exs. 23-25 (Cooper Depo. Exs. 32-34).

98.     Brewskee Ball team names appeared on websites that were fully available to the public, including to children. Cooper Depo. (Movit MSJ Decl. Ex. 5) at 250:17-251:21; 267:22-271:10.

99.     From time to time, Cooper would make posters bearing the moniker "Full Circle Magazine" that were posted on the Brewskee Ball website to commemorate events like players winning a Brewskee Ball championship. Cooper Depo. (Movit MSJ Decl. Ex. 5) at 265:19-266:16; 267:22-269:10; Movit MSJ Decl., Ex. 25 (Cooper Depo. Ex. 34).

100.     A Full Circle Magazine cover from Brewskee Ball San Francisco "Skeeson XXVI" prominently displays a rookie roller named "Salty Skeemen." Movit MSJ Decl., ¶ 63 & Ex. 51 at BT0000319.

101.     In July 2018, FCU released a "State of the Brewnion" video on the internet livestreaming platform Twitch in which Pavony spent several minutes discussing the legal

24

situation with BTE, during which he said that BTE and its employees are dishonest. Movit MSJ Decl., ¶ 4 & Video Exhibit 3.

102.    On November 2, 2020, BTE filed an application for trademark registration with the U.S. Patent and Trademark Office for the following design mark, which issued in a trademark registration on June 15, 2021 (the "Skee-Ball Design Mark"). Movit MSJ Decl., ¶¶ 80-81 & Exs. 68-69.



103.    On November 25, 2020, the Full Circle Bar Facebook account posted the following photograph making use of the Skee-Ball Design Mark, which BTE did not approve under the terms of Paragraphs 4.2 and 4.8 of the License Agreement:

25



Pavony Depo. (Movit MSJ Decl. Ex. 3) at 458:12-18; Movit MSJ Decl., ¶ 28 & Ex. 16 (Pavony Depo. Ex. 18).

104.    In the summer of 2021, FCU allowed members of Barstool Sports to attend an event at the Brooklyn Full Circle Bar at which Barstool Sports members conducted an Internet livestream that included discussions of the members' sexual exploits, in connection with an event at which the Mark was displayed by FCU and Pavony.  Pavony Depo. (Movit MSJ Decl. Ex. 3) at 444:21-445:21; 446:17-447:22; Movit MSJ Decl., ¶¶ 5, 42, 89 & Video Exhibit 4, Ex. 30 (at RFA Nos. 9-15), Ex. 77.

105.    Pavony attended the Barstool Sports event. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 444:21-445:21, 446:17-447:22; Pavony Depo. (Movit MSJ Decl. Ex. 3) at 444:21-445:21; 446:17-447:22; Movit MSJ Decl., Video Exhibit 4, Ex. 30 (at RFA Nos. 9-15), Ex. 77.

26

106.     The Mark was displayed during the Barstool Sports event and was visible during

the Internet livestream. Movit MSJ Decl., Video Exhibit 4, Ex. 30 (at RFA Nos. 9-15), Ex. 77.

### e.     Unauthorized Use of Third Party Intellectual Property

107.     Paragraph 7.8 of the License Agreement reads as follows:

> Unless otherwise agreed to in this Agreement, in the event that
> FCU seeks to use the SKEE-BALL Trademark in connection with
> the intellectual property of any third party, FCU shall first obtain
> any required third party authorization, release, approval, consent or
> license. FCU agrees never to use the SKEE-BALL Trademark in
> connection with the intellectual property of a competitor of SBI
> which shall mean a person, firm or entity that competes with the
> Business of SBI. FCU shall be solely responsible for any and all
> payments required to any third party with respect to the use of the
> SKEEBALL Trademark in connection with any third party
> intellectual property, as well as with respect to the marketing,
> advertising, sale distribution and/or promotion thereof.

Movit MSJ Decl., Ex. 2 at ¶ 7.8.

108.     FCU has published on its websites and/or social media accounts.the following

team names in connection with Skee-Ball events where the Mark is used: "Skee.I.Joes,"

"Skeeyonce Rolles," and "ACDSkee." Movit MSJ Decl., Movit MSJ Decl., Ex. 42 at

BT0000089-90; Ex. 49 at BT0000170' Ex. 52.

109.     "G.I. JOE" is a registered trademark and appears on the principal U.S. Trademark

Register. Movit MSJ Decl., ¶ 82 & Ex. 70.

110.     "BEYONCÉ" is a registered trademark and appears on the principal U.S.

Trademark Register.   Movit MSJ Decl., ¶ 83 & Ex. 71.

111.     "AC/DC" is registered trademark and appears on the principal U.S. Trademark

Register.   Movit MSJ Decl., ¶ 84 & Ex. 72.

112.     The foregoing team names were specifically highlighted in BTE's Counterclaims

filed on September 21, 2020. *See* Dkt. No. 25.

113.     Between September and November 2022, FCU published on its websites and/or social media accounts.the following team names in connection with Skee-Ball events where the Mark was used: "SKEEnage Mutant Ninja Turtles," "PusSKEEcat Dolls," "Shang-Skee and the 10 Brews," and "A-Skee/D-Skee." Movit MSJ Decl., ¶¶ 66-73 & Exs. 54-61.

114.     "TEENAGE MUTANT NINJA TURTLES" is a registered trademark and appears on the principal U.S. Trademark Register. Movit MSJ Decl., ¶ 85 & Ex. 73.

115.     "PUSSYCAT DOLLS" is a registered trademark and appears on the principal U.S. Trademark Register. Movit MSJ Decl., ¶ 86 & Ex. 74.

116.     "SHANG-CHI AND THE LEGEND OF THE TEN RINGS" is a registered trademark and appears on the principal U.S. Trademark Register. Movit MSJ Decl., ¶ 87 & Ex. 75.

117.     FCU did not seek or obtain authorization from BTE or from any third party to use third party intellectual property in connection with the Mark. Pavony Depo. (Movit MSJ Decl. Ex. 3) at 424:10-426:20; 437:10-15**.**

118.     The webpage for Gainesville Brewskee Ball contains sign-up instructions that encourage players to "craft a witty team name" and gives "Skee Amigos" as an example of such a name. Movit MSJ Decl., ¶¶ 59, 62 & Exs. 47, 50.

### f.        Unauthorized Broadcasts Of Live Play Events

119.     On multiple occasions since BTE was assigned the License Agreement in 2016, FCU has broadcast full Live Play matches and tournaments via online video streaming platforms such as Twitch. Movit MSJ Decl., ¶ 74 & Ex. 62.

120.     FCU sought to enter into a contract with ESPN under which ESPN would broadcast a Skee-Ball tournament. SAC ¶¶ 216, 219-220

### 2.    Claims For Declaratory Judgment (Counts VII and VIII)

### a.    The Duration Of The License Agreement

121.    Paragraph 11 of the License Agreement reads as follows:

The term of this Agreement ("Term") shall commence on the Effective Date of this Agreement and shall continue in force and effect unless and until one of the following "Termination Events" occurs:

11.1 FCU or SBI shall file a petition in bankruptcy and such bankruptcy is finalized, become insolvent, or make an assignment for the benefit of creditors.

11.2 The SKEE-BALL Trademark is abandoned, as that term is defined in the Lanham Act; or the SKEE-BALL Registration is cancelled, upon which time SBI will have free use of the term SKEEBALL and any variation thereof, notwithstanding Paragraph 12.

11.3 FCU ceases to operate its Live Play business, and there is no permitted Transfer of the Live Play business to a successor per Paragraphs 9.1 and 9.2.

11.4 There is a Transfer of any interest in FCU, by FCU, or any other person holding an ownership interest in FCU, in whole or in part, directly or indirectly, to a competitor of SBI, meaning a person, firm or entity competing with the Business of SBI, or there is any other unpermitted Transfer.

11.5 Further to the above, this Agreement also may be terminated (a) if there is a Transfer of SBI in which case FCU may, at its option, terminate the Agreement; and (b) at any time upon the signed agreement of both Parties to this Agreement.

11.6 If either Party perceives a material breach of this Agreement, that Party shall promptly notify the other Party in writing. The Party receiving such notice shall then have thirty (30) days from receiving such notice to cure such breach or to negotiate a resolution with the complaining Party (the "Cure Period"). During the Cure Period, no legal action shall be taken by the Party alleging the breach (except for provisional relief necessary to maintain a right or prevent irreparable harm) and the Parties shall negotiate in good faith to reach resolution. If the party receiving such notice has not cured the breach during the Cure Period, or has not negotiated another resolution with the complaining Party, then the

29

> complaining Party may terminate this Agreement and pursue all
> legal rights and remedies available to it to address the breach.

Movit MSJ Decl., Ex. 2 at ¶ 11.

122.    Paragraph 11 does not set forth an explicit term for the License Agreement. Movit

MSJ Decl., Ex. 2 at ¶ 11.

123.    The License Agreement does not state that it or FCU's rights granted thereunder

are to be considered perpetual. Movit MSJ Decl., Ex. 2.

### b.    FCU's Incurable Breaches Of The License Agreement

124.    BTE incorporates Statement of Undisputed Fact Nos. 68-120 herein.

### 3.    Trademark Infringement (Count I), False Endorsement (Count II) And Common Law Unfair Competition (Count IV)

125.    BTE is the lawful owner of the Mark at common law, and is the owner of the

registered "SKEE-BALL®" trademark, which it acquired from SBI on or around February 23,

2016. Movit MSJ Decl., Ex. 67; *see also id.,* Ex. 2 at recitals, ¶ 2.

126.    BTE incorporates Statement of Undisputed Fact Nos. 68-120 herein.

15030309.7

DATED:  New York, New York
    December 23, 2022

Respectfully submitted,

Mitchell Silberberg & Knupp LLP


By: /s/ Jeffrey M. Movit
  Christine Lepera (ctl@msk.com)
  Jeffrey M. Movit (jmm@msk.com)
  Elaine Nguyen (eln@msk.com)
  437 Madison Ave., 25th Floor
  New York, New York 10022-7001
  Telephone: (212) 509-3900
  Facsimile: (212) 509-7239

  Mark C. Humphrey (*pro hac vice*)
  2049 Century Park East, 18th Floor
  Los Angeles, California 90067-3120
  Telephone: (310) 312-2000
  Facsimile: (310) 312-3100
  Email: mxh@msk.com

  *Attorneys for Bay Tek Entertainment, Inc.*

15030309.7