# EXHIBIT 02

CONFIDENTIAL TRADEMARK LICENSE AGREEMENT

This confidential trademark license agreement (hereinafter "Agreement") is made effective as of the last date signed below once all parties have executed this Agreement (hereinafter the "Effective Date") by and between: Skee Ball, Inc., a Pennsylvania corporation ("SBI"), located at 121 Liberty Lane, Chalfont, PA 18914, on the one hand, and Full Circle United, LLC, a New York limited liability company ("FCU"), located at 132 Havemeyer Street, Suite 3A, Brooklyn, New York 11211, on the other hand. Each of the parties may be referred to herein individually as a "Party" or collectively as the "Parties."

WHEREAS, SBI is the owner of the trademark "SKEE-BALL®" (the "SKEE- BALL Trademark"), and is the owner of U.S. Trademark Reg. No. 0,256,496 for the SKEE-BALL Trademark in connection with a "game in the nature of a bowling game and parts thereof" (the "SKEE-BALL Registration");

WHEREAS, FCU is the owner of the trademark "BREWSKEE-BALL®" (the "BREWSKEE-BALL Trademark"), and is the owner of U.S. Trademark Reg. No. 3,389,014 for the BREWSKEE-BALL Trademark in connection with, among other things, "arranging and conducting skee-ball competitions" (the "BREWSKEE-BALL Registration");

WHEREAS, this Agreement is entered into as part of a settlement agreement ("Settlement Agreement"), executed contemporaneously herewith, regarding a Dispute (as defined in the Settlement Agreement) between the Parties;

WHEREAS, FCU is desirous of using the SKEE-BALL Trademark in connection with Live Play (as defined below); and

WHEREAS, SBI is desirous of granting to FCU a limited license to use the SKEE-BALL Trademark in connection with Live Play, subject to the restrictions, exclusions and other terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other good and valuable consideration, the Parties hereto agree as follows:

**1.    INCORPORATION BY REFERENCE OF RECITALS**

Each of the Recitals set forth above is hereby incorporated by reference as though set forth in full herein.

**2.    AGREEMENT NOT TO ATTACK OR CONTEST**

Pursuant to the terms of the Settlement Agreement of even date, and in further consideration of this Agreement, FCU agrees, from the Effective Date hereof, never to contest, directly or indirectly, or take any action, or to assist others in taking any action, directly or indirectly, to attack the legal sufficiency (including on grounds of genericness), status, or ownership of the SKEE-BALL Trademark or SKEE-BALL Registration.



FCU000000052
CONFIDENTIAL

3.    **LICENSE GRANT**

3.1    Subject to the terms, conditions, exclusions, and restrictions of this Agreement, including without limitation the SBI use guidelines set forth in Exhibit "A" hereto (the "SBI Use Guidelines"), SBI grants to FCU a worldwide, right and license to use the SKEE-BALL Trademark in connection with the following specified Licensed Uses during the Term and within the Territory:

a)    Conducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball® machines (including without limitation BREWSKEE BALL live play leagues, teams, events, and tournaments) utilizing alley rollers manufactured by SBI (collectively "Live Play").

b)    Developing, producing, selling, and distributing merchandise solely in connection with Live Play ("Live Play Merchandise") subject to the restrictions on merchandise set forth below.

c)    Developing, producing, offering, and using an electronic scoring application that will be made available for free, which allows Live Play players, teams, and leagues to record and maintain scores, statistics, league and player information, wins and losses, awards and rankings, solely and directly in connection with Live Play, and which does not include virtual play of the game manufactured by SBI known as Skee-Ball® (the "Scoring App").

d)    Using the Skee-Ball Trademark for sponsorships or endorsements solely and directly related to Live Play, provided however, that notice of such sponsorships or endorsement must be given to SBI, SBI shall receive a copy of the executed agreement and SBI shall receive five percent (5%) of Gross Sponsorship Revenues (as defined below in Paragraph 8.4).

3.2    The foregoing (a) – (d) are referred to as the "Licensed Uses." Pursuant to the license granted to FCU herein under Section 3.1, and subject to the restrictions and exclusions set forth below, the Parties acknowledge and agree that FCU may use the SKEE-BALL Trademark, for advertising and promotional purposes in any and all mediums now known or hereafter devised, so long as such use is solely in connection with and in compliance with the Licensed Uses above, and the restrictions, conditions and exclusions below.

4.    **RESTRICTIONS, CONDITIONS, AND EXCLUSIONS APPLICABLE TO LICENSED USES OF SKEE-BALL® TRADEMARK BY FCU**

FCU acknowledges and agrees that the license granted to it herein is limited to the right, license, and ability to use the SKEE-BALL Trademark in connection with the Licensed Uses, subject to the following terms, conditions, exclusions, and restrictions of this Agreement, including the SBI Use Guidelines.

4.1    The Scoring App will be an electronic application that solely allows Live Play players, teams, and leagues to record and maintain scores, statistics, league and player information, wins and losses, awards and rankings, solely and directly in connection with Live Play; and which does not include

2

FCU000000053
CONFIDENTIAL

virtual play of the game manufactured by SBI known as Skee-Ball®, it being understood that no rights for digital or virtual play or other digital rights are granted herein.  The Parties acknowledge and agree that nothing in this Agreement confers any right to FCU to use the SKEE-BALL Trademark in connection with a virtual, digital, mobile, and/or electronic game or app that allows the user to play the game of Skee-Ball® (whether by finger swiping or otherwise).  For the avoidance of doubt, the Scoring App shall not include virtual play of the game manufactured by SBI known as Skee-Ball®, and it is understood that no rights for digital or virtual play or other digital rights utilizing the SKEE-BALL Trademark beyond the Scoring App are granted to FCU herein.

4.2     FCU's Licensed Use of the SKEE-BALL Trademark in connection with  Live Play (as opposed to virtual play), includes the use of such phrases and slogans that include the SKEE-BALL Trademark such as: "First Ever Skee-Ball League", "National Skee-Ball League" and "National Skee-Ball League Championship",  including those phrases and slogans set forth on Exhibit B to this Agreement, and phrases and slogans that are not set forth on Exhibit B to this Agreement, but which FCU may wish to adopt and use in the future solely and directly with Live Play, subject to prior written approval by SBI, which approval shall not be unreasonably withheld or delayed so long as the phrases or slogans pertain to Live Play and are consistent with the terms, conditions, exclusions and restrictions of this Agreement (collectively "Live Play Phrases and Slogans").  No right is granted to FCU to ownership of the said Live Play Phrases and Slogans, it being understood that FCU is granted a license to use the SKEE-BALL Trademark in connection with such Live Play. All such use of the  Phrases and Slogans inures to the ownership rights of SBI in its trademark.  FCU will not seek to register, or otherwise assert an ownership interest or right in any such Live Play Phrases and Slogans referred to herein or subsequently approved and used in the Live Play business.

4.3     Use of the SKEE-BALL Trademark for any  sponsorships or endorsements solely and directly related to Live Play, including but not limited to product endorsements or product sponsorships, shall be consistent with the terms and conditions of this Agreement and the license for use of the SKEE-BALL Trademark for Live Play, and shall not diminish or tarnish the reputation of the SKEE-BALL Trademark, or SBI.  FCU may enter into a sponsorship or endorsement deal without  SBI's  prior written approval, provided, however, that FCU will notify SBI of all any sponsorships or endorsements and will provide a copy of all such executed agreements to SBI upon entering into such agreements. SBI shall receive five (5%)  of Gross Sponsorship Revenues as set forth herein.

4.4     Except as expressly set forth in Paragraph 3.1(b) and this Paragraph 4.4 regarding Live Play Merchandise, the SKEE-BALL Trademark may not be used by FCU in connection with any product, including, but not limited to, any physical product used to play the game of Skee-Ball®, including but not limited to an alley roller machine.  Notwithstanding the foregoing, FCU is given certain limited merchandising rights hereunder and the SKEE-BALL Trademark may be used by FCU on all categories of products usually the subject of entertainment and sports merchandising and not otherwise excluded under this Agreement, which may be sold or distributed through any retail channel, whether now known or hereafter created, developed or devised.

4.5     Except as expressly provided herein as to the Scoring App, FCU may not use the SKEE-BALL Trademark in connection with any digital, mobile, or electronic game, console, app, device, platform, or product whether in a format now known or hereafter created, developed or devised. For the avoidance of doubt, FCU has the right to use the SKEE-BALL Trademark, per Paragraph 3.2, via the

FCU000000054
CONFIDENTIAL

Internet, radio, television, or other communication and media outlets, whether now known or hereafter created, developed or devised, for promotional and marketing purposes only of its Live Play business (including for the purpose of allowing Live Play players to enroll in / sign up for Live Play) and Live Play Merchandise.

4.6     The SKEE-BALL Trademark also shall not be used on alcoholic beverages (although it may be used on alcohol-related products such as, without limitation, glassware, mugs, sleeves, and coasters, that are usually the subject of entertainment and sports merchandising). SBI acknowledges and agrees that FCU's use of the SKEE-BALL Trademark, and/or use of the Live Play Phrases and Slogans, pursuant to Paragraph 4.2, in connection with Live Play in bars or other venues where alcohol is served, or  endorsement or sponsorship of Live Play, consistent with the terms and conditions of this Agreement, by companies that sell alcohol, do not violate the foregoing restriction.

4.7     The Parties further acknowledge and agree that, with respect to Live Play Merchandise FCU shall not use the Skee-Ball Trademark without additional words, phrases, or indicators of Live Play; for example, FCU cannot produce a baseball cap solely with the SKEE-BALL Trademark on the cap, rather the cap must depict one or more of Live Play Phrases and Slogans set forth as allowed in this Agreement, including those on <u>Exhibit B</u>, such as "First Ever Skee Ball League" or "National Skee Ball League" or "National Skee Ball League Championship."

4.8     Should FCU desire, during the Term of this Agreement, to use the SKEE-Ball Trademark in any manner not expressly licensed under this Agreement, FCU shall make a written request to SBI of the proposed specific use(s), for SBI's prior written approval, and FCU may only use the said SKEE-BALL Trademark as requested if the Parties complete negotiation of terms related to such additional requested uses and such agreement is set forth in writing.

4.9     As set forth in the SBI Trademark Use Guidelines, FCU shall always use and place the federal trademark registration symbol "®" or the "™" symbol, as applicable, or otherwise reasonably specified by SBI, in connection with the use of the SKEE-BALL Trademark.

4.10    FCU understands and agrees that the license granted to FCU herein is personal to FCU and may only be transferred under certain limited conditions that are set forth in Paragraph 9. Any transfer in violation of Paragraph 9 shall subject this Agreement to termination.

## 5.    FCU'S BEST EFFORTS TO CREATE NATIONAL NETWORK, REQUIREMENT OF UTILIZING SKEE-BALL MACHINES FROM SBI, AND MUTUAL NON-COMPETE

5.1     FCU agrees to use best efforts to build a national network of Live Play teams, leagues, and/or events in at least fifteen (15) states in the United States within five (5) years of the Effective Date of this Agreement. It is acknowledged by SBI and FCU that as of the Effective Date, FCU had developed Live Play teams, leagues, and events in California, Texas, New York and North Carolina.

5.2     For as long as SBI,  or a successor, is a manufacturer of SKEE-BALL® branded alley roller machines, all Live Play  under the direction, control, sponsorship, authority, affiliation or supervision of FCU, or otherwise presented, promoted or marketed directly or indirectly by FCU, including but not limited to by permitted sub-licensees,  shall (i) utilize SKEE-BALL® branded alley

4

FCU000000055
CONFIDENTIAL

roller machines manufactured by SBI or its successor, and (ii) take place in a venue that exclusively utilizes (or will exclusively utilize if the venue does not house alley roller machines) SKEE-BALL® branded alley roller machines. In the event that SBI, or a successor, no longer manufactures SKEE-BALL® branded alley roller machines, or SBI, or a successor, are unable to fulfill FCU's needs for alley roller machines, FCU shall use its best efforts to comply with the aforementioned (i) and (ii), and have its sub-licensees do the same, but when compliance becomes impractical or unreasonable because SKEE-BALL® branded alley-roller machines are not available to buy, rent or borrow, FCU (and its sub-licensees) shall be relieved of the obligations set forth in this paragraph. Should SBI, or a successor, cease business as a manufacturer of alley rollers, then this Agreement shall not terminate so long as SBI or a successor continue to own the SKEE-BALL Trademark (unless the parties agree otherwise).

5.3     SBI hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term and in the Territory, operate, sponsor, or endorse a business, involving Live Play.

5.4     FCU hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term and in the Territory, enter into any business operations competitive with the Business of SBI. The phrase "Business of SBI" as used in this Agreement shall mean SBI's business, as that business was made known to FCU by SBI as of the Effective Date, and as FCU is further advised by SBI in writing after the Effective Date.

## 6. OWNERSHIP OF SKEE-BALL TRADEMARK / RESERVATION OF RIGHTS

SBI shall retain all ownership rights in the SKEE-BALL Trademark. All use of the SKEE-BALL Trademark, including the Licensed Uses, shall inure to the benefit of SBI. Nothing in this Agreement shall be interpreted as giving FCU any right, title, or interest in or to the SKEE-BALL Trademark, other than the right to use the SKEE-BALL Trademark in accordance with the terms of this Agreement. No license or other interest of any kind in any of SBI's rights or property is granted to FCU, whether directly or indirectly, except as specifically provided herein. Any rights in or to the SKEE-BALL Trademark not licensed hereunder are fully reserved to SBI and shall remain the property of SBI, to be used in any manner SBI deems appropriate. Except as otherwise set forth herein, FCU understands and acknowledges that SBI has reserved the right to authorize others to use the SKEE-BALL Trademark during the Term in connection with tangible and intangible products and services, unless otherwise agreed upon in this Agreement. The decision whether to pursue trademark infringement actions and the manner in which SBI pursues such actions shall solely rest with SBI and SBI shall not incur any liability to FCU based on SBI's decision whether or not to pursue such infringement actions or the manner in which it pursues such actions. FCU shall reasonably assist SBI in the pursuit of infringement actions when requested by SBI, provided, however, it is understood that FCU shall not be required to incur any costs or expenses as a result of providing any such assistance.

## 7. QUALITY CONTROL STANDARDS

7.1     FCU agrees that it will use the SKEE-BALL Trademark only in accordance with the terms of this Agreement. FCU is familiar with SBI's asserted high quality standards employed by SBI and agrees to maintain that standard of quality when using the SKEE-BALL Trademark so as to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark. SBI reserves the right to review FCU's uses of the SKEE-BALL Trademark in order to assure, without limitation, that

FCU000000056
CONFIDENTIAL

such standard of quality is maintained by FCU in its use of the SKEE-BALL Trademark, that the SKEE-BALL Trademark is being used in conformity with the terms and conditions of this Agreement, in a manner conforming to SBI's reputation, and in a manner that will not tarnish or otherwise malign the SKEE-BALL Trademark.

7.2    SBI and FCU each agree that they will use their respective best efforts to promote the Licensed Uses offered in connection with the SKEE-BALL Trademark and to coordinate the development, creation, distribution, sale, advertising, and promotion of the Licensed Uses so as to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark.

7.3    SBI shall have the right, in its reasonable discretion, to review or inspect, and to make reasonable requests to review or inspect, sample copies of any item, product, advertising, marketing, or promotional material offered or to be offered by FCU upon which the SKEE-BALL Trademark appears (the "Materials"). FCU shall ensure that the form, quality and standard of any Materials comply with relevant best manufacturing practices, including methods of storage, and with all relevant laws and regulations. FCU understands that if it distributes Materials that are not compliant with the terms of this Agreement, it may have to recall and/or destroy such non-compliant Materials at the request of SBI.

7.4    In the event SBI believes in good faith that FCU is not using the SKEE-BALL Trademark in compliance with the terms of this Agreement, SBI will notify FCU and the Parties agree to work diligently and in good faith to ensure that any deficiencies are remedied promptly. In the event that any Materials are determined to be defective or not otherwise in compliance with this Agreement or the standards set forth herein, SBI may demand the immediate recall of any and all such non-compliant Materials and may demand that FCU cease all distribution, sale and/or advertisement of such Materials until such time as the Materials have been corrected.

7.5    In the event that there are more than two instances during the Term of this Agreement when SBI has notified FCU in writing that Materials do not comply with this Agreement, then from that point on during the Term, SBI shall further have the right to request an inspection or accounting of and for all samples and/or materials used by FCU at any time. SBI shall also have the right to approve or disapprove any or all samples and/or materials for quality assurance, which approval shall not be unreasonably withheld or delayed. Once this Paragraph becomes operative, FCU shall not distribute, sell or advertise any version of the samples and/or materials that have not been approved by SBI.

7.6    FCU agrees that it will use the SKEE-BALL Trademark only in a manner consistent with proper trademark usage, and in a form and manner that is consistent with the registered format of the SKEE-BALL Trademark and consistent with the Use Guidelines set forth on Exhibit "A" hereto.

7.7    FCU shall not use the SKEE-BALL Trademark in a manner that disparages, demeans, tarnishes or dilutes the reputation of SBI or the SKEE-BALL Trademark. FCU acknowledges and agrees that SBI's SKEE-BALL Trademark branded goods and/or services are geared towards families and children and FCU will ensure that its use of SKEE-BALL Trademark shall not tarnish, dilute, weaken, blur or otherwise malign the SKEE-BALL Trademark and/or SBI.

7.8    Unless otherwise agreed to in this Agreement, in the event that FCU seeks to use the SKEE-BALL Trademark in connection with the intellectual property of any third party, FCU shall first obtain any required third party authorization, release, approval, consent or license. FCU agrees never

6

FCU000000057
CONFIDENTIAL

to use the SKEE-BALL Trademark in connection with the intellectual property of a competitor of SBI which shall mean a person, firm or entity that competes with the Business of SBI.  FCU shall be solely responsible for any and all payments required to any third party with respect to the use of the SKEE-BALL Trademark in connection with any third party intellectual property, as well as with respect to the marketing, advertising, sale distribution and/or promotion thereof.

## 8.    ROYALTIES AND AUDIT RIGHT

8.1    No royalties are payable under this Agreement for FCU's use of the SKEE-BALL Trademark in connection with Live Play except for: (1) the fifteen percent (15%) Gross Revenues from Live Play Merchandise, set forth in 8.2 below; (2) the five percent (5%) royalty in connection with the Scoring  App Revenue, set forth in 8.3; (3) the ten percent (10%) royalty on permitted Transfers of this license Agreement and (4) the  five percent (5%) royalty on Gross Sponsorship Revenues, set forth in 8.4 below.

8.2    SBI shall be entitled to fifteen percent (15%) of the Gross Revenues From Sale of Live Play Merchandise, which is defined as all gross revenues from any and all retail sales of Live Play Merchandise less only returns and allowances (including cash or credit refunds made to customers, rebates, and other allowances off the actual sale price), whether generated directly by FCU or as a result of outsourcing the merchandising of such products.  For the avoidance of doubt, in the event that FCU outsources Live Play Merchandise, SBI's percentage shall be based on the gross revenues generated by the outsourcing entity from merchandising, and not just what revenues FCU receives from the outsourcing entity.  In the event of any outsourcing of the Live Play Merchandise, SBI shall have prior written approval of the outsourcing agreement, which approval will not be unreasonably withheld, and which agreement shall include at a minimum that SBI shall be named as an indemnitee and additional insured under such agreement and, further, at a minimum the outsourcing  agreement shall conform to the terms, conditions, restrictions and exclusions of this Agreement.

8.3    FCU has represented that the Scoring App will be distributed free to patrons and will not generate revenue. However, in the event that the Scoring App embodies advertisements for third party products or services, and FCU generates advertising revenues from such advertisements, FCU shall pay to SBI  five percent (5%) of such "Scoring App Revenue" which is defined as gross revenue received by FCU from the sale of advertising on the Scoring App.  Scoring App Revenue does not include any money paid to FCU by a venue or company owned by Eric Pavony and/or FCU, including but not limited to Full Circle Bar.

8.4    FCU shall pay to SBI  five percent (5%) of all  "Gross Sponsorship Revenues," which is defined as the gross revenues FCU receives from sponsorships or endorsements of Live Play. Gross Sponsorship Revenues do not include any money paid to FCU by a venue or company owned by Eric Pavony and/or FCU, including but not limited to Full Circle Bar.

8.5    FCU shall, within thirty days after June 30 and December 31, deliver to SBI a statement with any payment due under this Agreement, except as to a payment due as a result of a Transfer.  With regard to the royalty on a permitted Transfer of the license, a statement and payment shall be made on closing of the transaction.  In the event of a Transfer that results in a payment, SBI shall provide wire instructions for use in wiring payment to SBI at closing. At SBI's expense, SBI shall have a right, during the Term, and during the twelve month period immediately following termination, to have a third party

FCU000000058
CONFIDENTIAL

audit, inspect and copy all books and records of FCU pertaining to the calculation of each statement, and payments required hereunder, in order to verify the accuracy of the calculation of the statements delivered and payments made. FCU shall make such books and records, and appropriate personnel, available during normal business hours for audit, inspection and copying by SBI or its authorized representative provided that SBI provides FCU with reasonable notice before any audit, inspection or copying. Such audit, inspection and copying may be conducted no more than once a year. SBI shall conduct or cause to be conducted such audit, inspection and copying, in a manner designed to minimize disruption of FCU's normal operations. Records reviewed by the third party will be kept confidential. Such audit, inspection and copying shall be conducted at the usual place of business of FCU, and during normal business hours, Monday to Friday, 9 a.m. to 5:30 p.m. In the event that there is any discrepancy in the amount reported and paid, and the parties agree that the amount determined after audit is a difference of five percent or more, then FCU shall bear the cost of the audit, inspection and copying, up to $5,000. Any under-payment will be cured within ten (10) business days with interest at the rate of ten (10) percent per annum on the under-payment to SBI from the date the payment was initially due.

## 9.    ASSIGNMENT

9.1    Neither this Agreement, not the rights granted to FCU hereunder, shall, without the prior written consent of SBI, be transferred or assigned, directly or indirectly  to any other person or entity, whether by asset sale, stock sale, sale of limited liability company interest, merger, or other acquisition transaction or form of conveyance ("Transfer"). SBI's prior written consent to a Transfer shall not be unreasonably withheld or delayed, however, in exercising its right to give approval or not, SBI may consider a number of factors including, but not limited to: (1) the financial wherewithal of the transferee; (2) the business of the transferee (the transferee cannot be a competitor of SBI meaning a person, firm or entity competing with the Business of SBI); (3) the business plans of the transferee; (4) the character and reputation of the transferee; (5) whether the transferee intends to continue using the SKEE-BALL Trademark; (6) whether the transferee intends to keep all existing contracts in place; (7) whether the proposed transferee is capable of maintaining the quality control standards set forth herein; and (8) the commitment of the transferee to continue the business of FCU and abide by the terms of the Settlement Agreement and this Agreement. If the proposed transferee is a competitor of SBI meaning a person, firm or entity competing with the Business of SBI, then the Transfer shall not be allowed. In addition, approval of any such Transfer by SBI is expressly conditioned on FCU's agreement that if this Agreement is assigned as a result of a Transfer pursuant to this Paragraph 9.1, SBI shall be entitled to receive 10 percent (10%) of the Gross Sales Proceeds of such transaction. Gross Sales Proceeds shall mean the gross amount for all consideration paid in such transaction. A statement of the sum due and payment will be made to SBI on closing of any such approved Transfer.

9.2    Notwithstanding Paragraph 9.1, FCU may, with notice to SBI, Transfer up to a 49% ownership interest in its business to a third party so long as: (a) such Transfer does not result in a change of control of FCU, such that at least 51% of the ownership of FCU resides with Eric Pavony and Eric Pavony maintains his status as a managing partner of FCU, and (b) the transferee is not a competitor of SBI meaning a person, firm or entity competing with the Business of SBI. The parties understand and agree that (i) no payment will be owed to SBI when a Transfer occurs under this paragraph 9.2, and (ii) SBI has no approval right over a Transfer that occurs under this paragraph 9.2.

FCU000000059
CONFIDENTIAL

9.3    FCU acknowledges and agrees that a Transfer of FCU, directly or indirectly, in whole or in part, to a competitor of SBI, meaning a person, firm or entity competing with the Business of SBI will result in the immediate termination of this Agreement.

9.3    This Agreement shall be binding upon and inure to the benefit of SBI's successors, representatives and assigns and FCU's permitted successors, representatives and assigns.

## 10. TERRITORY

The territory of this license Agreement ("Territory") shall be venues around the World for Live Play.

## 11.    TERM AND TERMINATION

The term of this Agreement ("Term") shall commence on the Effective Date of this Agreement and shall continue in force and effect unless and until one of the following "Termination Events" occurs:

11.1    FCU or SBI shall file a petition in bankruptcy and such bankruptcy is finalized, become insolvent, or make an assignment for the benefit of creditors.

11.2    The SKEE-BALL Trademark is abandoned, as that term is defined in the Lanham Act; or the SKEE-BALL Registration is cancelled, upon which time SBI will have free use of the term SKEE-BALL and any variation thereof, notwithstanding Paragraph 12.

11.3    FCU ceases to operate its Live Play business, and there is no permitted Transfer of the Live Play business to a successor per Paragraphs 9.1 and 9.2.

11.4    There is a Transfer of any interest in FCU, by FCU, or any other person holding an ownership interest in FCU, in whole or in part, directly or indirectly, to a competitor of SBI, meaning a person, firm or entity competing with the Business of SBI, or there is any other unpermitted Transfer.

11.5    Further to the above, this Agreement also may be terminated (a) if there is a Transfer of SBI in which case FCU may, at its option, terminate the Agreement; and (b) at any time upon the signed agreement of both Parties to this Agreement.

11.6    If either Party perceives a material breach of this Agreement, that Party shall promptly notify the other Party in writing. The Party receiving such notice shall then have thirty (30) days from receiving such notice to cure such breach or to negotiate a resolution with the complaining Party (the "Cure Period"). During the Cure Period, no legal action shall be taken by the Party alleging the breach (except for provisional relief necessary to maintain a right or prevent irreparable harm) and the Parties shall negotiate in good faith to reach resolution. If the party receiving such notice has not cured the breach during the Cure Period, or has not negotiated another resolution with the complaining Party, then the complaining Party may terminate this Agreement and pursue all legal rights and remedies available to it to address the breach.

FCU000000060
CONFIDENTIAL

## 12.    EFFECT OF TERMINATION

Upon termination of this Agreement, FCU agrees to immediately discontinue all use of the SKEE-BALL Trademark, and marks including the SKEE-BALL Trademark, and either destroy or deliver to SBI all remaining material bearing the SKEE-BALL Trademark, with the exception that FCU will have three (3) months from the effective date of termination to sell-off any remaining Live Play Merchandise in its possession, custody or control.   Upon SBI's written request, FCU shall provide to SBI a certificate of destruction signed by an officer of FCU under oath evidencing same. The obligations under Sections 2,   6,  12, 13, 14.1, 14.2, 14.3, 16, 17 and 18 of this Agreement shall survive any termination hereof.  Additionally, pursuant to Paragraph 8.2 and this Paragraph 12, SBI shall be entitled to royalties for Live Play Merchandise for sales made by FCU during the three (3) month post-termination sell-off period, and pursuant to Paragraph 8.5 SBI shall have the right to audit during the twelve month period immediately following termination.

## 13.    REPRESENTATIONS AND WARRANTIES

13.1    <u>Mutual Representations and Warranties</u>.  Each party represents and warrants to the other party that: (a) it is duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization or chartering; (b) it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted hereunder and to perform its obligations hereunder; (c) the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the party; and (d) when executed and delivered by such party, this Agreement will constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

13.2    SBI further represents and warrants to FCU that (a) SBI owns all right, title and interest in and to the SKEE-BALL Trademark and SKEE-BALL Registration; (b) the SKEE-BALL Trademark does not infringe, violate or conflict with any third party's personal, contractual, or proprietary rights including but not limited to trademark and copyright; (c) SBI's grant of license and its agreement to the terms herein does not violate or conflict with any existing agreement to which it is subject or a party; and (d) as of the Effective date of this Agreement SBI is not a party to any contract under which it has agreed to promote, operate, sponsor, or otherwise endorse a business involving Live Play.

## 14.    INDEMNIFICATION AND INSURANCE

14.1    FCU agrees to indemnify, hold harmless and defend, including the payment of any reasonable attorneys' fees and costs (with counsel approved by SBI except that if a carrier is providing a defense, the carrier will determine who counsel will be) SBI and all of its parent, subsidiary, related and affiliated persons and entities and each of the officers, directors, members, managers, shareholders, representatives, agents, and employees of the foregoing (hereinafter collectively referred to as "SBI Indemnified Parties") from any and all losses, actions, controversies, demands, suits, proceedings, claims or causes of action of any kind whatsoever, and all losses, claims, costs, interest, penalties, demands, expenses, damages and liabilities whatsoever (including reasonable attorneys' fees and costs of suit) (the foregoing collectively referred to as "Claims"), related to or arising, directly or indirectly, from: (a) breach by FCU of any representation, warranty or covenant herein, (b) Claims caused, or alleged to have been caused by FCU or any of its employees, agents, representatives, invitees, or sub-

10

licensees in connection with  business operations conducted in exploitation of the Licensed Uses including but not limited to Claims for personal injury (and death therefrom) and property damage,  and (c) any other Claims arising from FCU's exercise of its rights to the Licensed Uses, provided, however, that such indemnity obligations shall not apply to the extent that the Claim is a Claim for which SBI would owe indemnity to FCU (e.g., a Claim for trademark infringement based on FCU's use of the SKEE-BALL Trademark solely in compliance with this Agreement).  For the avoidance of doubt, SBI Indemnified Parties shall not include Dimensional Branding LLC, Dimensional Branding Group, or their officers, directors, shareholders, members, or managers.

14.2    SBI shall indemnify, hold harmless and defend, including the payment of any reasonable attorneys' fees and costs (with counsel approved by FCU except that if a carrier is providing a defense, the carrier will determine who counsel will be) FCU and all of its parent, subsidiary, related and affiliated persons and entities and each of the officers, directors, members, managers, shareholders, contractors, representatives, agents, and employees of the foregoing (hereinafter collectively referred to as "FCU Indemnified Parties") from any and all Claims, related to or arising, directly or indirectly, from: (a) breach by SBI of any representation, warranty or covenant herein, and (b) FCU's use of the SKEE-BALL Trademark solely in compliance with this Agreement, provided, however, that such indemnity obligations shall not apply to the extent that the Claim is a Claim for which FCU would owe indemnity to SBI.

14.3    The indemnification obligations of this Section are enforceable between the Parties regardless of whether there is insurance to cover the obligations. The indemnification obligations set forth in this Section shall survive any termination of this Agreement. Use of the word "sub-licensee" in this Agreement does not constitute approval over any sub-licensee; any sub-licensing agreement must be only as allowed under this Agreement.

14.4    FCU shall, take out, or cause to be taken out, and maintain in full force and effect, throughout the duration of the Term, at FCU's sole expense, a commercial general liability insurance policy or policies (including product liability, completed products, liquor liability,  personal injury, advertising injury, broad form contractual liability, broad form property damage and fire/legal liability, including property damage to property of third persons and real or personal property of SBI), in a form and with a company or companies reasonably acceptable to SBI, and naming SBI Indemnified Parties as additional insureds, insuring against direct or contingent losses, actions, controversies, demands, suits, proceedings, claims, causes of action and all damages, expenses or liabilities(including reasonable attorneys' fees and costs of suit) (the foregoing are referred to herein as "Insurance Claims") related to or arising, directly or indirectly, from: (a) breach by FCU of any representation, warranty or covenant herein, (b) Claims caused, or alleged to have been caused, by FCU or any of its employees, agents, representatives, invitees, or sub-licensees in connection with business operations conducted in exploitation of the Licensed Uses including but not limited to Claims for personal injury (and death therefrom) and property damage and (c) any other Claims arising from FCU's exercise of its rights to the Licensed Uses. The limits of liability shall be One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate during the Term of this Agreement.  Such insurance shall provide that it is primary insurance and not "excess over" or contributory with any other valid, existing and applicable insurance in force or on behalf of SBI. The policy shall not eliminate cross liability and shall contain a severability of interest(s) clause. SBI may, in its sole discretion, reasonably require FCU to increase insurance limits and coverage, during the Term as FCU's business grows and such growth justifies, in SBI's sole discretion, expanding limits and/or coverage.

11

FCU000000062
CONFIDENTIAL

(a)        **Workers' Compensation and Employers' Liability:**

FCU shall comply with the law on having Worker's Compensation Insurance. FCU represents and warrants that it does not have employees as of the Effective Date of this Agreement. When FCU hires employees, it shall obtain and then maintain in effect, at its own cost, workers' compensation and employers' liability insurance covering its employees for Workers' Compensation benefits, including employers' liability with a guaranteed limit of $100,000 (per accident), $500,000 (disease for all employees policy limit), and $100,000 (disease per employee)) or whatever the applicable limits are under New York law at that time.

(b)        **Insurance Criteria:**

All the insurance required under this Agreement shall:

1. Be issued by insurance companies with a financial rating of at least A VII of Best's Insurance Ratings.

2. Be issued as a primary policy and not contain, without the SBI's written consent, any special or non-customary exclusions.

3. Contain a policy endorsement requiring thirty (30) days written notice from the insurance company to both Parties before cancellation or change in the coverage, scope, or amount of any policy, and ten (10) days for non-payment.

(c)        **Evidence of Coverage:**

FCU agrees to add SBI as an additional insured on the policy by endorsement and to provide evidence of such endorsement. On renewal of the policy, at SBI's request, an additional insured certificate and evidence of payment of premium and additional insured endorsement shall be sent to SBI.

## 15.    SUBLICENSING AND FCU MANAGED EVENTS

The parties understand and agree that FCU shall primarily be responsible for organizing, holding, directing, managing, supervising and otherwise controlling all Live Play (collectively "FCU Managed Events"). For all FCU Managed Events, FCU shall take full responsibility for the venue agreement and all other agreements in connection with the Live Play event, and all obligations imposed by the venue and all other agreements in connection with Live Play event shall be the obligations of FCU, and neither the Live Play venue nor any other party connected with the Live Play event shall be, or is required to be a sub-licensee of the Licensed Uses. If FCU desires to authorize a Live Play event that is not an FCU Managed Event, then a sub-license to the Live Play venue, organizer, operator, host, sponsor or other person is required. FCU does not have any right to sub-license any of the Licensed Uses to any third party without the prior written consent of SBI.

FCU000000063
CONFIDENTIAL

**16.    NO JOINT VENTURE**

This Agreement does not constitute, and shall not be construed as constituting, a partnership or joint venture between SBI and FCU. Neither Party shall have any right to obligate or bind the other Party in any manner whatsoever, and nothing herein contained shall give, or is intended to give, any rights of any kind to any third person except as provided herein.

**17.    CONFIDENTIALITY; STRICT CONFIDENTIALITY**

17.1    The parties will issue the joint press release attached hereto as <u>Exhibit D</u> (the "Press Release"). Unless otherwise specifically provided for in this Agreement, the Parties agree to maintain the confidentiality of the negotiations leading up to this Agreement and the Settlement Agreement and the terms and subject matter of this Agreement and the Settlement Agreement and to refrain from disclosing same to any third party, other than to state at their discretion the very limited public disclosure with words to the effect that: "(1) as of the Effective Date SBI and FCU have resolved their legal differences and their lawsuits and have reached a mutually-agreeable confidential settlement; and (2) pursuant to that settlement the parties have entered into a business relationship by the terms of which FCU has become a licensee of SBI for live league play." No further comment shall be made, except for the statements set forth in the Press Release attached as Exhibit D to the Settlement Agreement. Nonetheless, it shall not be deemed a breach of this Agreement, and each Party shall have the right, to disclose this Agreement (or portions thereof): (a) to any third party, but only to the extent necessary to demonstrate or give effect to the releases granted herein, including without limitation the clauses relating to such releases and any portions of this Agreement which may be needed to give such releases a proper interpretation and/or their full force and effect; (b) if legally compelled to do so (including but not limited to by deposition, interrogatories, requests for documents, subpoena, civil investigative demand, court order, or similar process), provided that the disclosing party provides reasonable prior notice to the other Party so the other Party may seek a protective order to keep such information confidential; (c) as necessary in any legal proceeding in order to enforce any provision of this Agreement; (d) in order to comply with tax or other governmental filings; and (e) as necessary, to various legal, tax, financial and other advisors so long as the said advisors agree to keep the information confidential.

17.2    Pursuant to the agreement between SBI and Dimensional Branding Group, ("DBG"), a California Corporation, certain terms and conditions of the License Agreement were disclosed to DBG and Scopely in order to obtain Scopely's consent to certain Licensed Uses that are conditioned on Scopely's consent. In addition, a copy of the Settlement Agreement showing the release of Dimensional Branding LLC, DBG, and all of their parent, subsidiary, affiliated and related persons and entities and each of the respective officers, directors, employees, shareholders, members, managers, legal predecessors, legal successors, agents and employees of the foregoing and, including but not limited to, in their official and individual capacity, John Leonhardt and Larry Seidman, shall be given to DBG to confirm to them that the release has been given.

**18.    GENERAL PROVISIONS**

18.1    <u>Duly Existing</u>. Each of the Parties represents and warrants that it is duly existing, that it has the full right, power and authority to enter into this Agreement, and that there are no

FCU000000064
CONFIDENTIAL

other persons whose consent to this Agreement or whose joinder herein is necessary to make fully effective the provisions of this Agreement.

18.2    <u>Comprehension</u>. Each Party acknowledges to the other Party that it has been represented by independent legal counsel of its own choice throughout all of the negotiations which preceded the execution of this Agreement and that it has executed this Agreement with the consent and on the advice of such independent legal counsel.

18.3    <u>Interpretation</u>. The language of this Agreement has been approved by counsel for the Parties. The language of this Agreement shall be construed as a whole according to its fair meaning and none of the Parties (or the Parties' respective attorneys) shall be deemed to be the draftsman of this Agreement in any action which may hereafter arise between the Parties.

18.4    <u>Entire Agreement</u>. This is an enforceable Agreement. This Agreement, including the attached Exhibits, which are incorporated by reference herein, and the referenced Settlement Agreement, constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all previous communications, representations, agreements or understandings, either oral or written, between the Parties with respect to the subject matter hereof. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto which specifically refers to this Agreement.

18.5    <u>Waiver</u>. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party.

18.6    <u>Notices</u>. Any notice required or permitted by this Agreement shall be in writing and shall be sent by personal delivery, by a reliable overnight courier service or by U.S. Mail, Certified, Return-Receipt Requested with simultaneous email at the time of mailing, at the address below or to such other address for which such Party shall give notice hereunder. Such notice shall be deemed to have been given upon receipt, except in the case of delivery by mail and email, such notice shall be deemed to have been given upon receipt of the mailed notice.

<u>To SBI:</u>
Skee Ball, Inc.
Joseph W. Sladek
121 Liberty Lane
Chalfont, Pennsylvania 18914
Email: sladekjws@aol.com

<u>With a copy to:</u>

Idell & Seitel, LLP
Richard J. Idell, Esq.

14

Merchants Exchange Building
465 California Street, Suite 300
San Francisco, California 94014
Tel: (415) 986-2400
Email: richard.idell@idellseitel.com

To FCU:
Full Circle United, LLC
132 Havemeyer Street
Suite 3A
Brooklyn, New York 11211
Email: ericpavony@gmail.com

With a copy to:

Fish & Richardson P.C.
John T. Johnson, Esq.
Kristen McCallion, Esq.
McCallion@fr.com
601 Lexington Avenue - 52nd Floor
New York, NY 10022-4611
Tel.: (212)-765-5070
Email: jjohnson@fr.com; mccallion@fr.com

Any Party may change the address for notice at any time by giving notice to the other Party.

18.7    Governing Law, Jurisdiction, and Venue.  This Agreement shall be governed by, interpreted and construed in accordance with the laws of New York, without reference to conflicts of laws principles.  Any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement must be brought or otherwise commenced in a court of competent jurisdiction located in the boundaries of the Eastern District of New York; whether that court is a federal court or state court will depend on the nature of the case.

18.8    Severability. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable under any controlling body of law, that provision shall be reformed, construed and enforced to the maximum extent permissible; and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

18.9    Counterparts. This Agreement may be signed in counterparts, each of which shall be deemed an original hereof, but all of which together shall constitute one and the same instrument.

18.10   Effectiveness.  This instrument shall not be considered to be an agreement or contract, nor shall it create any obligation whatsoever on the part of SBI and FCU, or either of them, unless and until it has been signed by the duly-authorized representatives of SBI

FCU000000066
CONFIDENTIAL

and FCU and delivery has been made of a fully signed original. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one in the same instrument.

18.11    <u>Significance of Headings</u>. Paragraph headings contained herein are solely for the purpose of aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of this Agreement. Accordingly, in case of any question with respect to the construction of this Agreement, it is to be construed as though such section headings had been omitted.

[SIGNATURES ON NEXT PAGE-REMAINDER OF PAGE LEFT BLANK]

FCU000000067
CONFIDENTIAL

**IN WITNESS WHEREOF**, the Parties do hereby execute this Agreement by their duly authorized officials as of the Effective Date:

Skee Ball, Inc.

By: _____

Name: Joseph W. Sladek

Title: President

Date: _____ 7/17/14 _____

Full Circle United, LLC

By: _____

Name: Eric Pavony

Title: Manager

Date: _____

17

FCU000000068
CONFIDENTIAL

**IN WITNESS WHEREOF**, the Parties do hereby execute this Agreement by their duly authorized officials as of the Effective Date:

Skee Ball, Inc.

By: _____

Name: Joseph W. Sladek

Title: President

Date: _____

Full Circle United, LLC

By: _____

Name: Eric Pavony

Title: Manager

Date: 7/17/14

FCU000000069
CONFIDENTIAL

## EXHIBIT "A" to License Agreement

### SKEE-BALL®
### Use Guidelines


FCU shall always use and place the federal trademark registration symbol "®" or the "™" symbol immediately adjacent to the term "SKEE-BALL" or otherwise as reasonably specified by SBI in connection with the use of the SKEE-BALL Trademark.

**Legal language:**

Skee Ball, Inc. is the corporate name. "SKEE-BALL®" is the registered trademark.

**Legal lines:**

- ©20__ Skee Ball, Inc. & ® All Rights Reserved. Used Under Authorization
- ©20__ Skee Ball, Inc. & ® All Rights Reserved. Used Under License from Skee Ball, Inc.
- SKEE-BALL® is a Registered Trademark of Skee-Ball Amusement Games. All Rights Reserved

**In copy use: SKEE-BALL®**

Logo:  SKEE-BALL®

**Examples of approved co-branding uses:**

- BREWSKEE-BALL® tournaments are played on official SKEE-BALL® machines.
- Featuring official SKEE-BALL® machines.
- BREWSKEE-BALL® leagues use  official SKEE-BALL® machines.
- BREWSKEE-BALL® tournaments use  official SKEE-BALL® machines.
- BREWSKEE-BALL® is an authorized and approved operator of leagues and tournaments and uses official SKEE-BALL® machines.
- BREWSKEE-BALL® leagues and tournaments are authorized by Skee-Ball, Inc.
- BREWSKEE-BALL® tournaments are an authorized league for play on official SKEE-BALL® machines.
- NATIONAL SKEE-BALL LEAGUE tournaments are played on official SKEE-BALL® machines.
- NATIONAL SKEE-BALL LEAGUE events use official SKEE-BALL® machines.
- NATIONAL SKEE-BALL LEAGUE tournaments use official SKEE-BALL® machines.
- The NATIONAL SKEE-BALL LEAGUE is authorized by Skee-Ball, Inc.
- The NATIONAL SKEE-BALL LEAGUE is an authorized and approved operator of leagues and tournaments and uses official SKEE-BALL® machines.
- NATIONAL SKEE-BALL LEAGUE tournaments are authorized by Skee-Ball, Inc.

FCU000000070
CONFIDENTIAL

- Use of official SKEE-BALL® machines sanctioned by Skee Ball, Inc.
- BREWSKEE-BALL® Tournaments are a SKEE-BALL® authorized league for play on official SKEE-BALL® machines in bars.
- Use of official SKEE-BALL® machines sanctioned by Skee-Ball, Inc. for play in bars.

*Note*: FCU may use the phrases and slogans shown on <u>Exhibit B</u> in place of BREWSKEE-BALL® /NATIONAL SKEE-BALL LEAGUE in the examples of approved co-branding uses above.

**Not approved co-branding uses:**

- SKEE-BALL® presents or SKEE-BALL presents or any variation of same…….
- SKEE-BALL® / BREWSKEE-BALL®
- The Official SKEE-BALL®………

**Approval process:**

To Skee Ball, Inc. (Michael Sladek) via email.

**Categories of Live Play Merchandise Allowed And Channels of Trade:**

All categories of products usually the subject  of entertainment and sports merchandising and not otherwise excluded under this Agreement and may be sold through any retail channels, including but not limited to the Internet.

FCU000000071
CONFIDENTIAL

**EXHIBIT "B" to License Agreement**

National Skee-Ball League
National Skee-Ball Tour
National Skee-Ball Championship
National Skee-Ball Association
National Skee-Ball Organization
National Skee-Ball Federation
National Skee-Ball Club
National Skee-Ball Series
National Skee-Ball Circuit
National Skee-Ball Tournament
National Skee-Ball Council
National Skee-Ball Cup
National Skee-Ball Classic
National Skee-Ball Competition
National Skee-Ball

American Skee-Ball League
American Skee-Ball Tour
American Skee-Ball Championship
American Skee-Ball Association
American Skee-Ball Organization
American Skee-Ball Federation
American Skee-Ball Club
American Skee-Ball Series
American Skee-Ball Circuit
American Skee-Ball Tournament
American Skee-Ball Council
American Skee-Ball Cup
American Skee-Ball Classic
American Skee-Ball Competition
American Skee-Ball

U.S. Skee-Ball League
U.S. Skee-Ball Tour
U.S. Skee-Ball Championship
U.S. Skee-Ball Association
U.S. Skee-Ball Organization
U.S. Skee-Ball Federation
U.S. Skee-Ball Club
U.S. Skee-Ball Series
U.S. Skee-Ball Circuit
U.S. Skee-Ball Tournament
U.S. Skee-Ball Council

U.S. Skee-Ball Cup
U.S. Skee-Ball Classic
U.S. Skee-Ball Competition
U.S. Skee-Ball

World Skee-Ball League
World Skee-Ball Tour
World Skee-Ball Championship
World Skee-Ball Association
World Skee-Ball Organization
World Skee-Ball Federation
World Skee-Ball Club
World Skee-Ball Series
World Skee-Ball Circuit
World Skee-Ball Tournament
World Skee-Ball Council
World Skee-Ball Cup
World Skee-Ball Classic
World Skee-Ball Compeition
World Skee-Ball

International Skee-Ball League
International Skee-Ball Tour
International Skee-Ball Championship
International Skee-Ball Association
International Skee-Ball Organization
International Skee-Ball Federation
International Skee-Ball Club
International Skee-Ball Series
International Skee-Ball Circuit
International Skee-Ball Tournament
International Skee-Ball Council
International Skee-Ball Cup
International Skee-Ball Classic
International Skee-Ball Competition
International Skee-Ball

Premier Skee-Ball League
Premier Skee-Ball Tour
Premier Skee-Ball Championship
Premier Skee-Ball Association
Premier Skee-Ball Organization
Premier Skee-Ball Federation

20

FCU000000072
CONFIDENTIAL

Premier Skee-Ball Club
Premier Skee-Ball Series
Premier Skee-Ball Circuit
Premier Skee-Ball Tournament
Premier Skee-Ball Council
Premier Skee-Ball Cup
Premier Skee-Ball Classic
Premier Skee-Ball Competition
Premier Skee-Ball

Skee-Ball League
Skee-Ball Tour
Skee-Ball Championship
Skee-Ball Association
Skee-Ball Organization
Skee-Ball Federation
Skee-Ball Club
Skee-Ball Series
Skee-Ball Circuit
Skee-Ball Tournament
Skee-Ball Council
Skee-Ball Cup
Skee-Ball Classic
Skee-Ball Competition

Ultimate Skee-Ball League
Ultimate Skee-Ball Tour
Ultimate Skee-Ball Championship
Ultimate Skee-Ball Association
Ultimate Skee-Ball Organization
Ultimate Skee-Ball Federation
Ultimate Skee-Ball Club
Ultimate Skee-Ball Series
Ultimate Skee-Ball Circuit
Ultimate Skee-Ball Tournament
Ultimate Skee-Ball Council
Ultimate Skee-Ball Cup
Ultimate Skee-Ball Classic
Ultimate Skee-Ball Competition
Ultimate Skee-Ball

World Championships of Skee-Ball
World Series of Skee-Ball
Major League Skee-Ball
Pro Skee-Ball
Pro Skee-Ball Tour

Professional Skee-Ballers Association
Professional Skee-Ball Association

Skee-Ball Development League
Women's Skee-Ball League
Men's Skee-Ball League
Junior's Skee-Ball League

The Skee-Ball League
The Skee-Ball Tour
The Skee-Ball Championship
The Skee-Ball Tour Championship

Skee-Ball Challenge
Skee-Ball Pro League
Skee-Ball Roll-Off
Skee-Ball Masters
Skee-Ball Legends
Skee-Ball Showcase
Skee-Ball Cycle
Skee-Ball Major
Skee-Ball Exhibition
Skee-Ball Playoffs
Skee-Ball Match
Skee-Ball Contest
Skee-Ball Crown
Skee-Ball Standoff
Skee-Ball National Tour
Skee-Ball National Championship
Skee-Ball World Championship
Skee-Ball World Tour
Skee-Ball European Tour
Skee-Ball European Championship
Skee-Ball Smackdown
Skee-Ball After Dark
Skee-Ball Shoot-Out
Skee-Ball Derby
Skee-Ball Open
Skee-Ball Invitational
Skee-Ball Grand Slam

Skee-Ball Hall of Fame
Skee-Ball Slam
Skee-Ball Pro-Am
Skee-Ball Match Play

FCU000000073
CONFIDENTIAL

Skee-Ball Tour Championship
Skee-Ball Title
Skee-Ball Player
Skee-Ball World Tour
Skee-Ball Roller

New York Skee-Ball
Skee-Ball New York
Brooklyn Skee-Ball
Skee-Ball Brooklyn
NYC Skee-Ball
Skee-Ball NYC
NY Skee-Ball
Skee-Ball NY

Texas Skee-Ball
Skee-Ball Texas
TX Skee-Ball
Skee-Ball TX
Skee-Ball ATX
ATX Skee-Ball
Austin Skee-Ball
Skee-Ball Austin

Wilmington Skee-Ball
Skee-Ball Wilmington
North Carolina Skee-Ball
Skee-Ball North Carolina
NC Skee-Ball
Skee-Ball NC

San Francisco Skee-Ball
Skee-Ball San Francisco
SF Skee-Ball
Skee-Ball SF
California Skee-Ball
Skee-Ball California
CA Skee-Ball
Skee-Ball CA
Bay City Skee-Ball
Skee-Ball Bay City

Full Circle Bar Skee-Ball
FCB Skee-Ball
The Skee-Ball Bar

22

FCU000000074
CONFIDENTIAL