# EXHIBIT 05

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF NEW YORK

3    FULL CIRCLE UNITED, LLC          )

4                     Plaintiff       )

5    VS.                             )CIVIL ACTION

6    BAY TEK ENTERTAINMENT, INC., )NO.: 1:20-CV-03395

7                     Defendant       )
     _____

8

9    BAY TEK ENTERTAINMENT, INC., )

10     Counterclaim Plaintiff       )

11   VS.                             )

12   FULL CIRCLE UNITED, LLC         )

13     Counterclaim Defendant        )

14   and                             )

15   ERIC PAVONY,                    )

16    Additional Counterclaim        )

17    Defendant                      )
     _____)

18

19              -------------------------------------

                 VIDEOTAPED REMOTE ORAL DEPOSITION OF

20
                              ERIC COOPER
21
                            JUNE 6, 2022
22
                              VOLUME 1
23              -------------------------------------

24   REPORTED BY KATHRYN R. BAKER, RPR, CSR #6955

25   JOB #212203

1                        ERIC COOPER

2   no one else wanted to testify.

3        Q.   So did you give a statement -- pardon me -- did

4   you give a statement under oath in connection with that?

5        A.   I imagine I would have had to.  I cannot

6   remember if it was under oath.  I definitely gave multiple

7   statements.  But I would have to imagine that one of them

8   had to be under oath.

9        Q.   Okay.  Have you ever been charged with a crime?

10       A.   I had a DUI in 2006.

11       Q.   Anything else?

12       A.   No.

13       Q.   Okay.  Do you currently own or operate any

14  business entities?

15       A.   Yeah, I own -- I am a partner in Extra Positive

16  Land, which is the owner of Full Circle Bar Austin.

17       Q.   Is there any other LLCs that you've owned in the

18  past or have been a party to in the past?

19       A.   Yeah.  I had a quick one with some guys -- we

20  were trying to open a food truck, so there -- but it's

21  been dissolved.  It didn't -- it barely got off the

22  ground.  But it was dissolved a long time ago.

23       Q.   Was that Magic Meat, LLC?

24       A.   No.  Oh --

25       Q.   Tres Guapos?

ERIC COOPER

1

2    stores in New York City when they still existed.

3        Q.   So when did you live in New York City?

4        A.   I lived in New York City from the point when I

5    was born until -- I think I left and went to Boston for a

6    little while when I was 16 and 17.  And I came back at 18.

7    And then I lived in New York City from that point up

8    until -- I don't know how -- I can't -- I can do the math

9    to figure out how old I was, but it was pretty much -- I

10   moved to Austin in February of 2008.

11       Q.   2008?

12       A.   Uh-huh.

13       Q.   And why did you move to Austin?

14       A.   For -- to pursue a relationship, a personal

15   relationship.

16       Q.   Got it.

17            And so are you currently employed?

18       A.   I am, that I am the manager of Full Circle Bar

19   Austin and the runner of -- yeah, the Full Circle Bar.

20       Q.   And how long have you had that role for?

21       A.   I believe we opened in February of -- February

22   or March -- March, February of 2015.

23       Q.   Were you involved with Full Circle and Extra

24   Positive Land prior to the Austin bar opening?

25       A.   Extra Positive Land was not.  Full Circle United

1                        ERIC COOPER

2    was an entity.

3          Q.    Oh --

4          A.    Extra Positive Land is -- if I say EPL, I mean

5    the bar, pretty much, or Extra Positive Land.

6          Q.    When you say you're the runner, what do you mean

7    by that?

8          A.    I'm the general manager.

9          Q.    Of the bar?

10         A.    Yes.

11         Q.    So you're making sure everybody -- everybody is

12   happy and --

13         A.    Staffing, ordering, bills; all that.

14         Q.    Do you tell people how to use the Skee-Ball

15   machines -- well, are there Skee-Ball machines at the bar?

16         A.    I'm sorry, can you repeat the question.

17         Q.    Are there Skee-Ball lanes at the bar?

18         A.    There are Skee-Ball lanes at this bar.

19         Q.    And is one of your responsibilities showing

20   people how to use the lanes or facilitating them?

21         A.    One of my responsibilities is to run the

22   Brewskee-Ball league.  So I guess that would be a yes

23   there.  And then to show my employees how the lanes work,

24   so they can keep them working when I'm not there, sure.

25         Q.    We'll come back to that.  I want to ask you some

1                         ERIC COOPER

2         Q.   Well, let me ask you a question:  Who owns the

3    Full Circle Bar?

4         A.   Myself, Eric Wikman, Eric Pavony, and a few

5    other partners, a few other investors.

6         Q.   So you own the company individually, or do you

7    own it through an entity?

8         A.   LLC.  Extra Positive Land, LLC, owns Full Circle

9    Bar -- I'm talking about Full Circle Bar Austin

10   specifically, by the way.  Just so you know.

11        Q.   Correct.  Correct.

12        A.   Okay.

13        Q.   Correct.

14             Okay, so --

15             THE REPORTER:  Counsel, hold on just a

16   second.

17             Mr. Cooper, you need to wait and let him

18   finish his question before you answer.  You're kind of

19   jumping in there before he's finished.  I would appreciate

20   it.  Thanks.

21             THE WITNESS:  Understood.

22             THE REPORTER:  Tell me the -- when you

23   said -- the name of your entity, tell me that again, that

24   owns the bar, the LLC.

25             THE WITNESS:  Extra Positive Land, LLC --

```
 1                        ERIC COOPER

 2       A.    Yes.

 3       Q.    So this is January 1st, 2014.

 4             Do you see that?

 5       A.    I do.

 6       Q.    Well, before -- before I go through that.

 7             This is the First Circle United, LLC, Chase

 8  bank account that was introduced at Mr. Wikman's

 9  deposition.

10             And do you see the date here, January 1st,

11  2014, correct?

12       A.    Okay, yes.

13       Q.    And then at the end here, the date is December

14  31st, 2014.

15             Do you see that?

16       A.    Yes.

17       Q.    So you understand that Exhibit 17 is the bank

18  account for the entire year of 2014?

19       A.    Understood.

20       Q.    Okay.  Now I'm going to show you Exhibit 18.

21  Which I will put up.

22             Okay.  Do you see this, Mr. Cooper?

23       A.    Okay.

24       Q.    So I'll represent to you, again, this was

25  Exhibit 18 marked at Mr. Wikman's deposition.
```

1              ERIC COOPER

2              This is the Full Circle United, LLC, Chase

3    bank account.  And if you look at the upper right-hand

4    corner, the first date here is January 1st, 2015.

5              Do you see that?

6    A.    Yes.

7    Q.    And then the final date in here, once this

8    loads, is May 3rd, 2016.

9              Do you see that?

10   A.    Yes.

11   Q.    And then do you see at the top of this page

12   here, it says, Insufficient funds fee.

13              Do you see that, Mr. Cooper?

14   A.    Yes.

15   Q.    Are you aware of the Full Circle United bank

16   account being closed at any point?

17   A.    I am not aware of that.

18   Q.    Okay.  So I want you to think about these dates

19   again.

20              So the document I showed you a moment ago

21   was all of 2014, correct?

22   A.    Right.  And then is 2015 through --

23   Q.    May of 2016.

24   A.    -- May of 2016.

25   Q.    Right.

```
 1                         ERIC COOPER

 2       A.    Yeah.

 3       Q.    Now, your bank account that I showed you was

 4  January 1st, 2018, through September 30th, 2018, correct?

 5       A.    My bank account was 2018.

 6       Q.    Yes.

 7       A.    The UFCU account.

 8             Is that what you're talking about?

 9       Q.    Correct.

10       A.    Okay.  Yes.

11       Q.    And then I showed you -- I had shown you another

12  Full Circle account that was 2018 through 2021.

13             Do you recall looking at that one?

14       A.    Yeah, I recall it, yes.

15       Q.    Okay.  The reason I'm asking you this is because

16  these documents that I just showed you were produced as

17  being Full Circle's bank accounts for this period of time.

18             And it was represented by Mr. Wikman that

19  your bank account, that one that we showed you from

20  University Federal Credit Union was functioning as Full

21  Circle's bank account for that period of time.

22             Does that sound familiar to you at all?

23             MR. SKIBELL:  Objection to form.

24             I mean, how would -- he hasn't seen Eric

25  Wikman's deposition.  How would he be familiar with it?
```

1                        ERIC COOPER

2                    MR. HUMPHREY:  I am -- I'm not asking about

3    if he's familiar with the deposition.

4                    MR. SKIBELL:  Okay.

5                    MR. HUMPHREY:  I'm asking if he's familiar

6    with the idea of his bank account being used as Full

7    Circle's.  Was he ever told that.

8        A.   If that's what it was -- I mean --

9                    MR. SKIBELL:  Eric, don't speculate about

10   what other -- he's asking you merely, do you know if your

11   bank account was used for Full Circle?

12       A.   I don't recall exactly why I had to open that --

13   I opened that bank account.  I was asked to open that bank

14   account.

15       Q.   (BY MR. HUMPHREY)  Well --

16       A.   It sounds like you got the answer from

17   Mr. Wikman.

18       Q.   No.  Well, I'm asking you.

19                   MR. HUMPHREY:  And Reid, respectfully, you

20   should refrain from couching here.

21       Q.   (BY MR. HUMPHREY)  The question I'm asking here

22   is:  Do you have any knowledge of why Mr. Wikman would

23   have said your bank account was being used as Full

24   Circle's?

25                   MR. SKIBELL:  Objection, calls for

1                      ERIC COOPER

2    speculation as to Eric Wikman's state of mind.

3                   You can answer.

4         A.   I don't recall the specifics of why.  I thought

5    it had something to do with technology.

6         Q.   (BY MR. HUMPHREY)   So Mr. Wikman was the one

7    who asked you to open the bank account in your name,

8    correct?

9         A.   Yes.

10        Q.   Mr. Pavony didn't ask you that?

11        A.   I believe he was privy to the concept, but I

12   don't believe he was -- I think it was Eric Wikman.

13        Q.   When you say "concept," what do you mean?

14        A.   Whatever -- I meant opening an account.

15        Q.   Was the reason you were asked to open the

16   account was because Full Circle's bank account had been

17   closed for having insufficient funds?

18                   MR. SKIBELL:  Objection, calls for

19   speculation.

20        A.   I don't know the answer to that.

21        Q.   (BY MR. HUMPHREY)   So they told you to open a

22   bank account in your own name and you can't remember why

23   they asked you to do that?

24                   MR. SKIBELL:  Objection, misstates the

25   testimony.

1                        ERIC COOPER

2            I, Kathryn R. Baker, RPR, a Certified Shorthand

3    Reporter in and for the State of Texas, hereby certify to

4    the following:

5            That the witness, ERIC COOPER, was duly sworn by

6    the officer and that the transcript of the oral deposition

7    is a true record of the testimony given by the witness;

8            I further certify that pursuant to FRCP Rule

9    30(f)(1) that the signature of the deponent:

10           _X_ was requested by the deponent or a party

11   before the completion of the deposition and is to be

12   returned within 30 days from the date of receipt of the

13   transcript.  If returned, the attached Errata contain any

14   changes and the reasons therefor;

15           ___ was not requested by the deponent or a party

16   before the completion of the deposition.

17           I further certify that I am neither counsel for,

18   related to, nor employed by any of the parties or

19   attorneys in the action in which this proceeding was

20   taken, and further that I am not financially or otherwise

21   interested in the outcome of the action;

22

23

24

25

1                          ERIC COOPER

2          Subscribed and sworn to on this 16th day of June,

3     2022.

4

5     _____
      KATHRYN R. BAKER, RPR, CSR #6955
6     Expiration Date:  04/30/2023
      Firm Registration No. 615
7     TSG Reporting
      228 E. 45th Street
8     Suite 810
      New York, New York 10017
9     877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF NEW YORK

3    FULL CIRCLE UNITED, LLC        )

4                      Plaintiff    )

5    VS.                            )CIVIL ACTION

6    BAY TEK ENTERTAINMENT, INC., )NO.: 1:20-CV-03395

7                      Defendant    )
     _____

8

9    BAY TEK ENTERTAINMENT, INC., )

10     Counterclaim Plaintiff      )

11   VS.                           )

12   FULL CIRCLE UNITED, LLC        )

13     Counterclaim Defendant      )

14   and                           )

15   ERIC PAVONY,                   )

16    Additional Counterclaim      )

17    Defendant                    )

18   _____

19              -------------------------------------

20              VIDEOTAPED REMOTE ORAL DEPOSITION OF

21                          ERIC COOPER

22                        JUNE 8, 2022

23                          VOLUME 2
                -------------------------------------

24   REPORTED BY: KATHRYN R. BAKER, RPR, CSR #6955

25   JOB NO. 212204

1                          ERIC COOPER

2        A.    I do.

3        Q.    What do you understand that to mean?

4        A.    (Witness reviews document.)

5              I mean, I could just read it back to you.

6    I understand what it's saying.

7        Q.    Well, let me -- let me rephrase it.

8              Would you agree that it says that things

9    associated with the Skee-Ball trademark are intended to be

10   family friendly?

11             MS. REILLY:  Objection to form.

12       A.    I think what -- well, what do you mean by

13   "family friendly"?

14       Q.    (BY MR. HUMPHREY)  Appropriate for families and

15   children?

16       A.    Which is?

17       Q.    Not -- no use of vulgar language, sexually

18   suggestive things, things suggesting --

19       A.    I think that's -- I think that's subject --

20   subjective.

21       Q.    So you think that things like Skee Mature

22   Ejaculation would be appropriate?

23       A.    In a 21-and-plus environment?  I believe

24   it's -- I believe it's appropriate for a 21 -- a

25   21-and-older environment.

1                    ERIC COOPER

2   Oehrlein and Eric Wikman.

3        Q.   So this is an e-mail that you sent?

4        A.   Uh-huh.

5        Q.   And do you remember sending this e-mail?  Do you

6   recognize this?

7        A.   I don't remember this specifically, but it --

8   I'm sure it's from -- I would -- I would say that it's

9   from me, yes.

10       Q.   Okay.  So there are several attachments here.

11  And based on your e-mail, it says, Here's the schedules.

12            Would these have been schedules for

13  Brewskee-Ball events?

14       A.   For league -- it looks our Skeeson 29, week one.

15       Q.   Okay.  Let me jump through a few of these.

16       A.   Okay.

17       Q.   These is Skeeson 29, week one.

18            So these are times, right?

19       A.   Yes.

20       Q.   Okay.  But they're going to -- and these are the

21  teams that are playing each other?

22       A.   Uh-huh.

23       Q.   Okay.  I'm going to take you through a few of

24  these team names.

25            Well, first of all, let me -- let me ask

ERIC COOPER

1

2   you a question.

3            Is there any approval process for league

4   team names?

5        A.   Yeah.  I mean, yes.  I don't allow overly vulgar

6   things or offensive things.

7        Q.   What would you consider to be overly vulgar or

8   offensive?

9        A.   I -- you'd have to give me an example.  You

10  know, it just depends on what it is.  Like anything that's

11  not -- anything that's vulgarity without the -- without

12  the use of being clever in any way, I guess.

13       Q.   What would you define as clever?

14       A.   Well, you know, just -- we want to work with

15  puns or things like that.

16       Q.   Can you think of any specific names you haven't

17  approved in the past?

18       A.   I can't at the moment.

19       Q.   And before I move on, who is Sarah, by the way?

20       A.   She is a woman who helps me clerically run the

21  league.  She does the e-mails.

22       Q.   Is she an employee of Extra Positive Land?

23       A.   She is paid -- she is paid through -- through

24  the bar, yes.

25       Q.   Okay.  So let's get back to these team names.

1                         ERIC COOPER

2              So you won't approve things that you

3    consider to be excessively vulgar, correct?

4         A.   Yeah.

5         Q.   Unless they're clever, correct?

6              MS. REILLY:  Objection.

7         A.   Sure.  I mean...

8              I think I answered.

9         Q.   (BY MR. HUMPHREY)  Okay.  But you can't recall

10   any specific team names you disapproved?

11        A.   Not at the moment, no.

12        Q.   All right.  And are SKEE-E-Os trained in any

13   kind of process to approve team names, or who controls

14   that?

15             MS. REILLY:  Objection.

16        A.   They are -- they're in control of that, for the

17   most part.  If -- I would imagine if I saw something that

18   was -- that was overly or any -- or Mr. Pavony or I saw

19   something that was ridiculous, in our opinion, as far as

20   adult league goes, we might say something.  I can't think

21   of a specific instance though.

22        Q.   (BY MR. HUMPHREY)  Are SKEE-E-Os given any

23   training of the use of the Skee-Ball trademark?

24        A.   There -- as far as putting -- using the term

25   Skee-Ball and putting a trademark next to it, they are.

1                           ERIC COOPER

2    with children.

3         Q.   (BY MR. HUMPHREY)   But you would agree that the

4    License Agreement says that the Skee-Ball trademark is --

5    let me use the exact term -- geared towards family and

6    children.

7              Do you see that?  Do you remember that?

8         A.   I do believe that that is what is written, yes.

9         Q.   So are they instructed in any kind of usage of

10   the Skee-Ball trademark with the idea that the use of the

11   mark is supposed to be geared towards family and children?

12             MS. REILLY:  Objection.

13        A.   The -- the leagues take place -- and these are

14   adult leagues that take place in adult venues.

15        Q.   But you would agree that Full Circle's

16   conduct -- or pardon me.

17             Full Circle's content, the schedules, its

18   social media, those are all accessible to children on the

19   Internet, correct?

20             MS. REILLY:  Objection.

21        A.   I don't know the answer to that question.

22        Q.   (BY MR. HUMPHREY)   Are these things publicly

23   available?

24        A.   They are posted on our Web site or our Facebook

25   page.

1                         ERIC COOPER

2      Q.   And children could potentially access those?

3      A.   You tell me.  I don't know.

4      Q.   I --

5      A.   I don't speculate what children do.  I think

6  that's -- that's a little...

7      Q.   Okay.

8      A.   You asked me if they're publicly available.  I

9  said yes.  So you can draw the line between children and

10  Facebook.

11      Q.   You authorize the Web site, right, at least with

12  respect to the Austin bar?

13      A.   With respect to the Austin league.

14      Q.   And that's publicly accessible, right?

15      A.   Yes.

16      Q.   Do you place any kinds of restrictions on the

17  Web site?

18      A.   I need -- what do you mean?

19      Q.   Any age restrictions?

20      A.   Oh, is there an age restriction on the Web site?

21  I don't believe there is.

22      Q.   I want to take you through some of these names

23  here.

24              First one, you see up here there's a team

25  called Can You Skee My Balls?

```
 1                          ERIC COOPER
 2       A.   Uh-huh.
 3       Q.   Do you think that name reflects positively on
 4  the Skee-Ball trademark?
 5            MS. REILLY:  Objection, form.
 6       A.   Do I think that name reflects positively on the
 7  Skee-Ball trademark?
 8       Q.   (BY MR. HUMPHREY)   Yes.
 9       A.   I think it's -- I think it's humorous.  Yes, I
10  do think it -- I think it's just humorous and it's adult
11  and it's for adults.
12       Q.   So it -- that's not geared toward families and
13  children?
14            MS. REILLY:  Objection.
15       A.   It's an adult league.
16       Q.   (BY MR. HUMPHREY)   But you would agree that per
17  the terms of the License Agreement, the Skee-Ball
18  trademark is supposed to be geared towards families and
19  children, correct?
20            MS. REILLY:  Objection, form.
21       A.   I would -- I would agree that the term
22  "families" is -- the idea of families is a subjective
23  term.
24            And what families are -- what families are
25  exposed -- I --
```

```
 1                         ERIC COOPER

 2        Q.   (BY MR. HUMPHREY)   Is children a subjective

 3   term, Mr. Cooper?

 4        A.   No.  It just means somebody under 18, I imagine.

 5        Q.   Okay.  So I'm looking at 7.7 right now.  Full

 6   Circle acknowledges and agrees that the Skee-Ball

 7   trademark branded goods and/or services are geared towards

 8   families and children.  And Full Circle will ensure that

 9   its use of the trademark shall not tarnish, weaken, blur

10   or otherwise malign the trademark, or SBI, in this case it

11   would be Bay Tek, the successor.

12                    Do you understand that?

13        A.   I -- I understand what -- the sentence you just

14   read, yes.

15        Q.   Okay.  So my question to you is --

16        A.   Do I think -- I'm sorry, go ahead.

17        Q.   Does a name like Can You Skee My Balls, does

18   that satisfy this requirement that things are supposed to

19   be geared towards families and children?

20                    MS. REILLY:  Objection to form.

21        A.   Say -- say the question again.

22        Q.   (BY MR. HUMPHREY)   Does a team name like Can

23   You Skee My Balls, or down here, Hepatitis Skee, another

24   one --

25        A.   Uh-huh.
```

1                      ERIC COOPER

2       Q.    -- are these the kinds of names that are

3   geared -- strike that.

4               Are names like Can You Skee My Balls and

5   Hepatitis Skee appropriate to be used in connection with a

6   trademark that's geared towards families and children?

7               MS. REILLY:  Objection to form.

8       A.    They are appropriate in an adult league.

9       Q.    (BY MR. HUMPHREY)   So would you say that the

10  Hepatitis Skee would not tarnish, dilute, weaken, or

11  malign the Skee-Ball trademark?

12      A.    I would say it does not malign or weaken --

13              MS. REILLY:  Objection -- hold on, Eric.

14              THE WITNESS:  I'm sorry.

15              MS. REILLY:  Objection to form.  Sorry.

16              Objection to form.

17              You can answer.

18      A.    I do not believe that the term "Hepatitis Skee"

19  maligns or weakens the Skee-Ball trademark.

20      Q.    (BY MR. HUMPHREY)   What about the term "Full

21  Circle Jerks," do you think that maligns or weakens the

22  Skee-Ball trademark?

23              MS. REILLY:  Objection, objection.

24      A.    I do not.  I don't believe it has anything to do

25  with the Skee-Ball trademark.

1                        ERIC COOPER

2                   MS. REILLY:  Objection.

3       A.   -- people participating in an adult league

4   called Brewskee-Ball.

5       Q.   (BY MR. HUMPHREY)   So not families and

6   children?

7                   MS. REILLY:  Objection.

8       Q.   (BY MR. HUMPHREY)   I'm just trying to get a yes

9   or no answer, sir.

10      A.   I believe this shirt is fine for families and

11  children, depending on your -- under your concept of what

12  families and children are.

13      Q.   We're not talking about me.  We're talking about

14  the License Agreement.

15      A.   Okay.  Then I believe that that line is

16  subjective -- is up for subjectivity.

17      Q.   Let me show you another one.

18      A.   Okay.

19      Q.   This will be Exhibit 34.

20                  (Exhibit 34 marked.)

21      Q.   (BY MR. HUMPHREY)   Okay.  Mr. Cooper, do you

22  see this document?

23      A.   Yes.

24      Q.   Do you recognize this?

25      A.   It looks like the -- it looks like the -- is

1                            ERIC COOPER

2    it -- it looks like the Web site.

3         Q.   Which Web site?

4         A.   It looks like BrewskeeBall.com, I believe.  I

5    don't -- all I'm seeing is one photo.  It could be a

6    snapshot of it, but that's what it looks like.

7         Q.   Okay.  And I'm going to take you down here.

8              These are some photos of the league,

9    correct?

10        A.   That appears -- I would -- I would say possibly,

11   yes.

12        Q.   Do you see this picture here of a woman wearing

13   a shirt?

14        A.   Uh-huh.

15        Q.   What does that say?

16        A.   It says, Skee Mature Ejaculation.

17        Q.   Is that a T-shirt that was sold by

18   Brewskee-Ball?

19        A.   I don't believe so.

20        Q.   But that was a team in Brewskee-Ball, correct?

21        A.   I believe that that shirt was most likely made

22   by the team members for themselves.

23        Q.   Why was the merchandise Web site taken down?

24        A.   I don't know the answer to that.

25        Q.   You don't know why -- but -- let me back up.

1                    ERIC COOPER

2              You run the Web site with respect to the

3    Austin bar, correct?

4         A.   With respect to the Austin league.

5              Are you talking about the Brewskee-Ball Web

6    site?

7         Q.   I'm talking about --

8         A.   Or are you talking about --

9         Q.   Yeah, the Brewskee-Ball Web --

10        A.   Are you talking about Brewskee-Ball.com?

11        Q.   Brewskee-Ball.com?, yeah.

12        A.   With respect to the Austin league, I do post

13   things on that page.

14        Q.   So you weren't aware of why the merchandise Web

15   site was shut down?

16        A.   I don't remember why it -- why it was taken

17   down.

18        Q.   That didn't come up in any discussions about

19   your duties and responsibilities with respect to the Web

20   site?

21        A.   No.  That would be a question for Eric Wikman.

22        Q.   What is Full Circle Magazine?

23        A.   It's just a -- Full Circle Magazine is like a

24   clever way of -- it's not a real magazine.  It's something

25   that we say.

1                        ERIC COOPER

2                So it's almost like a -- like imagine you

3    were on the cover of a magazine, but there's no magazine

4    inside.  We just use that as our -- as a tool for

5    delivering posters, I guess.

6        Q.   So there is no actual magazine then?

7        A.   No, no.  It's just like -- imagine like a -- you

8    know, like you took like a fake photo of like you on Time

9    Magazine and put it on the wall kind of thing.  So that's

10   the same sort of concept.  It's like the splash page or

11   something like that.

12       Q.   That's actually exactly what I was thinking of.

13               So was this ever something that was given

14   out by people -- to people or was it some kind of --

15       A.   What was?

16       Q.   Well -- so Full Circle Magazine wasn't actually

17   something that was given out to people?

18       A.   No.

19       Q.   Okay.  But this picture here --

20       A.   It's like -- what's that?

21       Q.   No, sorry.  Go ahead.

22       A.   I was just going to say that, like, if someone

23   won the championship, I would make a poster of them

24   winning a championship, and then I would put the Full

25   Circle Magazine as like the -- like on the top, like it's

1                              ERIC COOPER

2    displayed there.

3         Q.   This particular picture here, this is -- this is

4    the Brewskee-Ball Web site, correct?

5         A.   I believe so, yeah.  I don't -- yeah, it looks

6    to be that, yes.

7         Q.   And so this picture was posted on the

8    Brewskee-Ball Web site, correct?

9         A.   Yes, I guess so.  If you're showing me a

10   screenshot, yeah.

11        Q.   And we established that the Web site was

12   publicly available, right?

13        A.   The Web site was what?

14        Q.   Publicly available?

15        A.   Yes.

16        Q.   So anybody who logged into the Web site could

17   potentially see this pictures?

18        A.   Yes.

19        Q.   Including, potentially, a child?

20             MS. REILLY:  Objection, form.

21        A.   That's not for me to say.

22        Q.   (BY MR. HUMPHREY)   You don't know if a child

23   with Internet access could see this?

24        A.   If you want to -- if you need to draw that line

25   between the two, go for it.  I'm not -- I'm not going to

1                              ERIC COOPER

2    speculate what a child does.

3         Q.   I'm not asking you to speculate.  I'm asking you

4    if it's possible.

5         A.   Is it possible for a child to get on the

6    Internet, yes.

7         Q.   And it's possible for a child to go on this Web

8    site and see this photo, correct?

9              MS. REILLY:  Objection.

10        A.   I don't want to -- I -- I don't -- I don't know

11   what children do.

12        Q.   (BY MR. HUMPHREY)  You don't have to know what

13   children do.  I'm just asking you is it possible --

14        A.   Is the Web site -- you asked me if the Web site

15   was -- I'm sorry, finish.

16        Q.   Well, is the Web site age restricted in any way?

17        A.   I already told you it wasn't.

18        Q.   Okay.  So -- but I'm just asking you, would it

19   be possible for a child with Internet access to come to

20   this Web site and see this photo?

21        A.   I've already answered this question about this

22   Web site.

23        Q.   Would it be possible for a child to do this is

24   what I'm asking?

25        A.   I don't want to draw a conclusion what a

1                        ERIC COOPER

2    child -- can a child get on the Internet?  Yes.  Is our

3    Web site age restricted?  No.  You feel free to draw your

4    own conclusion about what children do.

5         Q.   Why can't you draw that conclusion?

6         A.   I don't -- I don't want to.

7         Q.   Sir, it's not about what you want.  I'm asking

8    you a question.  I'm asking if it's possible that a child

9    could go to the Web site and see this photo?

10        A.   Yes.

11        Q.   Okay.  Did you -- do you have any background in

12   graphic design?

13        A.   Yeah.  Yes.  I told -- I believe you asked me my

14   education.

15        Q.   Yes.  That's right.  That's right.

16             So are you involved in graphic design at

17   all for Brewskee-Ball?

18        A.   For Austin -- for mostly Austin stuff.  Yeah,

19   some -- possibly some Brewskee-Ball stuff, when asked.

20        Q.   So those -- the schedules that we were looking

21   at earlier with the team names, do you design anything

22   like that?

23        A.   Yeah.  Those -- I created those.

24        Q.   Did you create those specifically?

25        A.   Yes.

1                          ERIC COOPER

2          I, Kathryn R. Baker, RPR, a Certified Shorthand

3    Reporter in and for the State of Texas, hereby certify to

4    the following:

5          That the witness, ERIC COOPER, was duly sworn by

6    the officer and that the transcript of the oral deposition

7    is a true record of the testimony given by the witness;

8          I further certify that pursuant to FRCP Rule

9    30(f)(1) that the signature of the deponent:

10          _X_ was requested by the deponent or a party

11   before the completion of the deposition and is to be

12   returned within 30 days from the date of receipt of the

13   transcript.  If returned, the attached Errata contain any

14   changes and the reasons therefor;

15          ___ was not requested by the deponent or a party

16   before the completion of the deposition.

17          I further certify that I am neither counsel for,

18   related to, nor employed by any of the parties or

19   attorneys in the action in which this proceeding was

20   taken, and further that I am not financially or otherwise

21   interested in the outcome of the action;

22

23

24

25

1                    ERIC COOPER

2          Subscribed and sworn to on this 21st day of June,

3    2022.

4

5          _____
           KATHRYN R. BAKER, RPR, CSR #6955
6          Expiration Date:  04/30/2023
           Firm Registration No. 615
7          TSG Reporting
           228 E. 45th Street
8          Suite 810
           New York, New York 10017
9          877-702-9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FULL CIRCLE UNITED, LLC, | Civ. Action No. 1:20-cv-03395 |
| *Plaintiff,* | **ERRATA SHEET** |
| *v.* | |
| BAY TEK ENTERTAINMENT, INC., | |
| *Defendant.* | |
| BAY TEK ENTERTAINMENT, INC., | |
| *Counterclaim Plaintiff,* | |
| *v.* | |
| FULL CIRCLE UNITED, LLC, | |
| *Counterclaim Defendant,* | |
| *and* | |
| ERIC PAVONY, | |
| *Additional Counterclaim Defendant.* | |

Eric Cooper, being duly sworn, deposes and says:

1. I have reviewed the transcript of my deposition taken on June 6 and 8, 2022. The following changes are necessary to correct my testimony:

| Page/Line | Corrected Testimony | Reason for Correction |
|---|---|---|
| 22/3 | "Skeeball" not "Brewskee-Ball" | Misspoke |
| 28/15 | "Bent" not "Vent" | Transcription error |
| 47/22 | Austinbrewskeeball@gmail.com not austinbarbrewskee-ball@gmail.com | Misspoke |
| 53/22 | I meant 'Brooklyn' Roller not 'Austin' Roller | Misspoke |
| 83/10 | "Austin" not "Also" | Transcription error |
| 140/2 | "kitsch, and puns" not "kitchen puns" | Transcription error |
| 140/18 | "kitsch, and puns" not "kitchen puns" | Transcription error |
| 142/18 | "kitsch, and puns" not "kitchen puns" | Transcription error |

| 158/20 | "Gaeton" not "Dayton" | Transcription error |
| 160/1 | "Austin" not "New York" | Misspoke |
| | | |

*E. C. Cooper* (signature)

ERIC COOPER

2