# EXHIBIT 07

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2             CIV. ACTION NO.:  1:20-cv-03395
3      FULL CIRCLE UNITED, LLC,
4              Plaintiff,
       v.
5
       BAY TEK ENTERTAINMENT, INC.,
6
               Defendant.
7      _____/
8      BAY TEK ENTERTAINMENT, INC.,
9              Counterclaim Plaintiff,
       v.
10
       FULL CIRCLE UNITED, LLC,
11
               Counterclaim Defendant,
12     and
13     ERIC PAVONY,
14             Additional Counterclaim
               Defendant.
15     _____/
16                      Monday, June 20, 2022
                        10:08 a.m. EST - 4:59 p.m. EST
17
18                     CONFIDENTIAL
19     VIDEOTAPED DEPOSITION TAKEN BY REMOTE VIDEOCONFERENCE
20        OF HOLLY HAMPTON, Individually and as 30(b)(6)
21               VOLUME I - Pages 1 - 209
22
23        Taken on behalf of the Plaintiff before Yvonne
       Corrigan, RPR, CRR, Notary Public in and for the State
24     of Florida at Large, pursuant to Notice in the above
       cause.
25

CONFIDENTIAL

Page 94

1  in connection with gambling?

2          A.   If we're saying lottery tickets are

3  gambling, we have a current licensing agreement with

4  Alchemy3 for lottery tickets.

5          Q.   Does the current license with GameCo

6  involve online casinos?

7          A.   No, it's just an app.

8          Q.   Has the Skee-Ball Mark ever been used in

9  connection with online casinos?

10          A.   No.

11          Q.   You're certain that the Skee-Ball Mark

12  has not ever been used in connection with Sands Point --

13  (audio lost) -- since 2016?

14          A.   For social slots with a company called

15  Zynga.  I don't know --

16              (Audio problems.)

17  BY MS. CASADONTE-APOSTOLOU:

18          Q.   You really cut out on that one.  I'm

19  going to ask you to repeat that.  You did cut out.

20              MR. MOVIT:  Yeah, the connection is

21          frozen.  If we can all just wait a minute, I

22          think, for the connection to restore.  And,

23          Christina, if you could please re-ask the

24          question.

25              Holly, are you there?  Your screen looks

CONFIDENTIAL

Page 106

```
 1              A.    That is true.
 2              Q.    Why, if Bay Tek had issues of
 3    Full Circle's use of the Skee-Ball Mark prior to 20- --
 4    I'll say -- did Bay-Tek have -- strike my previous
 5    question.
 6                    Did Bay Tek have any issues with
 7    Full Circle's use of the Skee-Ball Mark prior to 2020?
 8              A.    Yes, we were uncomfortable with how they
 9    were using it.  That was not, at the time -- was not as
10    big of a focus.  We were running a ████████ company
11    and -- and our expectation is that our licensees uphold
12    the language of the licensing agreements that they enter
13    in, and we -- our job is not to audit the use of -- of
14    the uses of our licensees, so this has been a small
15    part.  Our licensing agreement with Bay Tek is a small,
16    small part of our business.
17              Q.    What percentage of Bay Tek's business
18    would you consider Full Circle's license agreement?
19              A.    We've received $161.50 from them in eight
20    years, and we do typically ████████ a year in
21    revenue, so a very, very, very small part.
22              Q.    So you believe the only value of
23    Full Circle's license is -- I'm sorry, you mentioned an
24    amount.  What amount are you referring to?
25              A.    We received two revenue royalty
```

CONFIDENTIAL

Page 107

1    agreements from Full Circle.

2              Q.    So the royalties --

3              A.    The licensing agreement.

4              Q.    Do you know what the royalties received

5    from Full Circle were for?

6              A.    Sponsorships.

7              Q.    Anything else?

8              A.    They were just for sponsorships.

9              Q.    So your assessment of the value of

10   Full Circle --

11              (Court reporter seeks clarification.)

12              THE WITNESS:  They were just for

13              sponsorships.

14   BY MS. CASADONTE-APOSTOLOU:

15              Q.    Okay.  I'm going to move on.

16              Other than the 2016 BEEB event, did

17   Bay Tek ever attend any other events operated by

18   Full Circle?

19              A.    Yes.  I attended, along with some

20   coworkers, another BEEB event in 2017; and myself and

21   some coworkers attended a tournament one other time; and

22   I believe two of our employees went to another

23   tournament at another time.  So there's been a couple, a

24   few events that we've attended.

25              Q.    How many?

CONFIDENTIAL

Page 195

1          MR. MOVIT:  Okay.  Could we take a

2      five-minute break?  We have been going for

3      quite a while.

4          MS. CASADONTE-APOSTOLOU:  Yes, we can.

5          THE VIDEOGRAPHER:  We're off the record.

6      The time is 4:37 p.m.

7          (Recess taken -- 4:37 p.m.)

8          (Return from recess -- 4:46 p.m.)

9          THE VIDEOGRAPHER:  We're back on the

10     record.  The time is 4:46 p.m.

11         MS. CASADONTE-APOSTOLOU:  Thank you.

12         Q.   I'm looking at topic number 11 now.

13  "Bay Tek's attempts to develop or operate Live Play on

14  its own, including, but not limited to, its negotiations

15  with GameCo, LLC concerning the development of Live Play

16  for the casino market and family entertainment center,

17  FEC, market."

18         Ms. Hampton, can you tell me everything

19  that you did to prepare to testify on Bay Tek's behalf

20  concerning topic 11?

21         A.   I did nothing because I was in

22  communication with GameCo on this topic.  So I'm -- I

23  couldn't speak to it.

24         Q.   You were on each and every communication

25  with GameCo about this topic?

CONFIDENTIAL

Page 196

1          A.    Yes.

2          Q.    There are no communications involving

3     anyone at Bay Tek that have information of your

4     involvement to this topic?

5                    MR. MOVIT:  Objection.

6                    THE WITNESS:  Morgan Ward brought me this

7               contact, but I would have been on every -- I

8               feel very confidently that I am well-versed in

9               this topic.

10    BY MS. CASADONTE-APOSTOLOU:

11         Q.    Okay.  But you have not been on -- you

12    can't testify today that you have been on each and every

13    communication that Bay Tek has had with GameCo

14    concerning topic 11, right?

15                    MR. MOVIT:  Objection.  Asked and

16              answered.

17                    MS. CASADONTE-APOSTOLOU:  She didn't

18              answer the question.

19         Q.    Go ahead, Ms. Hampton.

20         A.    If we are considering Dimensional

21    Branding Group as a division of Bay Tek because Morgan

22    worked for DBG when she brought me this contact, I would

23    have been the only one in communication from Bay Tek

24    with GameCo.

25         Q.    So, I'm sorry, I don't follow.  Are you

CONFIDENTIAL

Page 197

1  considering Dimensional Branding Group separate from

2  Bay Tek for the purposes of topic 11?

3          A.    Yes.

4          Q.    So have you been considering Dimensional

5  Branding Group separately from Bay Tek for any other

6  topics identified on the 30(b)(6) notice?

7                MR. MOVIT:  Object to the form.

8                THE WITNESS:  If it says "Bay Tek," I

9          consider it Bay Tek.  If it says "Dimensional

10         Branding Group," I consider it Dimensional

11         Branding Group.  I --

12  BY MS. CASADONTE-APOSTOLOU:

13         Q.    Okay.  Do you know whether Morgan Ward

14  was employed by Bay Tek -- excuse me, strike that.

15               Do you know whether Morgan Ward was

16  employed -- I'm sorry -- by Bay Tek during the time

17  period that Bay Tek was communicating with GameCo, LLC

18  about topic 11?

19         A.    She was employed by Dimensional Branding

20  Group which was owned by Bay Tek, so I -- depending how

21  you want to look at it.

22         Q.    Okay.  Okay.  And what information can

23  you provide concerning topic 11?

24         A.    Certainly.  Pitch from GameCo.  After we

25  had done the iSkill gaming app deal brought us a

CONFIDENTIAL

Page 198



1

2

3

4

5

6

7

8

9

10

11

12             MR. MOVIT:  I'm going to mark that answer

13         attorneys' eyes only as it has nothing to do

14         with Skee-Ball.

15  BY MS. CASADONTE-APOSTOLOU:

16         Q.    Is it your testimony that there have been

17  no communications with GameCo, LLC about using the

18  Skee-Ball Mark?

19         A.    That is correct.

20         Q.    And your bay -- can you provide for me

21  all the information that -- to support your testimony?

22         A.    I was the one in contact with them around

23  this topic, and they never once requested Skee-Ball.

24         Q.    Number 12, "Bay Tek's knowledge of Full

25  Circle's activities, including Brewskee-Ball, and when

CONFIDENTIAL

Page 205

1              CERTIFICATE OF OATH OF WITNESS

2    STATE OF FLORIDA        )

3    COUNTY OF SARASOTA      )

4

5        I, YVONNE CORRIGAN, Registered Professional

6    Reporter, Certified Realtime Reporter, Notary Public in

7    and for the State of Florida at Large, certify that the

8    witness, HOLLY HAMPTON, VOLUME I, remotely appeared

9    before me on June 20, 2022 and was duly sworn by me.

10        WITNESS my hand and official seal this 28th day of

11   June, 2022.

12

13

14

                     YVONNE CORRIGAN, RPR, CRR

15                   Notary Public, State of Florida

                     Commission No. GG 283606

16                   Expires:  January 31, 2023

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 206

1              REPORTER'S DEPOSITION CERTIFICATE

2

3      I, YVONNE CORRIGAN, Registered Professional

4   Reporter, Certified Realtime Reporter, certify that I

5   was authorized to and did stenographically report the

6   foregoing remote deposition of HOLLY HAMPTON, the

7   witness herein on June 20, 2022; that a review of the

8   transcript was requested; and that the foregoing

9   transcript, VOLUME I, pages 1 through 209, is a true and

10  complete record of my stenographic notes.

11     I FURTHER certify that I am not a relative,

12  employee, attorney, or counsel of any of the parties,

13  nor am I a relative or employee of any of the parties'

14  attorney or counsel connected with the action, nor am I

15  financially interested in the action.

16     Dated this 28th day of June, 2022.

17

18

19

20                        *Yvonne Corrigan*

21                        YVONNE CORRIGAN, RPR, CRR

22

23

24

25

Page 210

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

FULL CIRCLE UNITED, LLC,

        Plaintiff,

vs.                          Civ. Action No. 1:20-cv-03395

BAY TEK ENTERTAINMENT, INC.,

        Defendant.
_____/

BAY TEK ENTERTAINMENT, INC.,

        Counterclaim Plaintiff,

vs.

FULL CIRCLE UNITED, LLC,

        Counterclaim Defendant,

and

ERIC PAVONY,

        Additional Counterclaim Defendant.
_____/

                    VOLUME II OF III
                    (Pages 210 - 374)

VIDEOTAPED
DEPOSITION OF:        HOLLY HAMPTON

TAKEN BY:            The Plaintiff/Counterclaim
                    Defendants

DATE TAKEN:         Wednesday, June 22, 2022

TIME:               9:07 a.m. - 3:13 p.m.
                    Central Standard Time

PLACE:              Via Zoom Videoconference

REPORTED BY:        Tonya H. Magee, Registered
                    Professional Reporter and Notary
                    Public, State of Florida at Large

Page 253

1   Bay Tek requesting that Bay Tek provide service for the

2   Skee-Ball Live lanes?

3           MR. MOVIT:  Can you read that back, Madam

4       Court Reporter?

5           MS. CASADONTE-APOSTOLOU:  Sure.  Please, go

6       ahead.

7           (The question was read back by the court

8   reporter.)

9           MR. MOVIT:  Okay.  No objection.

10      A.   I don't recall.

11      Q.  (BY MS. CASADONTE-APOSTOLOU)  Did Bay Tek enter

12   into a revenue share agreement with Full Circle at any

13   time?

14      A.   No.

15      Q.   Has -- to your knowledge, has Bay Tek ever

16   entered into a revenue share agreement with any other

17   third party, other than Full Circle?

18      A.   Yes.

19      Q.   Can you please identify the entity or

20   individual with whom Bay Tek has entered into a revenue

21   share agreement?

22          MR. MOVIT:  Objection to the question.  I am

23      designating this section attorneys' eyes only on

24      this topic.

25          (The requested section of testimony was

Page 282

1    manuals and we do our compliance testing.  We'll do a

2    ship test.  It's -- it's really the phase that is really

3    critical to -- to finishing up a development project and

4    getting it ready for a product to go live to

5    marketplace.

6           MR. MOVIT:  Just note that Ms. Hampton's

7        testimony about product development we're

8        designating it as attorneys' eyes only.

9           MS. CASADONTE-APOSTOLOU:  That's fine.

10          (The requested section of testimony was

11    designated attorneys' eyes only.)

12       Q.  (BY MS. CASADONTE-APOSTOLOU)  How -- how does

13    Bay Tek determine whether a product gets through

14    launchpad or not?

15       A.   So during -- during the development phase, we

16    need to have the game fully tested in the field.  That

17    includes hardware testing, software testing.  It

18    includes earnings and -- and payout testing.  So we need

19    to make sure that the game is going to earn well before

20    it's launched into the product -- into the marketplace.

21          Typically, most of our games are ticket

22    redemption.  So very, very key is that it pays out

23    correctly.  So we have to make sure we have the right

24    ticket patterns.  So all of that testing needs to be

25    fully confirmed before we would bring a product to

Page 283

1    market.

2        Q.    And then if the product gets through

3    launchpad, it is a production product at that point?

4        A.    Yeah, that would be fair to say, production.

5        Q.    When something is a production product, does

6    that mean that there are already orders for that

7    products or not?

8        A.    So they kind of go hand in hand.  We typically

9    don't preorder anything.  We will typically do what we

10   call soft launch even after we launch the product into

11   production, where depending on the type of game we will

12   pick a number, 25, 50, ten, and we will have full

13   production units go out into the field and then we'll

14   kind of have a holding period for maybe 30, 60 days.

15        Because with more units out in the field, you

16   just tend to uncover more problems and that allows us to

17   make any modifications that are needed once you get more

18   scale in the marketplace.  So typically, do a soft

19   launch of full production models and -- and -- yeah, I

20   think that answers your question.

21        Q.    Yes, it does.

22        Can you provide everything you did to prepare

23   to testify on behalf of Bay Tek concerning topic 32,

24   "Bay Tek's use and understanding of the term 'NSBL'"?

25        A.    So this one's pretty simple.  We just -- I

Page 286

1      Q.   Was develop -- was the development and

2   manufacture of the Skee-Ball Live lane outside of Bay

3   Tek's core business?

4      A.   This one, yes, a little bit, because it was --

5   because we were not going to do the project based on the

6   letter of intent that we had signed with Full Circle

7   until they had funding because we're not in the business

8   of developing products for customers without funding.

9   And we eventually decided to do a prototype with Full

10  Circle without funding.  So that would have fallen under

11  normal business outside of our core business.

12     Q.   Can you just explain what Bay Tek's core

13  business was in 2016?

14     A.   Sure.  Core business is to design and

15  manufacture arcades.  And our core business, Christina,

16  then would be to sell them to our distribution people.

17     Q.   In 2017, what was Bay Tek's core business?

18     A.   The same thing.

19     Q.   Did Bay Tek's core business change at any time

20  after 2016?

21     A.   In 2018, when we changed our name to Bay Tek

22  Entertainment, we had modified our mission and vision

23  statement to remove -- it was something along the lines

24  of designing and manufacture coin-operated games to

25  something a little bit more broader of designing and

Page 287

1  manufacturing innovative products and services.  So it

2  was a slight modification.  We just expanded our

3  umbrella.

4      Q.   Skee-Ball Live lanes weren't coin-operated

5  games, right?

6      A.   The prototypes that we made did not have coin

7  boxes.

8      Q.   Was there anything limiting Bay Tek's ability

9  to manufacture games that were not coin-operated games

10 prior to 2018?

11     A.   So the term "coin operated" is -- it's just a

12 general term that our industry uses for our products.  I

13 am smiling because I -- I loathe the word and I don't

14 think it -- it's just a really old, antiquated term

15 that's used to describe our industry's products.  They

16 have not -- they haven't been coin operated for a long

17 time.  They're usually player cards.  So it's just a

18 basic term and I think it's not used.

19     Q.   So was there anything limiting Bay Tek's

20 ability to go outside of the coin oper -- strike that.

21          So what is a coin-operated game?

22     A.   So it's just a term for typically arcade

23 games, right.  I mean, it started with an onset of all

24 games were played with quarters and -- video arcade

25 games in the '80s, and then they were played with tokens

Page 288

1   at Chuck E. Cheese and Dave & Busters.  They're always

2   played with some sort of a coin or token.

3          It's just a general layman terminology in our

4   industry of describing arcade games and it's just --

5   it's -- we also use the term "pay to play," right.  Our

6   games are typically pay to play versus in-home games or,

7   you know -- it's -- it's -- they're revenue generated.

8   So coin operated is just an old, antiquated term for our

9   industry in general.

10         Q.   Prior to 2017, had Bay Tek ever manufactured a

11  game with a free-play button?

12         A.   Yes.

13         Q.   What -- what game was manufactured by Bay Tek

14  with a free-play button prior to 2017?

15         A.   All of our trade show games are built with

16  free-play buttons.  We have -- at least for 2017, we had

17  a gentleman who worked on home parts in carnival

18  markets.  And home was really kind of defined as

19  non-revenue generating.  So we would sell games with

20  free-play buttons to homes, corporate offices, places

21  like that.

22         Q.   Can you provide everything you did to prepare

23  to provide testimony on behalf of Bay Tek concerning

24  topic 33.  I'm not going to read it.

25         A.   It's okay.  And, Christina, would it be okay

Page 301

1   decision was made by June 4, 2018.

2        Q.   (BY MS. CASADONTE-APOSTOLOU)  Do you have any

3   facts or information concerning the decision being made

4   prior to June 4, 2018?

5        A.   A driving force would have been around the

6   fact that we did not have our revenue share agreement in

7   place.

8        Q.   When you say you didn't have a revenue share

9   agreement in place, do you mean a written agreement or

10  any agreement?

11       A.   A legally binding revenue share agreement,

12  yeah, a written agreement signed by both parties.

13       Q.   Do you -- do you recall any facts or

14  information about discussing the terms of the -- a

15  revenue share agreement with Full Circle?

16       A.   There were some emails back and forth, but

17  nothing had ever -- had ever formalized.  And I -- I

18  wish that we had, like, a boilerplate agreement.  We

19  just didn't.  So it -- just it didn't happen and we

20  didn't want to -- we didn't want to continue to fund any

21  more efforts until we had that in place.

22       Q.   You didn't want to continue to fund

23  anything -- you trailed off there.

24       A.   We didn't want to continue to fund any more

25  efforts around the prototype project until we had a

1   them -- the proposals of 15 percent, it's just not the

2   business model that we're used to.  So we just wanted to

3   get that wrapped up for those ten lanes before we

4   continued to spend any more money.

5       Q.   So you testified that Bay Tek funded the

6   manufacture of the Skee-Ball Live lanes that were

7   delivered to Full Circle, right?

8       A.   Yeah.  The manufacturing and the development,

9   yeah, we -- we funded that.

10      Q.   Did Bay Tek, when it was funding the

11  manufacture of the Skee-Ball Live lanes, believe that

12  Full Circle was going to repay Bay Tek for its cost for

13  manufacturing the lanes?

14      A.   So there's two fundings that we're talking

15  about.  It's the -- the development time and cost and

16  resources and also then the -- the cost of the -- the

17  ten lanes.  We did believe that we were going to -- to

18  support those ten lanes on our rev share business model,

19  to which we had never agreed upon final terms.

20      Q.   So it was Bay Tek's understanding, at the time

21  it delivered the Skee-Ball Live lanes to Full Circle,

22  that there was a rev share in place, but its terms were

23  not agreed upon?

24      A.   We agreed that the business model to recoup

25  our costs for those ten lanes would be through a revenue

Page 305

1    share model and we've never -- we've never formally

2    agreed upon all of the terms.

3         Q.   It says here in this Exhibit 6, BT0007864,

4    "They don't know what we want from the app or why."

5             Do you have any recollection of what you were

6    referring to?

7         A.   I don't know.  I would only be speculating.

8         Q.   Okay.  In the last bullet of this email you

9    say -- you state, "We will see what their move will be

10   if we no longer support the live lane."

11            When you -- you're referring to Full Circle in

12   that statement, right?

13        A.   That is correct.

14        Q.   Do you recall what -- what you were referring

15   to here?  What moves could -- what moves were you

16   referring to?

17        A.   Oh, I don't know what moves, but I know that I

18   meant -- by no longer supporting the live lane meant

19   shelving that project and no longer funding with us.

20   That's what I meant.  I don't -- I don't know what that

21   they were -- I don't know what moves.

22        Q.   So at this point in time, Bay Tek had made a

23   decision not only to not continue to support the Live

24   Lanes, but to not work with Full Circle, right?

25        A.   That's not correct.

Page 306

1    Q.   In this email it says, "It's another example

2    of why we don't want to work with these guys."

3    A.   Yeah.  So what I mean by that is continuing to

4    fund and develop a project outside of the scope of our

5    licensing agreement.

6    Q.   So it's your position that Bay Tek was willing

7    to work with Full Circle in other capacities outside of

8    the Skee-Ball Live project?

9    A.   We still had a licensing agreement with them

10   that we were upholding.  It was just the fact that we

11   were doing this project above and beyond what was

12   expected from our responsibilities with the licensing

13   agreement and -- and we discussed this with -- with

14   Pavony and he -- this was at a critical time for our

15   business, where the family entertainment center business

16   was booming.

17        And the fact that we had taken -- we had four

18   product development teams.  And the fact that we had

19   taken one of them off full time to -- to come off of a

20   family entertainment center project on to this without

21   full clarity, we just -- just -- we were taking a

22   business gamble by doing that and we didn't have all of

23   the clarity that we needed.  So we just wanted to put

24   this on pause and -- and --

25   Q.   What clarity did Bay Tek need to --

1          MR. MOVIT:  Wait, wait, wait, wait, wait,

2      wait, wait.  Holly was not done.

3      Q.  (BY MS. CASADONTE-APOSTOLOU)  I apologize for

4  that.  I thought you were finished.  Apologies.

5      A.   No, it's okay.

6          I just -- you know, the statement prior to our

7  last -- second-to-last sentence is the video that they

8  posted and -- and so that's what I was also just

9  referring to.  So beyond the fact that we were taking

10  this 25 percent of our entire R&D efforts and putting it

11  toward this project where they didn't have funding, we

12  didn't have alignment on a revenue share agreement, and

13  then they were -- they were speaking poorly about us,

14  there's a lot of reasons why we just decided to put this

15  prototype project on hold.  But our licensing agreement

16  was still intact.

17      Q.   Was it Bay Tek's understanding that the

18  Skee-Ball Live lanes were not subject to the terms of

19  the licensing agreement between Full Circle and Bay Tek?

20      A.   That's correct.

21      Q.   So the development and manufacture of the

22  Skee-Ball Live lanes weren't -- was not a licensing

23  project for Bay Tek?

24          MR. MOVIT:  Object to the form of the

25      question; also calls for a legal conclusion.

Page 308

1      A.   Certainly, I believe that us developing the

2  Skee-Ball Live prototype was outside of the scope of our

3  licensing agreement with Full Circle.

4      Q.  (BY MS. CASADONTE-APOSTOLOU)   Would the

5  Skee-Ball Live lane project still be considered a

6  licensing project for Bay Tek?

7      A.   Good question.  I don't know.  We never

8  defined it.  I -- I don't know how we would have defined

9  that.

10     Q.   At this time, June 4, 2018, were you in charge

11 of licensing for Bay Tek?

12     A.   Yes.

13     Q.   So if anyone was going to define whether the

14 Skee-Ball Live lane project was a licensing project,

15 would you have been the person for Bay Tek to do so?

16     A.   No.  This was an R&D project working with one

17 of our licensees.  So I -- I would look at this more of

18 a product development than a licensing project.  It just

19 happened to be with one of our licensees.

20     Q.   So would the decision-maker concerning the

21 Skee-Ball Live lane project be an R&D person at Bay Tek?

22     A.   I mentioned that.  I think it would have

23 branded -- our -- our R&D leader owns the portfolio

24 team, and that's who would have, again, at the end of

25 the day, made the decisions on this.  And -- and

1    revenue share agreement between Full Circle and Bay Tek.

2         MR. MOVIT:  I'm going to object.  That is --

3         lack of foundation; assumes facts not in evidence.

4    Q.  (BY MS. CASADONTE-APOSTOLOU)  We were

5    discussing the revenue share agreement, right?

6    A.   We were sharing a business model of revenue

7    sharing potentially.

8    Q.   We -- you had testified concerning a revenue

9    share agreement Full Circle alleged existed between Bay

10   Tek and Full Circle, right?

11        MR. MOVIT:  Object to the form.  Are you

12        trying to ask if Ms. Hampton agrees with the

13        allegation or are you just asking her --

14        MS. CASADONTE-APOSTOLOU:  No, we -- we're

15        talking about a revenue share agreement.

16   A.   We were talking about the business model of

17   revenue sharing the ten lanes to Full Circle.  There was

18   never an agreement in place.

19   Q.  (BY MS. CASADONTE-APOSTOLOU)  Okay.  Was it

20   your under -- Bay Tek's understanding that the ten lanes

21   manufactured for Full Circle by Bay Tek were going to be

22   paid for pursuant to a revenue share model?

23   A.   Correct.

24   Q.   Okay.  But Bay Tek contends that there were no

25   terms concerning the revenue share agreement -- the

1   revenue share agreed upon between Bay Tek and Full

2   Circle?

3           MR. MOVIT:  Objection; calls for a legal

4       conclusion.

5       A.   There were basic terms discussed, but a full

6   agreement was never executed.

7       Q.  (BY MS. CASADONTE-APOSTOLOU)  What terms did

8   Bay Tek contend were not agreed to concerning the

9   revenue share agreement between Bay Tek and Full Circle?

10      A.   I don't know all of the terms that could be

11  found in a revenue share agreement.  We had spoken very

12  high level about basic business model terms, but I -- I

13  don't know what all would go into a revenue share

14  agreement.

15      Q.   Provided that all the terms of a revenue share

16  agreement had been agreed upon between Bay Tek and Full

17  Circle, was it Bay Tek's intention to continue with the

18  Skee-Ball Live project?

19          MR. MOVIT:  Objection; hypothetical.

20      A.   No.  The revenue share -- the lack of a

21  revenue share agreement was just one.  We never -- we

22  would only agree to move on with the project if it met

23  expectations for us to continue to fund it.

24      Q.  (BY MS. CASADONTE-APOSTOLOU)  What does that

25  mean, expectations to continue to fund it?

Page 371

1                    CERTIFICATE OF OATH

2  STATE OF FLORIDA:

3  COUNTY OF HILLSBOROUGH:

4

5          I, Tonya H. Magee, Registered Professional

6  Reporter, Notary Public, State of Florida, certify that

7  HOLLY HAMPTON personally appeared before me on June 2s,

8  2022, and was duly sworn.

9

10         Witness my hand and official seal this 28th

11 day of June 2022.

12

13

14

15                    _Tonya H. Magee_

16                    Tonya H. Magee,
                      Registered Professional Reporter
17                    Notary Public, State of Florida
                      My Commission No. GG 947928
18                    Expires:  March 8, 2024

19

20

21 Type of Identification Produced:  Wisconsin Driver's
   License

22

23

24

25

Page 372

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF HILLSBOROUGH:

4

5              I, Tonya H. Magee, Registered Professional

6    Reporter, Court Reporter, and Notary Public, certify

7    that I was authorized to and did stenographically report

8    the deposition of HOLLY HAMPTON; that a review of the

9    transcript was requested; and that the foregoing

10   transcript, pages 213 through 370, is a true and

11   accurate record of my stenographic notes.

12             I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18        DATED this 28th day of June 2022.

19

20

21

22

23             _Tonya H. Magee_

24             Tonya H. Magee, RPR

25

1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF NEW YORK

3    _____

     FULL CIRCLE UNITED, LLC,

4
         Plaintiff,

5
     vs.            Civ. Action No. 1:20-cv-03395

6
     BAY TEK ENTERTAINMENT, INC.,

7
         Defendant.

8    _____/
9    BAY TEK ENTERTAINMENT, INC.,
10       Counterclaim Plaintiff,
11   vs.
12   FULL CIRCLE UNITED, LLC,
13       Counterclaim Defendant,
14   and
15   ERIC PAVONY,
16       Additional Counterclaim Defendant.

     _____

17
18          Remote Videotaped Deposition of
19   HOLLY HAMPTON, Volume III of III, taken at the
20   instance of the Plaintiff/Counterclaim
21   Defendants, before KATHY P. PABICH, a Notary
22   Public in and for the State of Wisconsin,
23   taken from Green Bay, Wisconsin, on June 30,
24   2022, commencing at 12:49 p.m. and concluding
25   at 6:16 p.m., Central Standard Time.

Page 456

1    the product licensed under that license?

2          MR. MOVIT:  Object to the form of the

3    question.

4          THE WITNESS:  I don't see why not as long as

5    they're not running teams or leagues or -- or

6    tournaments.

7    BY MS. CASADONTE-APOSTOLOU:

8      Q    Do you know whether Alchemy3 has ever used

9    leagues or tournaments involving Skee-Ball ar --

10   Skee-Ball arcade games in connection with its

11   lottery promotion business?

12     A    They should not have because I've made it

13   clear that they cannot run leagues or tournaments

14   that we have -- that they're well a well aware of

15   Full Circle.

16     Q    How are they aware of Full Circle?

17     A    Because I've let them know that they cannot

18   run leagues or tournaments, but having a pair of

19   Skee-Ball alleys at a trade show to help promote the

20   Ohio State Skee-Ball ticket program is -- I don't

21   see that breaching our contract.

22     Q    So there would be conversations with Alchemy3

23   about leagues and tournaments involving the

24   Skee-Ball mark?

25          MR. MOVIT:  Object to the form of the

Page 457

1  question.

2       THE WITNESS:  I have -- Alchemy3 is a very

3  promotional-minded company, and I have just let them

4  know that if they're going to use Skee-Ball-branded

5  alley rollers, that they cannot run leagues or

6  tournaments.

7  BY MS. CASADONTE-APOSTOLOU:

8    Q   Have you -- do you recall any communications

9  with Alchemy3 about what they could use

10 Skee-Ball-branded alley rollers for in connection

11 with their license?

12   A   To promote their scratch-off tickets.

13   Q   Okay.  Mr. Atfeh, could you please bring up

14 what we'll mark as Exhibit 14.

15       (Exhibit 14 was marked for identification.)

16       MS. CASADONTE-APOSTOLOU:  Turn the music up.

17 Turn the volume on, please.

18       MR. ATFEH:  Can you hear it at all?

19       MS. CASADONTE-APOSTOLOU:  No.

20       MR. MOVIT:  No.

21       MR. ATFEH:  All right.  So maybe I need to

22 just unmute myself then.  Let me try that again.

23       MR. MOVIT:  No, we cannot hear it.

24       MS. CASADONTE-APOSTOLOU:  We cannot.

25       MR. ATFEH:  Can you hear it?

1          MR. MOVIT:  No.

2          MS. CASADONTE-APOSTOLOU:  No.

3          MR. ATFEH:  It's playing on mine.  I --

4          MS. CASADONTE-APOSTOLOU:  Move it to a

5     different screen maybe.

6      Q    Okay.  Are you aware -- have you ever seen

7     the video -- I'll wait actually.  Mr. Atfeh's trying

8     to bring up a one-minute video that was found on the

9     Internet.

10          MR. ATFEH:  Let me know if this works.

11          (Video played.)

12          MR. ATFEH:  Is that working?

13          MS. CASADONTE-APOSTOLOU:  Yes.

14          MR. MOVIT:  Yes.

15          (Video played.)

16    BY MS. CASADONTE-APOSTOLOU:

17     Q    Have you seen this video before?

18     A    I have not.

19     Q    But were you aware that Alchemy3 -- strike

20    that.

21          Were you aware of the use of the Skee-Ball

22    mark reflected in the video that has been marked as

23    Exhibit 14?

24          MR. MOVIT:  Objection, lacks foundation.

25    You've not authenticated the document.

Page 459

1          THE WITNESS:  I'm not aware.

2    BY MS. CASADONTE-APOSTOLOU:

3      Q   Do you recall any communications with

4    Alchemy3 about using the Skee-Ball mark in

5    connection with a promotional video for The Roll For

6    Ohio on TV?

7          MR. MOVIT:  Objection.  Was Alchemy3 even in

8    the video?

9          THE WITNESS:  Yeah, I don't --

10   BY MS. CASADONTE-APOSTOLOU:

11     Q   Alchemy3 is a promotional company.  That

12   wouldn't be in the video.

13     A   I don't --

14     Q   You testified that Alchemy3 has the right to

15   use the Skee-Ball mark in connection with promoting

16   state lotteries, right?

17     A   Correct.

18     Q   And even though it was within the scope of

19   the areas of inquiry, you couldn't think of any of

20   the states that they used the Skee-Ball mark under

21   the -- in connection with their license?

22     A   I can think of states.  I could not give you

23   an exhausted list.

24     Q   We -- we didn't name any of the states.

25         MR. MOVIT:  Would you like her to name some

Page 460

1  states?

2       MS. CASADONTE-APOSTOLOU:  Yeah, I have, I

3  would.

4       THE WITNESS:  We've been in Wisconsin --

5  BY MS. CASADONTE-APOSTOLOU:

6    Q   Oh, you're reading a list now.  Did someone

7  send you a list?

8    A   No, I'm not reading a list.

9    Q   You --

10      MR. MOVIT:  Stop badgering the witness.

11 BY MS. CASADONTE-APOSTOLOU:

12   Q   You looked down.  You --

13   A   I have a -- I'm holding a rock.

14   Q   Okay.  Well, it --

15   A   There's no list in front of me.

16   Q   Okay.

17   A   Wisconsin, Maryland, Missouri, Washington

18 State.  Those are a few that come to mind.

19   Q   Ohio is one, right?

20   A   Yes.

21   Q   Okay.  Were there any communications that you

22 can recall with Alchemy3 about creating a

23 promotional video for The Roll For Ohio Lottery that

24 involved the Skee-Ball mark?

25   A   Not that I recall.  This does not -- this was

Page 461

1  never approved and it does not look like it was a --

2  it looks like the lotto did this and not Alchemy3.

3     Q   It looks like what?

4     A   It looks like the state lotto did this and

5  not Alchemy3.

6     Q   Okay.  So you -- is it your testimony that if

7  Alchemy3 wasn't -- strike that.

8         Was it -- the use of the Skee -- do you

9  contend that the Skee-Ball mark was used in this

10 video?

11        MR. MOVIT:  First of all, I'm going to

12 caution the witness not to speculate again about a

13 document that she's never seen before.  The question

14 is whether the Skee-Ball mark was used in the video,

15 that calls for a legal conclusion, but you can

16 answer.

17        THE WITNESS:  Yes, the Skee-Ball mark was

18 used in the video.

19 BY MS. CASADONTE-APOSTOLOU:

20    Q   Okay.  Can you describe to the best of your

21 -- where it was used in the video?

22    A   It was used on -- I saw it on one of the

23 alley rollers.

24    Q   Any other use of the mark that you saw?

25    A   That's where I recall seeing it.

Page 462

1      Q   To the extent that the Skee-Ball mark was

2  used in this video, would Alchemy3 have had to get

3  your permission before using the mark in that

4  manner?

5          MR. MOVIT:  Objection.  Do you mean were they

6  supposed to have?

7          THE WITNESS:  If Alchemy3 was part of putting

8  this together, yes, we would have had permission --

9  they have sought permission.

10 BY MS. CASADONTE-APOSTOLOU:

11     Q   Do you have any reason to believe that they

12 weren't involved --

13         THE REPORTER:  Wait, repeat that, please, the

14 beginning.

15 BY MS. CASADONTE-APOSTOLOU:

16     Q   Do you have any reason -- strike that.

17         Are you aware of any promotional videos by

18 Alchemy -- involving Alchemy3 using the Skee-Ball

19 mark in connection with The Roll For Ohio?

20         MR. MOVIT:  Can you repeat that, Madam Court

21 Reporter.

22         THE REPORTER:  "Are you aware of any

23 promotional videos by Alchemy -- involving Alchemy3

24 using the Skee-Ball mark in connection with The Roll

25 For Ohio?"

Page 463

1          THE WITNESS:  Not to my -- not to my

2     knowledge.

3     BY MS. CASADONTE-APOSTOLOU:

4       Q   Okay.  Do you recall -- do you recall any

5     communication with Alchemy3 about using the

6     Skee-Ball mark in connection with Ohio State

7     Lottery?

8       A   I don't.  I didn't even recall that Ohio's

9     one of the states.

10      Q   But you stated Wisconsin, Missouri.  Who else

11    were --

12      A   Washington State, Maryland.

13      Q   Okay.  And is this -- is there just one

14    license with Alchemy3 for the Skee-Ball mark?

15      A   Yes.

16      Q   We're going to bring up, Mr. Atfeh, the ad --

17    or I'm sorry, it's not an ad, it's a website as

18    Exhibit 15.

19          MR. ATFEH:  I'm sorry.  Can you repeat that.

20          MS. CASADONTE-APOSTOLOU:  As Exhibit 15.

21          MR. ATFEH:  You would like me to pull up The

22    Roll --

23          MS. CASADONTE-APOSTOLOU:  The website --

24          MR. ATFEH:  -- The Roll --

25          MS. CASADONTE-APOSTOLOU:  -- the website.

1          MR. MOVIT:  Not yet, Christina.

2          MS. CASADONTE-APOSTOLOU:  All right.  I

3     mentioned earlier that my second screen broke and I

4     can't tell what you see.  Is it working now?

5          MR. MOVIT:  Yes.

6          MS. CASADONTE-APOSTOLOU:  What do you see?

7          THE WITNESS:  The licensing agreement.

8          MR. MOVIT:  It's very small.

9          MS. CASADONTE-APOSTOLOU:  That's not supposed

10    to be.  He's -- can you see it now?

11         MR. MOVIT:  Christina, we still see a very

12    small copy of the license agreement.

13         MS. CASADONTE-APOSTOLOU:  Okay, let me -- let

14    go off.  I'm sorry.  Go off --

15         THE VIDEOGRAPHER:  Off the record at 5:58

16    p.m.

17         (Pause in the proceedings.)

18         THE VIDEOGRAPHER:  We're back on the record

19    at 5:59 p.m.

20         (Exhibit 20 was marked for identification.)

21    BY MS. CASADONTE-APOSTOLOU:

22    Q    Okay, I've shared my screen, right?  Do you

23    see it?

24    A    Yes.

25    Q    BT0010281.  It's Exhibit 20, I think.  It's

Page 553

1    from you to Lance Treankler, February 16, 2018.  The

2    top e-mail says "We are currently at a stand still

3    with them on the Skee-Ball Live project.  They

4    continued to be bad partners.  D. Timm is working on

5    our next steps."

6          Who is D. Timm?

7     A    David Timm is our Bay Tek attorney.

8     Q    And previously the e-mail underneath, it's

9    from Lance to you on February 20 -- 16, 2018, and

10   that he's saying "What does this mean?" in response

11   to an e-mail you sent saying "Hey All, There has

12   been some verbal discussion around this topic this

13   week and I just wanted to follow up with an email

14   letting you know that we will cease all

15   communication with the Full Circle

16   (Brewskee Ball/NSBL) guys effective immediately.

17   I will be our point of contact for them moving

18   forward as we navigate our next steps.  Please let

19   your teams know this if you haven't already."

20         Am I -- so you're telling Lance Treankler

21   that Full Circle continues to be bad partners,

22   right?

23    A    That's what it says, yes.

24    Q    Why, why did you say -- why did you call Full

25   Circle bad partners?

Page 567

1  STATE OF WISCONSIN    )

                        ) ss.

2  COUNTY OF MILWAUKEE   )

3

4      I, KATHY P. PABICH, CSR, do hereby certify that

5  the preceding deposition was recorded by me and

6  reduced to writing under my personal direction.

7      I further certify that said deposition was taken

8  remotely from Green Bay, Wisconsin, on the 30th day

9  of June, 2022, commencing at 12:49 p.m. and

10  concluding at 6:16 p.m.

11      I further certify that I am not a relative or

12  employee or attorney or counsel of any of the

13  parties, nor a relative or employee of such attorney

14  or counsel, or financially interested directly or

15  indirectly in this action.

16      In witness whereof, I have hereunto set my hand at

17  Milwaukee, Wisconsin, this 5th day of July, 2022.

18

19

20

21  _Kathy Pabich_

        KATHY P. PABICH, CSR

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FULL CIRCLE UNITED, LLC,

     *Plaintiff*,

    v.

BAY TEK ENTERTAINMENT, INC.,

    *Defendant*.

---

BAY TEK ENTERTAINMENT, INC.,

     *Counterclaim Plaintiff*,

    v.

FULL CIRCLE UNITED, LLC,

     *Counterclaim Defendant*,

   *and*

ERIC PAVONY,

     *Additional Counterclaim Defendant*.

---

Case No.    1:20-cv-03395-BMC

**ERRATA SHEET**

---

Holly Hampton, being duly sworn, deposes and says:

1. I have reviewed the transcript of my deposition taken on June 20, 22, and 30, 2022. The

following changes are necessary to correct my testimony:

| Page/Line | Corrected Testimony | Reason for Correction |
|---|---|---|
| Page 51, lines 7-10 | I meant to say that Full Circle introduced themselves to us in 2015 before we bought SBI, and then we actually met them in-person in | Clarification |

| | 2016. | |
|---|---|---|
| Page 106, line 15 | "Bay Tek" should be "Full Circle" | Misspoke/Clarification |
| Page 111, line 17 | Insert "an" between "Jensen's" and "electrical " | Transcription error |
| Page 184, line 5 | Insert "the" between "use" and "Skee-Ball" | Clarification |
| Page 193, line 14 | Remove "and we" | Transcription error |
| Page 197, line 24 | "Pitch" should be "Rich." | Transcription error |
| Page 227, line 19 | "Simms" should be "Timm" | Transcription error |
| Page 231, line 7 | "Matusak" should be "Matuszak" | Transcription error |
| Page 231, line 8 | "Pralick" should be "Froelich" | Transcription error |
| Page 237, line 16 | "bowler" should be "roller" | Transcription error |
| Page 263, line 13 | "they're" should be "they were" | Transcription error |
| Page 265, line 18 | Insert "lane" after "Skee-Ball" | Transcription error/Clarification |
| Page 273, line 25 | "skew" should be "SKU" | Transcription error |
| Page 274, line 24 | "Jack Potrisen" should be "Jackpot Rising" | Transcription error |
| Page 284, line 4 | "who" should be "how" | Transcription error |
| Page 322, line 10 | "skews" should be "SKUs" | Transcription error |
| Page 394, line 21 | Remove "not" | Clarification |
| Page 450, line 11 | "exhausted" should be "exhaustive" | Transcription error/Clarification |
| Page 456, line 14 | Remove "well a" | Transcription error |
| Page 459, line 23 | "exhausted" should be "exhaustive" | Transcription error/Clarification |
| Page 462, line 9 | Insert "would" between "they" and "have" | Transcription error/Clarification |
| Page 467, lines 13-24 | The questioning refers to the use of the Skee-Ball mark by the Ohio State Lottery as a "permissible use of the Skee-Ball mark."  This was not a "permissible use of the Skee-Ball mark."  I did not know about this use of the Skee-Ball mark and did not endorse it. | Clarification based on mischaracterization of testimony in Full Circle's August 9, 2022 Response to Bay Tek's Pre-Motion Letter (ECF No. 129). |

_Holly Hampton_
HOLLY HAMPTON

14442458.1