# EXHIBIT 08

CONFIDENTIAL

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF WISCONSIN
 3  - - - - - - - - - - - - - - - - - - - - - - - - - -
    FULL CIRCLE UNITED, LLC,
 4
                Plaintiff,
 5
          vs.                         Case No.
 6                                    1:20-cv-03395
    BAY TEK ENTERTAINMENT, INC,
 7
                Defendant.            CONFIDENTIAL
 8  _____
 9  BAY TEK ENTERTAINMENT, INC.,
10         Counterclaim Plaintiff,
11   vs.
12  FULL CIRCLE UNITED, LLC,
13         Counterclaim Defendant,
14   and
15  ERIC PAVONY,
16         Additional Counterclaim
           Defendant.
17
    - - - - - - - - - - - - - - - - - - - - - - - - - -
18
                      CONFIDENTIAL
19       VIRTUAL VIDEO-RECORDED DEPOSITION OF:
                     LARRY TREANKLER
20
           TAKEN AT:  The Witness's Residence
21
          LOCATED AT:  6747 Kawula Lane
22             Sobieski, Wisconsin
23               July 12, 2022
              9:24 a.m. to 7:12 p.m.
24
       REPORTED BY:  VICKY L. ST. GEORGE, RMR.
25  - - - - - - - - - - - - - - - - - - - - - - - - - -
    JOB NO. 5304329
```

Veritext Legal Solutions

800-726-7007                                     305-376-8800

1  BY MS. CASADONTE-ASPSTOLOU:
2  Q.  When did -- do you recall when the acquisition of
3      Skee-Ball, Inc., closed?
4  A.  Late February of 2016.
5  Q.  In connection with your role on behalf of Bay Tek in
6      negotiating the acquisition of Skee-Ball, Inc., did
7      you review any agreements between Skee-Ball, Inc.,
8      and Full Circle United, LLC?
9  A.  I did not.
10 Q.  Are you familiar with Full Circle United, LLC?
11          MS. LEPERA:  Today?  Is he familiar with
12     them today?  Okay.
13          THE WITNESS:  Yes, I'm familiar with them
14     today.
15 BY MS. CASADONTE-ASPSTOLOU:
16 Q.  When did you first learn about Full Circle United,
17     LLC?
18 A.  So we learned about the contracts late 2015.  We had
19     two of our people in 2012 or '11 ish go to a
20     licensing show in New York, and they ended up going
21     to a bar that had the Brewskee-Ball environment in
22     it.  I don't know if we equated that to FCU or not.
23 Q.  Do you recall who the two people in 2012 that went to
24     the bar that had the Brewskee-Ball environment in it
25     were?

1      subsequent to the acquisition?
2   A. I don't know.
3   Q. Do you know whether the settlement agreement between
4      SBI and FCU was assigned to Bay Tek?
5          MS. LEPERA: Objection, calls for a legal
6      conclusion. You can answer to the extent you
7      understand as a layperson.
8          THE WITNESS: I think that both the
9      license agreement and the settlement agreement were
10     transferred to Bay Tek. I know the license
11     agreement was. I'm not sure of the legal, how it
12     legally worked with the settlement agreement in
13     terms of us whether you take title to that or not.
14     License agreement we did.
15  BY MS. CASADONTE-ASPSTOLOU:
16  Q. Were there -- are you aware of any rights or
17     obligations under the license agreement that were not
18     acquired by Bay Tek at the time of its acquisition of
19     SBI?
20         MS. LEPERA: Objection to form. Also
21     calls for a legal conclusion, vague and ambiguous.
22     If you understand as a layperson, you can answer.
23         THE WITNESS: I don't understand the
24     question. Can you ask me again?
25  BY MS. CASADONTE-ASPSTOLOU:

1                THE WITNESS:  Yes.
2    BY MS. CASADONTE-ASPSTOLOU:
3    Q.   And what was that understanding?
4    A.   That FCU, I think specifically Eric Wikman, had
5         written much, a good part of the code.
6    Q.   Other than -- Strike that.
7              The meeting that you referred to in
8         September of 2017 with Full Circle United, do you
9         recall where that meeting took place?
10   A.   We, I think we had a day at Bay Tek and then I spent
11        a good part of I think it was the morning after at a
12        diner with those guys.
13   Q.   Other than the meeting in September of 2017 with the
14        Full Circle United guys I'll call them at Bay Tek,
15        did you ever at any time meet with Full Circle in
16        person?
17             MS. LEPERA:  Objection to the form in
18        terms of characterization of Full Circle, but
19        subject to that, you can answer.
20             THE WITNESS:  I took a trip to Austin I
21        think in July of 2017 and all three Erics were
22        there.
23   BY MS. CASADONTE-ASPSTOLOU:
24   Q.   You took -- you cut out.  You took a trip to where?
25   A.   Austin, Texas.

1  Q.  Did you -- did anyone at Bay Tek to your knowledge
2      tell Full Circle why Bay Tek was pausing its efforts?
3              MS. LEPERA:  Objection to form.
4              THE WITNESS:  Yes.
5  BY MS. CASADONTE-ASPSTOLOU:
6  Q.  And what was the reason for the pause Bay Tek
7      communicated to Full Circle?
8  A.  Can you repeat the question?
9  Q.  Did Bay Tek communicate -- what was the reason to
10     communicate to Full Circle for the pause?
11 A.  We had asked them if we could do a nonrevenue
12     generating tournament for the football team that we
13     own, and they wanted to do a contract to do that.
14     And after we had made them 10 lanes and stopped
15     everything that we were doing to pull that off for
16     them, take my people off of other projects and do it
17     all hands on deck effort to produce those things for
18     them, that really irritated us.  And then we found
19     out that they were recording us, and that was
20     double -- that was double irritating.
21 Q.  Do you know what resources Bay Tek invested in
22     manufacturing the 10 custom lanes for Full Circle?
23 A.  Sure.
24             MS. LEPERA:  Object to the form.  Go
25     ahead.

1  A.  Okay.  Then can you repeat the second -- the most
2      recent question?
3  Q.  I didn't mean to ask it twice.
4          Can you think of any reason why Larry
5      Seidman would be copied on communications prior to
6      this litigation on Bay Tek communications concerning
7      revenue generated by the Skee -- by the NSBL lanes?
8          MS. LEPERA:  Object to the form of the
9      question, assumes facts not in evidence, no
10     foundation.
11         THE WITNESS:  No.
12 BY MS. CASADONTE-ASPSTOLOU:
13 Q.  You mentioned that Bay Tek placed the custom lane
14     effort on pause in part because it found out about
15     recording; is that correct?
16 A.  Yes --
17         MS. LEPERA:  Objection to form.  The
18     testimony is what it is.
19         COURT REPORTER:  Can you repeat the
20     answer?  I didn't hear it.
21         THE WITNESS:  I just said yes a second
22     time.
23 BY MS. CASADONTE-ASPSTOLOU:
24 Q.  When did Bay Tek first learn about the recordings
25     that you're referring to?

1  A.  Fall of 2017, early winter.
2  Q.  How did Bay Tek learn about the recordings in the
3      fall of 2017?
4  A.  Holly and Eric and I think Holly and Eric Wikman and
5      Eric Pavony were going to get on a conference call,
6      and the automated system they used let Holly know
7      that she was being recorded.
8  Q.  Did the automated system leave her a notification
9      that the call was being recorded?
10 A.  Right.
11 Q.  Prior to the fall of 2017 Bay Tek consented to being
12     recorded --
13         MS. LEPERA:  Objection to form,
14     mischaracterizes the record and the testimony.  You
15     can answer.
16         THE WITNESS:  So when Eric came, the Erics
17     came to visit, they brought a videographer with them
18     that was doing a documentary on Skee-Ball.  And we
19     authorized that to be done, not universally.  And
20     definitely not record our voice in times of
21     contention.  Two worlds apart, different things.
22 BY MS. CASADONTE-ASPSTOLOU:
23 Q.  Was Bay Tek's -- did Bay Tek communicate to Full
24     Circle that it was upset that Bay Tek -- that Full
25     Circle would -- was permitting the recording of audio

1    during -- Strike that.
2            Did anyone at Bay Tek ever tell Full Circle
3    that it was upset about the recordings prior to this
4    litigation?
5            MS. LEPERA: Object to the form of the
6    question to the extent that the record as revealed
7    in this litigation was produced prior to the
8    litigation by Full Circle to Bay Tek. Subject to
9    that objection, and mischaracterization, you can
10   answer.
11           THE WITNESS: Can you ask it again?
12   BY MS. CASADONTE-ASPSTOLOU:
13   Q.  Did anyone at Bay Tek communicate prior to this
14       litigation --
15   A.  Got it. Yes.
16   Q.  -- that it didn't -- who did?
17   A.  Holly Hampton.
18   Q.  How do you know that?
19   A.  She told me. I think she emailed that.
20   Q.  Do you recall the substance of the email that you're
21       referring to?
22   A.  Not the email.
23   Q.  So it's your testimony that Bay Tek told Full Circle
24       that it was upset with the recordings being made?
25   A.  Yes.

Page 130

1  Q.  And the recordings were part of the reason why Bay
2      Tek did not want to make customized for Full Circle
3      after the delivery of the 10 NSBL lanes?
4              MS. LEPERA:  Objection to the form of the
5      question, assumes facts not in evidence and
6      mischaracterizes the record.  You can answer.
7              THE WITNESS:  That was part of the reason.
8  BY MS. CASADONTE-ASPSTOLOU:
9  Q.  And the other reason was because Full Circle asked
10     for a -- an agreement in connection with a blizzard
11     event; is that right?
12 A.  Yes.
13 Q.  And why was that upsetting?
14 A.  I gave you that before.
15             MS. LEPERA:  Asked and answered.
16 BY MS. CASADONTE-ASPSTOLOU:
17 Q.  So it was upsetting because of the resources.  Back
18     to the resources.
19             Do you have any idea about how much money
20     Bay Tek invested, if any, in the manufacture of NSBL
21     lanes?
22             MS. LEPERA:  Objection to form of the
23     question.
24             THE WITNESS:  I don't -- I can't give you
25     that exactly.  Six figures plus.

Page 184

1  BY MS. CASADONTE-ASPSTOLOU:
2  Q.  On page 7083, do you recall receiving or reviewing
3      the revenue model slide at any time?
4  A.  I saw something like this.
5  Q.  And did you have any thoughts, good or bad or
6      otherwise, about these projections?
7  A.  So we talked about -- would be to get down to
8      those -- I talked to those guys about, you know, why
9      don't you build a small to medium-sized business that
10     you can control and take care of.  Because you get
11     down to those bigger numbers, and it's really,
12     really, really hard.  So we did not think that those
13     numbers would come true.
14 Q.  Well, wouldn't Full Circle need lanes, additional
15     lanes other than the 10 that were provided for it to
16     even see if its revenue model would come true?
17             MS. LEPERA:  Objection, argumentative,
18     speculative.  You asked his opinion, his viewpoint.
19             THE WITNESS:  So they were going to put
20     the 10 lanes that they had prototype lanes from us
21     after their event, their big event, out in between 5
22     and 10 bars.  And we were going to gather more
23     information as they got out of the controlled
24     environment of the Full Circle bars.  And if that
25     bore out good news, then we were going to consider

CONFIDENTIAL

Page 185

```
 1            moving on to produce more coupled with the other
 2            things that I gave you earlier.
 3     BY MS. CASADONTE-ASPSTOLOU:
 4     Q.     And again, did you communicate that expectation to
 5            Full Circle at any time prior -- at any time?
 6     A.     Yes.
 7     Q.     And when was that communicated?
 8     A.     Very specifically at the meeting at the diner.
 9     Q.     So are you saying you communicated to Full Circle
10            that Bay Tek expected it to move the 10 lanes that
11            were delivered to it by Bay Tek into other locations
12            after the BEEB?
13     A.     Yes.
14     Q.     And the BEEB was in October of 2017, correct?
15     A.     Right.
16     Q.     And at the time they were delivered, they may or may
17            not have had the ability to generate revenue, you
18            don't know?
19     A.     Like I said, I was almost positive they had dollar
20            bill acceptors on them.  But if they didn't have the
21            ability to take revenue, it would have taken seconds
22            for them to have the ability to take revenue.  They
23            all come prewired for dollar bill acceptors, so I'm
24            89 percent sure they should put the dollar bill
25            acceptors on.
```

```
 1                    C E R T I F I C A T E
 2    STATE OF WISCONSIN )
                         ) SS
 3    MILWAUKEE COUNTY   )
 4              I, VICKY L. ST. GEORGE, Registered Merit
 5    Reporter and Notary Public in and for the State of
 6    Wisconsin, do hereby certify that the preceding deposition
 7    was recorded by me and reduced to writing under my
 8    personal direction.
 9              I further certify that said deposition was
10    taken at the witness's residence, 6747 Kawula Lane,
11    Sobieski, Wisconsin on July 12, 2022, commencing at 9:24
12    a.m. and concluding at 7:12 p.m.
13              I further certify that I am not a relative or
14    employee or attorney or counsel of any of the parties, or
15    a relative or employee of such attorney or counsel, or
16    financially interested directly or indirectly in this
17    action.
18              In witness whereof, I have hereunto set my hand
19    and affixed my seal of office at Milwaukee, Wisconsin,
20    this 26th day of July, 2022.
21
22                              [Signature: Vicky L. St. George]
23                              VICKY L. ST. GEORGE
                                Notary Public in and for the
24                              State of Wisconsin
                                Commission Expires 1/29/2025
25
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FULL CIRCLE UNITED, LLC,<br><br>    *Plaintiff,*<br>v.<br><br>BAY TEK ENTERTAINMENT, INC.,<br><br>    *Defendant.* | Case No.  1:20-cv-03395-BMC<br><br>**ERRATA SHEET** |
| BAY TEK ENTERTAINMENT, INC.,<br><br>    *Counterclaim Plaintiff,*<br>v.<br><br>FULL CIRCLE UNITED, LLC,<br><br>    *Counterclaim Defendant,*<br><br>and<br><br>ERIC PAVONY,<br><br>    *Additional Counterclaim Defendant.* | |

Larry Treankler, being duly sworn, deposes and says:

1. I have reviewed the transcript of my deposition taken on July 12, 2022. The following changes are necessary to correct my testimony:

| Page/Line | Corrected Testimony | Reason for Correction |
|---|---|---|
| Page 53, line 15 | Add "that" so it reads "that Skee-Ball retained anything" | Clarification |
| Page 90, line 8 | Remove "the," should read "Holly is a leader | Transcription Error |

|  | of Bay Tek." |  |
| --- | --- | --- |
| Page 96, lines 9-11 | Should read "they tried to pay for them in part" | Clarification/Correction |
| Page 116, line 24 | Should read, "Yes, in part." | Clarification/Correction |
| Page 176, Line 14 | Should be "David Timm" | Correction |
| Page 199, Line 14 | Should read "That if we brought it to" | Clarification |
|  |  |  |

LARRY TREANKLER