**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CASE NO. 1:20-CV-03395-BMC

FULL CIRCLE UNITED, LLC,

       *Plaintiff*,

v.

BAY TEK ENTERTAINMENT, INC.,

       *Defendant*.

---

BAY TEK ENTERTAINMENT, INC.,

       *Counterclaim Plaintiff*,

v.

FULL CIRCLE UNITED, LLC,

       *Counterclaim Defendant*,

and

ERIC PAVONY,

       *Additional Counterclaim Defendant*.

 

**MEMORANDUM OF LAW IN OPPOSITION TO**
**FULL CIRCLE UNITED, LLC'S SECOND MOTION SEEKING LEAVE TO**
**FILE A THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................................. 1

PROCEDURAL HISTORY ............................................................................... 2

ARGUMENT ....................................................................................................... 4

I.      THE MOTION SHOULD BE DENIED BECAUSE FCU FAILED TO COMPLY WITH THE COURT'S EXPLICIT ORDER ..................................... 4

II.     FCU CANNOT SHOW "GOOD CAUSE" UNDER RULE 16 ........................................ 5

III.    THE PROPOSED TAC FAILS TO STATE A VALID CAUSE OF ACTION FOR ANY OF FCU'S NEW PROPOSED CLAIMS ............................................................... 8

        A.     The Proposed TAC Fails To State A Cause Of Action For Fraud .......................... 8

             1.     The Proposed TAC Improperly Reasserts FCU's Rejected Fraud Claim In Connection With The NDA ........................................ 9

             2.     FCU's Claim Regarding BTE's Alleged Representations Of Past, Present, And Future Performance Under Existing Contracts Is Not Actionable As Fraud .......................................................... 9

             3.     FCU's Claim That It Was Fraudulently Induced To Consent To The Assignment Of The License Agreement Fails As A Matter Of Law ........ 15

             4.     FCU Fails To Plead Fraud Against Mr. Treankler .................................. 16

        B.     FCU's Claim For Breach Of Contract Based On A Purported Failure To Provide Notice And Opportunity To Cure Fails To State A Cause Of Action ..... 17

        C.     FCU's Proposed Claim For Trademark Cancellation Fails To State A Cause Of Action As A Matter Of Law ........................................................... 19

             1.     FCU Lacks Standing To Assert A Cancellation Claim ............................ 19

             2.     The Proposed TAC Fails To Allege Any False Representation Of Fact—Let Alone A Knowing Misrepresentation—That Would Have Affected The USPTO's Granting Of A Trademark Registration ............ 21

             3.     The Proposed USPTO Claim Is Barred Under The Doctrine of Licensee Estoppel .................................................................. 24

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.V.E.L.A., Inc., v. Est. of Marilyn Monroe, LLC*,
    241 F. Supp. 3d 461 (S.D.N.Y. 2017)......................................................................19

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
    626 F.3d 699 (2d Cir. 2010).....................................................................................7

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,
    760 F.2d 442 (2d Cir. 1985)......................................................................................7

*Baez v. Delta Airlines, Inc.*,
    2013 WL 5272935 (S.D.N.Y. Sept. 18, 2013)......................................................5, 6

*Bertolli, USA, Inc. v. Filippo Bertolli Fine Foods*,
    662 F. Supp. 203 (S.D.N.Y. 1987) ........................................................................23

*Capri Sun GmbH v. American Beverage Corp.*,
    414 F. Supp. 3d 414 (S.D.N.Y. 2019).....................................................................25

*City of New York v. Tavern on the Green Int'l LLC*,
    351 F.Supp.3d 680 (S.D.N.Y. 2018).......................................................................18

*Cohen v. G & M Realty L.P.*,
    2015 WL 1182712 (E.D.N.Y. Mar. 13, 2015) .........................................................5

*Courageous Syndicate, Inc. v. People-to-People Sports Comm., Inc.*,
    529 N.Y.S.2d 520 (2d Dep't 1988)...................................................................10, 17

*Cronos Grp. Ltd. v. XComIP, LLC*,
    64 N.Y.S.3d 180 (1st Dep't 2017) ....................................................................11, 16

*Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*,
    68 N.Y.2d 954 (1986) ............................................................................................14

*Doller v. Prescott*,
    91 N.Y.S.3d 533 (3d Dep't 2018) ..........................................................................11

*Ellison v. Am. Image Motor Co., Inc.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999).......................................................................13

*First Bank of Americas v. Motor Car Funding, Inc.*,
    257 A.D.2d 287 (1st Dep't 1999) ...........................................................................14

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Foman v. Davis*,
371 U.S. 178 (1962)................................................................................................................2

*FPP, LLC v. Xaxis US, LLC*,
764 F. App'x 92 (2d Cir. 2019) .........................................................................................10

*Genins v. Morgan Stanley & Co.*,
2004 WL 95783 (S.D.N.Y. Jan. 20, 2004) ........................................................................12

*Guilbert v. Gardner*,
480 F.3d 140 (2d Cir. 2007)...............................................................................................11

*GWG MCA Cap., Inc. v. Nulook Cap., LLC*,
2019 WL 1084777 (E.D.N.Y. Mar. 7, 2019) ....................................................................10

*Haggar Int'l Corp. v. United Co. for Food Indust. Corp.*,
906 F. Supp. 2d 96 (E.D.N.Y. 2012) .................................................................................23

*HSW Enters., Inc. v. Woo Lae Oak, Inc.*,
2009 WL 4823920 (S.D.N.Y. Dec. 15, 2009) ..............................................................24, 25

*Knoll v. Equinox Fitness Clubs*,
2007 WL 4526596 (S.D.N.Y. Dec. 20, 2007) .....................................................................5

*Krasnyi Oktyabr, Inc. v. Trilini Imports*,
578 F. Supp. 2d 455 (E.D.N.Y. 2008) ...............................................................................19

*Krumme v. WestPoint Stevens Inc.*,
143 F.3d 71 (2d Cir. 1998)...................................................................................................7

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
495 F.2d 1265 (2d Cir.1974)..............................................................................................22

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
10 F. Supp. 3d 504 (S.D.N.Y. 2014)..................................................................................15

*Lee v. Matarrese*,
793 N.Y.S.2d 457 (2d Dep't 2005).....................................................................................10

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
244 F.R.D. 204 (S.D.N.Y. 2007) .......................................................................................13

*MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*,
84 N.Y.S.3d 157 (1st Dep't 2018) ......................................................................................14

<u>Page(s)</u>

*McCarthy v. Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007).....................................................2

*Metro. Transp. Auth. v. Triumph Advert. Prods., Inc.*,
   497 N.Y.S.2d 673 (1st Dep't 1986) ....................................10, 11

*Neckles Builders, Inc. v. Turner*,
   117 A.D.3d 923 (2d Dep't 2014) ............................................14

*Nielson Co. (U.S.) LLC v. Success Systems, Inc.*,
   112 F.Supp.3d 83 (S.D.N.Y. 2015) .........................................9

*Odyssey Re (London) Ltd. v. Sirling Cooke brown Holdings, Ltd.*,
   85 F. Supp. 2d 282 (S.D.N.Y. 2000)...................................13, 15

*Ortiz v. Case*,
   2019 WL 1236413 (W.D.N.Y. Mar. 18, 2019),
   *aff'd*, 782 F. App'x 65 (2d Cir. 2019)....................................7

*Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*,
   893 F. Supp. 285 (S.D.N.Y. 1995) ........................................10

*RKB Enterprises Inc. v. Ernst & Young*,
   182 A.D.2d 971 (3d Dep't 1992) ............................................14

*RKI Construction, LLC v. WDF Inc.*,
   2020 WL 6545915 (E.D.N.Y., Nov. 6, 2020)........................18

*S.F.P. Realty Corp. v. G.S. Rockaway Dev., Inc.*,
   614 N.Y.S.2d 443 (2d Dep't 1994)........................................17

*Shervington v. Vill. of Piermont*,
   732 F. Supp. 2d 423 (S.D.N.Y. 2010)....................................5

*Skydell v. Ares-Serono S.A.*,
   892 F. Supp. 498 (S.D.N.Y. 1995) ........................................16

*Starr v. Akdeniz*,
   162 A.D.3d 948 (2d Dep't 2018) ............................................14

*Werking v. Andrews*,
   526 F. App'x 94 (2d Cir. 2013) ..............................................5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Wild Bunch, SA v. Vendian Entertainment, LLC*,
   2018 WL 1365690 (S.D.N.Y., Feb. 26, 2018)........................................................15

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
   946 F.2d 1003 (2d Cir. 1991)................................................................................18

*Yurman Design Inc. v. Chaindom Enterprises*, *Inc.*,
   2000 WL 897141 (S.D.N.Y. July 5, 2000) ............................................................20

**OTHER AUTHORITIES**

Fed. R. Civ. P.
   Rule 9(b) ...............................................................................................9, 19, 22, 24
   Rule 12(b)(6).........................................................................................................1
   Rule 15 ..................................................................................................................1
   Rule 15(a)..............................................................................................................5
   Rule 16 ..................................................................................................................1
   Rule 16(b) .............................................................................................................5

Defendant/Counterclaim Plaintiff Bay Tek Entertainment, Inc. ("BTE") respectfully submits this Memorandum of Law in opposition to Plaintiff/Counterclaim Defendant Full Circle United, LLC's ("FCU") Motion for Leave to File a Third Amended Complaint (the "Proposed TAC"), dated December 21, 2022 (ECF No. 148, the "Motion").

## SUMMARY OF ARGUMENT

FCU's Motion offers its **fifth** pleading in this action, seeking to take a fifth bite at the apple without good cause after discovery has closed and BTE has filed for summary judgment. This highly prejudicial application also proposes new, entirely deficient claims; for all of these reasons the Motion should be denied.

First, notwithstanding that this Court denied FCU's last motion to file a new complaint asserting fraud and breach of contract based on a non-disclosure agreement that contained a Wisconsin forum selection clause, the new Proposed TAC is a thinly-veiled attempt to circumvent that Order and assert the same fraud claim, couched in allegations about disclosures of confidential information. Thus, it has been filed improperly, in disregard of this Court's Order.

Second, FCU cannot show good cause for this Motion under Rule 16 because the alleged facts upon which its new claims are purportedly premised have been known to FCU for many months and, in some instances, years. Moreover, BTE would suffer great prejudice by such a belated amendment—and the concomitant discovery that FCU seeks—at this stage of the case.

Third, each of FCU's new proposed claims fails to state a valid claim that could survive a Rule 12(b)(6) motion to dismiss. Thus, it would be futile for FCU to assert them.

As the Supreme Court has stated, a motion for leave to file an amended pleading under Rule 15 may be denied in a court's discretion for many reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). All of these grounds for denial are present here and leave should thus be denied.

## **PROCEDURAL HISTORY**

On July 28, 2020, FCU filed a 276-paragraph complaint (ECF No. 1) against BTE asserting three causes of action: (1) breach of the limited License Agreement, (2) breach of an alleged revenue share agreement; and (3) tortious interference with FCU's prospective business relations. (ECF No. 1). FCU amended the complaint twice to make changes to factual assertions (maintaining the same three causes of action), and the operative Second Amended Complaint was filed on November 13, 2020. ECF No. 52 (the "SAC").

On November 8, 2021, FCU sought leave to file a third amended complaint. (ECF No. 85). The proposed 307-paragraph pleading (ECF No. 85-1, "the "Initial Proposed TAC") sought to add BTE's chairman and owner, Larry Treankler ("Treankler"), as a defendant, and proposed **seven** causes of action: (1) fraud against BTE and Mr. Treankler for allegedly making misrepresentations to fraudulently induce FCU to execute and perform under a Nondisclosure Agreement ("NDA"); (2) breach of the NDA; (3) breach of a mutual non-compete clause at Paragraph 5.3 of the License Agreement; (4) breach of the License Agreement's Paragraph 7.2 "best efforts" provision; (5) breach of the implied covenant of good faith and fair dealing; (6) breach of an alleged revenue share agreement; and (7) tortious interference with prospective business relations. The motion was fully submitted on December 20, 2021. *See* ECF Nos. 91, 94, 97. While the motion was *sub judice*, the parties continued to engage in extensive discovery,[1]

---

[1] Pursuant to the Court's Order dated February 23, 2022, the scope of depositions encompassed

which was overseen by the appointed Special Master, Hon. Shirley W. Kornreich (Ret.), who issued nineteen discovery orders pertaining to disputes between the parties.

On August 4, 2022, BTE requested a pre-motion conference to move for summary judgment. ECF No. 128. The conference was held on November 29, 2022. ECF No. 146. Shortly thereafter, the Court issued an Order, *inter alia*, denying FCU's motion to amend on the ground that the claims for fraud and breach of the NDA are subject to the NDA's Wisconsin forum selection clause. *See* ECF No. 146. The Court ordered that "Full Circle may file a new motion to amend its complaint, **absent the fraud and breach claims relating to the NDA**, by December 20, 2022. Full Circle is reminded that adding factual detail to otherwise well-pleaded claims is not a proper ground for amendment." *Id.* (emphasis added).

On December 21, 2022, FCU filed the instant Motion for leave to file the Proposed TAC (ECF No. 148), which runs **356** paragraphs and seeks to bolster FCU's existing claims of breach of contract and tortious interference while proposing three additional claims: (1) fraud, for alleged misrepresentations and/or omissions by BTE that allegedly induced FCU to "continue to perform under the License Agreement and Revenue Share Agreement" so that BTE could "learn Full Circle's trade secrets and confidential information . . . to compete with Full Circle"; (2) breach of contract based on BTE's purported failure to undertake the "notice and cure" procedure set forth at Paragraph 11.6 of the License Agreement; and (3) cancellation of BTE's registration of the Skee-Ball® Live trademark for fraud.

On December 23, 2022, BTE filed its motion for partial summary judgment seeking, *inter alia*, judgment in BTE's favor on all of FCU's claims asserted in the operative SAC, and on certain of BTE's Counterclaims. ECF Nos. 149-54.

_____

the claims asserted in the Initial Proposed TAC pending decision on FCU's motion to amend.

# ARGUMENT

## I. THE MOTION SHOULD BE DENIED BECAUSE FCU FAILED TO COMPLY WITH THE COURT'S EXPLICIT ORDER

FCU's Motion should be summarily denied because it blatantly violates the Court's December 6, 2022 Order (ECF No. 146, the "Order").

The Proposed TAC tries to camouflage and resubmit the same fraud claim based on the NDA set forth in the Initial Proposed TAC, which was rejected by this Court. The Court's directive was unambiguous: "Full Circle may file a new motion to amend its complaint, **absent the fraud and breach claims relating to the NDA**[.]" (ECF No. 146) (emphasis added). Nonetheless, FCU's proposed new fraud claim is fixated on the same grievances about alleged improper disclosure of confidential information. For instance, FCU alleges that BTE and Mr. Treankler made "misrepresentations and omissions to induce Full Circle to continue to perform under the License Agreement and Revenue Share Agreement" to "*learn Full Circle's trade secrets and confidential information* . . . to compete with Full Circle." *See id.* at ¶¶ 329-30; *see also, e.g.*, ¶¶ 262-64 (alleging that "*Bay Tek had been sharing and continued to share Full Circle's confidential information* with Dimensional" and that "*Bay Tek shared information concerning Skee-Ball Live with its business partner*, Betson, again, without Full Circle's knowledge or authority.").[2] The Proposed TAC still even includes references to the NDA.

Further, FCU did not comply with this Court's directive that "adding factual detail to otherwise well-pleaded claims is not a proper ground for amendment" (ECF No. 146), as the Proposed TAC does just that. The Proposed TAC includes additional allegations regarding the

---

[2] Even this is misleading; Hampton's disclosure to Betson was for the purpose of seeking Betson's assistance in helping to scale FCU's business. *See* Declaration of Jeffrey M. Movit, dated January 3, 2023 ("Movit Decl."), Ex. 1 ("Hampton Tr."), at 313:14-25.

Skee-Ball® Mark (Proposed TAC ¶¶ 26-28, 36), BTE's general business (*see, e.g.*, *id.* at ¶ 33), and revisions to other paragraphs that have no bearing on the newly proposed claims (*see, e.g.*, *id.* at ¶¶ 41-43, 45, 47, 49- 53). Many of these are facts of which FCU was well aware since the inception of this litigation. *See, e.g.*, *id.* at ¶¶ 33-34, 85, 89, 91-92, 95-96, 112, 137-145, 149, 169, 208, 228-240, 286, 291, 296.

Lastly, the Order allowed FCU to "file a new motion to amend its complaint . . . by December 20, 2022." ECF No. 146. However, FCU filed its motion on December 21, 2022. *See* ECF No. 148. This is a separate basis to deny the Motion. *See Shervington v. Vill. of Piermont*, 732 F. Supp. 2d 423, 424 (S.D.N.Y. 2010) ("Because the motion was untimely, it is denied."); *Knoll v. Equinox Fitness Clubs*, 2007 WL 4526596, at *1 n.5 (S.D.N.Y. Dec. 20, 2007).

## II.     FCU CANNOT SHOW "GOOD CAUSE" UNDER RULE 16

FCU concedes that its proposed amendment long after the close of discovery must satisfy the "good cause" standard imposed by Fed. R. Civ. P. 15(a) and 16(b). Mtn. at 7-8; *Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013). "A party has not acted diligently where the proposed amendment to the pleading is based on information 'that the party knew, or should have known,' in advance of the deadline sought to be extended." *Cohen v. G & M Realty L.P.*, 2015 WL 1182712, at *4 (E.D.N.Y. Mar. 13, 2015) (citing cases). A court has discretion to consider other relevant factors including whether "the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, or the amendment would prejudice the defendant." *Baez v. Delta Airlines, Inc.*, 2013 WL 5272935, at *5 (S.D.N.Y. Sept. 18, 2013) (internal citation and quotation marks omitted). The moving party "bears the burden of demonstrating a satisfactory explanation for the delay." *Id.*

FCU's claim that it exercised diligence in obtaining facts supporting the Proposed TAC is

belied by the record.[3] Indeed, FCU's "new" theory underlying its fraud claim is the same unsupported and fanciful conspiracy theory it has espoused since it filed the Complaint. *See* Compl., ¶ 245 (ECF No. 1) ("Bay Tek's actions are intended to exhaust and frustrate FCU so it would capitulate to Bay Tek's offers that entailed giving up its Live Play License, or go out of business, so Bay Tek could operate Live Play itself.").

The Proposed TAC includes essentially no new facts that FCU has not known for months if not years. For example, the "newly obtained" emails FCU cites as "material misrepresentations and omissions" to support its new claims were produced in early October 2021, **over a month** before FCU made its first motion for leave. ECF No. 148 ("Motion" or "Mtn.") at p. 3. Moreover, many "newly discovered" facts alleged in the Proposed TAC reference events known to FCU **before** this litigation. *See, e.g.*, Exhibit A to Motion ("Proposed TAC") ¶¶ 137-45 (September 2017 meeting and emails in which FCU and Pavony participated); *id.* at ¶149 (September 2017 email on which Pavony was copied). And, FCU's new proposed cancellation claim is based on publicly available USPTO filings that **predate** this litigation. Proposed TAC, ¶¶ 228-240.

Even assuming *arguendo* that FCU did obtain new information on or immediately prior to the July 2022 close of discovery, FCU waited **five months** for this Court to render a decision on its initial motion, **after** the deadline to submit pre-motion summary judgment letters (ECF No. 128), with no indication it intended to assert these claims. That is delay—not diligence. FCU could have sought to supplement that filing with new information—tellingly, it did not.

FCU's untimely proposed amendment would also be highly prejudicial to BTE. *Baez v.*

---

[3] FCU blames BTE for allegedly engaging in discovery delay (which it did not). In fact, the Special Master repeatedly reined in FCU's overbroad and expansive discovery demands, including but not limited to seeking discovery into irrelevant aspects of BTE's business.

*Delta Airlines, Inc*., 2013 WL 5272935, at *7 (prejudice is one of "the most important reasons for denying a motion to amend"). Amendment is improper where it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or "significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A*., 626 F.3d 699, 725–26 (2d Cir. 2010). It is now 2023, and this litigation has been pursued for approximately two and a half years, with protracted motion practice and discovery of over 30,000 pages of documents, 13 depositions, and 19 Special Master Orders. Discovery closed by order of the Special Master in July 2022, and BTE filed a summary judgment motion under this Court's Scheduling Order. The Second Circuit has recognized it is "especially prejudicial" to allow a pleading to be amended after discovery has closed and after a defendant has filed a motion for summary judgment. *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998). FCU's vague reference to purported further additional discovery, without identifying the "three or four focused depositions" and "targeted document requests" (Mtn. at p. 10) it seeks, is also grounds to deny the Motion"[4] *Ortiz v. Case*, 2019 WL 1236413, at *10 (W.D.N.Y. Mar. 18, 2019), *aff'd*, 782 F. App'x 65 (2d Cir. 2019) (denying leave where plaintiff's delay of over a year was likely to prejudice defendants, "who face the potential of extensive discovery related to futile claims").

      Accordingly, FCU cannot meet its burden to show "diligence." The Motion can and should be denied for this reason alone.

---

[4] Importantly, the proposed claims arise from the same facts alleged in connection with the rejected fraud and NDA claims (*supra,* Section I), and discovery was already taken (13 depositions) under this Court's order allowing discovery related to the Initial Proposed TAC pending decision on FCU's motion to amend. Moreover, there are no newly learned facts in connection with the alleged notice and cure breach claim, or the registration cancellation claim.

**III. THE PROPOSED TAC FAILS TO STATE A VALID CAUSE OF ACTION FOR ANY OF FCU'S NEW PROPOSED CLAIMS**

**A.    The Proposed TAC Fails To State A Cause Of Action For Fraud**

FCU's latest attempt to assert a cause of action for fraud against BTE and Mr. Treankler is premised upon a jumble of scattershot allegations—none of which are new. These allegations appear to assert three separate theories (all legally insufficient) for purported fraud.

The first theory improperly recycles FCU's allegations in the Initial Proposed TAC as to BTE's alleged breach of an NDA between BTE and FCU. This directly violates the Court's Order, which only allowed FCU to seek leave to file a new complaint "**absent the fraud and breach claims relating to the NDA**[.]" ECF No. 146 (emphasis added). Nonetheless, the Proposed TAC alleges that BTE sought to trick FCU into disclosing its "confidential information" protected by the NDA, so that BTE could share it with third parties, including Dimensional. *See* Proposed TAC ¶¶ 262, 330. Tellingly, the new Proposed TAC maintains references to the NDA. *See* Proposed TAC ¶¶ 51, 89, 99, 135, 153, 180, 228, 259, 262, 330, 333.

The second theory is tied to conspiracy rhetoric espoused by FCU since day one, specifically that BTE purportedly "misrepresented and concealed existing facts for the purpose of **inducing Full Circle to continue performing** under the License Agreement and Revenue Share Agreement and therefore continue sharing its business plans and information and refrain from exercising its right under those agreements." Proposed TAC ¶ 257 (emphasis added); *see also* Proposed TAC ¶¶ 14, 266, 329, 336. FCU's assertion is **not** that it was fraudulently induced to **enter into** the License Agreement or alleged revenue share agreement, but rather that BTE allegedly misrepresented or concealed its past, present, and future performance or intent as to those contracts **after** they were entered into (or allegedly entered into), to "induce" FCU to **continue performing its preexisting contractual obligations**.

The third theory is a patently unavailing attempt to plead fraudulent inducement. Specifically, FCU alleges that it was fraudulently induced to consent to an assignment of the License Agreement from Skee-Ball, Inc. ("SBI") to BTE in December 2015, based upon an alleged "promise" by BTE to "make [FCU] custom lanes …." Proposed TAC ¶ 7. The Proposed TAC further alleges that "after obtaining [FCU's] consent [to the assignment] based on the promise [to make custom lanes]," BTE "reneged on the promise …." *Id.* at ¶¶ 7, 93, 94.

For the reasons set forth below, each fraud theory fails as a matter of law.

### 1. The Proposed TAC Improperly Reasserts FCU's Rejected Fraud Claim In Connection With The NDA

As set forth *supra*, FCU's first fraud theory is tied to its earlier proposed claims as to the NDA that the Court rejected. In particular, FCU alleges that BTE made "misrepresentations and omissions" to acquire FCU's business information, which BTE purportedly shared with third parties to compete with FCU. *See id.* at ¶¶ 329-30; *see also, e.g.*, *id.* at ¶¶ 262-64. This transparently repackages FCU's rejected earlier proposed pleading regarding alleged disclosure of FCU's purported confidential information—which claim can only be derived from the NDA. FCU should not be permitted to flout the Court's Order and add this fraud theory.

### 2. FCU's Claim Regarding BTE's Alleged Representations Of Past, Present, And Future Performance Under Existing Contracts Is Not Actionable As Fraud

FCU's second theory, based on purported misrepresentations by BTE regarding its past, present, and future performance under the parties' existing contracts (*i.e.*, the License Agreement and alleged revenue share agreement), is not actionable fraud as a matter of black letter law.

"To state a common law fraud in New York, a plaintiff must show that: [a] the defendant made a material false misrepresentation; [b] the defendant intended to defraud the plaintiff thereby; [c] the plaintiff reasonably relied upon the representation; and [d] the plaintiff suffered

damage as a result of such reliance." *Nielson Co. (U.S.) LLC v. Success Systems, Inc.*, 112 F.Supp.3d 83, 105 (S.D.N.Y. 2015). This is subject to Fed. R. Civ. P. 9(b), under which a plaintiff must (1) detail the statements (or omissions) the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent. *GWG MCA Cap., Inc. v. Nulook Cap., LLC*, 2019 WL 1084777, at *6 (E.D.N.Y. Mar. 7, 2019) (internal quotation marks and citation omitted).

Even if fraud is pled with particularity, courts in New York have "consistently held . . . that a cause of action for fraud does not arise when the only alleged fraud relates to a breach of contract." *Metro. Transp. Auth. v. Triumph Advert. Prods., Inc.*, 497 N.Y.S.2d 673, 675 (1st Dep't 1986); *see also Courageous Syndicate, Inc. v. People-to-People Sports Comm., Inc.*, 529 N.Y.S.2d 520, 521 (2d Dep't 1988) ("[T]his court has repeatedly observed that 'no cause of action to recover damages for fraud arises when the only fraud charged relates to a breach of contract.'") (citing cases); *FPP, LLC v. Xaxis US, LLC*, 764 F. App'x 92, 93–94 (2d Cir. 2019) ("Under New York law . . . a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract.") (internal quotation marks and citation omitted).

Accordingly, parallel fraud and contract claims may be brought only if the plaintiff "(1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." *GWG*, 2019 WL 1084777, at *5 (citing *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183–84 (2d Cir. 2007)). "A cause of action will be found to sound in tort rather than in contract only when the legal relations binding the parties are created by the utterance of a falsehood, with fraudulent intent and reliance

thereon, **and the cause of action is entirely independent of contractual relations between the parties**." *Lee v. Matarrese*, 793 N.Y.S.2d 457-58 (2d Dep't 2005) (emphasis added) (quoting *Hoydal v. City of New York*, 545 N.Y.S.2d 823, 824 (2d Dep't 1989)); *Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 290 (S.D.N.Y. 1995); *Guilbert v. Gardner*, 480 F.3d 140, 148 (2d Cir. 2007) ("The amended complaint, however, fails to support a claim of fraud under New York law because it is duplicative of the breach of contract claim.").

For this reason, courts consistently dismiss fraud claims where the alleged fraud concerns a misrepresentation of a party's intent to perform under an existing contract. *Doller v. Prescott, 91 N.Y.S.3d 533, 538 (3d Dep't 2018)* (failure to disclose intent with respect to future performance under contract, even if true, was not actionable as fraud); *Cronos Grp. Ltd. v. XComIP, LLC*, 64 N.Y.S.3d 180, 190 (1st Dep't 2017) ("The rule that an insincere promise to perform a contractual obligation is not actionable as fraud—absent which contract claims would be routinely pleaded in the alternative as fraud—guards against the erosion of the distinction between the two causes of action."); *Metro. Transp. Auth.*, 497 N.Y.S.2d at 675 (fraud claim alleging "only a breach of the representation of performance" and "subsequent assurance of performance" was redundant in light of breach of contract claim).

FCU alleges that BTE and Mr. Treankler "concealed Bay Tek's true intentions of not performing under the License Agreement or Revenue Share Agreement and terminating Full Circle's license" so BTE could "operate Live Play itself." Proposed TAC ¶¶ 5, 14, 333, 334. This is the same narrative FCU has recited since day one. *See* Compl., ¶ 245 (ECF No. 1) ("Bay Tek's actions are intended to exhaust and frustrate FCU so it would capitulate to Bay Tek's offers that entailed giving up its Live Play License, or go out of business, so Bay Tek could operate Live Play itself."). Only now is it the subject of an (improperly proposed) fraud claim.

BTE's alleged **intent to breach the parties' existing contracts** is the gravamen of the proposed fraud claim. According to FCU, BTE:

- Assured FCU that BTE was not seeking to operate Live Play, but purportedly was secretly planning to do so. That would be a breach of Paragraph 5.3 of the License Agreement, under which BTE agreed it would not compete with FCU by directly or indirectly operating, sponsoring, or endorsing a business involving Live Play. Proposed TAC ¶¶ 329, 330, 333, 334.

- Used FCU to obtain a "fraudulent" trademark registration for the ultimate purpose of entering the Live Play marketplace. Proposed TAC ¶¶ 329, 331.

- Concealed that it did not intend to honor the Alleged Revenue Share Agreement, even if FCU ultimately "proved the [business] model." Proposed TAC ¶ 331.

- Misled FCU to believe that BTE wanted to modify the License Agreement, when BTE purportedly was attempting to concoct a pretext to terminate it. Proposed TAC ¶ 332. This would be a breach of Paragraph 11 of the License Agreement, which sets forth the grounds on which the License Agreement may be terminated.

- Involved Dimensional in issues relating to the License Agreement in violation of the Settlement Agreement. Proposed TAC ¶ 334.[5]

Multiple of the foregoing are generalized allegations wholly deficient under 9(b). *See Genins v. Morgan Stanley & Co.*, 2004 WL 95783, at *2 (S.D.N.Y. Jan. 20, 2004) (dismissing fraud claims which did not indicate "what representations were made, to whom they were made, and when and where they were made.").

The Proposed TAC also purports to identify four affirmative misrepresentations

---

[5] FCU has not articulated what the damage of this would be, even if it were true.

**regarding BTE's performance under existing contracts**, alleging that:

- On September 6, 2017, Mr. Treankler falsely told FCU that BTE did not intend to operate Live Play.[6] Proposed TAC ¶¶ 137-143. This is the only allegation in the Proposed TAC of a purportedly fraudulent statement by Mr. Treankler.

- Ryan Cravens sent a September 2017 email to FCU falsely affirming BTE's "commitment to the Skee-Ball Live" project. Proposed TAC ¶ 145.

- April 2016 statements by BTE's former CEO, Gaetan Philippon, regarding whether the License Agreement was "separate" and "independent" from Dimensional, were false. Proposed TAC ¶ 260.

- Holly Hampton misrepresented BTE's reasons for not moving forward with the custom lanes project, which FCU contends BTE had agreed to undertake in the alleged revenue share agreement. Proposed TAC ¶ 269.[7]

Each of the foregoing is tied to an existing agreement (the License Agreement) or an alleged existing agreement (the alleged revenue share agreement), and in each case the alleged fraud relates to BTE's purported intent to breach same in the future. Lest there be any doubt, the Proposed TAC states that the purported misrepresentations and omissions were made for the

---

[6] The Proposed TAC alleges that the statements cited in ¶¶ 128-143 were uttered at two meetings on September 5 and 6, 2017. This is incorrect. The statements were all uttered at a meeting that took place on September 6, 2017, which FCU recorded on video.

[7] FCU fails to allege **any** other misrepresentation by **any current or former BTE employee**. Instead, FCU vaguely refers to "representations or omissions" by Bay Tek "officers and agents," but does not identify them, or the "officers and agents" that allegedly made them (aside from two generalized references to Mr. Treankler and Ms. Hampton). This does not meet the heightened pleading standards of fraud. *See Odyssey Re (London) Ltd. v. Sirling Cooke brown Holdings, Ltd.*, 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000); *see also Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 216 (S.D.N.Y. 2007); *Ellison v. Am. Image Motor Co., Inc.*, 36 F. Supp. 2d 628, 640-41 (S.D.N.Y. 1999).

purpose of "**concealing Bay Tek's true intentions of not performing under the License Agreement or alleged revenue share agreement**." Proposed TAC ¶ 14 (emphasis added). This is not actionable, and FCU's attempt to transform a contract claim into a duplicative tort claim is exactly what New York courts routinely prohibit.[8]

In its Motion, FCU cites legal authority it claims to support its theory that BTE "induced" FCU to "continue performing" under the parties' agreements. However, the Motion **exclusively** cites cases dealing with fraudulent inducement **to enter into an agreement in the first place— not to induce a party to "continue to perform" under an existing agreement**. *See Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 925–26 (2d Dep't 2014) (plaintiff successfully pleaded fraudulent inducement to **enter into contract**); *Starr v. Akdeniz*, 162 A.D.3d 948, 949 (2d Dep't 2018) (same); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954, 956 (1986) ("Involved in defendant's third counterclaim, therefore, is not a mere promissory statement as to what will be done in the future . . . rather a representation of present fact, not of future intent collateral to, **but which was the inducement for the contract**, and thus was neither duplicative of the second counterclaim[.]") (emphasis added; internal citation and quotation marks omitted); *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287 (1st Dep't 1999) (plaintiff pled it was fraudulently induced to enter into additional transactions); *RKB Enterprises Inc. v. Ernst & Young*, 182 A.D.2d 971, 972 (3d Dep't 1992) ("Here, plaintiff has alleged that it relied upon the advice and the opinion of defendants and was **thereby induced to enter into the contracts**[.]") (emphasis added). None of the foregoing support the proposition

---

[8] FCU's insertion of a boilerplate claim for punitive damages does not change this. *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, 84 N.Y.S.3d 157, 161 (1st Dep't 2018) ("A party cannot bootstrap a fraud claim seeking duplicative relief merely by alleging a potential for punitive damages.").

that FCU could have been fraudulently induced into continuing to perform its obligations under any agreements with BTE, as FCU already had a preexisting contractual duty to do so under the License Agreement and as alleged by FCU under the alleged revenue share agreement.[9]

### 3.    FCU's Claim That It Was Fraudulently Induced To Consent To The Assignment Of The License Agreement Fails As A Matter Of Law

FCU's third theory is that it was fraudulently induced by BTE to consent to the assignment of the License Agreement from SBI to BTE. FCU must prove "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Entertainment, LLC*, 2018 WL 1365690, at *3 (S.D.N.Y., Feb. 26, 2018) (internal quotation marks and citation omitted). FCU cannot do so.

FCU claims that in December 2015, BTE purportedly told FCU that if it consented to the assignment, BTE would manufacture custom lanes. But, FCU cannot show it relied to its detriment on any alleged misrepresentation made in connection with the assignment, or that it suffered resulting damage. The License Agreement does require FCU's consent if its licensor seeks to assign the License Agreement. Paragraph 9 only requires the **licensor's** consent if the **licensee** seeks to assign the agreement. It is not a two way street. FCU's only recourse in the

---

[9] FCU alleges that BTE committed fraud by omitting facts in discussions with FCU—most notably BTE's purported intent to breach the parties' existing agreements. In the case of fraud resting on alleged omissions, a plaintiff must allege facts giving rise to a duty to disclose. *See Odyssey*, 85 F. Supp. 2d at 296; *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 515 (S.D.N.Y. 2014). FCU alleges no such facts, and there is no such duty. Instead, the Proposed TAC, in conclusory and insufficient fashion, alleges that BTE and Mr. Treankler had "superior knowledge" of BTE's purported intent to breach the parties' agreements and failed to disclose same to induce FCU to "continue to perform" under said agreements. But, as explained *supra*, Section I.A.2, an alleged misrepresentation regarding future performance under a contract—whether via affirmative statements or failures to disclose—is not actionable as fraud.

event of a transfer by the licensor was to terminate the License Agreement. Paragraph 11.5 states that the License Agreement "may be terminated by FCU, at its option, if there is a transfer or assignment of SBI to any other person or entity[.]" Movit Decl., Ex. 2. This was stated in the consent to assignment form that FCU signed. Movit Decl., Ex. 3. Therefore, FCU had only two options: terminate the License Agreement (by declining to accept the assignment), or keep the License Agreement in force (by accepting the assignment). **FCU does not—because it cannot—allege that, but for BTE's purported misrepresentation, FCU would have elected to terminate the License Agreement.** Accordingly, FCU's fails to state a claim for fraud under this inducement theory.

### 4. FCU Fails To Plead Fraud Against Mr. Treankler

Aside from the September 6, 2017 statement by Mr. Treankler that FCU identified (discussed *supra*, Section III.A.2), FCU's only basis for trying to drag Mr. Treankler into this case is a conclusory allegation that he "has been an officer or director of Bay Tek, and directly controlled, authorized and benefitted from Bay Tek's conduct alleged herein." Proposed TAC ¶ 20. FCU attempts to buttress this in its Motion, declaring that Mr. Treankler "was directly involved with and controlled Bay Tek's decisions" as to the matters alleged, and that the alleged vague and deficient misrepresentations "were either made personally by Treankler, or at his direction and for his ultimate benefit." Mtn. at 13. These bald assertions, unsupported by any factual allegations, are insufficient to sustain a fraud claim against Mr. Treankler individually. *See Skydell v. Ares-Serono S.A.*, 892 F. Supp. 498, 501 (S.D.N.Y. 1995) (dismissing defendant where complaint failed to plead a misrepresentation or nondisclosure made by that defendant).

Mr. Treankler is not a party to the License Agreement or any oral agreement with FCU, and is not in privity with FCU. FCU's attempt to assert a fraud claim against him is clearly improper. As explained by New York's First Department, insincere promises to perform

16

contractual obligations are not actionable as fraud in order to "prevent the expansion of potential liability for conduct essentially constituting a breach of contract to persons and entities not in contractual privity with the plaintiff." *Cronos Grp.*, 64 N.Y.S.3d at 190 (emphasis added). Case after case has applied this principle to prevent using a tort claim to bring a corporate officer into a contract dispute. *See, e.g.*, *S.F.P. Realty Corp. v. G.S. Rockaway Dev., Inc.*, 614 N.Y.S.2d 443, 444 (2d Dep't 1994); *see also Courageous Syndicate*, 529 N.Y.S.2d at 521 ("[A] director of a corporation is not personally liable to one who has contracted with the corporation . . . merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken.") (citations and quotations omitted).

**B.**     **FCU's Claim For Breach Of Contract Based On A Purported Failure To Provide Notice And Opportunity To Cure Fails To State A Cause Of Action**

FCU belatedly attempts to plead breach of contract arising from BTE's alleged failure to undertake the License Agreement's "notice and cure" procedure. This fails for several reasons.

*First*, FCU's suggestion that BTE never provided notice is false. When BTE filed its Counterclaims, BTE sent a letter to FCU's counsel incorporating the Counterclaims by reference and specifically identified the various provisions of the License Agreement that it claimed FCU had breached. Movit Decl., Ex. 4. FCU in no way cured any breach following that letter.

*Second*, FCU has not identified any damage it suffered from this alleged breach. FCU merely claims it was "blindsided" by the Counterclaims and had to "expend tremendous resources to defend against them." That is not damage from BTE's purported failure to comply with Paragraph 11.6 because FCU did nothing, and still has done nothing to "cure" its incurable breaches. Instead it has compounded them since the filing of the Counterclaims. Indeed, in its Answer to the Counterclaims FCU established the futility of notice by denying any breach:

> Full Circle and Pavony specifically deny Full Circle has breached, or
> continues to breach, its obligations under the License Agreement and that

> the [sic] either or both of the Counterclaim Defendants have engaged in
> activity that has cheapened, disparaged, infringed upon, tarnished or
> diluted the Mark or harmed Bay Tek or the Mark. As for the remaining
> allegations in paragraph 53, denied.

FCU Answer to Counterclaims at ¶ 53 (ECF No. 53). FCU also asserted an Affirmative Defense

of "Condition Precedent / Failure to Give Notice and Opportunity to Cure." Nowhere in the

Answer or Affirmative Defenses did FCU allege that it would have cured its breaches but for

BTE's alleged failure to provide notice and an opportunity to cure, much less that FCU actually

had done so. Sending notice and waiting 30 days to sue therefore would have changed nothing;

the parties would be in the exact same position they are in now. Moreover, BTE did not

terminate the License Agreement but sought a declaration for a right to do so; until then FCU's

rights thereunder (including its limited rights to use the Skee-Ball Mark) remain undisturbed.[10]

*Third*, even though BTE sent a notice letter to FCU pursuant to Paragraph 11.6, it was not

required to do so. Courts have deemed compliance with notice and cure procedures in the face of

ongoing failures to cure (*i.e.*, continued breaches) to be "futile acts" or "useless gestures," and

have consistently held that compliance is not required in such circumstances. *See Wolff &*

*Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (strict

adherence to notice and cure provision would have been "useless act" in face of breaching

party's conduct); *City of New York v. Tavern on the Green Int'l LLC*, 351 F.Supp.3d 680, 693

(S.D.N.Y. 2018) (compliance with 20-business day notice and cure period before filing suit

would have been futile act due to defendant's ongoing failure to remove infringing statements

from website after being given notice). Such is the case here in light of FCU's failure to

---

[10] The few decisions BTE has located where a party was deemed to have breached a contract by
failing to adhere to a notice and cure procedure invariably involve termination of an agreement
without providing notice and an opportunity to cure. *See, e.g.*, *RKI Construction, LLC v. WDF
Inc.*, 2020 WL 6545915, at *19 (E.D.N.Y., Nov. 6, 2020). That, of course, did not happen here.

recognize no less cure its breaches, and because of its denials of breach.

### C. FCU's Proposed Claim For Trademark Cancellation Fails To State A Cause Of Action As A Matter Of Law

FCU's untimely effort to cancel BTE's trademark registration for "SKEE-BALL LIVE" (the "SBL Registration"), based on "fraud on the USPTO," fails to state a cause of action.

As FCU concedes, a cause of action for fraud in procuring a trademark registration requires clear and convincing evidence of **knowing** misrepresentations going to **material** facts, and occurs only where "an applicant knowingly makes false, material representations of fact in connection with his application … with the **intent to deceive the USPTO**." Mtn. at 15 (citing *MPC Franchise LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) (emphasis added). The purported fraudulent statements "may not be the product of mere error or inadvertence, but must indicate a **deliberate attempt to mislead the PTO**, and "the knowing misstatement must have been with respect to a material fact," *i.e.*, "**one that would have affected the PTO's action on the application[]**." Mtn. at 15 (emphasis added) (quoting *Orient Exp. Trading Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988)). Such a cause of action also must be alleged with particularity to meet the heightened pleading standards of Fed. R. Civ. P. 9(b). *A.V.E.L.A., Inc., v. Est. of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 480 (S.D.N.Y. 2017).

#### 1. FCU Lacks Standing To Assert A Cancellation Claim

To have standing to seek cancellation under Section 1119, "[a] petitioner … must show a real and rational basis for his belief that he would be damaged by the registration sought to be canceled, **stemming from an actual commercial or pecuniary interest in his own mark**." *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 473 (E.D.N.Y. 2008) (emphasis added) (quoting *Akhenaten v. Najee, LLC,* 544 F. Supp. 2d 320, 332 (S.D.N.Y.2008)).

FCU lacks standing because it has no trademark rights in "Skee-Ball Live." The License

Agreement is clear: any trademark uses by FCU of the "Skee-Ball" phrase—or related phrases such as "Skee-Ball Live"—inure to the benefit of the licensor and do not provide FCU with any trademark rights of its own. Paragraph 6 of the License Agreement provides in relevant part:

> SBI shall retain all ownership rights in the SK.EE-BALL Trademark. **All use of the SKEE-BALL Trademark, including the Licensed Uses, shall inure to the benefit of SBI. Nothing in this Agreement shall be interpreted as giving FCU any right, title, or interest in or to the SKEE-BALL Trademark**, other than the right to use the SKEE-BALL Trademark in accordance with the terms of this Agreement. No license or other interest of any kind in any of SBI's rights or property is granted to FCU, whether directly or indirectly, except as specifically provided herein. Any rights in or to the SKEE-BALL Trademark not licensed hereunder are fully reserved to SBI and shall remain the property of SBI, to be used in any manner SBI deems appropriate.

Movit Decl. Ex. 2 (emphasis added). Paragraph 4.2 similarly provides:

> …. [P]hrases and slogans … FCU may wish to adopt and use in the future solely and directly with Live Play, subject to prior written approval by SBI, which approval shall not be unreasonably withheld or delayed so long as the phrases or slogans pertain to Live Play and are consistent with the terms, conditions, exclusions and restrictions of this Agreement (collectively "Live Play Phrases and Slogans"). **No right is granted to FCU to ownership of the said Live Play Phrases and Slogans, it being understood that FCU is granted a license to use the SKEE-BALL Trademark in connection with such Live Play. All such use of the Phrases and Slogans inures to the ownership rights of SBI in its trademark.** FCU will not seek to register, or otherwise assert an ownership interest or right in any such Live Play Phrases and Slogans referred to herein or subsequently approved and used in the Live Play business.

Movit Decl. Ex. 2 (emphasis added). Accordingly, FCU's lack of any trademark ownership rights whatsoever in "Skee-Ball Live," is sufficient in and of itself to deprive FCU of standing.

Paragraph 4.2 (quoted immediately above) also makes clear that FCU is forbidden from using Live Play Phrases and Slogans—including but not limited to "Skee-Ball Live"—without BTE's express approval. Thus, regardless of whether "Skee-Ball Live" is a validly registered

trademark, FCU cannot use it without BTE's permission. For this reason as well, FCU lacks standing. *Yurman Design Inc. v. Chaindom Enterprises, Inc.*, 2000 WL 897141, at *4 (S.D.N.Y. July 5, 2000) ("The petitioner [for cancellation] must be one 'who believes that he is or will be damaged by the registration of a mark on the principal registry.'") (citing 15 U.S.C. § 1064).

Moreover, challenging BTE's trademark rights in "Skee-Ball Live" breaches the License Agreement and Settlement Agreement. Unquestionably, FCU is trying to arrogate rights for itself to use that mark. This violates Paragraph 4.2 of the License Agreement, which prohibits FCU from "assert[ing] an ownership interest or right in any such Live Play Phrases and Slogans referred to herein or subsequently approved and used in the Live Play business." Moreover, FCU has breached Paragraph 2 of the License Agreement and Paragraph 3 of the Settlement Agreement, both of which prohibit FCU from challenging the legal validity or sufficiency of the "SKEE-BALL Trademark" or the SKEE-BALL Registration." Movit Decl., Ex. 2.

Accordingly, FCU lacks standing to seek cancellation of the SBL Registration.

> **2.** **The Proposed TAC Fails To Allege Any False Representation Of Fact—Let Alone A Knowing Misrepresentation—That Would Have Affected The USPTO's Granting Of A Trademark Registration**

The Proposed TAC fails to allege any misrepresentations of fact in BTE's trademark registration filings, let alone any material and knowing misrepresentation that would have affected the USPTO's decision to grant the Skee-Ball Live Trademark Registration. FCU attempts to plead two purported "misrepresentations" by BTE in connection with its trademark registration application for "Skee-Ball" Live. Both fail.

First, FCU alleges that BTE provided a materially false description of the goods bearing the Skee-Ball Live trademark on its registration application, by describing them as: "Arcade redemption game machines which dispense tickets **or the like** to successful players" (emphasis added). FCU alleges that this description was false because the ten lanes that were delivered to

FCU and shown in the specimens submitted to the USPTO purportedly did not "dispense tickets." However, the description provided by BTE was accurate, and devoid of any misrepresentation. FCU pleads no facts to support why the operation of the "Live Play" lanes shown in the specimens would not qualify as "machines which dispense tickets **or the like** to successful players"—*e.g.*, by providing acknowledgment of achievement to successful players. *See* Proposed FAC ¶ 153 ("The Skee-Ball Live Prototype Lanes featured proprietary software that allowed for new types of gameplay and **tracked** rolling **achievements**") (emphasis added). Moreover, FCU pleads no facts as to why this particular description was material—*i.e.*, why it would have induced the USPTO to grant a trademark registration that it otherwise would not have granted. Nor does BTE plead facts, let alone facts sufficient to satisfy the stringent standards of Rule 9(b), regarding why this purported misrepresentation was knowing.

Second, the Proposed TAC alleges that BTE made a materially false representation "[b]y swearing under penalty of perjury that BTE had used its SKEE-BALL Live Mark in commerce [by October 25, 2017] when this was in fact untrue …."  Proposed TAC ¶ 329. As a matter of law, based upon FCU's own admissions, this statement did not constitute any type of misrepresentation by BTE, let alone a knowing and material misrepresentation. The Proposed TAC admits that: (a) machines emblazoned with "SKEE-BALL LIVE" were delivered by BTE to FCU on October 18, 2017; (b) the machines were then used with the approval of BTE at a public tournament called the "BEEB" on October 26-29, 2017; and (c) the machines remained in use thereafter by the public pursuant to a license granted by BTE to FCU.  *See* Proposed TAC ¶¶ 119, 151, 236.[11] These admissions are sufficient to establish that BTE's statement to the

---

[11] In paragraph 230 of the Proposed TAC, FCU inconsistently alleges that the machines were delivered by BTE to FCU on October 25, 2017, instead of on October 18, 2017, as the Proposed TAC elsewhere alleges (*see* Paragraph 151). The date in paragraph 230 of the Proposed TAC

USPTO was truthful and accurate. *See, e.g.*, *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271 (2d Cir.1974) ("Adoption and a single use of the mark may be sufficient to entitle the user to register the mark[.]"); *Bertolli, USA, Inc. v. Filippo Bertolli Fine Foods*, 662 F. Supp. 203, 205 (S.D.N.Y. 1987) ("To meet the definition of 'use in commerce' it is sufficient that the goods be transported in commerce.") (citing 15 U.S.C. § 1127).[12]

In an attempt to avoid FCU's own dispositive admissions, the Proposed TAC misquotes and mischaracterizes the deposition testimony of Mr. Treankler and Ms. Hampton. Mtn. at 2-4, 16, Proposed TAC ¶¶ 264, 343-44.[13] Specifically, the Proposed TAC misleadingly alleges in Paragraphs 343 and 344 that "Treankler testified that 'there is no Skee-Ball Live Lane'" and "Hampton testified during her deposition that Bay Tek has no plans to use the SKEE-Ball Live Mark in any way." In actuality, Mr. Treankler testified as follows:

> Q. Have you ever had any communications via email with Larry Seidman about revenue generated by the Skee-Ball Live lanes prior to this litigation?
>
> MS. LEPERA: Object to the form of the question.
>
> THE WITNESS: Yeah, there is no Skee-Ball Live lane. **That's our trademark.** But what was the question?

---

appears to be a typographical error by FCU. However, regardless of what date in October 2017 the lanes were actually delivered to FCU, its claim against BTE for purported fraud on the USPTO still would fail for all of the reasons discussed herein.

[12] Even if, *arguendo*, the date of use in BTE's trademark registration application had been inaccurate, that would not have constituted a material misrepresentation—let alone fraud on the USPTO—because it would not have affected the USPTO's decision to grant a trademark registration. *Haggar Int'l Corp. v. United Co. for Food Indust. Corp.,* 906 F. Supp. 2d 96 (E.D.N.Y. 2012) ("Even if [the registrant] provided an inaccurate date of first use in its 1989 trademark application, this alone does not constitute fraud on the USPTO.") (citing *Mister Leonard, Inc. v. Jacques Leonard Couture, Inc.*, 23 U.S.P.Q.2d 1064 (T.T.A.B. 1992)).

[13] Because the Proposed TAC cites the deposition testimony of Mr. Treankler and Ms. Hampton, the transcripts of their actual testimony are incorporated by reference into the Proposed TAC, and they may be considered by the Court in adjudicating this motion.

Movit Decl., Ex. 5, at 124:1-8 (emphasis added). This testimony in no way contradicts the accurate statement on BTE's trademark registration application that BTE had used its SKEE-BALL Live Mark in commerce by October 25, 2017. Similarly, Ms. Hampton testified:

> Q. Are there any plans by Bay Tek to build more Skee-Ball Live lanes?
> A. No.
> Q. Are there any plans by Bay Tek to use the Skee-Ball Live mark in any -- any way?
> A. No.

Hampton Tr., 532:20-25. Her testimony simply affirmed that as of June 2022, BTE had "no plans" to "use" the Skee-Ball Live Mark on a prospective basis.

These statements, made by non-attorneys, have no bearing on the truthful and accurate representations of BTE's trademark counsel to the USPTO in 2017 and 2018 attesting to use in commerce of the Skee-Ball Live mark. They certainly do not support a claim by FCU for fraud on the USPTO, particularly under the stringent standards of Rule 9(b).[14]

### 3. The Proposed USPTO Claim Is Barred Under The Doctrine of Licensee Estoppel

"Licensee estoppel is an equitable doctrine that bars a licensee from disputing the validity of the licensor's trademark on the theory that in entering the agreement, the licensee has assented to the validity of the mark." *HSW Enters., Inc. v. Woo Lae Oak, Inc.*, 2009 WL 4823920, at *2 (S.D.N.Y. Dec. 15, 2009). "A 'no challenge' provision in a license agreement … makes the [licensee] estoppel clear and explicit." *Id.* (citation omitted). Here, ***both*** the Settlement

---

[14] FCU further alleges, improperly, that in January 2019, BTE asked FCU to "operate under the Brewskee-Ball brand and not the Skee-Ball Live brand," and that when asked if BTE had "plans for the Skee-Ball Live brand," Treankler responded "We don't currently have any plans to do anything with the Skee-Ball LIVE brand." Proposed TAC ¶¶ 239-240. These statements are not only irrelevant, they also were made at a settlement negotiation meeting and therefore should not have been quoted by FCU, and do not constitute admissions in any event.

Agreement and License Agreement include express no-challenge provisions. *See* Movit Decl., Ex. 6, at ¶ 3; Ex. 2 at ¶ 2.

Courts in the Second Circuit apply the so-called "*Lear* balancing test" to determine whether licensee estoppel should apply. *Capri Sun GmbH v. American Beverage Corp.*, 414 F. Supp. 3d 414, 424-26 (S.D.N.Y. 2019); *HSW Enters.*, 2009 WL 4823920 at *2. This requires a "balancing of the public interest in favor of challenging invalid trademarks against the private interest in predictable contractual relationships." *Id*. (citation omitted). This test may be applied as a matter of law at the pleadings stage. *Capri Sun*, 414 F. Supp. 3d at 423.

Here, the *Lear* test strongly favors application of the licensee estoppel doctrine to preclude FCU's proposed claim as a matter of law. "… [T]he case law" applying the *Lear* test "generally holds the public interest served by assuring the validity of a trademark as insufficient to overcome implied or express estoppel." *Capri Sun*, 414 F. Supp. 3d at 426, citing *HSW Enters.*, 2009 WL 4823920, at *3 (citing *Idaho Potato Comm'n*, 335 F.3d at 136). Indeed, under the *Lear* test, a licensee "will be held to his contract unless enforcement of the contract would result in injury to the public through confusion," that would **"threaten [the public's] health or safety."** *Capri Sun*, 414 F. Supp at 427 (internal quotation marks and citations omitted; emphasis added). The Proposed TAC does not, and cannot, allege that the registration of "SKEE-Ball Live" is a threat to public "health or safety." Licensee estoppel should apply as a matter of law.

## CONCLUSION

For the foregoing reasons, FCU's Motion should be denied.

DATED:  New York, New York
            January 3, 2023

Respectfully submitted,

M<small>ITCHELL</small> S<small>ILBERBERG</small> & K<small>NUPP</small> LLP


By: /s/ Jeffrey M. Movit_____
     Christine Lepera (ctl@msk.com)
     Jeffrey M. Movit (jmm@msk.com)
     Mark Humphrey (mxh@msk.com
     Elaine Nguyen (eln@msk.com)
     437 Madison Ave., 25th Floor
     New York, New York 10022-7001
     Telephone: (212) 509-3900
     Facsimile: (212) 509-7239

     *Attorneys for Bay Tek Entertainment, Inc.*