## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

FULL CIRCLE UNITED, LLC,

        *Plaintiff*,

        v.

BAY TEK ENTERTAINMENT, INC.,

        *Defendant*.

Civ. Action No. 1:20-cv-03395

---

BAY TEK ENTERTAINMENT, INC.,

        *Counterclaim Plaintiff*,

        v.

FULL CIRCLE UNITED, LLC,

        *Counterclaim Defendant*,

        and

ERIC PAVONY,

        *Additional Counterclaim Defendant*.

**FULL CIRCLE UNITED, LLC AND ERIC PAVONY'S**
**AMENDED MEMORANDUM OF LAW IN OPPOSITION TO**
**BAY TEK ENTERTAINMENT, INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS.............................................................................................2

LEGAL STANDARD ..................................................................................................11

ARGUMENT................................................................................................................12

    A. BTE Has Failed to Establish it is Entitled to Summary Judgment on
       FCU's Claims. ...............................................................................................12

      i. BTE is not entitled to Summary Judgment on FCU's Claim for Breach
         of the License Agreement....................................................................12

        a. BTE is Not Entitled to Summary Judgment on FCU's Claim for
          Breach of 4.2 of the License Agreement .......................................12

        b. BTE is Not Entitled to Summary Judgment on FCU's Claim for
          Breach of 5.3 of the License Agreement .......................................13

        c. BTE is Not Entitled to Summary Judgment on FCU's Claim for
          Breach of 7.2 or on its Claim for Breach of the Implied Covenant of
          Good Faith and Fair Dealing..........................................................15

      ii. BTE is Not Entitled to Summary Judgment on FCU's Claim for
         Breach of the Oral Revenue Share Agreement...................................18

      iii. A Genuine Issue of Material Fact Exists as to Whether there was a
         Meeting of the Minds, Precluding Entry of Summary Judgment........19

      iv. A Genuine Issue of Material Fact Exists as to Whether the New York
         Uniform Commercial Code's Statute of Frauds Applies, and the Statute
         of Frauds is Satisfied in Any Event ...................................................21

    B. BTE is Not Entitled to Summary Judgment on FCU's Claim for
       Tortious Interference .....................................................................................24

    C. FCU Has Established its Entitlement to Lost Profits ................................25

    D. FCU Has Established its Loss with Reasonable Certainty .......................26

E. Plaintiff's Lost Profits Damages Were Fairly Within the Contemplation of the Parties. ...............................................................................................................32

    i. BTE Fails to Disprove that FCU is Entitled to Lost Profits Arising from BTE's Tortious Interference With Contract...................................................34

F. BTE Has Failed to Establish it is Entitled to Summary Judgment on its Counterclaims Against FCU ......................................................................................36

    i. BTE Has Not Demonstrated it is Entitled to Summary Judgment on its Contractual Counterclaims ................................................................................36

        1. Vulgar Phrases and Slogans and Unauthorized Use of Third-Party Trademarks in Connection with Mark..............................................39

        2. FCU Did Not Fail to Promote the Licensed Uses ............................................43

        3. FCU Satisfied its Obligation to Use Best Efforts to Create a Live Play Network ...........................................................................................43

        4. Live Play Sponsorships and Endorsements .....................................................44

    ii. BTE is Not Entitled to Declaratory Relief as a Matter of Law ......................44

        1. The License Agreement is Not Terminable at Will .........................................44

        2. BTE is Not Entitled to Terminate the License Agreement due to "FCU's Incurable Breaches" and Cannot Side-Step the Contracted-For Notice and Cure Provision ...........................................................................46

    iii. BTE Has Not Demonstrated it is Entitled to Summary Judgment on its Non-Contractual Counterclaims. ..................................................................46

    iv. FCU's Plays on Skee Are Protected under *Rogers*...............................................48

    v. BTE's Counterclaims are Barred by the Doctrines of Laches, Acquiescence, and Estoppel. ...............................................................................51

    vi. Pavony is Not Individually Liable .....................................................................56

CONCLUSION...........................................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
  2013 WL 5510770 (S.D.N.Y. Sept. 27, 2013) ........................................................ 32

*Abularach v. High Wing Aviation LLC*,
  2022 WL 18558800 (E.D.N.Y. Dec. 19, 2022) ..................................................... 18

*Ackerman v. Landes*,
  112 A.D.2d 1081 (2d Dep't 1985) ......................................................................... 19

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
  738 F.3d 960 (9th Cir. 2013) ................................................................................. 26

*AM Gen. LLC v. Activision Blizzard, Inc.*,
  450 F. Supp. 3d 467 (S.D.N.Y. 2020) .................................................................... 45

*Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*,
  2022 WL 2905368 (S.D.N.Y. July 22, 2022) ......................................................... 18

*Argus Rsch. Grp., Inc. v. Argus Media, Inc.*,
  562 F. Supp. 2d 260 (D. Conn. 2008) (applying New York law) .......................... 48

*Ashland Management Inc. v. Janien*,
  82 N.Y.2d 395 (1993) ...................................................................................... 23, 32

*Atateks Foreign Trade Ltd. v. Priv. Label Sourcing, LLC*,
  2009 WL 1803458 (S.D.N.Y. June 23, 2009) .................................................. 23, 31

*Awards.com, LLC v. Kinko's, Inc.*,
  42 A.D.3d 178 (1st Dep't 2007) ............................................................................ 31

*Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
  10 N.Y.3d 187 (2008) ............................................................................................ 32

*Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*,
  2007 WL 2914452 (S.D.N.Y. Oct. 5, 2007) .......................................................... 49

*Brown v. Sixteen, Inc.*,
  2009 WL 1159161 .................................................................................................. 49

*Celebrity Cruises Inc. v. Essef Corp.*,
  478 F. Supp. 2d 440 (S.D.N.Y. 2007) .................................................................... 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 10

*Champion v. Moda Operandi, Inc.*,
  561 F. Supp. 3d 419 (S.D.N.Y. 2021) .................................................................... 45

*Chemtex, LLC v. St. Anthony Enterprises, Inc.*,
  490 F. Supp. 2d 536 (S.D.N.Y. 2007) .................................................................... 19

*Cliffs Notes v. Bantam Doubleday Dell Publ. Group*,
　886 F.2d 490 (2d Cir. 1989) ................................................................. 46

*Coastal Aviation, Inc. v. Commander Aircraft Co.*,
　937 F. Supp. 1051 (S.D.N.Y. 1996) ...................................................... 23

*Columbia v. Columbia/HCA Healthcare Corp.*,
　964 F.Supp. 733 (S.D.N.Y. 1997) ....................................................49, 51

*Conopco, Inc. v. Campbell Soup*,
　95 F.3d 187 (2d Cir. 1996) ...............................................................49, 51

*D'Amico v. City of New York*,
　132 F.3d 145 (2d Cir. 1998) ................................................................. 10

*Dorset Indus., Inc. v. Unified Grocers, Inc.*,
　893 F. Supp. 2d 395 (E.D.N.Y. 2012) ................................................... 15

*Easter Unlimited, Inc. v. Rozier*,
　2021 WL 4409729 (E.D.N.Y. Sept. 27, 2021) ...................................... 47

*Ebony Media Operations, LLC v. Univision Commc'ns Inc.*,
　2019 WL 8405265 (S.D.N.Y. June 3, 2019) ......................................... 46

*Eppendorf-Netheler-Hinz GMBH v. Enterton Co. Establishment, et al.*,
　89 F. Supp. 2d 483 (S.D.N.Y. 2000), *aff'd* 14 Fed. Appx. 102 (2d Cir. 2001) ....................... 52

*Financial Tech. Int'l, Inc. v. Smith*,
　247 F. Supp. 2d 397 (S.D.N.Y. 2002) ................................................... 21

*Gem Fin. Serv., Inc. v. City of New York*,
　2022 WL 409618 (E.D.N.Y. Feb. 10, 2022) .......................................... 26

*Gold v. Att'y Gen . of N.Y.*,
　870 F.3d 89 (2d Cir. 2017) ................................................................... 46

*Grotian, Helfferich, Schulz, Th. Steinway Nachf. v. Steinway and Sons*,
　365 F. Supp. 707 (S.D.N.Y. 1973), *modified*, 523 F.2d 1331 (2d Cir. 1975) ......................... 51

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
　50 N.Y.2d 183 (1980) ........................................................................... 31

*Havel v. Kelsey–Hayes Co.*,
　83 A.D.2d 380, 445 N.Y.S.2d 333 (4th Dep't 1981) ............................ 15

*Hermes Int'l v. Rothschild*,
　2023 WL 1458126 (S.D.N.Y. Feb. 2, 2023) .......................... 45, 46, 47, 48

*Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc.*,
　2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010) .......................................... 23

*Hold Bros, Inc. v. Hartford Cas. Ins. Co.*,
　357 F.Supp.2d 651 (S.D.N.Y. 2005) ..................................................... 29

*In re Best Payphones, Inc.*,
　432 B.R. 46 (S.D.N.Y. 2010), *aff'd*, 450 F. App'x 8 (2d Cir. 2011) ..................26, 30

*In re Gen. Motors LLC Ignition Switch Litig.*,
2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018) ....................................................... 25

*In re Signature Apparel Grp. LLC*,
2015 WL 1009452 (Bankr. S.D.N.Y. Mar. 4, 2015) ......................................... 25

*Indeck Energy Servs., Inc. v. Merced Cap., L.P.*,
159 N.Y.S.3d 405 (1st Dep't 2021) ................................................................... 24

*Indeck Energy Servs., Inc. v. Merced Cap., L.P.*,
2020 WL 6081952 (N.Y. Sup. Ct. Oct. 15, 2020) ............................................. 28

*International Telecom, Inc. v. Generadora Electrica Del Oriente*,
2004 WL 784941 (S.D.N.Y. Apr. 13, 2004) ................................................26, 30

*Int'l Minerals and Res., S.A. v. Bomar Res., Inc.*,
5 Fed. Appx. 5 (2d Cir.2001) ............................................................................ 32

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ................................................... 50

*Kenford*,
73 N.Y.2d 540 N.Y.S.2d 1, 537 N.E.2d 176 ..................................................... 29

*Koch Indus., Inc. v. Aktiengesellschaft*,
727 F. Supp. 2d 199 (S.D.N.Y. 2010) ............................................................... 23

*Lopez v. Bonanza.com, Inc.*,
2019 WL 5199431 (S.D.N.Y. Sept. 30, 2019) ................................................. 44

*Lops v. YouTube, LLC*,
2023 WL 2349597 (D. Conn. Mar. 3, 2023) ..................................................... 43

*Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*,
868 F. Supp. 2d 172 (S.D.N.Y. 2012) ............................................................... 46

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
674 F. App'x 16 (2d Cir. 2016) ....................................................................46, 47

*McDonald's Corp. v. Druck & Gerner, DDS., P.C.*,
814 F. Supp. 1127 (N.D.N.Y. 1993) ................................................................. 51

*Morris v. Lindau*,
196 F.3d 102 (2d Cir. 1999) .............................................................................. 10

*Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd.*,
2019 WL 4735426 (S.D.N.Y. Sept. 27, 2019) (dismissing ............................. 54

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
980 F. Supp. 2d 400 (E.D.N.Y. 2013) ............................................................... 24

*New Era Publications Inter'l v. Henry Holt and Co., Inc.*,
873 F.2d 576 (2d Cir. 1989), *cert. denied*, 493 U.S. 1094 (1990).................. 51

*Playtex Prod., Inc. v. Procter & Gamble Co.*,
2003 WL 21242769 (S.D.N.Y. May 28, 2003), *aff'd*, 126 F. App'x 32 (2d Cir. 2005) ........... 26

*Precise Marketing Corp. v. Simpson Paper Co.*,
  1999 WL 259518 (S.D.N.Y. Apr. 30, 1999) ................................................................ 23

*Process Am., Inc. v. Cynergy Holdings, LLC*,
  839 F.3d 125 (2d Cir. 2016) ...................................................................................... 23

*ProFitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy P.C.*,
  314 F.3d 62 (2d Cir. 2002) ........................................................................................ 50

*Regal Custom Clothiers, Ltd. v. Mohan's Custom Tailors, Inc.*,
  1997 WL 370595 (S.D.N.Y. July 1, 1997) ................................................................. 19

*Reynolds v. Lifewatch, Inc.*,
  136 F. Supp. 3d 503 (S.D.N.Y. 2015)........................................................................ 54

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ...................................................................................... 45

*Rowe v. Great Atl. & Pac. Tea Co.*,
  46 N.Y.2d 62 (1978) .................................................................................................. 15

*Saratoga Vichy Spring Co., Inc. v. Lehman*,
  625 F.2d 1037 (2d Cir. 1980) .................................................................................... 49

*Saratoga*,
  625 F.2d............................................................................................................... 49

*Sir Speedy, Inc. v. L & P Graphics, Inc.*,
  957 F.2d 1033 (2d Cir. 1992) ..............................................................................23, 28

*Starr v. Freeport Dodge, Inc.*,
  54 Misc. 2d 271 (Dist. Ct., N.Y. Co. 1967) .............................................................. 18

*Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.*,
  925 F. Supp. 212 (S.D.N.Y. 1996) ............................................................................ 51

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010)......................................................................................... 43

*Toltec Fabrics, Inc. v. Aug. Inc.*,
  29 F.3d 778 (2d Cir. 1994) ........................................................................................ 23

*Townsquare Media, Inc. v. Regency Furniture, Inc.*,
  2022 WL 4538954 (S.D.N.Y. Sept. 28, 2022) ......................................................19, 20

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007)......................................................................................... 22

*Trademark Rsch. Corp.*,
  995 F.2d................................................................................................................. 26

*TSNY Mgmt*,
  2010 WL 11627255 ................................................................................................... 21

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) .................................................................................... 45

*Wamser v. Bamberger,*
   101 Wis. 2d 637 (Ct. App. 1981) ........................................... 19

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.,*
   *178 F. Supp. 655 (S.D.N.Y. 1959), aff'd, 280 F.2d 197 (2d Cir. 1960)* ............................ 41, 42

*Washington v. Kellwood Co.,*
   2015 WL 6437456 (S.D.N.Y. Oct. 14, 2015) ....................................... 24

*Wathne Imports, Ltd. v. PRL USA, Inc.,*
   101 A.D.3d 83 (1st Dep't 2012) ................................................ 24

*Williamson v. Delsener,*
   59 A.D.3d 291 (1st Dep't 2009) ............................................... 21

## Statutes

15 U.S.C. § 1115(b)(9) ............................................................ 48

New York Uniform Commercial Code Section 2-201 ............................ 18

§2-201(3)(c) ....................................................................... 18

## Rules

CPLR 2104 .......................................................................... 21

Fed. R. Civ. P. 56(c) ............................................................ 10

Fed. R. Civ. P. 56(e) ............................................................ 10

## Other Authorities

Restatement of Torts (Second) Section 774A (1977) ............................ 32

Restatement of Torts (Second) Section 774A comt ............................. 32

UCC § 2–201(3)(c) ................................................................. 19

Plaintiff/Counterclaim Defendant Full Circle United, LLC ("FCU") and Counterclaim Defendant Eric Pavony ("Pavony") submit this Memorandum of Law in Opposition to Bay Tek Entertainment, Inc.'s ("BTE") Motion for Summary Judgment on the Second Amended Complaint of Full Circle United, LLC and on certain of BTE's Counterclaims against FCU (ECF No.150). At the November 29, 2022 Pre-Motion Conference, the Court converted BTE's pending Motion for Judgment on the Pleadings to a Motion for Summary Judgment and permitted supplemental briefing. (ECF No. 146).[1]

## PRELIMINARY STATEMENT

Famously, *Rashomon* tells how three witnesses at a trial told three different versions of the same events in a forest that led to the death of a samurai. BTE's summary judgment papers bring *Rashomon* to mind because it seems BTE believes it can elevate to the status of uncontestable truth one version of how the samurai died.

The reality is that every material fact in this case is disputed. Depositions are replete with conflict between the testimony and written emails, other sworn statements, video recordings, and prior conduct of the parties and predecessors. It is for the jury to decide who killed the samurai in this case.

BTE's arguments are frequently based on mere incompletion. BTE will say something akin to "the man was driving with his headlights off" to suggest he has done something wrong but fail to mention it was daytime and the Sun was shining. Or BTE will obfuscate by using cleverly named defined terms to create false impressions and hide disputed facts within the broadly defined terms,

---

[1] On September 30, 2020, BTE filed a Motion for Judgment on the Pleadings on FCU's Complaint. (ECF No. 34). FCU opposed on October 28, 2020 (ECF No. 44), and BTE filed a Reply on November 23, 2020 (ECF No. 54). FCU incorporates herein these prior submissions.

such as when BTE defines "Standard Lanes" with a tricky setup that attempts to insert the term "stock lane" into the parties' contract. BTE also creates straw men. For example, BTE argues a claim for breach of the contractual provision requiring BTE to make "Custom Lanes" fails because that contractual provision does not exist. That may be, but nobody has brought that claim in this case. Finally, while BTE declined to bring a *Daubert* motion, BTE argues FCU's respected damages expert's methodology is suspect, without mentioning she computed lost profits based on a four-year track of earnings data.

In its motion, BTE has not taken a well-aimed rifle shot based on a few key indisputable facts that could trigger a resolution of the case on a pure issue of law. Instead, BTE has taken a shotgun approach to summary judgment, hoping the Court becomes lulled by the scattered analysis into usurping the jury's function.

## STATEMENT OF FACTS[2]

Bowling is an alley roller game that has spawned local and national leagues, tournaments, and television and Internet broadcasts promoting league events, among other things. (Pavony Decl. ¶5)[3] Recently, cornhole has blossomed into a nationwide phenomenon offering similar local and national promotion of the sport. (*Id.* at ¶6) These local and national leagues and tournaments are sometimes referred to as "Live Play." (*Id.* at ¶7)

More than 15 years ago, FCU came up with the idea of Live Play for Skee-Ball and began to operate adult leagues under the name "Brewskee-Ball," which FCU registered as a trademark.

---

[2] The following abbreviations will be used: BTE's Statement of Undisputed Facts ("SUF"); FCU and Pavony's Amended Response to BTE's Statement of Undisputed Facts ("RSUF"); FCU and Pavony's Amended Counterstatement of Material Facts ("CSUF"); and Amended Supplemental Declaration of Paul Thanasides ("Am. Thanasides MSJ Decl.").

[3] Declaration of Eric Pavony in Support of Opposition to Summary Judgment, Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 ("Pavony Decl.").

(*Id.* at ¶8; CSUF ¶¶6-8,10-12) FCU's founder owns two bars, one in Brooklyn, New York, and another in Austin, Texas, where FCU hosts Live Play. (*Id.* at ¶10) Brewskee-Ball became popular right away after FCU launched it. (*Id.* at ¶9)

In 2012, FCU introduced scoring technology to Brewskee-Ball, allowing players to track scores and other statistics, which fostered competition between players and across leagues. (*Id.* at ¶11, CSUF ¶14) Beginning in 2006, Brewskee-Ball used the Internet and social media to promote its Skee-Ball leagues, events, tournaments and competitions, and filmed and broadcasted Brewskee-Ball events and competitions. (*Id.* at ¶12, CSUF ¶15). Brewskee-Ball started using television to promote Live Play in 2007, and radio starting in 2010. (Pavony Decl. ¶12, CSUF ¶15) FCU earned significant revenue from the use of the lanes as a result of the league play. (Pavony Decl. ¶13, CSUF ¶13)

League participants and FCU itself would frequently use parody and puns for comedic artistic expression, such as referring to league operators as "skee-e-o's", saying "skee-ya-later" instead of goodbye, or calling league seasons "skeesons" (a pun used by BTE). (Pavony Decl. ¶14) League participants would sometimes use puns for team names because they believed the juxtaposition of a classic, old-timey game like Skee-Ball with modern or pop culture references was entertaining. (*Id.*) For example, Bay Tek executives and employees registered player names on the NSBL app in 2017 such as "Luke Skeewalker", "Skee-Willy" and "Skeeattle Super Sonics." (*Id.*) Bay Tek also worked with the Pulaski Chamber of Commerce to change a Pulaski road sign so it said "Pulaskee." (*Id.*)

FCU created a website, brewskeeball.com, that could be used by its customers, the league participants and volunteer league organizers, to post match schedules, communicate with other league participants, or register their team and player names online. (*Id.* at ¶15; Resp. SUF ¶66)

League participants also use the league app to edit match scores while playing in tournaments and league play. (Pavony Decl. ¶15)

BTE became aware of FCU's Live Play idea and liked it. (*Id.* at ¶16) Two members of BTE's product development team visited Full Circle Bar in Brooklyn "and saw what was going on" with Brewskee-Ball. (*Id.*) BTE then started making a Skee-Ball machine it called Beer Ball, which it expressly associated with the Skee-Ball mark, marketing it as "Skee-Ball all grown up!" for adult leagues and tournaments in bars. (*Id.*; CSUF ¶¶21-23) BTE was unsuccessful in emulating FCU's Live Play success in the adult market, so Beer Ball was later shuttered. (Pavony Decl. ¶16; CSUF ¶23)

In 2013, documentary filmmakers also took note of FCU's success and began to film a documentary of FCU's rise, following and filming its owner, Eric Pavony, in his day-to-day activities. (Pavony Decl. ¶18)

Shortly thereafter, in 2011, the owner of the Skee-Ball trademark, Skee-Ball, Inc. ("SBI"), sued FCU for trademark infringement and dilution by tarnishment. (*Id.* at ¶17, CSUF ¶24) FCU countersued for a declaration that the Skee-Ball mark was generic. (*Id.* ¶25; Pavony Decl. ¶17) SBI and FCU settled their dispute with a co-existence arrangement reflected in two contemporaneous written agreements: a License Agreement and a Settlement Agreement (the "Agreements"). (*Id.* at ¶19; CSUF ¶¶26-27, 32-33) In the Agreements, SBI released FCU for its allegedly tarnishing conduct, agreed to permit FCU to use the Skee-Ball mark in connection with Live Play, and confirmed FCU's valid ownership of the Brewskee-Ball mark. (Pavony Decl. ¶20; CSUF ¶¶28-30) FCU in turn agreed to refrain from claiming the Skee-Ball mark is generic and agreed to grow the Live Play business with SBI's "best efforts" assistance. (CSUF ¶31; Pavony Decl. ¶21)

When executing the Agreements, both FCU and SBI were aware that the skee puns would continue to be used as part of FCU's creative methods of expanding the market for Live Play and the game of skee-ball. (*Id.* at ¶¶22, 90) Yet, the parties did not address those uses because they were not uses of the Skee-Ball mark, since SBI made no claim to the word "skee" alone. (*Id.* at ¶23)

For a couple of years after execution of the Agreements, FCU continued operations undisturbed, including its use of puns and parodies, its Internet publication of recorded live tournaments, and the league participants' use of comedic team names. (*Id.* at ¶24) Others in the market created bar leagues with adult themes and associated drinking games. (*Id.* at ¶25) SBI did not object to any of it. (*Id.* at ¶91)

Against this backdrop of approved, continuous, and popular use of the Skee-Ball mark, BTE chose to buy the mark. (*Id.* at ¶26)

BTE needed FCU's consent to BTE's assignment and assumption of the Agreements with SBI. (*Id.* at ¶27; CSUF ¶¶33-34) To induce that consent, BTE made certain promises to FCU. (Pavony Decl. ¶27; CSUF ¶¶35-38) The first promise involved the supply of lanes for Live Play. (*Id.*; Pavony Decl. ¶28) To best promote a nationwide Live Play network for Skee-Ball, the lanes need features to be installed that make them ideal for league and tournament play and suitable for Internet networking. (*Id.* at ¶28; CSUF ¶118) BTE agreed to supply these modified lanes, confirming SBI's representation to FCU that BTE ███████████████████████ ████████████████████████████████████ (Pavony Decl. ¶29; Am. Thanasides MSJ Decl. ¶30 & Ex.29) Indeed, on April 15, 2016, BTE and FCU specifically discussed that, if BTE changed its mind and decided not to make the lanes, FCU had the right in the Agreements to go to a different manufacturer to build the lanes. (*Id.* at ¶30; CSUF ¶¶41-45)

Beginning with the inception of the idea of Live Play for Skee-Ball, FCU made these required modifications to the lanes itself. (Pavony Decl. ¶31) FCU has always been willing and able to make these modifications on its own. (*Id.* at ¶32) Indeed, FCU's consultant, Eric Wikman, created the technical modifications. (*Id.* at ¶33) When BTE wanted FCU's consent to its assignment of the Agreements, it told FCU that it would make the Live Play-modified lanes for FCU. (*Id.* at ¶33; CSUF ¶36) Had BTE not falsely represented its agreement to supply the Live Play lanes designed by FCU, FCU would not have consented to the assignment. (*Id.* at ¶34; CSUF ¶38)

FCU made BTE aware that FCU designed a custom skee-ball lane to launch the NSBL and was developing software that would enable players to compete against each other remotely, in real time. (Pavony Decl. ¶35; CSUF ¶39) FCU explained to BTE that its concept for the NSBL centered on a custom lane equipped with video cameras, an HD screen and software developed by FCU that created multiple new revenue streams, expanded the network of competitive Skee-Ball through remote and live-streamed competitions, made operating leagues and tournaments nearly effortless and easily scalable, and would facilitate making skee-ball a national sport. (*Id.* at ¶35; CSUF ¶39) On April 14, 2016, at a meeting at BTE's headquarters, FCU demonstrated some of the NSBL software it developed to BTE using a work-in-process prototype built by FCU by modifying an old Classic Skee-Ball Lane. (Pavony Decl. ¶36; CSUF ¶40) Bay Tek's CEO at the time told FCU that FCU shouldn't pitch outside investors, but rather keep the investment in the family. (Pavony Decl. ¶36; CSUF ¶68) The parties informally discussed having BTE complete the prototype. (Pavony Decl. ¶37; CSUF ¶40)

In the spring of 2017, FCU informed BTE the prototype was nearing completion, and it no longer needed the scope of work initially contemplated for a prototype, just a "dumb lane" and

little else. (Pavony Decl. ¶38) In March 2017, FCU requested wholesale pricing for BTE's Classic Skee-Ball lane shell. (*Id.* at ¶39)

In July 2017, Ms. Hampton, Mr. Treankler and Mr. Schadrie of BTE traveled to Austin to meet FCU and learned the prototype was nearly a fully functioning NSBL lane. (*Id.* at ¶40) Mr. Treankler told FCU it could stop seeking outside investment because BTE can and wants to handle the remaining R&D and would do it under a revenue share deal, so no outside investor would be needed. (*Id.* at ¶41; CSUF ¶68) On July 20, 2017, Mr. Schadrie memorialized BTE's commitment to build FCU 10 NSBL prototype lanes for FCU's 2016 National Championship tournament (the "BEEB"), as well as NSBL production model lanes. (*Id.* at ¶42; Am. Thanasides MSJ Decl. ¶142 & Ex. 107)

Based on this commitment, FCU started working with BTE's research and development team to complete NSBL prototype lanes in time for the BEEB. (*Id.* at ¶43) FCU disclosed its proprietary NSBL software and its detailed business plan to BTE in the process, in reliance upon BTE's agreement to build production model NSBL Lanes for FCU. (*Id.* at ¶44)

A few months later, at a meeting in a diner in Wisconsin, BTE agreed to make 36 customized NSBL lanes and to sell them to FCU using a revenue share to pay the purchase price (one of the 36 was to be temporarily held by BTE for its own R&D). (*Id.* at ¶45; CSUF ¶¶100-102) As part of this revenue share agreement, FCU agreed to pay more than the typical price for the lanes in reliance on the promise that it would get 36 total lanes to expand its business. (Pavony Decl. ¶46; CSUF ¶102) FCU asked for BTE to agree to put the name "Skee-Ball Live" on the lanes it was making FCU. (Pavony Decl. ¶47; CSUF ¶¶63-64 ) BTE agreed and shipped 10 lanes with the approved name on them, temporarily holding one for its own R&D purposes. (CSUF ¶65; Pavony Decl. ¶48) Bay Tek did not equip the 10 prototype lanes with case acceptors or credit card

7

readers. (*Id.* at ¶49) FCU later learned in a December 5, 2017 email from Holly Hampton that BTE did not realize FCU could build the app payment system themselves. (*Id.*)

After the initial 10 lanes were shipped, FCU hosted a tournament called the BEEB, which was attended by BTE executives. (*Id.* at ¶50; CSUF ¶51) In advance of the tournament, at a Brewskee-Ball Los Angeles event, Bay Tek executives registered their team name online as "Fuckin A" (Pavony Decl. ¶¶51, 100; CSUF ¶124) At the BEEB tournament a few days later, Bay Tek personnel registered their names as "Skee-Willy", Skeattle Super Sonics" and "Luke SkeeWalker" (Pavony Decl. ¶51; CSUF ¶¶52-56) They also drank at the tournament, competed in a portion of the tournament, posed with alcohol in front of the Skee-Ball Live lanes they made for FCU, and reported to FCU that the tournament was "kickass". (*Id.* at ¶51) After the BEEB, Mr. Schadrie and Mr. Pavony then exchanged emails about the "next 25" lanes. (*Id.* at ¶52; RSUF ¶48; Am. Thanasides MSJ Decl. ¶114 & Ex.79)

FCU itself created an app payment functionality for the 10 lanes to be able to monetize them to comply with the revenue share agreement. (Pavony Decl. ¶53) Once BTE learned how FCU created revenue from Live Play at the BEEB, it reneged on its promise to supply the additional 26 lanes under a revenue share, stating to FCU in January 3, 2018 that BTE was placing the "Skee-Ball Live project on hold," thereby admitting it continued to have obligations under the "project" after supplying the initial 10 lanes. (Pavony Decl. ¶54; CSUF ¶107)

On or around September 28, 2018, non-party George Petro, an executive with Play Mechanix, contacted BTE to place a purchase order with BTE for 20 stock Skee-Ball lanes after reaching an agreement in principle with FCU to help it finance and obtain lanes. (Pavony Decl. ¶55; CSUF ¶69) After Mr. Petro disclosed to BTE his understanding with FCU, he informed FCU that BTE refused to see and that it would not be willing to provide FCU any opportunity to obtain

Skee-Ball Lanes.( Pavony Decl. ¶56; CSUF ¶69; RSUF ¶63; Am. Thanasides MSJ Decl. ¶ 26, 27, 28 & Video Exs.25, 26, 27)

As FCU had done with SBI before BTE bought the mark, FCU next asked for the ability to directly purchase standard lanes that FCU could modify itself. (Pavony Decl. ¶57) For example, on November 22, 2019, Full Circle requested a quote from BTE for the purchase of 150 stock Skee-Ball Lanes and timeframe for production from BTE. (*Id.* at ¶58; CSUF ¶70) However, BTE would not let FCU buy the lanes and then modify them. (Pavony Decl. ¶59; CSUF ¶74) BTE claimed that it was in the business of making modifications to lanes to make them suitable for Live Play and therefore, if FCU made the modifications itself, it would be competing with BTE in violation of the License Agreement. (Pavony Decl. ¶60; CSUF ¶74)

FCU then asked BTE if it could buy the lanes from BTE and have BTE make the modifications, since it was supposedly in that business. (Pavony Decl. ¶61) BTE said it would not make modifications for FCU, though it continued to claim it was in the business of making those modifications. (*Id.* at ¶62) BTE also threatened FCU that it could not buy lanes from another manufacturer. (*Id.* at ¶63; CSUF ¶74)

Ultimately, BTE used the discretion it believes it has under the Agreements to force FCU into buying and using only standard lanes that FCU could not itself modify for Live Play and that are unsuitable for the Licensed Uses, in an effort to prevent FCU from enjoying the benefits of the License. (*Id.* at ¶64)

BTE's second promise to induce FCU's consent to the assignment of the Agreements was that it was agreeable to FCU's goal of producing professional tournament content for ESPN and other platforms to promote Live Play. (*Id.* at ¶65, CSUF ¶¶86-87) After years of effort to get the attention of ESPN, FCU put a deal together to produce Live Play tournament content that would

be aired on ESPN. (Pavony Decl. ¶66; CSUF ¶¶86-87) This would of course benefit everyone associated with Skee-Ball, including BTE. (Pavony Decl. ¶67) But, BTE threatened to sue and thus killed FCU's deal with ESPN, after agreeing to the goal when seeking FCU's consent to the assignment. (*Id.*; Am. Thanasides MSJ Decl. ¶¶92,93 & Exs. 57,58) Had BTE not falsely represented its approval of FCU's goal of broadcasting on ESPN, FCU would not have consented to the assignment. (Pavony Decl. ¶68; CSUF ¶¶36-38)

BTE's third promise to induce FCU's consent to the assignment was that BTE was agreeable to the manner in which FCU historically operated, including its, and its customers', use of puns and parody, and that it was excited to be a partner with FCU and would work to make the partnership a success for them both. (Pavony Decl. ¶69) This also turned out to be a false promise. (*Id.* at ¶70) Had BTE not falsely represented its approval of FCU's activities, FCU would not have consented to the assignment. (*Id.* at ¶71; CSUF ¶¶36-38)

Years after FCU consented, and years after FCU continued its consistent use of puns and parodies, BTE surprised FCU with claims of breach for the same type of conduct already settled in the SBI lawsuit and that BTE had previously approved, and without providing FCU notice and an opportunity to cure, as required by the Agreements. (*Id.* at ¶72) BTE did not stop there. (*Id.*) BTE registered the phrase "Skee-Ball Live" with the USPTO and then demanded that FCU cease and desist from using "Skee-Ball Live" in its operation of Skee-Ball Live Play. (Pavony Decl. ¶72; CSUF ¶66; Am. Thanasides MSJ Decl. ¶¶103,104 & Exs. 68,69) To obtain registration of the mark, BTE represented to the USPTO that FCU's uses of the phrase "Skee-Ball Live" were approved by BTE and then demanded FCU cease and desist from those same uses. (*Id.* at ¶73, CSUF ¶66) Finally, BTE repeatedly manufactured supposed defaults of the Agreements and then, when FCU would tender its cure, BTE would go silent, refusing to confirm the cures to create

uncertainty about the validity of the license. (Pavony Decl. ¶74) BTE's creation of uncertainty surrounding the license was designed to preclude outside investments or loans to FCU, to prevent its growth. (*Id.* at ¶75; CSUF ¶¶71, 72)

When BTE believed it had FCU on the ropes with its starvation ploy, BTE offered FCU a lifeline: BTE would take the Live Play License back for itself, leaving FCU with its own "Brewskee-Ball" mark. (Pavony Decl. ¶ 76, CSUF ¶¶96-97) BTE's proposal exposed its long-term goal to take the Live Play license from FCU. (Pavony Decl. ¶77, CSUF ¶¶96-97))

This goal was revealed in discovery in this case. Indeed, BTE made the decision it was going to try to engineer a termination or force a modification of FCU's license long before BTE put Skee-Ball Live "on hold." (CSUF ¶¶57-60) ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

**LEGAL STANDARD**

Summary judgment is appropriate if "there is no genuine issue as to any material fact[.]" Fed. R. Civ. P. 56(c). Summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. The initial burden falls on the moving party required to "demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir. 1999) (*quoting D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

## ARGUMENT

**A. BTE Has Failed to Establish it is Entitled to Summary Judgment on FCU's Claims.**

    **i.    BTE is not entitled to Summary Judgment on FCU's Claim for Breach of the License Agreement**

        **a.    BTE is Not Entitled to Summary Judgment on FCU's Claim for Breach of 4.2 of the License Agreement**

BTE claims it did not breach ¶4.2 by registering a trademark for Skee-Ball Live because it had "every right to register the trademark." (ECF No. 150 at 17) In its argument, BTE misstates FCU's claim, then omits the portion of ¶4.2 that FCU claims BTE breached. (*Id.*) Paragraph 4.2 of the License Agreement provides in relevant part:



(CSUF ¶77; License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶4.2)

FCU alleges BTE breached ¶4.2 by approving Skee-Ball Live as a Live Play Phrase, and therefore a Licensed Use, and then revoking FCU's right to use it. (CSUF ¶76) BTE does not dispute that it that it approved FCU's use of "Skee-Ball Live" in connection with Live Play and affixed the "Skee-Ball Live" mark on the lanes it delivered to FCU. (CSUF ¶65) Indeed, BTE cannot take those positions now, since it relied on FCU's use of the Skee-Ball Live phrase to establish prior use as part of its registration of the phrase with the USPTO. (Pavony Decl. ¶73; Am. Thanasides MSJ Decl. ¶¶103,104 & Exs. 68,69)

BTE argues instead that it had the right to revoke use of "Skee-Ball Live" because "such phrases or slogans inures to BTE's ownership rights in the Mark." (ECF No. 150 at 6). This argument is irrelevant. BTE surely can own the Skee-Ball Live mark, that is not at issue. What BTE cannot do is give FCU a license to use that phrase by approving the use of Skee-Ball Live as a Licensed Use, and then unilaterally revoke that agreement without cause. CSUF ¶31, (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) License Agreement at ¶3.1 (███████████████████ ████████████████████████████████████████████████████████████████ ███████████████); *see also Id.* (License Agreement) at ¶11 (███████████████ ███████████████████████████████████████████████ BTE points to nothing in the Agreements that would permit it to revoke a Licensed Use once approved.

### b. BTE is Not Entitled to Summary Judgment on FCU's Claim for Breach of 5.3 of the License Agreement

Paragraph 5.3 of the License Agreement provides, "SBI hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term and in the Territory, operate, sponsor, or endorse a business, involving Live Play." (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) (License Agreement) at ¶5.3) In addition, the Settlement Agreement provides, ███████████████ ████████████████████████████████████████████████████████████████

BTE claims FCU has no evidence it breached ¶5.3 relating to conduct involving Alchemy 3, GameCo, and Aunt Ethel's. (ECF No. 150 at 7) This is simply untrue.

As for Aunt Ethels, Mr. Pavony testified that BTE did endorse or allow others to operate Live Play, based on the fact that BTE employees frequented Aunt Ethel's, were aware that it was operating Live Play Leagues, and still promoted the venue's social media, which advertised its Live Play leagues. (RSUF ¶30)

In discovery, FCU learned of additional conduct violating 5.3. First, BTE delivered a "bank" of Skee-Ball branded lanes and provided custom components for Ed's Funcade, a venue that hosts a "Skee-Ball National Championship" every year, and places videos of the event on YouTube. (CSUF ¶85; Am. Thanasides MSJ Decl. ¶34 & Video Ex.33) FCU also learned that when BTE received a copy of FCU's proposed contract with ESPN for the Live Play broadcast on February 13, 2020, it forwarded the proposal to a third party entertainment media company, Wex Works, and then entered into a licensing deal with WexWorks for the production of unscripted shows using BTE's intellectual property, including the Mark. (CSUF ¶98)

Finally, in discovery, FCU learned BTE actively communicated with other skee-ball leagues competitive with FCU.

### c. BTE is Not Entitled to Summary Judgment on FCU's Claim for Breach of 7.2 or on its Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

BTE contends FCU's claims for breach of ¶7.2 and breach of the implied covenants of good faith and fair dealing should be dismissed as duplicative. (ECF No. 150 at 9, fn 3, 19-20)

They are not. They are alternative claims. FCU contends that the best efforts clause has been breached by the conduct of BTE designed to interfere with FCU's ability to enjoy the fruits of the license. BTE argues the best efforts clause is too narrow to be breached by that alleged conduct. If that position is correct, then FCU alleges the conduct breaches BTE's implied duty of good faith and fair dealing.

*Breach of ¶7.2:* Paragraph 7.2 of the License Agreement provides ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ ██████ ██████████ ██ ████ ████████████████████████████████████████████████████████████████ ████████████████████ License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.2)

FCU alleges BTE breached ¶7.2 by: 1) refusing to permit FCU to buy lanes from BTE and permit FCU to modify them itself, refusing to sell FCU modified lanes, and refusing to permit FCU to buy lanes from another manufacturer, thereby making it impossible for FCU to reap the benefits of promotion of Live Play and the Licensed Uses; 2) threatening to sue if FCU entered into its production agreement with ESPN to promote Live Play; and 3) claiming FCU cease and desist from using the phrase Skee-Ball Live after giving FCU approval to use the phrase, which ostensibly prevented FCU from being able to refer to its own business—Skee-Ball Live Play— even after representing to the USPTO that FCU's uses of the phrase "Skee-Ball Live" were approved by BTE; 4) repeatedly manufacturing supposed defaults of the Agreements and then, when FCU would tender its cure, go silent, refusing to confirm the cures to create uncertainty about the validity of the license; and 5) refusing to identify FCU as a Skee-Ball licensee along with

other licensees in BTE's Skee-Ball style guide for branding and license initiatives. (ECF No. 52 at ¶¶7-12, 176-225,242-252; CSUF ¶¶71-72,86-98)

BTE's intent to hurt FCU rather than use its best efforts to help it promote Live Play is clearly exemplified by BTE killing the ESPN deal, which would have been an enormous promotional benefit to Live Play. BTE claims FCU did not have the right to promote Live Play on the medium of television or other broadcast media. (ECF No. 150 at 9, 18-19) The plain terms of the agreement provide otherwise. Under ¶3.2 of the License Agreement, ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ (CSUF ¶32) The Licensed Uses include "conducting arranging, presenting, marketing and promoting live play leagues, teams, and events" and "developing, producing, selling and distributing merchandise solely in connection with Live Play." Broadcasting a skee-ball tournament on ESPN is of course promotion of Live Play. (CSUF ¶32) Indeed, it has always been the function of broadcasting the tournaments to create public interest and feed the Live Play business.

BayTek admits it shared information about Skee-Ball Live and the NSBL with its biggest customers including Betson, Main Event, and Dave & Busters, without FCU's knowledge or consent, and even though BTE and FCU entered into a non-disclosure agreement concerning the information. (CSUF ¶93) Dave and Buster's and Betson were interested in the NSBL. (CSUF ¶¶93-94) Certainly, if BTE was using its best efforts to promote, develop, and distribute Live Play, BTE would have shared the potential opportunity with FCU. Whether, under these circumstances, BTE complied with its best efforts obligations in Paragraph 7.2 should be for the jury to decide.

If the Court decides Paragraph 7.2 is too narrow to be breached by the actions of BTE to destroy the value of the license to FCU, FCU alleges those actions breach the implied duty of good

faith and fair dealing. New York does not require that a breach of the duty of good faith and fair dealing be tied to a specific contractual provision." *Dorset Indus., Inc. v. Unified Grocers, Inc*., 893 F. Supp. 2d 395, 405-07 (E.D.N.Y. 2012). The implied covenant need only be tethered to a contractual understanding and cannot give rise to a covenant not expressed by the parties. *See Havel v. Kelsey–Hayes Co*., 83 A.D.2d 380, 382-84, 445 N.Y.S.2d 333 (4th Dep't 1981) ("It is a primary rule of contract construction that where the terms of a written agreement are clear and unambiguous, the intent of the parties must be drawn from the contract language. This is so because 'it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists'. In achieving that end, due regard must be given the overriding principle that every contract contains an implied covenant of good faith performance and fair dealing. Moreover, that a specific promise has not been expressly stated does not always mean that it was not intended. '[T]he undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included'"). *See Rowe v. Great Atl. & Pac. Tea Co*., 46 N.Y.2d 62, 69 (1978)

In sum, BTE's conduct deprived FCU of the fruits of the License Agreement, since it could not enjoy or exploit the benefits it reasonably believed it had as an exclusive licensee of the Mark for Live Play.

### ii.    BTE is Not Entitled to Summary Judgment on FCU's Claim for Breach of the Oral Revenue Share Agreement

On September 6, 2017, BTE and FCU met at a diner in Wisconsin. (ECF No. 153 (Movit MSJ Decl.) at ¶ 3 & Video Ex 2) The meeting was attended by FCU, BTE's CEO, Mr Treankler, Mr. Cravens, another executive, and the documentary filmmaker that was following FCU. (*Id.*)The filmmaker videotaped the meeting. (*Id.*; Pavony Decl. ¶18) The video clearly reflects that the parties agreed BTE would supply 36 Skee-Ball machines to FCU (with one to be held by BTE for

its own R&D purposes) and that FCU would pay BTE 15% of the top line revenue the machines generate until they have paid 1.5x of the parts and labor cost. (*Id.*; CSUF ¶¶101,102) BTE supplied 10 of the 36 lanes (CSUF ¶105)[4] but reneged on the deal to supply the remaining. FCU paid 15% of the revenue generated by the lanes and BTE accepted the payments.(CSUF ¶105)[5] Several subsequent internal emails at BTE confirmed the agreement and the number of machines to be supplied. ███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

### iii. A Genuine Issue of Material Fact Exists as to Whether there was a Meeting of the Minds, Precluding Entry of Summary Judgment

BTE contends no agreement was reached because there was no meeting of the minds on material terms. BTE claims FCU and BTE only discussed various potential issues relative to future potential arrangement, however, the assertion is contradicted by the very video evidence BTE points to in support. Rather, Treankler confirmed on video that BTE would deliver an additional 25 lanes after the "first 11" so BTE could assess performance to determine whether BTE wanted to make an equity investment in FCU. As for Mr. Wikman's inquiry to Mr. Treankler concerning "…what would you be willing to put in?", in context, it is clear Mr. Wikman and Mr. Treankler were discussing BTE's potential equity investment if FCU succeeded with proving the business

---

[4] *See* Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 ((Bay Tek's Response to FCU's and Eric Pavony's First Set of Requests for Admissions ) at 7 (Admit[ting] that Bay Tek delivered 10 custom Skee-Ball Lanes to FCU)).

[5] *See* Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 ((Bay Tek's Response to FCU's and Eric Pavony's First Set of Requests for Admissions ) at 20 (Admit[ting] that Bay Tek has received $52,617.15 from Full Circle that was purportedly generated in connection with customers' purchase of games on Skee-Ball Live Lanes")) *see also* Am. Thanasides MSJ Decl. ¶91 & Ex.56 (sample of FCU revenue share payment checks deposited by BTE).

model with the lanes, not a potential revenue share arrangement for the lanes as BTE asserts. (RSUF ¶¶47-50)



BTE argues it "tried to memorialize a revenue share agreement, preparing a written agreement for FCU to sign pertaining only to the 10 Custom Lanes" in August 2018. Conveniently, Bay omits that its attorney initially recognized a revenue share agreement with FCU, claimed FCU breached the agreement, and demanded FCU purchase the lanes, or face repossession. (Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 ) When FCU explained that the lanes were part of a revenue share agreement, BTE's attorney badgered FCU to furnish any and all proof of the terms of the agreement in writing. (Am. Thanasides MSJ Decl. ¶144 & Ex.109) It was only after it investigated what written documentation existed that BTE furnished a proposed revenue share agreement for the 10 lanes, reflecting all other material terms the parties agreed upon other than the quantity of lanes. (*Id.*; Am. Thanasides MSJ Decl. ¶143 & Ex.108) Under the circumstances, there is a genuine

dispute of a material fact concerning whether there was a meeting of the minds that should be for a jury to decide.

    **iv.**    **A Genuine Issue of Material Fact Exists as to Whether the New York Uniform Commercial Code's Statute of Frauds Applies, and the Statute of Frauds is Satisfied in Any Event**

BTE contends the Revenue Share Agreement is void pursuant to the Statute of Frauds in New York Uniform Commercial Code Section 2-201, which requires there to be "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought" to enforce a contract for the sale of goods in excess of $500.

Partial performance provides an exception to the Statute of Frauds. *See Abularach v. High Wing Aviation LLC*, 2022 WL 18558800, at *2 (E.D.N.Y. Dec. 19, 2022) (citing to §2-201(3)(c)). The reason is "[r]eceipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists." *Id.* (quoting Official Comment 2). Accordingly, evidence that payment has been made and accepted is sufficient to make an oral agreement for the sale of goods enforceable. *See Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 2022 WL 2905368, at *11 (S.D.N.Y. July 22, 2022) (collecting authorities and finding that evidence of wire transfers satisfied Statute of Frauds). Indeed, even a partial payment for a good, such as a "$25 down payment on a car" can be "sufficient to prove existence of a contract." *Id.* (citing *Starr v. Freeport Dodge, Inc.*, 54 Misc. 2d 271, 272 (Dist. Ct., N.Y. Co. 1967); *see also Townsquare Media, Inc. v. Regency Furniture, Inc.*, 2022 WL 4538954, at *14 (S.D.N.Y. Sept. 28, 2022) (acceptance of payment "establishes both the mutual assent to contract as well as the existence of an enforceable contract"); *Regal Custom Clothiers, Ltd. v. Mohan's Custom Tailors,*

*Inc.*, 1997 WL 370595, at *5 (S.D.N.Y. July 1, 1997) (holding that "part performance under UCC § 2–201(3)(c) is sufficient to bring a contract outside of the Statute").[6]

Here, FCU performed by remitting to BTE the full revenue share earned by the lanes BTE delivered in partial performance of the contract. FCU agreed to pay more than the typical price for the lanes in reliance on the promise that it would get 36 total lanes to expand its business. The only contract to which FCU's payments are referrable is the Revenue Share Agreement, as the amounts paid by FCU and accepted by BTE match the terms of the contract. Indeed, there is no other agreement between the parties that could even serve as colorable explanation for BTE's acceptance of FCU's payments. Thus, there is no basis for summary judgment on BTE's Statute of Frauds defense. *See, e.g.*, *Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F. Supp. 2d 536, 544 (S.D.N.Y. 2007) (denying summary judgment on the Statue of Frauds based on evidence of payment that was "possible partial performance"); *Ackerman v. Landes*, 112 A.D.2d 1081, 1083 (2d Dep't 1985) (explaining that "denial of partial summary judgment in this case is additionally supported by the existence of triable issues of fact regarding, inter alia, whether there was sufficient partial performance by the plaintiffs unequivocally referable to the agreement to remove it from the Statute of Frauds.").

Moreover, BTE neglects to mention that lawyers acting on its behalf confirmed the existence of the Revenue Share Agreement in written communications with FCU. (RSUF ¶57) After BTE reneged on the remaining 25 lanes, its lawyers attempted to create a false record by claiming the agreement was limited to 10 lanes. But, written communications separately confirm the number of lanes to be supplied by BTE as 36 (with one temporarily being retained by BTE for

---

[6] Under Wisconsin law, partial performance, such as a "partial payment," is similarly "a defense to the statute of frauds." *Wamser v. Bamberger*, 101 Wis. 2d 637, 642 (Ct. App. 1981).

its own testing and R&D purposes). (Am. Thanasides MSJ Decl. ¶46 & Ex.11 (Treankler Depo.) at 119:7 – 120:1 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

It will be for a jury to decide if BTE's lawyer's letter admitting to the agreement but incorrectly stating the number of lanes to be supplied under the agreement is credible given the significant admissions by BTE to the contrary. *See Townsquare*, 2022 WL 4538954, at *14 (explaining that what constitutes an essential term "is necessarily flexible" and finding disputed issues of fact); *TSNY Mgmt*, 2010 WL 11627255, at *17 (denying summary judgment and finding disputed issues of fact as to agreement on the material terms of a contract). *See Williamson v. Delsener*, 59 A.D.3d 291, 291 (1st Dep't 2009) ("The e-mails exchanged between counsel, which contained their printed names at the end, constitute signed writings (CPLR 2104) within the meaning of the statute of frauds.").

---

[7] Am. Thanasides MSJ Decl. ¶117 & Ex.82 (BT0009225)

[8] Am. Thanasides MSJ Decl. ¶109 & Ex.74 (BT0005911)

[9] Am. Thanasides MSJ Decl. ¶114 & Ex.79 (BT0008171)

Accordingly, the parties memorialized the terms of the Revenue Share Agreement in a writing that would satisfy the Statute of Frauds in these communications. In any event, even if the parties failed to reach a written agreement, equitable estoppel may prevent a party from "denying the existence of a contract where the material terms of the contract have been agreed upon." *TSNY Mgmt. L.L.C. v. P'ship 93 L.P.*, 2010 WL 11627255, at *13 (E.D.N.Y. Nov. 1, 2010) (quoting *Financial Tech. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 409 n.8 (S.D.N.Y. 2002). The evidence is clear that the material terms of the Revenue Share Agreement were agreed upon and there was performance by both parties. BTE should therefore be estopped from denying the existence of the contract.

**B. BTE is Not Entitled to Summary Judgment on FCU's Claim for Tortious Interference**

BTE claims that it is a matter of undisputed fact that FCU and Play-Mechanix did not have an "agreement in principle." First, this contention is contradicted by correspondence between FCU and George Petro, of Play Mechanix, as well as a recorded conference with Mr. Petro and FCU. Second, BTE distorts the deposition testimony of Mr. Petro and Mr. Rochetti.



(Am. Thanasides MSJ Decl. ¶50 & Ex. 15 (Petro Depo.) at 75:11-22)

Moreover, if Mr. Rochetti testified accurately and honestly, then his conversation with Mr. Petro suggests that Mr. Petro *was* doing business with FCU before he spoke to Mr. Rochetti, creating a genuine issue of material fact as to what was said. That Mr. Petro had, prior to the call with Mr. Rochetti, spent hours on the phone with FCU and expressed excitement at the prospective of working with them before the conversation, couple a recording of Mr. Petro expressing to FCU that BTE presented an obstacle and he perceived a threat, creates another genuine disputed issue of material fact that should preclude entry of summary judgment.

### C. FCU Has Established its Entitlement to Lost Profits

BTE's motion for summary judgment as to the issue of damages must be denied. Under New York law, a party is entitled to recover lost profits as consequential damages if: (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). While BTE challenges the second and third prongs of the test, whether lost profits are reasonably certain or within the contemplation of the parties are classic issues for a factfinder to decide at trial, which is why BayTek's authorities largely concern bench trials or post-verdict challenges to lost profits.[10] *See, e.g.*, *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 220 (S.D.N.Y. 2010) ("Although plaintiffs may ultimately

---

[10] *See Toltec Fabrics, Inc. v. Aug. Inc.*, 29 F.3d 778, 779 (2d Cir. 1994) (ruling on a motion following a jury trial); *Atateks Foreign Trade Ltd. v. Priv. Label Sourcing, LLC*, 2009 WL 1803458, at *1 (S.D.N.Y. June 23, 2009) (ruling on lost profits after bench trial and post-hearing briefing); *Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc.*, 2010 WL 4892646, at *1 (S.D.N.Y. Dec. 2, 2010) (ruling on judgment as a matter of law at closure of plaintiff's case at trial); *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051 (S.D.N.Y. 1996) (ruling on lost profits after bench trial).

have difficulty establishing lost profits damages that are not speculative, the issue raises questions of fact that cannot be resolved at summary judgment.").

As set forth below, BTE fails to establish a lack of issues of triable fact as to lost profits.

### D. FCU Has Established its Loss with Reasonable Certainty

It is established New York law that lost profits need not "be proved with 'absolute certainty' or 'determined with mathematical precision.'" *Precise Marketing Corp. v. Simpson Paper Co.*, 1999 WL 259518, at *11 (S.D.N.Y. Apr. 30, 1999) (citing *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993)). "It requires only that the damages be capable of measurement based upon known reliable factors without undue speculation." *Ashland*, 82 N.Y.2d at 403 (citations omitted). Additionally, BTE does not dispute the existence of damages if FCU succeeds on its claims; it only challenges the quantum of damages. That is a critical concession because where, as here, a defendant has acknowledged the existence of damages that would have been caused by a contractual breach, "the burden of any uncertainty as to the amount of damages is on the breaching party." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016); *see also Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (holding that any doubts as to the calculation of damages should be resolved against the breaching party).

The decision in *Washington v. Kellwood Company* is instructive on this point, because it involved the alleged breach of a license agreement and, like here, a dispute as to whether the venture, which involved compression sports clothing, was a new business. Because there was no dispute that the defendant's breach (if proven) had caused harm, the court put aside the issue of whether the business was new in denying summary judgment:

> [I]n light of our responsibility to view the facts in a light most favorable to plaintiffs, we deny defendant's application for summary judgment insofar as it is premised on

the assertion that no reasonable fact-finder could determine that damages are "reasonably certain." We recognize that this standard—in the context of lost profits and lost value—imposes a higher burden on plaintiffs than if they were seeking only "general damages." Nevertheless, given (1) the nature and factual breadth of the dispute surrounding whether the venture in question should be considered a "new business," (2) the legal reality that, whether a business is new or not, the standard itself is unchanged (and merely filtered through the specific factual scenario of a new business), (3) a defendant cannot be permitted to benefit from uncertainty engendered by its own breaches, and (4) the reality that plaintiffs have already demonstrated an entitlement to a damages trial on the value of the breach of Section 9.3 of the License Agreement, we decline to grant defendant's motion in this respect.

*Washington v. Kellwood Co.*, 2015 WL 6437456, at *25 (S.D.N.Y. Oct. 14, 2015). The same is true here.

FCU's lost profits are plainly capable of measurement because FCU's expert, Laura Smith,[11] did just that in calculating its lost profits based on a range of historical evidence and inputs.[12] Ms. Smith assessed damages, in the form of lost profits, using an *ex post* approach, which discounts future lost profits back to the date of the trial and for past lost profits, prejudgment interest is applied forward up to the trial date. An *ex post* approach is particularly appropriate, as it allows for the consideration of the COVID-19 pandemic's effects on FCU's business. Ms. Smith

---

[11] While BTE asserts her opinions are inadmissible without even an attempt at explanation (ECF No. 150 at 31, fn.11), its decision not to file a *Daubert* motion is telling. Ms. Smith's credentials and extensive experience performing reliable damages calculations are set forth in her expert report. *See* Am. Thanasides MSJ Decl. ¶127 & Ex.92 (July 28, 2021 Expert Report of Laura Smith, CVA, CFE ("Smith Report")) at 5.

[12] *See Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 415 (E.D.N.Y. 2013) (denying summary judgment on lost profits); *Celebrity Cruises Inc. v. Essef Corp.*, 478 F. Supp. 2d 440, 449 (S.D.N.Y. 2007) (finding lost profits capable of estimation based on an expert's analysis); *Indeck Energy Servs., Inc. v. Merced Cap., L.P.*, 159 N.Y.S.3d 405, 408 (1st Dep't 2021) (finding the trial court properly relied on expert analysis in finding lost profits reasonably certain); *Wathne Imports, Ltd. v. PRL USA, Inc.*, 101 A.D.3d 83, 89 (1st Dep't 2012) (lost damages were reasonably certain were expert based his analysis on historical evidence).

assessed historic damages, from BTE's breach and tortious interference to an estimated trial date, and future damages using a projection period of five years. Further, Ms. Smith projected lost revenue on Skee-Ball Live lanes using historic, actual revenue per lane per month. *See* Smith Report, 20-21. BTE also declined to challenge the reliability of Ms. Smith's expert opinions through a *Daubert* motion, and thereby acknowledges that her opinions are admissible evidence. In and of themselves, Ms. Smith's opinions create an issue of fact, making summary judgment inappropriate on damages. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1638096, at *2 (S.D.N.Y. Apr. 3, 2018) (declining to rule on damages at summary judgment where moving party did not file a *Daubert* motion); *In re Signature Apparel Grp. LLC*, 2015 WL 1009452, at *15 (Bankr. S.D.N.Y. Mar. 4, 2015) ("As the Court will allow the testimony of the parties' competing experts, the Court declines to grant summary judgment to any party on the issue of damages.").

Additionally, Skee-ball Live is hardly an untested venture or new business. (Pavony Decl. ¶83) Skee-Ball has proven to be a remarkably successful product, as BTE's own business shows, and the concept of gaming and bars is one as old as recorded history. (Pavony Decl. ¶84) FCU has been successfully operating Skee-Ball Live Lanes since 2017 and running Brewskee-Ball leagues since 2005. (Pavony Decl. ¶85) Even under the worst circumstances imaginable— including BTE's misconduct described in this matter, BTE's refusal to install credit card readers, and a global pandemic—FCU's Skee-Ball Live Lanes have consistently generated significant revenue per lane. (Pavony Decl. ¶86)(*See also* Am. Thanasides MSJ Decl. ¶127 & Ex.92 (Smith Report) at Appendix C (demonstrating over four years of FCU's Skee-Ball Live lane revenue).) That four-year track record, particularly when combined with the other evidence Ms. Smith considered, is a

legitimate basis on which to calculate lost profits.[13] Any arguments to the contrary are "best addressed through [BTE's] experts and cross-examination." *Playtex Prod., Inc. v. Procter & Gamble Co.*, 2003 WL 21242769, at *6 (S.D.N.Y. May 28, 2003), *aff'd*, 126 F. App'x 32 (2d Cir. 2005); *see also Gem Fin. Serv., Inc. v. City of New York*, 2022 WL 409618, at *9 (E.D.N.Y. Feb. 10, 2022) (attacks on a lost profits methodology raised issues for trial).

While BTE raises several bluster-filled attacks on Ms. Smith and the evidence she relied upon, those contentions, at best, raise disputed factual issues that must be resolved at trial.

*First*, while BTE claims that Ms. Smith "admitted" that her damages calculation did not meet the reasonable certainty test under New York law (ECF. No. 150 at 31), that is **<u>false</u>**.



---

[13] *Compare In re Best Payphones, Inc.*, 432 B.R. 46, 64 (S.D.N.Y. 2010), *aff'd*, 450 F. App'x 8 (2d Cir. 2011) (holding that lost profits were properly calculated where court relied "on billing records reflecting actual usage by Best over the preceding twelve–month period"); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 971 (9th Cir. 2013) ("New York courts have upheld the award of lost profits, where, as here, past performance combined with some indicia of likelihood of future success were presented to the jury."); *with International Telecom, Inc. v. Generadora Electrica Del Oriente*, 2004 WL 784941, at *4 (S.D.N.Y. Apr. 13, 2004) (denying lost profits where plaintiff's projections were based on "two months revenues in a new business venture"); *Trademark Rsch. Corp.*, 995 F.2d at 333 (concluding that the plaintiff could not "extrapolate seven years of lost profits from four months" of sales of a new product).

(Am. Thanasides MSJ Decl. ¶44 & Ex.9 (July 6, 2022 Deposition of Laura Smith ("Smith Depo."))) at 46:2-13)

What BTE relies upon is a snippet of testimony concerning an irrelevant semantic issue. Ms. Smith was asked about her understanding of the term "reasonable certainty" as used in common parlance, in which she noted that the amount of future profits by definition could not be determined to an *exact number* because it is projection. By contrast, she testified that her calculation of FCU's lost profits was "reasonable because it was based on evidence, including a track record of how FCU's Skee-Ball machines operated in practice."[14] Artfully excerpting testimony, as was done here, provides no basis for summary judgment.

*Second*, BTE claims that Ms. Smith relied on "manipulated" and "doctored" financial data without any explanation; it asserts that this is true because the records contain supposedly "incomplete" documentation. (ECF No. 150 at 32). That makes no sense. The documents to which BTE is referring contain, among other things, sales numbers that were compiled in the normal course of FCU's business on its earnings on Skee-Ball going back to 2005. They are entirely complete as to the relevant information.

———————————

[14] For example, Ms. Smith explained as follows:

> Again, I'm not referencing law. I'm referencing to you what I know as a practitioner, as a quantum expert and as someone who has been assessing damages for 20 years. A reasonable certainty implies that something is exact, it's exactly certain that this is a fact. So when you talk about the fact that damages exist, you can have certainty, or reasonable certainty. When you talk about the quantification of what that damage is, you cannot have what is considered to be -- what I imply certainty to mean, which is exactness. What you have is a calculation that's done on a reasonable basis based on a variety of documents.

*Id.*, at 137:24-138:20.

Relatedly, BTE claims that Ms. Smith relied on "self-serving projections FCU included in pitches to BTE and potential investors." *Id.* While this bald claim is untrue because Ms. Smith relied on a historical four-year track record as opposed to projections, the fact that BTE received and relied on those very same projections in entering into the Revenue Share Agreement is telling. Outside of this litigation, BTE apparently found the numbers to be reliable, which would entitle an expert to rely upon them. *See Sir Speedy*, 957 F.2d 1039 (reversing a judgment notwithstanding the verdict where the expert relied on projections used by the parties in their business dealings); *Indeck Energy Servs., Inc. v. Merced Cap., L.P.*, 2020 WL 6081952, at *5 (N.Y. Sup. Ct. Oct. 15, 2020) ("If the projections are a good enough basis for sophisticated parties to invest significant amounts of real money, they are good enough for assessment of damages too.").

*Third*, BTE asserts that while Ms. Smith's conclusions are based on the assumption that FCU would have received outside funding, "it is undisputed that FCU tried, but failed, to obtain financing." (ECF No. 150 at 32). Not so. FCU received outside funding from a variety of sources, including BTE, which entered into the Revenue Share Agreement and repeatedly assured FCU that it would support the latter's needs. (Pavony Decl. ¶87) In any event, BTE cannot take advantage of the harm caused by its own conduct, which decimated FCU's business, to claim that FCU would not have raised funds *but for BTE's misconduct*. To take one example, if BTE had complied with the Revenue Share Agreement and shipped all 36 lanes, that would have provided funds for growth and further proof for investors and lenders. (Pavony Decl. ¶88)

*Fourth*, BTE makes the bewildering contention that Ms. Smith's calculations are "improperly" premised on FCU's interpretation of the terms of the License Agreement instead of BTE's interpretation. (ECF No. 150 at 32-33). Here BTE is arguing that the agreement is ambiguous and needs to be interpreted with parol evidence, which would, plainly, be an issue to

be resolved at trial. If FCU prevails on its suggested resolution of the ambiguity BTE believes exists—which would be a prerequisite to recover damages in any event—Ms. Smith's assumption will have been justified.

*Fifth*, BTE asserts that it or another supplier could not have supplied FCU with 1,750 Skee-Ball Live lanes within five years. (ECF No. 150 at 33). Yet FCU was in discussions with BTE and Play Mechanix for as many as 4,000 lanes, and contemporaneous documents demonstrate its intent to dramatically expand the business. (Pavony Decl. ¶92) Also, when BTE rolled out Beer Ball, it placed 600 lanes within six to eight months, which is more than double the 350 lanes per year that Ms. Smith utilizes in her model. (*Id.*)

### E. Plaintiff's Lost Profits Damages Were Fairly Within the Contemplation of the Parties.

While BTE asserts that lost profits were not in the contemplation of the parties when they entered into the License Agreement and Revenue Share Agreement, that contention fails on even a cursory examination. Under New York law, "a contractual term explicitly allowing consequential damages is not a prerequisite for the recovery of such damages. On the contrary, liability for particular consequential damages can be inferred from the nature, purpose and particular circumstances of the contract." *Hold Bros, Inc. v. Hartford Cas. Ins. Co.,* 357 F.Supp.2d 651 (S.D.N.Y. 2005), citing *Kenford,* 73 N.Y.2d at 319, 540 N.Y.S.2d 1, 537 N.E.2d 176. "In other words, under New York law, a court may fill in the gap in order to effectuate the intent of the parties." *Id.*

Here, the entire point of the collaboration between FCU and BTE was to create a network of Skee-Ball Live machines where patrons at bars could play against each other and in leagues across the nation, which would generate ongoing profits. The License Agreement itself reflects this reality in that it involves a perpetual license, requires FCU to expand Live Play to at least

fifteen states, and expressly contemplates that the license would be the foundation for the Live Play venture, which BTE had to use its best efforts to support. *See* License Agreement, Paragraph 7.2, Section 11. In other words, "the nature of the [License] Agreement itself reflects that the parties contemplated lost profits." *Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A.*, 2004 WL 784941, at *3 (S.D.N.Y. Apr. 13, 2004); *see also In re Best Payphones*, 432 B.R. at 64 (finding that lost profits were contemplated where the harm from any beach would result in lost profits). Given the foreseeability of significant lost profits, "[i]f [BTE] wanted to limit its liability for lost profits, it should have contracted for [that] limitation . . . ." *Id.*

Similarly, the Revenue Share Agreement was based on just that—the creation of a revenue stream, a portion of which would benefit BTE. Indeed, document after document that was exchanged between the parties, including the business plans and projections that BTE reviewed and relied upon in entering into the Revenue Share Agreement, reflect that the parties discussed that the Revenue Share Agreement would support the creation of a scalable business that would continue to generate profits. (Pavony Decl. ¶93; CSUF at ¶ 99; Am. Thanasides MSJ Decl. ¶ 127 & Ex.92 (Smith Report, Appendix B ("FCU Lane Data for Laura.xls")); Movit MSJ Decl., ¶ 3 & Video Exhibit 2 at 40:30-41:40; ███████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

As for the authorities that BTE relies upon, they are so inapposite they actually support denial of summary judgment here. BTE's cases either concern situations where there was "[no] extrinsic evidence that lost profits were within the parties' contemplation." *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 183 (1st Dep't 2007), or the "parties. . . could cease doing business with one another at any time." *Atateks Foreign Trade Ltd. v. Priv. Label Sourcing, LLC*, 2009 WL 1803458, at *23 (S.D.N.Y. June 23, 2009). By contrast, FCU and BTE expressly discussed the creation of Live Play and the profits that would be generated from it, and BTE could not cancel the License Agreement without cause.

### i. BTE Fails to Disprove that FCU is Entitled to Lost Profits Arising from BTE's Tortious Interference With Contract

BTE regurgitates its arguments regarding lost profits as to FCU's claim for tortious interference. For the same reasons discussed above, BTE's motion should be denied as to lost profits for tortious interference as well.

As a matter of law, New York's Court of Appeals has ruled that in an action for tortious interference with contract, a plaintiff is entitled to "full pecuniary loss of the benefits of the contract" breached due to the tortious interference, including "lost profits." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 197 (1980). Similarly, in a breach of contract action,

damages are to "place the [non-breaching party] in the position it would have been in had the contract been performed." *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 195 (2008).[15]

To recover lost profits for tortious interference with contract, a plaintiff must establish both the existence and amount of such damages with reasonable certainty, before the damages issue is even submitted to the jury. *Int'l Minerals and Res., S.A. v. Bomar Res., Inc.*, 5 Fed. Appx. 5, 8 (2d Cir.2001) ("*Int'l Minerals II*") ("under New York law, existence of damages must be capable of proof to the level of 'reasonable certainty' before damages issue is even submitted to jury."). Notably, this does not require plaintiff to prove lost profits "with absolute precision," but "they must be capable of measurement based upon known reliable factors without undue speculation." *Ashland*, 82 N.Y.2d at 403.

As discussed above, under New York law, "[a] party may not recover damages for lost profits unless they were within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty." *Id.*; *see also 16 Casa Duse, LLC v. Merkin*, 2013 WL 5510770, at *14 (S.D.N.Y. Sept. 27, 2013) (awarding consequential damages where the tortious interference resulted in a film screening's cancellation, which in turn prevented plaintiff from holding a post-screening reception, which directly resulted in the loss of non-refundable deposit of that amount).

---

[15] Wisconsin law is in agreement that lost profits are a proper element of damages for tortious interference with contractual relations. Restatement of Torts (Second) Section 774A comt. b (1977). *See also* Wis. JI Civil No. 2780, Comment ("Assuming a causal relationship between the defendant's actions and plaintiff's losses, damages may include: (a) pecuniary loss of benefits of the contract, [and] (b) causally related consequential losses. . . .," citing Restatement of Torts (Second) Section 774A (1977).

In the instant action, BTE's tortious interference with contract caused FCU millions of dollars in damages, including lost profits from the Live Play market that BTE was obligated to use its best efforts to help FCU develop. As set forth extensively above, FCU has established its loss with reasonable certainty, as well as the fact that lost profits were within the contemplation of the parties.

FCU respectfully requests that this Court deny BTE's motion for summary judgment, as BTE failed to disprove that FCU sustained damages, including lost profits, arising from BTE's tortious interference.

## F. BTE Has Failed to Establish it is Entitled to Summary Judgment on its Counterclaims Against FCU

### i. BTE Has Not Demonstrated it is Entitled to Summary Judgment on its Contractual Counterclaims

BTE's motion for summary judgment on its claim for breach of the License Agreement fails because BTE has not established it complied with the condition precedent of providing FCU with notice and an opportunity to cure required by Paragraphs 7.4 and 7.5 of the License Agreement.

Paragraph 7.4 of the License Agreement requires:



(CSUF ¶131; License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.4)

Paragraph 7.5 of the License Agreement requires:



(CSUF ¶132; License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.5)

BTE offers no record evidence that it provided FCU with the notice required by Paragraph 7.4 or that FCU failed to comply with Paragraph 7.4's remedy provisions upon notice. BTE also provides no record evidence that it exhausted its remedy under Paragraph 7.5 of the License Agreement or that FCU failed to comply with the remedy in Paragraph 7.5. The parties contracted for a remedy for uses of the Skee-Ball mark that SBI did not like. BTE does not get to escape the plain terms of the contract because it is better for BTE's litigation strategy to bring a counterclaim without first complying with the contract.

Additionally, certain conduct complained of, such as the registration of two domain names by Eric Pavony, occurred in 2007 and are subject to the broad release in the Settlement Agreement. (CSUF ¶¶126, 127, 134,135)

BTE also fails to overcome FCU's equitable estoppel affirmative defense. When BTE decided to acquire the Skee-Ball mark from SBI, FCU was already a licensee of the mark. BTE therefore needed FCU's consent to the assignment and assumption of the Agreements between BTE and SBI. To induce that consent, BTE made certain representations to FCU. BTE tricked FCU into believing it was agreeable to FCU's activities to induce FCU to give BTE its consent.

One of those representations was that BTE was agreeable to FCU's goal of producing professional tournament content for ESPN and other distribution platforms under the name National Skee-Ball League for purposes of promoting Live Play.[16] After years of substantial effort to get the attention of ESPN, FCU put a deal together to produce Live Play tournament content that would be aired on ESPN. This would of course benefit everyone associated with Skee-Ball, including BTE. But, BTE claimed the broadcast would was not a permitted use under the License Agreement.

The License Agreement provides "FCU a worldwide, right and license to use the SKEE-BALL Trademark in connection with":



The License Agreement further provides:

(CSUF ¶31; License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶3)

For years, both SBI and BTE permitted and encouraged FCU's promotion of Live Play through live and video replay of tournaments.[17] (Pavony Decl. ¶65) Notably, BTE's surprise new

---

[16] The statements in this paragraph and the next are all supported by the Pavony Decl. ¶¶ 65 to 69.
[17] FCU contends this language unambiguously provides FCU the right to use the mark to promote Live Play in any medium. BTE claims it unambiguously prevents video distribution of tournaments because that is not promotion of Live Play. In the event the Court finds the language to be ambiguous, and that BTE is not estopped from taking its position, the evidence of the parties' course of conduct should go to the jury.

interpretation of the License Agreement's permitted uses was announced only after it realized FCU had struck a major deal with ESPN that would result in tremendous success for FCU, thereby loosening the stranglehold BTE had on FCU to that point.

So, BTE threatened to sue and killed FCU's deal with ESPN, after agreeing to the goal when seeking FCU's consent to the assignment. Had BTE not falsely represented its approval of FCU's goal to air tournaments on ESPN and other platforms, FCU would not have consented to the assignment. BTE should thus be estopped from asserting a breach of the License Agreement based on FCU's promotion of Live Play tournaments on platforms such as YouTube, Twitch, and ESPN.

### 1. Vulgar Phrases and Slogans and Unauthorized Use of Third-Party Trademarks in Connection with Mark

Another representation that BTE made to induce FCU's consent to the assignment was that BTE was agreeable to the manner in which FCU historically operated, including its own use of puns and parody, and the use of those methods of expression by the league participants (FCU's customers). BTE represented that it was excited to be a partner with FCU and would work to make the partnership a success for them both. This turned out to be untrue, of course. Years later, BTE has sued FCU for doing the same thing BTE represented it approved of when inducing FCU to consent to the assignment. Had BTE not falsely represented its approval the way in which FCU promoted Live Play, FCU would not have consented to the assignment. (Pavony Decl. ¶68)

FCU's detrimental reliance on BTE's representations of approval of FCU's and its customers' methods of expression and FCU's goals of broadcasting tournaments to promote Live Play should give the jury reason to find in favor of FCU on all the elements of equitable estoppel in defense of BTE's claim for breach of the License Agreement.

Moreover, the provision of the License Agreement BTE claims was breached by FCU requires <u>FCU</u> to use the <u>Skee-Ball trademark</u>.

Paragraph 7.1 of the License Agreement reads as follows:



(License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.1)

Paragraph 7.7 of the License Agreement reads as follows:



(License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.7)

Paragraph 7.8 of the License Agreement reads as follows:



██████████████████████████████
██████████████████████████████.

(License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.8)

Yet, BTE has not established with record evidence that the claimed breaches of these paragraphs are actions of FCU, not others, or are even uses of the Skee-Ball mark (with one exception that is not relevant because it was not an FCU action and BTE does not claim it used intellectual property of others).

First, the breaches BTE complains about in paragraph 90 of its Rule 56.1 statement are screenshots from the brewskeeball.com web site. People who are not employees or under FCU's control have access to post things on that site, as it is used by participants in Brewskee-Ball leagues (FCU's customers) across the nation to schedule matches and communicate with each other. (Pavony Decl. ¶79)

Second, all of the breaches claimed by BTE in paragraph 90 of the Rule 56.1 statement are not uses of the Skee-Ball mark, except one. The others are uses of the word skee, which is not the mark specified in the License Agreement and is not even owned by BTE. [18] (Hampton Depo. at 163:5-11) ("No, we don't use the phrase or word or mark – "skee" is not even a mark. We don't – it's not part of our branding guide.").

The single exception is a screenshot of a 2020 Oakland, CA Brewskee-Ball league schedule which included a team name "Monica LewinSkee-Ball Liquors" that appeared on the

_____

[18]The parties also did not consider uses of the word skee uses of the mark when executing the License Agreement. The puns of the word skee had been used for years by FCU and its customers before the License Agreement was executed; yet the parties did not address them in the approved uses exhibit, though they knew they would continue to be used. (Pavony Decl. ¶¶23, 90) This is confirmed by the fact that, after the License Agreement was executed, SBI never raised an issue about the use of the puns. (Pavony Decl. ¶91)

brewskeeball.com league website. (SUF ¶95) FCU did not choose this name or make this post on the league website. (Pavony Decl. ¶¶78,80) BTE does not offer any record evidence in its motion for summary judgment when this team name was first used, who posted the schedule, when the page was removed (it is no longer on the site), or if anyone other than the person who posted it ever saw it. Given that the Monica Lewinsky newsworthy events entered pop culture in the late 1990s, it is entirely possible the team name was in use prior to execution of the Settlement Agreement with SBI and thus released as part of the general release in that agreement. (Pavony Decl. ¶81)

BTE points to two examples of disparagement, a video of Mr. Pavony and another by Barstool Sports. (ECF No. 150 at 37, 43-44) Paragraph 7.7 is not a non-disparagement provision. IT merely states ███████████████████████████████████████████████ ███████████████████████████████████████ (License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.7) The conduct prohibited is limited to uses of the Skee-Ball Trademark, but BTE has not made any effort whatsoever to identify where and how the Skee-Ball Trademark is used in these videos in relation to the purported disparagement.

Finally, the alleged breaches of Paragraphs 7.1 and 7.7 are based solely on BTE's subjective opinion of whether the conduct at issue harms the reputation of BTE or Skee-Ball mark. The agreement does not give BTE absolute discretion to determine reputational harm. To establish a breach in a court of law, a fact finder must find that there has been harm to the Skee-Ball mark or to BTE as the result of the conduct at issue. The contract does not give BTE the ability to decide the issue on its own, it is up to a jury. BTE has offered no proof whatsoever that it or the Skee-Ball mark has been harmed. It asks the Court to presume reputational harm based on the Court's

moral compass. Even if BTE could win the breach claim with merely presumptions based on moral opinions without proof of harm, that judgment would be a jury function.

It is worth noting, that despite BTE's complaints that its own officers and employees have engaged in the very conduct it complains of. In fact, four BTE officers and employees, including Ms. Hampton, registered NSBL player accounts at the BEEB with the following user names: "Skeeattle Super Sonics", "Holls Balls", "Luke SKEEwalker", "Skee-Willy." (Pavony Decl. ¶¶ 101-105) As for BTE's complaints about Barstool Sports, the "officialskeeball" Instagram account just posted an image endorsing the Yak and suggested that the Yak needed in studio official Skee-Ball lanes. (RSUF ¶¶104, Am. Thanasides MSJ Decl. ¶89 & Ex. 54)

## 2. FCU Did Not Fail to Promote the Licensed Uses

There is a genuine issue of material fact as to whether FCU satisfied its obligation to promote the Licensed Uses. First, there is no obligation that FCU build out Live Play using "Standard Lanes", and this theory has been raised for the first time in this litigation. In addition, it cannot be disputed that FCU has garnered national press attention, including for the Skee-Ball Live Lanes at the BEEB.

BTE was aware of FCU's growth and marketing strategies for the NSBL, and FCU's plan to grow Live Play through networked Skee-Ball lanes using FCU's software. (CSUF ¶118; RSUF ¶72) BTE never objected to the plan. (CSUF ¶118.) It was also aware of FCU's focus on using innovation and technology to grow the Licensed Uses. (CSUF ¶119) According to Cravens, "FCU's software was great and had the potential to bring more people into the Skee-Ball leagues… really just growing the network of Skee-Ball machines and growing the leagues, which would then give the potential to sell more units across the country." (CSUF ¶¶46-47,120)

## 3. FCU Satisfied its Obligation to Use Best Efforts to Create a Live Play Network

FCU could not build its Live Play network if BTE would not sell it Skee-Ball Live Lanes, and claimed FCU breached the License Agreement if it modified the lanes itself. (CSUF ¶117)

FCU has gone to great lengths to create a live play network. In addition to attempting to purchase lanes, FCU tried to rent and borrow skee-ball machines for Live Play from third-parties, including, but are not limited to, communicating with at least ten different third-parties, including contacts at Emerson Amusements, the UpDown (Minneapolis, MN and Des Moines, IA), the Eastburn (Portland, Oregon), The Greatest Bar (Boston, MA), Finnegan's Pub (Hoboken, NJ), Mr. Darcy Seattle (Seattle, WA), and Rabbit Hole (Seattle, WA) and individuals affiliated with other skee-ball leagues (NOLA Skee-Ball and Skee- League) between February 2019 and July 2019, to obtain additional skee-ball machines for Live Play. (CSUF ¶113)

Ultimately, FCU was able to secure additional machines for the 2019 Skee-Ball® Open, a 16-city, national remote Live Play tournament. (*Id.*)

#### 4. Live Play Sponsorships and Endorsements

FCU has obtained in-kind sponsors for Live Play events for the benefit of the Live Play event, a practice BTE was aware of and BTE did not object to after FCU sought assurances from BTE that its practice was consistent with BTE's understanding of FCU's obligations under the License Agreement. (Pavony Decl. ¶82) In addition, FCU is not required to remit Sponsorship Revenue to BTE for money paid to FCU by a venue or company owned by Mr. Pavony or FCU, including Full Circle Bar. *See* License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶8.1.

### ii. BTE is Not Entitled to Declaratory Relief as a Matter of Law

#### 1. The License Agreement is Not Terminable at Will

BTE asks this Court to find the License Agreement is terminable at will, conveniently ignoring both the plain terms of the agreement and its genesis as part of an integrated transaction

with the Settlement Agreement. First, The License Agreement here is not silent about termination. By its terms, the agreement permits termination upon the occurrence of specific events. The express termination provisions take the Agreements out of the category of those that are of indefinite duration. See Warner-*Lambert Pharm. Co. v. John J. Reynolds, Inc.,* 178 F. Supp. 655, 661 (S.D.N.Y. 1959), aff'd, 280 F.2d 197 (2d Cir. 1960).

The test of whether the Agreements are indefinite is the parties' intent, as manifest in the text of the agreements. The case cited by BTE is the seminal case on indefiniteness. In *Warner-Lambert*, a trade secret royalty agreement allowed the manufacturer of Listerine to use the secret formula for Listerine in exchange for a royalty based on the amount of product manufactured or sold. 178 F. Supp. 655. After 75 years, the manufacturer unsuccessfully sought to be relieved of its royalty obligation, alleging the secret formula was no longer secret and that the royalty agreement was terminable for indefiniteness as to the duration of the agreement. *Id.* BTE neglects to mention the Court denied the manufacturer's claim.

To discern the parties' intent for a definite term, *Warner-Lambert* teaches that courts must give meaning to the express termination provision in the parties' agreement. *Id.* at 661. Absent contrary language, courts presume that a license lasts for the life of the intellectual property rights licensed. *Warner-Lambert*, 178 F.Supp at 662, 664 (holding that "the obligation to continue payments as long as Lambert or his successors continue to manufacture or sell Listerine is plain from the language of the agreements and is implicit in their terms)." The quid-pro-quo here was FCU's agreement never to challenge the Skee-Ball Mark as generic, in exchange for a license to use the Mark for Live Play for the life of the Mark, or a termination event. For these reasons, the License Agreement is not indefinite, and cannot be said to be terminable within a reasonable time or revocable at will.

## 2. BTE is Not Entitled to Terminate the License Agreement due to "FCU's Incurable Breaches" and Cannot Side-Step the Contracted-For Notice and Cure Provision

While the law permits a non-breaching party to declare a total breach upon a material breach and to then discontinue performing, parties can contract away that right and to instead require a party to provide notice and opportunity to cure before declaring a breach. That is what the parties have done here.

BTE cannot escape its obligation to provide notice and opportunity to cure by merely concluding that it would have received no benefit from complying with the contract. Parties must comply with their obligations even if they do not believe they will benefit at the time. If FCU was unable to cure after giving notice, BTE could assert a breach at that time, but it cannot presume that FCU will not cure and simply ignore its obligation to give FCU notice and an opportunity to do so, especially when it offers no evidence whatsoever that the breaches could not be cured. On the contrary, in each instance BTE has identified a perceived breach, FCU has made a good faith attempt to cure the issue immediately.

### iii. BTE Has Not Demonstrated it is Entitled to Summary Judgment on its Non-Contractual Counterclaims.

Each of BTE's trademark infringement, false endorsement, and unfair competition counterclaims is predicated on the assertion that FCU has used the Skee-Ball mark in a manner prohibited by the License Agreement. It has not carried its burden on that claim. But even if one were to put the breach issue to the side, BTE would still not be entitled to summary judgment on its other claims.

As an initial matter, the majority of the uses BTE complains about are screenshots from the brewskeeball.com web site. People who are not employees or under FCU's control have access to post things on that site, as it is used by participants in Brewskee-Ball leagues across the nation

to schedule matches and communicate with each other. (Pavony Dec. ¶79) However, BTE has only brought claims for direct trademark infringement. (*See* ECF No. 150 at 40, 42-43 (acknowledging its claims are direct and based on FCU's use of the mark).) For that reason, use of the mark by persons other than FCU cannot serve as the basis for liability. *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 103 (2d Cir. 2010) (finding that the offering of counterfeit wares by users of its website was not a basis for a claim of direct trademark infringement against eBay); *Lops v. YouTube, LLC*, 2023 WL 2349597, at \*3 (D. Conn. Mar. 3, 2023) ("YouTube cannot be subject to direct liability for trademark infringement based on videos uploaded by third parties."). Accordingly, most of what BTE complains about is immaterial, including comments made by Barstool Sports or team names chosen and posted by others on FCU's website.[19]

Once uses of the mark by others are stripped away, all that is left in the motion for summary judgment are puns using the word skee[20] and claims for infringement that are not raised in the counterclaim. BTE does not claim to own a trademark in the word skee,[21] but nevertheless claims infringement for use of the word. BTE also claims infringement for marks it registered after it filed

---

[19] For indirect liability to attach, BTE would need to establish Full Circle's (1) specific knowledge of the infringing activity, and (2) control over the infringing persons. *See Lopez v. Bonanza.com, Inc.*, 2019 WL 5199431, at \*14 (S.D.N.Y. Sept. 30, 2019) (dismissing indirect trademark infringement claims). Analysis of those factors is unnecessary since BTE has not advanced this theory of liability.

[20] With one exception: BTE claims someone posted a team name "Monica LewinSkee-Ball Liquors" to the 2020 schedule for the Oakland Brewskee-Ball league on the brewskeeball.com web site. BTE does not establish when this pun was first used, who posted the schedule, when the page was removed (it is no longer on the site), or if anyone other than the person who posted it ever saw it. Given that the Monica Lewinsky newsworthy events entered pop culture in the late 1990s, it is entirely possible that the team name was in use prior to execution of the Settlement Agreement with SBI and thus released. (Pavony Decl. ¶81)

[21] Hampton Depo. at 163:5-11. ████████████████████████████
████████████████████████████████████

the counterclaim (which has not been amended to include the new infringement claims)[22] and conduct that was released in the Settlement Agreement, which was assumed by BTE.[23]

BTE's trademark infringement, unfair competition, and false endorsement claims all must be tried because every purported instance of an unlicensed use was an expressive act (i.e., a play on words) that is protected by the First Amendment under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989),[24] or was acquiesced to by BTE and thus barred by laches, acquiescence and equitable estoppel, or both.

### iv. FCU's Plays on Skee Are Protected under *Rogers*

Even if BTE owned the word "skee" as a protectable, registered trademark (it does not), the puns used by FCU are protected expression. In *Rogers*, the Second Circuit rejected a claim by Ginger Rogers that the use of her name in the title of the motion picture Ginger and Fred infringed her rights in her name. *Id.* The Second Circuit held that where the use of a mark is artistic or expressive, the Lanham Act must be interpreted "narrowly in order to avoid suppressing protected speech under the First Amendment." *Id.*, at 998. Following that decision, the doctrine has been

---

[22] BTE claims it registered a design mark in 2021 that has supposedly been infringed by a picture of a turkey posted on Facebook. This is obviously a claim not brought in the counterclaim, since the counterclaim was filed in 2020. Had BTE amended its counterclaim to include this new infringement claim, FCU would have established that it was the first user of the stacked circle images in the new logo. BTE stole the design from FCU. (Pavony Decl. ¶¶94-99)

[23] Because the release precludes BTE from complaining about conduct that preceded the release, BTE conveniently fails to identify the dates of the supposed infringements. The infringement claims are BTE's burden to prove, and without establishing the dates of the infringing acts, BTE cannot carry its burden.

[24] While *Rogers* is most closely associated with trademark infringement, courts also dismiss false endorsement and unfair competition that involve expressive activity under *Rogers*. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1380 (2d Cir. 1993) (holding that *Rogers* applies to state law unfair competition); *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 436 (S.D.N.Y. 2021); (holding that "since Vogue's use of the photographs falls comfortably within the parameters of the Rogers test, Plaintiffs have no viable false endorsement Lanham Act claim").

applied to broadly protect expressive activity beyond names in titles, including in expressive activity connected with commercial transactions. *See, e.g.*, *Hermes Int'l v. Rothschild*, 2023 WL 1458126, at *4 (S.D.N.Y. Feb. 2, 2023) (applying *Rogers* to NFTs for sale); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 477 (S.D.N.Y. 2020) (applying *Rogers* in the sale of a video game).

The *Rogers* test is straightforward: "[A]s the plaintiff's trademark is used to further plausibly expressive purposes, and not to mislead consumers about the origin of a product or suggest that the plaintiff endorsed or is affiliated with it, the First Amendment protects that use." *Hermes*, 2023 WL 1458126, at *4. The puns at issue satisfy both prongs of the test. See *Ebony Media Operations, LLC v. Univision Commc'ns Inc.*, 2019 WL 8405265, at *3 (S.D.N.Y. June 3, 2019) (holding that the fact a mark was used in "parody" . . . is fatal to each of Plaintiff's Lanham Act claims—trademark infringement, unfair competition, dilution, and false advertising.").

With respect to the first prong, puns are classic parody. *See Cliffs Notes v. Bantam Doubleday Dell Publ. Group*, 886 F.2d 490, 495 (2d Cir. 1989) (in a case involving a play by "Spy Notes" on "Cliff Notes", stating that "the Rogers balancing approach is generally applicable to Lanham Act claims against works of artistic expression," a category which includes "parody"); *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 175 (S.D.N.Y. 2012) (applying Rogers to use of fake Louis Vuitton bag in a movie, and to character's reference to that bag as a "Lewis Vuitton"). While BTE's lawyers may not appreciate FCU's sense of humor as much as BTE's senior executives did (as explained below), "a parody enjoys First Amendment protection notwithstanding that not everybody will get the joke." *Gold v. Att'y Gen . of N.Y.*, 870 F.3d 89, 102 (2d Cir. 2017).

"A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is not the original and is instead a parody." *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 674 F. App'x 16, 18 (2d Cir. 2016) (citation omitted). FCU's puns do just that. They are either plays on skee by using it as a verb, such as "skee you later," or plays on the term skee that poke fun at the juxtaposition between the old, classic game and modern pop culture references, such as "Skeefer Madness." *See, e.g.*, *id.*, at 18 (play on Louis Vuitton's luxury image was parody); *Easter Unlimited, Inc. v. Rozier*, 2021 WL 4409729, at *13 (E.D.N.Y. Sept. 27, 2021) (image of mask-wearing movie villain was parody when used "in the context of NBA players, NBA fans, and even the NBA media"). To the extent BTE may disagree, the issue of whether FCU's puns are an expressive activity is a "mixed question of law and fact" that is "well-suited for jury determination." *Hermes*, 2023 WL 1458126, at *8 (citation omitted).

As for the second prong, BTE punted on this issue in its memorandum by claiming it is not required to prove consumer confusion because FCU exceeded the licensed uses of the Skee-Ball mark. BTE is wrong for two reasons.

First, the puns at issue (with one exception) are not uses of the mark licensed to FCU, which is the two-word mark "Skee-Ball." All but one are plays on the word skee only, which is not a protected mark owned by BTE and is not subject to the license. While the lack of protection for the word skee is clear under the law, the parties also did not consider skee puns uses of the mark. The puns had been used by FCU for years before the License Agreement was executed; yet the parties did not address them in the approved uses exhibit, though they knew they would continue to be used. (Pavony Decl. ¶ 89) This is confirmed by the fact that, after the License Agreement was executed, SBI never raised an issue about the use of the puns. (Pavony Decl. ¶¶90-91) In sum, if the licensed mark is not being used, the use cannot exceed the scope of the

licensed use. A license is not a muzzle precluding the licensee from speaking all words other than the licensed mark's permitted uses.

Second, the authorities BTE relies on are not parody or Rogers cases, and "the most important difference between the Rogers consumer confusion inquiry and the classic consumer confusion test is that consumer confusion under Rogers must be clear and unambiguous to override the weighty First Amendment interests at stake." *Id.*, at *8. This heightened standard for the consumer confusion test is not applied in the cases cited by BTE. The cases that permit the answer to the consumer confusion test to be presumed in non-parody circumstances simply cannot apply to situation where the *Rogers* test is applied, since it is a different test.

In this circumstance, application of a presumption of consumer confusion would lead to an absurd result. The team names are chosen by the teams, who are obviously not BTE or FCU. They are young adults in bars trying to be funny. Why would the law presume that a consumer would be so nonsensical as to think for a second that team names chosen by bar patrons in bar leagues across the nation were actually chosen by the manufacturer of the lanes they play on? Would a consumer believe that a bowling league team name was chosen by the maker of the bowling ball?

### v. BTE's Counterclaims are Barred by the Doctrines of Laches, Acquiescence, and Estoppel.

BTE's counterclaims for trademark infringement, false designation of origin, and unfair competition fail for the additional and alternative reason that they are barred by the doctrines of laches, acquiescence, equitable estoppel, and release, each of which is equally applicable to all three counterclaims.[25]

---

[25] "Laches and acquiescence, both equitable defenses, are fundamental threshold matters that a court considering claims of trademark infringement and unfair competition should consider before reaching the merits of those claims." *Argus Rsch. Grp., Inc. v. Argus Media, Inc.*, 562 F. Supp. 2d 260, 272 (D. Conn. 2008) (applying New York law). Moreover, the Lanham Act provides that

Although acquiescence, estoppel, and laches are each discrete defenses, these defenses share common elements, in that they are grounded in the principles of equity and notions of fair play. It is simply unfair for the owner of a trademark, who learns of a supposed, arguable or technical infringement, to sit back and wait until the alleged infringer has developed a successful business and only then seek to stop the use and recover damages. Accordingly, where the trademark owner's actions or inaction causes the alleged infringer to believe that the trademark owner does not object, and, as a result, continues to use the mark, the trademark owner later is precluded from recovering damages, obtaining an injunction, or both.

Laches is an equitable defense which precludes a party from successfully asserting a claim of trademark infringement. *Brown v. Sixteen, Inc.*, 2009 WL 1159161, a *4 (S.D.N.Y. Apr. 28, 2009). The issue of laches must be resolved before reaching the merits of a trademark infringement claim. *Black Diamond Sportswear, Inc. v. Black Diamond Equipment, Ltd.*, 2007 WL 2914452 (S.D.N.Y. Oct. 5, 2007). Laches is a bar to recovery of monetary damages. *Columbia v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 751 (S.D.N.Y. 1997). To prove laches, a defendant must demonstrate the following: (1) plaintiff had knowledge of defendant's use of the mark, (2) plaintiff inexcusably delayed in taking action, and (3) the defendant suffered prejudice. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980); *Black Diamond*, 2007 WL 2914452, at *3. Failure of a plaintiff to show fraud by a defendant, means delay by plaintiff, of any length, becomes an increasingly important factor. *Saratoga*, 625 F.2d at 1048. Prejudice results if a defendant has detrimentally changed positions. *Conopco, Inc. v. Campbell Soup, Inc.*, 95 F.3d 187 (2d Cir. 1996); *Columbia Univ.*, 964 F.Supp. at 752. Evidence that the defendant has

---

incontestability may be defeated where "equitable principles, including laches, estoppel, and acquiescence, are applicable." 15 U.S.C. § 1115(b)(9).

made a substantial commitment of corporate money to promote the mark is sufficient to establish prejudice. *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *33 (S.D.N.Y. Apr. 19, 2006).

Acquiescence needs the active consent of the supposed trademark owner and requires proof that: (1) plaintiff actively represented that it would not assert its rights, (2) the delay between the representation, and initiation of suit is not excusable, and (3) the delay caused defendant prejudice. *ProFitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67–68 (2d Cir. 2002). Equitable estoppel is properly invoked where enforcement of the rights of one party would work an injustice upon the other party. *Juicy Couture*, 2006 WL 1012939, at *35. Equitable estoppel requires: (1) a misrepresentation by plaintiff, (2) reasonable reliance by defendant, and (3) prejudice to the defendant. *Id.*

The actions of BTE and its predecessor, SBI, are precisely the type of activities that preclude recovery on BTE's trademark infringement claims. At a minimum, there are issues of fact relating to whether the actions or inaction of BTE and SBI caused FCU to believe that it could continue to use the term skee and the circle stack design logo in the way FCU had been using them since 2014 following execution of the License and Settlement Agreements and that it could continue to promote Live Play on the Internet and via ESPN. The bottom line is that BTE and SBI failed to object to FCU's activities for six years, even though BTE and SBI were aware of them. It was not until 2020, years after BTE's and SBI's explicit knowledge and approval of FCU's promotional methods and after FCU initiated this action, that BTE claimed FCU was infringing on the Skee-Ball mark.

Waiting six years before commencing a lawsuit is too long, especially when the defendant has created its market niche and is given no reason to curtail its natural expansion and expenditures.

Far lesser delays have been found to be inexcusable in the context of trademark litigation. *See Columbia Univ.*, 964 F. Supp. at 751 (finding three and one-half years between knowledge of use and filing of action unreasonable when plaintiffs voiced no concerns during that period); *McDonald's Corp. v. Druck & Gerner, DDS, P.C.*, 814 F. Supp. 1127, 1137 (N.D.N.Y. 1993) ("Measuring from 1985 to 1987, when Plaintiff sent its first protest letters to Defendant . . . the court finds that Plaintiff did inexcusably delay in asserting its trademark rights against Defendant."). Indeed, lesser delays have been held to be unreasonably long even in situations where a party took some action to assert its rights. *See New Era Publications Inter'l v. Henry Holt and Co., Inc.*, 873 F.2d 576, 584-585 (2d Cir. 1989), *cert. denied*, 493 U.S. 1094 (1990) (finding two year delay between time of knowledge and lawsuit inexcusable, despite having brought lawsuits against defendant in different countries); *Tap Publications, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F. Supp. 212, 223 (S.D.N.Y. 1996) (holding that a party who waited almost three years between its first cease and desist letter and its second cease and desist letter had "unreasonably delayed in asserting its rights in the mark" at issue).

FCU has and will continue to be prejudiced by such delay. "A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim. Specifically, prejudice ensues when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'" *Conopco*, 95 F.3d at 192; *see also McDonald's Corp.*, 814 F. Supp. at 1137 (finding that the plaintiff inexcusably delayed in asserting trademark rights when it failed to send promptly protest letter after it received notice of infringement). "Commonly cited criteria of prejudice are the expenditure of significant amounts for advertising and promotion of a mark." *Grotian, Helfferich,*

*Schulz, Th. Steinway Nachf. v. Steinway and Sons,* 365 F. Supp. 707, 718 (S.D.N.Y. 1973), *modified*, 523 F.2d 1331 (2d Cir. 1975).

Allowing BTE to pursue its claims—and granting it any relief at this late date—after it and its predecessor sat idly by for six years, while FCU dedicated significant resources in promoting its comedic expressions and tournaments, would result in severe prejudice to FCU. *See Eppendorf-Netheler-Hinz GMBH v. Enterton Co. Establishment, et al.*, 89 F. Supp. 2d 483, 487 (S.D.N.Y. 2000), *aff'd* 14 Fed. Appx. 102 (2d Cir. 2001) (finding that defendants had experienced "prejudice resulting from their substantial expenditure of resources and effort to develop" a product without any interim protest from plaintiff).

Moreover, BTE tricked FCU into believing it was agreeable to FCU's activities to induce FCU to give BTE its consent. When BTE decided to acquire the Skee-Ball mark, FCU was already a licensee. BTE thus needed FCU's consent to BTE's assignment and assumption of the Agreements. To induce that consent, BTE made certain representations to FCU.

One of those representations was that BTE was agreeable to FCU's goal of producing professional tournament content for ESPN under the name National Skee-Ball League.[26] After years of effort to get the attention of ESPN, FCU put a deal together to produce Live Play tournament content that would be aired on ESPN. This would of course benefit everyone associated with Skee-Ball, including BTE. But, BTE claimed the broadcast would infringe its trademark and was not a permitted use under the License Agreement. It threatened to sue and killed FCU's deal with ESPN, after agreeing to the goal when seeking FCU's consent to the assignment.

---

[26] The statements in this paragraph and the next are all supported by the Pavony Decl. ¶¶ 65 to 77.

Had BTE not falsely represented its approval of FCU's goal to air tournaments on ESPN, FCU would not have consented to the assignment.

Another representation that BTE made to induce FCU's consent to the assignment was that BTE was agreeable to the manner in which FCU historically operated, including its own use of puns and parody, and the use of those methods of expression by the league participants (FCU's customers). BTE represented that it was excited to be a partner with FCU and would work to make the partnership a success for them both. This turned out to be untrue, of course. Years later, BTE has sued FCU for doing the same thing BTE represented it approved of when inducing FCU to consent to the assignment. Had BTE not falsely represented its approval of FCU's activities, FCU would not have consented to the assignment.

FCU's detrimental reliance on BTE's representations of approval of FCU's and its customers' methods of expression and FCU's goals of broadcasting on ESPN should give the jury reason to find in favor of FCU on all the elements of equitable estoppel in defense of BTE's claims for infringement, unfair competition, and false designation of origin.

Finally, BTE has not established the date of first use of the supposedly wrongful activities in its motion. Because the Settlement Agreement includes a release of all possible claims preceding the release, BTE has not established that it can sue for the claimed wrongs.

### vi.     Pavony is not individually liable

With respect to Mr. Pavony's purported individual liability, he incorporates FCU's arguments, statement of facts, and positions, above, herein. Even if the Court were to enter judgment as a matter of law on BTE's claims against FCU, however, multiple disputed facts remain for trial as to Pavony, individually. As BTE acknowledges, there is the issue of whether he was acting in a corporate capacity (which he was at all times) or an individual capacity. (ECF No. 150 at 43) For individual liability to attach to Pavony's conduct as a corporate officer, BTE would

have to demonstrate that he personally engaged in intentional tortious conduct in New York.[27] *See Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525 (S.D.N.Y. 2015) (distinguishing the authority BTE relies upon and explaining the limited reach of the New York doctrine). BTE has identified no such intent; nor could it. The only potential candidate for the intentional tortious conduct would be the tort of unfair competition because BTE's other counterclaims are either contractual or arise under the Lanham Act. And unfair competition requires a showing of bad faith, *see Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd.*, 2019 WL 4735426, at *10 (S.D.N.Y. Sept. 27, 2019) (dismissing unfair competition claim for failure to show bad faith), which BTE does not even attempt to demonstrate. (ECF No. 150 at 43-44)

## CONCLUSION

For the foregoing reasons, FCU respectfully requests that this Court deny BTE's motion for summary judgment in its entirety.

Dated: March 27, 2023

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Paul Thanasides*
Paul Thanasides
paul@mcintyrefirm.com
clservice@mcintyrefirm.com
Christina Casadonte-Apostolou
christina@mcintyrefirm.com
complexlit@mcintyrefirm.com
McIntyre Thanasides Bringgold Elliott
    Grimaldi Guito & Matthews, P.A.
500 E. Kennedy Blvd., Suite 200
Tampa, FL 33602
Telephone: 813.223.0000
Facsimile: 813.225.1221

</div>

---

[27] During most of the relevant events, Mr. Pavony resided in Texas. BTE has identified no basis to apply this New York doctrine to tortious conduct that Mr. Pavony engaged in from Texas that injured BTE in Wisconsin.

Reid Skibell
rskibell@glennagre.com
Glenn Agre Bergman & Fuentes
1185 Avenue of the Americas, 22nd Floor
New York, NY 10001
Telephone: 212-970-1600
***Counsel for Plaintiff/Counterclaim
Defendant Full Circle United, LLC and
Counterclaim Defendant Eric Pavony***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 27, 2023, a true and correct copy of the foregoing was electronically filed and served and served using the Court's CM/ECF system, and electronically served to all counsel of record via email to:

Christine Lepera, Esq.
ctl@msk.com
Jeffrey Movit, Esq.
jmm@msk.com
Elaine Nguyen, Esq.
eln@msk.com
John Matthew Williams, Esq.
mxw@msk.com
Mark Humphrey, Esq.
mxh@msk.com
Mitchell Silberberg & Knupp LLP
437 Madison Avenue, 25th Floor
New York, NY 10022
Telephone: 212.509.3900
Facsimile: 212.509.7239
***Counsel for Defendant/Counterclaim
Plaintiff Bay Tek Entertainment, Inc.***

*/s/ Paul Thanasides*
Attorney