# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

FULL CIRCLE UNITED, LLC,

        Plaintiff,

   *v.*

BAY TEK ENTERTAINMENT, INC.,

        Defendant.

CASE NO. 1:20-CV-03395-BMC

BAY TEK ENTERTAINMENT, INC.,

        Counterclaim Plaintiff,

   *v.*

FULL CIRCLE UNITED, LLC,

        Counterclaim Defendant,

  *and*

ERIC PAVONY,

        Additional Counterclaim
        Defendant.

## BAY TEK ENTERTAINMENT, INC.'S RESPONSES TO FULL CIRCLE UNITED, LLC AND ERIC PAVONY'S AMENDED COUNTERSTATEMENT OF MATERIAL FACTS TO WHICH IT IS PURPORTED THERE EXISTS A GENUINE ISSUE TO BE TRIED

Defendant/Counterclaim Plaintiff Bay Tek Entertainment, Inc. ("BTE") submits this statement pursuant to Local Rule 56.1 in response to Full Circle United, LLC ("FCU") and Eric Pavony's "Amended Counterstatement of Material Facts to Which There Exists a Genuine Issue to Be Tried."

1

### a. Purported Background Facts

#### i. Skee-Ball and SBI

1. Skee-ball is a game played with a machine, similar in concept to bowling, and a brand ("Skee-Ball").

Response: Undisputed solely for purposes of this motion.

2. "SKEE-BALL" is a trademark registered on the Principal Register of the United States Patent and Trademark Office (the "USPTO") in connection with "a game in the nature of a bowling game and parts thereof" (the "Mark"). Movit MSJ Decl. ¶¶ 75-76 & Exs.63-64

Response: Undisputed solely for purposes of this motion.

3. SBI, a manufacturer, acquired the Mark. Amended Supplemental Declaration of Paul Thanasides ("Am. Thanasides MSJ Decl." ¶ 46 & Ex.11) (Treankler Depo at 33:1-4).

Response: Undisputed solely for purposes of this motion.

4. SBI built Skee-Ball branded lanes ("Skee-Ball Lanes"). Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 32:1-8.

Response: Undisputed solely for purposes of this motion.

#### ii. Joe Sladek

5. Joe Sladek was the owner of Skee-Ball, Inc. Treankler Depo. (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 36:14-22.

Response: Undisputed solely for purposes of this motion.

#### iii. Eric Pavony

6. In 2005, Eric Pavony ("Mr. Pavony"), and a former partner launched Brewskee-Ball by bringing Skee-Ball Lanes into bars, and organizing adults to play the game competitively,

like a sport. Am. Thanasides MSJ Decl. ¶ 129 & Ex.94 (FCU's Answers to BTE's First Set of Interrogatories); Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶¶ 8,85).

Response: Undisputed solely for purposes of this motion.

7.    "BREWSKEE-BALL®" is a trademark registered on the Principal Register of the United States Patent and Trademark Office ("USPTO") on February 26, 2008, U.S. Trademark Reg. No. 3,389,014, in connection with "Entertainment in the nature of skee-ball games; entertainment services, namely, arranging and conducting of skee-ball competitions; providing a website that provides statistics for skee-ball league players; providing recognition and incentives by the way of awards to demonstrate excellence in the field of skee-ball." Am. Thanasides MSJ Decl. ¶ 101 & Ex.66.

Response: Undisputed solely for purposes of this motion.

8.    The Brewskee-Ball Mark remains registered on the USPTO. Am. Thanasides MSJ Decl. ¶ 102 & Ex.67 (USPTO "Brewskee-Ball" status page).

Response: Undisputed solely for purposes of this motion.

### iv.    Erik Wikman and Eric Cooper

9.    Erik Wikman ("Mr. Wikman") and Eric Cooper ("Mr. Cooper") provide ongoing consulting services for FCU, including software development. Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 17:2-11, 112:16-114:4); Wikman and FCU's Answers to BTE's First Set of Interrogatories (Movit MSJ Decl. Ex. 43) at Ex. 31 at No. 2.

Response: Undisputed solely for purposes of this motion.

### v.    Full Circle United

10.    Full Circle United, LLC ("FCU") is a marketing, promotions and entertainment company formed by Mr. Pavony. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶4)

3

Response: Undisputed solely for purposes of this motion.

11.     FCU owns and operates Skee-Ball leagues, tournaments, events and competitions under the Brewskee-Ball brand, and the National Skee-Ball League (the "NSBL"). Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 17:7-9.

Response: Undisputed solely for purposes of this motion.

12.     FCU is the owner of the Brewskee-Ball Mark. Am. Thanasides MSJ Decl. ¶ 102 & Ex.67 (USPTO "Brewskee-Ball" status page).

Response: Undisputed solely for purposes of this motion.

13.     FCU's business model includes purchasing skee-ball lanes, placing the lanes in venues and collecting the revenue generated by the lanes, among other things. Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 29:30-8.

Response: Undisputed solely for purposes of this motion, with the exception of this statement's improper use of the Mark, which violates the License Agreement.[1]

### vi.     **Brewskee-Ball**

14.     By 2012, Brewskee-Ball had leagues in states around the country and launched an app to help league members keep score. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶15); Am. Thanasides MSJ Decl. ¶ 98, 99 & Ex.63, 64.

Response: Undisputed solely for purposes of this motion.

15.     Beginning in 2006, Brewskee-Ball used the Internet and social media to promote its Skee-Ball leagues, events, tournaments and competitions, and filmed and broadcasted

---

[1] At least _**twelve**_ times in its Rule 56.1 Counterstatement, FCU refers improperly to Skee-Ball® and the Skee-Ball Mark as "skee-ball."  FCU covenanted not to do this under the License Agreement.  Movit MSJ Decl. Ex. 2 (License Agreement) ¶¶ 2, 7.6.

Brewskee-Ball events and competitions. Brewskee-Ball started using television to promote Live Play in 2007, and radio starting in 2010. Am. Thanasides MSJ Decl. ¶ 129 & Ex.94 (FCU's Answers to BTE's First Set of Interrogatories, at No. 4); Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶ 12).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. It is improperly ambiguous, given that it only refers in vague terms merely to what Brewskee-Ball "began" or "started" to do respectively in 2006, 2007, and 2010. Moreover, the materials cited by FCU in support of this assertion from FCU's own interrogatory responses are not admissible on a motion for summary judgment. *See Morangelli v. Chemed Corp.,* 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) (Cogan, J.) (quoting *Gilmore v. Macy's Retail Holdings,* Civ. No. 06–3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009) ("a litigant may not introduce statements from its own answers to interrogatories ... as evidence because such answers typically constitute hearsay when used in this manner.").

### vii. **Bay Tek**

16.    Gaetan Philippon ("Mr. Philippon") was the President of BTE from 2013 until 2016. Philippon Depo. (Am. Thanasides MSJ Decl. ¶ 49 & Ex.14) at 22:23-25; Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 (BTE's Response to FCU's and Eric Pavony's First Set of Requests for Admissions).

Response: Undisputed solely for purposes of this motion.

17.    Larry Treankler ("Mr. Treankler") is BTE's owner, and has been the Chairman or President of BTE, and related companies for the last 40 years. Treankler Depo. (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 17:13-18:12; Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 (Bay Tek's Response to FCU's and Eric Pavony's First Set of Requests for Admissions).

5

Response: Undisputed solely for purposes of this motion.

18.     Holly Hampton ("Ms. Hampton") was Director of Innovation at BTE from 2015 to 2020, and reported to Mr. Philippon and Mr. Treankler. Hampton Depo (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 46:6-47:11

Response: Undisputed solely for purposes of this motion.

19.     Ms. Hampton's role as Director of Innovation involved "find[ing] revenue streams outside of our core business, so developing business outside of our core. Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 48:12-22.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.

20.     Ms. Hampton became "business unit leader" of Dimensional Branding Group, LLC ("Dimensional") in September 2020. Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 47:12-15.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.

**viii.   Beer Ball**

21.     BTE developed a game called Beer Ball, a Skee-Ball game for bars, after it learned of Brewskee-Ball. Philippon Depo (Am. Thanasides MSJ Decl. ¶ 49 & Ex.14) at 89:10-93:23, 97:16-98:16; Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 28:2-4.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The cited testimony does not support that Beer Ball was a "Skee-Ball game." That phrase does not appear in the cited materials and improperly attempts to use the Skee-Ball Mark as a generic or descriptive term.  According to the testimony cited by FCU

6

above, Beer Ball was an "alley roller product" that BTE developed several years *before* it acquired the Skee-Ball trademark and brand in 2016, and before FCU had any licensing relationship with either SBI or BTE. *See* Am. Thanasides MSJ Decl. (hereinafter, "Thanasides MSJ Decl.") Ex.14 (Philippon Depo) at 89:10-89:14, 98:2-17, *id.* Ex. 10 (Hampton Depo.) at 28:2-7. BTE has not manufactured Beer Ball since approximately 2016. *See* SUF ¶ 5; Hampton Depo (Reply Declaration of Jeffrey M. Movit [Movit Reply Decl."]), ¶ 6 & Ex. 82 at 28:20-29:2.

22. According to Mr. Philippon, BTE's "Beer Ball journey" started because two members of its product development team visited Full Circle Bar in Brooklyn "and saw what was going on." Philippon Depo. (Am. Thanasides MSJ Decl. ¶ 49 & Ex.14) at 50:10-53:21; Am. Thanasides MSJ Decl. ¶ 4 & Video Ex. 3 (April 14, 2016 Recording of Meeting between BTE and FCU and presentation by FCU); Am. Thanasides MSJ Decl. ¶ 68 & Ex.33 (July 2011 email from BTE to FCU seeking information on Brewskee-ball and joining mail list).

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. BTE developed Beer Ball *prior to* its acquisition of the Skee-Ball Mark in 2016, and has not manufactured Beer Ball since approximately that same year. *See* SUF ¶ 5; Hampton Depo. (Movit Reply Decl. Ex 82) at 28:20-29:2.

23. BTE marketed Beer Ball as "Skee-Ball all grown up!" and promoted adult leagues and tournaments in bars. Philippon Depo (Am. Thanasides MSJ Decl. ¶ 49 & Ex.14) at 183:3-9, 184:3-186:13; Am. Thanasides MSJ Decl. ¶¶ 137,138 & Ex.102,103 (Beer Ball promotional material).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The materials cited by FCU in support of this assertion, including two exhibits that are unauthenticated and unexplained (including who authored the documents

7

and if or how they were ever used), do not establish that BTE "promoted adult leagues and tournaments" of Beer Ball in bars, or that BTE ever "marketed" Beer Ball using the quoted phrase. BTE developed Beer Ball *prior to* its acquisition of the Skee-Ball Mark in 2016, and has not manufactured Beer Ball since approximately 2016. *See* SUF ¶ 5; Hampton Depo. (Movit Reply Decl. Ex 82) at 28:20-29:2.

### ix. SBI/FCU Litigation

24.　On October 5, 2011, SBI sued Full Circle, seeking cancellation of the Brewskee-Ball Mark. SBI also asserted claims against Full Circle for common law unfair competition and three types of Lanham Act violations: trademark infringement, intentional dilution and tarnishment of the SKEE-BALL trademark, as well as false designation of origin services. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶17).

Response: Undisputed solely for purposes of this motion.

25.　FCU filed various counterclaims against SBI, and filed a Petition for cancellation of SBI's registration for the "Skee-Ball" trademark with the USPTO (the "Petition") (collectively, the "SBI Litigation"). Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶17).

Response: Undisputed solely for purposes of this motion.

### x. SBI/FCU Settlement

26.　The day before SBI's deadline to answer the Petition, FCU and SBI resolved the dispute by entering into a Settlement Agreement, which granted FCU a license pursuant to a License Agreement. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶19)

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The cited paragraph of the Pavony Declaration does not address the timing of the Settlement Agreement, and merely refers to the Settlement Agreement and License

8

Agreement as "contemporaneous." It also does not assert that the Settlement Agreement "granted FCU a license." *See* Thanasides MSJ Decl. Ex. 91 ("2023 Pavony Decl.") at ¶19; *infra*, ¶ 27. FCU's assertion that the "Settlement Agreement … granted FCU a license" is also controverted by FCU's Paragraph 29 of its Statement below, which refers to a "confidential settlement ***and a*** license agreement." (emphasis added).

27. Exhibit D to the Settlement Agreement is a Joint Press Released to be jointly issued by the parties, which states:

> "Skee-Ball, Inc. ("SBI") and Full Circle United, LLC ("FCU") jointly announce they have reached a confidential settlement and a license agreement. The settlement resolves existing lawsuits and legal claims between SBI and FCU.
>
> FCU will continue to advance creative concepts, including competitive SKEE-BALL® league play featuring only official SKEE-BALL® brand name machines.
>
> Skee-Ball Inc. is a pioneer in the U.S. in the development of amusement games including the game trademarked as Skee-Ball®, a trademark it has owned since 1929. Skee-Ball, Inc. will continue to manufacture high-quality SKEE-BALL® brand name machines, as well as other entertainment and amusement games.

Settlement Agreement (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at Ex. 3.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.

### xi. Settlement Agreement

28. Paragraph 3.2 of the Settlement Agreement states:

> Subject to the terms and conditions of this Agreement, SBI, on behalf of itself and the SBI Releasors, agrees that it shall not challenge or contest, or assist others in challenging or contesting, in any way, the BREWSKEE-BALL Trademark or the validity and enforceability of the BREWSKEE-BALL Registration.

Settlement Agreement (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶ 3.2

Response: Undisputed.

29. Paragraph 4.1 of the Settlement Agreement provides:

9

SBI hereby covenants, warrants, and agrees that it will not, directly or indirectly, operate, sponsor, or endorse a business, anywhere in the world, involving Live Play (as defined in the License Agreement attached as Exhibit "C") for as long as the license agreement contemporaneously entered into by the parties and attached hereto as Exhibit C (the "License Agreement") is in full force and effect.

Settlement Agreement (Dkt. 90-2) (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶4.1.

Response: Undisputed.

30.    The Settlement Agreement at ¶ 5.1 states:

With the exception of FCU's use of the SKEE-BALL Trademark in accordance with the terms of the License Agreement, after the Effective Date, neither Party shall use or exploit the others' trademarks without the prior written consent of the Party owning the trademark. The Parties acknowledge and agree that only SBI, and not FCU, has the full right to commence any action for infringement or improper use of the SKEE-BALL Trademark against any third party, and that only FCU, and not SBI, has the full right to commence any action for infringement or improper use of the BREWSKEE-BALL Trademark against any third Party.

Settlement Agreement (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶5.1.

Response: Undisputed.

### xii.    **Full Circle's Live Play License**

31.    Paragraph 3 of the License Agreement, "License Grant", states:

3.1 Subject to the terms, conditions, exclusions, and restrictions of this Agreement, including without limitation the SBI use guidelines set forth in Exhibit *"A" hereto (the* "SBI Use *Guidelines"), SBI grants to FCU a worldwide, right and license to use  the* SKEE-BALL Trademark  in  connection  with  the following specified Licensed Uses during the Term and within the Territory:

a) Conducting, arranging, presenting, marketing, and promoting live play leagues, teams, events, and tournaments utilizing alley rollers manufactured by SBI and called Skee-Ball® machines (including without limitation BREWSKEE BALL live play leagues, teams, events, and tournaments) utilizing alley rollers manufactured by SBI (collectively "*Live Play*").

b) Developing, producing, selling, and distributing merchandise solely in connection with Live Play ("Live Play Merchandise") subject to the restrictions on merchandise set forth below.

10

c) Developing, producing, offering, and using an electronic scoring application that will be made available for free, which allows Live Play players, teams, and leagues to record and maintain scores, statistics, league and player information, wins and losses, awards and rankings, solely and directly in connection with Live Play, and which does not include virtual play of the game manufactured by SBI known as Skee-Ball® (the "Scoring App").

d) Using the Skee-Ball Trademark for sponsorships or endorsements solely and directly related to Live Play, provided however, that notice of such sponsorships or endorsement must be given to SBI, SBI shall receive a copy of the executed agreement and SBI shall receive five percent (5%) of Gross Sponsorship Revenues (as defined below in Paragraph 8.4).

3.2 The foregoing (a) – (d) are referred to as the "Licensed Uses." Pursuant to the license granted to FCU herein under Section 3.1, and subject to the restrictions and exclusions set forth below, the Parties acknowledge and agree that FCU may use the SKEE-BALL Trademark, for advertising and promotional purposes in any and all mediums now known or hereafter devised, so long as such use is solely in connection with and in compliance with the Licensed Uses above, and the restrictions, conditions and exclusions below.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶3

Response: Undisputed.

32.    Paragraph 9.5 of the Settlement Agreement provides:

Entire Agreement. This is an enforceable Agreement. This Agreement, including the attached Exhibits, which are incorporated by reference herein, constitutes the entire agreement between the Parties regarding the subject matter hereof and supersedes all previous communications, representations, agreements or understandings, either oral or written, between the Parties with respect to the subject matter hereof. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto which specifically refers to this Agreement.

Settlement Agreement (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶9.5.

Response: Undisputed.

1 [*sic*]. The fourth "WHEREAS" clause of the Settlement Agreement states:

FCU is the owner of the trademark "BREWSKEE-BALL®" (the "BREWSKEEBALL Trademark"), and is the owner of U.S. Trademark Reg. No. 3,389,014 for the BREWSKEEBALL Trademark in connection with, among other things, "arranging and conducting skee-ball competitions" (the "BREWSKEE-

11

BALL Registration").

Settlement Agreement. (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5)

Response: FCU's statement is partially incorrect. The language FCU quotes above is not contained in the *fourth* "WHEREAS" clause of the Settlement Agreement, but rather in the *second* "WHEREAS" clause.

### xii.    Consent to Assignment

33.    Paragraph 8 of the Settlement Agreement states:

> This Agreement and the rights granted hereunder are personal to the Parties, and no Party may assign this Agreement or any right or obligation under this Agreement without the prior written consent of the other Party. Any assignment or transfer in violation of this Section 8.1 shall be null and void. This prohibition on assignment without prior written consent shall apply to any transfer, whether direct or indirect, including any transfer which arises from a change in control or any kind whatsoever, whether a stock sale, asset sale or other change in control, and whether part of a sale or transfer of a substantial portion of a Party's business (regardless of the manner in which any such transaction is effected). Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective affiliates and their permitted successors and assigns.

Settlement Agreement (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶8.

Response: Undisputed.

34.    BTE sought assignment of the License Agreement as part of their effort to purchase the Mark. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶26,27).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The cited paragraphs of Mr. Pavony's 2023 declaration, consisting of three brief sentences, neither state nor establish that seeking an "assignment of the License Agreement" was "part of [BTE's] effort to purchase the Mark," and offer inadmissible and unsupported legal conclusions such as ███████████████████████ Fed. R. Evid. 701;

*Cameron v. City of New York*, 598 F. 3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not 'present testimony in the form of legal conclusions.'") (quotation omitted); *compare* 2023 Pavony Decl. ¶ 27 with Movit MSJ Decl. Ex. 2 (License Agreement) at ¶¶ 4.10, 9.1, 9.3 (placing transfer restrictions only on FCU).

35.     Before consenting to the assignment of the Settlement Agreement and License Agreement, FCU insisted on speaking with SBI's Joe Sladek and BTE's Mr. Philippon. Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 341:5-19; Am. Thanasides MSJ Decl. ¶ 125 & Ex.90 (Decl. of Eric Pavony (Dkt. No. 45) at ¶¶3-4).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The materials cited by FCU above do not refer to FCU "insisting" on anything. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ This does not support any contention that FCU "insisted" on speaking with anyone. Even if, *arguendo*, FCU had "insisted" on speaking with someone, that would have no bearing on the claims and causes of action at issue on this motion.

36.     On December 18, 2015, FCU made BTE aware of FCU's goal to professionalize the game of skee-ball using new technology and a custom "lane of the future", and to make skee-ball a national sport shown on ESPN. Am. Thanasides MSJ Decl. ¶ 3 & Video Ex. 2 (December 18, 2015 Recording of call between FCU and Mr. Philippon); Pavony Depo (Am. Thanasides MSJ Decl. ¶ 41 & Ex.6) at 336:2-337:10.

Response: This statement makes improper use of the Skee-Ball Mark in violation of the

13

License Agreement. *See* BTE's Response to FCU's Paragraph 13 above, including footnote 1. Otherwise, this statement is undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. Contrary to FCU's suggestion, the FCU's making BTE "aware" of its "goals" does not expand BTE's duties under the License Agreement; FCU admits that Bay Tek had no obligation to manufacture custom lanes for FCU under the License Agreement, SUF ¶¶ 24, 34; RSUF ¶¶ 24, 34.

37.     Mr. Philippon confirmed that BTE would meet FCU's needs for Live Play. Am. Thanasides MSJ Decl. ¶ 3 & Video Ex. 2 (December 18, 2015 Recording of call between FCU and Mr. Philippon); Am. Thanasides MSJ Decl. ¶ 125 & Ex.90 (Decl. of Eric Pavony (Dkt. No. 45) at ¶¶5-8).

     Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. Neither the recorded telephone conversation, which FCU has submitted into the record, nor the cited paragraphs of Mr. Pavony's declaration, which mischaracterize this recorded conversation, demonstrate in any way that "Mr. Philippon confirmed that BTE would meet FCU's needs." *See, e.g.,* Thanasides MSJ Decl., Video Ex. 2 at timestamp 21:55 (Pavony: "I was just hoping that we could just, you know, introduce ourselves today…."). Even if *arguendo* Mr. Philippon had stated that "BTE would meet FCU's needs," such a vague statement would not change the terms of the License Agreement.

38.     FCU consented to the assignment of the License Agreement to BTE based on Mr. Philippon's commitment that BTE would meet FCU's demands for Live Play. Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 39:22-25, and 341:5-19; Am. Thanasides MSJ Decl. ¶ 125 & Ex.90 (Decl. of Eric Pavony (Dkt. No. 45) at ¶¶9-10).

     Response: This is a sham assertion, not supported by the record, which fails to raise a

14

material issue of triable fact. First, the License Agreement placed a restriction on *FCU's* assignment of the License Agreement, and not upon an assignment by SBI; therefore, "consent" by FCU was not required for SBI to assign the License Agreement. *See* Movit MSJ Decl. Ex. 2 at ¶¶ 4.10, 9.1, 9.3. The testimony by Wikman cited by FCU above merely offers unrelated hearsay attributed to SBI's former CEO, Joe Sladek, which cannot re-write the actual assignment provisions of the License Agreement. Second, the cited portion of Eric Pavony's declaration makes no reference to any purported "commitment" by BTE as claimed by FCU above.

### xiv. NSBL

39.     BTE was aware that FCU designed a custom skee-ball lane for the NSBL equipped with cameras and a HD screen, and was developing software that would enable players to compete against each other remotely, in real time. Philippon Depo. (Am. Thanasides MSJ Decl. ¶ 49,60 & Ex.14,25) at 233:15-235:14, Ex. 40; Am. Thanasides MSJ Decl. ¶¶ 5-24 & Ex.4-23) (April 14, 2016, Recordings of prototype presentation given by FCU to BTE Leadership Team); Am. Thanasides MSJ Decl. ¶ 4 & Video Ex.3 (April 14, 2016, Meeting between FCU and BTE Leadership Team).

Response: This statement makes improper use of the Skee-Ball Mark in violation of the License Agreement. *See* BTE's Response to FCU's Paragraph 13 above, including footnote 1. Otherwise, this statement is undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.

40.     On April 14, 2016, FCU demonstrated new software it developed for the NSBL to BTE using a prototype FCU built by making modifications to an old Classic skee-ball lane. Am. Thanasides MSJ Decl. ¶¶ 5-24 & Ex.4-23 (April 14, 2016, Recordings of prototype presentation given by FCU to BTE Leadership Team).

15

<u>Response</u>**:** This statement makes improper use of the Skee-Ball Mark in violation of the License Agreement. *See* BTE's Response to FCU's Paragraph 13 above, including footnote 1. Otherwise, this statement is undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.

41. BTE was aware that FCU claimed the right to find another manufacturing partner if BTE did not want to build the custom Skee-Ball lane for the NSBL at that time. Am. Thanasides MSJ Decl. ¶ 25 & Ex.24 (April 15, 2016 Meeting between FCU and BTE at 0:45).

<u>Response</u>**:** Not disputed solely to the extent that BTE was aware that FCU "claimed" the right to do this. However, such a claim of right was baseless under the License Agreement, because (1) it would be incompatible with BTE's obligations of quality control as trademark owner, (2) FCU *concedes* the License Agreement did not require Bay Tek to manufacture Custom Lanes, and (3) the License Agreement expressly required FCU to purchase lanes from SBI or its successor unless they were not available to "buy, rent or borrow." *See* SUF ¶¶ 24, 34; RSUF ¶¶ 24, 34; Movit MSJ Decl. Ex. 2 (License Agreement) at ¶ 3.1(a) (providing that Licensed Uses employ "alley rollers *manufactured by SBI* called Skee-Ball® machines") (emphasis added); *id.* at ¶ 5.2 (requiring purchase of lanes from SBI or its successor unless "SKEE-BALL® branded alley-roller machines [are] not available to buy, rent or borrow"); *id.* at Ex. A (referring to Live Play using "official SKEE-BALL® machines"); *see also* ¶ 27, *supra* (joint press release). That FCU made a baseless "claim"—which Bay Tek did accept—fails to raise any genuine issue to be tried.

42. On April 15, 2016, FCU and BTE discussed whether BTE was interested in being FCU's manufacturing partner to build a custom Skee-Ball lane for the NSBL. Am. Thanasides MSJ Decl. ¶ 25 & Ex.24 (April 15, 2016 Meeting between FCU and BTE at 0:45).

16

Response: Undisputed solely for purposes of this motion.

43.    On April 15, 2016, Mr. Philippon asked, "What if we look at our lineup of projects, and we say, 'ya know guys, from an ROI standpoint and everything it's not there, we're out, we're not going to build the lanes.' What would you guys do?" Am. Thanasides MSJ Decl. ¶ 25 & Ex.24 (April 15, 2016 Meeting between FCU and BTE at 0:45).

Response: Undisputed solely for purposes of this motion but irrelevant to the determination of this motion.

44.    Mr. Pavony responded, in relevant part, "[W]e can go somewhere else…" and Mr. Wikman added, "We can still call it National Skee-Ball League." Am. Thanasides MSJ Decl. ¶ 25 & Ex.24 (April 15, 2016 Meeting between FCU and BTE at 0:45).

Response: Undisputed solely for purposes of this motion but irrelevant to the determination of this motion.  The above-quoted statements by Mr. Wikman and Mr. Pavony are contrary to the express terms of the License Agreement. *See* Movit MSJ Decl. Ex. 2 (License Agreement) at ¶ 5.2 (requiring that FCU use "SKEE-BALL® branded alley roller machines manufactured by SBI or its successor" except in the event such lanes were not available to "buy, rent, or borrow").  That Mr. Pavony made legally baseless assertions has no bearing on the adjudication of this motion.

45.    Notes taken by Mr. Philippon on April 26, 2016 about the FCU meeting state: ██

███████████████████████████████████████████████████████████████

███████████████████    Philippon Depo (Am. Thanasides MSJ Decl. ¶¶ 49,61 & Ex.14,26) at 304:1-17, 307:20-308:19, Ex. 44.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  FCU egregiously misquotes the cited exhibit and ignores the cited

17

testimony of Mr. Philippon. ████████████████████████████████████████████
████████████████████████████████████████████████████████ and this also is

reflected in the cited testimony.  The claim is baseless given the plain language of the License

Agreement.  *See* Movit MSJ Decl. Ex. 2 (License Agreement) at ¶ 5.2 (requiring that FCU use

"SKEE-BALL® branded alley roller machines manufactured by SBI or its successor" except in

the event such lanes were not available to "buy, rent, or borrow").  FCU's assertion of a legally

baseless claim has no bearing on the adjudication of this motion.

### xv.  Ryan Cravens

46.    Ryan Cravens ("Mr. Cravens") was responsible for Business Development at BTE.

His responsibilities included assessing business opportunities and facilitating communication

between Mr. Treankler and Ms. Hampton, and FCU. Treankler Depo (Am. Thanasides MSJ Decl.

¶ 46 & Ex.11) at 222:5-12; Cravens Depo (Am. Thanasides MSJ Decl. ¶ 48 & Ex.13) at 32:12-

13, 42:18-43:4; Am. Thanasides MSJ Decl. ¶ 133 & Ex.98 (BTE's Response to FCU's First Set

of Interrogatories at No. 5).

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. The cited testimony says nothing about facilitating communication

between anyone and FCU.

47.    Mr. Cravens had a background with Big Buck Hunter, a successful game with an

online component created by Play Mechanix. Cravens Depo. (Am. Thanasides MSJ Decl. ¶ 48 &

Ex.13) at 21:6-14.

Response: Undisputed solely for purposes of this motion but irrelevant to the

determination of this motion.  Whether or not Mr. Cravens had prior involvement with Big Buck

Hunter has no bearing on any claim or cause of action at issue in this motion.

18

### xvi.   <u>Eric Schadrie</u>

48.   Eric Schadrie ("Mr. Schadrie") was a Concept Manager at BTE who also designed the Beer Ball game. Am. Thanasides MSJ Decl. ¶ 133 & Ex.98 (BTE's Response to FCU's First Set of Interrogatories at No. 5); Schadrie Depo (Am. Thanasides MSJ Decl. ¶ 134 & Ex.99) at 132:21-23.

<u>Response</u>:  Not disputed solely for purposes of this motion.

### xvii.   <u>Bay Tek and FCU</u>

49.   On July 28, 2011, FCU received an email from BTE's Marketing Communication Specialist, stating that she had signed up for Brewskee-Ball's "Skee-mail" list, and requesting more information about "Base Skeeball". Am. Thanasides MSJ Decl. ¶ 68 & Ex.33.

<u>Response</u>:  Undisputed solely for purposes of this motion but irrelevant to the determination of this motion.  The statement pertains to alleged events in ***2011***, long before BTE acquired the Skee-Ball Mark and became licensor of the Skee-Ball Mark to FCU.

50.   Between June 10, 2016 and October 17, 2017, ten (10) different BTE employees or officers, including Ms. Hampton and Mr. Treankler, traveled to meet with FCU in Austin, or to attend an event or tournament hosted by FCU, on no less than six (6) occasions. Am. Thanasides MSJ Decl. ¶ 133 & Ex.98 (BTE's Response to FCU's First Set of Interrogatories at No. 3)

<u>Response</u>: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The interrogatory response cited by BTE refers to fewer than ten employees or officers who "***may*** have attended events relating to Full Circle and/or Brewskee Ball" on certain dates (emphasis added).  It does not refer to these employees traveling "to meet with FCU in Austin or to attend an event or tournament hosted by FCU," and it does not refer to "no less than six" occasions between June 10, 2016 and October 17, 2017.  Moreover, BTE

19

personnel allegedly travelling to meet with FCU in Austin or to attend an FCU-hosted tournament or event "on no less than six occasions" has no bearing on any claim or cause of action at issue in this motion.

51. Six individuals attended FCU's 2016 National Championship (the "BEEB") at Full Circle Bar in Austin on October 27, 2016 on behalf of BTE: Mr. Cravens, Ms. Hampton, Todd Louthain, Luke Moore, Mr. Schadrie and William Jensen. (Am. Thanasides MSJ Decl. ¶ 133 & Ex.98 (BTE's Response to FCU's First Set of Interrogatories at No. 3).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The interrogatory response cited by BTE does not refer to any of the listed individuals attending FCU's 2016 National Championship at Full Circle Bar in Austin on October 27, 2016, let alone that they were doing so "on behalf of" BTE. Moreover, the alleged attendance of the listed individuals at the 2016 "BEEB" has no bearing on any claim or cause of action that is the subject of this motion.

52. On October 27, 2017, Mr. Cravens created a user account to play Skee-Ball on the Skee-Ball Live Lanes at Full Circle Bar and selected the NSBL display name "Skeeattle Super Sonics." Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl ¶ 101),

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The assertion relies on a single inadmissible sentence of a declaration provided by Eric Pavony, which is offered without foundation and without clarity as to whether it is made on personal knowledge or not. *See* 2023 Pavony Decl. ¶ 3 ("I make this declaration on personal knowledge, except where the circumstances clearly indicate otherwise."). Presumably, FCU has asserted this purported fact in defense of BTE's counterclaim for unauthorized use of the Mark. However, the purported fact also is irrelevant to that defense

20

because the License Agreement did not preclude an employee of **BTE** from creating such an account name.

53.     On October 27, 2017, Ms. Hampton created a user account to play Skee-Ball on the Skee-Ball Live Lanes at Full Circle Bar and selected the NSBL display name "HollsBalls." Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl ¶ 102)

Response**:** This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The assertion relies on a single inadmissible sentence of a declaration provided by Eric Pavony, which is offered without foundation and without clarity as to whether it is made on personal knowledge or not.  *See* 2023 Pavony Decl. ¶ 3 ("I make this declaration on personal knowledge, except where the circumstances clearly indicate otherwise."). Presumably, FCU has asserted this purported fact in defense of BTE's counterclaim for unauthorized use of the Mark.  However, the purported fact also is irrelevant to that defense because "HollsBalls" does not use the Mark.

54.     On October 27, 2017, Todd Louthain, a BTE employee, created a user account to play Skee-Ball on the Skee-Ball Live Lanes at Full Circle Bar and selected the NSBL display name "Holls Balls." Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl ¶103)

Response**:** This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The assertion relies on a single inadmissible sentence of a declaration provided by Eric Pavony, offered without foundation and without clarity as to whether it is made on personal knowledge or not (*see* 2023 Pavony Decl. ¶ 3), which in any event does not support the statement.  Presumably, FCU has asserted this purported fact in defense of BTE's counterclaim for unauthorized use of the Mark.  However, the purported fact also is irrelevant to that defense because "HollsBalls" does not use the Mark.

21

55.     On October 27, 2017, Luke Moore, a BTE employee, created a user account to play Skee-Ball on the Skee-Ball Live Lanes at Full Circle Bar and selected the NSBL display name "Luke SKEEwalker." Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl ¶104)

Response**:** This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The assertion relies on a single inadmissible sentence of a declaration provided by Eric Pavony, which is offered without foundation and without clarity as to whether it is made on personal knowledge or not.  *See* 2023 Pavony Decl. ¶ 3 ("I make this declaration on personal knowledge, except where the circumstances clearly indicate otherwise."). Presumably, FCU has asserted this purported fact in defense of BTE's counterclaim for unauthorized use of the Mark.  However, the purported fact also is **irrelevant** to that defense because the License Agreement did not preclude an employee of ***BTE*** from creating such an account name.

56.     On October 27, 2017, William Jensen, a BTE employee, created a user account to play Skee-Ball on the Skee-Ball Live Lanes at Full Circle Bar and selected the NSBL display name "Skee-Willy." Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl ¶105)

Response**:** This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The statement relies on a single inadmissible sentence of a declaration provided by Eric Pavony, which is offered without foundation and without clarity as to whether it is made on personal knowledge or not.  *See* 2023 Pavony Decl. ¶ 3 ("I make this declaration on personal knowledge, except where the circumstances clearly indicate otherwise."). Presumably, FCU has asserted this purported fact in defense of BTE's counterclaim for unauthorized use of the Mark.  However, the purported fact also is irrelevant to that defense because the License Agreement did not preclude an employee of ***BTE*** from creating such an

account name.

57.	On November 7, 2017, Ms. Hampton emailed Mr. Treankler and Mr. Cravens, █████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████ Am. Thanasides MSJ Decl. ¶ 120 & Ex.85.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.  It does not constitute a breach of a contract (such as the License Agreement) for a party thereto (such as BTE) to seek changes to the contract.

58.	Mr. Treankler admitted that he and Ms. Hampton discussed making changes to FCU's license before September 2017. Treankler Depo (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 218:1-11.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion.  It does not constitute a breach of a contract (such as the License Agreement) for a party thereto (such as BTE) to seek changes to the contract.

59.	On November 20, 2017, Ms.  Hampton wrote ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

Am. Thanasides MSJ Decl. ¶ 122 & Ex.87.

Response: Undisputed for purposes of this motion, but irrelevant to the determination of this motion.  It does not constitute a breach of a contract (such as the License Agreement) for a party thereto (such as BTE) to seek changes to the contract.

60.	On December 1, 2017, Mr. Scanlan wrote: ██████████████████████

██████████████████████████████████████████████████████████████

Ex.86.

Response: Undisputed solely for purposes of this motion, irrelevant to the determination

of this motion.  It does not constitute a breach of a contract (such as the License Agreement) for

a party thereto (such as BTE) to seek changes to the contract.

### xviii.   Skee-Ball Live

61.    FCU has successfully operated Skee-Ball Live since 2017, in addition to running

its Brewskee-Ball leagues since 2005. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl.

¶85).

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. This is a statement of opinion, not fact, and is not supported by the

cited materials, which consist solely of Mr. Pavony asserting the same sentence in conclusory

fashion.  Such a statement cannot, and does not, create a genuine issue to be tried.  *See, e.g.,*

*Pippins v. KPMG, LLP*, 759 F.3d 235, 251 (2d Cir. 2014).

62.    Paragraph 4.9 of the License Agreement states:

As set forth in the SBI Trademark Use Guidelines, FCU shall always use and
place the federal trademark registration symbol "®" or the "™" symbol, as
applicable, or otherwise reasonably specified by SBI, in connection with the use
of the SKEE-BALL Trademark.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶ 4.9.

Response: Not disputed.

63.    FCU created "Skee-Ball Live" to describe the custom Skee-Ball lane and software

technology it developed for the NSBL, presented "Skee-Ball Live" to BTE and submitted art to

BTE to place on the Skee-Ball Live Lane. Am. Thanasides MSJ Decl. ¶¶5,24 & Ex.4,23 (April

14, 2016, Recordings of prototype presentation given by FCU to BTE Leadership Team); Am. Thanasides MSJ Decl. ¶¶ 107,135,139 & Ex.72,100,104 (emails between BTE and FCU regarding artwork for NSBL).

Response: Not disputed solely for purposes of this motion, but irrelevant to the determination of this motion. Presumably, FCU has made this assertion in support of its claim that BTE purportedly breached the License Agreement by registering the trademark "Skee-Ball Live." However, Full Circle concedes that "Skee-Ball Live" is a "Live Play Phrase or Slogan" subject to Paragraph 4.2 of the License Agreement. *See* SUF ¶ 86; RSUF ¶86; Opp. at 13. Accordingly its use was subject to BTE approval, and only BTE was entitled to assert any ownership or other rights in the phrase.

64.     On September 22, 2016, Mr. Schadrie emailed Mr. Pavony, "This is the art we will go with unless you tell us differently or provide us new art. We have been trying to stay within the parameters of our SKEE BALL style guide, so we will need to collaborate and/or approve any art you provide. Of these decals, the one that we will want to have the "biggest say" on is the back panel graphic with the SKEE BALL LIVE logo on it." Am. Thanasides MSJ Decl. ¶¶ 139 & Ex.104.

Response: This statement is partially incorrect, but irrelevant in its entirety to the determination of this motion. The email quoted by FCU is dated September 22, ***2017*** (not 2016). That Bay Tek may have consented to affix the phrase "Skee-Ball Live" on the ten prototype custom lanes that it manufactured and delivered to FCU does not raise any genuine issue to be tried. This is because "Skee-Ball Live" is a "Live Play Phrase or Slogan" subject to Paragraph 4.2 of the License Agreement. *See* SUF ¶ 86; RSUF ¶86; Opp. at 13. Accordingly its use remained subject to BTE approval, and only BTE was entitled to assert any ownership or other

25

rights in the phrase.

65. BTE admits it affixed "Skee-Ball Live" onto the 10 Skee-Ball Live Lanes sent to FCU for the BEEB, its national championship in Austin. Am. Thanasides MSJ Decl. ¶130 & Ex.95 (BTE's Response to FCU's and Eric Pavony's First Set of Requests for Admissions).

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. That Bay Tek may have consented to affix the phrase "Skee-Ball Live" on the ten prototype custom lanes that it manufactured and delivered to FCU does not raise any genuine issue to be tried. This is because "Skee-Ball Live" is a "Live Play Phrase or Slogan" subject to Paragraph 4.2 of the License Agreement. See SUF ¶ 86; RSUF ¶86; Opp. at 13. Accordingly its use remained subject to BTE approval, and only BTE was entitled to assert any ownership or other rights in the phrase.

66. Before BTE delivered the Skee-Ball Live Lanes, BTE submitted an application for registration of the trademark "Skee-Ball Live" with the USPTO without FCU's knowledge or consent. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶72); Am. Thanasides MSJ Decl. ¶¶ 103,104 & Ex.68,69.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. BTE had no obligation to notify FCU or to seek FCU's "consent" to register the phrase "SKEE-BALL LIVE" with the USPTO, and FCU adduces no evidence of any such obligation, or any right corresponding right on the part of FCU. There is no dispute that the phrase "Skee-Ball Live" was a "Live Play Phrase or Slogan" under Paragraph 4.2 of the License Agreement, and that its use inured solely to BTE's benefit. See Response to ¶ 63, *supra*, incorporated by reference; Opp. at 13 ("BTE surely can own the Skee-Ball Live mark, *that is not at issue*.") (emphasis added).

26

### xix.    Alleged Attempts to Purchase Lanes for Live Play

67.    FCU had investors "totally onboard", and ready to fund the NSBL if FCU had a

manufacturing partner and could acquire the product. Wikman Depo. (Am. Thanasides MSJ Decl.

¶¶ 42 & Ex.7) at 145:13-20, 211:212-3, 213:13-19.

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. The assertion is inadmissible hearsay not supported by the cited

materials.  In the cited testimony, Mr. Wikman claims, without offering any specifics, ███

███████████████████████████████████████████████████████████████████████████

█████████ (emphasis added).  Claiming to repeat as testimony what investors purportedly

"told" FCU to prove the truth of the matter asserted is hearsay not falling under any exception.

Further, the statement is contradicted by FCU's own testimony. *See* Wikman Depo. at 289:8-22

(Thanasides MSJ Decl. Ex. 7) ███████████████████████████████████████████████

█████████████████████ Movit MSJ Decl. Ex. 13 ████████████████████████████

███████████████████████████████████████████████████████████████). *See*

*also, e.g.,* Movit Reply Decl., ¶ 2 & Ex. 78 (Pavony Depo.) at 205:5-24; *id.* Ex. 79 (Wikman

Depo.) at 289:8-290:2; 307:4-309:9.

The assertion further fails to raise a triable issue because it asserts that investors were

"onboard" only "*if FCU had a manufacturing partner and could acquire the product*"

(emphasis added).  FCU concedes that the License Agreement did not require BTE to

manufacture Custom Lanes, and the License Agreement does not require BTE, owner of the

Skee-Ball Mark, to allow other manufacturers to build Custom Lanes, or modify Standard Lanes,

to be placed into commerce under BTE's Mark.  SUF ¶¶ 24, 34; RSUF ¶¶ 24, 34; Movit MSJ

Decl. Ex. 2 (License agreement) at ¶¶ 3.1, 5.2.

68.     On multiple occasions BTE told FCU to stop seeking outside investors, and "keep it in the family." Wikman Depo (Am. Thanasides MSJ Decl. ¶¶ 42 & Ex.7) at 142:15-144:25.

<u>Response</u>:  This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The assertion is supported only by the vague, inadmissible, hearsay testimony of Mr. Wikman, a non-FCU employee testifying on FCU's behalf.  Mr. Wikman never laid a foundation establishing he had personal knowledge of what BTE purportedly "told FCU" or "told us" on "multiple occasions."  *See* RSUF ¶ 10 (not disputing that Mr. Wikman has "never been an employee of FCU"); Movit MSJ Decl. Ex. 4 (Wikman Depo) at 16:18-17:6. The statement also fails to raise a triable issue because FCU admits that it ***was*** seeking outside investment, but was unsuccessful.  *See* Response to ¶ 67, hereby incorporated by reference.

69.     On or around September 28, 2018, non-party George Petro ("Mr. Petro") contacted BTE to place a purchase order for 20 stock Skee-Ball Lanes with BTE for Full Circle after reaching an agreement in principle with Full Circle to help it finance and obtain Skee-Ball Lanes. After Mr. Petro disclosed to BTE his involvement with Full Circle, BTE conveyed to him that it would not be willing to provide Full Circle an opportunity to obtain Skee-Ball Lanes. Wikman Depo. (Am. Thanasides MSJ Decl. ¶¶ 42 & Ex.7) at 199:14-209:8.

<u>Response</u>:  This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The assertion is not supported by the materials cited by FCU above, which consist only of inadmissible hearsay offered by Eric Wikman at his deposition without foundation or personal knowledge.  Moreover, the statement is flatly contradicted by the admissible record evidence, which demonstrates there was never any agreement in principle between FCU and Mr. Petro. *See* Thanasides MSJ Decl., Video Exhibits 25-27 and 30, including Video Ex. 30 at timestamps 33:20-35, 43:25-53 (Petro would need to get the idea "sold

28

upstream" at Bay Tek and would want them to "sign something"); *id.* at 34:28-50 ("definitely

some things [Petro] would have to get over on [his] side business-wise;" imagining a "PO for X

number of lanes"); *id.* at 44:30-45:05 (Petro would need to obtain internal approval from

"Eugene" at his own company: "You guys chew on this, right? Chew on what I said. Tell me

what you think. You know, I saw your numbers. I think with these numbers, I can move this

conversation forward on my side."); *id.* 55:25-35 ("If I'm going to get in bed with you guys,

that's why I'd like you to come through our system and I'd like to be part of that").

Petro also testified that he never contacted BTE to place a purchase order, nor did he

attempt to place one. *See* Petro Depo. (Thanasides MSJ Decl. Ex. 15) at 75:11-13 ("Q. Did you

talk to Mr. Rochetti about placing purchase order for the lanes? A. No."); SUF ¶¶ 61-62; RSUF

¶¶ 61-62 (including FCU citation to Thanasides Video Ex. 30). *See also* Responses to ¶¶ 114-

116, *infra,* hereby incorporated by reference.

70. On November 22, 2019, Full Circle requested a quote from BTE for the purchase

of 150 stock Skee-Ball Lanes and timeframe for production from BTE. Am. Thanasides MSJ

Decl. ¶¶ 67 & Ex.32.

Response**:** Undisputed solely for purposes of this motion**.**

71. In response, Ms. Hampton sent an email stating FCU's request was "a surprise

given that the issues addressed in our July 26th default letter have not been fully addressed." Am.

Thanasides MSJ Decl. ¶¶ 67 & Ex.32.

Response**:** Undisputed solely for purposes of this motion, but irrelevant to the

determination of this motion, given that Ms. Hampton provided information to Mr. Pavony in

response to FCU's request. *See* Thanasides MSJ Decl. Ex.32 at FCU000002955-56.

72. FCU asked Ms. Hampton to identify the issues in the default letter that remained

unaddressed, but never received a response. Am. Thanasides MSJ Decl. ¶ 136 & Ex.101; Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶72).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. In the cited Exhibit 101, Eric Pavony states ███████████████████ ████████████████████████████████████████. The cited paragraph of Mr. Pavony's 2023 declaration is irrelevant to this statement. The materials cited by FCU do not support that FCU "never received a response."

73.    BTE claimed the lanes requested by FCU were being discontinued, it would be launching a new lane, refused to sell FCU the Skee-Ball lanes, and directed Full Circle to work with a third party. Movit MSJ Decl., Ex. 18 (Pavony Depo. Ex. 23).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The statement is not supported by the materials cited by FCU, which it grossly mischaracterizes. In the document FCU cites (which includes the same e-mail thread referenced in ¶¶ 70-72 above), BTE informed Mr. Pavony that it was replacing its current "Classic" and "Modern" lanes with updated versions of the *same models*, which were "very similar in look and feel with over 100 improvements," and that Bay Tek had "inventory to make another 60-75 units" of the "current Classic version" before the transition to the new versions. Movit MSJ Decl. Ex. 18 at FCU000002974, FCU000002976. ██████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ *See id..;* Thanasides MSJ Decl. Ex.101 at FCU000002971 (containing Pavony response).

74.    On December 17, 2019, Ms. Hampton sent an email to FCU stating in pertinent part:

Please note that BTE owns the Skee-Ball Live trademark and is not an authorized mark for FCU to use. Also note, that per our licensing agreement section 5.4 FCU cannot enter into business with anyone that would directly or indirectly compete with BTE. Having another manufacturer modify lanes, when BTE is capable to do so itself, would be competitive and, as such, a likely violation of the terms of the agreement. Finally, any unauthorized alterations made to BTE products voids the warranty. The new Skee-Ball lane warranty is now 2 years vs our standard game warranty of 6 months.

Movit MSJ Decl., Ex. 18 (Pavony Depo. Ex. 23)

Response: Undisputed solely for purposes of this motion, but irrelevant to the

determination of this motion. The statement by Ms. Hampton was not a "revocation" of BTE's

prior consent to use the phrase "Skee-Ball Live," which was limited to the phrase's affixation to

the 10 prototype lanes that FCU received from BTE, and which FCU continued to use. *See, e.g.,*

Second Amended Complaint at ¶ 193. As it notes, Ms. Hampton's statement that "BTE owns the

Skee-Ball Live trademark" and that it was "not an authorized mark for FCU to use" was being

made in the context of having "having ***another manufacturer modify [BTE] lanes***" for their use

in connection with Live Play. *See* Response to ¶ 41, *supra*, which is incorporated by reference.

*See also* ¶ 77, *infra*, quoting License Agreement ¶ 4.2 (use of "Live Play Phrases and Slogans"

must be "consistent with the terms, conditions, exclusions and restrictions of the [License

Agreement]").

75.     Paragraph 5.4 of the License Agreement states:

FCU hereby covenants, warrants, and agrees that it will not, directly or indirectly, during the Term and in the Territory, enter into any business operations competitive with the Business of SBI. The phrase "Business of SBI" as used in this Agreement shall mean SBI's business, as that business was made known to FCU by SBI as of the Effective Date, and as FCU is further advised by SBI in writing after the Effective Date.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶5.4.

Response: Not disputed.

31

1. **Bay Tek's Purported Breaches of the License Agreement**

   a. **Bay Tek's Purported Breach of ¶4.2**

   76.     FCU contends BTE breached ¶4.2 by asserting FCU does not have the right to use "Skee-Ball Live" after approving it pursuant to ¶4.2.  SAC at ¶¶78,23

   Response: Undisputed that FCU has made this claim; however, this claim is without merit.  In support of its claim, FCU points only to BTE's response to efforts to use the phrase in connection with lanes ***built or modified by other manufacturers***, in contrast to the 10 prototype lanes manufactured by BTE to which "Skee-Ball Live" was affixed as a "Live Play Phrase or Slogan."  BTE has never approved use of the "Skee-Ball Live" trademark for use in connection with lanes built or modified by other manufacturers, as this would be inconsistent with its obligations of quality control and with the express terms of the License Agreement.  *See* Responses to ¶¶ 41, 74, *supra*, which are hereby incorporated by reference.  *See also* ¶ 65, *supra* ("Skee-Ball Live" had been affixed to the 10 prototype lanes BTE manufactured and sent to FCU); Movit MSJ Decl. Ex. 18 at FCU000002974 (objecting to use of "Skee-Ball Live" in context of third-party modification).

   77.     Paragraph 4.2 of the License Agreement provides in relevant part:

   > FCU's Licensed Use of the SKEE-BALL Trademark in connection with Live Play (as opposed to virtual play), includes the use of such phrases and slogans that include the SKEE-BALL Trademark such as: "First Ever Skee-Ball League", "National Skee-Ball League" and  "National Skee- Ball League Championship", including those phrases and slogans set forth on Exhibit B to this Agreement,  and phrases and slogans that are not set forth on Exhibit B to this Agreement, but which FCU may wish to adopt and use in the future solely and directly with Live Play, subject to prior written approval by SBI, which approval shall not be unreasonably withheld or delayed so long as the phrases or slogans pertain to Live Play and  are consistent with the terms, conditions, exclusions and restrictions of this Agreement (collectively "Live Play Phrases and Slogans").

   License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶4.2

Response: Not disputed.

**b. Bay Tek's Purported Competition with FCU (Purported Breach of ¶5.3)**

      **i.** ███████

78. ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The statement is not supported by the cited material, and it is indeed contradicted by the actual agreement ████████████████████████

████████████████████████████████████████

████████████████. *Nicosia v. Amazon.com, Inc.,* 384 F. Supp. 3d 254, 268 (E.D.N.Y. 2019), *aff'd,* 815 F. App'x 612 (2d Cir. 2020).

████████████████████████████████████████

████████████████████████ *See* Movit Reply Decl., ¶¶ 10-11 & Exs. 86-87; *id.* Ex. 86 at BT0009854-9867, including Exhibit A at BT0009864 (defining "Licensed Products").

Rather, BTE's license with ██████ was for an **electronic gaming app**. *See* Hampton Depo. (Thanasides MSJ Decl. Ex. 10) at 92:5-6 ██████████████████

████████████); 97:2-21 ████████████████████

████████████████████████████████████████

████████████████████████ (emphasis added). A digital phone application would not impinge on Live Play or violate any provision of

33

the License Agreement.

79. ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

Response:

This is a sham assertion, not supported by the record, which fails to raise a material issue
of triable fact. The statement is not supported by the cited materials. ████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████ thereby violating the Best Evidence Rule; the assertions in the ████████
████████████ are contradicted by the actual agreement as produced in discovery. *See* Response to
¶ 78, *supra*, which is hereby incorporated by reference. ████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████ *See* Thanasides MSJ Decl. Ex. 89 at ¶ 6.

ii. ████████████

80. BTE's corporate representative admitted that providing a physical Skee-Ball
machine to be used in a broadcast of a league or tournament would be endorsing Live Play.
Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 428:8-16.

Response:

This is a sham assertion, not supported by the record, which fails to raise a material issue

34

of triable fact. The statement mischaracterizes the cited testimony of BTE's Ms. Hampton, who was not addressing use of a physical Skee-Ball machine "in a broadcast of a league or tournament." Instead, she was explaining that when BTE sent a physical Skee-Ball lane to a *news studio* for the purpose of "*having [FCU's] national champion on a news broadcast promoting tournaments and leagues*," this was "endorsing Full Circle's business of Live Play." Hampton Depo. at 428:11-18 (emphasis added). This testimony does not constitute an admission that "providing a physical Skee-Ball machine to be used in a broadcast of a league or tournament would be endorsing Live Play." There is no evidence that BTE provided any third party with "a physical Skee-Ball machine to be used in a broadcast of a league or tournament." *See* Responses to ¶¶ 81-84, *infra*.

81.     ████████ is a licensee of "Skee-Ball" to market and promote state lotteries on all channels of media, including the internet and television. Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 (BTE's Response to FCU's and Eric Pavony's First Set of Requests for Admissions, at No. 11); Am. Thanasides MSJ Decl. ¶ 131 & Ex.96 (BTE's Second Amended Response to FCU's Second Set of Interrogatories); Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 459:11-17.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The materials cited by FCU do not refer to "market[ing] and promot[ing] state lotteries on all channels of media," and do not support ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████    *See* Thanasides MSJ Decl. Ex. 96 at Ex. A.

35

82. ███████ clients include the state lotteries for the state of Ohio and the state of Maryland. Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 462:11-9, 463:4-12

Response: Undisputed solely for purposes of this motion but irrelevant to the determination of this motion.

83. On October 25, 2018, the state of Ohio lottery conducted a three-state Skee-Ball tournament that was live streamed on Twitch, using Skee-Ball lanes equipped with video cameras similar to the Skee-Ball Live Lanes and transmitted video of the tournament depicting the Skee-Ball trademark. Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45,55 & Ex.10,20) at 458:18, 464:9-467:24, Ex. 15; Am. Thanasides MSJ Decl. ¶ 29 & Video Ex.28 (Exhibit 14 of Hampton Deposition).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. FCU does not have a shred of evidence to support this assertion. Neither Hampton Exhibits 15 or 14 – respectively, Thanasides MSJ Decl. Ex. 20 (which was never produced in discovery at all) and Thanasides Video Ex. 28 (produced only by FCU) – are properly authenticated by the Thanasides declaration, and in the cited deposition excerpt, Ms. Hampton testified to never having seen either of them previously. See Hampton Depo. (Thanasides MSJ Decl. Ex. 10) at 458:6-459:1; 464:10-22. Moreover, the statements in the exhibits are inadmissible hearsay. Further, the cited materials do not support FCU's contentions that Skee-Ball lanes allegedly used at this event were "equipped with video cameras similar to the Skee-Ball Live Lane" or that the alleged tournament was "live streamed on Twitch."

84. BTE approves everything that gets put out using the Skee-Ball Mark to promote state lotteries, including promotions on television and on social media. Hampton Depo (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 440:13-441:22, 465:3-9, 467:21-24.

36

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. It is illogical and impossible that BTE could, or did, approve promotions for state lotteries that BTE was never told about. FCU's statement mischaracterizes Ms. Hampton's testimony to make the false claim that BTE automatically knew about, and approved, everything "put out" by a state lottery on television or social media that used the Skee-Ball Mark—when, in truth, she said nothing of the sort. *See* Hampton Depo. at 440:13-15, 465:3-5, 467:13-24.

### iii. Ed's Funcade

85.     BTE delivered a "bank" of Skee-Ball branded lanes and provided custom components for the lanes for Ed's Funcade, a venue that hosts a "Skee-Ball National Championship" every year, and places videos of the event on YouTube. Am. Thanasides MSJ Decl. ¶¶ 106,116 & Ex.71, 81.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. FCU points to no evidence that Bay Tek endorsed or had any knowledge that any "National Championship" occurred at Ed's Funcade—let alone that Bay Tek endorsed same. Exhibit 71 to the Thanasides MSJ Declaration is a June 5, 2017 e-mail sent by Rick Hallet and is entirely irrelevant to its false assertion. Exhibit 81 consists of ███████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████     *See* Ex. 81 at BT0009181-82. BTE's distributor's efforts to address service issues relating to Classic Lanes are irrelevant the License Agreement.

### c. Purported Breach of Best Efforts (¶7.2)

### i. ESPN

37

86.     FCU was using its best efforts to get Skee-Ball on ESPN. Pavony Depo (Am. Thanasides MSJ Decl. ¶ 41 & Ex.6) at 286:13-289:90.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The statement asserts a non-sequitur in the form of a legal conclusion, and is based solely on unqualified opinion testimony by Mr. Pavony that FCU was using its "best efforts to get to ESPN." *Cameron*, 598 F. 3d at 62 ("[W]itnesses may not 'present testimony in the form of legal conclusions.'") (quotation omitted); *see also* Fed. R. Evid. 701-702. In any event, the License Agreement did not grant FCU rights to commercially produce audiovisual content bearing the Skee-Ball Mark for broadcast. *See* License Agreement (Movit MSJ Decl. Ex. 2) at ¶ 4.5 (allowing FCU to use the Mark via media such as radio and television "for ***promotional and marketing purposes only*** of its Live Play business") (emphasis added).

87.     BTE was aware of FCU's goal to make skee-ball a national sport, and its goal to live stream its events and competitions. Treankler Depo (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 169:5-8, 170:5-14.¶¶

Response: This statement is disputed to the extent it makes improper use of the Skee-Ball Mark in violation of the License Agreement. *See* BTE's Response to FCU's Paragraph 13 above, including footnote 1. Otherwise, this statement is undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. It is irrelevant because FCU fails to inform the Court that in the portion of the deposition testimony of Mr. Treankler that it cites, Mr. Treankler actually states: "We were aware that they wanted to live-stream. ***That's not part of what they're licensed to do***." Treankler Depo.at 170:12-14 (emphasis added).

88.     On February 11, 2020, FCU had a proposed contract from ESPN for the broadcast of a Live Play event. Am. Thanasides MSJ Decl. ¶ 79 & Ex.44.

38

<u>Response</u>**:** This statement is undisputed, but incomplete. BTE does not dispute that FCU, without BTE's knowledge, engaged in negotiations with ESPN not just to "broadcast … a Live Play event," but for a "***deal … to produce Live Play tournament content that would be aired on ESPN***." Opp. Brief at 55 (emphasis added).  Thanasides MSJ Decl. Ex.44 at FCU0000009933-34; *see also id.* Ex. 21 at BT0010337-341.

89.     Paragraph 4.4 of the License Agreement states:

> Except as expressly set forth in Paragraph 3.1(b) and this Paragraph 4.4 regarding Live Play Merchandise, the SKEE-BALL Trademark may not be used by FCU in connection with any product, including, but not limited to, any physical product used to play the game of Skee-Ball®, including but not limited to an alley roller machine Notwithstanding the foregoing, FCU is given certain limited merchandising rights hereunder and the SKEE-BALL Trademark may be used by FCU on all categories of products usually the subject of entertainment and sports merchandising and not otherwise excluded under this Agreement, which may be sold or distributed through any retail channel, whether now known or hereafter created, developed or devised.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶4.4.

<u>Response</u>: Not disputed.

**ii.  Promoting the Licensed Uses**

90.     In the summer of 2016, BTE prepared a Skee-Ball style guide for branding and

39

license initiatives, and purposefully did not identify Full Circle on the Skee-Ball "Partners" page, even though it knew FCU was a licensee of the Mark at the time. Hampton Depo. (Am. Thanasides MSJ Decl. ¶¶ 45,52,53,54 & Ex.10,17,18,19) at 230:15-25, 232:25-235:18, 238:13-25. 239:10-240:2, 242:1-21, 243:7-244:3 Ex.'s 3, 4, and 5.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. Nothing in the testimony cited by FCU supports that BTE "purposefully" omitted FCU from any document. ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████ *See* Hampton Depo. (Thanasides MSJ Decl. Ex. 10) at 239:25-240:14, 242:7-12.

91.    FCU had no idea BTE was registering Skee-Ball Live. Wikman Depo (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 381:19-382:2.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. FCU had no right under the License Agreement to be notified of BTE's registration of the "SKEE-BALL LIVE" trademark. *See* Response to ¶ 66, *supra,* which is incorporated by reference.

### d.  Purported Breach of the Implied Covenant of Good Faith and Fair Dealing

92.    BTE breached the License Agreement by registering the Skee-Ball Live Mark for an improper purpose. Wikman Depo (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 371:20-373:6, 377:13-23.

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. The assertion states an unfounded legal conclusion as a "fact" based

solely on the inadmissible opinion testimony of Mr. Wikman. *See Cameron v. City of New York*,

598 F.3d 50, 62 (2d Cir. 2010) ("[W]itnesses may not 'present testimony in the form of legal

conclusions.'") (quotation omitted). Within the cited testimony itself, Mr. Wikman states, *"I*

**think we all agree that I'm not an attorney**…." Wikman Depo. (Thanasides MSJ Decl. Ex. 7)

at 377:13-14 (emphasis added).

93.　　BTE admits it shared information about Skee-Ball Live and the NSBL with

customers including ███████████████████████, without FCU's knowledge or

consent. Hampton Depo (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 311:11-21; Treankler

Depo. (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 204:23-206:15, 210:5-23.

　　Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. The testimony of Ms. Hampton and Mr. Treankler that is cited by

FCU does not establish that any "information about Skee-Ball Live and the NSBL" purportedly

shared by BTE was shared "without FCU's knowledge or consent," and FCU adduces no

evidence to support that was the case. Moreover, FCU cites no evidence here or elsewhere that

BTE "shared" anything that required "FCU's knowledge or consent" in the first place.

　　The statement also appears to relate, improperly, to FCU's claim for purported breach of

a non-disclosure agreement between the parties; FCU previously tried, but failed, to assert that

claim in this case but could not do so because the agreement contains a mandatory Wisconsin

choice-of-forum clause.

94.　　███████████████ was interested in the NSBL, but the opportunity was never

shared with FCU. Am. Thanasides MSJ Decl. ¶119,140 & Ex.84,105.

　　Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact.  The materials cited by FCU consist of two exhibits that FCU offers without any explanatory or authenticating testimony; they contain vague, inadmissible hearsay as to some type of purported "interest" expressed to someone at BTE.  FCU has failed establish that any purported "interest" involved an actual "opportunity" for FCU, or that BTE had any obligation to share such alleged information with FCU. Even had such an "opportunity" for FCU existed, the cited materials also do not support that it was "never shared with FCU."

Further, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ *See* Pavony Depo. (Movit MSJ Decl. Ex. 3) at 260:25-262:23; *id.* (Movit Reply Decl. Ex. 78) at 282:18-284:5.

95.    BTE actively communicated with other skee-ball leagues competitive with Full Circle. In a November 29, 2017 email to Ms. Hampton and others, Mr. Cravens reported he met with "Mike Fraser the Skee-E-O of the Skee-League", a league "independent of the Erics" who "really likes the Beer Ball machine" and Ms. Hampton went to a Skee-League league night in 2017 or 2018. Am. Thanasides MSJ Decl. ¶ 141 & Ex.106; Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 192:22 - 194:18.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact, and which again improperly uses the Mark in violation of the License Agreement (*see* fn. 1 above). The cited testimony of Ms. Hampton states ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████

████████ Contrary to FCU's assertion, these materials do not support "active communicat[ion] with other skee-ball [*sic*] leagues competitive with Full Circle."

Further, the License Agreement provides only that SBI would "not, directly or indirectly . . . **operate, sponsor, or endorse a business, *involving Live Play."*** Movit MSJ Decl. Ex. 2 at ¶ 5.3 (emphases added). The materials cited by FCU do not pertain to any acts of operating, sponsoring, or endorsing a Live Play-related business and do not relate to Live Play as defined in the License Agreement.

96.　　In January 2019, BTE proposed making FCU "Brewskee-Ball" lanes and terminating FCU's agreement. Treankler Depo (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 276:4-19, 288:10-19

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The passage of Mr. Treankler's deposition testimony cited by FCU refers to earlier testimony by Mr. Treankler about a **proposed settlement** in January 2019 that would have entailed terminating the License Agreement but having BTE manufacture lanes for FCU "using the Brewskee-Ball trademark." *See* Treankler Depo. (Thanasides MSJ Decl. Ex. 11) at 276:4-11; 288:10-12. The act of contemplating a settlement proposal does not constitute a breach of the License Agreement.

97.　　Terminating the license agreement for the Skee-Ball trademark, and operating as Brewskee-Ball, was the only "option" BTE gave FCU. Hampton Depo. (Am. Thanasides MSJ Decl. ¶ 45 & Ex.10) at 496:3-25.

43

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The sole material cited by FCU in support of this assertion is both inadmissible and irrelevant because it was made in the context of discussing a **settlement proposal**. This **proposed settlement** would have entailed terminating the License Agreement but having BTE manufacture lanes for FCU "using the Brewskee-Ball trademark." *See* Treankler Depo. (Thanasides MSJ Decl. Ex. 11) at 276:4-11; 288:10-12.

98.     When on February 13, 2010, BTE received a copy of the proposed contract with ESPN (for the Live Play broadcast) from FCU, it forwarded the proposal to a third party entertainment media company, ▮▮▮▮, and then entered into a licensing deal with ▮▮▮▮ for the production of unscripted shows using BTE's intellectual property, including the Mark, thereafter. Hampton Depo (Am. Thanasides MSJ Decl. ¶¶ 45,56 & Ex.10,21) at 472:4-25, 547:15- 548:14, Ex. 19.

Response**:** This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The materials cited by FCU, which refer to an e-mail sent on February 13, 2020, not 2010, and they do not indicate when it was "received." Moreover, FCU fails to proffer any evidence connecting the correspondence it cites and the licensing deal that BTE entered into more than six months later, which involved BTE's *own* intellectual property. *See* Hampton Depo (Thanasides MSJ Decl. Ex.10) at 472:4-25, 547:15- 548:14.

Further, this assertion appears to relate to FCU's claim for purported breach of a non-disclosure agreement between the parties; FCU previously tried, but failed, to assert that claim in this case but could not do so because the agreement contains a mandatory Wisconsin choice-of-forum clause.

44

## 2. Purported Breach of Alleged Oral Revenue Share Agreement

99. FCU provided BTE with business plans and projections, which BTE reviewed and relied upon in entering a Revenue Share Agreement that would support the creation of a scalable business that would continue to generate profits. ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The materials cited by FCU do not identify any "business plans and projections" at all, and do not support there having been any meeting of the minds between FCU

and BTE over mutually understood terms of a purported "Revenue Share Agreement" (which FCU does not define), let alone one that "would support the creation of a scalable business that would continue to generate profits." The cited Appendix B to the Smith Report, found in Thanasides MSJ Decl. Ex. 92, is merely a listing of materials that FCU's expert Laura Smith allegedly considered, and does not support that BTE review or relied upon any projections. Likewise, the cited portion of the recorded September 2017 diner meeting does not indicate that BTE reviewed or relied upon any plans or projections, let alone for purposes of entering an oral "Revenue Share Agreement." Thanasides MSJ Decl. Exhibit 72 is wholly unrelated to the statement, as it is not an email between Mr. Wikman and Mr. Treankler at all. Finally, Exhibits 74, 76, 78-79, and 82 are internal emails and unsent notes in e-mail form that do not indicate that BTE reviewed or relied upon any FCU plans or projections, do not indicate the existence of a contract for sale of goods to FCU under a "Revenue Share Agreement," are not signed by BTE or its authorized agent, and cannot overcome the lack of evidence for any meeting of the minds. For example, █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████  ███████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████  *See* SUF ¶¶ 52, 54; *see also*

46

Response to ¶ 101, *infra*, incorporated by reference.

100. During the September 7, 2017 diner meeting, Mr. Treankler agreed to build 36 lanes for FCU pursuant to the Revenue Share Agreement. Wikman Depo. (Am. Thanasides MSJDecl. ¶ 42 & Ex.7) at 289:8-18; Am. Thanasides MSJ Decl. ¶ 129 & Ex.94 (FCU Answers to BTE's First Set of Interrogatories at No. 6).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The materials cited by FCU do not support that a meeting of the minds as to a "Revenue Share Agreement," which FCU does not define, was concluded between the parties during the diner meeting, let alone that BTE would build 36 lanes "pursuant" to it. The excerpt from Mr. Wikman's deposition testimony that FCU cites pertains to FCU's failure to obtain investors, and is irrelevant to this statement. The conclusory assertion of a "Revenue Share Agreement" in FCU's own interrogatory response is inadmissible hearsay for this purpose, and in any event does not support that at the meeting, Mr. Treankler "agreed to build 36 lanes for FCU pursuant to [a] Revenue Share Agreement" either. *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) (Cogan, J.) (quoting *Gilmore v. Macy's Retail Holdings,* Civ. No. 06–3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009) ("a litigant may not introduce statements from its own answers to interrogatories ... as evidence because such answers typically constitute hearsay when used in this manner."). *See also* Response to ¶ 99, *supra*, hereby incorporated by reference.

101. On October 11, 2017, Mr. Schadrie wrote:



Am. Thanasides MSJ Decl. ¶ 113 & Ex.78

Response:  For purposes of this motion only, it is not disputed that Mr. Schadrie, a "Concept Manager" or "Concept Development Manager" employed by BTE, who was not present at the September 2017 diner meeting, wrote these sentences in an internal BTE e-mail on October 11, 2017. *See* ¶ 48, *supra*; SUF ¶ 46; RSUF ¶ 46.  However, this email fails to raise a material issue of fact for trial. ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████. The content of the statement is thus without foundation and is inadmissible hearsay, and can neither demonstrate a meeting of the minds nor satisfy the Statute of Frauds.  *E.K. Bare & Sons, Inc. v. Rolet Food Prod. Co., Inc.*, 2006 WL 8439620, at *7 (E.D.N.Y. Nov. 14, 2006) (no oral agreement despite attempt to rely on "hearsay testimony … that such an arrangement had been reached"), *report and recommendation adopted,* 2006 WL 8439621 (E.D.N.Y. Dec. 1, 2006).

102.    At that meeting, BTE and FCU agreed that the former would provide 36 customized Skee-Ball lanes to the latter – 11 prototype lanes followed by 25 production lanes – in exchange for BTE receiving 15% of the top line revenue generated by the lanes until they had received 1.5x of the parts and labor (i.e., $6,750 for a $4,500 lane), and that BTE would provide additional lanes under those terms if the 36 lanes were performing. Movit MSJ Decl., ¶ 3 & Video Exhibit 2 at 40:30 and 41:40.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. In *none* of these materials city by FCU are financial terms for revenue-sharing specified—let alone an agreement reached regarding same.  Indeed, at timestamp 40:20 in the video cited by FCU, Mr. Wikman stressed that "*I understand that none*

48

*of it is binding. . . ."*, and Mr. Treankler stated earlier in the meeting that even for purposes of

the 11 prototype lanes, "***how [we are] going to do that contractually***" would need to be "***figured***

***out***" Movit MSJ Decl. Ex. 2 at 32:40-33:15 (emphasis added).

103.    The terms of the Revenue Share Agreement were also memorialized in writing.

May 7, 2019 Letter from BTE attorney Patrick Coffey to FCU "Bay Tek is prepared to conduct

business relative to the oral revenue share agreement per BTE's understanding of its terms." Am.

Thanasides MSJ Decl. ¶ 76 & Ex.41.

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. The cited material consists of a written ***settlement proposal*** for a

***10-lane*** revenue-share agreement. FCU ***never*** agreed to this proposal. Moreover, in this

material, BTE's attorney states that BTE and FCU fundamentally ***disagreed*** as to the terms of

any purported revenue-share agreement. Moreover, the entire document, including its attached

term sheet, is on its face a privileged settlement communication inadmissible under Fed. R. Evid.

408.

104.    BTE partially performed under the agreement by having 10 Skee-Ball Live Lanes

delivered to Full Circle in Austin Texas between October 13-24, 2017. Am. Thanasides MSJ

Decl. ¶ 129 & Ex.94 (FCU Answers to BTE's First Set of Interrogatories at No. 6); Treankler

Depo. (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 119:7–120:1 (admitting that BTE

manufactured 11 prototypes, sent 10 to FCU and retained 1).

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. The materials cited by FCU consist of conclusory and inadmissible

statements by FCU in its own interrogatory responses that a revenue-share agreement existed,

and that BTE had "partially performed" under it. FCU's own self-serving interrogatory

responses are hearsay as used this purpose, and cannot create a material dispute.  *See Morangelli v. Chemed Corp.,* 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) (Cogan, J.) (quoting *Gilmore v. Macy's Retail Holdings,* Civ. No. 06–3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009).  Even if BTE "partially performed" on a purported oral revenue-share agreement, the "partial performance" exception to the U.C.C. Statute of Frauds would apply only to the ten prototype lanes actually manufactured and delivered to FCU, rendering the assertion irrelevant.

105.    FCU performed its end of the Revenue Share Agreement by remitting revenue share payments to BTE for lanes received, which BTE accepted. Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 (BTE's Response to FCU's and Eric Pavony's First Set of Requests for Admissions "Admit[ting] that BTE has received $52,617.15 from Full Circle that was purportedly generated in connection with customers' purchase of games on Skee-Ball Live Lanes").

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The phrase quoted by FCU is taken from BTE's response to FCU's Request for Admission Number 20.  That Request simply asked BTE to admit it had "accepted payments of lane revenue from Full Circle generated by Skee-Ball Live lanes." *See* Thanasides MSJ Decl. Ex 95 at No. 20.  BTE's response does not establish the existence of a "Revenue Share Agreement" or that FCU had "performed" on such an agreement. Even if FCU "partially performed" on a purported oral revenue-share agreement, the "partial performance" exception to the U.C.C. Statute of Frauds would apply only to the ten prototype lanes actually manufactured and delivered to FCU, rendering the assertion irrelevant.

106.    On January 3, 2018, Ms. Hampton explained that BTE preferred not to do business with formal documentation:

We just spent four months you know, building these lanes and resources and pretty

50

much just handing over with no, with just a handshake, 30 to $40,000 in cost in lanes with no documentations because that's just how we want to do business with our partners and people we want to trust and I get that that is part of your past and it sucks, but that just wasn't us and we just don't want to do business like that. We like doing business the way we did it, in ya know, in July and through October with you guys, like this is what we're gonna do and we'll do it, and we'll figure it out and we'll work together. And that's just how we do business.

Am. Thanasides MSJ Decl. ¶ 2 & Video Ex.1 (January 3, 2018, Recording at 2:45).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. In the cited recording, Ms. Hampton stated clearly, in response to questions by Mr. Pavony, that BTE has "***all sorts of contracts***." *See* Thanasides Video Exhibit 1 at 1:30-1:55; 6:50-7:05.

107.    During the same call, on January 3, 2018, Ms. Hampton informed Full Circle that BTE was placing the Skee-Ball Live project "on hold," and refused to build Full Circle additional Skee-Ball Live Lanes. Am. Thanasides MSJ Decl. ¶ 2 & Video Ex.1, at 6:20

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. In the cited recording, Ms. Hampton did ***not*** state that she or BTE was "refus[ing] to build Full Circle additional Skee-Ball Live Lanes."

108.    Mr. Treankler committed to building 11 lanes, providing 10 of the lanes to FCU, and keeping one of the lanes. Treankler Depo (Am. Thanasides MSJ Decl. ¶ 46 & Ex.11) at 119:7– 120:1.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The cited testimony of Mr. Treankler does not support that Mr. Treankler "committed" to building 11 lanes, providing 10 of them to FCU, and keeping one. Instead, it merely states that at one point, 11 customized "Live Lanes" had been manufactured by Bay Tek, of which 10 were shipped to Texas, and that one remained behind at Bay Tek. FCU

51

agreed these ten lanes were "prototype lanes."  *See* Opp. at 7; 2023 Pavony Decl., ¶ 49.

109.    BTE has accepted $52,617.15 of revenue generated by the Skee Ball Live Lanes Am. Thanasides MSJ Decl. ¶ 130 & Ex.95 (BTE's Response to FCU's and Eric Pavony's First Set of Requests for Admissions at No. 20).

Response: This statement is not disputed solely for purposes of this motion, but is irrelevant to the determination of this motion.  BTE incorporates by reference its Response to ¶ 105, *supra*.

110.    On May 7, 2019 BTE's attorney, Patrick Coffey, sent an email to FCU stating, "Bay Tek is prepared to conduct business relative to the oral revenue share agreement per Bay Tek's understanding of its terms." Am. Thanasides MSJ Decl. ¶ 76 & Ex.41.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  FCU's assertion misleadingly fails to include the entirety of the sentence that it partially quotes; the unquoted portion of the sentence denies FCU's allegations regarding an alleged agreement for 36 Custom Lanes.  Even more egregiously, FCU fails to note its source is not an "email" but a written ***settlement proposal***. *See* Thanasides MSJ Decl. Ex. 41. Even if this letter could support the existence of such an agreement—and it cannot—it would be inadmissible under Rule 408 for that purpose.  BTE further incorporates by reference its Response to ¶ 103, *supra*.

### 3.  Purported Tortious Interference

111.    In 2015, Mr. Pavony, on behalf of FCU, attempted to acquire additional skee-ball machines directly from SBI. Am. Thanasides MSJ Decl. ¶ 129 & Ex.94 (FCU Answers to BTE's First Set of Interrogatories at No. 6).

Response: This is a sham assertion, not supported by the record, which fails to raise a

52

material issue of triable fact, and which again improperly uses the Mark in violation of the License Agreement (*see* fn. 1 above).  This statement is not supported by the cited materials, which consist solely of FCU's own response to a BTE interrogatory.  The cited interrogatory response by FCU does not support that Mr. Pavony or FCU attempted to acquire Skee-Ball "machines" from any party in 2015, including SBI.  *See* Thanasides MSJ Decl. Ex.94 at No. 6 (pp. 6-7).  Moreover, even if the cited response was relevant, a party may not rely on its own interrogatory responses in this fashion.  *See Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) (Cogan, J.) (quoting *Gilmore v. Macy's Retail Holdings,* Civ. No. 06–3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009).

112.    Between 2015 through 2020 Mr. Pavony, on behalf of FCU, attempted to acquire additional skee-ball machines from BTE, both directly and through third-parties, as alleged in Full Circle's Second Amended Complaint. Am. Thanasides MSJ Decl. ¶ 129 & Ex.94 (FCU Answers to BTE's First Set of Interrogatories at No. 6).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact, and which again improperly uses the Mark in violation of the License Agreement (*see* fn. 1 above).  The cited interrogatory response by FCU does not support that Mr. Pavony so "attempted" between 2015 and through 2020.  *See* Thanasides MSJ Decl. Ex.94 at No. 6 (pp. 6-7).  Moreover, a party may not rely on its own interrogatory responses as admissible evidence in this fashion.  *See Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) (Cogan, J.) (quoting *Gilmore v. Macy's Retail Holdings,* Civ. No. 06–3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009).

113.    Mr. Pavony has also attempted to rent and borrow skee-ball machines for Live Play from third-parties, including, but not limited to, communicating with at least ten different third-

53

parties, including contacts at Emerson Amusements, the UpDown (Minneapolis, MN and Des Moines, IA), the Eastburn (Portland, Oregon), The Greatest Bar (Boston, MA), Finnegan's Pub (Hoboken, NJ), Mr. Darcy Seattle (Seattle, WA), and Rabbit Hole (Seattle, WA) and individuals affiliated with other skee-ball leagues (NOLA Skee-Ball and Skee- League) between February 2019 and July 2019, to obtain additional skee-ball machines for Live Play, and ultimately securing additional machines used for the 2019 Skee-Ball® Open. Am. Thanasides MSJ Decl. ¶132 & Ex.97 (Eric Pavony's Amended Answers to BTE's Second Set of Interrogatories).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact, and which again improperly uses the Mark in violation of the License Agreement (*see* fn. 1 above). The statement is not supported by the cited materials, which consist only of Mr. Pavony's own interrogatory responses, which are not inadmissible for this purpose. *See Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013) (Cogan, J.) (quoting *Gilmore v. Macy's Retail Holdings,* Civ. No. 06–3020, 2009 WL 140518, at *9 (D.N.J. Jan. 20, 2009) ("a litigant may not introduce statements from its own answers to interrogatories ... as evidence because such answers typically constitute hearsay when used in this manner.").

Further, Mr. Pavony's assertion that he "***attempted***" to rent and borrow Skee-Ball machines from other parties is **irrelevant** to FCU's tortious interference claim, and to FCU's other claims and defenses as well. The License Agreement excuses FCU from using "SKEE-BALL® branded alley roller machines manufactured by SBI or its successor" only if "compliance becomes impractical or unreasonable because SKEE-BALL® branded alley-roller machines ***are not available to buy, rent or borrow***." *See* Movit MSJ Decl. Ex. 2 (License Agreement) at ¶ 5.2 (emphasis added). Mr. Pavony's mere assertion that that he "attempted to

54

acquire" Standard Lanes from the listed parties, even were it admissible, would not establish that Standard Lanes were generally not available to buy, rent or borrow. *See* Thanasides MSJ Decl. Ex. 97 at No. 7 (pp. 5-6).

114. Mr. Petro proposed a revenue model to FCU, which was discussed and confirmed on August 1, 2018. Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 142:15-144:25.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The cited Wikman testimony bears no connection whatsoever to this statement or to Mr. Petro, or to anything that occurred on August 1, 2018. Furhter, Mr. Petro directly informed FCU that any plan to acquire and modify lanes would need to be "sold upstream" to Bay Tek ***and*** would need first to be internally approved at his own company, by Eugene Jarvis, neither of which ever occurred. *See* Responses to ¶ 69, *supra,* and ¶¶ 115-116, *infra*, which are incorporated by reference.

115. Mr. Petro sent a model reflecting the proposed terms to Eugene Jarvis, Mr. Petro's boss. Petro Depo (Am. Thanasides MSJ Decl. ¶¶ 50,62,63 & Ex.15,27,28) 102:2-120:16, Ex. 10, 12.

Response: Not disputed solely for purposes of this motion, but irrelevant to the determination of this motion. FCU's own statement describes any terms as "proposed," *see supra,* and in the very testimony FCU cites, Mr. Petro states that Mr. Jarvis never responded to his e-mail, that he "never received buy-in" from Mr. Jarvis, and that FCU and his company "never agreed to anything." *See* Thanasides MSJ Decl., Ex. 15 (Petro Depo.) at 102:1-11, 103:17-20, 118:18-119:21; Movit Reply Decl., ¶ 7 & Ex. 83 (Petro Depo.) at 99:24-102:11.

116. Mr. Petro needed buy-in from Eugene Jarvis before he reached out to Rick Rochetti at BTE, and Mr. Petro testifies that he did, in fact, reach out to Mr. Rochetti. Petro Depo. (Am.

Thanasides MSJ Decl. ¶ 50 & Ex.15) at 73:19-25; Am. Thanasides MSJ Decl. ¶57 & Ex.22

(Exhibit 9 from the Rochetti Deposition); Am. Thanasides MSJ Decl. ¶ 123 & Ex.88 (emails

between FCU and Mr. Petro).

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact. In the cited portion of Mr. Petro's testimony, Mr. Petro states that

he mentioned Mr. Pavony's name in discussion with Rick Rochetti at some point in or about

2018, not that he "reached out" to him, let alone for the purpose of buying lanes. Further, the

contents of Exhibit 88 have not been properly authenticated as to Mr. Petro and are hence

inadmissible. In any event, Exhibit 88 merely asserts that before Mr. Rochetti could be

approached, Mr. Petro would need internal "buy-in" from Mr. Jarvis, which Mr. Petro explained

at his deposition never occurred. *See* Thanasides MSJ Decl., Ex. 15 (Petro Depo.) at 102:1-11,

103:17-20, 118:18-119:21; Movit Reply Decl., Ex. 83 (Petro Depo.) at 99:24-102:11; *see also*

Thanasides MSJ Decl., Ex. 15 (Petro Depo.) at 75:11-13 (**"Q. Did you talk to Mr. Rochetti**

*about placing a purchase order for the lanes? A. No.***"**) (emphasis added).

**BTE's Counterclaims**

**I.      Breach of the License Agreement**

        **i.      Failure to Promote Live Play Uses**

                **1)      Building Live Play (using Standard Lanes)**

117.    FCU could not build its Live Play network if BTE would not sell it Skee-Ball Live

Lanes, and BTE claimed FCU breached the License Agreement if it modified the lanes itself.

Wikman Depo. (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 207:12-18.

Response: This is a sham assertion, not supported by the record, which fails to raise a

material issue of triable fact, and which again improperly uses the Mark in violation of the License Agreement (*see* fn. 1 above).  The statement is not support by the cited materials, which consist solely of the conclusory testimony of Mr. Wikman, squarely contradicted by the record, that it was "impossible [to] expand our league" without being able to obtain from Bay Tek the "product" it wanted, *i.e.* customized Skee-Ball "lanes . . . modified to be used for [its] network." *See* Thanasides MSJ Decl. Ex.7 (Wikman Depo.) at 207:9-208:22.

In contradiction to Mr. Wikman's self-serving testimony, FCU concedes that the License Agreement was entered into in **2014**, long before any Custom Lanes were ever used or manufactured for Live Play. RSUF ¶ 14. FCU further claims to have operated successfully for more than a decade **without** such Custom Lanes. *See* Second Amended Complaint at ¶ 4.

118.    BTE was aware of FCU's growth and marketing strategies for the NSBL, and FCU's plan to grow Live Play through networked Skee-Ball lanes using FCU's software. BTE never objected to the plan. Wikman Depo (Am. Thanasides MSJ Decl. ¶ 42 & Ex.7) at 393:6-394:2, 394:12-395:15; Am. Thanasides MSJ Decl. ¶ 4 & Video Ex.3 (April 14, 2016 Recording of meeting between FCU and BTE, and presentation by FCU).

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact, and which again improperly uses the Mark in violation of the License Agreement (*see* fn. 1 above).  The cited testimony of Mr. Wikman █████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ █████████ Wikman Depo. (Thanasides MSJ Decl. Ex. 7) at 394:12-395:15.  This does not support that BTE "never objected" to FCU focusing on Custom Lanes at the expense of the

57

15553576.1

License Agreement, a totally different matter, nor would such an objection be required. *See* Movit MSJ Decl. Ex. 2 (License Agreement) at ¶ 18.5 (no waiver provision). Further, the purported fact that BTE may have been "aware" of an FCU "plan to grow Live Play through networked Skee-Ball lanes using FCU's software" does not absolve FCU of its best efforts obligations under the License Agreement using Standard Lanes.

119.    FCU focused on innovation and technology to grow the Licensed Uses. Pavony Depo. (Am. Thanasides MSJ Decl. ¶ 41 & Ex.6) at 294:9-25.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. The cited deposition testimony of Mr. Pavony does not support that FCU "focused on innovation and technology to grow the Licensed Uses." Rather, in the testimony, Mr. Pavony merely makes a group of conclusory assertions that ██████████

██████████████████████████████████████████████████████████

████████████████████████████████

Further, FCU's best-efforts obligations under the License Agreement required FCU to use best efforts to build a ***national network of teams, leagues, and/or events in at least fifteen states***, and to promote and develop the Licensed Uses so as "***to maintain and enhance the value of the goodwill residing in the SKEE-BALL Trademark***." Movit MSJ Decl. Ex. 2 at ¶¶ 5.1, 7.2 (emphasis added). The License Agreement did not give FCU the option to ignore these obligations so it could "focus" on innovation and technology solely in the way it preferred.

120.    According to Mr. Cravens, "FCU's software was great and had the potential to bring more people into the Skee-Ball leagues… really just growing the network of Skee-Ball machines and growing the leagues, which would then give the potential to sell more units across the country." Cravens Depo. (Am. Thanasides MSJ Decl. ¶48 & Ex.13) at 36:1-37:6-9.

Response: Not disputed solely for purposes of this motion, but irrelevant to the determination of this motion. The cited pages of Mr. Cravens' testimony state Mr. Cravens was giving his "personal opinion" as of 2017, and that he was "not privy to any of the particulars of what [FCU's] business plan was." *See* Cravens Depo. (Thanasides MSJ Decl. Ex.13) at 36:17-20, 37:16-18. What a single BTE employee believed about FCU's software in 2017, or about the "potential" of this software, does not have any bearing on whether FCU was actually fulfilling its obligations under the License Agreement, including its best efforts obligations.

## 2) Sponsorship

121.    Paragraph 8.3 of the License Agreement states:

> FCU has represented that the Scoring App will be distributed free to patrons and will not generate revenue. However, in the event that the Scoring App embodies advertisements for third party products or services, and FCU generates advertising revenues from such advertisements, FCU shall pay to SBI five percent (5%) of such "Scoring App Revenue" which is defined as gross revenue received by FCU from the sale of advertising on the Scoring App. Scoring App Revenue does not include any money paid to FCU by a venue or company owned by Eric Pavony and/or FCU, including but not limited to Full Circle Bar.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶8.3.

Response: Not disputed.

122.    Paragraph 4.3 of the License Agreement states:

> Use of the SKEE-BALL Trademark for any sponsorships or endorsements solely and directly related to Live Play, including but not limited to product endorsements or product sponsorships, shall be consistent with the terms and conditions of this Agreement and the license for use of the SKEEBALL Trademark for Live Play, and shall not diminish or tarnish the reputation of the SKEE-BALL Trademark, or SBI. FCU may enter into a sponsorship or endorsement deal without SBI's prior written approval, provided, however, that FCU will notify SBI of all any sponsorships or endorsements and will provide a copy of all such executed agreements to SBI upon entering into such agreements. SBI shall receive five (5%) of Gross Sponsorship Revenues set forth herein.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶4.3.

59

Response: Not disputed.

### 3) Disparaging Uses

123.    On September 17, 2017, Mr. Cravens signed up to receive the league member emails for each of the Brewskee-Ball league cities.  Cravens Depo. (Am. Thanasides MSJ  Decl. ¶¶ 48,58,59 & Ex.13,23,24) at 82:14-21, Ex. 6,7.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  In the cited page of testimony, Mr. Cravens agreed that he had signed up for "email sent by Brewskee-Ball league cities," but neither his testimony nor the referenced exhibits indicate that he did this on September 17, 2017, or that these were "league member emails for each of the Brewskee-Ball league cites."  *See* Cravens Depo. (Thanasides MSJ  Decl. Ex.13) at 82:14-22; Thanasides MSJ Decl. Exs 23, 24.  FCU adduces no evidence as to whether Mr. Cravens actually received or reviewed such e-mails or what their content would have shown.

124.    October 18, 2017, Mr. Cravens, Ms. Hampton and Phil Marzullo, from GamerGreen, attended a league night for the Los Angeles Brewskee-Ball league, without informing FCU, and registered the team name "Fuckin A." Am. Thanasides MSJ Decl. ¶80 & Ex.45; Cravens Depo (Am. Thanasides MSJ Decl. ¶48 & Ex.13) at 34:5-11, 80:5-7;

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact.  The cited materials consist only of a single, hearsay-containing document produced by Full Circle including the name Phil Marzullo, not authenticated as to its source, plus testimony by Mr. Cravens (who was not shown the document) stating he was familiar with Phil Marzullo and had attended a league event in Los Angeles.  The cited materials, including the inadmissible exhibit, do not support that on "October 18, 2017, Mr. Cravens, Ms.

Hampton, and Mr. Marzullo . . . attended a league event" and together, "without informing FCU . . . registered the team name 'Fuckin A.'" Further, FCU supplies no basis for how these individuals purportedly "register[ing] a team name" could excuse FCU's **public** use of vulgar and disparaging names under the License Agreement. *See* Opp. at 8, 43 and Response to ¶ 52, *supra,* incorporated by reference.

125. BTE has been aware of the "State of the Brewnion" video since as early as August 16, 2018. Hampton Depo. (Am. Thanasides MSJ Decl. ¶45 & Ex.10) at 15:22-16:4.

Response: Undisputed solely for purposes of this motion, but irrelevant to the determination of this motion. Specifically, the timing of when BTE become aware of this video is irrelevant to BTE's motion. Full Circle does not dispute that the video was released by FCU in July 2018 and that in it, Mr. Pavony spent several minutes discussing the legal situation with BTE and said that BTE and its employees are dishonest. SUF ¶ 101; RSUF ¶ 101.

126. The ninth "Whereas" clause of the Settlement Agreement states:

WHEREAS, the Parties desire to settle amicably the Dispute (as defined below) without the expenditure of further time, burden and expense, without the adjudication of any issue of fact or law and without any admission of liability and to put to rest, once and for all, the Dispute between the Parties by comprehensive releases and covenants not to sue. The term "Dispute" as used herein shall mean the Litigations; all matters alleged or which could be alleged in the Litigations; all claims of any nature between the Parties as of the Effective Date, whether or not alleged in the Litigations; all matters alleged in the Petition or any matter that could be alleged in the Petition; any challenges to the Additional SBI Trademarks or to the Skee-Ball Logo and Design Trademark; and any challenges that either Party may bring against the other Party concerning their respective trademarks or registrations.

Settlement Agreement (Dkt. 90-2) (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5).

Response: Not disputed.

127. Paragraph 1.1 of the Settlement Agreement provides:

Except with respect to the obligations created by or arising out of this Agreement or as set forth below, SBI does hereby for itself, and its respective officers, directors, employees, shareholders, legal predecessors, successors, parents, subsidiaries, heirs, and assigns (the "SBI Releasors"), forever completely release and absolutely discharge FCU, and in their respective official and individual capacities, Eric Pavony and Evan Tobias, and all of their parent, subsidiary, affiliated and related persons and entities and each of their respective officers, directors, employees, shareholders, members, managers, legal predecessors, legal successors, agents and employees of the foregoing (the "FCU Releasees"), of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs, expenses, liens, attorneys' fees, actions and causes of action of every kind and nature whatsoever, known or unknown, in law, equity or otherwise, occurring up until the Effective Date of this Agreement, which SBI ever had, now has or hereafter can, shall, or may have, against the FCU Releasees, throughout the world, arising out of or based on the term SKEE-BALL, the SKEE-BALL Trademark, the SKEE-BALL Registration, the BREWSKEEBALL Trademark, the BREWSKEE-BALL Registration or the Dispute (the "SBI Released Claims"). This Agreement and the SBI Released Claims do not include or constitute a release of claims that arise between the Parties as a result of future conduct or matters between the Parties occurring after the Effective Date.

Settlement Agreement (Dkt. 90-2) (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶1.1.

> Response: Not disputed.

128.    Paragraph 2.1 of the Settlement Agreement reads as follows:

Subject to the terms and conditions of this Agreement, SBI, on behalf of itself and the SBI Releasors, hereby covenants, warrants, and agrees forever completely not to sue, threaten to sue, or assert any claim, counterclaim, third-party claim, contribution claim, indemnity claim, demand, action, causes of action, and any other claim of every kind and nature in law or equity, in any forum, against FCU and the FCU Releasees, whether arising under state, federal, international or other law, that is based upon the SBI Released Claims, whether such claims are known or unknown. Such covenant not to sue includes, but is not limited to, the agreement never to take any action, or to assist others in taking action, to challenge any trademark held by FCU, or for which a registration is pending as of the Effective Date.

Settlement Agreement (Dkt. 90-2) (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶2.1.

> Response: Not disputed.

129.    Paragraph 7.6 of the License Agreement states:

FCU agrees that it will use the SKEE-BALL Trademark only in a manner consistent with proper trademark usage, and in a form and manner that is consistent with the registered format of the SKEE-BALL Trademark and consistent with the Use Guidelines set forth on Exhibit "A" hereto.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.6.

Response: Not disputed.

130.    Paragraph 7.3 of the License Agreement states:

SBI shall have the right, in its reasonable discretion, to review or inspect, and to make reasonable requests to review or inspect, sample copies of any item, product, advertising, marketing, or promotional material offered or to be offered by FCU upon which the SKEE-BALL Trademark appears (the "Materials"). FCU shall ensure that the form, quality and standard of any Materials comply with relevant best manufacturing practices, including methods of storage, and with all relevant laws and regulations. FCU understands that if it distributes Materials that are not compliant with the terms of this Agreement, it may have to recall and/or destroy such non-compliant Materials at the request of SBI.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.3.

Response: Not disputed.

131.    Paragraph 7.4 of the License Agreement states:

In the event SBI believes in good faith that FCU is not using the SKEE-BALL Trademark in compliance with the terms of this Agreement, SBI will notify FCU and the Parties agree to work diligently and in good faith to ensure that any deficiencies are remedied promptly. In the event that any Materials are determined to be defective or not otherwise in compliance with this Agreement or the standards set forth herein, SBI may demand the immediate recall of any and all such non-compliant Materials and may demand that FCU cease all distribution, sale and/or advertisement of such Materials until such time as the Materials have been corrected.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.4.

Response: Not disputed.

132.    Paragraph 7.5 of the License Agreement states:

In the event that there are more than two instances during the Term of this Agreement when SBI has notified FCU in writing that Materials do not comply

with this Agreement, then from that point on during the Term, SBI shall further have the right to request an inspection or accounting of and for all samples and/or materials used by FCU at any time. SBI shall also have the right to approve or disapprove any or all samples and/or materials for quality assurance, which approval shall not be unreasonably withheld or delayed. Once this Paragraph becomes operative, FCU shall not distribute, sell or advertise any version of the samples and/or materials that have not been approved by SBI.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶7.5.

Response: Not disputed.

### ii. Declaratory Judgment

### a) Termination

133. Paragraph 4.1 of the License Agreement states:

FCU understands and agrees that the license granted to FCU herein is personal to FCU and may only be transferred under certain limited conditions that are set forth in Paragraph 9. Any transfer in violation of Paragraph 9 shall subject this Agreement to termination.

License Agreement (Am. Thanasides MSJ Decl. ¶ 39 & Ex.4) at ¶ 4.1.

Response: Partially incorrect. Paragraph *4.10* of the License Agreement—and not

Paragraph 4.1—contains the language quoted above by FCU.

### b) Infringement

134. Paragraph 7 of the Settlement Agreement provides:

7.1 Contemporaneous with the full execution of this Agreement, FCU shall transfer to SBI all of FCU's right, title and interest, if any, in and to the URL www.skeeball.com by unlocking that URL and providing SBI with the relevant authorization code. As a result of FCU's transfer of the URL to SBI, SBI assumes all rights and obligations of the URL with all accrued benefits and rights attached thereto. FCU agrees to provide to SBI any and all relevant documents and assist SBI with the transfer of the URL, to the extent necessary. SBI reserves the right to assign, or transfer the URL, whether in whole or in part, to any Party. If, for any reason, any other steps or action is necessary to assign or transfer the URL www.skee-ball.com to SBI, FCU shall take all such steps or action to assure that the URL www.skeeball.com is so assigned or transferred, including but not limited to any requirements of the domain registrar.

64

Settlement Agreement (Am. Thanasides MSJ Decl. ¶ 40 & Ex.5) at ¶7.

Response: Not disputed.

135.     Mr. Pavony registered, in his individual name, the domain names

http://www.nationalskeeballleague.com and http://www.skeeballleague.com in 2007.  Pavony

Depo (Am. Thanasides MSJ Decl. ¶41 & Ex.6) at Errata 189/2.

Response: Not disputed solely for purposes of this motion, but irrelevant to the

determination of this motion.  Neither FCU nor Mr. Pavony disputes that Mr. Pavony *renewed*

these registrations in or about July 2016—*i.e.*, after the entry of the License Agreement.  *See*

Movit MSJ Decl., Ex. 15 at FCU_EXPERT0001100.

136.     FCU has been using the design mark in connection with Full Circle Bar and FCU

since 2009. Am. Thanasides MSJ Decl. ¶ 126 & Ex.91 (Pavony Decl. ¶94).

Response: This statement is not disputed solely for purposes of this motion, but it is

evidence of FCU's liability, not its lack thereof.  By FCU's own admission, FCU has been using

BTE's long-existing Skee-Ball Design Mark, which dates back to at least the 1970s. *See*

Thanasides MSJ Decl. Ex. 17 ("Skee-Ball Style Guide") at BT0002178 (excerpt reproduced

below); *id.* Ex. 18 at BT0007563; Movit Reply Decl. ¶¶ 15-16 & Exs. 91-92 (prior registration of

Skee-Ball Design Mark with logo, identifying first use in commerce as 1977); ¶ 14 & Ex. 90

(Declaration of Internet Archive records request processor, attaching 2001-2007 webpages

archived from Skeeball.com website); *see also* SUF ¶¶ 102-103, which are incorporated by

reference.  An image of the Skee-Ball Design Mark is below.



(Source: Thanasides MSJ Decl. Ex. 17)

FCU's appropriation of the Skee-Ball Design Mark in its admitted November 2020 social media posting is disparaging, and contains disgusting sexual imagery in violation of the License Agreement:



(Source: Movit MSJ Decl. Ex. 16)

66

137.    On February 20, 2017, images from Full Circle Bar, Brooklyn, including the FCU Design Mark, were posted on the Skee-Ball Facebook account. Am. Thanasides MSJ Decl. ¶ 83, 84, 85, 86, 87, 88 & Ex.48, 49, 50, 51, 52, 53.

Response: This is a sham assertion, not supported by the record, which fails to raise a material issue of triable fact. First, as explained in the response to Paragraph 136, it is baseless to refer to the design mark at issue as the "FCU Design Mark" given that materially the same design mark had been used for decades prior by BTE and its predecessor. Second, the cited exhibits are described in the Thanasides Declaration only as documents produced by FCU; they are not authenticated as "images from Full Circle Bar, Brooklyn . . . posted on the Skee-Ball Facebook Account" on February 20, 2017. *See* Thanasides MSJ Decl. ¶¶ 83-88.  Moreover, they were produced by FCU on March 22, 2023, the day FCU filed its initial Opposition papers to BTE's motion, long after the close of discovery, and there is no excuse for them not having been produced earlier. These unauthenticated and untimely documents are inadmissible.

DATED:  New York, New York
             June 23, 2023

Respectfully submitted,

Mitchell Silberberg & Knupp LLP


By: /s/ Jeffrey M. Movit                              
        Christine Lepera
        Jeffrey M. Movit
        437 Madison Ave., 25th Floor
        New York, New York 10022-7001
        Telephone: (212) 509-3900
        Facsimile: (212) 509-7239
        Email: ctl@msk.com
        Email: jmm@msk.com

        *Attorneys for Bay Tek Entertainment, Inc.*

15553576.1