UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FULL CIRCLE UNITED, LLC,

   Plaintiff,

v.

BAY TEK ENTERTAINMENT, INC.,

   Defendant.

---

BAY TEK ENTERTAINMENT, INC.,

   Counterclaim Plaintiff,

v.

FULL CIRCLE UNITED, LLC,

   Counterclaim Defendant,

and

ERIC PAVONY,

   Additional Counterclaim
   Defendant.

CASE NO. 1:20-CV-03395-BMC

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
BAY TEK ENTERTAINMENT, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    CORE FALLACIES UNDERPINNING FCU'S CLAIMS AND DEFENSES ........... 3

III.   BTE IS ENTITLED TO SUMMARY JUDGMENT ON FCU'S CLAIMS ............... 7

       A.    FCU Has Failed To Adduce Evidence To Support Its Claims For Breach Of
             The License Agreement ........................................................................................ 7
             1.    BTE Did Not Breach ¶4.2 ........................................................................ 7
             2.    BTE Did Not Breach ¶5.3 ........................................................................ 7
             3.    BTE Did Not Breach ¶7.2 ........................................................................ 9
             4.    FCU's Claim For Breach Of The Implied Covenant Of Good Faith
                   And Fair Dealing Fails As A Matter Of Law .......................................... 12
             5.    FCU Itself Breached The License Agreement ......................................... 12

       B.    FCU Has Failed To Submit Evidence That Could Prove An Enforceable Oral
             Agreement.......................................................................................................... 12
             1.    The Statute Of Frauds Bars This Claim .................................................. 12
             2.    FCU Cannot Muster Evidence To Show It Could Meet Its Burden To
                   Demonstrate There Was A Meeting Of The Minds On Material Terms
                   Of An Oral Agreement............................................................................. 14
             3.    FCU's Tortious Interference Claim Fails As A Matter Of Law ............... 18

       C.    FCU Raises No Issue Of Fact That Could Support Its Lost Profits Claims ......... 19
             1.    FCU Cannot Satisfy The Requisite Standard For Proving
                   Consequential Damages On Its Contract Claims..................................... 20
             2.    FCU Cannot Establish Lost Profits For Alleged Tortious Interference.... 25

IV.    BTE IS ENTITLED TO JUDGMENT ON CERTAIN OF ITS
       COUNTERCLAIMS................................................................................................. 26

       A.    FCU Cannot Rebut That It Breached The License Agreement ........................... 26
             1.    FCU Failed To Use Best Efforts, In Breach Of ¶7.2 ............................... 26
             2.    FCU's Undisputed Failure To Comply With Obligations In ¶5.1 ........... 28
             3.    FCU Cannot Dispute That It Used The Mark In Unauthorized And
                   Vulgar Ways, In Breach Of ¶¶4.2, 7.7, And 7.8 ...................................... 29
             4.    FCU Breached ¶4.5 With Unauthorized Internet Broadcasts ................. 33
             5.    FCU's Equitable Estoppel Affirmative Defense To Liability For Its
                   Established Breaches Has Zero Evidentiary Support ............................... 33

       B.    FCU Fails To Rebut BTE's Declaratory Judgment Claims................................. 34

1.     BTE Is Entitled To Terminate Due To FCU's Breaches ......................... 34

2.     The License Agreement Is Terminable-At-Will ...................................... 35

C.    FCU Cannot Rebut That BTE Is Entitled To Judgment On Its Trademark Infringement, False Endorsement, and Unfair Competition Claims..................... 36

D.    Pavony Fails To Rebut That He Is Individually Liable For FCU's Torts ........... 39

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Bartenders Sch., Inc. v. 105 Madison Co.*,
59 N.Y.2d 716 (1983) ................................................................................33

*Awards.com, LLC v. Kinko's*,
42 A.D.3d 178 (2007), *aff'd*, 14 N.Y.3d 791 (2010) .......................................20, 23

*Bickerstaff v. Vassar College*,
196 F. 3d 435 (2d Cir. 1999), *cert. denied,* 530 U.S. 1242 (2000)...........................2

*Bloor v. Falstaff Brewing Corp.*,
601 F.2d 609 (2d Cir. 1979)......................................................................26

*Brown v. Marriott Int'l, Inc.*,
2017 WL 4484194 (E.D.N.Y. Sept. 29, 2017) .....................................................33

*Bulgartabac Holding AD v. Republic of Iraq*,
451 F. App'x 9 (2d Cir. 2011) ....................................................................32

*Bunn-O-Matic v. Bunn Coffee Serv. Inc.*,
88 F. Supp. 2d 914 (C.D. Ill. 2000) ..........................................................31, 37

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182 (2004) ...............................................................................19

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.*,
217 F. Supp. 2d 423 (S.D.N.Y. 2002).............................................................18

*Cent. New York Laborers' Health v. JWJ Indus., Inc.*,
2015 WL 12564221 (N.D.N.Y. Mar. 5, 2015) .....................................................34

*Chloe v. Queen Bee of Beverly Hills, LLC*,
2011 WL 3678802 (S.D.N.Y. Aug. 19, 2011).................................................39, 40

*City of New York v. Tavern on the Green Int'l LLC*,
351 F. Supp. 3d 680 (S.D.N.Y. 2018).............................................................35

*Coggins v. Cnty. of Nassau*,
615 F. Supp. 2d 11 (E.D.N.Y. 2009) ..............................................................33

<u>Page(s)</u>

*Colony Grill Dev., LLC v. Colony Grill, Inc.*,
  2022 WL 950950 (2d Cir. Mar. 30, 2022)...............................................................34

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
  976 F.3d 239 (2d Cir. 2020)....................................................................20, 24, 36

*Cuban Cigar Brands N v. Upmann Int'l, Inc.*,
  457 F. Supp. 1090 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979)...............39

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
  352 F.3d 775 (2d Cir. 2003)....................................................................................13

*Eastman Kodak Co. v. Rakow*,
  739 F. Supp. 116 (W.D.N.Y. 1989)........................................................................32

*EDF Renewable Dev.. Inc. v. Cnty. of Suffolk*,
  2016 WL 6804939 (E.D.N.Y. Nov. 17, 2016),
  *aff'd*, 693 F. App'x 42 (2d Cir. 2017)...................................................................32

*Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*,
  89 F. Supp. 2d 483 (S.D.N.Y. 2000)......................................................................39

*Fakhoury Enters., Inc. v. J.T. Distribs.*,
  1997 WL 291961 (S.D.N.Y. June 2, 1997) ............................................................15

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
  696 F. Supp. 2d 368 (S.D.N.Y. 2010).....................................................................38

*Franchised Stores of New York, Inc. v. Winter*,
  394 F.2d 664 (2d Cir. 1968)....................................................................................31

*Genova v. County of Nassau*,
  2020 WL 813160 (E.D.N.Y. Feb. 19, 2020)............................................................2

*Gianascio v. Giordano*,
  2003 WL 22999454 (S.D.N.Y. Dec. 19, 2003) ......................................................15

*Globecon Grp., LLC v. Hartford Fire Ins. Co.*,
  434 F.3d 165 (2d Cir. 2006)....................................................................................22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Great Earth Int'l Franchising Corp. v. Milks Dev.*,
   311 F. Supp. 2d 419 (S.D.N.Y. 2004)..............................................................22, 23

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
   365 F. Supp. 707 (S.D.N.Y. 1973), *modified*, 523 F.2d 1331 (2d Cir. 1975)..........39

*Halo Optical Prod., Inc. v. Liberty Sport, Inc.*,
   2017 WL 1082443 (N.D.N.Y. Mar. 22, 2017) ...............................................27, 36

*Harley-Davidson, Inc. v. Grottanelli*,
   164 F.3d 806 (2d Cir. 1999).....................................................................................38

*HSW Enterprises, Inc. v. Woo Lae Oak, Inc.*,
   2009 WL 4823920 (S.D.N.Y. Dec. 15, 2009) .........................................................34

*Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*,
   425 F.3d 708 (9th Cir. 2005) ....................................................................................4

*In re Best Film & Video Corp.*,
   46 B.R. 861 (Bankr. E.D.N.Y. 1985)......................................................................35

*In re Best Payphones, Inc.*,
   432 B.R. 46 (S.D.N.Y. 2010)...................................................................................23

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
   176 F. Supp. 3d 137 (E.D.N.Y. 2016) .....................................................................40

*Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A.*,
   2004 WL 784941 (S.D.N.Y. Apr. 13, 2004).............................................................23

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
   413 F.3d 257 (2d Cir. 2005)....................................................................................19

*Jack Daniel's Props., Inc. v. VIP Prod. LLC*,
   2023 WL 3872519 (U.S. June 8, 2023) ...................................................................38

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
   16 F.4th 47 (2d Cir. 2021) .........................................................................................2

*Johnson & Johnson Consumer Cos. v. Aini*,
540 F. Supp. 2d 374 (E.D.N.Y. 2008) .................................................39

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
52 N.Y.2d 105 (1981) ...........................................................................16

*Kelley v. Bryan Ins. Agency, Inc.*,
176 A.D.3d 1042 (2019) .......................................................................17

*Kelly v. Bensen*,
151 A.D.3d 1312 (2017) ..................................................................15, 17

*Kenford Co. v. Cnty. of Erie*,
73 N.Y.2d 312 (1989) ...........................................................................22

*Koch Indus., Inc. v. Aktiengesellschaft*,
727 F. Supp. 2d 199 (S.D.N.Y. 2010)...................................................22

*Kosher Provisions, Inc. v. Blue & White Food Prod. Corp.*,
2005 WL 1890039 (E.D.N.Y. Aug. 9, 2005)........................................15

*Kovens v. Paul*,
2009 WL 562280 (S.D.N.Y. Mar. 4, 2009),
*aff'd*, 358 F. App'x 228 (2d Cir. 2009)................................................23

*Levy v. P & R Dental Strategies, Inc.*,
302 A.D.2d 255 (2003) .........................................................................19

*Longview Equity Fund, LP v. McAndrew*,
2007 WL 186769 (S.D.N.Y. Jan. 23, 2007) .........................................34

*Lopez v. Bonanza.com, Inc.*,
2019 WL 5199431 (S.D.N.Y. Sept. 30, 2019).......................................37

*Lops v. YouTube, LLC*,
2023 WL 2349597 (D. Conn. Mar. 3, 2023) .........................................37

*LPD New York, LLC. v. Adidas Am., Inc.*,
2020 WL 9886308 (E.D.N.Y. Mar. 31, 2020),
*on reconsideration*, 2020 WL 9816008 (E.D.N.Y. July 24, 2020)........17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Macksey v. Egan*,
36 Mass. App. Ct. 463 (1994) ................................................................................. 9

*Mehmet v. Add2net, Inc.*,
66 A.D.3d 437 (2009) ............................................................................................ 12

*Midway Mfg. Co. v. Strohon*,
564 F. Supp. 741 (N.D. Ill. 1983) ........................................................................... 4

*Mindspirit, LLC v. Evalueserve Ltd.*,
470 F. Supp. 3d 366 (S.D.N.Y. 2020) .................................................................... 34

*Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*,
2018 WL 2012875 (E.D.N.Y. Apr. 30, 2018) ....................................................... 36

*N. Oil Co. v. Socony Mobil Oil Co.*,
347 F.2d 81 (2d Cir. 1965) .................................................................................... 17

*New York v. New Jersey*,
143 S. Ct. 918 (2023) ...................................................................................... 35, 36

*Nina Indus., Ltd. v. Target Corp.*,
2005 WL 323745 (S.D.N.Y. Feb. 8, 2005) ........................................................... 20

*Pfizer Inc. v. Sachs*,
652 F. Supp. 2d 512 (S.D.N.Y. 2009) .................................................................... 32

*Process Am., Inc. v. Cynergy Holdings, LLC*,
839 F.3d 125 (2d Cir. 2016) .................................................................................. 24

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
751 F.2d 69 (2d Cir. 1984) .................................................................................... 16

*Radix Org., Inc. v. Mack Trucks, Inc.*,
602 F.2d 45 (2d Cir. 1979) .................................................................................... 13

*Reynolds v. Lifewatch, Inc.*,
136 F. Supp. 3d 503 (S.D.N.Y. 2015) .................................................................... 40

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) ............................................................................37, 38

*Rosenfeld v. Zerneck*,
    4 Misc. 3d 193 (N.Y. Sup. Ct. 2004) ...................................................................17

*RXR WWP Owner LLC v. WWP Sponsor, LLC*,
    145 A.D.3d 494 (2016) .........................................................................................20

*SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*,
    2000 WL 729110 (S.D.N.Y. June 6, 2000) .........................................................27

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ................................................................................20

*Schulman v. Cont'l Ins.*,
    258 A.D.2d 639 (1999) .........................................................................................19

*Sir Speedy, Inc. v L & P Graphics, Inc.*,
    957 F.2d 1033 (2d Cir. 1992) ..............................................................................24

*Solow Management Corp. v. Hochman*,
    191 A.D.2d 250 (1993) .........................................................................................34

*Starr v. Freeport Dodge, Inc.*,
    54 Misc. 2d 271 (N.Y. Dist. Ct. 1967) ................................................................13

*Taylor v. Dollar Tree Stores*,
    2020 WL 2478663 (E.D.N.Y. May 13, 2020) .......................................................1

*Taylor v. Meirick*,
    712 F.2d 1112 (7th Cir. 1983) .............................................................................23

*Tenber Assocs. v. Bloomberg L.P.*,
    51 A.D.3d 573 (2008) ...........................................................................................34

*Thomas v. City of New York*,
    953 F. Supp. 2d 444 (E.D.N.Y. 2013) (Cogan, J.) ...............................................1

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Tiffany (NJ) v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010) ................................................................37

*Toltec Fabrics, Inc. v. August Inc.*,
  29 F.3d 778 (2d Cir. 1994) ................................................................23

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007) ................................................................20

*Trademark Research Corp. v. Maxwell Online, Inc.*,
  995 F.2d 326 (2d Cir. 1993) ..............................................................23

*TSNY Mgmt. L.L.C. v. P'ship*,
  2010 WL 11627255 (E.D.N.Y. 2010) ...............................................14

*Ty, Inc. v. Jones Group, Inc.*
  237 F.3d 891 (7th Cir. 2001) .............................................................37

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc*.,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) ........................31

*Warner–Lambert Co. v. Schick U.S.A., Inc.*,
  935 F. Supp. 130 (D. Conn. 1996) .....................................................39

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*,
  178 F. Supp. 655 (S.D.N.Y. 1959) ....................................................36

*Washington v. Kellwood*,
  2015 WL 6437456 (S.D.N.Y. Oct. 14, 2015) ....................................24

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*,
  744 F. Supp. 1259 (S.D.N.Y. 1990) ..................................................39

*Wood v. Lucy, Lady Duff-Gordon*,
  222 N.Y. 88 (1917) ............................................................................35

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>**Page(s)**</u>

**STATUTES**

15 U.S.C.
   § 1125(a) ...........................................................................................................7
   § 1127............................................................................................................37

N.Y. U.C.C. Law § 2-201(1) .............................................................................12, 13

N.Y. U.C.C. Law § 2-201(c)...................................................................................13

**OTHER AUTHORITIES**

Federal Rule of Evidence, Rule 408 ........................................................................18

https://dictionary.cambridge.org/us/dictionary/english/endorse.......................................7

4 *McCarthy on Trademarks and Unfair Competition* § 25:30 ...........................4, 31, 37

## I. PRELIMINARY STATEMENT

This is not *Rashomon*; there are not two sides to this story. Only BTE's position is sustained by the undisputed record under the rigors of the summary judgment standards. FCU admits about half of the facts in BTE's SUF.[1] In an attempt to evade summary judgment on its claims, and BTE's counterclaims, FCU tries to manufacture disputes and create smoke by submitting a long list of additional "facts." None of these purported disputes is based on any evidence that actually controverts the facts that entitle BTE to summary judgment as a matter of law. Rather, FCU relies on rank speculation, misdirection, and argument.[2]

Worse, FCU plays games by blatantly misrepresenting the evidence. Examples include:

- Claiming that in a recorded December 2015 call, BTE's then-president, Gaetan Philippon, "promised" that BTE would meet FCU's "needs," when the recording evidences nothing of the sort. *Compare* CSUF ¶37 *with* Thanasides Video Ex. 2.

- Claiming that Philippon agreed FCU had the rights to have a competing manufacturer build custom Skee-Ball-branded lanes, when Philippon's notes state only that FCU

---

[1] FCU admits SUF 3, 8, 10-18, 20, 24, 26, 31-35, 40-45, 52, 58-59, 65, 68-69, 71, 74-77, 79-81, 83-84, 86-87, 90, 93-94, 98-99, 101-02, 107, 109-10, 111, 114-16, 118-19, 121.

[2] In its Response to the SUF ("RSUF"), FCU repeatedly makes assertions unsupported by the cited evidence. *E.g.*, RSUF 21, 22, 27-30, 36, 38, 61-62, 89, 95, 108. In many instances, FCU's response does not cite evidence disputing the actual fact, but instead responds to collateral issues or nonexistent "suggestions." *E.g.*, RSUF 1, 5-7, 9, 19, 39, 46, 49, 50-51, 53-57, 63, 66-67, 70, 72-73, 78, 82, 85, 88, 90-92, 96, 103-05, 117, 120. And, FCU responds with baseless and immaterial arguments. *E.g.*, RSUF 2, 4, 21, 23, 25, 37, 47-48, 60, 64, 97, 100, 106, 112-13, 122-23, 125. FCU's Counterstatement ("CSUF") suffers from the same defects. *See* BTE's Response ("RCSUF"). FCU has failed to raise any genuine issue of material fact. *See Thomas v. City of New York*, 953 F. Supp. 2d 444, 449 (E.D.N.Y. 2013) (Cogan, J.) (granting summary judgment where "Plaintiff did not adequately dispute any of the statements contained [in moving party's statement]") (quoting Local Rule 56.1(d)); *Taylor v. Dollar Tree Stores*, 2020 WL 2478663, at *3 (E.D.N.Y. May 13, 2020) (refusing to consider statements that are "legal conclusions, irrelevant, or merely object to inferences drawn from the opposing party's statements").

"***claim* they have**" such rights. *Compare* CSUF ¶45 *with* Thanasides Ex. 26.

- Omitting a question mark in quoting from a BTE employee's notes, in a bad-faith attempt to construe that document as confirming an agreement on certain terms, instead of raising questions re same. *Compare* Opp. at 19 *with* Thanasides Ex. 82.

- Misrepresenting evidence as reflecting a BTE "refusal" to sell lanes to FCU, when in fact BTE did no such thing; it only would not allow lanes bearing its Mark to be modified by other manufacturers, which was BTE's right under the License Agreement. RCSUF ¶73.

The two declarations of FCU's sole member, Eric Pavony,[3] are likewise rife with statements that are flatly contradicted by undisputed documentary evidence. Such statements cannot create a triable issue. "'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F. 4th 47, 57 (2d Cir. 2021). Pavony's declarations are also largely "devoid of any specifics, but replete with conclusions, [which] are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar College,* 196 F. 3d 435, 452 (2d Cir. 1999), *cert. denied,* 530 U.S. 1242 (2000).

At bottom, in its zeal to elevate itself beyond a limited licensee of BTE's Mark and take over the Mark,[4] FCU tries to sell a fiction, employing obfuscation, conclusory statements, and clever rhetoric. That strategy is futile. The uncontroverted evidence and the law establish that

---

[3] FCU's Opposition cites Pavony's MSJ declaration directly more than ***60 times***. Where FCU has failed to address matters of fact in its Rule 56.1 statements, the Court may treat the issue as admitted. *See Genova v. County of Nassau*, 2020 WL 813160, at *9 (E.D.N.Y. Feb. 19, 2020).

[4] FCU repeatedly refers to the Skee-Ball Mark as "skee-ball" in a bad-faith effort to portray it as generic, which the License Agreement prohibits FCU from doing. Movit Ex. 2 ¶¶2, 7.6.

FCU has no claim or defense to BTE's Counterclaims. The undisputed record also establishes that this License Agreement must be terminated, on multiple grounds, to ensure that these exclusive rights are not wasted and the Mark is not further damaged by FCU's misuse.

## II.    CORE FALLACIES UNDERPINNING FCU'S CLAIMS AND DEFENSES

(1) <u>FCU Baselessly Contends It Had No Obligation To Utilize Standard Lanes.</u> At the heart of many of FCU's claims and defenses – including its massive claims for lost profits and its argument that it did not breach its best efforts obligations – is the baseless premise that it had no obligation to utilize Standard Lanes and did not have to engage in the Licensed Uses unless BTE manufactured Custom Lanes.[5] Opp. at 9, 43. This premise is defeated by the License Agreement *and FCU's admission that it does not require BTE to make Custom Lanes*. SUF ¶¶21-24, 34; RSUF ¶¶24, 34; CSUF ¶117. FCU had to "utilize SKEE-BALL® branded alley roller machines manufactured by SBI or its successor" *unless* "SKEE-BALL® branded alley-roller machines are not available to buy, rent or borrow" (SUF ¶35) – a condition FCU does not claim ever occurred. "[A]lley rollers manufactured by SBI[/BTE]" undisputedly refers to Standard Lanes, which undisputedly can be used – and were required to be used by FCU – to engage in the Licensed Uses. RSUF ¶79; Thanasides Ex. 91 ("2023 Pavony") ¶¶7-8.[6]

FCU also makes the tortured argument that the License Agreement requires BTE to allow

---

[5] BTE called (1) the non-custom alley rollers manufactured by SBI/BTE "Standard Lanes" (which FCU calls "stock" or "Classic," *see* Opp. at 7-9; RSUF ¶38), and (2) the customized alley rollers FCU *wanted* BTE to create as "Custom Lanes" (which FCU calls "Live" or "NSBL" Lanes, *see* RSUF fn. 2). FCU's quibbles over terminology do not create a genuine dispute.

[6] FCU falsely states that ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

3

FCU to *modify* BTE's Skee-Ball lanes, erroneously stating that ███████████

████████████████████████████████████████████████████

███████████████ RSUF ¶21. There is zero basis for this

fallacious argument. The License Agreement only authorizes FCU to use "*official* SKEE-

BALL® machines" manufactured by the trademark owner. Movit Ex. 2 ¶3.1(a) & Ex. A

(emphasis added); RCSUF ¶27. It is also contrary to law to suggest that BTE would surrender

quality control over its goods to FCU or another manufacturer.[7]

    **(2)** <u>**There Was No "Promise" That BTE Would Meet FCU's "Needs."**</u> FCU has

concocted a claim that BTE's ex-president made a promise, fatally vague as it is, to meet FCU's

"needs" for its business goals, such as making Custom Lanes. CSUF ¶37. This is not remotely

supported by Pavony's (surreptitious) recording of his introductory December 2015 conversation

with Philippon. *See* Thanasides Video Ex. 2 at 21:55 (Pavony: "I was just hoping that we could

just, you know, introduce ourselves today…."). Unsurprisingly, FCU quotes no portion of the

call. Pavony spoke about *his* hope to create customized "lanes of the future." Philippon made no

commitment at all, occasionally asking questions about FCU's expectations and relationship with

SBI and noting BTE had not even finalized the purchase of SBI's assets. RCSUF ¶37. FCU's

effort to turn this introductory call into a "promise" is absurd.[8]

---

[7] *See* 4 *McCarthy on Trademarks and Unfair Competition* § 25:30 (licensee infringes by selling trademarked goods where "licensor has been deprived of the opportunity to exercise quality control"); *see also Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721-22 (9th Cir. 2005); *Midway Mfg. Co. v. Strohon,* 564 F. Supp. 741, 754 (N.D. Ill. 1983) (arcade game "modification kit" enjoinable, as it would likely constitute false designation of origin).

[8] Pavony likens all discussions to "agreements." To show how nonsensical this is, months later in April 2016, FCU and BTE were still discussing "*whether* BTE was *interested* in being FCU's manufacturing partner to build a custom Skee-Ball lane…." CSUF ¶¶42-43 (emphases added).

4

**(3) FCU Had No Right To Block SBI's Assignment Of The License Agreement.** FCU

asserts BTE induced it to "consent" to SBI's assignment with false promises like the one

debunked above. There is no evidence of any such "promises," period. And SBI did not need

FCU's consent, as the License Agreement automatically "inure[d] to the benefit of SBI's …

assigns" and required consent only if **_FCU_** attempted to assign. Movit Ex. 2 ¶¶4.10, 9.1, 9.3.

Moreover, FCU was not harmed by "consenting." It had only two choices: maintain the license if

there was an assignment, or terminate and lose all rights to operate Live Play. *Id.* ¶11.5.

**(4) FCU Cannot Prove Any Enforceable Oral Agreement Requiring BTE To Make**

**Custom Lanes After The Prototypes.** FCU claims that during a September 6, 2017 discussion

with BTE's CEO Larry Treankler over lunch, recorded on video, BTE and FCU entered into an

oral agreement on all material terms obligating BTE to create 25 Custom Lanes after delivering

10 prototypes. The video (Movit Video Ex. 2) reflects general discussions and questions about

how any agreement for any further lanes might work, and the need for a writing. This is another

effort by FCU to turn casual discussions into binding agreements, negated again by its own

admissions. ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████ RSUF ¶¶52, 54. No reasonable juror could conclude that a meeting of the minds occurred,

no less on all material terms, for any oral agreement outside the License Agreement.

**(5) FCU's Allegations Regarding Play Mechanix Are Refuted By The Evidence.** FCU

asserts it had an "agreement in principle" with Play Mechanix to finance and buy Skee-Ball lanes

for FCU from BTE (with an intent to modify them), and that BTE threatened Play Mechanix and

refused its purchase order. Opp. at 8-9, 24-25. This is completely unsupported: George Petro of Play Mechanix testified he never attempted to make any such order and was never threatened. RCSUF ¶69; SUF ¶63. This was corroborated by BTE's Rick Rochetti, with whom Petro spoke. *Id.* Petro also testified no agreement was ever made with FCU. RCSUF ¶61; SUF ¶61.

**(6) BTE Did Not Compete With FCU's Live Play License.** FCU has no evidence that could support its claims that BTE operated, sponsored, or endorsed competing Live Play. Most egregiously, ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████. RCSUF ¶¶78-79. FCU's other conclusory efforts to show competition also fail, as discussed below.

**(7) FCU's Claim That It Did Not Breach The License Agreement Or That "Others" Were Responsible For Infringing The Mark Is Unsupported By FCU's Own Evidence.** FCU argues it did not breach the License Agreement or commit trademark infringement by posting unauthorized Live Play phrases on its website and social media, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ 2023 Pavony ¶79 (emphasis added). FCU's blatant misrepresentation also flies in the face of the actual screenshots, which show that the Mark was used to sell t-shirts and promote FCU's business, including in a feature called Full Circle Magazine bearing an FCU copyright notice. SUF ¶99.

### III. BTE IS ENTITLED TO SUMMARY JUDGMENT ON FCU'S CLAIMS

#### A. FCU Has Failed To Adduce Evidence To Support Its Claims For Breach Of The License Agreement

##### 1. BTE Did Not Breach ¶4.2

FCU's claim that BTE breached ¶4.2 by registering SKEE-BALL LIVE and "revoking its approval" for FCU to use it (SAC ¶¶11, 234) fails. FCU **concedes** it has no claim for BTE's registration. Opp. at 12. FCU does not dispute that BTE owns all rights in the SKEE-BALL Mark and all derivative marks, and FCU's use was required to be "consistent with the terms, conditions, exclusions, and restrictions of [the License] Agreement" and "subject to prior written approval by [BTE]." Mot. at 6, 17; SUF ¶25; Dkt. 34 at 11. FCU also has no evidence that (1) it requested to use SKEE-BALL LIVE for an **authorized** use, (2) BTE gave prior written approval of such use, or (3) BTE revoked that approval. RSUF ¶25; CSUF ¶¶76-77; *see also* RCSUF ¶76.

##### 2. BTE Did Not Breach ¶5.3

FCU has adduced no evidence that BTE directly or indirectly "operate[d], sponsor[ed], or endorse[d] a business, involving Live Play[.]" SUF ¶26.[9] In the context of a trademark license, "sponsoring" requires public dissemination in commerce. *See* 15 U.S.C. § 1125(a). The definition of "endorse" is "to make a public statement of your approval or support for something or someone." https://dictionary.cambridge.org/us/dictionary/english/endorse. Each of FCU's purported grievances is unsupported by facts that could demonstrate any breach.



Opp. at 14; RSUF ¶27; CSUF ¶¶78-79.

---

[9] Of course, nothing in the License Agreement, including ¶5.3, prohibits BTE from endorsing any business **having** a Skee-Ball machine; otherwise, BTE would be unable to sell Skee-Ball lanes to others, which clearly it can do. RSUF ¶31.

This is undisputedly false. ████████████████████████████████████

(Thanasides Ex. 89, ¶5), which was not attached thereto, refutes it. RCSUF ¶78; Movit Reply

Exs. 86, 87 at Ex. A. ████████████████████████████████████

████████████████████████████████████████████████████

████████ *Id.* Neither constitutes Live Play. SUF ¶¶33, 43. ████████████████

████████████████████████████████████ RCSUF ¶¶78-79.

**(b) <u>Alchemy 3</u>.** FCU next points the finger at Alchemy 3, ██████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

RCSUF ¶83; RSUF ¶¶28-29 ████████████████████████████████████

████████████████████████ s. *Id.* FCU instead speculates wildly: ████████████

████████████████████████████████████████████

████████████████████████████████ (emphasis added).

**(c) <u>Aunt Ethel's</u>.** Citing only Pavony's testimony, FCU claims ████████████

████████████████████████████████████████████████████████

████████████████████ r. RSUF ¶30. This is not even evidence of any Live Play at Aunt

Ethel's, much less any alleged endorsement by BTE of competing Live Play.

**(d)** ████████████ FCU alleges BTE entered into a license agreement with ████████████

about potential game shows utilizing BTE's IP. But FCU has not shown that the agreement

involved Live Play, or that the shows were ever made or advertised. RCSUF ¶98.

**(e) <u>Ed's Funcade</u>.** FCU claims BTE sold lanes and unspecified "custom components" to

Ed's Funcade. But as FCU admits, venues can have Skee-Ball lanes for non-Live Play purposes, and FCU's sole "evidence" is an email thread relating to a service request made not to BTE but to its distributor, concerning a delivery of Standard, "*classic*" lanes. RSUF ¶31; Thanasides Ex. 81 at BT0009181-82. FCU offers no evidence that the solutions considered, such as fixing bumpers or updating software, had anything to do with Live Play. RCSUF ¶85.

**(f) Other Alley Roller Leagues.** FCU claims BTE communicated with and attended events for other alley roller leagues. That is not a violation of ¶5.3. RCSUF ¶95. FCU's own submission also reflects that those other leagues did not utilize Skee-Ball branded alley rollers – a prerequisite for Live Play under the License Agreement. *Id.*; SUF ¶33.

**(g) Up Down Bar.** FCU has abandoned any claim as to Up Down. Mot. at 7; SUF ¶30.

### 3. BTE Did Not Breach ¶7.2

FCU tries, contrary to law, to use the best efforts clause in ¶7.2 to negate the express provisions of the License Agreement, which it cannot do; nor can FCU use ¶7.2 to "import a material new promise into an express contract[.]" *Macksey v. Egan*, 36 Mass. App. Ct. 463, 472 (1994) (citing *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613-15 (2d Cir. 1979)). FCU's purported grievances – including minor and illusory ones – all fail as a matter of undisputed fact under these authorities and also because they have nothing to do with "promoting the Licensed Uses."

**(a) BTE Had No Obligation To Sell Custom Lanes Or Allow FCU To Modify Lanes.** FCU's claim that BTE breached by "refusing to sell FCU modified lanes" (Opp. at 16) fails once again because the License Agreement admittedly did not require BTE to sell Custom Lanes. SUF ¶¶24, 34. FCU has no evidence disputing that BTE stood ready to sell it Standard Lanes. *See* RSUF ¶36; RCSUF ¶¶73-74. FCU's claim that BTE breached by "refusing to permit FCU to buy

9

lanes from another manufacturer" fails because FCU undisputedly could not do that unless

"SKEE-BALL® branded alley-roller machines [are] not available to buy, rent, or borrow." SUF

¶¶35, 36. FCU does not claim, and has no evidence, that this occurred. RSUF ¶36; RCSUF ¶41.

Finally, FCU's claim that BTE breached by refusing to "permit FCU to modify" Skee-Ball lanes

has the same fatal deficiency for the same reasons. Also, the License Agreement does not grant

FCU a naked license to modify BTE's lanes in violation of FCU's obligation to conduct Live

Play on "official SKEE-BALL® machines." RSUF ¶32; CSUF ¶27; *see* RCSUF ¶¶41, 73-74.[10]

**(b) FCU Had No Right To Enter Into A Production Agreement With ESPN.** BTE did

not breach by objecting to FCU's deal with ESPN, as it was wildly beyond the limited scope of

the License Agreement. The Licensed Uses do not include use of the Mark to produce, sell,

license, broadcast, or promote television shows, or to provide audiovisual content containing the

Mark to third parties. SUF ¶33. And "[n]o license … [wa]s granted to FCU, whether directly or

indirectly, except as specifically provided herein." SUF ¶68; *see* SUF ¶43. FCU could not even

sub-license the Licensed Uses "without the prior written consent of SBI." Movit Ex. 2 ¶15. The

License Agreement also limited use of the Mark (*e.g.*, broadcasting) to advertising, promotional,

and marketing purposes ***only***, with no grant of digital rights. SUF ¶¶42-44.

FCU fallaciously argues the ESPN deal falls under ¶3.2. That provision unambiguously

states the Mark can be used "for advertising and promotional purposes … ***so long as such use is***

***solely in connection with and in compliance with the Licensed Uses above, and the***

***restrictions, conditions and exclusions below***." Movit Ex. 2 ¶3.2 (emphasis added). Advertising

---

[10] As discussed above, FCU's claim that BTE blocked it from buying Standard Lanes via Play Mechanix is baseless. *See also* RCSUF ¶69. And FCU admits it intended to "***modify the lanes***" (SAC ¶179 (emphasis added); SUF ¶¶38-41; RSUF ¶¶40-41) – which FCU had no right to do.

of the Licensed Uses does not include a grant of an entirely new use. █████████████

██████████████████████████████████████████████████████████████████████████████████

Thanasides Ex. 44 at FCU000009933-34. ███████████████████████████████████

███████████████████████████████████████ FCU's distorted characterization of ¶3.2

would allow new, unlicensed uses and void the License Agreement's restrictions. *See* Mot. at 19.

    **(c) <u>Skee-Ball Live.</u>** This claim fails for the reasons discussed above in Section III.A.1.

    **(d) <u>FCU Has Not Shown BTE "Repeatedly Manufactured Defaults."</u>** FCU has

submitted no evidence showing (1) any defaults at issue, (2) how they were "manufactured,"

(3) that this happened "repeatedly," (4) whether and how FCU cured them, (5) that BTE sought

to create uncertainty about the license, or (6) any resulting damage.[11]

    **(e) <u>FCU's Alleged Non-Inclusion In A BTE Licensing Guide Is Not A Breach.</u>** FCU

fails to identify any obligation by BTE to include FCU in licensing or branding guides – there is

none – no less any evidence that BTE "refused" to identify FCU as a licensee. In fact, after the

"onboarding" process of SBI's assets, BTE updated its guide to *include* FCU. RCSUF ¶90.

    **(f) <u>BTE's Discussions With Third Parties About FCU.</u>** FCU's vague complaints that

BTE spoke to others fail. First, FCU has no breach of NDA claim; this Court ruled any such

claim is foreclosed by the NDA's Wisconsin forum selection clause. Dkt. 146. Second, FCU

submits no evidence of what was allegedly shared, or how such sharing purportedly violated

anything. RCSUF ¶93. Third, as to FCU's illogical claim that BTE breached by *failing to share*

with FCU that Dave & Busters expressed "interest" in the NSBL, FCU offers only hearsay

---

[11] FCU's only "evidence" on this issue is meaningless: a December 2019 email in which Pavony asked BTE what defaults remained unaddressed. CSUF ¶¶71-72. ██████████████████████████████████████████████████████████████ RCSUF ¶¶71-72.

references illustrating nothing of substance as to any actual opportunity for FCU or that it was not shared. RCSUF ¶94. Finally, FCU's claim that BTE breached by speaking to other alley roller leagues fails as those leagues undisputedly did not engage in Live Play. RCSUF ¶95.

### 4. FCU's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Fails As A Matter Of Law

FCU's implied covenant claim fails because it is either duplicative of its claims for breach of contract or based on claimed obligations not contained in the fully integrated License Agreement. *See* Mot. at 20; Dkt. 34 at 12-15; Dkt. 54 at 10. As discussed above, none of FCU's grievances raises any issue of fact that BTE breached any obligation.

### 5. FCU Itself Breached The License Agreement

A party in breach cannot recover for alleged breach of contract. *See, e.g.*, *Mehmet v. Add2net, Inc.*, 66 A.D.3d 437, 438 (2009). As further discussed below, BTE has conclusively established as a matter of law that FCU breached the License Agreement; thus, BTE is entitled to judgment on FCU's contract claims on this independent basis.

### B. FCU Has Failed To Submit Evidence That Could Prove An Enforceable Oral Agreement

### 1. The Statute Of Frauds Bars This Claim[12]

FCU concedes its claim for breach of an alleged oral contract for BTE to deliver Custom Lanes beyond 10 prototypes is subject to the UCC's Statute of Frauds. Opp. at 21-24. The alleged oral agreement is void absent a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." N.Y. U.C.C. Law § 2–201(1).

---

[12] Should the Court agree that the Statute of Frauds is dispositive in BTE's favor on this claim, it need not address the lack of evidence as to a meeting of the minds.

FCU makes three unavailing arguments regardless of its concession. First, FCU invokes the "partial performance" doctrine but fails to understand that "partial performance of contractual obligations validates a contract, ***but only to the extent of such partial performance***." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 782 (2d Cir. 2003) (emphasis added); *see* N.Y. U.C.C. Law § 2-201(c). In other words, that 10 prototypes were built and allegedly paid for does not show any partial performance in terms of any further lanes not built, delivered, or paid for. RCSUF ¶¶104-05. This is not a situation where down payment was made for a single article. *See Starr v. Freeport Dodge, Inc.*, 54 Misc. 2d 271, 274 (N.Y. Dist. Ct. 1967) (UCC "validates … a divisible contract only for as much of the goods as have been paid for").

Second, FCU contends that BTE's lawyers confirmed the alleged oral revenue share agreement but "incorrectly stat[ed] the number of lanes to be supplied" as 10 prototype lanes. Opp. at 22-23; RSUF ¶¶56-57; RCSUF ¶103. However, a writing "is not enforceable … beyond the quantity of goods shown in such writing." N.Y. U.C.C. Law § 2-201(1). Further, the cited document denied any such oral agreement ever existed. Thanasides Ex. 41.

Third, FCU incorrectly argues "written communications separately confirm the number of lanes to be supplied by BTE as 36[.]" Opp. at 22-23. The cited emails (Thanasides Exs. 74, 79, 82) only reflect ***discussions***, not an agreement on specifications, timing, and other material terms for any further Custom Lanes. None indicates a ***contract for sale***. FCU simply has no evidence of confirmatory writings signed by BTE or its authorized agent to defeat the Statute of Frauds. *See Radix Org., Inc. v. Mack Trucks, Inc.*, 602 F.2d 45, 47 (2d Cir. 1979); RCSUF ¶99.

Finally, FCU's invocation of equitable estoppel fails for all of the above reasons and those below, and because FCU has no evidence that BTE sought to "'mislead or defraud'" FCU

13

"by inducing reliance on an oral agreement that resulted in unconscionable injury," *i.e.*, "'injury beyond that which flows naturally from the non-performance of the unenforceable agreement.'" *TSNY Mgmt. L.L.C. v. P'ship*, 2010 WL 11627255, at *18 (E.D.N.Y. 2010).

     **2.**      **FCU Cannot Muster Evidence To Show It Could Meet Its Burden To Demonstrate There Was A Meeting Of The Minds On Material Terms Of An Oral Agreement**

     **(a) <u>FCU's Admission Demonstrates That No Agreement Was Reached</u>.** FCU's claim is that an oral revenue share agreement regarding 25 production Custom Lanes was officially entered into over lunch on September 6, 2017. This is undisputedly contradicted by FCU's own documents. ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████ FCU has no explanation, because there is none. Opp. at 20. It merely tries to deflect by pointing to emails in late ████████

████████████████████████████████████████

████████████████████████ e any reliance on these earlier emails.

     **(b) <u>The Diner Conversation Is Insufficient Evidence Of A Meeting Of The Minds</u>.**

The above documents are dispositive that there was no meeting of the minds as claimed.[13]

However, even the September 6, 2017 diner video – which FCU claims is when the parties

---

[13] FCU claims BTE orally contracted to "provide 36 customized Skee-Ball lanes to [FCU] – 11 prototype lanes followed by 25 production lanes – in exchange for BTE receiving 15% of the top line revenue generated by the lanes until they had received 1.5x of the parts and labor (i.e., $6,750 for a $4,500 lane)[.]" CSUF ¶102.

agreed on all material terms of an enforceable contract – itself demonstrates the undisputed lack of merit to this claim. This confirms that FCU failed to meet its burden to produce evidence showing a meeting of the minds took place. *See Gianascio v. Giordano*, 2003 WL 22999454, at *7 (S.D.N.Y. Dec. 19, 2003) (granting summary judgment and dismissing counterclaims because counterclaimant failed to adduce evidence that contract was made).

Ignoring most of the video, in which the parties went back and forth about possibly changing their relationship in various ways, FCU cites two vague snippets. RCSUF ¶102; Movit Video Ex. 2 at 40:30 and 41:40.[14] These isolated statements out of context cannot stand as sufficient proof of material terms to create an enforceable contract. *See Kelly v. Bensen*, 151 A.D.3d 1312, 1313 (2017) (dismissing oral contract claims; "neither witness described the scope of work in sufficiently specific terms to support a determination that the parties had reached a meeting of the minds"); *Kosher Provisions, Inc. v. Blue & White Food Prod. Corp.*, 2005 WL 1890039, at *5 (E.D.N.Y. Aug. 9, 2005).

Moreover, the cited snippets say nothing – much less evidence agreement – about lanes being ***sold*** to FCU in exchange for a financing plan, let alone several other essential terms, such as the price for any production lanes, the timing and manner of their manufacturing or delivery, or where they would be located. *See Fakhoury Enters., Inc. v. J.T. Distribs.*, 1997 WL 291961, at *3 (S.D.N.Y. June 2, 1997) ("the essential terms are quantity, price, and time and manner of delivery"). Indeed, the alleged financial terms do not appear ***anywhere*** in evidence submitted by

---

[14] The snippets (*see* RSUF ¶47) consist of Pavony making multi-part statements and Treankler saying, "Right" or "Yup." In the first, Pavony's statement is also unclear as to whether the "show case" (FCU proving the profitability of its proposal) would occur before or after any production lanes. In the second, Treankler's response shows he was replying to Pavony's remark that BTE would provide "no help right now with operational cash for us to roll that out."

FCU. *See* RCSUF ¶¶99-102. Further, FCU has admitted the subsequent production lanes had yet-undetermined "specifications for the Skee-Ball Live Lane [and] the ability to collect credit payments." SAC ¶¶258-59; *see id.* ¶117.[15] FCU does not dispute that specifications and any manufacturing or delivery dates were not agreed upon. RSUF ¶51. At most, the evidence shows an unenforceable agreement to agree. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) (agreement for lease renewal for rent "to be agreed upon" was unenforceable "agreement to agree, in which a material term is left for future negotiations").

FCU's claim fails for the independent reason that the parties communicated an intent not to be bound absent a written agreement. Mot. at 21. As the video establishes, BTE's Treankler queried that if the prototypes delivered for the test event (the BEEB) were then "deployed" by FCU, "***how [we are] going to do that contractually***" as that would need to be "***figured out***." Movit Video Ex. 2 at 32:40-33:15 (emphasis added). Key material terms not evidenced would include the specifications for the creation and manufacturing of 25 or "maybe more" Custom Lanes, financial terms and potential financing, and delivery/location terms, all unquestionably the type of terms typically reduced to writing. *See R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (discussion of $2 million investment showed it was the kind of agreement that would usually be committed in writing).

**(c) <u>The Later Emails Cannot Substitute For A Meeting Of The Minds On All Material Terms</u>.** FCU claims 2017 emails of lower-level BTE employees after the diner meeting can provide sufficient evidence of an agreement on all material terms. Not so. "[T]he

---

[15] That BTE accepted some payments for the 10 ***prototypes*** does not show an agreement as to any financial terms, or other essential terms, regarding possible production lanes.

court looks not to the parties' after-the-fact professed subjective intent, but rather at their objective intent as manifested by their expressed words and conduct at the time of the agreement." *Kelly*, 151 A.D.3d at 1313 (quotations omitted). Later statements, even references to an "agreement," cannot create a legally binding contract where no meeting of the minds occurred. *See Kelley v. Bryan Ins. Agency, Inc.*, 176 A.D.3d 1042, 1045 (2019) (statement that agreement was in effect did "not establish that a valid contract existed where the other evidence establishes that there was no meeting of the minds"); *LPD New York, LLC. v. Adidas Am., Inc.*, 2020 WL 9886308, at *5 (E.D.N.Y. Mar. 31, 2020), *on reconsideration*, 2020 WL 9816008 (E.D.N.Y. July 24, 2020) (claim failed because parties did not have binding agreement on material terms, despite defendants' internal emails suggesting a potential agreement).

Undisputedly, the emails submitted by FCU contain no agreement on all material terms for production lanes, including price, payment obligations, specifications, timing of production, or location or timing for any delivery. *See* CSUF ¶¶99-102. One poses ***questions***, improperly elided by FCU, about what the terms might be – not a statement about an agreement. Thanasides Ex. 82; *compare* Opp. at 19. ████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████ Thanasides Exs. 35, 74, 76, 78, 79; *see Rosenfeld v. Zerneck*, 4 Misc. 3d 193, 196 (N.Y. Sup. Ct. 2004). In any event, any statement by these employees regarding a possible agreement would be inadmissible hearsay. FCU has no evidence that forming a contract "was within the apparent range of [these employees'] authority." *N. Oil Co. v. Socony Mobil Oil Co.*, 347 F.2d 81, 84 (2d Cir. 1965).

FCU's other arguments are equally unavailing. ████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. Thanasides Ex. 10 at 317:5-14.

Grasping at straws, FCU argues the wording of Hampton's January 2, 2018 communication that

the Skee-Ball Live project was "on hold" was ████████████████████████████████████████

██████████████████████████████████████████." Opp. at 20. BTE's

consistent position has been that it would observe how the 10 prototypes performed as a test case

before deciding whether it would agree or not to build further Custom Lanes and on what terms.

Mot. at 3. Finally, FCU's misleading assertion that BTE "recognized" a revenue share agreement

applies solely to BTE's attempt to enter a written contract for the prototypes. SUF ¶55.[16]

### 3.    FCU's Tortious Interference Claim Fails As A Matter Of Law

FCU's tortious interference claim fails under Wisconsin law (which FCU has argued

controls, Dkt. 44 at 21) and New York law. First, FCU cites no evidence of any "agreement in

principle" with Play Mechanix "to purchase stock Classic Lanes from Bay Tek and pay all the

expenses to modify the lanes for Live Play" (SAC ¶¶179, 271), much less a sufficiently concrete

prospective contract under Wisconsin law (Dkt. 54 at 4-5), or a contract FCU would have

obtained but for the alleged interference (*Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 217 F.

Supp. 2d 423, 440 (S.D.N.Y. 2002)). FCU points to a recorded August 1, 2018 call between Play

Mechanix's Petro and Pavony, but it contains a preliminary ***discussion – not an agreement***.

---

[16] BTE's May 2019 settlement proposal to settle this dispute pre-litigation is inadmissible under
Rule 408, and is of no use to FCU; it contains no agreement or concession regarding building
FCU further Custom Lanes. *See* RCSUF ¶103.

Petro did not make an agreement, and stated he would need his superior Eugene Jarvis to do so.[17] And as Petro testified, Jarvis never approved or even responded to the concept of any agreement. RCSUF ¶¶115-16; Thanasides Ex. 15 (Petro Depo.) at 102:1-11, 103:17-20, 118:18-119:21.

Second, FCU has no evidence that BTE interfered with any agreement, as there was none, no less engaged in wrongful means to do so, *i.e.*, "acts that would be criminal or independently tortious[.]" *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 192 (2004) (wrongful means do not "include persuasion alone although it is knowingly directed at interference").[18] And of course, BTE did not. FCU has no evidence to contradict Petro's testimony that he was not "threatened" by Rochetti. RSUF ¶63. FCU's argument that there is a genuine issue "as to what was said" because Petro and Rochetti's testimony was not entirely consistent (Opp. at 25) is rank speculation. Neither witness's testimony supports FCU's claim, and FCU has no other evidence. *See Schulman v. Cont'l Ins.*, 258 A.D.2d 639, 640 (1999); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact").

### C.    FCU Raises No Issue Of Fact That Could Support Its Lost Profits Claims[19]

---

[17] *See* RSUF ¶61; RCSUF ¶69 (plan would need to be "sold upstream" to BTE; "***If I'm going to get in bed with you guys***, that's why I'd like you to come through our system and I'd like to be part of that"; "You guys chew on this, right? Chew on what I said. Tell me what you think. You know, I saw your numbers. ***I think with these numbers, I can move this conversation forward on my side***.") (emphases added).

[18] Again, BTE has the right not to permit any third party to modify its own alley rollers and no obligation to FCU under the License Agreement or otherwise to forgo that right. *See Levy v. P & R Dental Strategies, Inc.*, 302 A.D.2d 255 (2003) (summary judgment; "Defendants committed no wrong, much less one sufficiently egregious to support a claim for tortious interference with prospective economic advantage, in refusing to waive the economic protection to which [defendant] was purportedly contractually entitled") (citations omitted).

[19] The Court need not reach this issue if it finds in BTE's favor as to liability on FCU's claims.

19

FCU's Opposition fails to refute that its lost profits claims are not just speculative, but moreover, they are *premised* upon assumptions that are *controverted* by the undisputed record. No reasonable jury could award lost profits to FCU.

### 1. FCU Cannot Satisfy The Requisite Standard For Proving Consequential Damages On Its Contract Claims

FCU concedes its contract-based claims for lost profits are for *consequential*, not general, damages, requiring it to prove (1) "with certainty" that damages were caused by the breach, (2) that the alleged damages "were fairly within the contemplation of the parties," and (3) the "extent of the loss … with reasonable certainty." Opp. at 25. And, as FCU's cited authority establishes, there is a "higher burden for proving consequential damages" than for general damages. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 111 (2d Cir. 2007). Such claims are routinely dismissed on summary judgment.[20] That result should obtain here, because the damages opinions of Laura Smith – FCU's sole "evidence" of lost profits – are based on false premises and utterly unreliable.[21] The trier of fact could not find in FCU's favor as to any of the three requisite elements of its lost-profits claims.

### a. FCU Cannot Establish, Let Alone With "Certainty," That Any Damages Were Caused By The Alleged Breaches

---

[20] *E.g.*, *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239 (2d Cir. 2020) (noting "more exacting standard"); *Nina Indus., Ltd. v. Target Corp.*, 2005 WL 323745, at *2 (S.D.N.Y. Feb. 8, 2005) ("claim is too speculative to stand"); *RXR WWP Owner LLC v. WWP Sponsor, LLC*, 145 A.D.3d 494, 495 (2016); *Awards.com, LLC v. Kinko's*, 42 A.D.3d 178, 183 (2007), *aff'd*, 14 N.Y.3d 791 (2010).

[21] FCU's argument that BTE was required to file a separate *Daubert* motion (Opp. at 27-28) is specious. As BTE's Motion explained: "Ms. Smith's baseless assumptions warrant her preclusion under *Daubert*… But the Court need not engage in a *Daubert* analysis because plaintiff 'failed to establish a foundation for the existence of damages for lost profits ….' *Schonfeld v. Hilliard*, 218 F.3d 164, 171 (2d Cir. 2000)." Mot. at 31 n.11. FCU's cases (Opp. at 28) involve completely inapposite situations (such as a case in which dispositive motion practice was denied without prejudice as discovery was not complete) and are not to the contrary.

20

Contrary to FCU's assertion, BTE has consistently, and correctly, maintained that FCU cannot establish the existence of ***any*** damages caused by the alleged breaches – let alone with the requisite certainty. *See* Mot. at 30, 1 n. 2; Dkt. 34 at 18-21; Dkt. 54 at 2-4.

Smith's $23M+ calculation for alleged breach of the License Agreement is premised on an untenable assumption that BTE would have delivered ***1,750 Custom Lanes***. Movit Ex. 26 ("Smith Report") ¶52 (p. 27). But as FCU admits, ***the License Agreement did not require BTE to make a single Custom Lane***. RSUF ¶¶24, 34.[22] It is beyond ludicrous for FCU to claim any damages flowing under the License Agreement for failure to produce Custom Lanes when it admits BTE has no such obligation in the first place. This is a fundamental, fatal flaw in Smith's analysis inconsistent with FCU's own admissions that warrants its outright preclusion.

FCU cannot establish the existence of lost profits with respect to the purported oral revenue share agreement, as it is refuted by Pavony's own contemporaneous admission. In August 2018, Pavony was asked (in a call he secretly recorded): "And if Bay Tek called you tomorrow and said, hey if we deliver the 26 lanes will you be ready?" Pavony replied, "We'd be ready for them, but we wouldn't take them, because we don't have any interest in working with Bay Tek anymore because we can't trust them." Thanasides Video Ex. 30 at 27:35-55. Given Pavony's admission, FCU cannot establish lost profits from BTE's alleged failure to provide those lanes with requisite ***certainty***.

> **b.** **FCU Cannot Adduce Probative Evidence That The Parties Contemplated An Award Of Lost Profits, As They Did Not**

---

[22] Smith's damages analysis in connection with BTE's breach-of-License-Agreement claim – which again is premised on the creation of 1,750 Custom Lanes – remains untenable, even if one (wrongly) assumes the truth of FCU's allegations regarding the purported oral agreement in analyzing that claim. FCU concedes that at the diner, BTE "would not commit to … further [Custom] lane production" after the claimed 36 Custom Lanes. RSUF ¶48.

Further, no reasonable jury could find the parties contemplated lost profits, in connection with the License Agreement or the alleged oral contract. FCU wrongly contends this issue cannot be resolved on summary judgment (Opp. at 25), citing *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199 (S.D.N.Y. 2010). There – unlike here – the parties' agreement included ***specific provisions*** entitling plaintiffs to recover "consequential losses." *Id.* at 220.

In contrast, the License Agreement contains no mention of consequential damages. Opp. at 32; RSUF ¶45. FCU argues an express term is not required, but this is contrary to "significant New York authority for the proposition that a party seeking consequential damages must identify specific contractual provisions demonstrating that recovery of such damages was contemplated by the parties." *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006). FCU has zero evidence of any intent for consequential damages. Whether consequential damages were contemplated is assessed at "***the time of or prior to contracting***[.]" *Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 319 (1989) (emphasis added). Obviously, as there is not even an obligation to make Custom Lanes, there was no such contemplation. Further, "the parties must contemplate, not turning a profit, but '***the particular damages***' owing to lost profits should the deal turn sour." *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 435 (S.D.N.Y. 2004) (emphasis added). This is a complete non-sequitur as to the License Agreement.

As to the alleged oral agreement, FCU similarly has zero evidence of any manifestation of the parties' intent for consequential damages. While FCU argues the purported agreement was about "creation of a revenue stream" (Opp. at 32-33), that is insufficient. *See Great Earth*, 311 F. Supp. 2d at 435; *Taylor v. Meirick,* 712 F.2d 1112, 1121 (7th Cir. 1983) ("[A] loss of revenue is not the same thing as a loss of profits."). "It would be highly speculative and unreasonable to

infer an intent to assume the risk of lost profits in what was to be a start-up venture by [plaintiff]." *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 184 (2007); Mot. at 30. In any event, there is no evidence the parties even discussed liability for lost profits. *See Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 334 (2d Cir. 1993) (no evidence established that liability for lost profits was discussed and accepted at the time of contracting).[23]

### c. FCU's Lost-Profits Claim Is Improperly Speculative For Numerous Additional Reasons

FCU's lost-profits claims are improperly speculative as a matter of law for numerous reasons. *See* Mot. at 12-13, 30-34; Dkt. 34 at 18-21; Dkt. 54 at 2-4. FCU's allegations establish that the "Skee-Ball Live Concept" is new and untested, and would need Custom Lanes supplied to "hundreds of bars throughout the country," to develop a new national league (NSBL). Complaint ¶3. FCU's claims depend on many uncertain factors, including obtaining financing, building relationships with "hundreds of bars" not owned by FCU, and having those bars create the environment and patronage FCU hoped could exist. *See* Dkt. 34 at 20; *e.g.*, *Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 781 (2d Cir. 1994); *Kovens v. Paul*, 2009 WL 562280, at *7 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 358 F. App'x 228 (2d Cir. 2009).[24]

---

[23] FCU's authority is inapposite. In *Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A.*, 2004 WL 784941, at *3 (S.D.N.Y. Apr. 13, 2004), probative evidence of the parties' discussion of lost profits was adduced. In *In re Best Payphones, Inc.*, 432 B.R. 46, 63-64 (S.D.N.Y. 2010), the contract had a limitation of liability that applied only to one party. *In re Best* did not hold that the only insulation against a lost profits claim is to "contract for [that] limitation." Opp. at 33. Rather, the court held that a clearly asymmetrical damages provision ***may*** allow an inference about what the parties contemplated. 432 B.R. at 64. There is no such provision here.

[24] The cases FCU cites do not hold otherwise. *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) addressed the lower standard for general damages. *Sir Speedy, Inc. v L & P Graphics, Inc.*, 957 F.2d 1033 (2d Cir. 1992), did not apply New York law. And FCU's reliance on *Washington v. Kellwood*, 2015 WL 6437456 (S.D.N.Y. Oct. 14, 2015), is misplaced because BTE has not conceded the existence of damages, and FCU's allegations establish that

FCU's ultimate goal – a Custom Lane-based NSBL – was an early-stage venture, at best, that only began operations in 2018. The data Smith relied upon came only from the 10 prototype Custom Lanes in the **two FCU bars owned by Pavony**. Smith Report ¶38. Smith simply assumed, without basis, that but for BTE's alleged breach of a concededly non-existent obligation to manufacture and pay for 1,750 Custom Lanes, FCU would have succeeded in creating a network of Live Play bars **owned by third parties**. Smith Report pp. 25-30, App'x J.

Smith parroted FCU's pie-in-the-sky projections, which does not meet the standard. She said so, **repeatedly**. *See, e.g.*, Movit Reply Ex. 81 (Smith Depo.) at 47:11-12 ███████████ ████████████████████████████████████ 130:18-21 ████████████████████████████████████████████ ████████████████████████████ FCU tries to retract this, unavailingly. Opp. at 29-30. But Smith did not (and could not) determine reasonably certain figures.

In addition, each aspect of Smith's calculation is "built upon one baseless, flawed assumption after another." *Compania Embotelladora*, 650 F Supp. 2d at 321. For example:

- Smith based her calculations on incomplete data. Mot. at 31-33. FCU does not dispute this (RSUF ¶¶64-65), but claims Smith relied on "sales numbers that were compiled in the normal course of FCU's business on its earnings on Skee-Ball going back to 2005." Opp. at 30. Not so; her report based its projections entirely on the 10 "prototype" lanes used only in FCU's own two bars from 2018 to the first half of 2021, relying on data

---

the venture was new. (Only "prototype" lanes were delivered, and stayed in FCU's possession. SAC ¶¶135, 165.) Moreover, *Washington* acknowledged that reasonable certainty was required whether or not a venture was a "new business," and declined to grant defendant's motion in part because plaintiffs had already demonstrated entitlement to trial on another issue. *Id.* at *25.

Wikman manually generated. Smith Report at pp. 12, 15, 21, 26.[25]

- Smith took the purported revenue from 10 prototype Custom Lanes, operated *only in FCU's bars*, assumed such revenue would increase over the next five years well beyond the historical revenue per lane, then extrapolated these assumptions to *production lanes* not created and not deployed beyond FCU's own bars. For the License Agreement claim, Smith made the unfounded decision that there would have been 1,750 lanes in operation within five years – despite no commitment by BTE, or anyone else, to take on the risk of paying millions to fund 1,750 Custom Lanes. Smith Report at pp. 25-30 & Appendix J.

- Smith simply assumed FCU could financially scale the NSBL. FCU had no investors, little or no experience with investors (Movit Ex. 13), and no money; for a period between 2016 and 2018, FCU could not even maintain a bank account and used instead an account opened in the name of its consultant, Eric Cooper. SUF ¶65; RSUF ¶65. Despite this, and despite ███████████████████████████████████████ Smith assumed that "potential" sources for funding would exist. Movit Ex. 27 ¶¶63-64.

### 2. FCU Cannot Establish Lost Profits For Alleged Tortious Interference

FCU concedes it "must establish both the existence and amount of [interference] damages with reasonable certainty," and that such damages must have been "within the contemplation of the parties." Opp. at 35-36. Smith's $6.8M+ calculation unquestionably fails in both regards. Mot. at 33-34. FCU has no evidence the parties contemplated that SBI would be liable for lost profits for not allowing it to have a competing manufacturer modify Skee-Ball lanes – which

---

[25] Wikman testified ███████████████████████████████████████████████
████████████████████████████████████████████ Movit Ex. 4
(Wikman Depo.) at 401:4-406:15; 494:13-500:23.

FCU had no right to do. And there is no evidence to support Smith's assumption ██████

████████████████████████████████████████████████████████████████████████ but

for some alleged threat. Smith also admitted she relied on the same faulty inputs and assumptions

discussed in Section III.C.1.c above. *See* Movit Ex. 26 at 30-34.[26]

## IV.     BTE IS ENTITLED TO JUDGMENT ON CERTAIN OF ITS COUNTERCLAIMS

### A.     <u>FCU Cannot Rebut That It Breached The License Agreement</u>

#### 1.     FCU Failed To Use Best Efforts, In Breach Of ¶7.2

FCU was obligated to use its "best efforts to promote the Licensed Uses[.]" SUF ¶32. As

the License Agreement expressly states, such efforts are to inure to the benefit of BTE. Mot. at

34. That is the whole point of a trademark owner licensing exclusive rights to use a trademark –

so the licensor can earn revenue from licensed uses. That is why "[e]ven without the best efforts

clause [FCU] would have been bound to make a good faith effort to see that substantial sales of"

the Licensed Uses occurred. *Bloor*, 601 F.2d at 614. To establish breach, it is sufficient to show

that the licensee "simply didn't care about" the licensor's revenue." *Id.* "The burden then shift[s]

to [the licensee] to prove there was nothing significant it could have done to promote [the

licensor's] sales that would not have been financially disastrous." *Id.* at 614-15. To say FCU

"simply didn't care about" BTE earning only ***$161.50*** (SUF ¶77) is an understatement.

<u>**¶3.1(a): FCU's Admitted Failure To Buy And Utilize Standard Lanes To Build Out**</u>

<u>**Live Play**</u>. FCU was required to use its best efforts to build out "live play leagues, teams, events,

and tournaments ***utilizing alley rollers manufactured by SBI***[.]" RSUF ¶33 (emphasis added).

---

[26] Smith cites a call between Pavony and Petro in December 2016, but that was nearly ***two years***
before the events underlying FCU's claim. Smith Report ¶30 n. 66. Moreover, their 2018
recorded call makes clear they were discussing a hypothetical order with BTE for "X number of
lanes," and, as Petro stressed, he did not have the requisite internal approval. RCSUF ¶69.

FCU undisputedly did not purchase a ***single*** Standard Lane from BTE.[27] FCU's contention (Opp. at 43, 16) that it had no obligation to buy "alley rollers manufactured by SBI," *i.e.* the Standard Lanes, and could instead demand that BTE build Custom Lanes, is wholly devoid of evidentiary support and blatantly contradicts the License Agreement and again FCU's own admission that the License Agreement did not require BTE to manufacture Custom Lanes. RSUF ¶¶24, 34.

FCU was required to promote the *Licensed* Uses (RSUF ¶32), which in turn required it to utilize available Skee-Ball lanes manufactured by BTE – not demand that BTE spend money on FCU's desired specifications for Custom Lanes or allow BTE's Skee-Ball-branded lanes to be modified elsewhere. *See Halo Optical Prod., Inc. v. Liberty Sport, Inc*., 2017 WL 1082443, at *10 (N.D.N.Y. Mar. 22, 2017) (where licensor retained right to manufacture and inspect products, licensee's ordering of products without licensor's consent and inspection "was clearly outside the scope of the license"). FCU's unsupported and erroneous contentions would turn a License Agreement expressly intended to inure to BTE's benefit completely upside down.[28]

**¶3.1(b): FCU's Admitted Failure To Sell Live Play Merchandise.** It is undisputed that FCU did not sell ***any*** Live Play merchandise, one of the four Licensed Uses. RSUF ¶¶72, 74. Instead, FCU undisputedly sold its Brewskee-Ball merchandise, for which BTE received no

---

[27] FCU's refusal to use the Mark with Standard Lanes is manifested by Pavony's first and only request for a quote for Standard Lanes ***over three years after BTE acquired the Mark***. It was a meaningless request, as he only wanted them if he could modify them – which he had no right to do, so he never purchased them. 2023 Pavony ¶¶58-59.

[28] FCU's desire to "grow Live Play through networked Skee-Ball lanes using FCU's software" using "innovation and technology to grow the Licensed Uses" (CSUF ¶¶118-19; Opp. at 43) is not an excuse not to comply with the License Agreement and use Standard Lanes. The License Agreement undisputedly did not give FCU the ability to abrogate its obligations because it wanted to dictate specifications of Skee-Ball machines for Live Play. *See SATCOM Int'l Grp. PLC v. ORBCOMM Int'l Partners, L.P.*, 2000 WL 729110, at *19 (S.D.N.Y. June 6, 2000).

revenue. RSUF ¶¶73, 74. FCU's brief does not even address this, conceding a breach.

**¶3.1(d): FCU's Admitted Failure To Use Mark For Live Play Sponsorships.** FCU took in-kind donations (*e.g.*, alcohol donations) that benefitted its bars while using the Mark, but sought no sponsorships and endorsements (one of the four Licensed Uses) for which FCU would have to pay BTE a 15% royalty. Mot. at 13-14, 35-36. FCU has no explanation for this breach, and in fact doubled down on these undisputed facts by stating FCU is not required to remit revenue "for money paid to FCU by a venue or company owned by Mr. Pavony or FCU[.]" Opp. at 44. FCU only used the License Agreement to benefit itself, failing to use any effort, no less best efforts, to obtain sponsorships that were required to benefit BTE. Movit Ex. 2 ¶¶8.1, 8.4.

## 2.     FCU's Undisputed Failure To Comply With Obligations In ¶5.1

Given the exclusive license for Live Play, FCU was obligated to "use best efforts to build a national network of Live Play teams, leagues, and/or events in at least fifteen (15) states … within five (5) years," *i.e.*, by July 16, 2019. RSUF ¶79. The License Agreement stated that as of its execution, FCU had developed Live Play teams, leagues, and events in only *4* states. *Id.* FCU admits that between July 2014 and the beginning of 2019, it operated Live Play for the first time in just *2* additional states, for a total of 6. Movit Ex. 3 (Pavony Errata).

FCU undisputedly breached this obligation. Mot. at 36-37. Consistent with his cavalier disregard of FCU's obligations, Pavony announced in 2018 that he considered ¶5.1 (in his words) a "bullshit clause." Thanasides Video Ex. 30 at 9:40. The undisputed evidence shows that FCU did not build a national network in 15 states or make best efforts to do so. Instead, FCU scrambled at the last moment to "check the boxes" on a requirement it spent nearly five years

ignoring. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████ *See* RSUF ¶¶80-82. This does not

constitute "teams, leagues, and/or events" in a state, let alone a national *network* in 15.[30]

### 3. FCU Cannot Dispute That It Used The Mark In Unauthorized And Vulgar Ways, In Breach Of ¶¶4.2, 7.7, And 7.8

There is no genuine issue that FCU breached its obligations (1) to obtain BTE's "prior

written approval" for phrases using the Mark; (2) not to use the Mark "in connection with the

intellectual property of any third party" without consent; and (3) to "ensure" that its use of the

Mark "shall not tarnish, dilute, weaken, blur or otherwise malign" BTE or the Mark, which FCU

acknowledged "is geared towards families and children." RSUF ¶¶86, 94, 107.

First, it is uncontroverted that FCU did not obtain BTE's prior *written* approval for any of

the undisputed uses at issue – a breach of ¶4.2. RSUF ¶90; SUF ¶¶95, 97. Second, it is

uncontroverted that the Mark was used in connection with third-party IP for which FCU did not

obtain prior consent – a breach of ¶7.8. SUF ¶¶108-17. Third, FCU cannot and does not contend

that phrases and uses referencing sex, diseases, drug use, a political sex scandal, and the murder

of a child are consistent with the Mark's family-friendly image – a breach of ¶7.7. SUF ¶¶ 95-98.

FCU tries to deflect by claiming at least as to the online uses, ██████████████████

██████████████████████████████████████████████

---

[29] FCU claims to have operated Live Play in one of those states, Colorado, for the first time in 2011. RSUF ¶¶83-84. However, there is no evidence in the record that FCU was still doing so by the time the License Agreement was executed in July 2014, or at any point thereafter.

[30] FCU's claim that it was unable to build its network without Custom Lanes is nonsense, and irrelevant; FCU of course could have built a national network using Standard Lanes, as the License Agreement required. It simply did not want to do so. RCSUF ¶117.

██████████████████ RSUF ¶¶90, 95, 108. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ 2023

Pavony ¶79. The documentary evidence – website screenshots – establishes these uses did not appear in others' comments. They were used on FCU's website to sell "Hepatitis Skee" t-shirts, on posters promoting FCU's business, and on its ongoing Full Circle Magazine feature, marked "© Full Circle United LLC All Rights Reserved." Movit Exs. 24-25, 42-52. FCU's agent, Cooper, **_admitted_** that FCU created and distributed the Full Circle Magazine images, one of which used the phrase "Salty Skeemen," for display on FCU's website. SUF ¶¶99-100; Movit Exs. 24-25, 42; Movit Reply Ex. 80 (Cooper Depo.) at 258:10-259:24.

Ultimately it is irrelevant who actually posted because FCU used these phrases on its sites, as well as offline, to promote its business. Moreover, ¶¶7.7, 7.8, and 15 of the License Agreement imposed quality control obligations on FCU, and prohibited FCU from sub-licensing without BTE's prior written consent. FCU and **_Pavony_** controlled the website. Movit Reply Ex. 80 at 30:19-31:4. It also encouraged players to use "Skee." RSUF ¶118. There was an approval process for team names, and Cooper could not recall any instance when he had declined to approve a name and considered any name using the Mark to be permissible if it was "clever." Movit Ex. 5 (Cooper Depo.) at 247:7-18; RSUF ¶¶96-97.

FCU next argues it did not use the Mark in connection with these admittedly improper uses because only "Skee" was used in most instances. Opp. at 41.[31] This fails for four separate

---

[31] FCU admits "Monica LewinSkee-Ball Liquors" used "Skee-Ball." Opp. at 41-42. Pavony's

reasons. First, FCU was required to use the Mark "only in a manner consistent with proper trademark usage, and in a form and manner that is consistent with the registered format of the SKEE-BALL Trademark." License Agreement ¶7.6. Second, even if the License Agreement had not specifically addressed the use of "Skee" alone, that "does not mean that such a use is permitted." 4 *McCarthy* § 25:30; *see Bunn-O-Matic*, 88 F. Supp. 2d 914, 921 (C.D. Ill. 2000) (New York law; where agreement licensed use of BUNN COFFEE SERVICE and did not specifically address use of BUNN, licensee's use of BUNN "is not authorized and constitutes a breach"). Third, the registered format is "SKEE-BALL," but the registration expressly disclaimed the word "Ball." Movit Ex. 63.[32] The disclaimer establishes "Skee" is the dominant part of the Mark that impacts most strongly on consumers. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 530 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013). Fourth, FCU not only used "Skee" in team names, it used those names *in connection with* the use of the entire Skee-Ball Mark and the Licensed Uses (Live Play). *E.g.*, Movit Exs. 25, 42, 49, 51; *see Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668 (2d Cir. 1968) (because Carvel mark covered service (retail outlet), licensee "must be deemed to have used the Carvel mark in connection with" sale of non-Carvel product although it was sold in a plain cup).

The undisputed evidence shows FCU also used the Mark without BTE's authority for the

---

[32] Hampton did not testify that use of "Skee" would not infringe the Mark. FCU distorts her testimony: Hampton was asked only if BTE counsels licensees about how to use "skee" standing alone, and she explained BTE does not. Thanasides Ex. 10 (Hampton Depo.) at 163:5-11.

assertion that no person under FCU's control posted or was aware of this name (2023 Pavony ¶¶78, 80) lacks personal knowledge and is inadmissible. His speculation that this name might have been "in use prior to execution of the Settlement Agreement" in 2014 *(id.* ¶81) is inadmissible and insufficient to show release, and is controverted by his expert's report. Movit Ex. 26, App'x E ("Brewskee-Ball Teams, 2015-2021"). In any event, it is undisputed this infringing use appears on the *2020* Oakland BrewSkee-Ball league schedule. Movit Ex. 49.

domain names nationalskeeballleague.com and skeeballleague.com. Movit Ex. 15 at pp. 3-4.

FCU's baseless contention that these original 2007 registrations were released by the 2014

Settlement Agreement ignores the undisputed fact that Pavony **renewed** the registrations in 2016.

*Id.* The Settlement Agreement did not give FCU the right to engage in later unauthorized

conduct. FCU also improperly used BTE's Skee-Ball design mark, established for decades,

without authorization and in a disgusting manner. RSUF ¶¶102-03; RCSUF ¶136.[33] Pavony also

undisputedly appeared in a livestream of a Barstool Sports event, at which the Mark was

displayed and participants discussed sexual exploits.[34] SUF ¶104; Movit Video Ex. 4 at 2:05.

It is undisputed that none of these uses are allowed under the License Agreement, and so

they constitute breaches. In addition, uses at issue – like "Skeemature Ejaculation" –

undisputedly are not geared to families and children. *See Pfizer Inc. v. Sachs*, 652 F. Supp. 2d

512, 525 (S.D.N.Y. 2009) ("It is well settled that 'a mark is tarnished when its likeness is placed

in the context of sexual activity, obscenity, or illegal activity.'"); *Eastman Kodak Co. v. Rakow*,

739 F. Supp. 116, 118 (W.D.N.Y. 1989) (granting summary judgment; same).[35]

---

[33] FCU asserts it has used its own purported "design mark" since 2009, and alleges BTE "stole the design from FCU" (Opp. 48), but this is absurd. The mark was being used by SBI before FCU even existed. RCSUF ¶136; Movit Reply ¶¶14-16 & Exs. 90-92.

[34] FCU points to a recent social media post regarding Barstool Sports by the official Skee-Ball Instagram account, arguing this somehow controverts BTE's claim. Opp. at 43. It does not: A positive social media post about Barstool Sports broadly, nearly two years later, does not change what happened at the event in connection with the Mark.

[35] Contrary to FCU's contention (Opp. at 36), neither ¶7.4 nor ¶7.5 requires notice or any cure period as a condition precedent to suit. *See Bulgartabac Holding AD v. Republic of Iraq*, 451 F. App'x 9, 10-11 (2d Cir. 2011) (clauses calling for "amicable resolution of any dispute" did not create condition precedent to suit); *EDF Renewable Dev.. Inc. v. Cnty. of Suffolk*, 2016 WL 6804939, at *14 (E.D.N.Y. Nov. 17, 2016), *aff'd*, 693 F. App'x 42 (2d Cir. 2017) ("Notice and cure provisions that have been held to create conditions precedent state, without equivocation, that failure to comply therewith preclude commencement of any action for damages.").

### 4. FCU Breached ¶4.5 With Unauthorized Internet Broadcasts

FCU does not dispute it used the Mark in broadcasting full Live Play matches online. RSUF ¶119. And, it submits no evidence BTE approved broadcasting full Live Play matches. This violated the prohibition of uses beyond limited promotional purposes. Mot. at 38, 41.

### 5. FCU's Equitable Estoppel Affirmative Defense To Liability For Its Established Breaches Has Zero Evidentiary Support

Under New York's "'rather restrictive'" doctrine, the party asserting estoppel must show, by clear and convincing evidence, that the other party engaged in conduct amounting to a false representation or concealment of material facts. *Coggins v. Cnty. of Nassau*, 615 F. Supp. 2d 11, 22 (E.D.N.Y. 2009); *see Brown v. Marriott Int'l, Inc.*, 2017 WL 4484194 at *14 (E.D.N.Y. Sept. 29, 2017). It must also show, as to itself: (1) lack of knowledge of the true facts, (2) reliance on the other's conduct, and (3) prejudicial change in position. *Id.* "[U]nconscionable injury and loss" is required. *Am. Bartenders Sch., Inc. v. 105 Madison Co.*, 59 N.Y.2d 716, 718 (1983).

As discussed in Section II, FCU's claim that BTE "promised" to "meet [FCU's] needs" is pure fiction, as is FCU's theory that BTE "needed" FCU's consent to assignment. FCU further contends BTE waived and approved of its use of vulgar names and third-party IP with the Mark, full live-streaming of Live Play events, and efforts to get Skee-Ball onto ESPN. Opp. at 37-38. None of these excuses, albeit all baseless, relates to FCU's undisputed breach of its best efforts obligations. In any event, there is zero evidence that BTE made any false representations.

Nor can FCU show reasonable reliance. The License Agreement prohibits modifications except by "a written instrument duly executed" by both parties, and states no waiver shall "be effective unless made in writing and signed" or waive any subsequent breach. Movit Ex. 2 ¶¶18.4, 18.5. FCU had no right to rely on any purported oral modification or waiver as a matter

of law. *See Mindspirit, LLC v. Evalueserve Ltd.*, 470 F. Supp. 3d 366, 383 (S.D.N.Y. 2020)

("Courts addressing claims of equitable estoppel have repeatedly held that it is unreasonable to

rely on oral representations that contradict a written contract's express terms.").[36]

      Finally, FCU has shown no prejudice. Even if FCU had terminated the License

Agreement, the Settlement Agreement's releases, coupled with the doctrine of licensee estoppel,

would have barred it "from disputing the validity of the licensor's trademark." *HSW Enterprises,*

*Inc. v. Woo Lae Oak, Inc.*, 2009 WL 4823920, at *2 (S.D.N.Y. Dec. 15, 2009); *see Colony Grill*

*Dev., LLC v. Colony Grill, Inc.*, 2022 WL 950950, at *1, 2-3 (2d Cir. Mar. 30, 2022) (licensee

estoppel can bar former licensee from challenging mark after license termination).

     **B.**     **FCU Fails To Rebut BTE's Declaratory Judgment Claims**

     **1.**     **BTE Is Entitled To Terminate Due To FCU's Breaches**

      Based on the undisputed facts establishing FCU's material breaches of the License

Agreement by exceeding its scope, failing to use best efforts thereunder, and disparaging the

Mark ***including after*** BTE's breach notice of September 23, 2020, BTE is entitled to terminate.

Critically, when a licensee holds a valuable exclusive right, with the ability to bar its licensor

from hiring others, the duty of best efforts is critical, otherwise the asset is tied up improperly,

leading to loss of income. FCU's years of material breaches, and admitted refusal to promote the

Licensed Uses to generate royalties for BTE, vitiate the heart of the License Agreement. *See*

---

[36] *See also Cent. New York Laborers' Health v. JWJ Indus., Inc.*, 2015 WL 12564221, at *11
(N.D.N.Y. Mar. 5, 2015); *Tenber Assocs. v. Bloomberg L.P.*, 51 A.D.3d 573, 574 (2008). Insofar
as FCU is arguing that BTE represented it would not enforce the License Agreement's
provisions, the defense fails because "statements relating to the future conduct of the [party],
rather than a representation concerning a past or present fact, cannot form the basis for equitable
estoppel." *Solow Management Corp. v. Hochman*, 191 A.D.2d 250, 251 (1993); *see Longview
Equity Fund, LP v. McAndrew*, 2007 WL 186769, at *5 (S.D.N.Y. Jan. 23, 2007).

*Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 92 (1917); SUF ¶¶103-05, 113-17.

Unable to challenge the undisputed and egregious nature of these breaches, FCU resorts to complaining that BTE allegedly did not provide it with sufficient notice and cure opportunity. This is nonsense. BTE **sued FCU** via Counterclaims on September 21, 2020 (Dkt. 25), later amended (Dkt. 48), **and** sent a breach notice (Movit Reply Ex. 88), and that did nothing to stop the breaches. *See In re Best Film & Video Corp.*, 46 B.R. 861, 877 (Bankr. E.D.N.Y. 1985) (complaint seeking declaration that the contract should be terminated gave notice of breach). FCU's "continued infringement even after the suit was commenced makes clear that [it] never would have availed itself of the opportunity to cure[.]" *City of New York v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 693 (S.D.N.Y. 2018); Mot. at 44. Any notice and cure would be – and here was – futile. Were there any doubt (there is not), FCU's Opposition confirms it has no intent to use Standard Lanes, or make best efforts to promote the Licensed Uses for BTE's benefit. FCU just doubles down with rhetoric and excuses to justify its non-contractual demands to exceed the scope of the License Agreement and use the Mark as it sees fit. Opp. at 44.

### 2. The License Agreement Is Terminable-At-Will

While BTE has demonstrated it has right to terminate for cause as a matter of law, it also is entitled to terminate at will because the License Agreement does not have a definite term. A contract that "contemplates … performance for an indefinite time is to be interpreted as stipulating only for performance terminable at the will of either party." *New York v. New Jersey*, 143 S. Ct. 918, 924 (2023). "Parties to a contract that calls for ongoing and indefinite performance generally need not continue performance after the contractual relationship has soured, or when the circumstances that originally motivated the agreement's formation have changed, for example." *Id.* This default rule is only inapplicable if the contract "states expressly

and unequivocally that the parties intend to be perpetually bound." *Compania Embotelladora*, 976 F.3d at 245. FCU does not dispute there is no such clear expression, as it is clear there is not. Instead, FCU contends the License Agreement "permits termination upon the occurrence of specific events." Opp. at 45. That provision enumerating events in which a party may terminate however is not a "clear statement of perpetuity." *Compania Embotelladora* at 246; *see id.* at 242.[37]

### C. FCU Cannot Rebut That BTE Is Entitled To Judgment On Its Trademark Infringement, False Endorsement, and Unfair Competition Claims

As discussed in Section IV.A, FCU exceeded the scope of the License Agreement by using the Mark in unauthorized ways, including in phrases without prior written consent, in disgusting manners, and in connection with broadcasts. Such uses also constitute trademark infringement. Mot. at 41. Where a licensee exceeds the licensed scope, "consumer confusion is established as a matter of law," without the need to consider the *Polaroid* factors. *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, 2018 WL 2012875, at *11 (E.D.N.Y. Apr. 30, 2018) (citing cases); *accord Halo Optical*, 2017 WL 1082443, at *11. This rule applies whether or not the marks are identical, because a licensee's use of a similar mark is likely to cause confusion as to origin and sponsorship by the licensor. *See Mitsubishi Motors*, 2018 WL 2012875, at *11. This also satisfies likelihood of confusion for BTE's false endorsement claim. Mot. at 42-43.

FCU cannot dispute that the unauthorized uses occurred, or the consequences therefrom under these governing standard. FCU thus has no viable counter or defense as a matter of law.

---

[37] Contrary to FCU's contention (Opp. at 45), *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655 (S.D.N.Y. 1959) did *not* presume that a license lasts for the life of the intellectual property rights licensed, but held the licensee *could* terminate "its obligation to pay whenever in good faith it desires to cease the manufacture or sale of Listerine." *Id.* at 663.

First, as set forth in Section IV.A.3, FCU cannot avoid liability claiming others posted the unapproved phrases because (1) it has no evidence of same and (2) FCU's own website and accounts undisputedly displayed the infringing uses to advertise its own business. *See* 15 U.S.C. § 1127 (a mark is deemed used when "used or displayed in the sale or advertising of services"). FCU's reliance on online platform cases is unavailing. In *Tiffany (NJ) v. eBay, Inc.*, 600 F.3d 93, 101-03 (2d Cir. 2010), Tiffany's direct infringement claim failed because eBay used Tiffany's mark to accurately refer to Tiffany's products, and "eBay promptly removed all listings that Tiffany challenged as counterfeit and took affirmative steps to identify and remove illegitimate Tiffany goods." *Id.* at 103. In *Lopez v. Bonanza.com, Inc.*, 2019 WL 5199431, at *10 (S.D.N.Y. Sept. 30, 2019) and *Lops v. YouTube, LLC*, 2023 WL 2349597, at *2 (D. Conn. Mar. 3, 2023), the online platforms did not use the mark in connection with selling or advertising their own services. The undisputed record shows that FCU created and posted its own infringing uses, and encouraged others to do so, in connection with selling and promoting its business.

Second, FCU's claim that only "Skee" was used and that "the lack of protection for the word skee is clear under the law" is erroneous. Opp. at 50. "Skee" is the well-known part, "rendering it the more salient portion of the [M]ark and therefore deserving greater weight than the surrounding elements." *Ty, Inc. v. Jones Group, Inc.* 237 F.3d 891, 899 (7th Cir. 2001) (use of "Beanie" part of "Beanie Babies" mark could cause consumer confusion). And, a "licensee's use of the mark in a composite or format appearance other that than permitted by the license constitutes an infringement." 4 *McCarthy* § 25:30; *see Bunn-O-Matic*, 88 F. Supp. 2d at 921-23.

Third, the *Rogers v. Grimaldi* test does not apply. FCU's uses of the Mark exceeding the license establish likelihood of confusion as a matter of law. FCU also agreed not to use the Mark

in a disparaging manner. FCU has cited **no** decision where *Rogers* has been applied to absolve a **licensee** that used a mark in violation of the license. Moreover, *Rogers* applies to "works of artistic expression," such as "[m]ovies, plays, books, and songs[.]" *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989). And it does not apply where the infringer uses the mark to sell its own goods and services. *See Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999).

Just this month, the Supreme Court rejected a defendant's analogous attempt to invoke the *Rogers* defense to protect its "Bad Spaniels" dog toy, and held that when

> the use is "at least in part" for "source identification"—when the defendant may be "trading on the good will of the trademark owner to market its own goods"— *Rogers* has no proper role.... And that is so … even if the defendant is also "making an expressive comment," including a parody of a different product….

*Jack Daniel's Props., Inc. v. VIP Prod. LLC*, 2023 WL 3872519, at *8 (U.S. June 8, 2023). Here, the undisputed record shows FCU and Pavony repeatedly used unapproved phrases using the Mark **as a designation of source** – that source being FCU or the NSBL – for their goods and services. These include, without limitation, t-shirts bearing the phrase "Hepatitis Skee" and the "Full Circle Magazine" promotional feature with the cover phrase "Skeemature Ejaculation." SUF ¶¶99-100; Movit Exs. 24-25, 42; Movit Reply Ex. 80 (Cooper Depo.) at 258:10-259:24.

Fourth, FCU's asserted defenses are unavailing. FCU's "consent to assignment" equitable estoppel defense fails for the reasons discussed above. Its acquiescence defense is an improper attempt to circumvent the no-waiver and no-oral-modification clauses of the License Agreement, and fails because FCU has no evidence BTE "actively consented" to infringement. *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 380 (S.D.N.Y. 2010) ("silence is far from 'active acquiescence'"). FCU's estoppel, acquiescence, and laches defenses fail also for want of evidence of prejudice. FCU baldly asserts it "dedicated significant resources in promoting its

comedic expressions and tournaments." Opp. at 55. FCU offers no evidence of such resources, and continuing business or expending costs to infringe is legally insufficient to establish undue prejudice. *See Cuban Cigar Brands N v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1098 (S.D.N.Y. 1978) (more prejudice required "than the simple fact that the business continued during the period of delay"), *aff'd*, 607 F.2d 995 (2d Cir. 1979).[38] Finally, FCU's infringements accrued and were online *after* the Settlement Agreement and thus in no way were released in 2014.[39]

### D.   Pavony Fails To Rebut That He Is Individually Liable For FCU's Torts

Pavony cannot contest that a corporate officer who is a "moving, active, conscious force" behind a party's infringement is subject to personal liability, such as when the officer was "either the sole shareholder and employee, and therefore must have approved of the infringing act, or a direct participant in the infringing activity." *Chloe v. Queen Bee of Beverly Hills, LLC*, 2011 WL 3678802, at *5 (S.D.N.Y. Aug. 19, 2011).[40] He also cannot dispute that he is FCU's president

---

[38] *See also Warner–Lambert Co. v. Schick U.S.A., Inc.*, 935 F. Supp. 130, 142 (D. Conn. 1996); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1287 (S.D.N.Y. 1990). The cases FCU cites do not help it. FCU has not shown "prejudice resulting from [its] substantial expenditure of resources and effort," *Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*, 89 F. Supp. 2d 483, 487 (S.D.N.Y. 2000) or that it increased revenues "for the product being sold under the mark," *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 718 (S.D.N.Y. 1973), *modified*, 523 F.2d 1331 (2d Cir. 1975). It is undisputed that FCU has paid BTE a grand total of *$161.50*. SUF ¶77.

[39] While not necessary for BTE's trademark and false endorsement claims, but solely for BTE's New York unfair competition claim, BTE submits the record undisputedly shows FCU used the Mark in bad faith, intending to trade on it without BTE's approval, notwithstanding the License Agreement's prohibitions. BTE has adduced substantial undisputed evidence post the filing of BTE's Counterclaims and September 23, 2020 breach notice, that FCU engaged in infringing conduct, including posting team names on its social media accounts that incorporate third-party intellectual property without permission, and using the Skee-Ball design mark in a disparaging and inappropriate manner in a November 2020 Facebook post. Movit Ex. 16, 54-62.

[40] *See Johnson & Johnson Consumer Cos. v. Aini*, 540 F. Supp. 2d 374, 397-98 (E.D.N.Y. 2008) (president/sole shareholder); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F.

and sole member, and that FCU has never had any employees. RSUF ¶¶6, 10, 11.[41] Under

relevant law, Pavony "therefore must have approved" FCU's infringing acts. *Chloe*, 2011 WL

3678802 at *5. The undisputed record establishes beyond cavil that FCU is controlled by

Pavony, including as to its use of the Mark. Pavony directly participated in FCU's infringing

activities, including participating in the Barstool Sports broadcast and running FCU's websites.

SUF ¶¶92, 104-105; Movit Reply Ex. 80 (Cooper Depo.) at 30:19-31:4. In addition, as to unfair

competition, the record is rife with evidence that Pavony acted in bad faith to misappropriate the

Mark. For example, Pavony renewed registrations for infringing domains in 2016, despite

knowing that FCU did not own the Mark. Movit Ex. 15 (Pavony Depo. Ex. 7); Movit Ex. 2 ¶4.2.

FCU's reliance on *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525 (S.D.N.Y. 2015) is

wholly misplaced, because Pavony's liability is not predicated on piercing the corporate veil.

DATED:  New York, New York
           June 23, 2023

Respectfully submitted,

Mitchell Silberberg & Knupp LLP


By: /s/ Jeffrey M. Movit
      Christine Lepera
      Jeffrey M. Movit
      437 Madison Ave., 25th Floor
      New York, New York 10022-7001
      Telephone: (212) 509-3900
      Facsimile: (212) 509-7239
      Email: ctl@msk.com, jmm@msk.com

*Attorneys for Bay Tek Entertainment, Inc.*

15553677.1

---

Supp. 3d 137, 155 (E.D.N.Y. 2016) (sole owner with direct oversight over infringing acts).

[41] FCU admitted it has never had any employees. Movit Ex. 4 (Wikman Depo.) at 47:16-20.
FCU's vague assertion that others beyond Pavony "have performed work for FCU" does not
legitimately dispute that the company has never had any employees. RSUF ¶6.