UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

FULL CIRCLE UNITED, LLC,

               Plaintiff,

         -against-

BAY TEK ENTERTAINMENT, INC.,

              Defendant.

--------------------------------------------------------- X

BAY TEK ENTERTAINMENT, INC.,

            Counterclaim Plaintiff,

         -against-

FULL CIRCLE UNITED, LLC,

           Counterclaim Defendant.

         -and-

ERIC PAVONY,

      Additional Counterclaim Defendant.

--------------------------------------------------------- X

:
:
:
:
:
:
:
:

:
:
:
:
:
:
:
:
:
:
:

**MEMORANDUM DECISION AND ORDER**

20-cv-03395 (BMC)

**COGAN**, District Judge.

     Before me are plaintiff Full Circle United, LLC's Second Motion for Leave to File its Third Amended Complaint and defendant Bay Tek Entertainment, Inc.'s Motion for Summary Judgment. For the following reasons, the motion to amend is denied and the motion for summary judgment is granted in part and denied in part.

# BACKGROUND

Since 2005, Full Circle and its sole member Eric Pavony have organized, operated, and promoted "Brewskee-Ball" leagues, tournaments, and events in venues across the country. Skee-Ball, Inc. ("SBI"), the owner of the federally registered SKEE-BALL ® trademark, sued Full Circle in 2011 for trademark infringement. The suit settled in 2014 when the parties entered into an agreement (the "License Agreement) in which SBI licensed certain uses of the mark to Full Circle. The License Agreement provided, among other things, that Full Circle could use the mark in connection with live Skee-Ball tournaments, leagues, and other events. Two years later, Bay Tek, an arcade-game manufacturer, purchased various SBI assets related to the mark, and SBI assigned the License Agreement to Bay Tek.

Bay Tek and Full Circle eventually began to discuss a project they called "Skee-Ball Live," for which Bay Tek would manufacture custom Skee-Ball lanes connected to a software application geared towards tournament and league play. The parties communicated about the design of the machines, the app, and the Skee-Ball Live logo over the next few years. Bay Tek built and delivered to Full Circle ten custom lanes, each with the phrase "Skee-Ball Live" emblazoned on the side, and trademarked the phrase SKEE-BALL LIVE with the USPTO. Outside of the initial ten lanes, Bay Tek did not deliver any more custom lanes to Full Circle. After some disagreements between the parties, Full Circle attempted to purchase the same custom lanes from a third-party manufacturer and to hire a third-party manufacturer to modify Bay Tek's standard lanes.

The disagreements ultimately resulted in this lawsuit. In the operative second-amended complaint, Full Circle brought three counts against Bay Tek: breach of the License Agreement (Count 1), breach of a putative "Revenue Share Agreement" (Count II), and tortious interference

with Full Circle's prospective business relationship (Count III).  In response, Bay Tek asserted eight counterclaims: trademark infringement (Count 1), false endorsement (Count 2), and trademark dilution (Count 3) under the Lanham Act; common law unfair competition (Count 4); NY statutory dilution (Count 5); breach of the License Agreement (Count 6); declaratory judgment that Full Circle has terminated the License Agreement (Count 7); and declaratory judgment that the License Agreement is terminable at will (Count 8).

This is Full Circle's second motion to amend its second amended complaint.  We denied the prior motion because the proposed complaint added fraud and breach-of-contract claims related to a nondisclosure agreement subject to a Wisconsin forum-selection clause.  Full Circle then filed its second motion to amend, and Bay Tek filed its motion for summary judgment on the second amended complaint two days thereafter.  I address each motion in turn.

## DISCUSSION

## I.    Full Circle's Motion to Amend

Although "leave to amend should be freely granted when justice so requires," a district court has "broad discretion in determining whether to grant leave to amend."  7 W. 57th St. Realty Co. v. Citigroup, Inc., 314 F. Supp. 3d 497 (S.D.N.Y. 2018), aff'd, 771 F. App'x 498 (2d Cir. 2019) (citations omitted).  There are four traditional bases for denying leave: "futility, bad faith, undue delay, or undue prejudice to the opposing party."  TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014).  A party's proposed amendment is "futile" when "the proposed claim could not withstand a motion to dismiss pursuant to [Federal Rule of Civil Procedure] 12(b)(6)."  In re IBM Arb. Agreement Litig., 76 F.4th 74, 87 (2d Cir. 2023) (quoting Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002)).

Full Circle's motion seeks to bring three new claims: (1) a fraud claim against Bay Tek and Larry Treankler, a Bay Tek executive; (2) a claim seeking cancellation of the Skee-Ball Live trademark; and (3) a breach-of-contract claim against Bay Tek, alleging that it breached ¶ 11.6 of the License Agreement. Each is futile.

I begin with the fraud claim. Full Circle relies on a series of misrepresentations by Bay Tek and Treankler, alleging that they repeatedly concealed their "present intent not to perform under the License Agreement." Specifically, Full Circle alleges that Bay Tek and Treankler concealed their intent to not perform under the License Agreement and misrepresented the reasons why Bay Tek put Skee-Ball Live on hold. These misrepresentations, the proposed Third Amended Complaint states, induced Full Circle to consent to the assignment of the License Agreement and to continue performing under the agreement.

Full Circle is right that New York law recognizes fraud claims based on misrepresentations of fact "collateral to" a contract. Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88 (1986). Yet New York law is also clear that "a broken promise is not a misrepresentation of fact." Air Italy S.p.A. v. Aviation Techs., Inc., 10-cv-0020, 2010 WL 2925949, at *6 (E.D.N.Y. July 21, 2010). Thus, "while some jurisdictions recognize a cause of action for fraud where a defendant enters into a contract with no intention of performing it . . . New York does not." Id. This squarely describes the fraud alleged in the Third Amended Complaint. Full Circle does not contend that Bay Tek made any factual misrepresentations. Instead, Full Circle accuses Bay Tek of concealing its intent to breach the License Agreement – an accusation that cannot support a fraud claim in New York.

I turn next to Full Circle's cancellation claim. It invokes a provision of the Lanham Act that grants courts the discretion to cancel trademarks. See 15 U.S.C. § 1064(3). Relevant here, a

4

court can cancel a trademark when the mark was obtained fraudulently – that is, when "an applicant knowingly makes false, material representations of fact in connection with his application … with the intent to deceive the USPTO." MPC Franchise LLC v. Tarntino, 826 F.3d 653, 658 (2d Cir. 2016). According to the Third Amended Complaint, Bay Tek knowingly, with an intent to deceive the USPTO, made two false, material representations of facts. First, it described the Skee-Ball machines pictured in its application as "arcade redemption game machines which dispense tickets or the like to successful players." The machines pictured, Full Circle alleges, were custom Skee-Ball Live lanes used at the NSBL national championship, which do not dispense tickets at all. Second, Full Circle argues that, although Bay Tek's application represented that Bay Tek had used the Skee-Ball Live mark in commerce, Treankler's deposition makes clear that it had not done so.

Much is lacking from the Third Amended Complaint's allegations in support of its cancellation claim. The complaint does not allege facts making it plausible that Bay Tek acted with an "intent to deceive the USPTO." Id. Nor does it allege facts indicating that the custom lanes' ability to dispense tickets was "material" to Bay Tek's trademark application (although, presumably, the use of the mark in commerce would be material). Most glaringly, the complaint does not plead facts indicating that either of Bay Tek's statements were false. Bay Tek stated that the custom lanes "dispensed tickets and the like," and the complaint only alleges that the machines do not dispense tickets; the machines could have very well dispensed "the like," such as virtual rewards. The complaint even recognizes that the app connected to the custom lanes "tracked rolling achievements." Tellingly, nowhere in its briefs does Full Circle grapple with this part of Bay Tek's statement either. And Full Circle's own allegations confirm that Bay Tek

used the phrase "Skee-Ball Live" in commerce: on the custom machines Bay Tek built for Full Circle. The Third Amended Complaint therefore does not state a trademark cancellation claim.

Finally, Full Circle's new contractual claim would similarly not survive a motion to dismiss. Adding to the litany of provisions in the License Agreement that it alleges Bay Tek breached, Full Circle seeks in its Third Amended Complaint to hold Bay Tek liable for breaching ¶ 11.6, a "notice and cure" provision. Full Circle posits that ¶ 11.6 imposes a condition precedent to the parties filing suit for breach of the License Agreement: the nonbreaching party must notify the breaching party of the perceived breach and give the breaching party an opportunity to cure the breach. Bay Tek violated that provision, Full Circle contends, when it brought its counterclaims without first notifying Full Circle.

Preliminarily, New York courts are hesitant find conditions precedent to litigation in contracts. "[I]t must clearly appear' from the parties' agreement itself that they intended a notice provision . . . to operate as a condition precedent to suit." EDF Renewable Dev., Inc. v. Cnty. of Suffolk, No. 13-cv-3361, 2016 WL 6804939 at *14 (E.D.N.Y. Nov. 17, 2016), aff'd sub nom., 693 F. App'x 42 (2d Cir. 2017). But even if the condition precedent is clear from ¶ 11.6, Bay Tek would not be required to comply with that condition here. Under New York law, "[p]roviding notice and cure is not required where it would be futile." Point Prods. A.G. v. Sony Music Ent., Inc., No. 93-cv-4001, 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000). Full Circle admits that Bay Tek brought its action for breach as a counterclaim, and therefore after Full Circle had already sued Bay Tek. Bay Tek, then, was under no obligation to comply with the notice and cure provision. Full Circle had already made compliance futile. Cf. Wolff & Munier, Inc. v. Whiting-Turning Contracting Co., 946 F.2d 1003, 1008 (2d Cir. 1991).

For these reasons, I conclude that the Third Amended Complaint does not seek to add any claims that would survive a motion to dismiss. Thus, Full Circle's motion for leave to amend is denied.

## II. Baytek's Motion for Summary Judgment

### A. Standard

Summary judgment is proper where there is no genuine dispute of material fact remaining for trial. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To show that there is no dispute of material fact, a moving party must either submit evidence that "negates an essential element of the non-moving party's claim," or demonstrate that "the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017). "A factual dispute does not present a genuine issue precluding summary judgment unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Woodford v. Cmty. Action of Greene Cnty., Inc., 268 F.3d 51, 54 (2d Cir. 2001).

### B. Full Circle's Claims

#### 1. Breach of the License Agreement

Full Circle's first breach-of-contract claim asserts that Bay Tek violated a bevy of provisions in the License Agreement. To prune issues in advance of trial, I address each provision separately. See Fed. R. Civ. P. 56(g).

**Paragraph 4.2**. In ¶ 4.2, the License Agreement outlines the scope of Full Circle's rights to the mark. The paragraph sets forth specific permissible uses of the mark that relate to Live Play. It also provides that Full Circle may use phrases not set forth in the License Agreement,

subject to prior written approval by Bay Tek, so long as those phrases relate to Live Play and are consistent with the rest of the Agreement.  Bay Tek may not withhold its approval arbitrarily.

Full Circle alleges that Bay Tek breached ¶ 4.2 by designating the phrase "Skee-Ball Live" as a Licensed Use, then preventing Full Circle from enjoying that use by trademarking the phrase.  This theory of breach has many defects; for instance, nowhere does ¶ 4.2 seem to prohibit Bay Tek from revoking its consent to any additional uses of the mark, so long as that revocation is not arbitrary or in bad faith.  But the clearest defect is that no reasonable jury could conclude that Bay Tek approved Skee-Ball Live as a Licensed Use.  Because "Skee-Ball Live" is not listed in the License Agreement, Full Circle had a right to use the phrase only if Bay Tek provided "express written approval," and Full Circle has not provided us with any such written approval.  Although its amended complaint alleges that Bay Tek approved Full Circle's use of "Skee-Ball Live" in "various written correspondence," the record contains no evidence of any such correspondence.

Indeed, Full Circle's summary judgment briefs abandon the "written correspondence" approach, relying instead on Bay Tek's application to the USPTO for the Skee-Ball Live trademark.  Bay Tek included in its application a picture Ball of Skee machines with a sign hanging in the background reading "NSBL Skee-Ball Live" to show that it had used the mark in commerce.  Full Circle claims that the pictures were taken at one of Full Circle's Skee-Ball tournaments, and thus Bay Tek "represented" to the USPTO that Bay Tek had approved of Full Circle's use of the mark.  Yet, the application itself contradicts Full Circle's contention.  It states that the photo was "showing four *games* being utilized."  (emphasis added).  It presents the games, not the sign, as examples of the mark used in commerce.  Even viewed in the light most favorable to Full Circle, then, the application merely shows that Bay Tek was aware that Full

Circle was using the mark, not that Bay Tek had approved of the use. A reasonable jury could not infer from these facts that Bay Tek had issued the requisite written approval.

**Paragraph 5.3**. In ¶ 5.3, Bay Tek agreed that it would not operate, sponsor, or endorse a business competitive with Full Circle's Live Play events. Full Circle provides heaps of evidence that it claims establishes that Bay Tek violated this covenant not to compete, none of which creates a material issue of fact.

First, Full Circle alleges that Bay Tek assisted Alchemy3, another licensee of Bay Tek, with Live-Play-related activities. Its evidence in support of that contention is virtually nonexistent. Full Circle offers only that, during a livestreamed Skee-Ball tournament, business partners of Alchemy3 used Skee-Ball lanes similar in appearance to the custom Skee-Ball Live lanes Bay Tek produced for Full Circle. Full Circle provides no evidence suggesting that Alchemy3 was even aware of its partners' tournament, not to mention evidence that Bay Tek was somehow operating, sponsoring, or endorsing the tournament, directly or indirectly.

Next, Full Circle accuses Bay Tek of entering into an agreement with another company with the intent to, one day, allow the company to operate competitive Skee-Ball leagues and tournaments. Yet the agreement does not refer to any activities licensed to Full Circle. And, by Full Circle's own admission, Bay Tek and the other business only "intended" to one day roll out something that looks like Live Play. Bay Tek did not lend support to a business that was competing with Full Circle's use of the Skee-Ball mark.

Full Circle then accuses Bay Tek of endorsing Aunt Ethel's – a bar near Full Circle's bar that also had Skee-Ball lanes. Pavony testified that Bay Tek employees had been to Aunt Ethel's and posted the bar on social media. None of Pavony's testimony, however, establishes that Bay

Tek, the corporate entity, endorsed Aunt Ethel's. It merely establishes that some of its employees, in their free time, went to the bar.

Full Circle also claims it unearthed additional violative conduct throughout discovery. Bay Tek, Full Circle contends, delivered lanes and custom components to Ed's Funcade, which hosts a "Skee-Ball National Championship" every year. Yet Full Circle provides no evidence that Ed's Funcade was engaged in Live Play. And, even if Ed's Funcade had done so, Full Circle does not explain how Bay Tek's conduct rose to the level of operating, endorsing, or sponsoring Ed's Funcade. In fact, email threads uncovered by Full Circle in discovery make clear that Bay Tek provided new parts for Ed's Funcade's Skee-Ball classic lanes, not any custom Skee-Ball Live lanes.

Full Circle's final batch of allegations on this issue relate to Bay Tek's communications with other Skee-Ball leagues competitive with Full Circle. Again, these allegations are patently insufficient. Paragraph 4.2 does not prevent Bay Tek from communicating with other businesses that operate competitive Skee-Ball matches, nor does it require Bay Tek to enforce its trademark rights against those businesses. It merely prohibits Bay Tek from lending support to businesses competitive with Full Circle, and Full Circle does not provide evidence that Bay Tek did so here.

**Paragraph 7.2.** Finally, Full Circle alleges that Bay Tek breached ¶ 7.2, the so-called "best efforts" clause. As its name suggests, the best-efforts clause requires both Full Circle and Bay Tek to use their best efforts to promote the licensed uses of the mark. "New York law on best efforts clauses is far from clear." Cruz v. FXDirectDealer, 720 F.3d 115 (2d Cir. 2013). At minimum, the clause requires that the parties "act with good faith in light of [their] own capabilities." Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 613 n. 7 (2d Cir.1979).

Nevertheless, a party still has a "right to give reasonable consideration to its own interests." Id. at 614.

Full Circle has established a material issue of fact as to whether Bay Tek acted in good faith to promote Full Circle's licensed uses of the Skee-Ball mark. Paragraph 4.2 clearly establishes that Full Circle can use the mark in connection with Live Play and that Bay Tek cannot withhold its approval of any use of the mark related to Live Play in bad faith. To this end, Full Circle has produced evidence that, by trademarking "Skee-Ball Live" and prohibiting Full Circle from using that term, Bay Tek interfered with Full Circle's ability to promote its Live Play leagues, tournaments, and events. Of course, Bay Tek may have concluded, in good faith, that it needed exclusive use of the phrase after considering its own capabilities and financial interests. But because the evidence on this score points in both directions, that is a question for the jury.

Bay Tek counters that the license agreement did not include "Skee-Ball Live" as a licensed use or obligate Bay Tek to provide custom lanes to Full Circle. Of course it didn't – if the License Agreement had such provisions, Bay Tek would have clearly breached them. What is relevant is that the License Agreement does not prohibit Full Circle from requesting that Bay Tek approve "Skee-Ball Live" as a licensed use or from requesting that Bay Tek manufacture custom lanes. If a jury finds that Bay Tek was not acting in good faith, considering its own capabilities, in ultimately rejecting these requests, then Bay Tek breached ¶ 7.2.

**Implied Covenant of Good Faith and Fair Dealing.** Full Circle's final claim related to the License Agreement is that Bay Tek violated the implied covenant of good faith and fair dealing. However, "New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon

11

the same facts, is also pled." FXDirectDealer, 720 F.3d at 125 (quoting Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002)). "[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." Id. Full Circle premises its good-faith-and-fair-dealing claim and its best-efforts claim on the same facts; indeed, it even notes that it brings the former claim as an alternative to the latter. Thus, as a matter of law, Full Circle cannot establish a breach of the covenant of good faith and fair dealing.

### 2. Breach of the Revenue Share Agreement

Full Circle bases its second contractual claim on a purported oral agreement formed in 2014. According to Full Circle, various Bay Tek executives and Pavony agreed that Bay Tek would provide 36 custom machines to Full Circle in exchange for 15% of the top-line revenue generated by the machines until Bay Tek recouped 150% of the parts and labor cost. Bay Tek, on the other hand, argues that its executives agreed to build only ten custom machines as prototypes and that it merely suggested an openness to building more after assessing the performance of those ten.

"[I]f the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract." Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc., No. 06-cv-2652, 2008 WL 5169495, at *3 (S.D.N.Y. Dec. 9, 2008). Because the risk of ambiguity is "particularly acute in the cases involving oral contracts," New York law also requires that courts consider the following four factors when asked to enforce an oral contract:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the

contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Scarpinato v. 1770 Inn, LLC, No. 13-cv-0955, 2015 WL 4751656, at *3-4 (E.D.N.Y. Aug. 11, 2015) (quoting Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985)). "Whether the essential terms of a contract are too indefinite is generally an issue of law, properly determined on a motion for summary judgment." Scarpinato, 2015 WL 4751656, at *3.

Viewing the video of the diner meeting and the corroborating evidence in the light most favorable to Full Circle, I cannot conclude that any of the four oral-contract factors favor Full Circle. A Bay Tek employee stated at the meeting that the parties would need to "figure[] out" how the parties are "going to do [the additional lanes] contractually." Full Circle does not allege that Bay Tek manufactured any lanes beyond the initial 10. The parties did not discuss delivery dates, methods of payment, or even the number of additional machines that were to be manufactured. See Berkson v. Gogo LLC, 97 F. Supp. 3d 359 (E.D.N.Y. 2015). And complicated contracts for the manufacture and delivery of bespoke goods are usually reduced to writing. See Rubinstein v. Clark & Green, Inc., 395 F. App'x 786, 790 (2d Cir. 2010). Accordingly, the parties did not bind themselves to an enforceable oral contract.

### 3.    Tortious Interference with Prospective Business Relationship

Full Circle's tortious-interference claim fails out of the starting gate. Full Circle alleges that, after Bay Tek refused to deliver the custom lanes, another manufacturer, Play Mechanix, "agreed to help Full Circle obtain Skee-Ball Live Lanes in exchange for a share of lane revenue," but Bay Tek withheld its approval. Further, it alleges that an outside investor wanted to "inject a substantial amount of operational capital into Full Circle" before Bay Tek intervened in the Play Mechanix deal.

There are four elements of tortious interference with business relationships: "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." Hadami, S.A. v. Xerox Corp., 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017) (quoting Goldhirsh Grp., Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997)). New York courts have clarified that to satisfy the improper conduct requirement, a plaintiff must show that "the defendant's conduct ... amount[ed] to a crime or an independent tort." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247 (2d Cir. 2015) (alteration in original) (quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189, 785 N.Y.S.2d 359 (2004)).

Full Circle has made no showing that Bay Tek acted with malice or improper means. Bay Tek refusing to consent to the Play Mechanix deal is not criminal nor tortious; in fact, Full Circle does not even argue that Bay Tek lacked the authority to do so under the agreement. And it has provided no evidence that Bay Tek acted with the "sole purpose" of harming Full Circle.

### 4. Lost Profits

Because Full Circle's contractual claim against Bay Tek survives in part, I must turn to one final issue on which Bay Tek seeks summary judgment: whether Full Circle is entitled to recover lost profits. The parties agree that, here, lost profits are "consequential damages" which Full Circle can recover only if "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007). Bay

Tek argues that, as a matter of law, Full Circle cannot satisfy the latter two requirements. I disagree.

First, proof of lost profits is "reasonably certain" when the profits are "capable of measurement based upon known reliable factors without undue speculation." Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912 (1993); cf. Schonfeld v. Hilliard, 218 F.3d 164, 173 (2d Cir. 2000) (finding that the extent of loss was not reasonably ascertainable because "[t]he operating entity's profits . . .were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers"). Bay Tek trains its argument on the reliability of Full Circle's expert testimony quantifying Full Circle's lost profits. It challenges the completeness and accuracy of the expert's data set; the expert's assumption that Full Circle would have obtained additional financing, despite Full Circle having failed to do previously; and the expert's assumption that the success of the original 36 lanes would spur the production of 1,750 other lanes.

To be sure, the expert's assumptions are dubious, and her conclusion that Bay Tek's breaches of the License Agreement caused Full Circle to lose out on $23,488,030 in profits on a venture that didn't even reach the start-up stage is borderline fantastical. But I am not ruling on a Daubert motion. Cf. In re Gen. Motors LLC Ignition Switch Litig., 2018 WL 1638096, at *2 (S.D.N.Y. Apr. 3, 2018). Nor am I not presiding over a bench trial. Cf. Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC, No. 07-cv-6665, 2009 WL 1803458, at *23 (S.D.N.Y. June 23, 2009). I am merely looking at whether Full Circle's lost profits can be measured based on known, objective factors and without guesswork. And the data on which Full Circle's expert relies is not based in pure hypotheticals, like in Schonfield. The expert purports to extrapolate

from Full Circle's monthly revenue from its other Skee-Ball lanes. This is enough to create a material issue of fact as to whether Full Circle can recover lost profits. Cf. Pac. Controls Inc. v. Cummins Inc., No. 19-cv-03428, 2021 WL 4462725, at \*9 (S.D.N.Y. Sept. 29, 2021).

Second, "[w]here the contract is silent on the subject [of liability for lost profits], the court must take a 'common sense' approach,"; that is, it must "determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'" Schonfeld, 218 F.3d at 172 (2d Cir.2000) (alterations in original) (quoting Kenford Co. v. County of Erie, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1 (1989)). Common sense straightforwardly tells me that the parties contemplated the recovery of lost profits here. The only loss that Full Circle could possibly suffer from Bay Tek's breach of the license agreement would be profits associated with the use of the mark; thus, the parties must have intended Full Circle to be able to recover these profits upon breach. Moreover, Bay Tek's argument that the parties did not intend to recover lost profits is seriously undermined by its own counterclaim which seeks to recover "consequential damages" caused by Full Circle's breach of the License Agreement – or, in other words, lost profits. Whether Full Circle is entitled to lost profits is accordingly a question for the jury.

### C. Bay Tek's Counterclaims

#### 1. Breach of the License Agreement

Like Full Circle's analogous claim, Bay Tek's breach-of-contract counterclaim charges Full Circle with breaching a slew of provisions in the License Agreement. So, like with Full Circle's claim, I address the provisions separately. See Fed. R. Civ. P. 56(g).

**Paragraphs ¶ 4.2, 7.7, 7.8.**  Bay Tek primarily asserts that Full Circle used the Skee-Ball mark in ways proscribed by the License Agreement.  Specifically, Bay Tek alleges that Full Circle used the mark in phrases that were not approved by Bay Tek, violating ¶ 4.2; in vulgar phrases and slogans, violating ¶ 7.7; and alongside third-party trademarks, violating ¶ 7.8.  In support, Bay Tek directs us towards Skee-Ball puns used in BrewSkee-Ball promotional materials, in team names posted on Full Circle's website, and on merchandise sold by Full Circle.  Many of the puns are vulgar ("Skeemature Ejaculation"), some of the puns clearly use third-party trademarks ("SKEEnage Mutant Ninja Turtles"), and none of the puns were approved by Bay Tek.  Critically, however, nearly all these puns do not use the Skee-Ball mark (although some come very close, like "Can You Skee My Balls").[1]  Because they "closely resemble" the mark, they could support a trademark infringement claim.  See, e.g., Jack Daniels Props., Inc. v. VIP Prods. LLC, 599 U.S. 140, 147 (2023).  But the puns do not use the trademarked phrase "Skee-Ball," and therefore they do not evidence breaches of the License Agreement.

Bay Tek flags only one genuine use of the mark.  The Oakland BrewSkee-Ball League's 2020 schedule, posted on Full Circle's website, listed a team named "Monica LewinSkee-Ball Liquors."  This use cannot violate ¶ 7.8 because the team's name contains no third-party trademarks, but Bay Tek argues that it is both vulgar and unapproved.  Full Circle does not dispute that the name appeared on the league schedule, that the schedule was posted on Full Circle's website, or that the phrase is vulgar.  Despite these concessions, though, Bay Tek is not

---

[1] Bay Tek responds that even the use of the word "Skee" constitutes use of the mark because the trademark registration "disclaimed the word ball."  The disclaimer, Bay Tek contends, "establishes that Skee is the dominant part of the Mark that impacts most strongly on consumers."  That might be true, but it is only relevant for trademark infringement purposes, as evidenced by the case on which Bay Tek relies.  See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 530 (S.D.N.Y. 2011).

entitled to summary judgment because it provides no evidence that Full Circle posted the schedule on its own website. A website owner doesn't "use" a mark whenever another party posts a mark on the website, even when the owner knew or had reason to know that the mark appeared on its site. See Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 103 (2d Cir. 2010). The owner itself must post the mark. Id. at 102-03. Here, Pavony testified that no one at Full Circle posted or knew about the Oakland BrewSkee-Ball schedule. There is accordingly a factual issue as to whether Full Circle breached ¶¶ 4.2 and 7.2.

**Paragraphs 7.2 and 5.1.** Like Full Circle, Bay Tek accuses its counterparty of failing to use its "best efforts" to promote the licensed uses of the Skee-Ball mark, in violation of ¶ 7.2. It also asserts that Full Circle did not use its best efforts to expand Live Play to 15 states, which ¶ 5.1 requires separately from ¶ 7.2.

Whether Full Circle used its best efforts to build out Live Play raises a material issue of fact. Full Circle's theory in defense is that it planned to build out Live Play using the custom lanes, but Bay Tek hampered this plan by refusing to manufacture those lanes and blocking Full Circle from using the phrase "Skee-Ball Live." Indeed, much of the evidence indicates that Bay Tek represented that it would build additional custom Live Play lanes, such as the parties' discussion at the diner, the meeting notes indicating that Bay Tek was considering building the lanes, and the email from a Bay Tek executive stating that Bay Tek was planning on "building 35 lanes for the Brewskee-Ball group to use in all of these cities." I cannot conclude, as a matter of law, that Full Circle acted in bad faith without knowing whether the best-efforts clause obligated

Bay Tek to manufacture the custom lanes.[2]  As discussed above, that is a question for the jury. And, for the same reasons, Bay Tek is not entitled to summary judgment on its ¶ 5.1 claim either. Regardless of whether Full Circle expanded Live Play to 15 states, there is a factual question as to whether it exerted its best efforts to do so.

**Paragraph 4.5.**  Finally, Bay Tek provides us with evidence that Full Circle streamed full Skee-Ball Live matches online, which is patently outside the rights conferred in ¶ 4.5.  Full Circle does not dispute that it streamed the matches; instead, it raises an equitable-estoppel defense.  Bay Tek should be equitably estopped from enforcing the License Agreement in this manner, Full Circle claims, because it represented that Full Circle could stream its live play matches.  However, Full Circle does not identify a particular misrepresentation.  See Brenner v. Brenner, 821 F. Supp. 2d 533 (E.D.N.Y. 2011) ("As the cases make clear, the doctrine of equitable estoppel requires proof that the defendant made an actual misrepresentation or committed some other affirmative wrongdoing." (citation omitted)).  And, in any event, "[s]tatements relating to the future conduct of the party, rather than a representation concerning a past or present fact, cannot form the basis for equitable estoppel."  Longview Equity Fund, LP v. McAndrew, 2007 WL 186769, at *5 (S.D.N.Y. Jan. 23, 2007).  Bay Tek is accordingly entitled to summary judgment on this part of its counterclaim.

---

[2] Bay Tek sets forth two other bases for its claim under ¶ 7.2: that Full Circle did not use its best efforts to secure sponsorships and that Full Circle did not use its best efforts to sell merchandise.  I need not reach these bases because Bay Tek would not be entitled to complete relief as a matter of law if it prevailed on those grounds.  Like with its claim that Full Circle breached ¶ 4.5, discussed below, Bay Tek has not shown that such a limited breach of ¶ 7.2 would be material.  See Doner-Hedrick v. N.Y. Ins. of Tech., 874 F. Supp. 2d 227, 242 (S.D.N.Y. 2012).

2. <u>Declaratory Judgment</u>

Bay Tek seeks two declarations from this Court: (1) that the License Agreement is terminable at will, and (2) that Full Circle's uncurable breaches have terminated the License Agreement. Bay Tek's first request belies the clear language of the License Agreement. A contract is not terminable at will when it "states expressly and unequivocally that the parties intend to be perpetually bound." <u>Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.</u>, 976 F.3d 239, 245 (2d Cir. 2020). And the License Agreement expressly and unequivocally states that it shall remain in effect unless and until one of six events occurs. This provision is not describing when the parties *can* terminate the agreement. <u>Cf.</u> <u>id.</u> at 242. It flatly provides that the six events are necessary conditions to termination.

Likewise, Bay Tek is not entitled to summary judgment on its second request. The License Agreement makes no reference to "incurable breaches." Instead, it allows a party to terminate the agreement when its counter party materially breaches the contract. Bay Tek has shown as a matter of law that Full Circle breached ¶ 4.5, but it has produced no evidence that the breach of ¶ 4.5 alone is a "material breach." I therefore cannot conclude that Bay Tek is entitled to terminate the license agreement at this juncture.

3. <u>Remaining Claims</u>

I can now swiftly work through Bay Tek's remaining counterclaims, none of which can be resolved at summary judgment.[3] Bay Tek bases its trademark-infringement claim on Full Circle's alleged breaches of ¶¶ 4.2, 7.7. Bay Tek is right that, if Full Circle's use of the phrase

---

[3] Because Bay Tek has not established liability on these claims as matter of law, it has also not established that Pavony is individually liable.

20

"Monica LewinSkee-Ball" breached the license agreement, Bay Tek could also pursue Full

Circle for trademark infringement.  See Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.,

2018 WL 2012875, at *11 (E.D.N.Y., Apr. 30, 2018).  But because there is a material issue of

fact as to whether Full Circle "used" the phrase, there is a correlative material issue of fact as to

whether it infringed the mark.  And Bay Tek does not explain how any uses of the mark that did

not breach the agreement constitute trademark infringement.

Similarly, Bay Tek has not seriously endeavored to develop its arguments on the false-

endorsement and trademark-dilution claims.  See Abdou v. Walker, No. 19-cv-1824, 2022 WL

3334700, at *3 (S.D.N.Y. Aug. 12, 2022) ("Undeveloped arguments are waived because it is not

the obligation of the court to research and construct legal arguments open to parties.").  It offers

nothing more than a conclusory statement that Full Circle's use of the mark constitutes a "false

or misleading representation of fact" necessary to establish false endorsement.  Burck v. Mars,

Inc., 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008).  And it has not even briefed the trademark

dilution issue.  The same goes for the state-law claim.  Outside of concluding that Full Circle's

bad faith is "indisputable" based on the breaches of the License Agreement, Bay Tek has made

no attempt to satisfy the "bad faith" element of an unfair-competition claim.  See Carson Optical,

Inc. v. Prym Consumer USA, Inc., 11 F. Supp. 3d 317, 329 (E.D.N.Y. 2014).

**CONCLUSION**

Full Circle's [148] Second Motion for Leave to File its Third Amended Complaint is

DENIED.  Bay Tek's [149] Motion for Summary Judgment is GRANTED as to Bay Tek's claim

that Full Circle breached ¶ 4.5 of the License Agreement and Full Circle's claims that Bay Tek

breached ¶¶ 4.2 and 7.3 of the License Agreement, breached the implied covenant of good faith

and fair dealing, breached the revenue share agreement, and tortiously interfered with Full Circle's business relationships.  Bay Tek's motion is otherwise DENIED.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated:  Brooklyn, New York
         September 23, 2024