```
 1                UNITED STATES DISTRICT COURT
 2                EASTERN DISTRICT OF NEW YORK
     -------------------------------------------------------
 3   FULL CIRCLE UNITED, LLC,
 4                     Plaintiff,
 5      -vs-                   Civ. Action No. 1:20-cv-03395
 6   BAY TEK ENTERTAINMENT, INC.,
 7                     Defendant.
     -------------------------------------------------------
 8   BAY TEK ENTERTAINMENT, INC.,
 9                     Counterclaim Plaintiff,
10      -vs-
11   FULL CIRCLE UNITED, LLC,
12                     Counterclaim Defendant,
13      and
14   ERIC PAVONY,
15                     Additional Counterclaim Defendant.
     -------------------------------------------------------
16                         CONFIDENTIAL
17            Videotape Examination of RAYMOND DRAGON,
18       taken at the instance of the Plaintiff, under and
19       pursuant to the New York Rules of Civil Procedure,
20       before Dawn M. Lahti, a Certified Realtime Reporter,
21       Registered Professional Reporter and Notary Public
22       in and for the State of Wisconsin, with all
23       participants appearing via Zoom videoconference, on
24       July 8, 2022, commencing at 10:11 a.m. and
25       concluding at 4:18 p.m.
```

1  A   I looked at them just because it's always good
2      to refresh one's knowledge and make sure that
3      your existing beliefs are consistent with that.
4  Q   And what's your understanding as to New York
5      law on lost profits?
6  A   Okay.  First of all, can you be more specific?
7      I mean, you've asked a very general question
8      here.
9  Q   ==Do you have an understanding as to if there is==
10     ==a standard of proof for lost profits under New==
11     ==York law?==
12 A   ==Yes.  My understanding is that the standard is==
13     ==what's called reasonable certainty.==
14 Q   And what is your understanding of the
15     reasonable certainty standard?
16 A   Okay.  First, I'm not an attorney, so I'm not
17     giving a legal opinion here.  I'm just giving a
18     layman's definition of reasonable certainty.
19     But my understanding of reasonable certainty
20     would be that if, for example, you were doing a
21     forecast that would be data to support the
22     forecast that at the time was considered the
23     likely or reasonable future for a business and
24     that the calculation model that is being used
25     has no significant errors or omissions that

1      would throw off the calculation, so it's a
2      combination of verifiable market-based data and
3      an accurate model that provides I think what an
4      average person would say, okay, that the data
5      is reasonable, it's supported, and the model
6      has got no significant errors so that the
7      calculation using that data would be reasonably
8      certain.
9  Q   And is it your understanding that the
10     reasonable certainty standard applies to lost
11     profits calculations; is that right?
12 A   Yes.
13 Q   And that's a different standard than what would
14     be applied than if you were doing an evaluation
15     of an existing business, correct?
16 A   No, not necessarily.
17 Q   So you're aware of the fact that in a lost
18     profits calculation, you're talking about a
19     hypothetical world that didn't occur, correct?
20          MR. WILLIAMS:  Objection to form.
21          THE WITNESS:  Yes.  It's a
22     hypothetical calculation, that's correct.
23 BY MR. SKIBELL:
24 Q   And when one values an existing business, it's
25     an existing current, not hypothetical,

1           MR. WILLIAMS:  Are we going off the
2      record or staying on for this?
3           MR. SKIBELL:  He said it would only
4      take a minute.  I don't really care.
5           THE WITNESS:  Okay.
6   BY MR. SKIBELL:
7   Q   All right.  In any event, what we're going to
8       ask you about is what is on page 11 here.  And
9       you see that there is a sentence before the
10      first bullet point and it reads, "The Smith
11      report is also premised upon numerous untenable
12      assumptions including but not limited to."
13                You'll see the first assumption
14      there is the following which I'll read, "As is
15      apparent from the Smith report and the
16      documentation reviewed, there is no written
17      agreement between the parties stating that BT
18      will manufacture any customized Skee-Ball Live
19      Lanes whatsoever, no less the number 1,750;
20      again, FC has claimed an oral agreement only to
21      manufacture 26 custom lanes."
22                So if I understand correctly,
23      Mr. Dragon, you reached the conclusion here
24      that there's no agreement between Bay Tek and
25      Full Circle that would require Full Circle

1       to -- I mean, Bay Tek to produce any lanes for
2       Full Circle; is that right?
3    A  I said no written agreement.
4    Q  There's -- in your opinion -- are you reaching
5       the opinion that there's no written agreement
6       that would require Bay Tek to manufacture any
7       lanes for Full Circle; that's right?
8    A  That's my understanding.
9    Q  And that's based on your review of the written
10      agreements in this case?
11   A  Review of the documentation, yes.
12   Q  And you see the next sentence reads, "The Smith
13      report nonetheless attempts to concoct such an
14      obligation by virtue of an agreement by BT to
15      exercise 'best efforts' under the written
16      agreement and extrapolate lost profits from
17      there."
18              The next sentence reads, "This
19      assumption is unhinged from any explicit
20      guarantee or promise by BT to supply anything
21      tangible to FC from which a lost profits
22      calculation can even be made."
23              So if I understand correctly,
24      Mr. Dragon, you reviewed the best efforts
25      clause and the license agreement in this case?

```
1    A    I noted that it was in there, yes.
2    Q    And you found that this agreement -- that the
3         best efforts clause does not require Bay Tek to
4         manufacture any lanes for Full Circle, correct?
5    A    That's my understanding.
6    Q    Now, did you review any deposition testimony
7         relating to the license agreement?
8    A    I'm not sure.  I may have.
9    Q    Is any identified in your expert report?
10   A    I didn't review any deposition testimony at the
11        time this report was written.  The depositions
12        hadn't been taken.
13   Q    After this report was written, did you review
14        any deposition testimony?
15   A    I looked over some depositions, but I don't
16        recall anything dealing with the subject.
17   Q    Which depositions did you look over?
18   A    I think it was Pavony's first deposition and
19        the other gentleman's first deposition.
20   Q    Is that gentleman a Full Circle witness?
21   A    Yeah.  It was -- I'm trying to remember his
22        name.  It was like Wikman.
23   Q    Eric Wikman?
24   A    I believe that's the person, yes.
25   Q    Did you review all of those depositions or only
```

1    THE WITNESS: Golden Tee leagues?
2  BY MR. SKIBELL:
3  Q   Well, I'll --
4  A   I'm not sure what you're talking about there.
5  Q   Are you familiar with an arcade game that
6      appears in bars where people play golf?
7             MR. WILLIAMS: Objection to form.
8             THE WITNESS: You're going to want me
9      to spend a lot of time in bars. I imagine
10     there's all kinds of games that are in bars.
11 BY MR. SKIBELL:
12 Q   Did you look -- you testified earlier about --
13     let me rephrase the question.
14                Do you recall earlier testimony
15     about Yerba Mate that when calculating growth
16     curves, you looked at similar beverages that
17     were farther along the life cycle in
18     Yerba Mate?
19                Do you recall that, Mr. Dragon?
20 A   Yes.
21 Q   So would you agree with me that games in bars
22     that were farther along than Skee-Ball Live
23     would be a useful metric in considering whether
24     Skee-Ball Live in bars was a business that
25     would match up with how the current prototype

1      lanes are generating revenue?
2  A   It would depend on the nature of the games and
3      whether they were truly comparable.  The
4      Skee-Ball game is a very, very old-tech game.
5              I think a lot of game players
6      these days are much more interested in video
7      games that have, you know, high levels of
8      animation, et cetera.
9  Q   So are you familiar with bowling, Mr. Dragon?
10 A   Am I familiar with bowling?
11 Q   Yeah, the sport of bowling.
12 A   Yes, I've heard of bowling.
13 Q   So in that sport, you throw a ball at pins,
14     right?
15 A   That's correct.
16 Q   And in Skee-Ball, you throw a ball at little
17     holes, right?
18 A   That's correct.
19 Q   And I assume you're aware that bowling alleys
20     regularly serve alcohol.  Are you aware of
21     that?
22 A   Some do.  Some don't.  I don't know what the
23     percentage is, but most bars don't have bowling
24     alleys.
25 Q   So a bowling alley would be too large for a