C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x
FULL CIRCLE UNITED, LLC,

                        Plaintiff,

        -against-             Case No.
                              1:20-cv-03395
BAY TEK ENTERTAINMENT, INC.,
                        Defendant.
-------------------------------------x
BAY TEK ENTERTAINMENT, INC.,
        Counterclaim Plaintiff,

        -against-

FULL CIRCLE UNITED, LLC,
        Counterclaim Defendant,

                -and-

ERIC PAVONY,
   Additional Counterclaim Defendant.
-------------------------------------x

               June 14, 2022


    Continued Remote Videotaped Deposition of

Full Circle United, LLC, by ERIC PAVONY, and

ERIC PAVONY, individually, held via Zoom before

Joseph R. Danyo, a Shorthand Reporter and Notary

Public within and for the State of New York.


Reported by: Joseph R. Danyo

Job No. 211445

1  PAVONY - Confidential
2  please.
3  (Record read)
4  A. And you're asking me to remember any
5  words that he said seven years ago? Off the top
6  of my head, I can't remember any specific words
7  that he said that day specifically, but like I
8  was saying, like I was saying, like, and the
9  reason I bring this up is the purpose of the
10 conversation was to understand that Bay Tek
11 understood what it was that Full Circle United
12 does and wanted to accomplish, and that was the
13 purpose of that conversation, and we had it prior
14 to us assigning the agreements over, and had Bay
15 Tek never given us the oral promise that they,
16 and agreed to manufacture lanes for us prior to
17 the assignment, we never would have assigned the
18 agreement over to Bay Tek.
19 Q. Okay. So again the intention in here
20 is that there was an agreement that was made,
21 correct?
22 MR. SKIBELL: Objection.
23 Q. Page 5, paragraph 5. What were the
24 material terms of the agreement that was made in
25 that conversation that he uttered?

1  PAVONY - Confidential
2  A. I can't remember exactly anything he
3  uttered specifically like you keep asking me,
4  but, you know, we talked about manufacturing of
5  lanes, custom lanes at that, and we talked about
6  how many lanes, over how many, you know, broken
7  up, you know, how many lanes, how many years or
8  how many lanes per year. We talked about the
9  purpose of turning Skee-Ball into a bona fide
10 sport to bring it to television networks such as
11 ESPN. That was what was being discussed and what
12 Gaetan agreed to.
13 Q. I'm asking you to tell me what he
14 agreed to, not what was discussed. Do you have
15 anything further to add to your testimony as to
16 what he said?
17 MR. SKIBELL: Christine, why don't
18 you refresh his recollection with the
19 transcript if you want him to answer about
20 specific words?
21 MS. LEPERA: No. My deposition, I do
22 it my way. I have the transcript. Would
23 you like me to comment on it?
24 A. My answer --
25 Q. Do you have anything else to add, Mr.

1  PAVONY - Confidential
2  Pavony?
3  A. Yes.
4  Q. Specific words that Mr. Philippon
5  said that manifested an agreement to do any of
6  the things you mention in paragraph 5?
7  A. I can't remember specific words, but
8  like paragraph 5 says, it says that Bay Tek would
9  manufacture Skee-Ball lanes for Full Circle, and
10 Full Circle could broadcast its tournaments,
11 league play and events.
12 Q. And if I read you the transcript and
13 audio, those words came out of Mr. Philippon's
14 mouth or yours?
15 A. Well, this was our first
16 conversation. You know, our company has the
17 license to Live Play, which is, you know,
18 broadcasting of tournaments and league play and
19 events. So the purpose of this initial
20 conversation with at that time a potential new
21 owner of the Skee-Ball company, the purpose of
22 that conversation was to talk about what each of
23 our respective companies did and how we were
24 going to work together and how we were going to
25 help each other be successful.

1  PAVONY - Confidential
2  Q. Okay. Do you have anything further
3  to add or is that it? I'm giving you a full and
4  fair opportunity.
5  MR. SKIBELL: Objection to form.
6  Q. Okay. You made a claim against --
7  MR. SKIBELL: Did you get a chance to
8  answer? I didn't hear anything on the
9  record.
10 MS. LEPERA: He nodded his head, but
11 I thought he was done.
12 A. I think we discussed it.
13 Q. You said no, right? Nothing further
14 to add?
15 A. Nothing further to add regarding what
16 we were just discussing. Sure.
17 Q. Exactly. You made a claim against
18 Mr. Sladek in the SBI litigation that he made an
19 agreement with you, because he told you good luck
20 on something that you had expressed regarding
21 your goals and desires. Do you recall that?
22 MR. SKIBELL: Objection, lacks
23 foundation.
24 MS. LEPERA: I'm asking if he
25 recalls.

Page 343

1  PAVONY - Confidential
2  A. So you're referring to the oral
3  agreement that Joe Sladek gave us in 2005, which
4  is a long time ago now, but I remember what
5  you're referring to. He didn't just wish us good
6  luck. You know, we again explained to him what
7  it was our company was doing, and he didn't just
8  say good luck. He gave us, he said, he agreed to
9  us doing what it was we presented him with.
10  Q. Okay. The court disagreed with you
11  on that, correct? Threw that claim out, right?
12  MR. SKIBELL: Objection to form.
13  Calls for a legal conclusion.
14  You can answer.
15  A. I actually don't recall what the
16  court said on that.
17  Q. You don't recall the court saying
18  Full Circle, who has failed to plausibly assert
19  the formation of an oral contract, no less a
20  breach thereof? You don't recall that?
21  A. I don't recall that specifically.
22  That lawsuit settled many years ago, but I do
23  remember Joe Sladek not contesting that point
24  during the litigation when it was brought up.
25  Joe himself said, he goes, yes, yes, Joe admitted

Page 344

1  PAVONY - Confidential
2  during the course of the litigation that, yes,
3  that conversation in 2005 where he did wish us
4  good luck where he did say, yes, you can host
5  Skee-Ball tournaments, you can call it
6  Brewskee-Ball, you can do all these things that
7  we presented him with.
8  Joe decided, I guess because he
9  wanted to tell the truth, that he decided in that
10  litigation, he said, yeah, no, I'm not denying
11  that. That happened. That's what Joe said.
12  Q. Okay. Is that before or after the
13  court threw out your claim?
14  MR. SKIBELL: Objection,
15  argumentative.
16  MS. LEPERA: It's a question. It's
17  cross.
18  Q. Was that conversation that Mr. Sladek
19  allegedly said that, was that before or after the
20  court dismissed your claim against him for
21  alleged oral contract breach?
22  A. I don't recall the exact date, but I
23  think Joe said that during one of the
24  court-appointed mediations when that discussion,
25  that 2005 discussion and that 2005 agreement with

Page 345

1  PAVONY - Confidential
2  Joe was being discussed. I think it was a
3  court-appointed mediation where Joe said that. I
4  don't know if that was before or after what you
5  are referencing.
6  Q. Okay. You say in paragraph 9 of this
7  document, and I believe you just testified to a
8  similar thing, that you relied on the agreement
9  made by Philippon on behalf of Bay Tek to execute
10  Full Circle's consent to the assignment of the
11  license agreement and settlement agreement from
12  Skee-Ball to Bay Tek. Do you see that?
13  A. Number 9?
14  Q. Yes, sir.
15  A. Yes.
16  Q. Okay.
17  MS. LEPERA: I would like to mark if
18  you would number 12, the consent to
19  assignment. It's FCU multiple zeros 48
20  through 50.
21  (Pavony Exhibit 12, Consent to
22  assignment dated December 3, 2015 Bates
23  stamped FCU 48 through 50, was so marked
24  for identification, as of this date.)
25  MS. LEPERA: So he can identify if

Page 346

1  PAVONY - Confidential
2  this is what he's talking about.
3  Q. Mr. Pavony, we are showing you what
4  we have marked as Pavony 12, a December 3, 2015
5  document entitled "Potential Sale of Skee-Ball
6  Inc.," and review the four pages and tell me if
7  you recognize it.
8  A. Can I still scroll?
9  MS. NGUYEN: Yes, you can.
10  THE WITNESS: Okay. Thank you.
11  A. Okay.
12  Q. Are you familiar with these
13  documents?
14  A. Um-hum.
15  Q. Okay, and this is a letter that Mr.
16  Sladek wrote to you regarding a potential sale of
17  Skee-Ball, Inc. December 3, 2015 attaching a
18  document that is entitled Consent to Assignment
19  of Confidential Settlement Agreement. Do you see
20  that?
21  A. Yes. The date is correct. The name
22  of the letter you said is right, and then this
23  part is the consent to assignment of confidential
24  settlement agreement. Correct.
25  Q. Okay, and this is the document that

1  PAVONY - Confidential
2  letter, if you would, and then we will look at
3  the consent to assignment.  There's no request in
4  Joe Sladek's letter for Full Circle's consent to
5  waive transfer of the license agreement?
6      A.   So you're making the distinction of
7  consent?
8      Q.   Yes, I am.
9      A.   Because when I read it, you know,
10 number 7, it refers to, it says SBI intends to
11 assign the agreements, and then the definition of
12 agreements is the license agreement and the
13 settlement agreement.
14        So, when I read that, it says SBI
15 intends to assign the agreements, plural,
16 agreements with an S, and to transfer its rights
17 and obligations under the agreements, again
18 transfer its rights and obligations under the
19 agreements, plural, the license and the
20 settlement.  So that's the one I am referring to.
21     Q.   Right, but if you could point me to,
22 and I'm going to tell you there isn't any
23 provision in either the letter or the consent
24 form where Full Circle consents to, it asks to
25 consent to a transfer of the license agreement

1  PAVONY - Confidential
2  and consents to a transfer of the license
3  agreement.
4         MR. SKIBELL:  Objection to form.
5         If you understand the question, you
6     can respond.
7      A.   I was just saying that SBI was
8  telling us what they were doing, and they were
9  telling us they were assigning both of the
10 agreements.
11     Q.   Correct.  Very simply, Mr. Pavony,
12 without getting into all of the legal
13 terminology, are you aware or are you not aware
14 that Full Circle's only recourse if SBI chose to
15 transfer the license agreement was to terminate
16 the license agreement under paragraph 11.5 of the
17 license agreement, which is what you refer to in
18 paragraph 6 of the consent that you signed?
19        MR. SKIBELL:  Objection to form.
20    Outside the scope of the 30(b)(6).
21    But you can answer.
22     A.   I'm just reciting your question back.
23 You're saying the only recourse FCU had was to
24 terminate the license agreement?
25     Q.   Correct, that there was no

1  PAVONY - Confidential
2  requirement to obtain FCU's consent to such
3  transfer under the terms of the license
4  agreement?
5      A.   Alright.  I took it as --
6         THE WITNESS:  I'm sorry, Reid.
7         MR. SKIBELL:  Same objections, but
8     you can answer.
9      A.   I was going to say Joe Sladek was
10 asking or telling us that he was transferring.
11 You're saying that there was no consent, but
12 regardless, Joe Sladek still told FCU that he was
13 transferring, SBI was transferring both the
14 license and settlement agreement to Bay Tek, so I
15 agree with that.
16     Q.   No.  I'm saying that there was no
17 requirement to consent.  SBI could do it without
18 consent, and you elected to not terminate the
19 license agreement, but your only remedy was to
20 terminate the license agreement?
21        MR. SKIBELL:  Objection to form.
22    Calls for a legal conclusion.  Outside the
23    scope of the 30(b)(6).
24    You can answer.
25     Q.   Do you agree with that?

1  PAVONY - Confidential
2      A.   Okay.  So, yes, you know, this is,
3  you know, this is attorney stuff here we are
4  talking about, but I believe that the license
5  agreement is mentioned in the settlement
6  agreement.  It's a part of the settlement
7  agreement, so I also would have thought that that
8  encapsulated the license agreement.
9      Q.   Again, there are separate provisions,
10 whether or not they are related, so the question
11 becomes were you aware that under the license
12 agreement, the only recourse that you had, if SBI
13 transferred the asset, the license agreement, was
14 to terminate?
15        MR. SKIBELL:  Objection to form.
16    Calls for a legal conclusion.  Outside the
17    scope of the 30(b)(6).
18    You can answer.
19     A.   I wasn't necessarily I think entirely
20 understanding what you're saying, but I
21 understand what you're saying, what you're trying
22 to say now, but again I'm not an attorney.
23     Q.   No worries.  Let me just move to
24 paragraph 10 of your declaration, which is
25 Exhibit 11, so we can move on here.  You see that

PAVONY - Confidential

you wrote in this sworn document that consent, which we have established now is Exhibit 12, yes, precluded Full Circle from declaring the license agreement terminated and resurrecting its claim in a prior lawsuit that Skee-Ball is generic. Do you see that?

A. Yes.

Q. What was the basis of your assertion there?

A. Hang on. I need to read it and understand it. I'm going to scroll up a little bit.

Q. Sure.

A. I just want to see it in context. Okay. What was your question again about 10?

Q. What is the basis of your statement in paragraph 10?

A. I think the basis is that after talking to Gaetan that, you know, he gave us, he agreed. He promised that they were going to work with us, and therefore, like I said earlier, like, you know, we wouldn't have assigned agreements, both of the agreements. We wouldn't have assigned those agreements over to Bay Tek,

PAVONY - Confidential

had we not had this prior conversation with Bay Tek where they agreed to make us lanes, and so I think what I'm saying in number 10 is that we agreed, Bay Tek agreed that they would make us lanes and understood that we were going to bring competitive Skee-Ball as a sport to ESPN, and I think what this is referring to is that because we got that promise and agreement from Bay Tek, that is what led us to assign both the license and the settlement over to Bay Tek, and therefore, because we did that, because Bay Tek represented that they would make us lanes, we assigned it over, and once we assigned it over, we lost the opportunity at that moment to what does it say? To terminate the license.

Q. Okay.

MS. LEPERA: I move to strike everything other than the last part of that, because the question really is what in the consent, what in the consent precluded you from declaring the license agreement terminated.

MR. SKIBELL: Objection. Calls for a legal conclusion.

PAVONY - Confidential

You can answer.

MS. LEPERA: It's in his declaration.

A. What in the consent precluded?

Q. What consent precluded Full Circle from declaring the license agreement terminated?

A. I think the consent that's being discussed here is Gaetan's consent that Bay Tek would make us lanes, right?

Q. I'm asking you. It's your declaration, sir. I don't know the consent that you're talking about.

A. That's what I'm talking about. That's what I said.

Q. I'm sorry. I don't mean to talk over you. Is the consent that you're referring to in paragraph 10 the consent that we just looked at that is number 12, the consent document you signed?

A. The consent that I'm referring to in that line there is I got Gaetan's consent. I got Gaetan's, you know, call it a promise or agreement. We got Gaetan's consent that they would make us lanes, and because that was the whole point of that conversation prior to Bay Tek

PAVONY - Confidential

acquiring SBI obviously. We needed to either assign the license and settlement to them or not, right, and we asked to have a call with a representative of Bay Tek prior, and that whole thing was predicated on will you make us the lanes we need for Live Play, and I think the consent I'm talking about there is that consent, and then that consent is what made us comfortable assigning the license and the settlement agreement to Bay Tek.

Q. Okay. So just, to put a pin on it, you're not talking about Exhibit 12, when you say the word that consent, the one you just referred to in paragraph 9? You're not talking about that one?

MR. SKIBELL: Objection to form.

A. I'm reading this out loud just so everyone can hear it.

MR. SKIBELL: Don't read out loud. It messes up the record. If you want to read it, read it to yourself.

A. I'm reading it back because it speaks for itself what it says. Anyway. Yeah, I relied on the agreements made by Gaetan, and that's why

Page 403

```
 1            PAVONY - Confidential
 2  place?
 3          MR. SKIBELL:  So I mean you can
 4      repeat the substance of conversations, but
 5      if there is legal advice that was in
 6      connection with those, you need to be
 7      careful not to disclose the content of
 8      discussions with lawyers, Eric.  If you
 9      have any question about that, we can take
10      a break and you can ask me.
11          MS. LEPERA:  Not related to the
12      question I just asked.
13          MR. SKIBELL:  I'm just instructing
14      the witness not to reveal the substance of
15      attorney-client communications.  I'm not
16      directing him not to answer the question.
17          MS. LEPERA:  What does my question
18      have to do with privileged communication?
19          MR. SKIBELL:  Because he can explain
20      how he learned something, and I just don't
21      want him to accidentally volunteer
22      attorney-client communications.
23      Q.   I'm not asking you any conversation
24  you had with your lawyer.  I'm asking you about
25  the conversation you had with Blaine.  Blaine, I
```

Page 404

```
 1            PAVONY - Confidential
 2  take it, is not your lawyer?
 3          MR. SKIBELL:  Objection.  Different
 4      question.  It lacks foundation.
 5      Q.   Tell me what conversation you had
 6  with Blaine.
 7      A.   I never had a conversation with
 8  Blaine.
 9      Q.   Oh.  Okay.  So you're reporting this
10  as a secondhand conversation you heard from
11  someone else?
12      A.   Yes.
13      Q.   Okay, and do you have any
14  documentation that reflects communications with
15  Blaine and Full Circle?
16      A.   Like I said, I was only briefly told
17  broadly that someone, and I think his name might
18  be Blaine, talked about how Bay Tek and GameCo
19  were talking about operating Live Play casinos.
20  That's the extent of what I know.
21      Q.   And did that ever happen?
22      A.   Did operating Live Play and Gameco --
23  did Bay Tek and GameCo ever operate Live Play in
24  casinos?
25      Q.   Yes.
```

Page 405

```
 1            PAVONY - Confidential
 2      A.   I don't know.
 3      Q.   Do you have any evidence that they
 4  did?
 5      A.   I don't know.
 6      Q.   No.  I'm asking you do you have any
 7  evidence that they did?
 8      A.   Oh, well, I wasn't the one that was
 9  talking to Blaine, so I imagine, you know, I
10  imagine this is for my attorneys to figure out.
11      Q.   I'm not asking what your attorneys
12  told you, I'm asking you whether or not there is
13  any evidence of an actual Live Play in a casino
14  by GameCo participated in by Bay Tek.
15      A.   I will tell you what I know about
16  GameCo is there were discussions between Bay Tek
17  and GameCo about operating Live Play in casinos,
18  which is a breach of the license.
19      Q.   A discussion is a breach that you're
20  not even fully aware of whether it took place or
21  not?
22          MR. SKIBELL:  Mischaracterizes his
23      testimony.  Form.
24      Q.   Again, I will ask you very simply.
25  Do you have any knowledge or information of any
```

Page 406

```
 1            PAVONY - Confidential
 2  Live Play in casinos by GameCo taking place?
 3      A.   It may have, it may not have, I don't
 4  know.  I really can't speak intelligently on the
 5  GameCo stuff, because all I was just told was
 6  that someone from GameCo at a high level was in
 7  discussions with Bay Tek about Live Play.  That's
 8  what I know.
 9      Q.   Okay.  No evidence, correct, of it
10  actually occurring?
11          MR. SKIBELL:  Objection.  Asked and
12      answered.
13      Q.   Do you want to add anything more, Mr.
14  Pavony, as to whether you have any evidence of
15  GameCo doing Live Play at casinos?
16      A.   There might be evidence that I'm
17  unaware of.  I personally don't know of any
18  evidence.
19      Q.   Okay.  Are you aware about any
20  evidence in Full Circle's possession, custody and
21  control that shows that GameCo was doing Live
22  Play in casinos?
23      A.   I'm not aware.
24      Q.   Okay.  Now let me move up to
25  Alchemy3.  You say it was doing Live Play in Ohio
```

Page 443

```
 1            PAVONY - Confidential
 2       A.   Maybe it is produced.  I don't know.
 3       Q.   It was not.  I'm telling you again I
 4  would have seen it.  So the other thing I would
 5  like to ask you.
 6            You think it's really funny talking
 7  about killing of a two-year-old child?
 8            MR. SKIBELL:  Objection, lacks
 9       foundation.
10       Q.   Well, what is Casey Anthony about?
11  Is that a parody on a particular situation to use
12  your phraseology of parody?
13            MR. SKIBELL:  Objection, lacks
14       foundation.  No one knows what you're
15       talking about.
16            MS. LEPERA:  It's in the
17       counterclaim.
18       A.   The Casey Anthony is a pun on
19  someone's name is what you're referring to, and
20  what was the question about that?
21       Q.   Never mind.  Barstool Sports.  You
22  posted, and I say you, because I think you, and I
23  will ask you.  Did you post videos to the
24  Brewskee-Ball website personally?
25       A.   The Brewskee-Ball website?  I have
```

Page 444

```
 1            PAVONY - Confidential
 2  posted some videos to the Brewskee-Ball website.
 3  Not a lot.
 4       Q.   The video that, you're aware of the
 5  video that I'm talking about, correct, where
 6  Barstool Sports participated in an event that was
 7  at Full Circle Bar?
 8       A.   I do remember the Barstool event that
 9  you're referring to, but I don't believe I ever
10  posted a video of that on the website, on the
11  Brewskee-Ball website.
12       Q.   The Brewskee-Ball website belongs to
13  Full Circle, doesn't it?
14       A.   When you say Brewskee-Ball website,
15  are you referring to like the actual
16  Brewskee-Ball.com website?
17       Q.   Yes.
18       A.   I don't remember it being on there,
19  on the actual Brewskee-Ball website.  I believe
20  it was on the Brewskee-Ball Twitch page.
21       Q.   Okay.  In any event, there was a
22  Brewskee-Ball event at which Barstool Sports was
23  present, correct?
24       A.   Yes.
25       Q.   In Full Circle Bar.  I don't know if
```

Page 445

```
 1            PAVONY - Confidential
 2  it was the one in New York or in Austin.  You can
 3  tell me.
 4       A.   It was in Brooklyn.
 5       Q.   Okay.  In Brooklyn, and it's a
 6  lengthy video, but you prepared the video,
 7  correct?
 8       A.   Yes.
 9       Q.   And the Barstool guys were having a
10  conversation in the Full Circle Bar at which the
11  Skee-Ball Live tournament was held, correct?
12       A.   It was a Brewskee-Ball tournament on
13  Skee-Ball Live Lanes, but, and the Barstool guys
14  had a show, a Barstool podcast.  They had their
15  own show that they did prior to the Brewskee-Ball
16  event.
17       Q.   In your bar?
18       A.   In Full Circle Bar in Brooklyn,
19  correct.
20       Q.   And you were present, correct?
21       A.   Yeah.
22       Q.   And there was the National Skee-Ball
23  League Lanes, and the mark was being used on
24  those lanes, correct?
25            MR. SKIBELL:  Objection.
```

Page 446

```
 1            PAVONY - Confidential
 2       A.   They were the Skee-Ball Live Lanes,
 3  and there's I think the National Skee-Ball League
 4  mark.  It just said SBL on the lanes.
 5       Q.   But that's a trademark that belongs
 6  to Bay Tek, correct?
 7       A.   SBL, I don't believe so.
 8       Q.   The National Skee-Ball League does
 9  not belong to Bay Tek, the trademark slogan?
10  Should we go back to the license agreement?
11            MR. SKIBELL:  Objection to form.
12       Argumentative.  Please give the witness a
13       chance to answer and stop badgering him.
14       Q.   You were using --
15            MR. SKIBELL:  Bulging your eyes out
16       is really inappropriate.
17       Q.   Well, I'm about to say something that
18  I really detest having to even say, but I'm going
19  to say it.  I'm going to say it, because in
20  watching that video and watching the Barstool
21  guys talk about pussy and what kind of pussy did
22  you get, and what kind of other disgusting things
23  that they were saying in that bar, whether before
24  the event, during the event, and obviously
25  sanctioned by you, you think that's appropriate?
```

1  PAVONY - Confidential
2      A.  So you're asking a question --
3      Q.  Based on a family-friendly mark?
4      A.  You're throwing a lot of questions at
5  me at once.
6      Q.  No, I'm not.
7          MR. SKIBELL:  Yes, you are.  Let him
8      answer, Christine.  We know you've been
9      building up to this, so let him answer.
10     A.  There was a question about -- first
11 of all, you said is the National Skee-Ball League
12 a trademark of Bay Tek.  I don't believe as far
13 as I know that National Skee-Ball League that
14 phrase is trademarked.  I'm just answering that,
15 but it doesn't say that on the lanes.  It says
16 NSBL on the lanes.  I just wanted to close that.
17 Button that up.
18         Then, as far as what the Barstool
19 guys were saying, that was the Barstool guys
20 saying those things on their show.
21     Q.  In your bar.
22     A.  In the bar.  Right.
23     Q.  In the bar and allowed to be
24 broadcast along with the Skee-Ball tournament.
25         MR. SKIBELL:  Objection.

1  PAVONY - Confidential
2      Q.  You allowed it, correct?
3          MR. SKIBELL:  Objection,
4      mischaracterizes testimony.  It's not a
5      Skee-Ball event.  Let him answer.
6          MS. LEPERA:  It's not a Skee-Ball
7      event on the Skee-Ball live lanes?
8      A.  It was a Brewskee-Ball tournament.
9  It was a Brewskee-Ball event.  We own the
10 Brewskee-Ball trademark, but so, just to be
11 clear, the Barstool show was not concurrent with
12 the Brewskee-Ball tournament.  Right?  It was
13 before the Brewskee-Ball tournament, and, you
14 know, we made sure that like we always do the
15 type of environment that we create during these
16 types of events like I said earlier is about not
17 harassing anyone and no derogatory language, and
18 essentially what we do is we try to have a very
19 positive, an extra positive environment, a safe
20 environment, and we told that to Barstool, and we
21 also, one of the ways that you do that is you
22 have a moderator, which we had, but the views of
23 Barstool are not the views of Brewskee-Ball or
24 Full Circle United.
25     Q.  What efforts did you take to make

1  PAVONY - Confidential
2  sure that that was not posted anywhere near or
3  anywhere around the Skee-Ball lanes and your use
4  of the Live Skee-Ball Lanes that you got from Bay
5  Tek whatever the day?
6      A.  So, okay.  So I just said some of the
7  effort that we took.  Right?  So we explained to
8  Barstool the type of environment, atmosphere that
9  we conduct when we do these types of events.  We
10 made it very clear to them.  You know, no
11 harassing language, no going after people based
12 on sexual orientation or race or ethnicity or
13 political views, and we also had a moderator as
14 well, which is the sole purpose is of trying to
15 do that, because these are realtime events, these
16 are live events, and we can't know what is coming
17 out of people's mouths in realtime.  What we can
18 do is have a moderator, which we did, and then
19 also, as far as the Barstool guys are concerned,
20 this is all happening in Full Circle Bar, so --
21     Q.  Which you own.
22     A.  Right, but what I'm saying is that it
23 is happening in the bar before the Brewskee-Ball
24 event.  So you're trying to, like these guys this
25 was not part of the Brewskee-Ball tournament.

1  PAVONY - Confidential
2      Q.  You mean to tell me that when you go
3  on and look at the video it is separated out and
4  it is not one full entire production?
5          MR. SKIBELL:  Objection to form.
6      Q.  I looked at it.
7          MR. SKIBELL:  Christine, there is no
8      reason to bug your eyes out at the witness
9      for emphasis.  Give him a chance to answer
10     your questions.  Eric, do you want to
11     answer?
12     Q.  It's one continuous video, correct?
13 It's not separate?
14     A.  I thought so.  So, first of all, you
15 asked me the efforts that we were making
16 regarding Barstool stuff.  So, you know, all the
17 stuff I just said we did have a moderator,
18 explained to them the atmosphere and the
19 environment we create.  We did all those things.
20 We had a moderator.  In realtime, we can't
21 control what comes out of people's mouths in
22 realtime, but what we can do is moderate how
23 that's perceived, and it was understood that
24 those weren't the views of Brewskee-Ball or Full
25 Circle United, and, you know, we also believed as

Page 475

```
 1            PAVONY - Confidential
 2   move forward with our six-month plan, and those
 3   plans couldn't happen anymore, so I told people
 4   the truth, what I believed to be the truth, which
 5   was they were dishonest based on breaking the
 6   promises to manufacture lanes for us.
 7       Q.   That is your opinion, sir.  I'm not
 8   going to get into a debate with you, but you
 9   agree with me it's not a nice thing to say about
10   someone to call them dishonest and unethical,
11   correct?
12            MR. SKIBELL:  Objection.
13       A.   I believe that, if someone is not
14   dishonest and if someone is not unethical, then I
15   agree with you that it is not nice to call them
16   those things, but, if they are in fact dishonest
17   and they are in fact unethical, then I believe
18   that that's what you call them.
19       Q.   And you believe that you're honest in
20   all things, correct?
21       A.   Can you repeat that.
22       Q.   Do you believe you're honest in all
23   things?
24       A.   I try to be honest.  True.
25       Q.   Okay, and is it honest to tape-record
```

Page 476

```
 1            PAVONY - Confidential
 2   someone without telling them you're
 3   tape-recording them?  You conceal it?  Is that
 4   honest?
 5            MR. SKIBELL:  Objection.
 6        Mischaracterizes that testimony.
 7       Q.   You consider that honest?
 8            MR. SKIBELL:  Please stop harassing
 9        the witness, and let him answer a
10        question.
11            MS. LEPERA:  I'm asking him if he
12        considers that honesty.
13            MR. SKIBELL:  You're asking over and
14        over again.  That's what we call
15        badgering.  Let him answer.
16            MS. LEPERA:  It's the first time I've
17        asked this question.
18       A.   We spoke about that already.
19       Q.   But I didn't ask you if you think
20   it's honest.
21       A.   Right.  As part of a documentary for
22   purposes of the documentary, we were filming, I
23   recorded a few things, yes.
24       Q.   Does doing a documentary excuse one
25   from being honest to another person with whom
```

Page 477

```
 1            PAVONY - Confidential
 2   you're trying to do business and in the business
 3   conversation you're having they are
 4   surreptitiously being recorded without their
 5   knowledge?
 6            MR. SKIBELL:  Objection to form.
 7       A.   We did tell them about the film, and
 8   ultimately everyone that was involved approved of
 9   the film, embraced the film and welcomed the
10   filmmakers in with open arms and enjoyed their
11   company.
12       Q.   So when Ryan Cravens and George Petro
13   testify with chagrin at your behavior in taping
14   them without permission, that gives you no pause?
15            MR. SKIBELL:  Objection.  Lacks
16        foundation.  Form.
17            You can answer if you understand.
18       A.   I believe that for most of those if
19   not all of those and it's not that many
20   recordings of them they were aware of the fact
21   that there was a documentary that was in
22   production.
23       Q.   Oh.  So they're lying when they
24   testified that they didn't know?
25            MR. SKIBELL:  Objection, lacks
```

Page 478

```
 1            PAVONY - Confidential
 2        foundation.
 3       A.   I'm sorry?
 4       Q.   Well, assuming they testified that
 5   they didn't know.  You didn't tell them, and you
 6   didn't get permission.
 7            MR. SKIBELL:  Objection, speculation.
 8            MS. LEPERA:  It's not speculation.
 9            MR. SKIBELL:  It is.  You're asking a
10        hypothetical.
11            MS. LEPERA:  I'm laying a foundation.
12            MR. SKIBELL:  Lay a foundation like a
13        proper questioning attorney would do, but
14        don't ask hypotheticals.
15       Q.   I'm telling you that they testified
16   under oath that they didn't know that they were
17   being surreptitiously recorded by you and they
18   didn't give you permission.  Does that give you
19   any pause?
20       A.   I didn't say that they were lying
21   about that.  What I said was I believe they were
22   aware that there was a documentary in production.
23       Q.   Okay, if that's your excuse.  Is that
24   your excuse, Mr. Pavony, for doing that without
25   asking permission?
```

PAVONY - Confidential

MR. SKIBELL: Objection. Asked and answered.

Q. Had you at any point in time between 2005 and May 18, 2018 gotten anything, as you call here, investor money that is in the nature of FU money?

A. Investor money for what?

Q. Anything for your business.

A. Bay Tek invested in it. Well, Bay Tek was the first initial investor in it when they invested in the prototype, building of the prototype, 36 prototype and production model lanes.

Q. Alright. Moving on. We already went over that.

So at this point in time, when you're saying you want to go get FU money, you hadn't gotten any FU money before that, right?

A. Sorry. The question was?

Q. How are you going to get FU money when you could never get it before? I guess that's my question.

A. Right. So I guess by FU money I just mean a lot of money I guess.

PAVONY - Confidential

Q. Yes.

A. Is that what you're referring to?

Q. Yes.

A. Okay. Yeah. So we were, first of all, you know, like I said earlier I think yesterday or maybe it was, yeah, it was yesterday, you know, getting investment for a company was a two-part approach, right? The first part came from Bay Tek. The second part Bay Tek said they would invest, but we were also speaking with many other potential investors, okay? Some of them were within the industry, for example, George Petro of Play Mechanics. Some of them were other strategic operators within the industry, and some of them were within like the VC, you know, private equity world. Some of them were, you know, considered to be angel investors, but we had several avenues in which we could raise money. However, we raised the initial piece with Bay Tek, and they said, if we prove the 36-lane model, then they would invest.

So it was really Bay Tek that made it unnecessary for us to raise money at the time, because Bay Tek said, once we prove the model,

PAVONY - Confidential

they would invest in a second phased approach, and so, you know, like I said earlier or yesterday, when Bay Tek undercut us after we proved the concept, we couldn't give any assurances to these other folks that I mentioned that we, one, could have a third party manufacture the lanes, because we had to put the Skee-Ball mark, right? No matter who was manufacturing the lanes, Full Circle was obligated to put the Skee-Ball mark on those lanes. So we couldn't give assurances to a manufacturer, and in a similar fashion we couldn't give regarding getting a lot of money or money enough for the second part of the investment we couldn't give our potential investors outside of Bay Tek assurances either, because they created uncertainty, and they made, like I said yesterday, the license unstable.

Q. You couldn't get any money. You keep talking about Bay Tek, but you were in the business of survive. You couldn't get any money for your Skee-Ball League dream at any point in time.

Now in May of 2018 you're saying you

PAVONY - Confidential

are going to get get an investor, that is, FU money, and so I'm asking you what happened then? What did you do then to go get an investor?

A. Okay. Well, let me just address the first part of the question.

Q. You just repeat the same thing you were repeating.

A. No, I'm not.

Q. You've given the same speech. You've given it 12 times.

A. I'm not. Alright. Now I'll answer the second part of the question for you. So at this time, can we scroll up? What's the date of this? 2018, May?

Q. Correct.

A. Okay. So I think at this point we were talking to George Petro and Play Mechanics as a potential investor to come in and to, like, you know, we were initially trying to get Skee-Ball lanes from Bay Tek, and then we tried to get Skee-Ball lanes from Bay Tek through George Petro purchasing the stock lanes from Bay Tek.

So I think at this point you asked me

Page 483

```
 1              PAVONY - Confidential
 2   like what did we do.  I think this is when we
 3   started to talking to George more as an investor,
 4   less as an advisor.
 5        Q.   Okay.  George Petro, so that's what
 6   you said, number one, you started talking to him.
 7   What else did you do?  Did you talk to anybody
 8   else?
 9        A.   We were talking to some VC company
10   from California.
11        Q.   And who was that?
12        A.   The name of the company escapes me,
13   but I think they were I think like Merrill Lynch
14   finance guys that also had their own like private
15   equity company that did like, you know, 8-figure
16   raises for companies.
17        Q.   And what happened there?
18        A.   They were extremely enthusiastic and
19   interested to give us the investment that we
20   needed even more so when we told them that we
21   were actually going to include George Petro as a
22   strategic partner and a strategic -- and a part
23   of the rollout plan, and so they were really just
24   waiting for us, like I said, they were waiting
25   for assurances that we actually could leverage
```

Page 484

```
 1              PAVONY - Confidential
 2   our licenses within Live Play to build the
 3   product Skee-Ball Live, and so this was all
 4   happening concurrently actually.  Then the
 5   investment from the VC guys was happening
 6   concurrently with our talks with Play Mechanics
 7   about them purchasing lanes through Bay Tek.
 8        Q.   And then anybody else involved at any
 9   point in time after that?
10             MR. SKIBELL:  By the way, I'm going
11        to object to this line of questioning as
12        outside of the scope of 30(b)(6).  Mr.
13        Wikman was the rep on this issue.
14             But you can answer in your individual
15        capacity.
16        Q.   Full Circle's efforts to obtain lanes
17   for Live Play, whether from Bay Tek or any other
18   entity.
19             MR. SKIBELL:  You're asking about
20        finances, raising money.  You're now
21        asking about lanes.
22             MS. LEPERA:  They're hand in glove, I
23        assume, right?
24        Q.   Anyway, Mr. Pavony, you were --
25        A.   So, alright, so lanes.  So lanes
```

Page 485

```
 1              PAVONY - Confidential
 2   specifically, yes, we also started talking, yes,
 3   there's George, so, yes, you were asking about
 4   finances initially.
 5        Q.   Both.
 6        A.   As far as lanes, we actually tried to
 7   get lanes built from another company called
 8   Wickham Amusements to see if they could build us
 9   lanes.  We tried to get lanes from like local
10   vendors, local operators, to see if we could, you
11   know, rent those lanes or borrow those lanes.  We
12   actually also I think touched on this a bit
13   yesterday.  We used lanes from several venues
14   around the country on which to host the 17-city
15   Skee-Ball Open.
16        Q.   Alright.  So let me see if I
17   understand this.  So, other than Petro, other
18   than the Merrill Lynch guys, other than you're
19   talking, trying to go buy, we'll talk about what
20   type of lanes in a minute, lanes from various
21   sources, did you speak to anybody else after this
22   May 18th missive trying to get money and/or lanes
23   from any source other than Bay Tek?
24        A.   So getting money and getting lanes
25   are two separate things, so I would like to
```

Page 486

```
 1              PAVONY - Confidential
 2   address those.
 3        Q.   Sure.  However you want to do it.
 4        A.   Okay.  Well, I just said a lot about
 5   where we were trying to get lanes from.  Do you
 6   want me to recap that?
 7        Q.   Well, you've given me the name of
 8   Wickham Amusements and local vendors and then
 9   potential other venues which you haven't named.
10        A.   I did name them yesterday.  Yes.  We
11   talked about all those other venues yesterday
12   that we got lanes from in which to host the
13   Skee-Ball Open.  So they were places like
14   Cheezy's and places like Abbott Hall from Seattle
15   and the Delta House in Boston.  I mean all those
16   places we were able to, we used those, we got
17   lanes from those venues.  That was what I was
18   referring to.  So lanes, do you want me to recap
19   the lanes?
20        Q.   No, I understand now.  So what you're
21   saying is all of those establishments that you
22   discussed with me yesterday in the various states
23   had their own lanes?
24        A.   That we used, yeah, that we used to
25   host the Skee-Ball.
```