```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
 2
    FULL CIRCLE UNITED, LLC,        §
 3                                  §
         Plaintiff,                 §
 4                                  §
    VS.                             §
 5                                  §
    BAY TEK ENTERTAINMENT, INC.     §  CASE NO. 1:20-CV-03395
 6                                  §
         Defendant.                 §
 7  _____ §
                                    §
 8  BAY TEK ENTERTAINMENT, INC.,    §
                                    §
 9       Counterclaim Plaintiff,    §
                                    §
10  VS.                             §
                                    §
11  FULL CIRCLE UNITED, LLC,        §
                                    §
12       Counterclaim Defendant,    §
                                    §
13  and                             §
                                    §
14  ERIC PAVONY,                    §
                                    §
15       Additional Counterclaim    §
         Defendant.                 §
16

17        CONFIDENTIAL - ATTORNEYS' EYES ONLY

18     VIDEO-RECORDED ORAL DEPOSITION OF ERIC WIKMAN

19    INDIVIDUALLY AND AS CORPORATE REPRESENTATIVE OF

20               FULL CIRCLE UNITED, LLC

21                      VOLUME 2

22              Thursday, May 26, 2022

23

24  REPORTED BY:
    Linda Russell, CSR
25  JOB NO:  211443
```

1                    WIKMAN

2            And I -- I can re-export that data

3    now, too, I think.  It's not -- so, like if you

4    were concerned with wanting to verify something,

5    like, I can still export stuff out of Stripe.

6    But those are the locations where I stored it.

7    BY MR. WILLIAMS:

8         Q.  Was anything from this external hard

9    drive that you're referencing collected and

10   produced in this lawsuit?

11        A.  No, there was -- CSV files, the --

12   no, huh-uh, I didn't -- I didn't -- I don't

13   believe I gave anybody those CSV files.

14            MR. WILLIAMS:  Okay.  Jim, can we

15   please mark A2?

16            MR. BERKLEY:  Yeah, let me pull that

17   up.

18            (Exhibit 15 marked for identification.)

19            MS. NGUYEN:  For the record, this is

20   Wikman Exhibit Number 15, which is Full Circle

21   United, LLC's Answers to Bay Tek Entertainment,

22   Inc.'s First Set of Interrogatories to Full

23   Circle United.

24   BY MR. WILLIAMS:

25        Q.  Okay.  Mr. Wikman, did you

1                    WIKMAN

2     participate in the preparation of these

3     interrogatory responses?

4         A.   I'm not sure.  I don't -- I don't --

5     I don't recall.  I'm not sure.

6         Q.   Do you recall whether you've

7     participated personally in the preparation of any

8     interrogatory responses in this case?

9         A.   I'm sure I did, but I don't -- I

10    don't have a specific memory of doing that.  I

11    shouldn't speculate, but -- but I don't have a --

12    I don't have a specific memory of doing that.

13        Q.   Okay.  So -- so these are from

14    October 26, 2020.

15             Interrogatory Number 7 --

16             MR. WILLIAMS:  And, Jim, if you can

17    scroll down to that.

18    BY MR. WILLIAMS:

19        Q.   -- states, "Identify all revenue and

20    profits generated to date in connection with the

21    10 Skee-Ball Live Lanes, which you allege in

22    Paragraph 130 of the Complaint were delivered to

23    you on October 18, 2017."

24             Do you see that interrogatory?

25        A.   Yes, I do.  Yeah, it took me a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            WIKMAN

2    second, but I caught up with you when you went to

3    the end of it.  Yes, I see it now.

4         Q.  And there's a short answer underneath

5    that that says, "The Skee-Ball Live Lanes have

6    generated $350,781 in revenue and $298,163.85 in

7    profits to date."  Do you see those numbers?

8         A.  I do.

9         Q.  And do you have any information about

10   how the profit number would have been arrived

11   upon to answer this interrogatory?

12              MS. CASADONTE-APOSTOLOU:  Objection.

13        A.  The -- I can't definitively say, but

14   we do -- we do our best to estimate our monthly

15   expense per lane in our models.  So it could --

16   it could be based on -- like, the -- the real --

17   the main expense is in relation to maintenance to

18   those lanes.

19   BY MR. WILLIAMS:

20        Q.  What -- what do you do to estimate

21   that expense?

22              MS. CASADONTE-APOSTOLOU:  Objection.

23        A.  We went through an exercise where

24   we -- we -- well, one, we asked the different

25   people that run the Skee-Ball lanes, like, how

```
 1                  WIKMAN
 2        A.   Yeah.  The cost of the servers
 3   that -- that are used to -- for the Skee-Ball
 4   Live Lanes to work, that's an expense that's
 5   directly attributable to the Skee-Ball Live
 6   Lanes.
 7   BY MR. WILLIAMS:
 8        Q.   Any others?
 9        A.   Not that I can think of off -- at
10   this time.
11             MR. WILLIAMS:  Jim, can you mark A3,
12   the Amended Interrogatory Responses from
13   September 3rd, 2021, please.
14             MR. BERKLEY:  Yes.
15        (Exhibit 16 marked for identification.)
16             MS. NGUYEN:  For the record, this is
17   Wikman Exhibit Number 16.
18             MR. WILLIAMS:  Can you move down to
19   Number 7 again, Jim, in the report?
20   BY MR. WILLIAMS:
21        Q.   Just take a quick look at that,
22   please, Mr. Wikman.
23        A.   Okay.  The -- the first two
24   paragraphs appear to me to most likely be
25   identical to what you showed me previously.
```

1                    WIKMAN

2  knows he can answer in his personal capacity.

3         A.  I think Reid advised me yesterday

4  that that's privileged, and so I'm not -- I don't

5  know --

6  BY MR. WILLIAMS:

7         Q.  Well, I'm not asking you about who is

8  paying for it, I'm asking if FCU is paying for

9  it.

10              MS. CASADONTE-APOSTOLOU:  If you

11  know.  Objection.

12         A.  Not -- not fully, but we are heavily

13  paying for it.  But -- but, yeah, I don't -- I

14  can't really answer beyond that, I guess.  I

15  don't know.

16              MR. WILLIAMS:  Okay.  Yeah, I'd like

17  to again request production of the agreement

18  under this litigation and move on from that.

19  BY MR. WILLIAMS:

20         Q.  But I'd like to ask why would this

21  account, that I take it from your testimony was

22  created for FCU, would this be created in the

23  name of Eric Cooper?

24         A.  Eric Cooper --

25              MS. CASADONTE-APOSTOLOU:  This is --

```
 1                    WIKMAN
 2   objection in a deposition.
 3             MS. CASADONTE-APOSTOLOU:  That's
 4   fine, but it --
 5   BY MR. WILLIAMS:
 6        Q.  Can you answer the question, please.
 7        A.  I don't know the answer to the
 8   question.  I know the question was asked why is
 9   it in Eric Cooper's, and I don't know the answer
10   to that.
11        Q.  Okay.  And you have not reviewed
12   these particular statements previously; is that
13   correct?
14             MS. CASADONTE-APOSTOLOU:  Objection.
15        A.  I -- I do not recall reviewing these
16   documents, the UFC ones.
17             MR. WILLIAMS:  Okay.  Thank you.
18             Can we mark the next one.
19             (Exhibit 20 marked for identification.)
20             MS. NGUYEN:  Marking as Exhibit --
21   Wikman Exhibit Number 20 is FCU-5399.
22             THE WITNESS:  I can't see the top of
23   this document.
24             MR. WILLIAMS:  Yeah, please give the
25   witness control of the document, if we can, and
```

```
 1                         WIKMAN
 2     make sure he can see the top of the document.
 3                  MS. CASADONTE-APOSTOLOU:  Can you --
 4     Wik, can you move the bar, the Zoom bar at the
 5     top?
 6                  THE WITNESS:  I don't -- yeah, I
 7     guess I can slide it to the left and the right.
 8     So I -- I guess I'll slide it all the way to the
 9     left.
10                  MR. BERKLEY:  You should be able to
11     see it now, I think, right?
12                  THE WITNESS:  Yeah, the talking box
13     is over it.  Let me move that.
14                  MR. WILLIAMS:  I think you can
15     also -- I think you can also move the image of
16     the video around the screen, if that helps,
17     Mr. Wikman.
18                  THE WITNESS:  Yeah, I minimized it,
19     but it just ended up right over what Jim was
20     asking if I could see.  But, yes, I see
21     October 9th, 2018 through October 31st, 2018.
22                  MR. WILLIAMS:  Okay.  Thank you.
23                  And then, Jim, can you scroll to the
24     end to show us where these documents conclude?
25                  Okay.
```

1      WIKMAN

2            Sorry, that was a little quick, Jim.

3    I saw -- I saw an end date of 2020 --

4            MR. BERKLEY:  I apologize.  Here, I'm

5    going to take us back.

6    BY MR. WILLIAMS:

7        Q.   Okay.  So, Mr. Wikman, do you see

8    there the ending dates there are July 31, 2021

9    through August 31, 2021?

10       A.   Yes, I do.

11       Q.   And you reviewed these documents,

12   JPMorgan Chase statements from this time period

13   previously?

14       A.   I reviewed some -- some Chase bank

15   statements in preparation, but I do not recall

16   which months I saw -- looked at.

17       Q.   Okay.  And when you did review those

18   bank statements, what was the purpose of

19   reviewing them for your preparation?

20            MS. CASADONTE-APOSTOLOU:  Objection.

21       A.   I don't know.

22   BY MR. WILLIAMS:

23       Q.   Do you?

24       A.   I'm -- I thought it -- I thought that

25   it seemed like an appropriate thing to review,

```
 1                        WIKMAN
 2              MR. WILLIAMS:  Well, thank you for
 3   the -- for the offer.  I'll continue a few
 4   minutes and then we can figure out whether we
 5   should talk.  But I appreciate the offer.
 6              Okay.  Jim, can you mark A11, please.
 7              And in the meantime, Darryl, could
 8   you tell me how much time on the record we've had
 9   today.
10              THE VIDEOGRAPHER:  Total run time is
11   4 hours and 41 minutes.
12              MS. CASADONTE-APOSTOLOU:  In addition
13   to the 5:10.
14              MR. WILLIAMS:  Yes.
15              MS. NGUYEN:  Wikman Exhibit Number 22
16   will be FCU_EXPERT-2.
17         (Exhibit 22 marked for identification.)
18   BY MR. WILLIAMS:
19       Q.  So, Mr. Wikman, this is a document
20   that was attached to Ms. Smith's report, as well
21   as -- well, I think it was only produced as
22   attached to her report, actually.
23              Do you recognize this document?
24       A.  No, I do not.
25              MR. WILLIAMS:  And can you scroll
```

```
 1                      WIKMAN
 2   down to where it covers revenue and expenses.
 3   Yeah, you're close.  You've got revenue there.
 4   BY MR. WILLIAMS:
 5        Q.   Do you see that, Mr. Wikman?
 6             MR. WILLIAMS:  Sorry, Jim, move back
 7   up one page.
 8   BY MR. WILLIAMS:
 9        Q.   You see how it says "Revenue" there
10   at the bottom?
11        A.   Yes, I do.
12        Q.   And then you see it says "Expenses"
13   and then on the following page it has a list of
14   numbers?
15        A.   Yes, I do.
16        Q.   Do you know how those numbers would
17   have been calculated?
18        A.   No, I do not.
19        Q.   And since you told me you don't
20   recognize it, is it your belief this isn't
21   something you provided to Ms. Smith?
22        A.   I did not provide this.
23        Q.   Did you provide her data from which
24   you believe that these numbers could be
25   calculated accurately?
```