**FULL CIRCLE'S DESIGNATED TESTIMONY FROM THE JULY 12, 2022 DEPOSITION OF LARRY TREANKLER TO WHICH BAY TEK ENTERTAINMENT, INC. OBJECTS**

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF WISCONSIN
 3   - - - - - - - - - - - - - - - - - - - - - - - - - -
     FULL CIRCLE UNITED, LLC,
 4
                       Plaintiff,
 5
         vs.                          Case No.
 6                                    1:20-cv-03395
     BAY TEK ENTERTAINMENT, INC,
 7
                       Defendant.     CONFIDENTIAL
 8   _____
 9   BAY TEK ENTERTAINMENT, INC.,
10           Counterclaim Plaintiff,
11    vs.
12   FULL CIRCLE UNITED, LLC,
13           Counterclaim Defendant,
14    and
15   ERIC PAVONY,
16           Additional Counterclaim
             Defendant.
17
     - - - - - - - - - - - - - - - - - - - - - - - - - -
18
                       CONFIDENTIAL
19       VIRTUAL VIDEO-RECORDED DEPOSITION OF:
                    LARRY TREANKLER
20
             TAKEN AT:  The Witness's Residence
21
               LOCATED AT:  6747 Kawula Lane
22                 Sobieski, Wisconsin
23                  July 12, 2022
                9:24 a.m. to 7:12 p.m.
24
           REPORTED BY:  VICKY L. ST. GEORGE, RMR.
25   - - - - - - - - - - - - - - - - - - - - - - - - - -
     JOB NO. 5304329
```

1  Q.   Prior to the acquisition of SBI, did you have an

2       understanding of what, if any, obligations at -- Bay

3       Tek had in manufacturing any products for Full Circle

4       in connection with its license?

5               MS. LEPERA:  Objection to form, vague and

6       ambiguous.  Prior to the acquisition?

7               MS. CASADONTE-ASPSTOLOU:  Yes.

8               THE WITNESS:  We didn't have any

9       obligation prior to the acquisition.

10  BY MS. CASADONTE-ASPSTOLOU:

11  Q.   At any time did Full Circle ask Bay Tek to

12       manufacture any product for it in connection with its

13       business?

14  A.   Yes.

15  Q.   What do you remember about Full Circle's request for

16       Bay Tek to manufacture a product for Full Circle in

17       connection with its business?

18  A.   I missed the first half of your question.

19  Q.   What, if anything, do you recall about Full Circle's

20       request that Bay Tek manufacture product for it in

21       connection with its business?

22               MS. LEPERA:  Objection to the form of the

23       question.  You can answer.

24               THE WITNESS:  They were looking for custom

25       lanes.

1   A.   I don't.

2   Q.   Do you recall the identity of the individual --

3        Strike that.

4            How did you learn about the term NSBL?

5   A.   Either from our internal people or directly from FCU.

6   Q.   The prototype lanes -- Strike that.

7            What else, if anything, do you remember

8        about how the term NSBL was used at Bay Tek?

9            MS. LEPERA:  Objection, form,

10       mischaracterizes.  You can answer if you understand.

11           THE WITNESS:  I need you to ask that

12       again.

13  BY MS. CASADONTE-ASPSTOLOU:

14  Q.   Was the term NSBL used at Bay Tek?

15           MS. LEPERA:  Objection to form.  You can

16       answer.

17           THE WITNESS:  Yes.

18  BY MS. CASADONTE-ASPSTOLOU:

19  Q.   Do you recall how it was used?

20  A.   It was just part of the dialogue for the custom game.

21  Q.   Okay.  So Bay Tek referred to the 10 prototype games

22       it manufactured for Full Circle as NSBL?

23           MS. LEPERA:  Objection to form, no

24       foundation.  You can answer.

25           THE WITNESS:  We referred to making those

1  10 lanes as custom lanes for FCU.  Whether NSBL was

2  in the dialogue specifically, I don't remember.  We

3  were aware of NSBL for sure.

4  BY MS. CASADONTE-ASPSTOLOU:

5  Q.  Were you aware of an app being developed by Full

6  Circle in connection with NSBL?

7       MS. LEPERA:  Objection to form, vague,

8  ambiguous.  You can answer if you understand.

9       THE WITNESS:  Yes.

10  BY MS. CASADONTE-ASPSTOLOU:

11  Q.  What do you recall about the app being developed by

12  Full Circle in connection with NSBL?

13  A.  It was a scoring app.

14  Q.  What does that mean?

15       MS. LEPERA:  Objection to form.

16       THE WITNESS:  The ability to keep track of

17  the scores on the games.

18  BY MS. CASADONTE-ASPSTOLOU:

19  Q.  At any time did anyone convey to you any other

20  functionalities Full Circle was developing in

21  connection with an app to be used for the NSBL?

22       MS. LEPERA:  Objection to form.

23       THE WITNESS:  I'm not -- I'm not really

24  sure what you're asking.

25  BY MS. CASADONTE-ASPSTOLOU:

1  Q.   Other than scoring, did anyone at Bay Tek -- Strike

2       that.

3            Other than the ability to keep score of

4       things, did anyone at any time provide information to

5       you about other functionalities that the app Full

6       Circle was developing would have?

7            MS. LEPERA:  Objection to form.

8            THE WITNESS:  I'm not sure how to answer

9       that.  I don't -- I guess the answer is I don't

10      know.

11           MS. CASADONTE-ASPSTOLOU:  Okay.

12  BY MS. CASADONTE-ASPSTOLOU:

13  Q.   Did you at any time become aware of Full Circle's

14       intention to develop an app to work with the custom

15       lanes that Bay Tek manufactured for it?

16           MS. LEPERA:  Objection to form.  You can

17       answer.

18           THE WITNESS:  Yes.

19  BY MS. CASADONTE-ASPSTOLOU:

20  Q.   When did you become aware of that?

21  A.   I'm not sure --

22           MS. LEPERA:  I didn't hear the end of the

23       question.  Did you just drop off?  Oh, it was when?

24       When.  Okay.  Go ahead.

25           THE WITNESS:  2016, 2017 timeframe.

1    Q.   When you say "our," who are you referring to?

2    A.   Bay Tek.

3    Q.   Okay.  Do you recall when you saw the app interacting

4         with a lane at Bay Tek's R&D?

5    A.   Sometime in the fall of 2017.

6    Q.   Was any -- was anyone on behalf of Full Circle

7         present when you saw the app interact with the lane

8         at Bay Tek's R&D?

9    A.   I don't think they were up at our place at that time.

10   Q.   Do you recall the identity of any individual --

11        Strike that.

12             Were you alone when you observed they had

13        been interacting with the lane at Bay Tek's R&D?

14   A.   I doubt that I was alone.

15   Q.   You what?

16   A.   I would not have been alone.

17   Q.   Okay.  Do you recall who else was there when you saw

18        the app interacting with the lane at Bay Tek's R&D?

19   A.   I do not.

20   Q.   Is there anything else that -- Strike that.

21             Did you have an understanding at the time

22        that you saw the app interacting with the lane of who

23        developed that functionality for the app?

24             MS. LEPERA:  Objection, no foundation.

25        You can answer if you understand.

1  Q.   Why did you go to Austin, Texas in July 2017?

2  A.   To view the Brewskee environment.

3  Q.   At that time did Bay Tek -- Strike that.  I'll move

4       on.

5            Did you end up observing the Brewskee-Ball

6       environment in July 2017 in Austin?

7  A.   I did.

8  Q.   Okay.  What do you recall about what you observed

9       about Brewskee-Ball in July 2017?

10 A.   It was interesting.

11 Q.   Other than being interesting, do you recall any other

12      aspect of the Brewskee-Ball environment that you

13      observed in 2017?

14 A.   That there was a passionate group of Skee-Ball

15      players.  It was fun.

16 Q.   Did you in July 2017 participate in any Brewskee Ball

17      events offered --

18            MS. LEPERA:  Objection to form, vague and

19      ambiguous.  You can answer.

20            THE WITNESS:  We were there to witness it.

21 BY MS. CASADONTE-ASPSTOLOU:

22 Q.   What specifically were you there to witness?

23            MS. LEPERA:  Objection.

24            THE WITNESS:  I think --

25            MS. LEPERA:  Sorry, let me get it in

```
 1              MS. LEPERA:  Objection to form, assumes
 2         facts not in evidence, no foundation.
 3         Mischaracterizes, but you can answer.
 4              THE WITNESS:  Yes.
 5    BY MS. CASADONTE-ASPSTOLOU:
 6    Q.   Did you see the lanes delivered to Full Circle before
 7         they were delivered?
 8              MS. LEPERA:  Same objection.
 9              THE WITNESS:  I'm sure I saw the lanes.  I
10         don't know if I saw all 10 of them, but I'm sure I
11         saw the lanes.
12    BY MS. CASADONTE-ASPSTOLOU:
13    Q.   How did those lanes receive payment if they did
14         receive payment?
15              MS. LEPERA:  Objection, vague and
16         ambiguous.
17              THE WITNESS:  I think that they received
18         payment for what they were using them for initially
19         was that there was no payment.  We put free play
20         buttons on there for them.
21    BY MS. CASADONTE-ASPSTOLOU:
22    Q.   Did Full Circle ask for the free play buttons to be
23         put on the custom lanes?
24    A.   Yes.
25              MS. LEPERA:  Objection.  Go ahead.
```

1                    THE WITNESS:  I'm quite certain they did,

2          yes.

3      BY MS. CASADONTE-ASPSTOLOU:

4      Q.   How did Full Circle pay for the lanes that were

5           delivered by Bay Tek to Full Circle?

6                    MS. LEPERA:  Objection, no foundation,

7           vague and ambiguous, also calls for -- assumes facts

8           not in evidence.

9                    THE WITNESS:  They paid for them over a

10          couple year period with 15 percent of the revenue

11          earned.

12     BY MS. CASADONTE-ASPSTOLOU:

13     Q.   Did Bay Tek enter into an agreement with Full Circle

14          for Full Circle to pay for the lanes pursuant to a

15          revenue share agreement?

16                   MS. LEPERA:  Objection, calls for a legal

17          conclusion.  You can answer the question obviously

18          if you understand it.

19                   MS. CASADONTE-ASPSTOLOU:  You got cut off.

20                   MS. LEPERA:  I said object to the form of

21          the question, calls for a legal conclusion.  The

22          witness can certainly answer the question to the

23          best of his ability.

24                   THE WITNESS:  We never signed a revenue

25          share agreement with Full Circle.

1      THE WITNESS:  I don't specifically

2   remember anybody chugging beer.

3   BY MS. CASADONTE-ASPSTOLOU:

4   Q.   Were you consuming alcohol at the bar during the

5        event at the Full Circle that you attended in July of

6        2017?

7   A.   Yes.

8   Q.   Are you aware of any communications conveyed to Full

9        Circle at any time that Bay Tek felt that consumption

10       of alcohol was bad for the Skee-Ball brand?

11      MS. LEPERA:  Objection to the form,

12   mischaracterizes the record, assumes certain facts

13   in evidence, et cetera.  You can answer to the

14   extent you understand.

15      THE WITNESS:  Were you speaking of that

16   evening?

17   BY MS. CASADONTE-ASPSTOLOU:

18   Q.   No, ever.

19   A.   Yeah, I think we communicated that along the way.

20   Q.   Did you --

21   A.   Not that evening.  I did not that evening.

22   Q.   Did Bay Tek communicate that it felt that chugging

23       alcohol was bad for the Skee-Ball brand prior -- to

24       Full Circle prior to this litigation being

25       commencing?

1      conversations around how we would move forward if we
2      went beyond those 10 games.
3   BY MS. CASADONTE-ASPSTOLOU:
4   Q.   Did you have any communications whatsoever about
5        payment terms for the lanes that were delivered to
6        Full Circle?
7   A.   I don't think at that time.
8   Q.   Do you know when Bay Tek first communicated with Full
9        Circle about payment terms for the 10 lanes that were
10       delivered by Bay Tek to Full Circle?
11              MS. LEPERA:   Objection to the form of the
12       question, vague and ambiguous.   You can answer.
13       Yeah.
14              THE WITNESS:   Yeah, I think March, April
15       of 2018.
16   BY MS. CASADONTE-ASPSTOLOU:
17   Q.   And do you know who on behalf of Bay Tek communicated
18       with Full Circle in March or April of 2018 about the
19       payment terms for the 10 NSBL prototype lanes?
20   A.   Yes, David Timm.
21   Q.   And who is David Timm?
22   A.   He's my corporate attorney.
23   Q.   Why did this communication go through David Timm
24       rather than through Bay Tek?
25              MS. LEPERA:   Objection and instruct the

```
 1              MS. LEPERA:  Same objection.
 2              THE WITNESS:  All I can address is the
 3       scoring app software that we were helping be able to
 4       be used on the customized lanes we were working on.
 5  BY MS. CASADONTE-ASPSTOLOU:
 6  Q.   The customized lanes that what Bay Tek was working on
 7       were networked, right?
 8              MS. LEPERA:  Objection to form,
 9       foundation.
10              THE WITNESS:  Again, I'm not literate that
11       way, so I don't know.
12  BY MS. CASADONTE-ASPSTOLOU:
13  Q.   Do you know whether the NSBL lanes delivered to Full
14       Circle Bay Tek had the ability to communicate to
15       other lanes that were located in a remote location?
16  A.   Yeah, I think so.
17  Q.   Okay.  So for the purpose of this question I'll ask
18       that -- Strike that.  We'll move on.
19              Prior to building the NSBL lanes had Bay
20       Tek ever built any game that had the ability to
21       communicate with another game that was placed in a
22       remote location?
23              MS. LEPERA:  If you know.
24              THE WITNESS:  I don't know.
25  BY MS. CASADONTE-ASPSTOLOU:
```

1     moving on to produce more coupled with the other

2     things that I gave you earlier.

3  BY MS. CASADONTE-ASPSTOLOU:

4  Q.   And again, did you communicate that expectation to

5     Full Circle at any time prior -- at any time?

6  A.   Yes.

7  Q.   And when was that communicated?

8  A.   Very specifically at the meeting at the diner.

9  Q.   So are you saying you communicated to Full Circle

10     that Bay Tek expected it to move the 10 lanes that

11     were delivered to it by Bay Tek into other locations

12     after the BEEB?

13  A.   Yes.

14  Q.   And the BEEB was in October of 2017, correct?

15  A.   Right.

16  Q.   And at the time they were delivered, they may or may

17     not have had the ability to generate revenue, you

18     don't know?

19  A.   Like I said, I was almost positive they had dollar

20     bill acceptors on them.  But if they didn't have the

21     ability to take revenue, it would have taken seconds

22     for them to have the ability to take revenue.  They

23     all come prewired for dollar bill acceptors, so I'm

24     89 percent sure they should put the dollar bill

25     acceptors on.

1          THE WITNESS:  I don't recall talking to

2     Ryan Cravens about the technology.  But like I said,

3     the technology is not my cup of tea.

4     BY MS. CASADONTE-ASPSTOLOU:

5     Q.   Are you aware of any development, are you aware of

6          any software developed by Full Circle that's used in

7          connection with GamerGreen?

8     A.   No.

9     Q.   You say that with certainty even though this -- you

10         said is not your area of expertise.  Why is that?

11             MS. LEPERA:  Objection to form.

12             THE WITNESS:  We --

13             MS. LEPERA:  You can answer, Larry.

14             THE WITNESS:  We just wouldn't do that.

15     We just wouldn't do that.  We would -- if we were to

16     do that, we would have created a relationship with

17     Full Circle to do that.  We would never just do that

18     ever, ever, ever.

19             MS. CASADONTE-ASPSTOLOU:  Keep going, Mr.

20     Atfeh.  I'm on BT0007087.

21     BY CASADONTE-ASPSTOLOU:

22     Q.   Do you recall seeing the information on this page?

23     A.   Not specifically.

24     Q.   Okay.  Do you agree -- Strike that.

25             Have you ever had any communications with

1    Full Circle about their license being perpetual?
2  A.   Yes.
3            MS. LEPERA:  Objection to the form of the
4       question, document speaks for itself, assumes a
5       legal conclusion and facts and legal matters not in
6       evidence.  Go ahead.
7            THE WITNESS:  Yes.
8  BY MS. CASADONTE-ASPSTOLOU:
9  Q.   What do you remember about that, those
10      communications?
11 A.   That that was something that we wanted to work with
12      them on to create a term.
13 Q.   Did you ever communicate to Full Circle how you
14      wanted to change the term?
15 A.   In general, yeah.  Sorry, Christine, if I interrupted
16      you.
17           MS. LEPERA:  That's okay.  I was getting
18      to that.
19           THE WITNESS:  Yeah, generally.  In general
20      we talked about, you know, five years with some,
21      some level of performance associated with it.
22 BY MS. CASADONTE-ASPSTOLOU:
23 Q.   When did this happen, this communication happen?
24 A.   Along the way somewhere in the middle of 2017.
25 Q.   Is it your testimony that you communicated to Full

CONFIDENTIAL

1            something?

2                    MS. LEPERA:  I don't know what the

3        question is.  I really don't.  If you understand the

4        question.  I don't.

5    BY MS. CASADONTE-ASPSTOLOU:

6    Q.    Are you aware that Bay Tek has alleged that Full

7          Circle is in breach of the license agreement?

8    A.    Yes.

9    Q.    Can you identify in your lay opinion how Full Circle

10         has breached the license agreement?

11                   MS. LEPERA:  I'm going to obviously object

12         to that to the extent it calls for a legal

13         conclusion and he's not a lawyer, but you're

14         certainly allowed to probe his understanding as a

15         lay witness.

16                   THE WITNESS:  Yeah, the use of the

17         disparaging elements to our brand.  The more we

18         learn, the worse it got.

19    BY MS. CASADONTE-ASPSTOLOU:

20    Q.    Can you identify the disparaging conduct that you

21          believe in your lay opinion served as the basis of

22          Full Circle's breach of the license agreement?

23    A.    The terminology that includes our brand, our mark in

24          it.

25    Q.    What terminology specifically?

1    A.   I don't know.  I don't have that specifically or

2         categorically.

3    Q.   Okay.  Other than disparaging terminology and I think

4         you said use of the mark, is there any other conduct

5         in your lay opinion that you believe serves as the

6         basis of Full Circle's breach of the license

7         agreement?

8                   MS. LEPERA:  Again, the document and the

9         complaint, counterclaims, speak for itself, but

10        you're allowed to probe his knowledge or information

11        with respect to that as a layperson.

12                  THE WITNESS:  Yeah, I don't have anything

13        to add.

14   BY MS. CASADONTE-ASPSTOLOU:

15   Q.   Are you aware that Bay Tek has asserted a

16        counterclaim against Full Circle?

17   A.   I thought you just asked me that before.

18                  MS. LEPERA:  Again, she's asking you the

19        same questions.

20   BY MS. CASADONTE-ASPSTOLOU:

21   Q.   No, I said -- sorry.  Excuse me.  A counterclaim

22        for -- I said breach of contract with the first

23        thing, and then the other thing was tarnishment of

24        the Skee-Ball mark.

25                  Other than the conduct that you identified,

1  Q.   Okay.  And you told Full Circle quote, unquote, this
2       is cool shit peeps, in part, right?
3  A.   Yes.
4  Q.   What were you referring to specifically, if you know?
5  A.   That we were moving forward on the development of
6       those 10 games.
7  Q.   Do you recall telling Full Circle to prepare a
8       business model for the NSBL in the Texas market that
9       did not include operators and distributors?
10              MS. LEPERA:  Object to form.  Are we off
11      this document?
12              MS. CASADONTE-ASPSTOLOU:  Yeah, I can't
13      scroll.  Can you scroll down?  It's the last
14      paragraph.
15              MS. LEPERA:  A part of this is under the
16      pictures of us, too.  It's hard to read it.
17  BY MS. CASADONTE-ASPSTOLOU:
18  Q.   It says Wikman and Pavony put together a snapshot of
19      what just the Texas NSBL market would look like if we
20      do not involve operators, distributors or give a cut
21      to the venues.
22  A.   Yeah --
23              MS. LEPERA:  This is Pavony's document you
24      read.
25              MS. CASADONTE-ASPSTOLOU:  I understand.

1          included in the offer, settlement offer.

2     BY MS. CASADONTE-ASPSTOLOU:

3     Q.   What other marks, if any, were included in the offer

4          to Full Circle?

5     A.   The offer meaning that they would get if we had

6          agreed to that settlement?

7     Q.   You're characterizing it as a settlement.  But the

8          term sheet that Bay Tek proposed to Full Circle

9          involved -- actually, strike that.

10              What do you recall --

11              MS. LEPERA:  Wait, wait.  I object -- I

12         object to the commentary and the criticism of the

13         witness's testimony, your characterizing it as a

14         settlement agreement.  He's answered the question,

15         and he said it was a settlement proposal.  What

16         right do you have to contradict him.

17              MS. CASADONTE-ASPSTOLOU:  -- proposal.

18    BY MS. CASADONTE-ASPSTOLOU:

19    Q.   Can you share with me, please, what, if anything, you

20         recall about the contents, substantively, of the term

21         sheet that was provided to Full Circle by Bay Tek

22         prior to this litigation?

23    A.   I made an offer to produce games for them, but they

24         would have been under the Brewskee-Ball umbrella,

25         marquee.  We were seeking to have the freedom to take

1  our Skee-Ball mark and be able to do with it what we

2  pleased.  We were going to support them in the bar --

3  their bar market endeavors.  We would have asked them

4  to support us in the family entertainment endeavors.

5  Q.  What do you mean by support as it concerns supporting

6  Bay Tek in your family entertainment endeavors?

7  A.  If they came up, they came across an opportunity that

8  fit us, that they would in good faith communicate

9  that to us.  And as we came across opportunities that

10  would fit them, that we would in good faith try to

11  help them win that business.

12  Q.  So the offer contemplated Bay Tek and Full Circle

13  operating live play, is that accurate?

14           MS. LEPERA:  Objection to form to the

15  extent you're using the definition from the license

16  agreement.

17           THE WITNESS:  We would have gotten the

18  opportunity to do live play.  We had nothing active

19  to do live play but we would have gotten that.  That

20  would have been an opportunity for us if we had

21  signed that particular agreement.

22  BY MS. CASADONTE-ASPSTOLOU:

23  Q.  And what, if any, rights did the proposal contemplate

24  for Full Circle as it concerns Skee-Ball mark?

25  A.  They wouldn't have had any.

1   Q.   Did the proposal contemplate Full Circle having any
2        rights to use Skee-Ball Live mark?
3   A.   They would not have had the right to use the
4        Skee-Ball Live mark.
5   Q.   Who, if anyone, would be able to use the Skee-Ball
6        Live mark if Full Circle had accepted its terms of
7        the proposal?
8   A.   Bay Tek would have had the right and anybody that we
9        would have chosen to license that out to if we chose
10       to would have had that right.
11  Q.   Are you aware of Full Circle's -- do you know whether
12       Full Circle has ever used the Skee-Ball Live mark?
13            MS. LEPERA:  Objection to form.
14            THE WITNESS:  I -- I don't think so but I
15       don't know.
16  BY MS. CASADONTE-ASPSTOLOU:
17  Q.   Has Bay Tek ever used a Skee-Ball Live mark?
18  A.   No.
19  Q.   So is it -- the proposal you made terminated the
20       existing license agreement?
21            MS. LEPERA:  Objection to form.
22            THE WITNESS:  Yes.
23            MS. LEPERA:  Document speaks for itself,
24       assumes and ignores facts in the record.
25  BY MS. CASADONTE-ASPSTOLOU:

1     be allowed to put my objection in and then he can

2     answer the question.

3  BY MS. CASADONTE-ASPSTOLOU:

4  Q.   You said that the proposal made by Bay Tek to Full

5     Circle terminated the license agreement, right?

6            MS. LEPERA:  Objection to the form of the

7     question, mischaracterizes.

8            MS. CASADONTE:  Please answer for the

9     court reporter, please.

10            THE WITNESS:  We proposed terminating the

11     license agreement.

12            MS. LEPERA:  Right.

13  BY MS. CASADONTE-ASPSTOLOU:

14  Q.   Right.  So the decision made to make the proposal to

15     terminate the license agreement, right?

16  A.   Yes.

17  Q.   Were you the person that made that decision?

18            MS. LEPERA:  To make the proposal?

19            THE WITNESS:  Yes.

20            MS. CASADONTE-ASPSTOLOU:  I asked the

21     question -- thank you.

22            COURT REPORTER:  Can you repeat your

23     answer?

24            THE WITNESS:  Yes.

25  BY MS. CASADONTE-ASPSTOLOU:

1      something.  Say how is the weather.

2                  THE WITNESS:  How is the weather.

3                  MS. LEPERA:  That worked.

4                  MS. NGUYEN:  Is your iPad plugged in,

5      Larry?

6                  THE WITNESS:  Yeah, it's down to 26

7      percent but it's been plugged in all day.  Can you

8      guys hear me?

9                  MS. LEPERA:  That 26 percent should get us

10     through.

11                 MR. MOUHANNAD:  I hear you now.  Do you

12     want me to move the sheet?

13                 THE WITNESS:  You can go up to real and

14     estimated value.

15                 MR. MOUHANNAD:  This is the end of the

16     document by the way.

17                 THE WITNESS:  All right.  I'm almost done.

18                 (Witness peruses document.)

19                 THE WITNESS:  Okay.

20     BY MS. CASADONTE-ASPSTOLOU:

21     Q.    Do you recognize the term sheet that's attached to

22           the letter in the document that's been Bates marked

23           starting with FTU000005631?

24     A.    I do.

25     Q.    Did you draft this agreement -- excuse me, what is

1   it?

2   A.   It's a settlement offer.

3   Q.   It's titled Full Circle United Brewskee-Ball term

4        sheet, right?

5   A.   It is.

6   Q.   Is this the term sheet that you were referring to

7        previously in the deposition that was provided by Bay

8        Tek to Full Circle?

9   A.   Yes.

10  Q.   Were there any other term sheets reflecting an offer

11       made by Bay Tek to Full Circle concerning the license

12       agreement?

13            MS. LEPERA:  Objection to form.

14       Objection, form.  You can answer.

15            THE WITNESS:  Okay.  We -- I

16       hand-delivered this to them and then it was sent

17       here again under this email.

18  BY MS. CASADONTE-ASPSTOLOU:

19  Q.   When did you hand-deliver the other term sheet to

20       Full Circle?

21  A.   December of '18 or January of '19.

22  Q.   Was the term sheet that you hand-delivered to Full

23       Circle at that time substantively identical as the

24       one that you're looking at right now on the screen

25       that's been marked as Exhibit 8?

1    BY MS. CASADONTE-ASPSTOLOU:

2    Q.   And the $778,838 in ongoing annual revenue, how

3         did -- how is that calculated?

4    A.   I assume I took $155,768 times 5.

5    Q.   Where are you getting that number?

6    A.   I took the annualized estimate for 10 and I

7         multiplied it out for 50.

8    Q.   So you used assumptions of the performance of NSBL

9         lanes provided by Full Circle to value the --

10                  THE WITNESS:  You broke up.

11                  MS. LEPERA:  Wait, I'm not in yet.  She's

12        not finished with her question.  I didn't get my

13        chance yet.

14   BY MS. CASADONTE-ASPSTOLOU:

15   Q.   So you took --

16                  MS. LEPERA:  Are you changing the

17        question?

18   BY MS. CASADONTE-ASPSTOLOU:

19   Q.   You took the assumptions provided for the performance

20        of the NSBL lane provided by Full Circle and used

21        them to prepare this term sheet, right?

22                  MS. LEPERA:  Objection as to form, no

23        foundation.  You can answer.

24                  THE WITNESS:  I used their numbers.

25                  MS. CASADONTE-ASPSTOLOU:  Okay.

```
1    BY MS. CASADONTE-ASPSTOLOU:

2    Q.   Do you think those numbers were fair?

3    A.   I think they were fair and probably accurate for 10.

4         I had no idea what -- how they would be able to go

5         from 10 to 50 and be able to generate the revenue

6         they did on 10.  The 10 were inside their house.

7    Q.   Okay.  Do you know who owns the Brewskee-Ball

8         trademark?

9    A.   FCU does.

10   Q.   So this offer was for games manufactured by Bay Tek

11        using the Brewskee-Ball trademark, right?

12   A.   Yes.

13              MS. LEPERA:  Objection to form.

14   BY MS. CASADONTE-ASPSTOLOU:

15   Q.   It wasn't a license agreement, this wasn't an offer

16        for a license agreement, right?

17              MS. LEPERA:  Objection to form.  You can

18        answer.

19              THE WITNESS:  It was not.

20              MS. CASADONTE-ASPSTOLOU:  Can you scroll

21        back up, Mr. Atfeh, please.  Keep going down,

22        please.  Where it says rescind in the middle of the

23        page.

24   BY MS. CASADONTE-ASPSTOLOU:

25   Q.   It says in the middle of the page rescind current rev
```

1        conclusion of the acquisition of SBI by Bay Tek?

2    A.   I don't think so.

3    Q.   Do you recall -- I think I might have asked this.

4             Do you recall who -- who you learned about

5        the existence of the carve-out agreement from?

6    A.   I don't.

7    Q.   Do you know whether it was someone other than an

8        attorney?

9    A.   I would not have gotten that from an attorney.

10             MS. CASADONTE-ASPSTOLOU:  How much time

11       have we been on the record?

12             THE VIDEO OPERATOR:  6:46.

13             MS. LEPERA:  14 minutes or so left.

14             MS. CASADONTE-ASPSTOLOU:  Let me get off,

15       please.

16             THE VIDEO OPERATOR:  We are off the record

17       at 6:38 p.m.

18             (Recess taken.)

19             THE VIDEO OPERATOR:  We are back on the

20       record at 6:48 p.m.

21   BY MS. CASADONTE-ASPSTOLOU:

22   Q.   Mr. Treankler, do you see the second bullet point

23       under the bullet that starts rescind, BTE to convert

24       physical artwork on Skee-Ball Live lanes to

25       Brewskee-Ball brand at BTE expense?

1    A.    Yes.

2    Q.    Do you know what lanes are being referred to in this

3          bullet point?

4    A.    The 10 prototype lanes.

5    Q.    Do you know why they're being referred to as

6          Skee-Ball Live lanes?

7    A.    I think that they had, may have had that monicker on

8          there.  I think, sorry, I think I misspoke earlier

9          when I said I didn't think it was on there.  I think

10         it was on there.

11   Q.    The Skee-Ball Live mark was on the what we've been

12         referring to as the NSBL lanes?

13   A.    I think so for those 10.

14   Q.    Okay.  Do you know who -- whether Bay Tek placed the

15         Skee-Ball Live mark on the lane that we've been

16         referring to as the NSBL lanes?

17   A.    We would have physically put the marquee in there.

18   Q.    What marquee?

19   A.    The marquee that would have had the Skee-Ball Live on

20         it.

21   Q.    A marquee on the lane itself?

22   A.    Right.

23   Q.    Okay.  So Bay Tek put the mark on the lane itself?

24   A.    I don't know if it was a mark or a marquee.  To me a

25         mark is a little thing in the corner.  I think it was

1                C E R T I F I C A T E

2   STATE OF WISCONSIN )

                        ) SS

3   MILWAUKEE COUNTY    )

4          I, VICKY L. ST. GEORGE, Registered Merit

5   Reporter and Notary Public in and for the State of

6   Wisconsin, do hereby certify that the preceding deposition

7   was recorded by me and reduced to writing under my

8   personal direction.

9          I further certify that said deposition was

10  taken at the witness's residence, 6747 Kawula Lane,

11  Sobieski, Wisconsin on July 12, 2022, commencing at 9:24

12  a.m. and concluding at 7:12 p.m.

13         I further certify that I am not a relative or

14  employee or attorney or counsel of any of the parties, or

15  a relative or employee of such attorney or counsel, or

16  financially interested directly or indirectly in this

17  action.

18         In witness whereof, I have hereunto set my hand

19  and affixed my seal of office at Milwaukee, Wisconsin,

20  this 26th day of July, 2022.

21

22         *Vicky L. St. George*

23         VICKY L. ST. GEORGE

           Notary Public in and for the

24         State of Wisconsin

           Commission Expires 1/29/2025

25